**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER; AMERICAN
GATEWAYS; and THE COUNTY OF EL
PASO, TEXAS,

                  *Plaintiffs*,

    v.

STEVEN C. MCCRAW, in his official
capacity as Director of the State of Texas
Department of Public Safety, and BILL D.
HICKS, in his official capacity as District
Attorney for the 34th District,

                  *Defendants*.

Cause No. 1:23-cv-1537

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. This action challenges Senate Bill 4 (88th Leg. (4th special session)) ("S.B. 4"), which purports to give Texas state officials the unprecedented power to arrest, detain, and deport noncitizens in the State of Texas. Under this novel system, the State of Texas has created its own immigration entry and re-entry crimes; state police arrest noncitizens for alleged violations of these crimes; state prosecutors bring charges in state courts; state judges order deportation; and state officers carry out those orders. The federal government has no role in, and no control over, Texas's scheme.

2. S.B. 4 violates the Supremacy Clause of the United States Constitution. Immigration is a quintessentially federal authority. Congress has created a carefully calibrated immigration system, with detailed procedures that determine whether a person may remain in the United

States, when criminal entry and re-entry charges may be deployed in the exercise of prosecutorial discretion, and what protections people receive to ensure that they are not removed to a place where they face persecution.

3. Congress placed all of the relevant tools and decision-making in the hands of *federal* officials—in keeping with the federal government's exclusive immigration powers and the sensitive foreign policy implications of these powers. S.B. 4 jettisons this system, grasping control over immigration from the federal government and depriving people subject to that system of *all* of the federal rights and due process that Congress provided to them, including the rights to contest removal and seek asylum.

4. S.B. 4 is patently illegal. A state cannot replace Congress's immigration scheme with its own. Plaintiffs hereby file this complaint for declaratory and permanent injunctive relief. Plaintiffs will seek a preliminary injunction necessary to enjoin enforcement of S.B. 4 in advance of the law's March 5, 2024 effective date.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

6. Venue is proper in the Western District of Texas because a substantial portion of the relevant events occurred or will occur in the District and because Defendants reside in the District. 28 U.S.C. § 1391(b).

## PARTIES

7. Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization dedicated to serving the legal needs of low-income noncitizens and asylum seekers in West Texas, Southern New Mexico, and Ciudad Juarez, Mexico.

8. Las Americas is headquartered in El Paso, Texas, and is one of the only organizations in this region that provides pro bono representation to noncitizens. Las Americas' mission is to provide high-quality legal services to low-income immigrants; to advocate for human rights, including by ensuring that newly arrived noncitizens can access the humanitarian protections available under federal law; and to integrate noncitizens into the community through referrals with shelters and local partners.

9. Las Americas' work includes direct representation of noncitizens in every stage of the federal removal system; legal advice and referral support; and Know Your Rights seminars on federal immigration policies.

10. Plaintiff American Gateways is a nonprofit organization founded in 1987 that is incorporated in Texas and has offices in Austin, San Antonio, and Waco, Texas. American Gateways provides a broad range of low- and no-cost legal services to noncitizens throughout the region, including asylum seekers and victims of family violence, sexual assault, and human trafficking.

11. Plaintiff El Paso County, Texas is a county recognized as a legal subdivision of the State. Tex. Const. art. 11, § 1. El Paso County has the constitutional and statutory authority to set policies and regulations, raise revenue, and administer programs for its residents in certain areas. This includes administering its county judicial system and providing health and social services to El Paso County residents, including residents who are immigrants. El Paso County's mission is to deliver exceptional public service to the people of El Paso County through judicious, efficient, and responsive government, and the conscientious development of ideas that produce compassionate solutions to the community's obligations, challenges, and ever-changing needs.

12. Defendant Steven C. McCraw is the Director and Colonel of the Texas Department of Public Safety ("DPS"). He is "directly responsible . . . for the conduct of the department's affairs" and serves as "executive director of the department," among other duties and responsibilities, and has stated that DPS will enforce S.B. 4. Tex. Gov't Code § 411.006(a)(1)-(2).  He is sued in his official capacity.

13. Defendant Bill D. Hicks is the District Attorney for the 34th Judicial District, which includes Culbertson, Hudspeth, and El Paso Counties.  Tex. Gov't Code § 43.120(a).  As the District Attorney for the 34th Judicial District, District Attorney Hicks "represents the state in all criminal cases before every district court having jurisdiction in El Paso County" and "represents the state in all criminal cases pending in the inferior courts having jurisdiction in El Paso County," which will include charges brought under S.B. 4. Tex. Gov't Code §§ 43.120(b), (c).  District Attorney Hicks is sued in his official capacity.

