**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; and THE COUNTY OF EL PASO, TEXAS, <br><br>        *Plaintiffs*, <br><br>   v. <br><br> STEVEN C. MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety, and BILL D. HICKS, in his official capacity as District Attorney for the 34th District, <br><br>        *Defendants*. | Case No. 1:23-cv-1537 |

**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

    A.    The Federal Government Has Exclusive Authority to Regulate Immigration. ............... 1

    B.    Texas Enacts S.B. 4 to Regulate Entry into and Removal from the Country. ................ 3

STANDARD OF REVIEW ................................................................................................. 5

ARGUMENT ...................................................................................................................... 5

    I.    S. B. 4 is Preempted. ................................................................................................. 5

        A.    S.B. 4 Intrudes on the Exclusively Federal Field of Entry and Removal. ................... 5

        B.    S.B. 4 Conflicts with the Federal Immigration System. ............................................ 10

    II.    The Equities Strongly Favor an Injunction. .................................................... 17

        A.    Plaintiffs Have Standing and S.B. 4 Will Irreparably Harm Them. .......................... 17

        B.    The Balance of Equities and Public Interest Support an Injunction .......................... 19

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*,
   567 U.S. 387 (2012)..................................................................................... passim

*Biden v. Texas*,
   142 S. Ct. 2528 (2022)................................................................................... 3

*Biden v. Texas*,
   597 U.S. 785 (2022)...................................................................................... 14

*Chy Lung v. Freeman*,
   92 U.S. 275 (1875)................................................................................... 6, 13

*City of Alpine v. Abbot*,
   730 F. Supp. 2d 630 (W.D. Tex. 2010)...................................................... 18

*City of El Cenizo, Texas v. Texas*,
   890 F.3d 164 (5th Cir. 2018) ...................................................................... 13

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)..................................................................................... 15

*Crown Castle Fiber, L.L.C. v. City of Pasadena, Texas*,
   76 F.4th 425 (5th Cir. 2023) ....................................................................... 17

*De Canas v. Bica*,
   424 U.S. 351 (1976)....................................................................................... 6

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
   691 F.3d 1250 (11th Cir. 2012) ............................................................ passim

*Garcia v. Kerry*,
   557 F. App'x 304 (5th Cir. 2014) ................................................................. 7

*Grace v. Barr*,
   965 F.3d 883 (D.C. Cir. 2020) .................................................................... 11

*Gutierrez v. State*,
   380 S.W.3d 167 (Tex. Crim. App. 2012).................................................. 7, 8

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)..................................................................................... 18

*Hernandez v. State*,
   613 S.W.2d 287 (Tex. Crim. App. 1980) ................................................................. 7

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ............................................................................. 6, 7, 10, 13

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022) .............................................................................. 20

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ............................................................................................ 10

*INS v. Yueh-Shaio Yang*,
   519 U.S. 2 (1996) .................................................................................................. 3

*Jama v. ICE*,
   543 U.S. 335 (2005) ............................................................................................ 13

*Lewis v. Hughs*,
   475 F. Supp. 3d 597 (W.D. Tex. 2020) ................................................................ 18

*Lozano v. City of Hazleton*,
   724 F.3d 297 (3d Cir. 2013) .................................................................................. 7

*Make the Road New York v. Pompeo*,
   475 F. Supp. 3d 232 (S.D.N.Y. 2020) ................................................................. 21

*Ms. L. v. ICE*,
   310 F. Supp. 3d 1133 (S.D. Cal. 2018) ............................................................... 20

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................................ 20

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
   715 F.3d 1268 (11th Cir. 2013) ........................................................................... 19

*Ortega-Melendres v. Arpaio*,
   836 F. Supp. 2d 959 (D. Ariz. 2011) ................................................................... 20

*Pennsylvania v. Nelson*,
   350 U.S. 497 (1956) .............................................................................................. 8

*Reno v. American-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ............................................................................................ 12

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1990)................................................................................................. 6

*Rogers v. Brockette*,
    588 F.2d 1057 (5th Cir.1979) ............................................................................... 19

*Singh v. Gonzales*,
    499 F.3d 969 (9th Cir. 2007) ................................................................................. 8

*Speaks v. Kruse*,
    445 F.3d 396 (5th Cir. 2006) ................................................................................. 5

*Takahashi v. Fish & Game Comm'n*,
    334 U.S. 410 (1948)................................................................................................. 6

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) .................................................................................. 7

*Toll v. Moreno*,
    458 U.S. 1 (1982).............................................................................................. 7, 13

*Trans World Airlines, Inc. v. Mattox*,
    897 F.2d 773 (5th Cir. 1990) ............................................................................... 19

*Truax v. Raich*,
    239 U.S. 33 (1915).............................................................................................. 6, 7

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) .................................................................... passim

*United States v. Sanchez-Milam*,
    305 F.3d 310 (5th Cir. 2002) ............................................................................... 16

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ......................................................................... 10, 13

*United States v. South Carolina*,
    840 F. Supp. 2d 898 (D.S.C. 2011)..................................................................... 10

*United States v. Texas*,
    599 U.S. 670 (2023)............................................................................................. 12

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*,
    726 F.3d 524 (5th Cir. 2013) ........................................................................ passim

**Statutes**

8 U.S.C. § 1101(a)(15)(T) ............................................................................................... 3, 11

8 U.S.C. § 1101(a)(15)(U) .............................................................................................. 3, 11

8 U.S.C. § 1101(a)(27)(J) .................................................................................................... 3

8 U.S.C. § 1103 ................................................................................................................... 9

8 U.S.C. §§ 1151–1382 ....................................................................................................... 2

8 U.S.C. § 1158 .................................................................................................... 2, 9, 10, 11

