## DECLARATION OF JENNIFER BABAIE

## LAS AMERICAS IMMIGRANT ADVOCACY CENTER

I, Jennifer Babaie, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully.

2.     I am an attorney licensed to practice law in California. I have been the Advocacy and Legal Services Director at Las Americas Immigrant Advocacy Center (Las Americas) since January 2023. Prior to joining Las Americas, I worked in various related positions. Starting in 2018, I worked as a supervising attorney and program director at the International Refugee Assistance Project, where I represented refugees, asylum seekers, and others seeking humanitarian assistance and family reunification, and I ran a cross-border program focused on providing direct legal services to persons in Ciudad Juarez seeking access to safety and family reunification in the United States.

3.     Las Americas is a nonprofit legal services organization based in El Paso, Texas. Our mission is to provide high-quality legal services to low-income immigrants, and to advocate for human rights. We seek to ensure that individuals have a fair opportunity to establish their eligibility for relief from removal from the United States, with a primary focus on ensure individuals are not wrongfully removed to persecution or torture.

4.     We provide immigration counseling and representation to immigrants seeking asylum and those detained by the U.S. government in and around West Texas, New Mexico, and Ciudad Juarez, Mexico, including by assisting and representing individuals living in the community to apply affirmatively for asylum, individuals facing expedited removal who are

undergoing Credible Fear Interviews (CFIs). We also represent people subject to reinstatement of a prior removal order in Reasonable Fear Interviews (RFIs).

5.      I am writing to address the substantive harm that Las Americas will experience because of a new law passed by the State of Texas, Senate Bill 4 (88th Leg. (4th special session)) ("S.B. 4")

**S.B. 4**

6.      S.B. 4 makes it a crime under Texas law for a noncitizen to enter or attempt to enter Texas from a foreign nation at any location other than a lawful port of entry. S.B. 4 also makes it a crime under Texas law for a noncitizen to enter, attempt to enter, or be found in the state after the person has been denied admission to or excluded, deported, or removed from the United States, or has departed from the United States while an order of exclusion, deportation, or removal is outstanding.  I refer to these new crimes as "state illegal entry" and "state illegal re-entry" respectively.

7.      A first offense under S.B. 4's illegal entry provision is a Class B  misdemeanor; a repeat offense, a state jail felony.  An offense under S.B. 4's illegal reentry provision is a Class A misdemeanor, unless the individual was previously convicted of or removed subsequent to certain criminal charges, in which case the offense is, at a minimum, a felony in the third degree. If the individual was previously convicted of a felony, a state illegal reentry offense is a felony in the second degree.

8.      S.B. 4 empowers officers of the State of Texas to order those charged with either crime to return to the foreign nation from which they entered.  First, after an initial appearance, a magistrate or judge may order a person returned to the foreign nation from which they entered, if certain conditions are met, in lieu of continuing the prosecution for the crimes of illegal entry or

reentry. Second, as part of the sentence imposed for either crime, a judge must order the person returned to the foreign nation from which they entered.

9.      S.B. 4 makes it a felony in the second degree to refuse to comply with an order to return to the foreign nation from which they entered or attempted to enter.

**Las Americas' Mission & Programs**

10.      Las Americas has served people in our community from over 80 countries since 1987. We are dedicated to serving the legal needs of low-income noncitizens and asylum seekers in West Texas, New Mexico, and Ciudad Juarez, Mexico. Our goal is to provide high-quality legal services for low-income immigrant communities by helping them establish asylum eligibility, avoid wrongful detention, maintain family unity, prevent removal to persecution or torture, and assist with their integration into the community through referrals with shelters and local partners.

11.      Our goal in all of our work with asylum seekers is to ensure that everyone has a fair opportunity to establish their eligibility for protection and that they are not wrongfully removed to persecution or torture. It is absolutely essential to our vision that asylum seekers have a meaningful chance to fully develop and present their claims.

12.      To advance this mission, our goal is to serve as many asylum seekers as possible with our limited resources while focusing our efforts on ensuring that those noncitizens at the greatest danger from removal are able to access protection.

13.      In line with this goal, we focus on assistance to those facing summary removal in expedited removal proceedings.  We similarly have shifted our priorities in the past to meet this goal in response to changes in federal policies.  For example, in response to the "Title 42" expulsion system established by the Centers for Disease Control and Prevention we developed a

system to assist vulnerable asylum seekers in Mexico to apply for exemptions to enter the United States.

14.     We are one of the only organizations providing pro bono representation to immigrants, asylum seekers, and other persons migrating or in removal proceedings in the West Texas, New Mexico, and Ciudad Juarez area. For this reason, we have consistently focused our efforts on the most vulnerable to removal, such as asylum seekers and the victims of crime, and those whom the private bar may be less able or willing to represent.  Responding to S.B. 4 through changes to our programs is a necessary part of and consistent with our programmatic mission.

