## DECLARATION OF EDNA YANG, AMERICAN GATEWAYS

I, Edna Yang, declare pursuant to 28 U.S.C. § 1746, as follows:

1. My name is Edna Yang, and I am currently the Co-Executive Director of American Gateways. I have worked at American Gateways since 2002 and have been in my current position since 2020. I have personal knowledge of the matters set forth herein, and I can and will testify thereto if called upon.

2. I am writing to address the substantive harm American Gateways will experience because of a new law enacted by the State of Texas, "Procedures for Certain Offenses Involving Illegal Entry Into This State," S.B. 4.

3. The mission of American Gateways is to champion the dignity and human rights of immigrants, refugees, and survivors of persecution, torture, conflict, or human trafficking. We do so by providing exceptional legal services at low or no cost, by conducting community educational programming, and by engaging in policy-based advocacy on behalf of immigrant communities.

4. American Gateways serves immigrant communities throughout Central Texas and has offices in Austin, San Antonio, and Waco, Texas.

5. American Gateways was founded in Austin, Texas, as the Political Asylum Project of Austin (PAPA), in 1987. The organization's original mission was to provide representation to Central American Immigrants fleeing persecution and seeking asylum in the United States. Over the past thirty-three years, American Gateways has grown to provide a broad range of immigration legal services to low-income individuals and families throughout the region. We have become an indispensable legal service provider for low-income asylum seekers and other immigrants in Central Texas.

6. As Co-Executive Director, I oversee all of the work that American Gateways does, including our representation of people seeking asylum and our work at immigration detention centers in Texas.

**The Mission and Work of American Gateways**

7. American Gateways provides free, culturally sensitive, trauma-informed legal representation to individuals and families seeking asylum and other kinds of immigration relief in the United States.

8. American Gateways provides direct representation to people appearing in the San Antonio Immigration Court. We also provide legal orientation, pro se workshops, and pro bono legal representation at three immigrant detention facilities in Central Texas:

<ol start="8" style="list-style:none">
<li>the T. Don Hutto Residential Center in Taylor, Texas ("Hutto"); the South Texas Residential Center in Pearsall, Texas ("Pearsall"); and the Karnes County Residential Center in Karnes City, Texas ("Karnes").</li>

<li>9. A central feature of American Gateways' mission is to engage and educate immigrant communities and local stakeholders about immigration law, processes, relief, and an individual's rights in the immigration process. We regularly hold trainings on these topics in the communities we serve.</li>

<li>10. American Gateways works in co-counsel relationships with pro bono attorneys on many of its cases.</li>

<li>11. Since 1987, American Gateways has provided direct immigration legal services to thousands of individuals. In 2022, we provided free direct legal services to 1,367 clients and their families.</li>

<li>12. American Gateways represents clients who are applying for a wide array of federal immigration benefits. Many of our clients seek asylum and related protection. Currently, we are representing more than 150 people in their asylum cases.</li>

<li>13. About 30% of our asylum cases are affirmative cases before U.S. Citizenship and Immigration Services (USCIS). The remainder are defensive cases in immigration court. Almost all of the people we represent in immigration court were, or are, detained at Hutto, Pearsall, or Karnes.</li>

<li>14. American Gateways also represents noncitizens applying to USCIS for forms of federal immigration status available to survivors of rape, sexual assault, domestic violence, human trafficking, and other crimes. These forms of immigration status, known as U and T visas, require that applicants obtain certifications from law enforcement agencies attesting that the applicant cooperated with law enforcement. We currently represent more than 300 people pursuing U or T visa applications.</li>

<li>15. In addition to the cases that we take on for full representation, American Gateways is the Legal Orientation Program (LOP) provider for the detention centers that we serve. LOP is a program funded by the Department of Justice's Executive Office for Immigration Review (EOIR) that enables us and other organizations around the country to provide pro se assistance to immigrants in selected detention centers and courts. Through our LOP programming, we provide four layers of service: (1) general orientations, (2) individual orientations, (3) pro se workshops, and (4) referrals for pro bono representation.</li>

<li>16. In addition to these legal services, a central feature of our mission is to engage and educate immigrant communities, as well as local stakeholders, about immigration law</li>
</ol>

and processes, an individual's rights within these processes, and forms of immigration relief or status for which an individual might be eligible.

**S.B. 4 Seriously and Irreparably Harms American Gateways**

17. S.B. 4 will frustrate the mission of American Gateways, force us to divert organizational resources, and cause irreparable harm to the organization.

18. First, S.B. 4 will directly compromise the ability of American Gateways to serve and represent people seeking asylum. Most of our asylum clients enter the United States at the southern border without inspection between ports of entry. As a result, they will be subject to arrest and prosecution under S.B. 4 and to detention in state facilities. Moreover, they will be subject to S.B. 4's removal provisions.

19. Because they will be kept in state custody until removal, and because removal proceedings in immigration court can take years, people arrested, detained, and removed pursuant to S.B. 4 generally will not begin or will be unable to complete federal removal proceedings. As a result, they will not be able to seek asylum defensively in federal removal proceedings.

20. Similarly, because they will be in state custody and subject to rapid state removal, S.B. 4 will in practice prevent people who could otherwise apply for asylum affirmatively with USCIS from doing so. Affirmative asylum applications must be filed within a year of entry, 8 U.S.C. 1158(a)(2)(B), can take over a year to adjudicate, and require at least one interview with an asylum officer.

21. American Gateways will therefore be severely obstructed in assisting people subjected to S.B. 4 to asylum through either the defensive or affirmative federal asylum processes, despite these individuals having a legal right to assert such claims.