## STATEMENT OF FACTS

**A. Legal Background: Comprehensive Federal Immigration System**

14. The federal government has exclusive power over immigration.  *See*, *e.g.*, *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).

15. Congress has created a comprehensive system of federal laws regulating and enforcing immigration in the Immigration and Nationality Act ("INA").  *See* 8 U.S.C. § 1101 et seq.

16. Federal immigration statutes and the associated implementing regulations and precedential administrative law decisions form an exceptionally detailed, complex, and finely reticulated regulatory regime.  Congress has frequently amended the relevant provisions of the INA, including particularly significant legislation in 1952, 1965, 1980, 1986, 1990, 1996, 2000, 2001, 2005, and 2008, along with dozens of other Acts modifying the

immigration regime in countless ways. Immigration legislation is proposed in every single Congress and frequently forms a point of major national debate.

17. The INA was amended in 1980 by the Refugee Act, Pub. L. No. 96-21, to codify certain protections for those fleeing violence and danger. Under U.S. law, every noncitizen "who is physically present in the United States or who arrives in the United States" has the right to apply for asylum, "whether or not" they enter at a port of entry. 8 U.S.C. § 1158(a)(1).

18. Congress provided a range of other protections within the INA. Consistent with international obligations, people cannot be removed to countries where they will face persecution, 8 U.S.C. § 1231(b)(3)(A), or torture, *id.* § 1231. Likewise, Congress has provided various other forms of relief, including status for unaccompanied children, *id.* § 1101(a)(27)(J), trafficking victims, *id.* § 1101(a)(15)(T), and victims of crimes, *id.* § 1101(a)(15)(U). All of these protections allow the federal government to permit a person who otherwise would have no legal status to avoid removal.

19. The INA contains complex and exclusive procedures for determining immigration and citizenship status and for determining whether an individual may lawfully remain in the United States, either temporarily or permanently. *See*, *e.g.*, 8 U.S.C. § 1229a(a)(3). Under federal law, there is no single, readily ascertainable category or characteristic that establishes whether a particular person may or may not be permitted to remain in the United States. The answer to that question can only be reached through the processes outlined in the INA and may depend on the discretionary determinations of federal officials.

20. Many people who enter the United States between ports of entry ultimately obtain federal authorization to remain in the United States temporarily, indefinitely, or permanently.

21. Congress has established that entry into the United States is a crime under certain circumstances.  8 U.S.C. § 1325 ("Improper Entry by Alien") provides criminal penalties for noncitizens who, *inter alia*, enter the United States at any time or place other than as designated by immigration officers.  8 U.S.C. § 1326 provides criminal penalties for noncitizens who reenter the United States without authorization after entry of an order of removal.  8 U.S.C. § 1253 ("Penalties related to removal") provides criminal penalties for a failure to comply with a federal order of removal.

22. Congress also created specific procedures to remove individuals from the United States.  These are generally called removal proceedings and can take multiple forms, including full removal proceedings, pursuant to 8 U.S.C. § 1229a; expedited removal proceedings, pursuant to 8 U.S.C. § 1225; and reinstatement of removal proceedings, pursuant to 8 U.S.C. § 1231(a)(5).  Each of these proceedings requires, at a minimum, notice and an opportunity to contest the grounds for removal, as well as an opportunity to raise humanitarian claims for protection from removal, including under the withholding of removal statute and the Convention Against Torture.

23. Under federal law, people are allowed to remain in the United States while administrative removal proceedings prescribed by the INA are pending.

24. Prosecution for the federal entry crimes, the decision to pursue the removal of a given person from the country, and the choice of which of the available removal processes to invoke, are matters of federal discretion.  Federal agents and policymakers may choose to deploy these tools—or not—for a wide range of reasons, including national priorities, migration patterns, international relationships, and humanitarian concerns.

**B. S.B. 4**

25. On December 18, 2023, Governor Abbott signed S.B. 4 into law. It is effective on March 5, 2024.

26. S.B. 4. creates three new state law offenses: Illegal Entry from Foreign Nation, Tex. Penal Code §51.02; Illegal Reentry By Certain Aliens, *id.* § 51.03; and Refusal to Comply with [State] Order to Return to Foreign Nation, *id.* §51.04.