8 U.S.C. § 1182 ..................................................................................................... 2, 8, 9, 17

8 U.S.C. § 1225 .......................................................................................................... passim

8 U.S.C. § 1226 ................................................................................................................... 9

8 U.S.C. § 1227 ................................................................................................................... 8

8 U.S.C. § 1229 .......................................................................................................... passim

8 U.S.C. § 1231 .......................................................................................................... passim

8 U.S.C. § 1232 ................................................................................................................. 11

8 U.S.C. § 1254(a) .............................................................................................................. 3

8 U.S.C. § 1321 ................................................................................................................... 2

8 U.S.C. § 1323 ............................................................................................................... 2, 9

8 U.S.C. § 1324 ......................................................................................................... 2, 9, 15

8 U.S.C. § 1325 .......................................................................................................... passim

8 U.S.C. § 1326 ..................................................................................................... 2, 9, 12, 16

8 U.S.C. § 1327 ................................................................................................................... 9

8 U.S.C. § 1328 ................................................................................................................... 9

8 U.S.C. § 1329 ................................................................................................................... 9

Senate Bill 4 (88th Leg. (4th special session)) ..................................................... passim

Tex. Code of Crim. Proc. Art. 5B.002(a).............................................................. 4

Tex. Code of Crim. Proc. Art. 5B.002(b) .............................................................. 4

Tex. Code of Crim. Proc. Art. 5B.002(c).............................................................. 4

Tex. Code of Crim. Proc. Art. 5B.002(d) .......................................................... 4, 14

Tex. Code of Crim. Proc. Art. 5B.003 .............................................................. 5, 11

Tex. Penal Code § 51.02 ...................................................................................... 14

Tex. Penal Code § 51.02(a).................................................................................... 4

Tex. Penal Code § 51.02(c).................................................................. 4, 11, 16, 17

Tex. Penal Code § 51.03 ................................................................................ 16, 17

Tex. Penal Code § 51.04 ........................................................................................ 4

## Other Authorities

Government of Mexico, Press Release 476 (Nov. 15, 2023),

   https://www.gob.mx/sre/prensa/mexican-government-opposes-the-anti-immigrant-legislation-

   passed-in-texas?idiom=en ................................................................................ 15

Office of the Texas Gov., *Governor Abbott Signs Historic Border Security Measures In*

   *Brownsville* (Dec. 18, 2023), *available at* https://gov.texas.gov/news/post/governor-abbott-

   signs-historic-border-security-measures-in-brownsville (Texas Governor Greg Abbott's

   statement at signing that President Biden's "deliberate inaction has left Texas to fend for

   itself.") ................................................................................................................ 3

## Regulations

8 C.F.R. § 208.4 .................................................................................................... 9

8 C.F.R. § 212.2(d) ............................................................................................. 16

## INTRODUCTION

The regulation of immigration—determining which noncitizens can enter the country, under what conditions, what status they are afforded while here, and whether, when, and how they might be removed—is an exclusive federal power.  But in S.B. 4, Texas has created a draconian *state* immigration system, in which the State unilaterally arrests, convicts, and removes noncitizens for entering the country between ports, with no federal control.  In 150 years of federal immigration legislation, no state has ever passed a law like S.B. 4.  If the law takes effect on March 5, 2024, it will sweep aside the extremely detailed procedures and substantive rights Congress created to govern entry and removal.  It will severely disrupt the federal system's balance between criminal enforcement, civil removal, and forms of relief from removal.  It will eliminate the federal Executive's broad discretion over immigration decisions and disrupt the United States' sovereign power over foreign relations with our southern neighbor.

The harms of enforcement will be immense.  Vulnerable noncitizens seeking safety will face removal to persecution or torture without access to the federally mandated removal process and protections.  Communities face the arrest and summary removal of loved ones, and the separation of families.  And the Plaintiffs—advocates dedicated to helping noncitizens access critical federal protections like asylum, and the County of El Paso, which must bear the fiscal and human costs of implementing the State's new law—will be severely impacted.

## BACKGROUND

### A.  The Federal Government Has Exclusive Authority to Regulate Immigration.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."  *Arizona v. United States*, 567 U.S. 387, 394 (2012).  In the Immigration and Nationality Act ("INA"), Congress created a complex system to regulate entry into and removal from the United States.  *See generally,* 8 U.S.C. §§ 1151–1382.

That scheme balances policy goals, including discouraging irregular entry between ports and providing for humanitarian and other protections. To do so, it offers federal officers a range of tools to regulate immigration, including civil immigration procedures and criminal charges.

On the civil side, Congress has specified categories of noncitizens who may be denied admission to the United States, *see* 8 U.S.C. § 1182, including those who enter between ports of entry, *see id.* § 1182(a)(6).  To decide whether a person who entered without inspection at a port will be removed, Congress has established several alternative removal procedures, including full removal proceedings with trial-like processes subject to administrative and judicial appeals, 8 U.S.C. § 1229a, and expedited removal proceedings, a shortened form of proceedings applicable to recent border crossers, 8 U.S.C. § 1225(b)(1).  On the criminal side, unlawful entry and reentry into the country are federal offenses, along with various other criminal regulations related to irregular entries. 8 U.S.C. §§ 1325, 1326; *see also, e.g.*, §§ 1321, 1323, 1324 (criminalizing the "unauthorized landing of aliens," and "unlawful bringing of aliens" into the country).