15.     Las Americas' total budget in the fiscal year ending 2023 was about $1.4 million. The grants we receive make up approximately 78% of our budget, and some of them have requirements regarding the number of people we serve. Low bono client fees for individuals served by our Community Migrant Assistance Program (CMAP) and other individual contributions make up the remainder of our income sources, but all our services for detained noncitizens, and our services in Mexico are provided at no cost to the individual.

16.     Las Americas' United States staff consists of 15 people, including attorneys, accredited representatives, and paralegals. Two additional staff work in Mexico. We have several programmatic areas.

17.     Our Detained Program serves migrants in the El Paso Processing Center, Otero Service Center, and the Torrance and Cibola detention facilities, in New Mexico. The heart of our Detained Program is helping individuals in expedited removal proceedings through the credible fear process and then seeking their release from detention. We provide consultations in advance of the CFI and full representation in CFIs on a limited basis where our capacity permits.

18.     For individuals who are able to clear the CFI hurdle, our detained team helps with subsequent stages of the immigration process when capacity allows, including asylum applications, evidence gathering, appeals, bond and parole requests, mental health screenings, competency evaluations, and more. Where resources allow, we provide these services as part of full representation in immigration court and before the Board of Immigration Appeals. In other cases, we offer these services as *pro se* assistance. For *pro se* individuals, we also provide assistance with document preparation and translation.

19.     We also assist individuals who have recently entered the United States and are not detained.  We provide Know Your Rights presentations in shelters and other community venues to educate on immigration benefits to which they may be entitled, screen for eligibility for asylum and other forms of protection from removal, assist or directly represent non-citizens in affirmative applications for asylum, make referrals for housing and medical assistance, and assist in the transportation for those who seek to leave the El Paso area to join family elsewhere in the United States.

20.     We also provide services to established immigrant communities in the region . These communities have existed for decades, and include families who have resided in the United States for 20 years or more and are comprised of mixed status members, some of whom are U.S. citizens and some of whom are not. These services include family reunification petitions, residency and citizenship applications, DACA renewal applications, work permit applications, applications for asylum, withholding of removal, and protection under the convention against torture, applications for visas on behalf of survivors of crimes committed in the U.S., including more than 40 individuals impacted by the 2019 Walmart mass shooting incident in El Paso, Texas.

21.     In 2023, Las Americas served over 4,000 people. We secured exemptions from the "Title 42" expulsion system established by the Centers for Disease Control and Prevention and from the CBPOne appointment preference policy for approximately 160 individuals. Additionally, we provided legal information and assistance to more than 3700 individuals seeking CBPOne appointments . We also served over 400 individuals in Immigration and Customs Enforcement (ICE) custody. This work occurred alongside our casework on behalf of people seeking immigration benefits from USCIS. Across programs, we opened over 600 new cases last year. More than half of the clients that Las Americas serves are asylum seekers, and at present, we have about 140 open cases in our Detained Program. Additionally, we serve hundreds of people each month with Know Your Rights presentations in shelters, both in El Paso and in Mexico.

**S.B. 4's Effects on Las Americas**

22.     Las Americas work is designed entirely to assist individuals and communities navigate the immigration system, including by assisting people to obtain the relief the federal government has created that prevents removal.  The staffing of Las Americas, and the allocation of resources, has always been designed to provide the assistance and representation people need to seek protection through the federal immigration system.

23.     S.B. 4 creates a new state system to regulate immigration that operates independently of the federal system.  S.B. 4 provides for criminal penalties and for removal outside the federal system for illegal entry and reentry.

24.     S.B. 4 will cause harm to Las Americas' mission. S.B. 4 has already forced us to divert our limited resources, and will continue to do so.

25.     Because our mission is premised on ensuring access to asylum and protection from removal for the most vulnerable noncitizens in our region, S.B. 4 directly impacts and fundamentally frustrates our organization's purpose by creating major, new impediments to the ability of individuals to seek asylum in the United States for huge numbers of people.

26.     A substantial number of Las Americas' clients are noncitizens living in the community who have recently entered or reentered the United States without inspection. These community-based clients have been released after an initial arrest by CBP or ICE officers or have never encountered a federal immigration officer.

27.     Las Americas serves its non-detained clients through a community representation model.  Under this model, Las Americas works with partner organizations like shelters, churches, hospitals, and consulates to make contact with noncitizen clients, who then come to Las Americas offices in person for further consultation and representation. In 2023, we served approximately 480 people through these non-detained services.