22. Despite these impediments, American Gateways will continue to help people subject to S.B. 4 attempt to seek asylum, such as by filing an affirmative application. In order to do so, American Gateways will need to divert substantial resources to assist people in state facilities. American Gateways does not currently assist individuals who, for the first time, will be jailed in state criminal facilities. Developing a program to provide such representation will require a major investment of resources that will necessarily decrease our ability to maintain our existing programs of serving any noncitizens in Texas who are either out of custody and require affirmative applications for asylum or other humanitarian benefits, or who are placed in federal removal proceedings.

23. Even in cases where we are able to begin asylum representation (such as filing an affirmative asylum application) on behalf of people who enter the country without inspection, S.B. 4 will require additional work and the diversion of resources from

other priorities. In many instances, we may need to devote staff time and resources to preparing and filing asylum applications sooner than we would otherwise, or make strategic decisions to affirmatively file for asylum in cases that we would not have in the past, in an attempt to preserve our clients' asylum eligibility before they are arrested, detained, or removed by the State under S.B. 4. This will undoubtedly require a great deal of additional resources.

24. S.B. 4 will also create other barriers for those seeking asylum that will frustrate our mission and make our work more difficult. Even if some asylum clients are able to re-enter the United States following their detention, prosecution, and removal under S.B. 4, representing them upon their return would require significant additional time and resources. For example, some such clients will have missed the one-year filing deadline for their asylum applications because of their detention and removal by the State. Representing them in seeking asylum in their federal removal proceedings will require that we develop arguments and evidence in support of exceptions to the filing deadline that we would not have to contest were it not for S.B. 4. Other clients will have been issued federal removal orders *in absentia* by the immigration court because their detention and removal under S.B. 4 caused them to miss immigration court hearings. Some of those clients will then have their federal removal orders reinstated when they re-enter the United States, which will make them ineligible for asylum and instead only eligible for other forms of protection—withholding of removal and protection under the Convention Against Torture—that are much more difficult to obtain. It will require significantly more staff time and resources to try to meet the higher evidentiary standards required for those forms of protection. Even if they do not have their federal removal orders reinstated, clients who receive *in absentia* federal removal orders because they were detained and removed by the State under S.B. 4 would face other obstacles. In those cases, our attorneys would have to prepare and file motions seeking to have the prior federal removal order reopened so that our clients can apply for asylum. All of these consequences of S.B. 4 will make it much more difficult for us to successfully represent our asylum clients.

25. S.B. 4 will also directly frustrate American Gateways' work representing survivors of human trafficking and others crimes to apply for immigration status in the form of U and T visas. Seeking immigration relief for these vulnerable individuals often requires that the applicants report the crimes or trafficking to law enforcement officials and cooperate with their investigations. Because S.B. 4 increases the risk and perception that reporting crimes or trafficking to law enforcement could result in arrest and removal for the new state illegal entry or reentry offenses, S.B. 4 will chill crime and trafficking survivors' participation in these programs and therefore reduce our ability to represent to represent people to seek and obtain the lawful status for which they are eligible.  American Gateways staff have already received questions from community members who are afraid of any kind of encounter with law enforcement, including voluntary encounters to seek help, as a result of the news of S.B. 4.

26. S.B. 4 will also require additional outreach and advocacy by American Gateways staff to the immigrant community and law enforcement about the importance of these forms of immigration relief and how they intersect with S.B. 4.

27. S.B. 4 will also force American Gateways to divert resources in other ways, particularly as it relates to our community education and LOP services. The fundamental core of those services is to educate members of the immigrant community of their rights and to help them prepare for self-representation in the event that they are not able to obtain legal counsel. To adequately provide this education, we will have to spend time and money to understand how the S.B. 4 operates in practice and the impact it will have on the immigrant communities we serve. We will need to spend significant resources addressing confusion caused by S.B. 4 in those communities.

28. We will also need to significantly alter the materials we have developed for our LOP workshops in immigration detention facilities for individuals who will eventually be released from detention to continue pursuing their claims. Even determining how best to communicate the complexity of the S.B. 4 in orientations and workshops will require significant time and effort. We will need to make significant changes to the materials we use to train staff, community members, lawyers, and others.

29. In addition, S.B. 4 will impact current our current funding and grant sources and the deliverables under those sources. Some of our annual funding is based on taking on a certain number of immigration cases during the year. For the reasons explained above, S.B. 4 will reduce the number of asylum cases that we are able to take on, as well as the number of U and T visa cases. Additionally, as explained above, S.B. 4 will make the asylum cases that we can take on more complicated and time-consuming, leaving less time to take on and represent other clients. All of this jeopardizes our ability to meet our deliverables under our funding arrangements, and therefore jeopardizing our funding.

30. Even if the removal provisions of S.B. 4 did not exist, the law would still negatively impact American Gateways' resources, as arrests and detention under the law will continue to negatively impact people's ability to apply for asylum and other forms of lawful immigration status and make representing our clients more difficult and time-consuming. For example, even without S.B. 4's removal provisions, our legal staff would still need to make strategic determinations to file for asylum sooner than they would have previously for some of our clients to protect their right to seek asylum because of the risks of arrest and detention under S.B. 4, which would have the effect of causing further delay in both affirmative and defensive asylum application asylum adjudications for our asylum seeker clients overall. Furthermore, S.B. 4 would continue to instill fear in the immigrant communities we serve even without the

removal provisions, and we would still need to modify our community education and LOP services about the law in light of the significant and unprecedented consequences of its other provisions for the immigrant community and those going through the LOP process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of January 2024 in Austin, TX.

_____
Edna Yang