27. Each of these offenses can only be committed by a "person who is an alien," meaning any person who is not a citizen or national of the United States.

28. S.B. 4 creates a new state judicial power to deport individuals from the United States. Specifically, it authorizes state judges to "order [a defendant] to return to the foreign nation from which the person entered." Tex. Code Crim. Pro. art. 5B.002. S.B. 4 makes an "Order to Return" a mandatory part of all judgments imposed for a conviction of the new illegal entry and reentry crimes.

29. Texas Penal Code Section 51.02 ("State Illegal Entry") criminalizes a noncitizen's entry or attempt to enter into Texas directly from a foreign nation at any location other than a port of entry.

30. "[A]ffirmative defense[s] to prosecution" for State Illegal Entry exist when a noncitizen has been granted "lawful presence" or "asylum" by the federal government, if the conduct was not a violation of the federal illegal entry statute, 8 U.S.C. §1325(a), or if the noncitizen was approved for benefits under the federal Deferred Action for Childhood Arrivals (DACA) program.

31. S.B. 4 does not provide a defense for people who are currently seeking asylum, other humanitarian protection, or any other relief available under federal law. The new law

prohibits courts from abating "the prosecution of an offense under [S.B. 4] on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Pro. art. 5B.003.

32. S.B. 4 specifies that certain "federal programs"— the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program and "any program not enacted by the United States Congress that is a successor to or materially similar to DACA or DAPA"— are not affirmative defenses to prosecution.

33. A first violation of State Illegal Entry is a Class B Misdemeanor. A repeat offense is a state jail felony.

34. S.B. 4 also creates a state crime of Illegal Reentry ("State Illegal Reentry"). Texas Penal Code Section 51.03 makes it a state crime if a noncitizen "enters, attempts to enter, or is at any time found in this state after the person (1) has been denied admission to, excluded, deported, or removed from the United States; or (2) departed from the United States while an order of exclusion, deportation, or removal was outstanding."

35. For purposes of State Illegal Reentry, S.B. 4 defines "removal" to include a state Order to Return to a foreign nation.

36. S.B. 4 creates no affirmative defenses to a violation of State Illegal Reentry.

37. State Illegal Reentry is punishable as a Class A misdemeanor. Where an individual was previously removed subsequent to certain criminal convictions or, based on certain criminal charges, a violation is punishable as a felony of the Second or Third Degree, authorizing sentences of up to twenty years in prison.

38. S.B. 4's removal provision amends the Texas Code of Criminal Procedure to require state magistrates and judges to issue a State "Order to Return" as part of the judgment for every conviction of State Illegal Entry or Reentry.

39. A State Order to Return "takes effect on completion of the term of confinement or imprisonment imposed by the judgment" and requires a person to return to the foreign nation from which they entered or attempted to enter.

40. Alternatively, a state magistrate or judge may enter a State Order to Return prior to a conviction for State Illegal Entry or Reentry in lieu of continuing the prosecution. After making a determination that probable cause exists, a state magistrate or judge may issue an Order to Return if the individual agrees to the order and meets certain requirements.

41. Texas Penal Code Section 51.04 creates a third criminal offense: Refusal to Comply with Order to Return to Foreign Nation.

42. Refusal to Comply with Order to Return to Foreign Nation is a felony of the Second degree, punishable by between 2 and 20 years in prison.

43. There is no affirmative defense to a violation of Section 51.04.

**C. The Effect of S.B. 4 on Plaintiffs**

44. S.B. 4 creates a new state system to regulate immigration that completely bypasses and conflicts with the federal system. It allows state officers to arrest, detain, and remove individuals from the United States and mandates removal for those who are convicted of the new state crimes of illegal entry and reentry—all without any input or involvement whatsoever from federal officials.

45. S.B. 4 requires state officers to make determinations of federal immigration status and to incarcerate and remove noncitizens pursuant to these determinations, but it does not

provide noncitizens with any of the mechanisms or pathways to apply for or receive federal protection from removal. Moreover, the system prohibits state courts from pausing cases to obtain determinations of status from the federal government or abstaining while federal immigration proceedings take place.

46. The State adopted the statute, as a whole, to address the perceived failures of the federal government to arrest, detain and remove noncitizens. The Legislature failed to adopt prior versions that did not include the removal authority.

47. In testimony before the Texas legislature in 2023, Director McCraw stated that DPS estimates there could be approximately 72,000 arrests per year under the new law.