Even as it rendered noncitizens entering between ports "inadmissible" and subject to criminal penalties, Congress enacted a range of protections that are available despite unlawful entry.  Asylum, a form of humanitarian protection that can lead to permanent residence and eventually citizenship, is specifically available "whether or not" a noncitizen enters "at a designated port of arrival," and "irrespective of such [noncitizen's] status."  8 U.S.C. § 1158(a)(1).  Congress also barred federal officials from removing people to likely persecution or torture, in compliance with the United States' obligations under international treaties.  *See id.* § 1231(b)(3); Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).  In addition, individuals who are placed in full removal proceedings may apply for other forms of relief Congress has extended, including cancellation of

removal.  8 U.S.C. § 1229b(b).  Noncitizens who have entered without inspection may also apply affirmatively for numerous other forms of relief outside of removal proceedings, including visas for victims of crimes and trafficking, § 1101(a)(15)(U); 1101(a)(15)(T); temporary protected status, § 1254(a), and Special Immigrant Juvenile Status for noncitizens under 21 years of age, § 1101(a)(27)(J).

Given the complexities of the immigration system, federal discretion and control is vital. A "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.  Federal officials  "decide whether it makes sense to pursue removal at all."  *Id.*  Federal officials choose among the several removal processes Congress established.  *See Biden v. Texas*, 142 S. Ct. 2528, 2535 (2022).  Federal officials decide whether to deploy the associated criminal immigration charges.  *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1265 (11th Cir. 2012).  And once removal procedures have been initiated, federal officials decide whether to extend relief to otherwise removable noncitizens.  *See, e.g.*, *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996).

**B. Texas Enacts S.B. 4 to Regulate Entry into and Removal from the Country.**

S.B. 4 is a blatant attempt to supersede this complex federal system.[1]  It establishes three new state crimes that criminalize irregular entry into the United States and direct state officers to effectuate deportations without any federal discretion or protection from removal.

The challenged law makes it a crime under Texas law for a noncitizen to enter or attempt to enter Texas directly from a foreign nation—which, as a practical matter, means entry across

---

[1] *See, e.g.,* Office of the Texas Gov., *Governor Abbott Signs Historic Border Security Measures In Brownsville* (Dec. 18, 2023), *available at* https://gov.texas.gov/news/post/governor-abbott-signs-historic-border-security-measures-in-brownsville (Texas Governor Greg Abbott's statement at signing that President Biden's "deliberate inaction has left Texas to fend for itself.").

the United States-Mexico border—at any location other than a port of entry.  SB 4, § 2, 88th Legis., 4th Spec. Sess. (Tex. 2023) (codified at Tex. Penal Code § 51.02(a)).  Affirmative defenses are available when the conduct did not violate the federal illegal entry statute or when a noncitizen has been granted "lawful presence," asylum, or benefits under the Deferred Action for Childhood Arrivals program.  S.B. 4 § 51.02(c).  S.B. 4 does not provide an affirmative defense for noncitizens seeking federal status, including asylum, or who wish to petition the federal government for relief.  *Id.*

S.B. 4 also creates a new state "reentry" charge, applicable if a noncitizen enters, attempts to enter, or is at any time found in Texas after the person has been denied admission to, excluded, deported, or removed from the United States, or departed from the United States while an order of exclusion, deportation, or removal was outstanding.  S.B. 4 § 51.03(a).  There are no affirmative defenses for this crime.  *Id.*

Finally, S.B. 4 creates a mechanism for the State of Texas to unilaterally deport individuals from the United States.  If a person is convicted under S.B. 4's entry or reentry provisions, the state judge *must* enter an Order to Return, which requires the defendant to return to the foreign nation from which they entered.  SB 4, § 1 (codified at Tex. Code of Crim. Proc. Art. 5B.002(d)).  A state magistrate or judge may alternatively enter an Order to Return in lieu of continuing the prosecution if certain conditions are met.  S.B. 4 Art. 5B.002(a)-(c).  Refusal to comply with an Order to Return is a state crime punishable by up to 20 years in prison; there are no affirmative defenses.  S.B. 4 § 51.04.  In addition to state deportation, S.B. 4 provides that an "Order to Return" is a predicate deportation for the State's reentry crime.

As to all of these offenses, S.B. 4 specifically prohibits "abat[ing] the prosecution . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."  S.B. 4. Art. 5B.003.

## STANDARD OF REVIEW

"A preliminary injunction should issue if the movant establishes (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury . . . , (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006) (quotation marks omitted).

## ARGUMENT

### I.      S. B. 4 is Preempted.

S.B. 4 regulates entry and removal—the quintessential exclusively federal field.  S.B. 4 also conflicts with federal law in numerous ways, eliminating immigration relief and federal discretion and interfering with foreign policy and Congress's calibrated regulation of irregular entry.

### A. S.B. 4 Intrudes on the Exclusively Federal Field of Entry and Removal.

In S.B. 4, Texas established an unprecedented state immigration system that entirely bypasses Congress's comprehensive scheme.  Texas has regulated and criminalized entry into the United States; chosen for itself who will be permitted to remain in the country, what statuses will qualify as defenses to removal, and what procedures will apply; and claimed the power to deport noncitizens by ordering them to depart the United States on pain of severe additional punishment.  But immigration is an exclusively federal power, and Congress has long occupied the field of entry and removal.  This case is thus simple: S.B. 4 is field preempted.

Courts may infer field preemption from either a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'"  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1990)).