28.     Las Americas also serves noncitizen asylum seekers who are in ICE detention. These noncitizens are primarily detained by ICE after having presented at a port of entry.  Las Americas provides know-your-rights presentations in the ICE facilities, and then screens individuals for further legal representational needs. Las Americas has developed systems to gain access to detainees, arrange for group presentations, reserve sufficient time and space in the facility for confidential attorney-client meetings, track the progress of detained noncitizens, and remain in contact with clients through video conference, phone calls, and written correspondence throughout their case.

29.     Enforcement of S.B. 4 will subject the individuals whom Las Americas serves in the community to arrest by state officers and detention in jails and prisons.  It will also divert

those who may otherwise be detained by federal immigration officers in ICE and CBP facilities and placed in removal proceedings into state criminal proceedings.

30.     Las Americas does not have any programs or provide any services to individuals in state or county jails or prisons. S.B. 4 requires Las Americas to develop an entirely new operation to provide immigration representation to those arrested under S.B. 4.

31.     Las Americas will have to identify when a noncitizen is charged with a violation of S.B. 4, meet with them while they are detained to advise them of the consequences of their criminal proceedings on their immigration proceedings, screen them for asylum eligibility or other immigration pathways, and then provide them with legal assistance while they are detained in county jails.

32.     Individuals are barred from applying for asylum unless they apply within one year of arriving in the United States or can show changed or exceptional circumstances. 8 U.S.C. 1158(a)(2)(B). Noncitizens arrested under S.B. 4 risk missing the one-year filing deadline unless Las Americas is able to establish sufficient legal outreach and representational programs in jails and prisons. Thus, reaching out when individuals are arrested is critical to ensuring that they are advised as to their ability to apply for asylum, and submit timely applications.

33.     For those who miss the one-year deadline because of their state incarceration, Las Americas will have to divert resources to develop materials on changed and exceptional circumstances to ensure that those noncitizens who become clients after release from local detention can apply for asylum.

34.     Development of this program will require a major investment of resources.  Las Americas will need to develop new relationships with actors in the criminal justice system –

including the defense bar, the court system, and wardens – in order to identify, communicate with, and counsel noncitizens.

35.     Las Americas will also need to train staff members to address the specific needs of those detained pursuant to S.B. 4, and develop new materials to advise defendants of their rights and the manner in which the state law intersects with their rights under federal law.

36.     S.B. 4 will result in a decrease in the number of people Las Americas can serve. Through community-based representation, Las Americas is able to reach and assist the largest number of noncitizens.  Las Americas staff can reach community members through group presentations and clinics, and assist individuals through in-person office consultations.

37.     Moreover, a good number of the individuals Las Americas counsels through community-based work do not plan on remaining in Texas, and Las Americas' work is thus limited to initial counseling and referrals to nonprofits and pro bono immigration lawyers at the noncitizens' final destination to complete representational work, or limited services to prepare work-permit applications for those who are eligible.  In contrast, Las Americas will need to provide more comprehensive representation to those detained under S.B. 4, as they will remain within the state criminal system.

38.     Because Las Americas will need to shift resources from community-based representation to S.B. 4 based representation, S.B. 4 will necessarily decrease the number of people Las Americas can serve. The time needed to engage in outreach and representation of those detained pursuant to S.B. 4 will require Las Americas to decrease work done in other areas. As one example, the number of clinics and shelter based legal services Las Americas provides will need to be reduced to allocate the necessary time and resources for asylum seekers jailed under S.B. 4.

39.     Compounding this decrease in capacity, S.B. 4 will require Las Americas to create a new services model and infrastructure to identify, reach, advise, and represent charged and incarcerated non-citizens to seek and obtain federal immigration relief.  This work requires: the development of relationships with state criminal justice actors to track and reach noncitizen defendants, which Las Americas currently does not have; the development of materials and presentations to advise noncitizen defendants of their rights under federal immigration law, its intersection with the new state illegal entry and reentry crimes; and the time needed to provide individual representation to those detained in state and local facilities under S.B. 4 to seek immigration relief, including asylum.

40.     Even where Las Americas is able to reach and assist asylum seekers detained under S.B. 4, its work will be frustrated.  The mandatory removal provisions will expose these individuals to removal, preventing them from continuing to seek asylum or other forms of humanitarian relief.

41.     As a result of S.B. 4, many individuals with whom Las Americas attempts to assist in seeking asylum will face removal and termination of their applications for immigration relief, frustrating Las Americas' purpose.

42.     S.B. 4 will separately frustrate Las Americas' Crime Victims' Practice and its Human Trafficking Program.  Under this program, Las Americas assists noncitizen victims to report crimes to state and local law enforcement officers.

43.     Las Americas developed these programs to ensure that noncitizens who are the victim of crimes like domestic abuse and human trafficking obtain the assistance and protection need from law enforcement, and are able to apply for immigration status created by Congress such as U and T visas.  Pursuant to these programs, Las Americas assists noncitizens to report

domestic violence and trafficking to state and local police, and to apply for visas that can allow them to regularize their immigration status.