48. Enforcement of S.B. 4 will directly frustrate Plaintiff Las Americas' mission to ensure access to humanitarian protection and immigration relief to as many noncitizens as it can reach.

49. The majority of individuals served by Las Americas' programming, including programs that provide *pro se* legal information, are nondetained noncitizens living in the community. A significant portion of these individuals have recently entered without inspection. These community-based clients have been released after an initial arrest by Customs and Border Protection (CBP) or Immigration and Customs Enforcement officers(ICE), or they have never encountered a federal immigration officer.

50. In addition, Las Americas assists noncitizens who are detained in the federal immigration system and are facing expedited removal. Las Americas has developed relationships with ICE facilities to provide Know Your Rights presentations and assistance to individuals in their credible fear proceedings, which is a system developed by federal authorities to adjudicate the claims of noncitizens in expedited removal proceedings.

51. Enforcement of S.B. 4 will require Las Americas to restructure its services. Las Americas does not currently provide any services to people detained or incarcerated for state crimes. But under S.B. 4, noncitizens will be imprisoned for alleged state immigration offenses and then deported through the state mandatory removal system. In intention or effect, the state will preclude the communities Las Americas serves from ever coming into contact with the federal immigration process. To continue to pursue its mission, Las Americas will need to develop an entirely new system of tracking, counseling, and representing individuals held in state and county jails and prisons to ensure that they are screened and advised of their eligibility for federal immigration relief, and are assisted in applying for relief.

52. Las Americas will need to prioritize outreach and assistance to noncitizens arrested under S.B. 4 because the time they spend incarcerated could cause them to lose eligibility for asylum. Indeed, individuals have one year from their date of arrival to the United States to apply for asylum or otherwise lose their eligibility. *See* 8 U.S.C. § 1158(a)(2)(B). Las Americas has structured its operations to ensure that noncitizens are able to meet this filing deadline, as failing to do so can result in an individual's return to persecution or torture in their home country. These individuals, who currently access Las Americas' services in the community, will be located in state and county jails and prisons pursuant to S.B. 4. Las Americas will have to shift its work into these facilities in order to screen individuals for asylum eligibility and prepare applications for protection.

53. Enforcement of S.B. 4 will require Las Americas to dedicate more resources to ensure access to asylum and protection to those detained in the state system created by S.B. 4. Currently, Las Americas' asylum work for individuals out of custody concludes upon an

11

initial application, as individuals may leave the El Paso area to join family members elsewhere in the United States. Thus, Las Americas relies on referrals to other organizations and lawyers in the United States to continue representation. S.B. 4 changes this operational model. Because such out-of-state referrals will not be available for people detained pursuant to S.B. 4, Las Americas will need to provide continuing representation to those individuals. Each case will require more of Las Americas' resources. As a result, Las Americas will be able to serve fewer clients, frustrating its organizational mission.

54. S.B. 4's removal provisions will increase the need for Las Americas to prioritize reaching those arrested under the law. As early as their first appearance before a magistrate, individuals arrested under S.B. 4 may be asked to accept the entry of an Order to Return in lieu of prosecution. Las Americas will thus need to seek to access defendants as early as possible to ensure they understand their rights under federal law to humanitarian protection and their individual eligibility for relief from federal removal. Las Americas will also need to prioritize counseling for individuals who are convicted under S.B. 4 to ensure that they can pursue asylum or other relief under existing federal law before their state detention ends and an Order to Return is entered.

This work will require Las Americas to develop wholly new materials and resources to advise individuals how to seek federal immigration relief while subject to S.B. 4.

55. Las Americas will further need to develop and implement new advocacy models to protect individuals applying for asylum from removal where they are subject to a State Order to Return.

56. To meet and prioritize the needs of those arrested and detained under S.B. 4, Las Americas will need to divert resources away from the representation of those it currently serves in the community.

57. S.B. 4 will decrease the total number of noncitizens Las Americas is able to assist in seeking asylum and other forms of immigration relief. Community based representational models allow Las Americas to assist the greatest number of individuals, as Las Americas can connect with and serve individuals or groups of individuals in its offices much more efficiently than when the individuals it is serving are detained. Because S.B. 4 creates a new detention scheme for immigrants, Las Americas will have to divert resources to serve immigrants in the less efficient setting of state prison facilities. Ultimately, this diminishes the number of immigrants Las Americas can serve.