The federal interest in immigration, *see id.* at 399, is "overwhelmingly dominant."  *Ga. Latino All.*, 691 F.3d at 1264.  For 150 years—ever since Congress began systematically regulating immigration—the Supreme Court has been crystal clear: Regulation of entry into and expulsion from the United States are exclusively federal matters from which the States are excluded.  *See, e.g.*, *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *Hines v. Davidowitz*, 312 U.S. 52, 62 & n.10 (1941) (noting the "continuous recognition by this Court" of "the supremacy of the national power . . . over immigration . . . and deportation"); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States [and] the period they may remain," and "the states are granted no such powers"); *De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."); *Arizona*, 567 U.S. at 409 ("the removal process is entrusted to the discretion of the Federal Government").[2]

---

[2] The federal government's exclusive authority derives from multiple constitutional sources, including the Federal Governments power 'to establish a uniform Rule of Naturalization,' its power 'to regulate Commerce with foreign Nations,' and its broad authority over foreign

In light of this unbroken line of precedent, the Fifth Circuit has likewise recognized that entry, exclusion, and deportation are exclusively federal matters.  *See, e.g.*, *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022) (because "[p]olicies pertaining to the entry of aliens and their right to remain here are entrusted exclusively to Congress[,] [a]n attempt by Texas to establish an alternative classification system . . . would be preempted") (cleaned up); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 537 (5th Cir. 2013) (en banc); *Garcia v. Kerry*, 557 F. App'x 304, 308 (5th Cir. 2014).[3]  Other lower federal courts are in accord.  *See, e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) ("The power to expel aliens has long been recognized as an exclusively federal power."); *Lozano v. City of Hazleton*, 724 F.3d 297, 315 (3d Cir. 2013) (similar).  Even Texas's state courts recognize that "the matter of entry into the United States" is "wholly preempted by federal law," *Hernandez v. State*, 613 S.W.2d 287, 290 (Tex. Crim. App. 1980), as are "matters involving deportation," *Gutierrez v. State*, 380 S.W.3d 167, 173, 176 (Tex. Crim. App. 2012).

Indeed, courts have struck down laws as preempted even when they only *indirectly* infringe on the federal government's power over entry and removal.  *See, e.g.*, *Truax*, 239 U.S. at 42 (state regulation of noncitizens "opportunity of earning a livelihood" amounted to an impermissible regulation of their "entrance and abode"); *Alabama*, 691 F.3d at 1294-95 (state

---

affairs," *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (cleaned up, citations omitted); *see also Hines*, 312 U.S. at 62.

[3] While the preemption analysis of the housing ordinance at issue in *Farmers Branch* yielded disagreement and a number of separate opinions, *not one* member of the en banc Court disagreed with "the longstanding, unremarkable principle that the federal government's authority to exclude or remove foreign nationals . . . is necessarily exclusive of infringement by state or local legislation."  726 F.3d at 545(Dennis, J., specially concurring); *see id.* at 557 (Owen, J., concurring in part) ("the federal government undeniably has the exclusive power to determine questions of removal and deportation"); *id.* at 559 & n.77 (similar); *id.* at 567 (Jones, J., dissenting) (the Constitution "vests exclusive control over the 'authority to control immigration—to admit or exclude aliens— . . . solely in the Federal government'").

law limits on noncitizens' ability to enter into contract reflected a preempted "policy of expulsion"); *see also Gutierrez*, 380 S.W.3d at 170, 173 (striking down probation condition directing defendant to leave the United States). Here, Texas has *directly* regulated entry and authorized state deportations.

Consistent with this dominant federal interest, Congress's entry-and-removal regime is highly "pervasive." *Arizona*, 567 U.S. at 399 (internal quotation marks omitted). Through the INA, Congress has established an exceptionally detailed, complex, and finely reticulated regulatory framework governing the inspection, admission, and removal of noncitizens seeking to enter the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225, 1227, 1229c, 1229b, 1231; *see also Alabama*, 691 F.3d at 1294 (discussing "Congress's comprehensive statutory framework governing alien removal"). Congress has specifically provided that the INA's provisions shall be "the sole and exclusive procedure" for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. 8 U.S.C. § 1229a(a)(3); *see Farmers Branch*, 726 F.3d at 537. To call the immigration statutes—and their implementing regulations and precedential administrative adjudications—comprehensive is an understatement; the immigration laws have "been described as second only to the Internal Revenue Code in complexity." *Singh v. Gonzales*, 499 F.3d 969, 980 (9th Cir. 2007) (cleaned up). And Congress has frequently amended this statutory scheme, including multiple significant amendments to the provisions most relevant here. *See Ga. Latino All.*, 691 F.3d at 1264 n.10 (discussing similar history of legislation to support field preemption) (citing *Pennsylvania v. Nelson*, 350 U.S. 497 (1956)).[4]

---

[4] *See, e.g.*, Immigration and Nationality Act, Pub. L. No. 414, 66 Stat. 163 (1952); Refugee Act of 1980, Pub. L. 96–212, 94 Stat. 102; Illegal Immigration Reform and Immigrant Responsibility

In particular, Congress has extensively regulated individuals who enter between ports of entry—those whom Texas is attempting regulate through S.B. 4.  On one hand, as explained, the federal scheme contains a variety of enforcement mechanisms.  Congress has created multiple removal pathways, with detailed procedures and multiple layers of review by federal officials, including a special "expedited removal" system specifically for those who arrive at our borders without visas or other valid immigration documents.  *See, e.g.*, 8 U.S.C. §§ 1225(b)(1) (expedited removal procedures), 1229, 1229a (regular removal procedures), 1231(a)(5) (reinstatement of removal).  Congress has also criminalized entry and re-entry between ports of entry, along with efforts to assist or facilitate entry between ports.  *See id.* §§ 1325, 1326, 1323, 1324, 1327, 1328, 1329; *Ga. Latino All.*, 691 F.3d at 1264 (discussing the "larger context of federal statutes" addressing entry).  And Congress has provided a detailed set of standards and procedures for when people who enter between ports may be arrested and detained by federal officials.  *See, e.g.*, 8 U.S.C. §§ 1225(b), 1226(a)-(c), 1182(d)(5)(A).  On the other hand, Congress has established numerous forms of relief from removal for people who enter between ports: Asylum is available "whether or not" a noncitizen arrives "at a designated port of arrival," *id.* § 1158(a)(1), and can be accessed through multiple procedural channels, *see id.* § 1225(b)(1)(B), 1158(d); 8 C.F.R. § 208.4.  Withholding of removal bars a person's removal to any country where they face persecution or torture.  *See* 8 C.F.R. § 1231(b)(3) and Note.  And Congress has given federal officials "broad discretion" to decide whether it makes sense to detain, remove, or prosecute in the first place.  *Arizona*, 567 U.S. at 398; 8 U.S.C. § 1103(a)(1), (a)(5).