44.     Las Americas has approximately 130 open cases involving petitions for crime victims, and we have a backlog of more than 20 requests from survivors in the community seeking eligibility determinations and assistance with filing petitions.

45.     For example, the U nonimmigrant status (U visa) is set aside for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. T Visas are set aside for victims of trafficking crimes who have complied with requests for assistance from law enforcement in the detection, investigation, or prosecution of human trafficking. Through our community outreach program, we meet, screen, and prioritize representation of individuals who are eligible benefits including U and T Visas to report and assist law enforcement in investigating the crimes they experienced and to apply for the relevant visa.

46.     Las Americas has already received questions from community members about S.B. 4 – whether and when interaction with state law enforcement will result in questioning about form of entry into the United States and, thus, arrest and removal from the United States. The law has created a fear that reporting crimes will result in removal, despite the availability of potential federal immigration relief.

47.     In our experience, reporting a crime will often require disclosing information about immigration status, length of time in the United States, and the mode of entry into the United States.

48.     S.B. 4's chilling effect on the immigrant clients Las Americas serves and on the specific Crime Victims' Practice and Human Trafficking Program will impair the mission of the

organization. By instilling fear in immigrants through an expansive and extremely harsh law, S.B. 4 prevents Las Americas from carrying out its purpose, to aid clients in seeking immigration pathways and community integration.

49.     If Las Americas is able to continue this program, it will require an investment in time and resources to develop assurances that when clients report crimes, they will not be subject to questioning about their mode of entry into the United State or status, and increased counseling time by our staff to ensure that reporting crimes does not make crime victims subject to arrest and removal under state law.  Even if we are successful in doing so, the time dedicated to developing these assurances will necessarily decrease the amount of people we can represent through this program.

50.     S.B. 4's enactment alone has created confusion and fear in the communities Las Americas serves.  Noncitizens living in Las Americas' operating regions have expressed fear and confusion about the operation of the law and its enforcement.  Las Americas has already received questions about the potential for noncitizen parents of U.S. citizen children being arrested and removed because of interaction with state officers; the interaction between S.B. 4 and federal removal proceedings; and the impact of S.B. 4 on the ability to seek asylum.

51.     Las Americas has already begun community outreach and presentations to advise and counsel on the impact of the law, and will need to continue to do so.  We have been involved in three such presentations since the bill became law.  This outreach is very different from our existing community work because of the sweep of S.B. 4.  S.B. 4 is not limited to recent entrants to the United States.  Thus, we are responding to fear from mixed status families in the community who have lived here for years and are concerned about the separation of their families through a state removal system.  To reach these families, we must schedule

presentations outside of work and school hours, on evenings and weekends.  Continuing this work will require us to modify our staffing and contracts, which currently allows for only limited paid staff time working outside of our normal business day.  Moreover, the time spent doing specific community outreach about S.B. 4 will necessarily decrease the time staff can spend doing our existing outreach developed to advise and screen people for other forms of immigration relief.

52.     Even if the removal provisions of S.B. 4 did not exist, the law would still negatively Las Americas' resources, as arrests and detention under the law will continue to negatively impact people's ability to apply for asylum and other forms of lawful immigration status and make representing our clients more difficult and time-consuming. For example, even without S.B. 4's removal provisions, our legal staff would still need to decide asylum sooner than they would have previously for some of our clients to protect their right to seek asylum because of the risks of arrest and detention under S.B. 4. We will still have to develop an S.B. 4 specific program to screen, assist and represent those detained under S.B. 4 to ensure they can meet the one year deadline to affirmatively for asylum.  S.B. 4 would continue to instill fear in the immigrant communities we serve even without the removal provisions, and we would still need to engage in significant community education to counsel families.

**Conclusion**

53.     In sum, enforcement S.B. 4 will frustrate almost every aspect of Las Americas' work.

54.     Las Americas will have to divert its resources to create an entirely new representation program and *Know Your Rights* trainings to ensure that those detained pursuant to S.B. 4 can seek critical humanitarian protections such as asylum. Las Americas must educate the

community about enforcement under S.B. 4.  Las Americas will have to make significant changes and cutbacks to programs designed to protect noncitizen crime victims living in the community.

55.     These changes in Las Americas' services will necessarily require diverting funding and staff time from community-based representation programs, and decrease the number of people Las Americas can serve.

56.     Even with these changes, Las Americas' purpose will be frustrated, as S.B. 4 will subject noncitizens to rapid removal outside of federal removal proceedings and before Las Americas can assist them in seeking the relief federal law provides.

Jennifer Babaie
Director of Advocacy and Legal Services
Las Americas Immigrant Advocacy Center

Executed this eleventh day of January 2024 in El Paso, Texas