58. The creation of new programs to serve those arrested and detained under S.B. 4—including the requisite training, staff time spent in criminal justice facilities, and advocacy with a sweeping range of law enforcement agencies and state stakeholders—will necessarily decrease the number of people represented in the community, as well as in federal immigration detention facilities. Budget allocations and staff will need to be diverted from programs that help community members with their federal immigration claims to programs that help immigrants detained in state jails.

59. S.B. 4 will also frustrate Las Americas' programming designed to connect noncitizens who may have lived longer in the community with local law enforcement. The program is designed to bring noncitizen communities out of the shadows and allow them to apply for visas the federal government has developed for crime victims and victims of trafficking. In bypassing the federal system and threatening state immigration enforcement, S.B. 4

creates the heightened perception that a noncitizen reporting a crime will be arrested for illegal entry or reentry and removal, foreseeably chilling participation in the program and impairing the organization's ability to fulfill its mission.

60. Plaintiff American Gateways provides direct representation to people appearing in the San Antonio Immigration Court. It also provides legal orientation, immigration workshops, and pro bono legal representation at three immigrant detention facilities in Taylor, Pearsall, and Karnes City, Texas.

61. S.B. 4 will frustrate American Gateways' mission to provide free, culturally sensitive, trauma-informed legal representation to individuals and families seeking asylum and other forms of humanitarian immigration relief in the United States.

62. S.B. 4 will frustrate American Gateways' mission to represent low-income noncitizens in securing asylum and other forms of immigration relief. S.B. 4 will eliminate American Gateways' ability to assist noncitizens in securing protection because they will be detained and removed by the State before they can seek federal protections. SB 4 will also detrimentally affect the representation that American Gateways provides to crime victims eligible for immigration relief, as they will fear arrest and deportation should they report their victimization.

63. S.B. 4 will also force American Gateways to divert organizational resources and develop new programming. In addition to providing legal services, a central feature of American Gateways' mission is to engage and educate immigrant communities and local stakeholders about the immigration system and individuals' rights in the immigration process.

64. American Gateways regularly holds trainings on these topics in the communities it serves. American Gateways will have to divert its resources to educate clients and community

members about the impact of S.B. 4. The organization has received calls from community members concerned about S.B. 4 and how the law might expose them and their loved ones to arbitrary arrest and detention, removal, and separation from their families. American Gateways has already been asked to conduct several Know Your Rights sessions focused on S.B. 4 in each of its offices, which will require the diversion of staff time and resources from other programs.

65. Determining how best to communicate about S.B. 4, what the legislation requires, how it might be applied to individuals, and how people can protect themselves, will require time and effort. American Gateways anticipates needing to make significant changes to the community education materials it uses to train staff, community members, lawyers, and others.

66. Plaintiff El Paso County represents a multicultural border community largely made up of immigrants. El Paso County has over 850,000 residents, more than 82 percent of whom are Hispanic and more than 25 percent of whom are foreign-born.

67. Immigrant households are an integral part of the El Paso community. Many of these households are mixed-status families, with U.S. citizens living with undocumented family members who are their fathers, mothers, or children.

68. El Paso's immigrant community pays approximately $591.8 million in taxes. It includes individuals who have naturalized, individuals who hold legal permanent resident status, individuals with temporary status, and individuals who are undocumented.

69. El Paso County's strategic vision involves serving its constituency by fostering inclusion and quality of life for local immigrants and refugees and promoting collaboration with external partners such as Mexico. An example of the programming created by El Paso

County to serve its strategic vision is the Office of New Americans (ONA), which aims to improve the inclusion, integration, and overall quality of life for the County's immigrants and refugees through enhanced collaboration with the community, education institutions, nonprofits, and interfaith organizations. In collaboration with other County departments, the ONA supports and facilitates community programs and presentations on topics such as citizenship workshops, English as a Second Language (ESL) classes, and legal rights. The ONA will need to develop new materials and resources to advise individuals of their rights under S.B. 4 and its impact on them.

70. El Paso County additionally manages, administers, and funds a migrant support services center. The center first opened on October 10, 2022, when the El Paso area saw an influx of migrants. In one year of operations, the center assisted approximately 56,247 migrants by facilitating self-pay travel needs of asylum seekers who have a sponsor in the U.S. and have the resources to travel to their destination quickly. S.B. 4 will interfere with the operation of the migrant support service center provided by the County by potentially subjecting people whom El Paso County is assisting to reach their final destinations to state criminal prosecution and state removal.