---

Act of 1996, Pub. L. 104–208, Div. C, 110 Stat. 3009-546.  Further changes are proposed in every Congress—and are often a focus of intense national political debate.

Through these many intricate and interrelated provisions, Congress has established "a full set of standards governing" those who enter between ports, "including the punishment for noncompliance"—a system that is "designed as a 'harmonious whole.'"  *Arizona*, 567 U.S. at 401 (quoting *Hines*, 312 U.S. at 72).  As such, "States may not enter" this field "in any respect," and "even complementary state regulation is impermissible."  *Id*. at 401-02.

In sum, when it comes to regulating noncitizens' entry into the United States, their permission to remain, and their removal, the case for field preemption is straightforward.  Indeed, "[t]he regulation of immigration is *the* quintessential example of field preemption." *United States v. South Carolina*, 840 F. Supp. 2d 898, 913 (D.S.C. 2011), *aff'd,* 720 F.3d 518 (4th Cir. 2013) (emphasis added).  Probably for that very reason—and because for 150 years the Supreme Court has reiterated that states lack authority over such matters—no state has ever sought to seize the federal government's prerogatives and set up its own state-law alternative immigration system.  Until now.  S.B. 4 is unlawful and should be immediately enjoined.

### B.  S.B. 4 Conflicts with the Federal Immigration System.

In addition, S.B. 4 is conflict preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in multiple respects.  *Arizona*, 567 U.S. at 399 (quoting *Hines,* 312 U.S. at 67).

*First*, S.B. 4 bypasses *all* of the defenses to removal that Congress has established. Perhaps most notably, as explained above, Congress carefully enshrined asylum and other protection from persecution and torture as defenses to removal, specifically providing that asylum would be available to individuals who enter the country between ports of entry.  *See* 8 U.S.C. §§ 1158(a)(1) (providing for asylum "whether or not at a designated port of arrival"), 1231(b)(3), 1231 note; *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).  And when

Congress established the expedited removal system to address noncitizens arriving at our borders without valid visas, it took care to provide access to such humanitarian protections through the "credible fear" screening process.  *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (B); *Grace v. Barr*, 965 F.3d 883, 887, 902 (D.C. Cir. 2020) (discussing credible fear process).  Other relief is also available in the federal system, including special protections for unaccompanied minors and victims of crime and trafficking.  8 U.S.C. § 1232;  8 U.S.C. § 1101(a)(15)(T)-(U).

Under Texas's new immigration system, all this is wiped away.  Noncitizens are arrested by state officers, held in state custody, and then ordered deported by state agents.  Because this new process entirely sidesteps Congress's removal system, noncitizens will be subjected to state removal without the opportunity to seek asylum or other forms of humanitarian protection available under federal law.  Indeed, S.B. 4 makes this explicit, providing that a "court may not abate the prosecution of an offense under" its new criminal provisions "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." S.B. 4.  Tex. Code Crim. Proc. Art. 5B.003.[5]

A state cannot simply take away people's federal right to seek asylum or numerous other defenses to removal.  Texas has impermissibly declared that noncitizens entering between ports "cannot be tolerated within its territory, without regard for any of the [federal] statutory processes or avenues for granting an alien permission to remain lawfully within the country." *Alabama*, 691 F.3d at 1295.  But Congress's clear policy is that relief from removal, including

---

[5] If a noncitizen has been actually *granted* asylum, that fact provides an affirmative defense to the state illegal entry crime (although not to the illegal reentry crime).  S.B. 4. § 51.02(c)(1)(B). But federal law enshrines the right to *seek* asylum, which, if eventually granted, precludes removal, *see* 8 U.S.C. § 1158(a)(1), (c)(1)(A)—a right S.B. 4 denies.

asylum, is available to individuals even when they enter the country between ports.  S.B. 4 impermissibly rejects, obstructs, and frustrates that policy, and is accordingly preempted.

*Second*, S.B. 4 obstructs federal law by entirely wresting from the federal government *all* discretion over the immigration processing, prosecution, and removal of noncitizens entering between ports.  "A principal feature of the removal system is the broad discretion exercised by immigration officials."  *Arizona*, 567 U.S. at 396.  Specifically, Congress has provided federal Executive Branch officials with a range of tools to address noncitizens entering between ports. Federal prosecutors may choose to bring criminal charges under 8 U.S.C. §§ 1325 or 1326; immigration officials may initiate ordinary removal proceedings, *id.* § 1229a, or expedited proceedings if applicable, *id.* § 1225(b)(1); and immigration agents or administrative hearing officers may exercise discretion to forego removal proceedings, defer removal, or take other discretionary action to ameliorate the potential harshness of the immigration laws.  *see Arizona*, 567 U.S. at 396, 409.  Indeed, in a case decided last term rejecting one of Texas's recent efforts to dictate immigration policy, the Supreme Court emphasized the federal government's broad discretion over questions of arrests, initiating removal proceedings, and removals, explaining that such discretion "implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'"  *United States v. Texas*, 599 U.S. 670, 679 (2023) (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).