71. The County is further responsible for funding and managing the County jail system, the County Public Defender's office, and providing funding for the state judicial system. Under S.B. 4, the County will be forced to expend its limited resources to implement the law, likely redirecting funds from existing programs and needs.

72. Upon information and belief, El Paso County could see an additional 8,000 arrests per year pursuant to S.B. 4, and the County will have to house those individuals in its jails. The main detention facility in El Paso County is the El Paso County jail. DPS agents book

detainees into the El Paso County jail and the jail staff are required by state law to take custody of those persons. El Paso County would potentially be liable for the unlawful detention of persons held in an El Paso County jail facility under S.B. 4.

73. Given that number of anticipated arrests, the County will incur nearly $24 million per year in additional costs to simply house these additional defendants. The County estimates it will need to authorize and spend a further $162 million to build additional jail and bed space.

74. S.B. 4 further requires law enforcement agents to collect certain biometric information and cross-reference that information with existing databases. Implementation of S.B. 4 thus requires additional expenditure by the County to provide access to this information.

75. S.B. 4 will require El Paso County to provide training to peace officers who are funded by the County, including Constables and Sheriff's staff. The County will need to expend resources to do so. The County will also have to fund the legal defense of any County official sued under federal law for implementing S.B. 4.

76. El Paso County issued a 2020-2024 Strategic Plan that lists as one of its top priorities "Leading in Justice Reform." One of the key strategies in achieving that priority is to make best efforts to only incarcerate those that are a high risk to public safety. S.B. 4 will directly frustrate the County's goal of leading justice reform by forcing it to incarcerate persons that may not be a high risk to public safety.

77. The County funds and manages legal services to families in a broad range of areas that include mental health, adult protective services, child protective services, juvenile and family violence. El Paso County relies on public trust to enforce laws and to support the most vulnerable residents of the County. S.B. 4 directly frustrates the County's efforts to

provide these legal services by diluting the trust the El Paso County community has in its local government, making it less likely that community members cooperate with local law enforcement and with County staff that seek to provide them with legal services.

## CLAIMS FOR RELIEF

### Count One: Preemption

78. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."

79. Federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

80. S.B. 4 violates the Supremacy Clause because it attempts to regulate matters that are exclusively reserved to the federal government and because it operates in a field over which Congress has exercised exclusive authority.

81. S.B. 4 further violates the Supremacy Clause because it conflicts with federal laws, contradicts federal admission and release decisions, imposes burdens and penalties not authorized by and contrary to federal law, creates its own immigration classifications, and directs state officers to take unilateral immigration enforcement actions.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court grant the following relief:

a. Declare that S.B. 4 is unlawful in its entirety;

b. Preliminarily and permanently enjoin Defendant from enforcing S.B. 4;

c. Grant any other and further relief that this Court may deem fit and proper.

Dated: December 19, 2023

/s/ *David A. Donatti*
David A. Donatti (TX Bar No. 24097612)
Adriana C. Piñon (TX Bar No. 24089768)
AMERICAN CIVIL LIBERTIES UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

*For Plaintiffs Las Americas Immigrant Advocacy Center, American Gateways, and County of El Paso*

Anand Balakrishnan*
Omar Jadwat*
Lee Gelernt*
Wafa Junaid*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
abalakrishnan@aclu.org
ojadwat@aclu.org
lgelernt@aclu.org
wjunaid@aclu.org

Spencer Amdur*
Cody Wofsy*
Hannah Schoen*
Morgan Russell*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
samdur@aclu.org
cwofsy@aclu.org
hschoen@aclu.org
mrussell@aclu.org

*For Plaintiffs Las Americas Immigrant Advocacy Center, American Gateways, and County of El Paso*

*Pro Hac Vice Motion Forthcoming

Tamara F. Goodlette (TX Bar No. 24117561)
Erin D. Thorn (TX Bar No. 24093261)
Daniel Hatoum (TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
1017 W. Hackberry Ave.
Alamo, TX 78516
Telephone: (512) 474-5073, ext. 207
Facsimile: (956) 787-6348
tami@texascivilrightsproject.org
erin@texascivilrightsproject.org
daniel@texascivilrightsproject.org

*For Plaintiffs Las Americas Immigrant Advocacy Center and American Gateways*

Jo Anne Bernal, (TX Bar No. 02208720)
El Paso County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
joanneb@epcounty.com

Bernardo Rafael Cruz, (TX Bar No. 24109774)
Assistant County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
b.cruz@epcounty.com

*For Plaintiff County of El Paso*

20