But under S.B. 4, the federal government gets no say at all over whether a noncitizen is prosecuted, detained, or removed; it is entirely cut out of the process.  The statute thus blatantly "violates the principle that the removal process is entrusted to the discretion of the Federal Government."  *Arizona*, 567 U.S. at 409; *Farmers Branch*, 726 F.3d at 534 (same); *id.* at 546 (Dennis, J., specially concurring) (same).  Indeed, the violation is even starker here than in

*Arizona*, which involved state police conducting arrests but otherwise left the removal process in federal hands.  *See Farmers Branch*, 726 F.3d at 534 (discussing *Arizona*).  Here, Texas has enacted an unprecedented "usurpation of federal power over immigration"—leaving no federal discretion at all.  *Toll*, 458 U.S. at 29 (Rehnquist, J., dissenting).  That "is not a decision for [Texas] to make."  *Alabama*, 691 F.3d at 1295 (statute conflict preempted where state had "taken it upon itself to unilaterally determine that any alien unlawfully present in the United States cannot live within the state's territory, regardless of whether the Executive Branch would exercise its discretion to permit the alien's presence"); *United States v. South Carolina*, 720 F.3d 518, 531-32 (4th Cir. 2013) (provisions preempted where they "improperly place in the hands of state officials the nation's immigration policy, and strip federal officials of the authority and discretion necessary in managing foreign affairs"); *Georgia Latino All.*, 691 F.3d at 1265 (similar, emphasizing discretion of federal prosecutors over immigration crimes); *cf. City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 179-80 (5th Cir. 2018) (holding state law did not interfere with federal discretion because it "require[d] a predicate federal *request* for assistance").

> *Third*, S.B. 4 also injects Texas directly into sensitive foreign policy matters reserved exclusively for the federal government.  Determinations regarding the entry into the United States by foreign nationals, and their removal from it, "touch on foreign relations," and therefore "must be made with one voice."  *Arizona*, 567 U.S. at 409; *see also Jama v. ICE*, 543 U.S. 335, 348 (2005) (similar).  Indeed, the obvious danger that unilateral state immigration regulation could "embroil us in disastrous quarrels with other nations" has for 150 years been a cornerstone of the doctrine (explained above) that "[t]he passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."  *Chy*, 92 U.S. at 280; *see Hines*, 312 U.S. at 63-64 (similar).  That risk is only heightened in this

case, as the United States has negotiated and committed to humanitarian international commitments, and Texas now proposes to toss those agreements aside.

Here, that general interference with federal foreign affairs authority is heightened because S.B. 4 has already created a direct conflict with national policy towards Mexico.  Under its terms, state judges order noncitizens—regardless of their nationality—"to return to the foreign nation from which the person entered," on penalty of even more severe punishment.  S.B. 4 Art. 5B.002(d).  For all (or nearly all) defendants, that will be Mexico.  *See* S.B. 4 § 51.02 (criminalizing entry into Texas "directly from a foreign country" and not at a port).

As the Supreme Court recently observed in rejecting another Texas effort to dictate immigration policy, given Mexico's sovereignty even the federal government "cannot unilaterally return . . . migrants to Mexico."  *Biden v. Texas*, 597 U.S. 785, 806 (2022).  The same is obviously true of Texas.  As the Court explained, the federal government's efforts to negotiate such returns with Mexico had "'played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.'"  *Id.* (internal quotation marks omitted).  The Court rejected Texas's proffered statutory interpretation, which would have "tie[d] the hands of the Executive" by allowing a court to supervise such foreign policy negotiations to obtain Mexican agreement.  *Id*.  Here, the interference with foreign policy is worse.  Rather than supervising federal negotiations, S.B. 4 purports to cut the federal government out entirely, as it would be Texas—not the United States—either negotiating with Mexico or ignoring Mexico's wishes and violating its sovereignty.[6]

---

[6] Notably, in response to S.B. 4's passage, Mexico stated that it "categorically rejects any measure that allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory."  Government of Mexico, Press Release 476 (Nov. 15, 2023),

*Fourth*, and finally, S.B. 4's new entry and re-entry crimes present an obstacle to Congress's criminal entry statutes and overall removal scheme.  Indeed, that conclusion follows from the *en banc* Fifth Circuit's conclusions in *Farmers Branch*.  There, the Court struck down an ordinance requiring noncitizens to be "lawfully present" as a condition to rent property, and establishing state criminal procedures to enforce that requirement.  726 F.3d at 526-27.[7]

Like the *Farmers Branch* ordinance, S.B. 4's entry and re-entry crimes "disrupt[] the federal immigration framework" by "allowing state officers to hold aliens in custody" for immigration crimes "without federal direction and supervision."  *Farmers Branch*, 726 F.3d at 529 (cleaned up).  Under Congress's system, "the federal government retains sole authority under the statute to prosecute, convict, and sentence offenders" for unlawful entry and reentry.  *Id.* at 530.  But S.B. 4 purports to grant "unilateral state authority to prosecute as well as to detain" for parallel state entry crimes.  *Id*. at 534.  Because even "the fact of a common end" cannot "neutralize[] conflicting means," S.B. 4—no less than the *Farmers Branch* ordinance— "interferes with the careful balance struck by Congress with respect to" entry crimes.  *Id*. at 528, 531 (cleaned up); *see also Alabama*, 691 F.3d at 1287 (finding state analog to 8 U.S.C. § 1324 conflict preempted for similar reasons); *Ga. Latino All.*, 691 F.3d at 1266 ("Each time a state enacts its own parallel to the INA, the federal government loses control over enforcement of the INA, thereby further detracting from the integrated scheme of regulation created by Congress.") (cleaned up).

---

https://www.gob.mx/sre/prensa/mexican-government-opposes-the-anti-immigrant-legislation-passed-in-texas?idiom=en; *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 382-85 (2000) (citing protests lodged by foreign nations as evidence that state statute interfered with federal foreign policy).

[7] Judge Higginson wrote the lead opinion for five judges.  Judge Dennis's special concurrence for four more judges largely agreed with Judge Higginson's analysis but explained that the ordinance was "even more fundamentally flawed."  726 F.3d at 543-44.

Nor is that the only problem.  For example, the state re-entry crime is far broader than the corresponding federal statute.  A noncitizen cannot be convicted of the latter if she has obtained federal "consent" to again seek admission to the United States.  8 U.S.C. § 1326(a)(2)(A).  So, for example, a noncitizen previously removed from the United States who has access to an immigrant visa may seek and obtain federal consent to return to the United States and be admitted as a lawful permanent resident.  *See United States v. Sanchez-Milam*, 305 F.3d 310, 312 (5th Cir. 2002) (per curiam); 8 C.F.R. § 212.2(d).  That person is not subject to federal prosecution under § 1326(a)(2)(A).  But the new Texas law contains no such limitation.  *See* S.B. 4 §51.03 (criminalizing noncitizen "found in this state after" she "has been . . . removed").  Indeed, unlike the new state *entry* crime, nothing in S.B. 4 curtails the vastly wider scope of the state re-entry provision.  *Cf.* S.B. 4 §51.03(c)(2) (providing affirmative defense, inapplicable to re-entry crime, where "the defendant's conduct does not constitute a violation of 8 U.S.C. Section 1325(a)").  The result is that people who the federal government has expressly permitted to return to the United States, and who have been granted long-term legal status, are nevertheless criminalized by Texas.  This represents an enormous and "'untenable expansion of the federal [reentry] provision." *Farmers Branch*, 726 F.3d at 531 n.9 (quoting *Alabama*, 691 F.3d at 1288).

Finally, the entry provision also incorporates a key flaw emphasized by *Farmers Branch*: empowering "state courts to assess the legality of a non-citizen's presence."  *Id*. at 536.  Under S.B. 4, state courts are tasked with deciding who "the federal government has granted . . . lawful presence in the United States."  S.B. 4 § 51.02(c)(1).  That term has no general meaning in immigration law that applies to the question of whether a noncitizen should be permitted to enter or allowed to remain in the United States; rather, as noted above, those questions are answered through federal removal proceedings as well as Executive discretion.  Therefore, as in *Farmers*

*Branch*, there is "no definition that would be applicable" to these state criminal proceedings, thus "opening the door to conflicting state and federal rulings on the question." 726 F.3d at 533, 536.[8]  And S.B. 4 similarly requires state courts to make numerous other determinations about federal immigration law that may conflict with federal determinations.  *See, e.g.*, S.B. 4 § 51.02(c)(2) (whether conduct violates 8 U.S.C. § 1325(a)); S.B. 4 § 51.03(b)(1) (whether prior removal was based on 8 U.S.C. § 1182(a)(3)(B) or 1231(a)(4)(B)).

## II.    The Equities Strongly Favor an Injunction.

### A.  Plaintiffs Have Standing and S.B. 4 Will Irreparably Harm Them.

S.B. 4 directly conflicts with and frustrates the mission of the El Paso based Plaintiff Las Americas Immigrant Advocacy Center, which is dedicated to serving those must vulnerable to removal to seek relief through the federal immigration system.[9]  Babaie Dec. ¶¶ 3, 11, 12.  *See N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (injury where an organization's "ability to pursue its mission is 'perceptibly impaired' by the need to divert resources "to counteract the defendant's conduct."). Las Americas currently serves its clients, many of whom have entered the state between ports, in the community and in federal immigration detention.  *Id.* ¶¶ 26-29.  S.B. 4 will instead place these clients in state and local jails and prisons, and result in their removal under state law, outside the federal removal processes.  *Id.* ¶¶ 30, 40-41.

Las Americas will need to develop an entirely new program to identify, counsel, and advocate for noncitizens in state and local jails so that they can attempt obtain asylum and other

---

[8] Indeed, the en banc Fifth Circuit was *unanimous* in concluding that state court's unilateral assessment of lawful presence was preempted.  *See* 726 F.3d at 549 (Dennis, J., concurring); *id.* at 558-59 (Owen, J., concurring in part); *id.* at 584 (Jones, J., dissenting).

[9] The plaintiffs have an equitable cause of action to challenge S.B. 4 as preempted.  *See Crown Castle Fiber, L.L.C. v. City of Pasadena, Texas*, 76 F.4th 425, 433-35 (5th Cir. 2023).

protections from removal.  *Id.* ¶¶ 30-31.  Las Americas has no such program in place, and will need to "divert resources from its usual activities in order to lessen [S.B 4's] harm to its mission."  *Lewis v. Hughs,* 475 F. Supp. 3d 597, 612 (W.D. Tex. 2020) (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982)).  Las Americas will necessarily have to divert resources from community representation to the resource intensive process of representing people detained under S.B. 4, decreasing the total number of people served in obtaining immigration relief.  Babaie Decl. ¶ 38.  S.B. 4 will curtail Las Americas' specific program to assist victims of crime regularize status through immigration visas such as U and T Visas. *Id.* ¶¶ 44-49. Cooperating with law enforcement in reporting and investigating crimes is a necessary predicate to relief, but S.B. 4 now exposes noncitizens who report crimes to arrest and removal.

Plaintiff American Gateways is dedicated to providing free immigration assistance to noncitizens in Texas, with a particular focus on asylum representation.  Yang Decl. ¶¶ 12-13. American Gateways provides assistance in *federal* immigration detention facilities and in *federal* removal proceedings.  *Id.*  ¶¶ 8, 13.  S.B. 4 will place American Gateways' clients—the majority of whom have entered without inspection—into a separate state system, severely impacting American Gateways' ability to ensure their access to protections.  *Id.*  ¶¶ 18, 22.  This shift will impact American Gateways' operations and efficacy, as the organization must divert resources to provide additional representation to clients who must seek asylum but face removal by the State under S.B. 4.  *Id.*  ¶¶ 22-24.

The County of El Paso will bear the costs of implementing a law that it believes to "violate[] the Supremacy Clause of the constitution because it is inconsistent with" the INA, and inconsistent with the County's own values.  *City of Alpine v. Abbot*, 730 F. Supp. 2d 630, 632 (W.D. Tex. 2010) ("where a suit by a political subdivision against its state creator is based on a

18

constitutional provision that protects structural rights — such as the Supremacy Clause — the political subdivision may sue"); *see also Rogers v. Brockette*, 588 F.2d 1057 (5th Cir.1979).  The County will have to pay to hold defendants charged under the law in its jails (likely requiring new jail space), provide counsel for indigent defendants, and train and hire Sheriff staff, police officers, and court personnel; moreover, the demands will frustrate its goal of minimizing incarceration of low public safety risk persons.  Carillo Decl. ¶¶ 11-13.  A drastic increase in expenditures will likely require elimination of programs or an increase in taxation. *Id.* ¶  15. S.B. 4 will erode the public trust the County has set as a strategic goal, and cause families to fear that interaction with County services, including domestic violence and child protective services, will result in removal.  Gutierrez Decl. ¶ 18.  S.B. 4 will frustrate the Counties' programming to integrate its diverse community local agencies and officers, including the Office of New Americans (ONA) and the migrant support services center.  *Id.* ¶¶ 8-13.

### B.  The Balance of Equities and Public Interest Support an Injunction

The State has no legitimate interest in enforcing an unconstitutional law or regulating in an exclusively federal arena.  *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (states faced no injury from injunction of preempted regulation); *Alabama*, 691 F.3d at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation").

The public interest also clearly favors an injunction. States' "[f]rustration of federal statutes and prerogatives [is] not in the public interest."  *Alabama*, 691 F.3d at 1301.  That is particularly so where state action invades federal domains, and interferes with federal foreign relations.  *See, e.g.*, *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013).  Furthermore, under S.B. 4, individuals crossing the border into the United States—including those fleeing persecution and torture—will be arrested, prosecuted, and

removed without any opportunity to raise federal defenses to removal.  *See Nken v. Holder*, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").  That harm is acute because S.B. 4 directs that noncitizens be removed to Mexico, where it is well documented that migrants face truly extraordinary dangers of abduction, rape, torture, and death.  *See* Junaid Decl., Exh. 1-20 (documenting harms to asylum seekers in Mexico); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (pointing to "stomach-churning evidence of death, torture, and rape" caused by policy of expelling migrants, primarily to Mexico).  S.B. 4 contains no prohibition on enforcement against parents, who would likely have to be separated from their children for prosecutions to take place.  *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1148-49 (S.D. Cal. 2018) (enjoining government policy of separating noncitizen families).

S.B. 4 applies to the interior, and is not limited to very recent entrants, and thus threatens to rip individuals away from their families and communities years after they entered the country.  Even those who have status will fear being targeted and racially profiled.  *See Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979-980 (D. Ariz. 2011); Junaid Decl., Exh. 21 (documenting racial profiling in state policing of the border).  Noncitizens and their families will fear that interaction with officials, to report crimes, or obtain assistance, will result in their removal.  S.B. 4 will erode the public trust that governments like the County have worked to create with migrant communities that is integral to public safety.  *See Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232, 270 (S.D.N.Y. 2020) (enjoining public charge rule because of chilling effect the rule had on immigrants seeking services).

## CONCLUSION

The Court should grant a preliminary injunction.

Dated: January 12, 2024

David A. Donatti (TX Bar No. 24097612)
Adriana C. Piñon (TX Bar No. 24089768)
AMERICAN CIVIL LIBERTIES UNION OF
TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

*For Plaintiffs Las Americas Immigrant*
*Advocacy Center, American Gateways, and*
*County of El Paso*

Tamara F. Goodlette (TX Bar No. 24117561)
Erin D. Thorn (TX Bar No. 24093261)
Daniel Hatoum (TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
1017 W. Hackberry Ave.
Alamo, TX 78516
Telephone: (512) 474-5073, ext. 207
Facsimile: (956) 787-6348
tami@texascivilrightsproject.org
erin@texascivilrightsproject.org
daniel@texascivilrightsproject.org

*For Plaintiffs Las Americas Immigrant*
*Advocacy Center and American Gateways*

Jo Anne Bernal, (TX Bar No. 02208720)
El Paso County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
joanneb@epcounty.com

Bernardo Rafael Cruz, (TX Bar No. 24109774)
Assistant County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
b.cruz@epcounty.com

*For Plaintiff County of El Paso*

*/s/ Cody Wofsy* .
Cody Wofsy
Spencer Amdur
Hannah Schoen
Morgan Russell
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
cwofsy@aclu.org
samdur@aclu.org
hschoen@aclu.org
mrussell@aclu.org

Anand Balakrishnan
Omar Jadwat
Lee Gelernt
Wafa Junaid
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
abalakrishnan@aclu.org
ojadwat@aclu.org
lgelernt@aclu.org
wjunaid@aclu.org

*For Plaintiffs Las Americas Immigrant*
*Advocacy Center, American Gateways,*
*and County of El Paso*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2024, I electronically filed the foregoing with the

Clerk of Court by using the District Court CM/ECF system. A true and correct copy of this

document has been served via the Court's CM/ECF system on all counsel of record.

*/s/ Cody Wofsy*
Cody Wofsy