**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; and THE COUNTY OF EL PASO, TEXAS,<br><br>　　　　　　　*Plaintiffs*,<br><br>　v.<br><br>STEVEN C. MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety; and BILL D. HICKS, in his official capacity as District Attorney for the 34th District,<br><br>　　　　　　　*Defendants*. | No. 1:23-cv-1537 |

## DECLARATION OF WAFA JUNAID

I, Wafa Junaid, declare as follows:

I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently as follows:

1. I am over eighteen years of age and am competent to make this Declaration.

2. I am an attorney with the American Civil Liberties Union Immigrants' Rights Project. I am one of the attorneys representing Plaintiffs in the instant case.

3. Attached hereto as exhibits are true and correct copies of the following.

**Exhibit Document**

1. WOLA, *Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico*, Stephanie Brewer, Lesley Tejada, and Maureen Meyer (Jun. 2022), *available at*

https://www.wola.org/wp-content/uploads/2022/06/FINAL-Struggling-to-Survive-Asylum-Seekers-in-Tapachula.pdf (last visited Jan. 10, 2024).

2. Human Rights First, *Mexico: Still Not Safe for Refugees and Migrants,* Fact Sheet (March 2018), *available at* https://humanrightsfirst.org/wp-content/uploads/2022/10/Mexico_Not_Safe.pdf (last visited Jan. 10, 2024).

3. WOLA, Situation of Impunity and Violence in Mexico's Northern Border Region, Daniella Burgi-Palomino, Maureen Meyer, and Joanna Williams (Mar. 2017), *available at* https://www.wola.org/wp-content/uploads/2017/04/Situation-of-Impunity-and-Violence-in-Mexicos-northern-border-LAWG-WOLA-KBI.pdf (last visited Jan. 10, 2024).

4. WOLA, Access to Justice for Migrants in Mexico: A Right That Exists Only on the Books, Ximena Suárez, Andrés Díaz, José Knippen, and Maureen Meyer (Jul. 2017), *available at* https://www.wola.org/wp-content/uploads/2017/07/Access-to-Justice-for-Migrants_July-2017.pdf (last visited Jan. 10, 2024).

5. Human Rights Watch, *Mexico Fact Sheet: Events of 2022, available at* https://www.hrw.org/world-report/2023/country-chapters/mexico (last visited Jan. 10, 2024).

6. Women's Refugee Commission, *Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021,* Gretchen Kuhner (Feb. 2, 2022), *available at* https://www.womensrefugeecommission.org/research-resources/stuck-in-uncertainty-and-exposed-to-violence-the-impact-of-us-and-mexican-migration-policies-on-women-seeking-protection-in-2021/ (last visited Jan. 10, 2024).

7. Human Rights First, Asylum Ban Strands Asylum Seekers and Migrants in Mexico and Returns Them to Danger, Christina Asencio (Nov. 28, 2023), *available at* https://humanrightsfirst.org/library/asylum-ban-strands-asylum-seekers-and-migrants-in-mexico-and-returns-them-to-danger/ (last visited Jan. 10, 2024).

8. Human Rights First, *Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021,* Linda Uruena Marino and Christina Asencio (Dec. 2022), *available at* https://humanrightsfirst.org/wp-content/uploads/2022/12/Attacks-on-Asylum-Seekers-Blocked-Expelled-or-Returned-to-Mexico-During-Biden-Administration-1.pdf (last visited Jan. 10, 2024).

9. Human Rights First, *Tracker of Reported Attacks Against Asylum Seekers and Migrants Stranded in Mexico Due to the Asylum Ban Since May 12, 2023,* Linda Uruena Marino and Christina Asencio (Nov. 2023), *available at* https://humanrightsfirst.org/library/asylum-ban-harms-tracker/ (last visited Jan. 10, 2024).

10. WOLA, *An Uncertain Path Justice for Crimes and Human Rights Violations against Migrants and Refugees in Mexico,* José Knippen, and Clay Boggs (Nov. 2015) *available at* https://www.wola.org/analysis/joint-report-justice-for-crimes-and-human-rights-violations-against-migrants-and-refugees-in-mexico/ (last visited Jan. 10, 2024).

11. Women's Refugee Commission, *Migrant and Refugee Caravans: Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid*, Tatiana Broft (May 2019), *available at* https://www.womensrefugeecommission.org/wp-content/uploads/2020/04/Migrant-and-Refugee-Caravans-Failed-Responses-to-Women-Children-in-Need-of-International-Protection-Humanitarian-Aid.pdf (last visited Jan. 10, 2024).

12. Human Rights Watch, *US: LGBT Asylum Seekers in Danger at the Border* (May 31, 2022), *available at* https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border (last visited Jan. 10, 2024).

13. Human Rights First, *Human Rights Stain, Public Health Farce: Evasion of Asylum Law and Title 42 Abuse Must End – and Never Be Revived,* Julia Neusner, Kennji Kizuka, and Eleanor Acer (Dec. 15, 2022), *available at* https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ (last visited Jan. 10, 2024).

14. The University of Texas at Austin Strauss Center, *Metering Update* (August 2022), *available at* https://www.strausscenter.org/publications/metering-update-august-2022/ (last visited Jan. 10, 2024).

15. National Immigration Forum, *Mexico's Asylum System: Good in Theory, Insufficient in Practice*, Arturo Castellanos-Canales (Mar. 15, 2023), *available at* https://immigrationforum.org/article/mexicos-asylum-system-good-in-theory-insufficient-in-practice/ (last visited Jan. 10, 2024).

16. U.S. Dep't of State, *Travel Advisories: Mexico Travel Advisory* (August 2023), *available at* https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (last visited Jan. 10, 2024).

17. Human Rights Watch, *"This Hell Was My Only Option": Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap,* Martina Rapido Ragozzino and Juan Pappier (Nov. 9, 2023), *available at* https://www.hrw.org/report/2023/11/09/hell-was-my-only-option/abuses-against-migrants-and-asylum-seekers-pushed-cross (last visited Jan. 10, 2024).

18. Doctors Without Borders/Médecins Sans Frontières, *The Darién Gap: "A nightmare with 1,001 demons"* (Aug. 5, 2021), *available at* https://www.doctorswithoutborders.org/latest/darien-gap-nightmare-1001-demons (last visited Jan. 10, 2024).

19. Doctors Without Borders/Médecins Sans Frontières, *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis* (May 2017), *available at* https://www.msf.org/sites/default/files/msf_forced-to-flee-central-americas-northern-triangle_e.pdf (last visited Jan. 10, 2024).

20. Center for Gender and Refugee Studies, *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico,* S. Priya Morley et al. (Feb. 2021), *available at* https://cgrs.uclawsf.edu/sites/default/files/A-Journey-of-Hope-Haitian-Womens-Migration-to%20Tapachula%20(1).pdf (last visited Jan. 10, 2024).

21. ACLU of Texas, Letter to DOJ re: Operation Lone Star, Racial Profiling in Texas Department of Public Safety (DPS) Traffic Stops and High Death Toll from DPS Vehicle Pursuits (Dec. 2021), *available at* https://www.aclutx.org/sites/default/files/field_documents/ols_trespass_arrest_title_vi_complaint.pdf (last visited Jan. 10, 2024).

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 10th of January, 2024 in New York City, New York.

_____

Wafa Junaid

# EXHIBIT 1

# Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico

By: Stephanie Brewer, Lesly Tejada, and Maureen Meyer

## JUNE 2022



RESEARCH
**REPORT**



Advocacy for Human Rights in the Americas

# TABLE OF CONTENTS

Key Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

Introduction and Acknowledgements . . . . . . . . . . . . . . . **3**

Background on Mexico's Asylum System . . . . . . . . . . . **5**

Legal and institutional framework . . . . . . . . . . . . . . . . . . . . . **5**

Trends in asylum claims and approvals . . . . . . . . . . . . . . . . . . . **6**

Migration enforcement role of the armed forces, including the National Guard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

The role of Tapachula in the asylum process . . . . . . . . . . . . . . . . . **8**

Findings from WOLA's 2022 Visit to Tapachula . . . . . . **10**

Lack of immediate access to asylum at Mexico's southern border puts families and individuals at risk . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

Diverse factors have caused drastic increases in asylum claims, overwhelming COMAR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

Asylum seekers' and institutions' responses, 2021-2022 . . . . . . . . . **15**

The importance of resettlement and integration support to stabilize forced migration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**Asylum intake patterns in 2022** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**The "prison city": migrants and asylum seekers caught between a rock and a hard place** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

## U.S. government engagement with Mexico on access to protection for refugees . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**U.S. government support to Mexico's asylum system and efforts to address root causes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**U.S. migration policies and Mexico: a failed attempt to deter largely forced migration** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

## Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

## Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

## Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

# KEY FINDINGS

- **Migrants and asylum seekers arriving in Tapachula—the city in southern Mexico where the vast majority of asylum claims are made—face what service providers repeatedly described to us as a "system to wear people down" (*política de desgaste*).** This refers not to a written policy, but rather to the combined effects of a series of government actions and omissions that leave people struggling to survive and vulnerable to abuse and arbitrary treatment as they navigate multiple backlogged legal processes. These conditions do not contribute to addressing forced migration to or through Mexico; rather, they increase the suffering and risks faced by people on the move.

- **Skyrocketing asylum claims in Mexico reflect growing forced displacement and protection needs in the region and worldwide. They also reflect a failure to respond adequately to the different needs of the migrant population, including people who migrate in search of economic opportunities or for other reasons that fall outside the recognized grounds for seeking asylum.** Asylum claims in Mexico have grown a hundredfold since 2013 to reach over 130,000 in 2021. Mexico's asylum system is overwhelmed and under-resourced, with prolonged delays in case processing times. In addition to large numbers of people in need of international protection, Mexican migration authorities' reticence to facilitate access to other legal pathways has the effect of channeling people into Mexico's asylum system as though it were the only option to seek a documented status in the country, creating an even more acute situation.

- **Those needing protection are almost never able to request it at ports of entry. This puts people at further risk and constitutes an undue barrier to seeking asylum.** People displaced from their homes by violence, repression, or other threats to their survival arrive at Mexico's border with protection needs, generally after additional violence and trauma on the journey north. Yet even if they are prepared to claim asylum, protection-seeking families and individuals have found themselves blocked from doing so at ports of entry, where agents of the National Migration Institute (*Instituto Nacional de Migración*, INM) may instead tell them that this is not the right place to seek asylum or instruct them to cross between ports of entry without documentation. Migrants who are able to request asylum at ports of entry will generally be detained by the INM and held for at least a few days for processing. As a result, asylum seekers are often forced to cross between ports and try to reach the offices of Mexico's refugee agency (*Comisión Mexicana de Ayuda a Refugiados*, COMAR) to claim asylum without being

detained by enforcement authorities or victimized by criminals.

- **While trapped in Tapachula, asylum seekers struggle to survive. Mexican authorities' efforts to contain them there are both arbitrary and untenable.** Mexican asylum law requires asylum seekers to wait out their cases in the state where they made their claim. In reality, security forces generally block them from leaving Tapachula itself. Asylum seekers in Tapachula face scarce employment opportunities, obstacles to healthcare, and a dearth of affordable housing, with government, United Nations, and civil society support programs insufficient to meet overwhelming levels of demand. Tapachula's close proximity to Central America puts some people at risk of encounters with their persecutors. Asylum seekers also face abuses by authorities ranging from arbitrary detention to extortion to other forms of violence. Women and Afro-descendant migrants face particular situations of risk and discrimination. All of these factors point to the need to end Mexico's containment policy for asylum seekers.

- **Deterrence-based tactics that only serve to put more suffering and danger in migrants' paths will not decrease forced migration to and through Mexico.** Closing off legal paths to migration forces the displaced population into hiding along dangerous migratory routes, while the growing list of visa restrictions for South American countries that prevent people from flying into Mexico force more people to cross north by land. These inescapable realities highlight the need to prioritize access to protection in regional migration management, alleviating the human suffering in places like Tapachula, and developing sustainable solutions for the migrant population.

- **Initiatives to support migrants' and asylum seekers' integration into other parts of Mexico, such as those currently led by the UN Refugee Agency (UNHCR), are crucial to preventing humanitarian crises in Tapachula and providing solutions and stability to the migrant population.** As desperation, overcrowding, and marches by migrants increased over 2021, the INM sporadically transported migrants and asylum seekers to other states, but it did so without clear criteria or coordination with other institutions. A regularized relocation system, more resources for Mexico's refugee agency, and additional efforts to provide legal status to migrants seeking better opportunities would be important measures to address the growing number of migrants arriving at Mexico's southern border.

# Introduction and acknowledgements



*WOLA staff and partners at the Mexico-Guatemala border in Cuidad Hidalgo, a crossing point for many asylum seekers bound for Tapachula*

This report is based on a visit by WOLA staff to Mexico City and Tapachula, Chiapas state, in late February and early March 2022.

As part of WOLA's work on regional migration patterns, access to asylum, and the impact of border enforcement measures, in recent years we have closely monitored and visited the city of Tapachula on Mexico's southern border, a crucial crossing point where the vast majority of Mexico's asylum requests are filed. Tapachula provides both a relevant snapshot of northward migration trends and a paradigmatic example of the consequences of containment policies on asylum seekers. The present report fits within our reporting from the Mexico-Guatemala border over the past decade and our overall analysis of the impacts of U.S. and regional migration policies on the movement and rights of migrants throughout the hemisphere.

On this occasion, the WOLA delegation met with asylum seekers, government officials, UN agencies, and civil society partners providing services to people on the move in southern Mexico. We particularly acknowledge the support of the Fray Matías de Córdova Human Rights Center, a 2020 WOLA Human Rights Award recipient organization, whose staff generously helped us to convene meetings with civil society organizations and asylum seekers, as well as providing information on the trends and practices they are documenting in their day-to-day work with the asylum-seeking population. We are also especially grateful to the three asylum seekers who agreed to be interviewed on video by the WOLA team so that their stories could be quoted in this report and shown in the videos that accompany it.

During our visit, we also met with officials of the Tapachula and national offices of Mexico's refugee agency, the Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*, COMAR); the Tapachula and national offices of the UN Refugee Agency

(UNHCR); the Tapachula office of Mexico's Welfare Ministry (*Secretaría de Bienestar*); and the U.S. Embassy in Mexico City. We spoke with representatives of legal service providers and civil society organizations including *Formación y Capacitación* (FOCA), American Friends Service Committee (AFSC), the Migration Program (*Programa de Asuntos Migratorios*, Prami) of the Universidad Iberoamericana Mexico City, *Una Mano Amiga en la Lucha contra el SIDA*, *Iniciativas para el Desarrollo Humano*, Coalition for Humane Immigrant Rights (CHIRLA), Jesuit Refugee Service, and the Institute for Women in Migration (*Instituto para las Mujeres en la Migración*, IMUMI). Most of these organizations form part of the Southeast Mexico Human Rights Observation and Monitoring Collective (*Colectivo de Observación y Monitoreo de Derechos Humanos en el Sureste Mexicano*), which documents human rights abuses against migrants and asylum seekers. Despite our attempts to obtain a meeting with the National Migration Institute (*Instituto Nacional de Migración*, INM), we were unable to meet with representatives of this agency.

The information provided in these meetings, our observations in different parts of Tapachula and at the Mexico-Guatemala border, as well as our ongoing written research and monitoring have led to the present report, which aims to present an updated window into the situation of asylum seekers arriving and seeking protection in Tapachula. Our analysis leads us to set out recommendations for the Mexican and U.S. governments, focusing both on domestic policies and regional collaboration to respond to forced migration.

# BACKGROUND ON MEXICO'S ASYLUM SYSTEM

### Legal and institutional framework

In 2000, Mexico became a party to the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees, the cornerstone United Nations (UN) agreements that provide for the right to seek asylum from persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Mexico's Law on Refugees, Complementary Protection and Political Asylum (*Ley Sobre Refugiados, Protección Complementaria y Asilo Político*, "Law on Refugees") incorporates this protection framework as well as gender-based persecution. It further incorporates additional grounds for protection outlined in the Cartagena Declaration.[1] Thus, Mexican law recognizes refugee status for people who have fled their country of origin "because their lives, security, or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive human rights violations, or other circumstances that have seriously disturbed public order[.]"[2]



*Mural near the Mexico-Guatemala border*

Mexico's refugee law also provides for "complementary protection" to people who are not recognized as refugees but whose life would be in danger or who would be at risk of torture or ill treatment if returned to another country.[3] Complementary protection applies to the person who requested protection, but it is not extended to their family members. These different forms of protection do not cover all people forcibly displaced from their countries of origin: in particular, disasters provoked by climate change and other environmental factors are increasingly relevant drivers of forced migration, but families and individuals displaced by climate disasters were not understood to be refugees at the time the aforementioned international and national legal instruments were drafted. However, Mexico's legal framework protects a decidedly broader class of refugees than U.S. law does.

The Mexican Commission for Refugee Assistance (COMAR), housed within the Ministry of the Interior *(Secretaría de Gobernación,* SEGOB) is the government agency charged with processing asylum claims. COMAR has central offices in Mexico City, as well as offices in the south and north of the country (two in Chiapas and one each in the states of Tabasco, Veracruz, Coahuila, Nuevo León, Baja California, and the central state of Jalisco).

The National Migration Institute (INM), also within SEGOB, is in charge of overseeing migrant arrivals at ports of entry, granting visas and legal residency, and migration enforcement. One of the INM's functions as outlined by the Law on Refugees' implementing regulations is to detect individuals in need of international protection and assist and coordinate with COMAR in facilitating their access to the asylum system.[4]

Families and individuals seeking asylum must submit their application no later than 30 business days after entering the country.[5] After the application has been received, COMAR issues a document *(constancia)* that serves as proof of an open asylum case. Once someone has requested refugee protection, legally they cannot be returned back to their country of origin during the processing of their case.[6]

With their *constancia* from COMAR, asylum seekers can apply with the INM to receive a humanitarian visa, known as a Visitor Card for Humanitarian Reasons *(Tarjeta de Visitante por Razones Humanitarias,* TVRH), which confers legal permission for people to live and work in Mexico for a year.

To determine refugee status, COMAR will interview applicants about the reason for leaving their country (with the participation of interpreters when an asylum seeker does not speak Spanish).[7] By law, COMAR has 45 business days to process applications, which may be extended up to 90 days.[8] These limits are not currently observed, as will be discussed below. Crucially, while a claim is being processed, asylum seekers are required by the Law on Refugees' current regulations to remain in the state where they filed their asylum request,[9] unless they receive special permission to relocate and continue their case from a different state.[10]

### Trends in asylum claims and approvals

In 2021 Mexico received a record-breaking 130,627 asylum requests, more than 100 times the number received just eight years ago in 2013.[11] The top three nationalities that applied for asylum in Mexico in 2021 were Haitians, Hondurans, and Cubans. The number of Haitian asylum seekers saw the most dramatic increase from 2020 to 2021, from 5,917 to 51,337. Children born to Haitian parents also accounted for a large percentage of 2021 asylum seekers from Chile and Brazil, who increased from a combined total of 1,170 in 2020 to 10,749 in 2021.



In 2021, COMAR resolved 38,054 asylum cases, with an overall asylum grant rate of 72 percent (74 percent counting complementary protection), considerably higher than the average U.S. asylum approval rate of roughly 37 percent in FY2021. There were significant disparities in approval rates for applicants of different nationalities. The major nationalities that saw the highest percentage of approval rates last year were Venezuelans (97 percent), Hondurans (85 percent), and Salvadorans (85 percent). COMAR regularly evaluates applications from nationals of these countries under the broader criteria of the Cartagena Declaration. Of the top asylum-seeking nationalities, Haitians had the lowest approval rate at 23 percent.



Asylum claims in Mexico continue to rise and may be on track to break new records, with 40,026 requests filed in the first four months of 2022—the highest number in the January-April period in the past three years.

### Migration enforcement role of the armed forces, including the National Guard

While not officially responsible for the asylum process, Mexico's armed forces currently play a leading role in migration enforcement, bringing them into direct contact with arriving families and individuals, with consequences that can impact people's access to asylum. As of late April 2022, 28,542 military troops were deployed in a migration enforcement role at Mexico's borders. Available data suggest that military forces, in particular the army and the National Guard,[12] carry out or collaborate in the majority of migratory detentions in Mexico, depriving hundreds of thousands of migrants of their liberty in recent years.

Military troops are primarily trained to combat enemy forces, a background that raises obvious concerns when assigning troops to be potential first contact points for migrant and asylum-seeking families, children, and adults. The deployment of the armed forces to intercept migrants is a clear example of an official response that treats migration—including forced migration and those seeking protection—as though it were a national security threat rather than a movement of people who have disproportionately high levels of vulnerability, trauma, and humanitarian needs. Concerns regarding militarization of border and migration tasks in Mexico are not just theoretical: in 2021, army and National Guard troops shot and killed two migrants in separate incidents in Chiapas, while the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH) has issued recommendations finding National Guard troops responsible for other violations against migrants at Mexico's southern border. In 2021, the CNDH received complaints against the National Guard in Chiapas for cruel and inhumane treatment, arbitrary detention, and torture.

While a detailed analysis of border militarization is beyond the scope of this report, this remains one of the most concerning aspects of the armed forces' multiplying roles in Mexico. It is also an area in which the U.S. government has negatively influenced migrant rights and access to protection in Mexico in recent years by pressuring Mexican authorities to crack down on northward migration, including through the threat of tariffs on Mexican exports during the Trump administration and by praising Mexico's efforts to stop migrant caravans, which translates into the deployment of military troops.

### The role of Tapachula in the asylum process

Due to its location just inland of the Mexico-Guatemala border, size, and connectivity to main highways from Central America, Tapachula is the main point of arrival for a significant portion of migrants and asylum seekers coming by land to Mexico. A large majority of asylum claims—89,613 in 2021—were filed in COMAR's Tapachula office, creating an enormous strain on this office and prolonged delays in case processing, stretching into wait times of many months for asylum applicants.

*Map showing Tapachula/southern border*



Since asylum seekers are generally required to wait out their cases in the state where they file their claims, tens of thousands of asylum seekers are currently expected to live in Chiapas, the southern border state where Tapachula is located (and Mexico's poorest state, with a poverty rate of 75.5 percent in 2020). In practice, Mexican authorities seek to confine these families and individuals not just to Chiapas state, but to the city of Tapachula itself. For this reason, Tapachula is known as the "prison city" (*ciudad cárcel*) for asylum seekers. As we will discuss below, this containment policy has led to a series of negative consequences including lack of access to basic services and the means to survive, pushing asylum seekers to try to find ways to leave the city.



*Bicentennial Park in Tapachula, where migrants and asylum seekers without a place to stay often spend the night*

# FINDINGS FROM WOLA'S 2022 VISIT TO TAPACHULA

*Lack of immediate access to asylum at Mexico's southern border puts families and individuals at risk*

While Mexico continues to experience mixed migration flows, a large number of people arriving in Tapachula have international protection needs after fleeing life-threatening circumstances in their home countries.

Migrants and asylum seekers generally arrive in Mexico after living through different forms of violence, trauma, and exploitation during their journey north. As numerous people told us, every step along the migratory route to Mexico costs money, whether due to criminal extortion, bribes demanded by authorities, fees to secure guides, or other payments necessary to move from one place to another with as little violence as possible. Even those able to muster resources through their family and social networks are still vulnerable to violence and repeated criminal attacks, including kidnapping and rape, while people forced to flee their homes with little prior notice are likely to travel with even fewer resources and thus have even less of an opportunity to fend off detention and violent attacks. Regardless of their circumstances, arriving migrants and asylum seekers in Tapachula, especially those in a heightened situation of vulnerability such as children, are likely to arrive in need of physical, psychological, and other humanitarian attention after their journey, as well as with the right to request international protection or to pursue other pathways for temporary or permanent legal status.

> **"It's impossible to live in Honduras. It's so dangerous now. The gangs see 12-year-olds, 13-year-olds, and they already want to recruit them… I have a 10-year-old daughter and a 14-year-old daughter, that's why I had to leave my country, leave my family and everything behind, because the gangs came… they said they were going to recruit my daughters… and that if I didn't let them, they were going to kill us all, my children and me…"**
>
> **-"Maria," Honduran asylum seeker**

Families and individuals face severe obstacles in requesting asylum when they arrive at Mexico's border because COMAR does not have a regular presence at ports of entry, which are instead manned by INM agents. Despite the INM's legal mandate to assist and collaborate with COMAR, according to multiple service providers in Tapachula, INM agents at ports of entry are known to tell asylum seekers that they cannot seek asylum at the border and cannot enter Mexico without documents.

Paradoxically, rather than seeking truly to block the path of asylum seekers into Mexico, the

INM agents themselves may also instruct people to cross between ports of entry in order to make their way to COMAR's Tapachula office to claim asylum. Only in certain cases, such as when a service-providing organization has contacted authorities to request entry for an asylum-seeking person or group, are there greater guarantees of asylum seekers' being able to cross at a port of entry and to avoid detention in the INM's migration stations (detention centers) while their paperwork is being processed.



*The Suchiate River, which divides Tecún Umán, Guatemala from Ciudad Hidalgo, Mexico*

The result of this approach by the INM is that many asylum-seeking families and individuals must cross Mexico's border in hiding and try to make it from the border to the COMAR office or an NGO or other service provider without documentation that authorizes their presence in Mexico. These journeys put asylum seekers at risk of attacks and extortion by criminal groups who prey on migrants and of detention or extortion by INM agents, state and local police, and military forces.

**"When you're an immigrant and you're on the move… the authorities, instead of helping you because they're authorities, no, what they do is take what little you have… even if you have children, they don't care, they take their papers, and it's, 'either give me what you have or I'll send you back or I'll imprison you…' As a migrant, you're afraid, so you agree to whatever they ask of you… you just say, 'yes.'"**

**–"Maria," Honduran asylum seeker**

WOLA staff heard accounts of detentions and abuses by the INM, police agents, and the military even against migrants with official permission to be in Mexican territory; for arriving asylum seekers with no documentation who are forced to cross irregularly into the country,

the risks are even higher. According to <u>data</u> collected from 2,742 asylum seekers in Tapachula between October 2020 and October 2021 by the Danish Refugee Council (DRC) and the Jesuit Refugee Service Mexico (JRS), 98.3 percent of respondents affirmed having entered Mexico irregularly, and 34.3 percent of these respondents "describe incidents of extortion, violence, threats, and other abuses, compared with only 9.1% of respondents who indicate having entered the country regularly."

Detention by authorities may lead to extortion and/or temporary imprisonment in the INM's detention centers. According to international standards and guidelines, detention of asylum seekers should be <u>exceptional</u> and based on an evaluation of the specific need for detention in each case. In Mexico, such detention tends to respond to few criteria other than migratory status and may be prolonged for months. While an alternatives-to-detention program exists in Mexico, which releases asylum seekers from detention and refers them to shelters in coordination with COMAR and support from the <u>UN Refugee Agency</u>, the INM has <u>curtailed</u> its use in recent years. Interviews conducted during our visit and reporting from organizations working with asylum seekers suggest that the INM has become less responsive to requests for migrants to be released from detention.

Once detained, many asylum seekers are told that if they make a protection claim, they will remain locked up while their case moves forward. This factor alone makes it much more difficult for people to prepare their asylum case, as they face obstacles such as inadequate access to information, legal assistance, and healthcare, overcrowding, or safety issues. This leads some people with protection needs to desist from their claims in order to be released from detention.

A 2020 <u>reform</u> to Mexico's migration and refugee framework established that children (unaccompanied and those with their families) should not be held in detention by the INM.[13] Children and their families should instead be referred to the National System for Integral Family Development (*Sistema Nacional para el Desarrollo Integral de la Familia*, DIF). However, service providers told WOLA that this sometimes <u>amounts</u> to little more than a change of detention setting for <u>individuals</u> and <u>families</u> sent to DIF shelters. Civil society counterparts also told WOLA of the INM's practice of <u>separating</u> families, for instance by detaining a father in a migration station and sending a mother and children to a DIF facility.

**"At the first checkpoint… [the authorities] took me; they brought me to the *Siglo XXI* migrant detention center… I was scared when I got there, I've never been detained… after three and a half months, I couldn't stand it there anymore… I decided not to continue [with that asylum request], because I wasn't sleeping, I wasn't eating well by then… it got to the point where I would talk to myself…"**

**–Nelson, Nicaraguan asylum seeker**

*Diverse factors have caused drastic increases in asylum claims, overwhelming COMAR*

Mirroring global trends, there has been a dramatic increase in people displaced from their homes throughout the Western Hemisphere. Mexico, which in 2021 became the <u>third country</u>

worldwide in the number of asylum requests received, has become a significant destination country for a growing number of people.

Latin America has witnessed an increase in human mobility in recent years as both long-standing and emerging causes of displacement force more people to flee their homes. Latin American and Caribbean countries consistently lead the world in homicide rates, with gang violence in Central America and organized crime in Mexico continuing to be significant causes of displacement. Repression and political and humanitarian crises, exemplified in different forms in countries such as Venezuela, Nicaragua, and Cuba, add to forced displacement. The devastation caused by Hurricanes Eta and Iota in Central America in 2020 highlighted the increasing percentage of people on the move who can be considered climate refugees. Violence, poverty, and other already life-threatening crises have now been aggravated by the Covid-19 pandemic.

In addition to people fleeing directly from their countries of origin, a large percentage of 2021 asylum requests in Mexico came from people of Haitian origin who had previously fled Haiti following its devastating 2010 earthquake, resettled for a time in South American countries (notably Brazil and Chile), but once again found themselves on the move due to shrinking visa availability, scant labor opportunities, and racism and discrimination in South America, with fewer possibilities than ever of returning to Haiti as gang violence, political crises, and natural disasters engulfed the country in 2021.

In this context, the modern face of northward migration through Latin America includes a significant percentage of women and children, with many families migrating and seeking asylum together.



In addition to these trends, both authorities and civil society counterparts agree that people on the move are currently funneled into Mexico's asylum system even though Mexican law has some other paths available to those seeking a legalized status in the country. In particular, while

Mexican law makes TVRH humanitarian visas available to migrants who have been victims of or witnessed a crime in Mexico, children, or for other humanitarian purposes or public interest reasons,[14] in practice these visas have not been made widely available to migrants. Even asylum seekers face steep obstacles in obtaining a TVRH. In 2021, the INM issued 87,174 TVRHs. However, only 35,397 were provided to asylum seekers, contributing to the obstacles WOLA staff witnessed in Tapachula with asylum seekers unable to access employment because they lacked this visa. At the same time, the fact that more than half (48,611) of these visas were issued for humanitarian reasons, including 30,057 to Haitians (and another 6,547 to Brazilians and Chileans, many of whom are likely children of Haitians born in these countries), illustrates that in the context of high levels of forced migration and significant pressure as a result of the tens of thousands of migrants and asylum seekers trapped in Tapachula in the fall of 2021, the Mexican government more broadly used TVRHs as a tool to provide temporary status in Mexico. In contrast, the INM issued only 25,414 TVRHs in 2020, with less than a thousand, 862, provided for humanitarian reasons.

Given the INM's reticence to offer alternatives to migrants arriving at Mexico's southern border, seeking asylum is seen as the necessary route to obtain a TVRH for most arriving migrants, contributing to COMAR's increased caseload. This also means that an unknown number of people who intend to reach the United States to reunite with family or for other reasons find themselves channeled into applying for asylum in Mexico to regularize their presence in the country, even though Mexico is not their final destination.

Finally, with the U.S. border closed to many arriving asylum seekers under Title 42 since March 2020, some asylum seekers may have requested protection from COMAR even if they do not feel safe in Mexico, following expulsion or being blocked at U.S. ports of entry. If the Title 42 policy is lifted, part of this population will likely move to the U.S. border in the hope of being able to request asylum in the United States. These asylum seekers would join a growing number of other foreign nationals who have been bottled up along the U.S.-Mexico border awaiting their chance to approach a port of entry and request asylum in the United States, with U.S. authorities estimating this number could be around 25,000.

The record-breaking rise in asylum requests in Mexico has meant that those arriving find themselves navigating an asylum system that is overwhelmed, under-resourced, and severely backlogged. Nowhere is this reality more evident than in Tapachula.

**"I came here, not because I had some American dream, but because I was fleeing so that [the authorities] wouldn't hurt my family, first of all, and secondly to protect my own life…**

**[This has been] an emotional and economic change that hit me hard, believe me… I don't wish this on anyone. That's what I can tell you: I don't wish this on anyone."**

**–Nelson, Nicaraguan asylum seeker**

As has been evident in the images of hundreds of asylum seekers waiting outside of COMAR's offices in Tapachula, the agency has yet to secure enough resources to process current caseloads. In response to rising numbers of claims, COMAR has expanded in recent years with support from the UN Refugee Agency; today, COMAR has nine offices throughout the country and plans to open more, including a coordinating office in Chiapas state to oversee the work of the multiple Chiapas COMAR offices. With UNHCR support, COMAR increased its processing capacity by 116 percent between 2020 and 2021, and has gone from 20,466 case determinations in 2019 to 38,054 in 2021. In December 2021, COMAR signed a new agreement with UNHCR that will allow COMAR to directly hire 230 staff members (under Mexican law, government officers must be the ones to make asylum determinations; that is, staff directly paid by UNHCR cannot substitute COMAR in this role).



However, even with this additional support, the resources afforded to COMAR are still far from sufficient to enable prompt processing of incoming asylum requests, with the agency's overall domestic budget remaining essentially stable from 2021 to 2022 despite skyrocketing levels of asylum claims.[15]



### Asylum seekers' and institutions' responses, 2021-2022

As mentioned, delays of many months in refugee determinations, coupled with Mexico's containment policy, have effectively trapped tens of thousands of foreign nationals in

untenable conditions in Tapachula. As this situation reached crisis levels in 2021, lack of access to job opportunities, housing, healthcare, and other necessities in Tapachula; safety concerns; discrimination; and desperation at seemingly never-ending legal processes led large groups of asylum seekers to try to leave the city.

In perhaps the best-known <u>example</u>, hundreds of foreign nationals sought to leave Tapachula by marching north together in "caravans" in the second half of 2021, particularly beginning at the end of August. However, the caravans met with blockades, detention, and sometimes violent <u>repression</u> from <u>INM agents</u> and the National Guard. Since then, multiple <u>caravans</u> have left Tapachula, with some reaching other states, though none remaining intact beyond the center of the country.



*Mexican immigration agents detain a Haitian migrant in Escuintla, Chiapas state, Mexico in September 2021 (AP Photo/Marco Ugarte)*

For its part, COMAR's Tapachula office tried several strategies throughout 2021 to increase its capacity to process asylum claims. At the beginning of the year, unable to keep up with case intake, the office began issuing appointment notices (*citatorios*), which stipulate a later date for the formalization of a family's or individual's asylum application. In mid-2021, COMAR set up an <u>online</u> platform for use in Tapachula to request asylum appointments. However, WOLA staff was told, the system received tens of thousands of online requests in a single week, grew to include people who had not yet arrived in Mexico, and led to large numbers of case inquiries. Service providers pointed out that the online system also created <u>challenges</u> for asylum seekers unfamiliar with navigating the internet or unable to access the online platform.

Changing tactics, from late September to late November COMAR <u>convened</u> asylum seekers to come in person to Tapachula's stadium to confirm their appointment requests, in an unprecedented strategy in which <u>UN agencies</u> and other Mexican institutions collaborated. Approximately <u>55,000</u> asylum seekers participated, allowing COMAR to reorganize and open up appointment times.

These efforts were disrupted, however, by the INM's own parallel response strategies. As growing numbers of desperate asylum seekers sought to leave Tapachula on foot, producing high-level news coverage including images of caravans and repression, the INM began offering caravan participants or would-be participants humanitarian visas and relocation by bus to a series of other Mexican states. In this context, the INM announced that it too would use Tapachula's stadium at the end of November 2021 to program transportation to other states. INM's announcement prompted families and individuals to abandon jobs, housing, and other activities in Tapachula to camp out around the stadium, awaiting what they believed would be their turn to leave. Given Tapachula's extremely hot conditions, the situation for families and children in particular was often unbearable according to service providers who sought to assist asylum seekers at the time.

Not everyone waiting at the stadium received transportation, however. In December, the INM began issuing QR codes to migrants and asylum seekers, instructing them to pay their own way to one of a list of different states (determined in each case by the QR code) and then report to an INM office within 30 days to regularize their status. It is estimated that some 35,000 people were relocated to 17 central and northern Mexican cities through the INM programs. The long list of states in which the INM issued over 1,000 humanitarian visas in December 2021 (44,425 TVRHs in total) is one indicator of the application of this program.

While the initiative to move people out of Tapachula points to recognition of the failure of the containment policy, the INM has implemented this plan in a piecemeal and reactive manner, and it is not permanently or universally available. The main criterion for busing seems to be a desire to break up caravans, deactivate protests, and diminish the crisis of overcrowding in Tapachula.

The INM also failed to adequately coordinate its busing project with COMAR, and asylum seekers were sometimes unwittingly considered to have abandoned their claims by virtue of no longer being able to show up at Tapachula's COMAR office. Some, having struggled to leave Tapachula, even found themselves returning there once they realized they could not follow up on their cases from other states. WOLA was told that the INM eventually began providing more complete data to COMAR on which asylum seekers were transported to what destinations, which would allow COMAR to re-open their cases. However, it is unclear what will happen to many of the transported migrants who wish to pursue their asylum claims.

**"Abuses by authorities, corruption, and impunity are very severe problems… and they're aggravated when the victim is a person who isn't perceived as a person… they're perceived as the other."**

**–Brenda Ochoa, Director of the Fray Matías de Córdova Human Rights Center**

### The importance of resettlement and integration support to stabilize forced migration

Stakeholders interviewed by WOLA emphasized that the extent to which resettlement and integration is available and supported in Mexico, giving refugees access to services and the ability to live and work throughout the country, influences the number of people who will opt to resettle in Mexico and the stability of that resettlement. In this vein, while many counterparts spoke of the need to facilitate immediate humanitarian visas to asylum seekers and other migrants who qualify for them, several also signaled the need to think beyond short-term solutions and to recognize that without permanent resident status, people on the move will live in a more vulnerable situation in which they must constantly renew their documentation.

Positive examples of integration support exist and can provide guidance for expanding such efforts. In particular, UNHCR has led an integration program (Local Integration Program, *Programa de Integración Local*, PIL) that has helped more than 10,000 refugees relocate within Mexico and start their lives in their new communities since 2016. The program has helped move refugees from the southern part of the country to eight cities in the center and north of Mexico. A UN study demonstrates the success of the program: while in southern Mexico, only 10 percent of refugees were employed and 17 percent had sporadic informal jobs, but after their relocation, 92 percent were in formal employment with earnings that were on average 60 percent higher than in the south.

In December 2021, the International Organization for Migration (IOM) and UNHCR presented a pilot project that aims to support the stabilization and integration of Haitians in Mexico. The program will allow Haitian families who have not applied for asylum to participate in the PIL program. It will be important to monitor the success of this new initiative, including the extent to which it is able to facilitate access to work for women as well as men.

Initiatives such as this one fit within the overall, recognized need for countries to expand legal pathways to resettlement for people who need to leave their homes. For example, UNHCR has emphasized the importance of complementary pathways, or safe and regulated avenues that complement refugee resettlement, which offer alternatives to resorting to irregular and dangerous movement and facilitate the acquisition of a sustainable and durable migration status. Complementary pathways for admission are diverse and can include humanitarian visas, family reunification, and education and labor opportunities, among others.

### Asylum intake patterns in 2022

During our visit, COMAR's Tapachula offices were intaking some 250 asylum seekers per day, although that number is sometimes several times higher on Mondays. Stakeholders were unanimous in telling us of an increase in the number of Venezuelans, Cubans, and Nicaraguans arriving by land this year. They also noted an increase in extra-continental migrants and asylum seekers, largely from African countries.

In part, these movements reflect trends apparent in 2021, which saw significant increases in the number of Venezuelans, Cubans, and Nicaraguans requesting asylum in Mexico and detained in Mexico (a total of 26,705 people of these nationalities were apprehended by Mexican authorities in 2021, a more than tenfold increase from the 2,204 Venezuelans, Cubans,

and Nicaraguans detained in 2020). However, more recent reported upticks in the number of Venezuelans arriving in Tapachula in particular would seem also to be a consequence of Mexico's new visa requirements for Venezuelans, imposed in January 2022 following reported requests from the United States, which block air travel to many Venezuelan migrants and hence drive more Venezuelans to migrate north by land through Central America and Mexico. Mexico similarly imposed visa requirements on nationals of Brazil and Ecuador in 2021 in response to increasing arrivals from those countries at the U.S. southern border.

More Cubans are also arriving in Mexico, in part due to Nicaragua's lifting of visa requirements for Cubans in November 2021, enabling them to fly to Nicaragua to continue their journey north. COMAR's asylum applications reflect these shifts in nationalities, with more Cubans requesting asylum in Mexico in the first four months of 2022 (8,445) than in all of 2021 (8,298), while 4,270 Venezuelans requested protection in this same period, as compared to 6,192 in all of 2021. In the first four months of 2022, 841 people from Senegal also requested protection in Mexico.



The land route from South America to Mexico passes through the notorious Darién Gap that connects Colombia to Panama, a migratory corridor known for extreme levels of lawlessness and violence (including rape), robbery and extorsion, deaths from exposure to extreme conditions, and other life-threatening and trauma-inducing conditions. In November 2021, Doctors without Borders reported that since April of that year they had attended 288 victims of sexual violence in the Darién Gap in their reception centers and with the Panamanian Ministry of Health, estimating that this represented only a quarter of the actual cases. U.S., Mexican, or other regional migration policies that channel larger numbers of people through this route thus will necessarily have extremely severe negative effects on the lives of migrants and asylum seekers.

**"In our group [of migrants crossing the Darién Gap], one man fell… I don't know how he managed to grab onto something, because if he had fallen to the bottom there, he would have died. […] [On the path] you see things, you see dead bodies, you see everything people have left behind, because you get to a point where even your own clothes weigh you down from the sweat. […] At a certain point, I couldn't breathe… I said, 'go on ahead, I'm going to stay here a while…' […] And when I woke up, there were only two people there… they said they hadn't left because they saw that I was still breathing. Because I had lost consciousness completely. […] We walked and walked and walked and walked and walked and walked…"**

**–Frantz, Haitian asylum seeker**

Finally, we note that COMAR may acquire a large new portfolio of work stemming from a proposed General Law on Forced Displacement that has passed in Mexico's House of Representatives and is now under consideration in the Senate. This law would recognize and create a system for attending to Mexico's own large population of internally displaced people (IDPs), with tens of thousands of people displaced in large-scale movements in 2021 alone and potentially hundreds of thousands displaced in total in recent years. Under the proposed legislation, COMAR will become the institution in charge of implementing the law and supporting the IDP population. However, WOLA was told that the agency's plan is to keep its refugee and IDP functions as separate as possible, ensuring separate structures and budgets to cover both. It remains to be seen if the law passes in its current form and how implementation and funding of the law will play out in practice. The Mexican Senate ended its normal legislative session in late April 2022 without moving forward with the legislation.

### The "prison city": migrants and asylum seekers caught between a rock and a hard place

Recalling that Chiapas is Mexico's poorest state and Tapachula is a city of some 350,000 residents, it is unsurprising that foreign nationals' need for jobs surpass Tapachula's labor market. As was described to us repeatedly during our visit, migrants and asylum seekers in Tapachula also tend to face obstacles to accessing healthcare, education, and housing, as well as experiencing racial discrimination and abuses by authorities, including arbitrary detention. Language barriers and racism faced by Haitian and other Afro-descendant and indigenous migrants have further impeded their access to public services. WOLA staff conversations with a Spanish-speaking Haitian asylum seeker also made clear that language barriers impact Haitians' ability to access and understand Mexico's asylum system, as has been documented by several civil society organizations. These circumstances make clear that, as thousands of people continue to arrive and ask for protection, authorities must remove existing obstacles to dignified living conditions in the city, improve access to services for non-Spanish-speaking

migrants, address institutional racism, and reform the containment policy so that Tapachula is no longer a prison city for people on the move.

A migrant or asylum seeker's stay in Tapachula is marked by arbitrary rules and long wait times that leave them in a constant state of uncertainty. INM agents and the National Guard operate fixed and moving checkpoints in and around the city, as well as conducting raids, particularly at night, in which they detain migrants for alleged failure to demonstrate their permission to be in Mexico. In reality, detentions have swept up people with legal permission to be in Mexico, including asylum seekers. Service providers told us that security forces will target a certain park or hotel to raid, and sometimes ask to see even bystanders' identifications; we heard accounts of such authorities destroying asylum seekers' documents that proved that they were lawfully present or had ongoing cases.

**"In the raids [to detain migrants], authorities commit serious abuses, there is a lot of violence even against women, girls, boys, adolescents…"**

**–Brenda Ochoa, Director of the Fray Matías de Córdova Human Rights Center**

Those detained may be imprisoned for weeks or more in INM detention centers, where, according to civil society investigations, INM agents regularly pressure asylum seekers to abandon their cases—and some, desperate to be released from detention, opt to do so. As mentioned, an alternatives-to-detention program, albeit an imperfect one, has existed since 2016, but the INM has greatly curtailed access to the program since 2020. Detention of asylum seekers deprives them of a wide variety of rights, separates families, exacerbates trauma, and makes it much more difficult for them to continue their asylum cases with due process.

Even the many asylum seekers who are able to avoid detention and live in Tapachula face safety risks that include extortion by authorities and attacks by criminals. Tapachula's close proximity to Guatemala means that gang members can easily show up there, and service providers told us of cases in which asylum seekers had been found by members of the Central American gangs from which they had fled in the first place. Although a request can be made for COMAR to transfer cases to a COMAR office in another state for security reasons, it is a cumbersome process requiring the asylum seeker to present detailed documentation of the risk.

Beyond safety concerns, day to day living conditions are often untenable, aggravated by the bureaucracy of the processes required to regularize one's migratory status. Desperation was palpable the day that members of WOLA and the Fray Matías Center visited the overflowing line of migrants waiting all day in direct sunlight and sweltering heat outside an INM office for a chance at an appointment, a pattern often repeated day after day.



*Migrants and asylum seekers waiting for appointments outside the National Migration Institute*

Most asylum seekers need income to survive. However, existing employment opportunities in the formal sector are <u>insufficient</u> and require that people have documentation showing their permission to work in Mexico—though employers may balk at hiring migrants even when presented with humanitarian visas. Some asylum seekers set up stands or other informal businesses to provide goods and services to the population, but municipal authorities sometimes clear them out of certain parks or areas, making it harder for them to earn income.



*Sign that prohibits migrants from selling their wares in a plaza in Tapachula*

Mexico's Welfare Ministry (*Secretaría de Bienestar*) runs a program for asylum seekers and other migrants seeking regularization in which it provides them with cash support in exchange for several hours of volunteer work through its Social Emergency Program (*Programa de Emergencia Social*). Participating migrants take part in construction, planting, cleaning, translating, and other jobs. Officials in charge of the program in Tapachula told WOLA that enrolled migrants generally remain in Tapachula throughout the duration of their regularization processes. However, the program does not have the capacity to include all the asylum seekers and migrants who seek to participate: we were told in March 2022 that it covered approximately 1,400 people in Tapachula. The day of our visit, a crowd of people was lined up at the door of the program's headquarters, seeking to enroll.

Asylum seekers face steep obstacles in access to housing. Shelters in Tapachula lack the capacity to house the arriving population, and local landlords have taken advantage of increased migration levels to charge usurious rates to rent apartments or rooms, including charging per person for renting shared rooms between groups of people.

Healthcare is another right that many migrants and asylum seekers are prevented from accessing. Service providers and asylum seekers told WOLA that hospitals and other healthcare providers require identification and ask for documentation that asylum seekers may not have, especially if they have arrived recently. Service providers expressed particular concern for the situation of women, including pregnant women and non-Spanish speakers. Those who require care unavailable in Tapachula face difficulties in accessing it; partners told us that it is complicated to obtain permission to bring a migrant even as far as the capital city of Chiapas state. In addition to physical ailments or injuries, migrants and asylum seekers frequently need psychological healthcare after surviving trauma along the migratory route.

**"My 6-year-old daughter had an accident… Here at the hospital, they didn't want to perform surgery on her; they said that they couldn't send her to a different hospital because I was an immigrant…"**

**-"Maria," Honduran asylum seeker**

To help address asylum seekers' need for services in Tapachula, UNHCR provides direct assistance to them after an initial interview to identify their needs, a process facilitated by the opening in March 2021 of the Center to Support Refugees (*Centro de Atención a Refugiados*, CAR), which operates next to COMAR's registration center. However, the scope of this program depends on the availability of resources, which are currently insufficient. UNHCR seeks to support asylum seekers with school inscription, protection against threats to their safety, psychosocial attention, access to healthcare and medicines, and orientation about available migrant shelters and other support mechanisms.

Certain migrant and asylum-seeking groups face particularly acute situations, especially as migrants have become more visible and vulnerable to local xenophobia. It is not uncommon for longstanding Tapachula residents to reject the presence of migrants in the city because of the perception that they are taking jobs from the local people.

There is an insufficient offer of adapted public services for migrants who do not speak Spanish. In the case of families from countries where Spanish is not a common language, women are especially likely to face language barriers that further reduce their access to services. This leads to patterns in which women's access to services is dependent on male relatives' liaising with authorities.

As mentioned, Haitian migrants and asylum seekers face anti-Black discrimination as well as frequent language barriers. An investigation by the Center for Gender and Refugee Studies, IMUMI, and Haitian Bridge Alliance found that "[f]ew to none of the immigration officials or non-governmental service providers in Tapachula speak Kreyol, and as a result, Haitian migrants have difficulty understanding the immigration system and how to access the networks of legal and humanitarian services available to them." By December 2021, COMAR's Tapachula office had increased its number of Haitian Creole interpreters from two to eight, but concerns persist about how Haitian cases are processed. Legal service providers signal that the notably low rates of asylum grants for Haitians bely insufficient analysis of their cases, especially given the high rates of approvals for other nationalities whose countries of origin suffer from generalized violence or crises. Beyond the asylum process itself, Haitian migrants report experiencing racism from both authorities and the local population.

During WOLA's visit, we were struck by the fact that multiple institutional actors expressed that asylum seekers of Haitian nationality or descent were unlikely to qualify for asylum. While we understand that they were referencing a pattern of secondary movements by Haitians who had previously migrated to South American countries (which differs from a 'typical' asylum case in which a person flees directly from their country of persecution), we recall that domestic and international asylum law require an individualized evaluation of each person's case. We also note that growing numbers of Haitians are now arriving directly from Haiti following that country's 2021 security, political, and natural crises. Furthermore, unlike asylum claims from Honduras, Venezuela, and El Salvador, which are generally processed using the standards outlined in the Cartagena Declaration, COMAR has not designated Haiti as a country whose nationals have access to this differentiated asylum procedure.

Given all of the conditions described above, migrants and asylum seekers in Tapachula increasingly protest in a variety of ways to call for permission to leave Tapachula and regularize their migratory status; the caravans attempting to leave the city are one clear expression of this. In order to bring attention to the desperate situation they are facing, migrants have sewn their lips together, gone on hunger strikes, chained themselves, and marched with crosses. On March 11, 2022, during president Andrés Manuel López Obrador's visit to Tapachula, migrants protested outside a military base where the president held his daily news conference. Those 150 migrants were told they would receive humanitarian visas by the end of the day, in addition to approximately 800 migrants who were given documents in the days leading up to the president's visit, according to immigration authorities. These numbers are just a small fraction of the tens of thousands of foreign nationals waiting in Tapachula.

**"The paperwork... they keep you going round in circles to see if you get tired."**


**-Frantz, Haitian asylum seeker**

Asylum seekers and migrants defend their rights not just by protesting, but also by providing direct assistance to other asylum seekers and migrants and by advocating with relevant authorities. As always, non-governmental organizations and migrant shelters also continue to be on the front lines of providing migrants with legal representation and humanitarian assistance, as well as documenting abuses against them. Throughout 2020 and 2021, the organizations that form part of the <u>Southeast Mexico Human Rights Observation and Monitoring Collective</u> have been documenting abuses against migrants and asylum seekers throughout the region and monitoring INM and National Guard actions during caravans and other moments of mass movements of migrants.

> **"[The police] arrived, they broke open the door, and they said, 'down,' pointing at us with guns, anti-gang police they're called here… They took us to an empty lot and they started beating us… and asking us what gang we belonged to, what cartel, what organization…"**

> **-Nelson, Nicaraguan asylum seeker**

The inspiring work done by partners on the ground in Tapachula and elsewhere in Chiapas, and the tireless struggle of migrants and asylum seekers themselves, have led to growing recognition of the crisis caused by Mexico's attempts to contain tens of thousands of vulnerable people at its southern border. Until reforms are made, however, asylum seekers in Tapachula will continue to face what multiple interviewees described to us as a "system to wear people down" (*política de desgaste*)—a combination of norms, arbitrary actions, inefficiencies, and lack of capacity that traps people in a prolonged limbo of uncertainty, risk, and precarious conditions. This situation represents the worst of all worlds: it increases the suffering and vulnerability of asylum seekers while doing nothing to sustainably or constructively manage migratory flows or advance a regionally shared plan to provide protection to those who need it.



*Patio of the Fray Matías de Córdova Human Rights Center*

"I went to the park and I could identify the people who didn't speak Spanish. And I said to them, 'what do you need?' Like one patient asking another patient, 'what do you need?' And one says, 'I don't understand the paperwork,' because sometimes [the authorities] give you a document and you have to read it and you don't understand. 'Oh, no? I'll translate for you.' Pretty soon, I had 20, 30 people waiting for me to translate for them… So, I started helping people… […] And soon, every day I would get up… and go to the park… to Fray Matías [Human Rights Center]… to COMAR… Sometimes I would lose my voice by the time I got home. Because I was so hoarse from the work that we had done."

**-Frantz, Haitian asylum seeker**

# U.S. GOVERNMENT ENGAGEMENT WITH MEXICO ON ACCESS TO PROTECTION FOR REFUGEES

U.S. influence on people's access to protection in Mexico stems from both U.S. support for Mexico's asylum system and overall U.S. migration policy—two frameworks that do not necessarily align with one another.

### *U.S. government support to Mexico's asylum system and efforts to address root causes*

The State Department's Bureau of Population, Refugees, and Migration (PRM) manages U.S. support for access to asylum in Mexico and Central America, focusing on humanitarian assistance, capacity-building, and diplomatic engagement.[16] The U.S. government is the largest financial supporter of UNHCR activities in Mexico: in 2021, UNHCR Mexico reported a U.S. contribution of $38,715,766, which constituted 77 percent of total UNHCR contributions earmarked for Mexico in 2021. In turn, UNHCR funds a large share of COMAR's work, enabling it to operate with significantly more staff than it could with its domestic budget.

While such U.S. support has been ongoing over a number of years, the U.S. Congress has recently reinforced the need to invest in Mexico's asylum processing capacity in the face of its overwhelming caseload, including language linked to U.S. foreign assistance specifying the need to support COMAR and INM "to improve intake facilities and asylum case management and processing."[17]

In a letter sent to Secretary of State Antony Blinken in March 2021, 19 members of Congress stated that Mexico's asylum system "merits priority attention":

> While Mexico's refugee agency, Comisión Mexicana de Ayuda a Refugiados (COMAR), has improved its processing capacity, asylum seekers continue to face inadequate screening for protection concerns by migration enforcement officials, poor conditions in detention centers, and long processing times. [...] U.S.-Mexico cooperation should seek to improve access to protection in Mexico, in coordination with the United Nations High Commissioner for Refugees (UNHCR) and civil society organizations, by increasing COMAR's presence throughout the country, supporting alternatives to detention for asylum seekers, and further improving COMAR's capacity.

In July 2021, the White House published its Collaborative Migration Management Strategy (CMMS), which lays out eight lines of action through which the U.S. government seeks a comprehensive regional approach to migration. One of these is "Expand Access to International Protection," an area in which the Biden administration specifically cites cooperation with Mexico, stating:

> The United States will support regional government efforts to strengthen and expand their asylum systems to provide vulnerable individuals with

> protection... [...] For example, since 2016, the Mexican Commission for Refugee Assistance has expanded dramatically with U.S. support, opening new field offices and tripling its annual case processing capacity. The United States will continue to work with Mexico to build on this success and with other regional governments to help expand their asylum systems.

The CMMS also points to Mexico as an example of the need for strong internal relocation and resettlement programs:

> The United States will support inclusion and integration programs that ensure individuals can access livelihood opportunities, services, healthcare, and education, and can develop roots in their new communities. The United States will look to expand successful ongoing integration efforts, such as a program that relocates protection recipients from southern Mexico to industrial belt municipalities in Mexico with labor needs.

In line with the CMMS, U.S. embassy officials in Mexico City told WOLA that the embassy, led by U.S. Ambassador Ken Salazar, advocates with Mexican authorities for migration management that includes, among other components, addressing the root causes of migration, attending to the displaced population, effective asylum processing, and modernized border infrastructure.

The Biden administration has made especially clear that it seeks to address the root causes of forced migration, particularly from Central America. The White House published its multifaceted Root Causes Strategy along with the CMMS in July 2021. For its part, Mexico's federal government is implementing social programs in northern Central America through its international development agency, AMEXCID (*Agencia Mexicana de Cooperación Internacional para el Desarrollo*). These programs largely replicate the Mexican government's signature domestic social programs "Sowing Life" (*Sembrando Vida*, a program that pays participants to plant trees) and Youth Constructing the Future (*Jóvenes Construyendo el Futuro*, a paid internship program for young people). AMEXCID reports that its programs dramatically decrease Central American participants' plans to emigrate, although investigations have denounced irregularities in the implementation of these programs in Mexico. USAID and AMEXCID are coordinating certain assistance in Honduras, Guatemala, and El Salvador within a framework known as "Sowing Opportunities" (*Sembrando Oportunidades*).

Beyond the actions described above, there is a need to improve U.S.-Mexico collaboration to protect specific groups of people who arrive in Mexico with protection needs but whose safe and sustainable resettlement warrants relocation to the United States. This is the case, for example, of unaccompanied asylum-seeking children trying to reunite with U.S.-based family members. Such children should not be forced either to seek asylum in Mexico or to migrate north in hiding when it is clearly in their best interest to join their relatives in the United States. In other cases, families or individuals may have compelling safety reasons to seek protection in the United States rather than in Mexico. Identifying such cases and facilitating a pathway to request protection in the United States would avoid the need for these groups to be processed by Mexico's asylum system when ultimately Mexico will not be a viable destination for them.

*U.S. migration policies and Mexico: a failed attempt to deter largely forced migration*

Despite its financial support for Mexico's asylum system, overall U.S. migration policy under the Biden administration has followed that of previous administrations and prioritized reducing the number of migrants and asylum seekers crossing the Mexico-U.S. border. U.S. actions have included prolonging <u>Title 42</u>, the Trump-era anti-asylum policy that blocks or expels asylum seekers back into Mexico without a chance to request protection; asking Mexican authorities to <u>crack down</u> on northward-bound migration through Mexico; and <u>requesting</u> Mexico to implement increased visa requirements for other nationalities. This overall context helps to explain Mexico's harsh and arbitrary enforcement of its asylum seeker containment policy in Tapachula, failure to facilitate a greater number of humanitarian visas to migrants, large numbers of migrant detentions (with a record <u>307,679</u> in 2021), and continued militarization of migration enforcement along its borders.

Such U.S. strategies are not new. As WOLA has <u>reported previously</u>, in response to the surge of unaccompanied minors from Central America in 2014 (during the administration of president Barack Obama), the U.S. government backed Mexico's <u>Southern Border Program</u>, which increased apprehensions and deportations of migrants traveling through Mexico's southern border region. In 2019, when migrant arrivals increased at the U.S. border once more, then-president Trump <u>threatened</u> to impose tariffs on Mexican goods if Mexican authorities did not tighten migration enforcement, which resulted in the Mexican government's agreement to deploy the National Guard at its borders to crack down on migration (a policy in place in Mexico today). In addition to this <u>containment role</u> centered on blocking migrants' paths through Mexico, Mexico's federal government under López Obrador has accepted unlawful and counterproductive U.S. anti-asylum programs in its territory, including Title 42 expulsions and the <u>Remain in Mexico</u> program, which forces select U.S.-bound asylum seekers to wait in Mexico for their immigration hearings. The Biden administration even flew Central American nationals on <u>expulsion flights</u> to Tapachula and Villahermosa, Tabasco state during several months in 2021, where Mexican immigration agents and National Guard troops forced them to cross into Guatemala without the opportunity to request asylum in Mexico, violating international law and placing people in danger of what the UN has termed "<u>chain refoulement</u>."

These sorts of policies increase risks to asylum seekers and create obstacles and delays in their access to protection in either Mexico or the United States. What they do not do is end forced migration. As shown by WOLA's <u>analysis</u> of trends in U.S. Customs and Border Protection (CBP) southwest border encounters over the past decade, crackdowns do not lead to sustainable reductions in migration. As pointed out by the <u>American Immigration Council</u>, U.S. government strategies centered on deterrence, blocking, family separation, and detention of migrants and asylum seekers follow a cyclical pattern in which they have "temporarily suppressed arrivals, but the push factors in home countries and drivers of migration have remained. Within a few years of each punitive policy's implementation, there was another increase in people coming to the border."



*\*Note that FY2020 and FY2021 data, in particular, overestimate total migrants encountered. This occurs due to increased repeat crossings prompted by Title 42 border expulsions. For instance, the total number of individuals encountered in FY2021 is likely just over <u>one million</u>. Source of FY2021 data: <u>https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters</u>.*
*Source of FY2006–FY2020 data: <u>https://www.cbp.gov/newsroom/media-resources/stats</u>.*

During our visit to Tapachula, numerous counterparts stated that Mexican authorities' reluctance to expand access to legal migration pathways outside the asylum system, such as visas for humanitarian or public interest reasons, has stemmed in part from <u>opposition</u> by the U.S. government, as temporary legal status for migrants in Mexico has been viewed as a factor that would increase arrivals at the U.S. border. Ironically, however, to the extent that current practices make it difficult to obtain legal status in Mexico (and hence to resettle in Mexico with access to work, school, and other services), migrants who otherwise would seek to make their lives in Mexico may instead be pushed to continue north to the United States. At the same time, migrants and asylum seekers determined to set out for the United States due to family connections or other needs will continue to do so both on their own and through the networks of smugglers who fill this demand.

Against this backdrop, it is urgent for the U.S. and Mexican governments, as well as other governments of the region, to recognize the counterproductive nature of deterrence and containment policies as responses to forced migration—and especially as responses to families and individuals fleeing life-threatening conditions in their home countries.

A concrete opportunity to do so will occur shortly after the publication of this report at the Ninth Summit of the Americas, hosted by the U.S. government in June 2022 in Los Angeles. While not one of the Summit's official themes, regional cooperation on migration will be one of the focus issues of the Summit, which comes after Biden administration officials' participation in ministerial meetings on regional migration management in <u>Colombia</u> in October 2021 and <u>Panama</u> in April 2022, as well as numerous bilateral meetings with Mexican and other officials, including the signing of bilateral arrangements on migration and protection with <u>Panama</u> and <u>Costa Rica</u>. Ahead of the Summit, a coalition of civil society organizations, including WOLA, have laid out a set of <u>guiding principles</u> for regional migration cooperation, centering human rights, access to protection, and sustainable solutions to forced displacement.

# CONCLUSIONS

Like regional forced migration in general, migration to and through Tapachula will not diminish anytime soon, and certainly will not decrease through deterrence-based tactics that only serve to put more suffering and danger in migrants' and asylum seekers' paths. On the contrary, policies designed to block migration through Mexico, such as the growing list of visa restrictions for South American countries that prevent people from flying into Mexico, force more people from these countries to cross north by land through treacherous routes. This inescapable reality highlights the need to make good on government pledges to prioritize access to protection in regional migration management, alleviating the human suffering in places like Tapachula and developing sustainable solutions for the migrant population.

In the case of Tapachula, guaranteeing access to asylum requires ensuring that arriving families and individuals can safely and immediately file their asylum claims and that authorities in charge of border crossing points, intake, and processing are from appropriate agencies and attend to the needs of this population as required by Mexican and international law. It also requires diversifying responses to the migrant population, recognizing that arriving people have different needs and that Mexican law provides for regularization for a number of reasons—not just due to filing an asylum claim.

Mexican authorities must take decisive steps to end abuses and discrimination by authorities against the asylum-seeking and migrant population. This includes curbing arbitrary detentions by the INM and the military, investigating allegations of abuse against migrants and asylum seekers and sanctioning those agents found responsible, and ensuring access to basic services. Finally, in addition to taking needed steps to promptly resolve asylum claims, the Mexican government should cease holding asylum seekers in Tapachula and reform its state-based containment policy to allow asylum seekers to access work and dignified living conditions in other parts of Mexico.

# RECOMMENDATIONS

*To the Mexican government:*

- **Guarantee that asylum-seeking families, children, and adults arriving at Mexico's southern border can request protection at official ports of entry.** This could be done by stationing COMAR personnel at ports of entry to register asylum claims. To the extent that ports of entry continue to be manned by INM agents, these agents should be instructed to admit asylum seekers and facilitate their access to COMAR without automatic detention, and mechanisms should be established to monitor and guarantee compliance with these obligations. Arriving asylum seekers should immediately receive documents indicating that they have permission to be in Mexico, avoiding scenarios in which people are forced to cross irregularly and make their way to COMAR.

- **End the practice of containing asylum seekers in Tapachula.** It is illegal and untenable to forcibly contain tens of thousands of asylum seekers in a single city for months or years, much less one that is ill-equipped to provide them with adequate public services and employment opportunities. The federal government should reform the official state-based containment policy currently established in administrative regulations, promptly allowing asylum seekers to move to different states in order to find work, reunite with family, and otherwise begin integration processes. COMAR should strengthen its ability to transfer asylum cases between its offices.

- **End detention of asylum seekers** except where compelling reasons exist for such a measure, as foreseen in international law. Detention should be exceptional and based only on an analysis of the need for such a measure in the individual case. Unnecessary detention dissuades asylum claims, causes people to desist from existing requests, makes it more difficult to pursue ongoing cases, and causes needless suffering, economic impacts, and health consequences for the detained people and their family members. (We define "detention" as housing people inside government or other facilities from which they are not free to leave, regardless of the institution in charge of such facilities or the terms used under Mexican law to describe such deprivation of liberty.)

- **Provide humanitarian and other visas as foreseen in Mexican law.** The National Migration Institute should make available humanitarian and other visas to those who qualify for them based on any of the grounds set out in domestic law. Asylum seekers who have submitted their claim before COMAR should be promptly provided with a humanitarian visa (TVRH).

- **Develop a coordinated system amongst Mexican agencies for the asylum process.** Instead of pursuing legal processes before COMAR and the INM, asylum seekers should only have to provide their information once. Since applying for asylum entitles the applicant to a TVRH, this should automatically be processed and issued based on the asylum application filed with COMAR.

- **Ensure access to healthcare, schools, and other basic services.** Authorities in these sectors should receive all necessary guidelines on guaranteeing registration and access of migrant children, families, and adults to vital services, and officials should promptly investigate reports of exclusion from such services and implement corrective measures. In particular,

accusations of discrimination by Mexican officials against women, Afro-descendant, indigenous, or other migrants should be investigated and adequately addressed.

- **Maximize integration and resettlement programs.** This crucial component of the migration and refugee process is the subject of ongoing and pilot programs coordinated by UNHCR. Mexican authorities should continue to collaborate with these efforts as well as strengthening their domestic inter-agency coordination and programming to ensure that growing numbers of asylum seekers, refugees, and other migrants are able not only to relocate, but also to integrate into a range of Mexican cities and states, providing a sustainable response to forced migration.

- **Increase government funding and support for COMAR.** Mexico received the third highest number of asylum requests worldwide for 2021. In spite of this, COMAR's 2022 budget remains essentially unchanged. While UNHCR provides crucial support and resources for COMAR, the Mexican government must also do its part. Insufficient resources contribute to long processing times, overworked staff, a lack of interpreters to support asylum seekers who speak indigenous languages and Haitian Creole, and limits on COMAR's presence along Mexico's southern border.

- **Hold Mexican migration agents and security forces accountable for abuses against migrants and asylum seekers.** Mexican and international civil society organizations have documented widespread abuses against migrants and asylum seekers in southern Mexico by INM agents, members of the military and National Guard, and police forces, as has the CNDH in a growing number of cases. Afro-descendant migrants, particularly Haitian migrants, have also faced racism and discrimination by Mexican authorities. The failure to hold agents accountable for their actions facilitates the perpetration of further abuses.

*To the U.S. government:*

- **Ensure that migration cooperation with Mexico and other countries prioritizes access to protection and solutions for the forcibly displaced population, rather than a counterproductive focus on blocking the paths of migrants and asylum seekers.** Measures such as border militarization, increases in detentions, and visa requirements produce changes in migration patterns, but a sustainable reduction in forced migration is not one of these changes. Approaches centered on deterrence and detention push migrants and asylum seekers to dangerous and hidden routes, increase demand and profits for human smugglers, and increase suffering and loss of life among people on the move. Families, children, and adults will continue to be displaced and to migrate as long as violence, extreme poverty, climate disasters, and other factors leave them no realistic path to safety and survival at home. Only by offering options for short- and long-term resettlement can the governments of the region stabilize the crisis of forced displacement, bring migrants and asylum seekers out of hiding, cut profits to organized criminal groups, and ensure protection for vulnerable families and individuals.

- **Work with Mexican authorities to identify and facilitate access to the United States for unaccompanied children seeking to reunite with U.S.-based family members and for people who cannot resettle in Mexico due to risks deriving from their concrete situation.** Even with improvements to its asylum system, Mexico is not a logical destination for all individuals. People arriving in Mexico who identify the United States as their destination

and who have compelling reasons to seek protection there, such as reunification with adult family members, should be supported in doing so.

- **Continue to provide robust funding to support access to protection in Mexico, while upholding national and international law on the ability to access asylum in the United States.** The United States continues to be the largest donor for UNHCR in Mexico, providing almost $39 million in assistance in 2021. Additional support to COMAR and international organizations operating in Mexico has been provided through the State Department's Bureau of Population, Refugees and Migration.

# ENDNOTES

1      The Cartagena Declaration is a regional agreement on refugees specific to Latin America. It delineates broader grounds for refugee status that include threats of generalized violence and disturbance of public order.

2      Law on Refugees, art. 13.II.

3      Law on Refugees, art. 28.

4      Regulations of the Law on Refugees, art. 16.

5      Law on Refugees, art. 18.

6      Law on Refugees, art. 7; Regulations of the Law on Refugees, art. 22.

7      Law on Refugees, art. 23.

8      Law on Refugees, art. 24.

9      Regulations of the Law on Refugees, art. 38.

10     Regulations of the Law on Refugees, art. 23.

11     These and all asylum statistics quoted subsequently come from COMAR's monthly information bulletin, as updated through May 1, 2022, at: https://www.gob.mx/cms/uploads/attachment/file/722490/ Cierre_Abril-2022__1-Mayo_.pdf, except for data on women and children, which are updated as of February 2022 and are available here:  https://www.gob.mx/cms/uploads/attachment/file/707121/02_MUJERES_ NNA_Febrero-2022.pdf and here: https://www.gob.mx/cms/uploads/attachment/file/706715/Cierre_Febrero-2022__1-Marzo_.pdf.

12     The National Guard is a militarized security force proposed by Mexican president Andrés Manuel López Obrador and created by law in 2019. It replaced the Federal Police and was announced as a new force to prevent crime and maintain public security, formally housed within the Ministry of Security and Citizen Protection (*Secretaría de Seguridad y Protección Ciudadana*, SSPC). Despite formally belonging to a civilian ministry, the National Guard is under the operational control of the Ministry of Defense (*Secretaría de la Defensa Nacional*, SEDENA) and is composed primarily of members of the armed forces. President López Obrador has announced that he will propose the formal incorporation of the National Guard into SEDENA, which would constitute the final step in the militarization of federal policing tasks in Mexico. The deployment of the National Guard to Mexico's border with Guatemala began in 2019, as part of the Mexican government's June 2019 agreement with the Trump administration to increase immigration enforcement.

13     See, for example, Law on Refugees, art. 20.

14     Migration Law (*Ley de Migración*), art. 52.V.

15     COMAR's annual budget can be viewed at line N00 of the Ministry of the Interior's annual budget, available at: https://www.pef.hacienda.gob.mx/work/models/aVbnZty0/PEF2022/kgp8I9cM/docs/04/r04_aae. pdf (2022) and https://www.pef.hacienda.gob.mx/work/models/PEF2021/docs/04/r04_aae.pdf (2021).

16     According to the PRM website: "PRM support in the region aims to address the humanitarian needs of vulnerable migrants, internally displaced persons, asylum seekers, and refugees, in support of national government responses. PRM funding supports programming in the following sectors: protection (including child protection and GBV prevention and response); emergency and cash based initiatives; shelter; water, health, and sanitation; and livelihood programming. The Bureau funds its traditional partners, including the United Nations High Commissioner for Refugees (UNHCR), the International Committee of the Red Cross (ICRC), the International Organization for Migration (IOM), and NGOs (in limited locations)."

17     The joint explanatory statement accompanying the FY2022 omnibus appropriations legislation incorporates these instructions set out on page 119 of House Report 117-84. The same document notes troubling reports "that agents in Mexico's National Migration Agency have committed human rights violations and have not been held accountable." Ibid.

# ABOUT THE AUTHORS

Stephanie Brewer is the Director for Mexico and Migrant Rights at WOLA. Lesly Tejada is the Program Assistant for the Mexico and Migration & Border Security programs at WOLA. Maureen Meyer serves as WOLA's Vice President for Programs.

# ACKNOWLEDGEMENTS

This report would not have been possible without the generous support of the Open Society Foundations.

## ABOUT WOLA

WOLA is a leading research and advocacy organization advancing human rights in the Americas. We envision a future where public policies in the Americas protect human rights, recognize human dignity, and where justice overcomes violence.

**WOLA.ORG** | 1666 CONNECTICUT AVE NW, SUITE 400, WASHINGTON DC 20009| 202-797-2171

# EXHIBIT 2

**human rights first**

American ideals. Universal values.

FACT SHEET March 2018

# Mexico: Still Not Safe for Refugees and Migrants

The Trump Administration seeks to prevent refugees who pass through Mexico from receiving asylum in the United States. In addition to pushing for legislative change that would allow the U.S. Secretary of Homeland Security to unilaterally declare Mexico a "safe third country," recent reports also indicate the administration aims to press Mexico to agree to a safe third country agreement.

In a July 2017 report Human Rights First found that Mexico was not a safe third country for refugees. The organization's findings included that refugees and migrants face acute risks of kidnapping, disappearance, sexual assault, trafficking, and other grave harms in Mexico; that Mexican migration officers deport Central Americans who have expressed fear of return despite the country's *nonrefoulement* and human rights obligations; and that deficiencies, barriers, and flaws in the Mexican asylum system leave many refugees unprotected.

Since July 2017, the dangers facing refugees and migrants in Mexico have escalated. Recent reports confirm that Mexican authorities continue to improperly return asylum seekers to their countries of persecution and that the deficiencies in the Mexican asylum system have grown.

**Increasing Violence in Mexico**

Human Rights First's July 2017 report found that migrants and refugees face grave risks of kidnapping, disappearance, sexual assault, trafficking, and other harms in Mexico. They are targeted not only due to their inherent vulnerabilities as refugees and migrants, but also due to their nationality, race, gender, sexual orientation and gender identity. Some have been trafficked into forced labor, while refugee and migrant women and girls have been trafficked to Mexico's southern border where they have been exploited in bars and

night clubs that cater to police, military and other forces in the area.

In the last year, violence in Mexico has increased; 2017 was the deadliest year in Mexico, with a record 29,168 homicide victims, a 27 percent increase from 2016. In January 2018, the U.S. State Department even issued its highest level of travel warning for five Mexican states—Sinaloa, Colima, Michoacán, Guerrero, and Tamaulipas—due to high crime levels.

In September 2017, the U.N. Committee on the Protection of the Rights of All Migrant Workers and their families expressed concern at "the significant increase in crimes against migrants" in Mexico and at increasing reports of xenophobia towards migrants. Migrants shelters have reported increases in crimes against migrants, including robbery, kidnapping, and extortion, as detailed in the Washington Office on Latin America (WOLA)'s 2017 report. WOLA also reported exceedingly high impunity rates for crimes against migrants and asylum seekers, and the Kino Border Initiative reported in September 2017 that crimes against asylum seekers and migrants—including assault, extortion, kidnapping, rape, and murder—largely go uninvestigated and unpunished.

***Refoulement* and Suppression of Asylum Claims**

As party to both the 1951 Convention Relating to the Status of Refugees and the Convention Against Torture, the Mexican government is obligated to prevent the return (*refoulement*) of any person to a country where they would face ongoing threats of persecution or torture. Human Rights First found that Mexico deports many refugees who are blocked or discouraged from seeking asylum in Mexico, or who do not even know they can apply for asylum. Subsequent reports indicate that these practices,

which lead to the return of refugees to their countries of persecution, continue.

A 2018 report by Amnesty International found that 75 percent of migrants and asylum seekers surveyed who were detained by the National Institute of Migration (INM)—Mexico's immigration enforcement agency—were not informed of their right to seek asylum, even though this is required by Mexican law. Additionally, testimony of 120 of the asylum seekers surveyed by researchers indicated that *refoulement* had occurred.

Human Rights First's report found that Mexican INM officers who work at detention facilities encourage asylum seekers to accept deportation and to not pursue asylum applications. This occurs through various forms of coercion, including INM officers telling asylum seekers that they will be held in detention for three months or longer if they pursue asylum. Amnesty International's report also concluded that the INM's default process of requiring all migrants and asylum seekers to sign "voluntary return" paperwork during their initial INM interviews often prevents asylum seekers from pursuing asylum. Many people signed these forms under coercion or without knowledge of their contents.

**Mexican Asylum System Lacks Capacity to Timely and Fairly Adjudicate Cases**

As Human Rights First has detailed, despite the steep rise in asylum filings in Mexico, the Mexican asylum system lacks effective national reach and capacity. These deficiencies have grown worse since July 2017 and in the wake of the October 2017 suspension of the Mexico City office of the Mexican Commission for Refugee Assistance (COMAR). Many of the functions performed in that office were suspended following the September 2017 earthquake; the suspension has not yet been lifted as of March 2018.

The number of asylum applications filed in Mexico has risen sharply in recent years and so too has the number of asylum applications.  Between 2013 and 2016, the number of asylum applications rose by 1226 percent. In 2017, 14,596 people applied for asylum. However, 7,719 of those cases remain unresolved. Only 4,475 of these applicants, or 30.7 percent, concluded their proceedings. In

comparison, 71 percent of asylum applicants concluded their proceedings in 2016. Moreover, 2,233 cases were abandoned and 167 were withdrawn. The National Human Rights Commission (CNDH) in Mexico has indicated that this high number of abandoned cases is likely the result of the long processing delays. Legal groups working with asylum seekers in Mexico have reported to Human Rights First that the suspension of the Mexico City COMAR office has contributed to long delays in interviewing asylum applicants and recognizing claims.

On February 25, 2018, the National Human Rights Commission (CNDH) in Mexico issued an urgent call to the federal government warning of the possible collapse of the refugee protection system and urging the government to send a clear signal of its commitment to honor its asylum and refugee obligations. The Commission also warned that the long delays and associated deficiencies constitute a denial of international protection.

While Human Rights First's prior report had noted an improvement in recognition rates, more recent reports of declines and disparities in recognition rates raise concerns that refugees from the Northern Triangle are being denied protection in Mexico. Statistics show that asylum recognition rates for 2017 are far below 2016 recognition rates.

In addition, non-profit legal organizations in Mexico City reported concerns to Human Rights First about variations in asylum recognition rates based on nationality. The statistics provided by the Mexican government confirm these concerns. For example, while 907 of the 4,042 Venezuelans (22.4 percent) who applied for asylum in 2017 were granted asylum, only 378 of the 4,272 Hondurans (8.9 percent) and 525 of the 3,708 Salvadorans (14.2 percent) who applied for asylum in 2017 were granted protection. Grant rates are further reduced for other countries, including Cuba and Somalia. Therefore, statistics that had previously indicated an improvement in Mexico's over-all recognition rate may have instead reflected the higher approval rate for the increased number of asylum applications from Venezuelans.

# EXHIBIT 3

**Situation of Impunity and Violence in Mexico's Northern Border Region**

**March 2017**

**Introduction**

The situation of insecurity and violence along Mexico's northern border and the government's failure to effectively investigate and prosecute these crimes poses dangers for migrants and asylum seekers, in particular unaccompanied children and women who are attempting to reach the United States.  Asylum seekers who are forcibly turned back after claiming fear with U.S. migration officials at the U.S.-Mexico border and left to seek protection through clandestine means are particularly at risk.

Violence and crimes against migrants in Mexico's northern border states have long been documented to include cases of disappearances, kidnappings, rape, trafficking, extortion, executions, and sexual and labor exploitation by state and non-state actors. The situation is compounded by ineffective responses by Mexican authorities to investigate and prosecute crimes against migrants and other human rights violations. While the sparse civil society actors, including several migrant shelters often operating well above their capacity, do what they can to offer protection to migrants in transit and repatriated Mexican nationals, they too suffer attacks due to their work and the generalized situation of violence in the region. The  2015 Inter-American Commission on Human Rights (IACHR) report on the situation of human rights in Mexico identified violence as being particularly acute in the Mexican states of Baja California Norte, Sonora, Chihuahua, Coahuila, Nuevo León, and Tamaulipas due to the effects of drug trafficking and organized crime in this area.[i] A recent study states that in 2016, the border cities of Tijuana and Ciudad Juarez were among the top five Mexican cities with the highest level of homicides in the country.[ii] The Inter-American Commission has noted with great concern that that the disappearance of persons had become common practice in several states in northern Mexico, severely impacting migrants and Mexicans crossing Mexico on their way to the United States, as well as Mexicans deported from the United States to certain areas of the border region.[iii]

The U.S. State Department has issued travel advisories for all six of Mexico's northern states sharing a border with the United States, noting the dangers of transiting through them, the prevalence of organized crime, and the high rates of crimes.[iv] The 2016 State Department Human Rights report on Mexico noted the persistence of the involvement of the police and military in serious abuses across the country, including in executions, torture, and disappearances alongside impunity and corruption among Mexican law enforcement and in the justice system.[v] The same report highlighted the role of organized criminal groups in murdering, kidnapping, extorting, and intimidating individuals and in particular women, migrants, journalists, and human rights defenders. Violence against migrants and trafficking in persons were noted as particular problems in Mexico.

This situation confirms that the increasing of Customs and Border Protection agents refusing entry to asylum-seekers and turning back others without proper documents at the U.S. Ports of Entry at the border places only returns individuals, families, and children at risk, exposing them to organized crime and smugglers as well as corrupt state authorities unable to protect them or investigate the crimes they have suffered.  Furthermore, the proposal in the U.S. government executive order "*Border Security and Immigration Enforcement Improvements,*" issued January 25, 2017, and accompanying implementation memo to return to non-Mexican individuals to Mexico while they await a final resolution of their

immigration proceedings would further the practice of sending vulnerable migrants and asylum seekers back to danger in Mexico.[vi] It should be noted that the Mexican government has made clear that it will not receive from the U.S. deported migrants from any other country.[vii]

**Crimes against Migrants, Shelters and Violence by Geographical Area**

**Baja California: Tijuana and Mexicali**

Official statistics from the Baja State Secretariat for Public Security evidence an increase in homicide rates in the state of Baja California from January 2016 to July 2016, compared to the same period in the previous year.[viii] The U.S. State Department travel warning notes "violent crime areas" and "targeted criminal assassinations" throughout the state.[ix] According to an article by the *Los Angeles Times*, 2016 was on track to be the most violent year in Tijuana since 2010. Through the end of September 2016 there were 636 killings.[x]

Recently, the Tijuana port of entry area has been overwhelmed by the number of migrants and asylum seekers who have arrived, a large portion of them Haitians. The local Mexican government has been unable to support this population. NGO service providers have documented cases of extortion and kidnapping, reporting that the level of violence has increased recently.[xi] In Mexicali, local migrant shelters have been operating far above capacity given the numbers of migrants arriving. For example, one shelter has capacity for 100 individuals but at times in fall 2016 it received around 500.[xii] The security situation of shelters is also tenuous; shelters have identified instances where organized crime operatives have infiltrated their spaces.[xiii] Here, too, the local city government has not been responsive to complaints of crimes against migrants.

Violence against migrants in this part of the border is not new. In 2012, a WOLA report included accounts from Mexican officials and civil society about frequent kidnappings of migrants in the mountain region between Tijuana and Mexicali.[xiv] A 2006 study focusing on the areas of Tijuana and Mexicali reported that migrants traveling through these areas experience high rates of verbal, psychological, and physical violence perpetrated by local police and judges, along with high rates of sexual violence perpetrated by members of organized crime and the military.[xv]

**Sonora: Nogales, Caborca and Altar**

The U.S. State Department includes a travel advisory for the state of Sonora, noting that "Sonora is a key region in the international drug and human trafficking trades."[xvi]

According to NGO reports, kidnapping and extortion continue with impunity in the city of Nogales. From 2014 to the present, the Kino Border Initiative has assisted migrants in filing 95 police reports, primarily for victims of kidnapping. None of the crimes have been adequately investigated and the majority of people who are victims of crime do not want to file a police report. In September 2016, the Kino Border Initiative soup kitchen was vandalized and electronics were stolen, possibly by organized crime, after the staff had received death threats.[xvii] The attacks were thought to be a reprisal against staff for their work reporting complaints of migrant kidnappings in the area.

In Caborca, Sonora the local community is hostile to migrants and Mexican authorities regularly violate the rights of migrants. NGOs have documented ongoing raids by the Mexican National Migration Institute (*Instituto Nacional de Migración*, INM) including targeting migrants inside private residences.[xviii]

In Altar, Sonora organized crime regularly attacks and commits crimes against migrants, including homicides.[xix] Municipal police also regularly detain, extort, and rob migrants. The local community is hostile to migrants here as well.

## Chihuahua: Ciudad Juárez and Chihuahua

The U.S. State Department includes a travel advisory for the state of Chihuahua, stating "criminal activity and violence remains an issue throughout the state of Chihuahua and its major cities." The warning urges individuals to exercise caution in all areas of Ciudad Juarez and prohibits U.S. employees from traveling after dark to certain areas.[xx]

After reporting a decrease in homicides in the state of Chihuahua, Mexico from 2011 to 2015, the U.S. Department of State 2017 Crime and Safety report documents a significant increase in 2016, with murders increasing from 1,151 in 2015 to 1,470 in 2016.[xxi]

Likewise, the cities of Ciudad Juarez and Chihuahua experienced an increase in reported murders in 2016, after a decrease from 2014 to 2015. In Ciudad Juarez, numbers fluctuated from 438 murders in 2014, to 312 in 2015, and peaked at 545 murders in 2016. There were over 150 homicides in Ciudad Juarez in the first two months of 2017.[xxii] In the city of Chihuahua, there were 219 reported murders in 2014, 158 reported murders in 2015, and 236 reported murders in 2016.[xxiii] *InSight Crime* reports that in October 2016 alone, the state of Chihuahua had 186 homicides, with 90 homicides occurring in Ciudad Juarez.[xxiv] Violence against women is historically a cause of grave concern in the area around Ciudad Juarez and in greater Mexico. Chihuahua is still the only state that has not incorporated femicide into its criminal code, despite the 2,318 women that have been murdered in Mexico over the course of nine years as reported by the National Citizen Femicide Observatory.[xxv]

The State Department reported kidnappings have increased in the state of Chihuahua; reporting nine in 2016, six in 2015, and eight in 2014. The report analyzes that these numbers may be artificially low due to under-reporting because of fear of retribution as well as differences in recording based on if the kidnappings relate to drug trafficking.[xxvi] Migrant shelters have likewise reported frequent kidnappings.

There is only one migrant shelter in the city of Chihuahua which recently opened on November 28th, 2016.[xxvii] Civil society presence here is not as developed as in other cities along the Mexican side of the border. The migrant population in the city is often mixed with other indigent groups, which has led to discrimination and criminalization of migrants.

## Coahuila: Saltillo, Piedras Negras

The U.S. State Department issued a travel warning for the state of Coahuila, noting "violence and criminal activity, including homicide, armed robbery, carjacking, kidnapping, extortion, and sexual assault, pose significant and continuing security concerns, particularly along the highways between Piedras Negras and Nuevo Laredo."[xxviii]

The state of Coahuila has been notorious for crimes against migrants and a lack of response by local government authorities to these abuses. Organized crime controls the border region and it is unsafe for migrants to proceed beyond Saltillo. This is one factor that causes groups of migrants to be stranded in the city. The situation of violence is ongoing and continues to increase. The migrant shelter in Saltillo, *Frontera con Justicia*, in documented more crimes against migrants: kidnapping, extortion, robbery and other abuses in the first seven months of 2016 than in all of 2015.[xxix] The border town of Piedras Negras also continues to experience violence. In November 2016, five Salvadoran migrants, including a woman and child, were rescued by Mexican authorities after having been kidnapped there.[xxx]

Migrant shelters and their staff have also been impacted by violence and impunity. The director and other staff from the Casa del Migrante shelter in Saltillo have been threated organized criminal organizations on multiple occasions[xxxi] The most recent incident occurred in October 2016. As a result of the harassment and threats they have experienced, the director and staff have been beneficiaries of precautionary measured by the IACHR since 2010.[xxxii] When migrants are detained by Mexican migration agents human rights defenders are often not given access to them and the migrants themselves are not informed of their rights.

**Nuevo Leon: Monterrey**

The U.S. State Department travel advisory notes that U.S. government personnel should travel outside of the city of Monterrey only during daylight hours. The 2016 Crime and Safety Report released by the U.S. Department of State categorizes Monterrey's consular district as a high crime area. Violent crime in the forms of kidnappings, extortions, homicides, as well as non-violent crimes of vehicle threats and others, remain serious concerns for the area. Police and cartel confrontations can at times put the public at risk through shootouts, or via the weapons and explosives discovered after a confrontation.

In Monterrey, shelters have reported violence against migrants perpetuated by organized crime as well as local police. Kidnappings of migrants are ongoing. The municipal police has also forcibly disappeared migrants, not just on the streets but also from houses. Police extort migrants and have even detained volunteers from the migrant shelters. In a recent survey, the *Casa Monarca* migrant shelter found that 82% of migrants who have experienced threats report that they were threatened by the police. The INM claims to be rescuing migrants from situations of insecurity when it is in fact detaining and deporting them.[xxxiii]

Crimes committed against migrants are also not new in this state. In 2012, forty-nine migrants were kidnapped and executed by organized crime in the city of Cadereyta, Nuevo Leon. Five years later, the identification of all of their remains is still pending.[xxxiv]

**Tamaulipas: Matamorros, Nuevo Laredo & Reynosa**

The U.S. State Department's December 2016 travel advisory warns: "U.S. citizens should defer all non-essential travel to the state of Tamaulipas due to violent crime, including homicide, armed robbery, carjacking, kidnapping, extortion, and sexual assault. State and municipal law enforcement capacity is limited to nonexistent in many parts of Tamaulipas. Violent criminal activity occurs more frequently along the northern border and organized criminal groups may target public and private passenger buses traveling through Tamaulipas. These groups sometimes take all passengers hostage and demand ransom

payments. Matamoros, Reynosa, Nuevo Laredo, and Ciudad Victoria have experienced numerous gun battles and attacks with explosive devices in the past year."[xxxv]

The 2016 Crime and Safety Report issued by the U.S. Department of State on Nuevo Laredo, Tamaulipas demonstrated the continued absence of police in regulating crimes in the area. The violence primarily stems from organized crime. Kidnapping and other violence statistics have not improved from 2015. U.S. government statistics list Tamaulipas as the highest state for kidnappings in the country, a record held for 2015 and 2016. [xxxvi] Similarly, Tamaulipas has the third highest missing person's rate in Mexico due to major migrant routes that traverse the border state and an ongoing territorial battle between organized crime groups.[xxxvii]

Nuevo Laredo has also long presented a danger for migrants in transit, as well as those who are returned. The *Casa del Migrante* Nuevo Laredo reports that it is dangerous for migrants to be on the street or in the bus stations. NGOs have requested that Mexican marines or army position themselves at the bus station in Nuevo Laredo to provide security, but the government has not taken action. There is almost no government support even for deported Mexican migrants in this border town. The government only brings migrants from the point of deportation to the migrant shelter. There is no support from the local government for migrants to return to their place of origin and the burden falls to the migrant shelters.[xxxviii]

Migrants continue to be victims of crime in Reynosa as well. In December 2016 it was reported that a Guatemalan migrant women in Reynosa approached U.S. authorities at the Port of Entry to request asylum and she was turned away only to be kidnapped by smugglers.[xxxix] In April 2016, Mexican marines rescued 49 Central American migrants who had also been kidnapped in Reynosa.[xl]

In 2010 and 2011, some of the most egregious cases of mass kidnapping and execution of migrants were committed in the city of San Fernando, Tamaulipas. While organized crime was the main perpetrator behind the massacres, additional evidence since then has confirmed the collusion of municipal police forces in disappearing and handing the migrants over to organized crime for execution.[xli]

**Contact:**

Daniella Burgi-Palomino, Senior Associate, Mexico, Migrant Rights and Border Issues, Latin America Working Group (LAWG), dburgipalomino@lawg.org

Maureen Meyer, Senior Associate, Mexico, Migrant Rights and Border Issues, Washington Office on Latin America (WOLA), mmeyer@wola.org

Joanna Williams, Director of Education and Advocacy, Kino Border Initiative, jwilliams@kinoborderinitiative.org

---

[i] IACHR, Country Report México: Situation of Human Rights in Mexico, December 31, 2015 http://www.oas.org/en/iachr/reports/pdfs/Mexico2016-en.pdf.
[ii] Ferreira, Octavio Rodríguez, "Resurgence of Violence in Tijuana," University of San Diego, February 3, 3017 https://www.wilsoncenter.org/event/the-state-security-mexico-why-are-homicides-increasing-how-to-reduce-the-violence.
[iii] IACHR, pg. 89.

iv "Mexico Travel Warning," U.S Passports and International Travel, U.S. Department of State, Bureau of Consular Affairs, last updated December 8, 2016, https://travel.state.gov/content/passports/en/alertswarnings/mexico-travel-warning.html.

v Mexico Human Rights Report, Country Reports on Human Rights Practices for 2016, United States Department of State Bureau of Democracy, Human Rights, and Labor  https://www.state.gov/documents/organization/265812.pdf

vi Department of Homeland Security, Memo, "Implement e President's Border Security and Immigration Enforcement Improvements Policies", February 20, 2017, https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf

vii El Universal, "México no aceptará deportados de otros países: Videgaray, February 22, 2017, http://www.eluniversal.com.mx/articulo/nacion/politica/2017/02/22/mexico-no-aceptara-migrantes-de-otros-paises-videgaray

viii "Mexico Travel Warning

ix Ibid.

x Dibble, Sandra, "Killings Rise Anew in Tijuana, a City Haunted by Years of Violence," *Los Angeles Times*, October 9, 2016, http://www.latimes.com/world/mexico-americas/la-fg-mexico-tijuana-crime-20161005-snap-story.html.

xixi Casa del Migrante en Tijuana, "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Iniciativa Frontera Norte de México. .

xii Centro Comunitario de Ayuda a Migrantes (C-CAM), "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Iniciativa Frontera Norte de México. .

xiii Casa del Migrante Mexicali, Módulo de Atención al Migrante Deportado, "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Iniciativa Frontera Norte de México. .

xiv Isacson, Adam and Meyer, Maureen, "Beyond the Border Buildup Security and Migrants Along the U.S.-Mexico Border", April 2012 https://www.wola.org/files/Beyond_the_Border_Buildup_FINAL.pdf

xvInfante, C., Idrovo, A.J., Sánchez-Domínguez, M.S. et al, J Immigrant Minority Health (2012), http://rdcu.be/pUG5.

xvi "Mexico Travel Warning."

xvii Centro Prodh "Agresiones contra Iniciativa Kino, refugio de migrantes en Sonora," September 29, 2016, http://centroprodh.org.mx/sididh_2_0_alfa/?p=47201

xviii Centro Comunitario de Ayuda a Migrantes (C-CAM).

xix Centro Comunitario de Atención al Migrante y Necesitado (CCAMYN).

xx "Mexico Travel Warning."

xxi "Mexico 2017 Crime & Safety Report: Ciudad Juarez ," OSAC, United States Department of State, Bureau of Diplomatic Security, February 14, 2017, https://www.osac.gov/pages/ContentReportDetails.aspx?cid=21251.

xxii Woody, Christopher, Business Insider, "Mexico's ascendant cartel is making a deadly addition to a trafficking hub on the US border", March 4, 2017, http://www.businessinsider.com/jalisco-cjng-sinaloa-cartel-violence-in-ciudad-juarez-mexico-2017-3

xxiii Ibid.

xxiv Alonso, Luis Fernando, "Rising Violence in Juárez, Mexico May Signal Return of Cartel War," *InSight Crime*, October 31, 2016, http://www.insightcrime.org/news-briefs/rising-violence-in-juarez-mexico-may-signal-return-of-cartel-war.

xxv Gallegos, Zorayda, "Mexican Deputies Toughen up Femicide Legislation," *El País*, February, 6, 2017 http://elpais.com/elpais/2017/02/06/inenglish/1486380569_447772.html

xxvi Ibid.

xxvii Casa del Migrante 1 de 7 migrando, "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Iniciativa Frontera Norte de México.

xxviii "Mexico 2017 Crime & Safety Report: Ciudad Juarez."

xxix Meyer, Maureen, "Migrants in Transit Face Crimes and Human Rights Abuses," WOLA, November 15, 2016, https://www.wola.org/analysis/migrants-transit-face-crimes-human-rights-abuses-mexican-government-prioritizes-detention-deportation-protection/.

xxx Ramos, Leopold, La Jornada, "Rescatan a migrantes secuestrados en Piedras Negras", Nov. 11, 2016, http://www.jornada.unam.mx/ultimas/2016/11/11/rescatan-a-migrantes-secuestrados-en-piedras-negras

xxxi Casa Monarca, Casa Nicolás, "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Kino Border Initiative.

[xxxii] Inter-American Commission of Human Rights, Precautionary Measures, PM 270/10 − PM 312-09 - Father Pedro Pantoja Arreola and his Team of Collaborators at the Belén Migrant Shelter, Mexico, http://www.oas.org/es/cidh/defensores/proteccion/cautelares.asp

[xxxiii] Ibid.

[xxxiv] "El caso de 49 torsos encontrados en la carretera de Cadereyta, Nuevo León," Fundación Para la Justicia y el Estado Democrático de Derecho, http://fundacionjusticia.org/el-caso-de-49-torsos-encontrados-en-la-carretera-de-cadereyta-nuevo-leon/.

[xxxv] "Mexico Travel Warning."

[xxxvi] "Mexico 2016 Crime & Safety Report: Nuevo Laredo," OSAC, United States Department of State, Bureau of Diplomatic Security, April 12, 2016, https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=19475.

[xxxvii] Estadísticas Fuero Federal, Secretaria de Gobernación, 28 de febrero de 2017 http://secretariadoejecutivo.gob.mx/rnped/estadisticas-fuerofederal.php.

[xxxviii] Casa del Migrante Nuevo Laredo, "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Iniciativa Frontera Norte de México.

[xxxix] Nelson, Aaron, San Antonio Express News, Dec. 29, 2016, "Asylum-seeking immigrants flood international bridges, many sent back to Mexico", http://www.expressnews.com/news/local/article/Asylum-seeking-immigrants-flood-international-10825675.php?t=01c86173346a5efc77&cmpid=fb-premium&cmpid=twitter-premium

[xl] De Llano, Pablo, El País, "Un operativo militar rescata en Reynosa a 49 centroamericanos secuestrados", April 23, 2016,  http://internacional.elpais.com/internacional/2016/04/22/mexico/1461333055_498254.html

[xli] "Fosas clandestinas en San Fernando, Tamaulipas," Fundación Para la Justicia y el Estado Democrático de Derecho, http://fundacionjusticia.org/47-fosas-con-193-restos-en-san-fernando-tamaulipas/.

EXHIBIT 4

# ACCESS TO JUSTICE FOR MIGRANTS IN MEXICO

## A Right That Exists Only on the Books

### JULY 2017



RESEARCH
**REPORT**

*AP Photo/Felix Marquez*










## IN MEMORY OF



This report is dedicated to the life and work of Alberto Donis, migrants' rights defender and coordinator of the shelter *Hermanos en el Camino* in Oaxaca, who died in June 2017. Beto always demanded justice for crimes and abuses committed against migrants in Mexico. We will never forget you, Beto.

# ACCESS TO JUSTICE FOR MIGRANTS IN MEXICO

## A Right That Exists Only on the Books

By Ximena Suárez, Andrés Díaz, José Knippen, and Maureen Meyer

**JULY 2017**

## TABLE OF CONTENTS

FINDINGS ................................................................................. 4

INTRODUCTION ..................................................................... 7

OFFICIAL FIGURES *VERSUS* REALITY ............................... 9

OBSTACLES TO DENOUNCING CRIMES
AGAINST MIGRANTS ............................................................ 13

OBSTACLES TO INVESTIGATING CRIMES
AGAINST MIGRANTS ............................................................ 19

REPORTS OF CRIMES AGAINST MIGRANTS
RECEIVED FROM ABROAD ................................................. 32

CONCLUSIONS AND RECOMMENDATIONS ................... 35

NOTES ..................................................................................... 38

# FINDINGS

- **ACCORDING TO ALL OF THE MIGRANT SHELTERS THAT COLLABORATED IN THIS REPORT, THE NUMBER OF KIDNAPPINGS, FORCED DISAPPEARANCES, AND OTHER TYPES OF FALSE IMPRISONMENT OF MIGRANTS REMAINS HIGH IN MEXICO.** The data and testimonies collected show that organized criminal groups are involved in these cases and are often in collusion with authorities from different levels of government.

- **BETWEEN 2014 AND 2016, THERE WAS A 575 PERCENT INCREASE IN THE NUMBER OF MIGRANTS WHO REGULARIZED THEIR MIGRATION STATUS IN MEXICO BECAUSE THEY WERE VICTIMS OR WITNESSES OF GRAVE CRIMES IN THE COUNTRY. THIS CONFIRMS THAT CRIMES AGAINST MIGRANTS ARE ON THE RISE.**

- **IMPUNITY FOR CRIMES AGAINST MIGRANTS IN MEXICO IS AT ALARMING LEVELS.** According to official figures for the 2014-2016 period, of 5,824 crimes against migrants reported in Chiapas, Oaxaca, Tabasco, Sonora, Coahuila, and at the federal level, there is evidence of only 49 sentences, leaving 99 percent of the cases in impunity.

- **MEXICO HAS DRASTICALLY INCREASED ITS CAPACITY TO DETAIN AND DEPORT MIGRANTS, BUT IT HAS NOT GIVEN THE SAME PRIORITY TO, NOR TREATED WITH THE SAME URGENCY, THE NEED TO DEVELOP MECHANISMS FOR INVESTIGATING CRIMES AGAINST THEM.** The creation of special local prosecutor's offices and a federal unit within the federal Attorney General's Office (*Procuraduría General de la República*, PGR) is important, but not enough to ensure justice. In practice, reporting crimes is difficult and the offices in charge of investigations do not have sufficient human and financial resources, nor do they have comprehensive and clear strategies for investigating the crimes. Effective procedures to allow migrants to denounce crimes and abuses while held at migrant detention centers are also lacking.

- **MANY STATE OFFICIALS IN MEXICO SHOW A CLEAR LACK OF WILL TO INVESTIGATE CRIMES COMMITTED AGAINST MIGRANTS.** Mexican authorities commonly justify the lack of results saying that if victims do not stay in the country, investigations cannot move forward. However, we found that authorities do not adequately use the two main resources available for investigating these cases: the production of evidence before a trial ("*pruebas anticipadas*") and the regularization of the migration status of migrants who are victims of or witnesses to crimes.

# FINDINGS

- **THE MECHANISM FOR FOREIGN SUPPORT (*MECANISMO DE APOYO EXTERIOR*, MAE) THAT PERMITS CRIMES COMMITTED AGAINST MIGRANTS IN MEXICO TO BE DENOUNCED FROM ABROAD, WORKS THANKS TO THE EFFORTS OF CENTRAL AMERICAN GROUPS WHOSE FAMILY MEMBERS HAVE BEEN VICTIMS OF THESE CRIMES, HUMAN RIGHTS ORGANIZATIONS ACCOMPANYING MIGRANTS, AND SPECIFIC ACTIONS OF SOME GOVERNMENT OFFICIALS.** However, Mexico's Ministry of Foreign Affairs (*Secretaría de Relaciones Exteriores*, SRE) and Attorney General's Office have not yet shown the will to make the Mechanism work adequately, facilitate case intake, and educate Mexico's consular network about it. Significant challenges exist to keep families in their country of origin or residency informed about their cases and to facilitate family travel to Mexico when they have to participate directly in the investigation.

- **THE CENTRAL AMERICAN CONSULATES IN MEXICO DO NOT MAKE THE NECESSARY EFFORTS TO ASSIST THEIR CITIZENS WHEN THEY FALL VICTIM TO CRIME IN MEXICO, SUCH AS THROUGH ACTIVELY PARTICIPATING IN THE INVESTIGATION OF ABUSES AGAINST MIGRANTS OR BY FACILITATING INFORMATION THAT IS NEEDED FROM THE VICTIMS DURING INVESTIGATIONS.** In Coahuila, for instance, the Honduran consul has been recognized for the strong support he provides to migrants who are crime victims. In other states, such as Oaxaca, consular support to Central American migrants is insufficient.

- **ALTHOUGH THE NATIONAL HUMAN RIGHTS COMMISSION (*COMISIÓN NACIONAL DE LOS DERECHOS HUMANOS*, CNDH) REGULARLY VISITS MIGRANT DETENTION CENTERS TO DOCUMENT THE CONDITIONS AND TREATMENT OF MIGRANTS, IT HAS MADE FEW RECOMMENDATIONS TO THE NATIONAL MIGRATION INSTITUTE (*INSTITUTO NACIONAL DE MIGRACIÓN*, INM) ON HOW TO IMPROVE THE SITUATION.** The number of recommendations issued by the CNDH on abuses in the detention centers and against migrants is surprisingly low compared to the accounts of migrants, who identify migration enforcement operations and their stay in detention centers as sources of abuse and human rights violations, and INM agents as perpetrators.

- **OFFICIAL STATISTICS SHOW AN INCOMPLETE STORY—FAR LESS VIOLENT AND HARMFUL—THAN MIGRANTS' TESTIMONIES ON THE CRIMES AND ABUSES THEY SUFFER IN MEXICO.** In some cases, there is not disaggregated data on crimes against migrants. In others, the attorney general or special prosecutor's offices do not have information on how many of their investigations resulted in

# FINDINGS

sentences. Statistics on violence against migrants are not gathered at the national level even though many federal and local cases may be related, making it difficult to obtain information on criminal networks that target migrants and operate throughout the country. Shelters and organizations supporting migrants who have been victims of crimes are an essential source of information and have better statistics than the government.

- **MIGRANTS' RIGHTS DEFENDERS ARE VICTIMS OF THREATS AND INTIMIDATION FOR THEIR WORK.** Similar to crimes against migrants, attacks on migrants' rights defenders go unpunished. Furthermore, there have been attempts to discredit, limit, and halt the work of defenders supporting the identification of victims' remains in the San Fernando and Cadereyta massacres.

# INTRODUCTION

*When I left there (the U.S. Customs and Border Protection office at the border with Reynosa on the day I went to apply for asylum) at 6:30 p.m., they grabbed me and kidnapped me.... A guy wearing glasses came up to me and said, "Let's go," and I said, "No." Two minutes later, they showed up in a cab and forced me to get in. There were two other male migrants there and they shoved them in against their will. I got in willingly. When we got to the store, they beat them up with an iron rod, but not me because I had gone willingly. There were people from everywhere there—Hondurans, Guatemalans, Africans, South Americans—everyone was crying. My mom paid money so they would let me go. She is in Guatemala. She took out a loan and still has to pay it back. I don't remember when I got out. —Pedro, 18-year-old Guatemalan migrant[1]*

Since 2014, there has been a drastic increase in the number of migrants traveling through Mexico that are fleeing violence and threats from gangs in their home countries and who are fighting, literally, for their lives. The majority come from Central America's Northern Triangle—Guatemala, El Salvador, and Honduras. As they journey through Mexico, they often face more violence and, just like in their countries of origin, the crimes and abuses they fare victim to are almost never investigated or punished. Although Mexico claims to "prioritize the protection of the human rights of migrants,"[2] migrants' testimonies[3] reveal a different reality: extortion, kidnapping, torture, sexual abuse and rape, homicide, robbery, and disappearances of migrants are all frequent occurrences.

Mexican authorities have implemented a number of measures to investigate crimes against migrants. For example, in 2015, under pressure from civil society organizations, the federal Attorney General's Office (*Procuraduría General de la República*, PGR) created the Unit for the Investigation of Crimes for Migrants (*Unidad de Investigación de Delitos para Personas Migrantes*, UIDPM) tasked with investigating federal crimes committed against or by migrants in Mexico. It also established the Mechanism for Foreign Support (*Mecanismo de Apoyo Exterior*, MAE), which allows migrants and their families to report crimes that occurred in Mexico from abroad. Since 2008, seven states—Chiapas, Oaxaca, Veracruz, Coahuila, Tabasco, Campeche, and Quintana Roo—have opened prosecutor's offices or offices specialized in investigating crimes against migrants. Nonetheless, Mexico continues to prioritize the detention and deportation of migrants—a policy that has prompted an upsurge in crimes and human rights violations against migrants—and it has not treated with the same urgency the need to develop more effective mechanisms for investigating the crimes and abuses against them. Access to justice is secondary, impunity is the general rule, and successful investigations are the exception.

In this report, we analyze whether the creation of these special prosecutor's offices, units, and mechanisms have helped to reduce impunity for crimes and human rights violations committed against migrants.[4]

The final section of this report presents proposals and recommendations on how to improve migrants' access to justice in Mexico.

## METHODOLOGY AND COLLABORATION WITH MIGRANT SHELTERS, ORGANIZATIONS OF THE FAMILIES OF DISAPPEARED MIGRANTS, AND HUMAN RIGHTS DEFENDERS

This report is the result of close collaboration between *Casa del Migrante "Frontera con Justicia"* in Saltillo, Coahuila; "Red Migrante Sonora", a coalition of five organizations that offer support to migrants in Sonora; "Hermanos en el Camino" migrant shelter in Ixtepec, Oaxaca; *"La 72, Hogar—Refugio para Personas Migrantes"* in Tenosique, Tabasco; Washington Office on Latin America (WOLA); and Fundar: *Centro de Análisis e Investigación. Fundación para la Justicia y el Estado Democrático de Derecho* participated in the elaboration of the section on the Mechanism for Foreign Support and the final revision of the report.

The content of the report is based on visits to migrant shelters during the months of February and March 2017 in the states of Sonora, Coahuila, Tabasco, and Oaxaca, where migration flows are high. We held interviews with migrants who were victims of crime in Mexico, lawyers who accompany them, human rights defenders, prosecutors in charge of investigating and prosecuting crimes against migrants, officials from public human rights bodies, and federal officials in charge of determining the country's migration policies. In total, we conducted 44 interviews and submitted 26 access to information requests to obtain statistics on crimes and human rights violations committed against migrants and

information on the status of investigations, trials, and rulings between 2014—the year Mexico began to implement its Southern Border Program (*Programa Frontera Sur*, PFS)—and 2016. The report presents an analysis of official statistics and an exhaustive review of migrant shelters' documentation of crimes and abuses. The names of migrants who shared their stories have been modified to protect their identity and integrity.



*Mural at the Hermanos en el Camino shelter in Ixtepec, Oaxaca*

# OFFICIAL FIGURES *VERSUS* REALITY

## VIOLENCE AGAINST MIGRANTS IN MEXICO

The first challenge to assessing the magnitude of violence against migrants in Mexico is the inconsistency and unreliability of official figures. They tell an incomplete story—far less violent and harmful—of what migrants actually experience. Therefore, hearing the testimonies of migrants who are victims of crime in Mexico and the organizations that document the abuses is fundamental to uncovering the reality that migrants face in the country.

For this section of the report, we submitted access to information requests to the officials in charge of investigating and prosecuting crimes against migrants at the federal level and in the states of Sonora, Coahuila, Oaxaca, and Tabasco, as well as to the judges who hear cases on these crimes. We requested access to the official figures for 2014, 2015, and 2016 (taking into account that the PFS was launched in Mexico in 2014) to ascertain how many reported cases have resulted in sentences.[5] We also presented requests to authorities in Chiapas, the first state to open a prosecutor's office specialized in crimes against migrants, as it serves as an important point of reference for other officials.



FIGURE 1
**CRIMES AGAINST MIGRANTS IN MEXICO, OFFICIAL DATA, 2014-2016**

*\* The 2014 data for Coahuila corresponds to the period between July and December.*
*\*\* It is not possible to disaggregate the data by year.*
*Source: Reponses to access to information requests. The data includes investigative files and case files.*

We found a number of shortcomings in authorities' responses to our requests: they did not provide all of the information requested, states do not utilize a clear or uniform system for classifying crimes, and, in some cases, disaggregated data on violence against migrants does not exist. We further found that the official figures fragment crimes against migrants between different states and jurisdictions which creates an obstacle to justice because implementing adequate policies to address criminality requires reliable and quality information. In other words, it is important to be able to identify perpetrators' *modus operandi*, patterns of violence, types of victims, and places where crime levels are high.

Despite these difficulties, we succeeded in retrieving some figures that present an official overview of crimes committed against migrants in Mexico. Each table contains explanations on the methodologies used.

The responses to our information requests also confirmed that officials, seeking to minimize the severity of the violence migrants face, only document part of the crimes migrants report, and therefore official data do not adequately reflect more serious crimes. For example, according to Figure 2, which was prepared using official figures, the most common crime documented at the local level is robbery, whereas at the federal level, it is human trafficking. Furthermore, while we found that kidnapping continues to occur frequently, this is not shown in the data.

We share below some of migrants' cases and stories that are not reflected in the official data.

The *Casa del Migrante de Saltillo* shelter has documented cases in which the Saltillo Municipal Operational Reaction Group (*Grupo de Reacción Operativa Metropolitana de Saltillo*, GROMS), an elite police force, has detained migrants traveling



## FIGURE 2
## MOST COMMON CRIMES AGAINST MIGRANTS BY STATE, OFFICIAL DATA, 2014–2016

| State | Crime | Value |
|---|---|---|
| CHIAPAS | Robbery to bystanders | 533 |
| TABASCO | Robbery* | 332 |
| OAXACA | Assault and robbery with violence | 714 |
| COAHUILA | Robbery** | 74 |
| SONORA | Robbery*** | 336 |
| FEDERAL | Human trafficking | 260 |

*Includes cases of: robbery with violence; robbery; aggravated robbery; aggravated robbery committed in a public space; aggravated robbery of a vehicle; aggravated robbery committed in a confined area; aggravated burglary.*
*\*\* Includes cases of: aggravated robbery; simple robbery; robbery; robbery and sexual abuse; robbery and injuries; assault and robbery.*
*\*\*\* Includes cases of: simple robbery; burglary; robbery of a vehicle; robbery of a business; robbery of auto parts.*
*Source: Responses to access to information requests.*

along the train tracks, taken them away in patrol cars, and tortured them to force them to sign statements. In 2013, the shelter documented various cases involving a total of 47 migrants that followed the same pattern: migrants were arrested on the trains, tortured, and later accused of drug possession or other drug-related crimes. The shelter has also registered abuses that the Special Weapons and Tactics Group (*Grupo de Armas y Tácticas Especiales*, GATE) has committed against migrants.

In Sonora, crimes against migrants are in many cases related to organized crime, often with the involvement of federal and state authorities. Approximately three years ago, local organizations detected cases of abuse by officials, including cases where the Federal Police extorted migrants. The *modus operandi* for extortion is to detain migrants on buses, make them get off the bus, and beat them. Now, the responsibility for these crimes is in the hands of the "mafia", which robs, kidnaps, and charges fees to let people pass or travel through an area. They have even gone so far as to mutilate people to force them to pay.

Areas around the bus stations in Sonora are particularly vulnerable to crime. "Since there are no security guards, they go in through the back of the station and as people get off the bus, they say to them, 'You're the one,' and take them away." Violence against migrants also occurs in other areas. For example, as some cab drivers explained: "Around the corner from where we provide services, they kidnap migrants. They take them to places controlled by the mafia, but in the same city." In 2013, "people from Central America were kidnapped. Some were to obtain ransom money, but in other cases, it was to tell them, 'You can't go through here.' Some smugglers even started to smuggle only Mexicans in order to avoid problems with the mafia."

The Migrant Orientation Center (*Centro de Orientación del Migrante*, COMI) in Oaxaca has also detected an increase in abuses and crimes



FIGURE 3

**CASES DOCUMENTED BY THE CASA DEL MIGRANTE DE SALTILLO IN COAHUILA, 2014–2016**

*Source: Cases documented by the Casa del Migrante de Saltillo.*



**FIGURE 4**

## CASES DOCUMENTED BY LA 72 IN TENOSIQUE, TABASCO, 2014-2016

*Source: Cases documented by La 72, Hogar—Refugio para Personas Migrantes.*

against migrants on buses.[6] Some testimonies confirm collusion between agents of the National Institute of Migration (*Instituto Nacional de Migración*, INM) and bus operators, who turn migrants in to the INM so that they can conduct searches. There are also documented cases in which bus operators extort migrants to force them to pay a fee in order to avoid being "turned in to the INM." In Ixtepec, three Garifuna migrants from Honduras, aged 17, 23, and 20, told us that every time they entered Mexico, they were violently attacked by hooded men armed with guns and machetes, who took their belongings, their clothes, and their money.

# OBSTACLES TO DENOUNCING CRIMES AGAINST MIGRANTS

*"To avoid the train, I crossed the mountains on foot. In San Fernando, they took everything I had: my documents, my clothes, my backpack. They beat me up, but they let me go."*
*—Juan, Garifuna migrant from Honduras staying at the shelter in Ixtepec*

*"Even the people for whom things go well along the way will have to deal with at least one attempt at extortion"* *—comment made at the Casa del Migrante de Saltillo*

## PROSECUTOR'S OFFICES SPECIALIZED IN MIGRANT CASES ARE FAR FROM THE PLACES WHERE CRIMES AGAINST MIGRANTS ARE COMMITTED, AND INVESTIGATIONS ARE DELAYED UNDER THE PRETEXT OF LACK OF JURISDICTION

The first obstacle to justice migrants encounter is the difficulty of denouncing the crimes they have suffered in Mexico. Seven Mexican states have established special prosecutor's offices to investigate state-level crimes against migrants— Chiapas, Oaxaca, Tabasco, Campeche, Veracruz, Coahuila, and Quintana Roo—and the Unit for the Investigation of Crimes for Migrants within the PGR, which investigates federal crimes, is based in Mexico City. While the PGR has offices throughout the country, these offices are not located in the places where abuses against migrants most frequently occur, and neither federal nor local authorities have coordinated with the Unit to assist with case intake.

Migrants are often subjected to crimes and human rights violations while traveling from one state to another, while aboard the cargo train known as "The Beast" ("*La Bestia*"), during migration control operations, and while passing through isolated and inhospitable areas that are not on the train's route—where they are easy prey for criminals— in order to avoid being detected by officials. Oftentimes, migrants do not denounce crimes in the states where they occur, either because authorities are not present in the locations where the crimes take place, or due to lack of trust or fear that authorities are in collusion with the criminal groups that attack them. For example, the majority of the crimes that take place in Chiapas are documented in Oaxaca, crimes in Veracruz and Chiapas are reported in Tabasco, and only a few of the cases denounced in Coahuila actually happen in that state.

This situation impedes investigations, and local prosecutor's offices justify the delays by saying that the crimes occurred in areas outside their jurisdiction.



*Special prosecutor's offices for migrants in Mexico*

## ADEQUATE PROCEDURES FOR REPORTING CASES AND HUMAN RIGHTS VIOLATIONS IN MIGRANT DETENTION CENTERS ARE LACKING

Another obstacle stems from a lack of adequate procedures to ensure that migrants held in migrant detention centers have access to the UIDPM or local prosecutor's offices. Organizations that have access to the detention centers play a critical role in giving visibility to the crimes detainees want to denounce, but only a few are allowed inside the facilities. Their access is restricted to certain hours and days of the week, and they can only visit migrants who have requested their assistance.

Without access to human rights organizations or the necessary authorities, detained migrants' options for denouncing crimes are limited to reporting them to INM agents or to Mexico's National Human Rights Commission (*Comisión Nacional de los Derechos Humanos,* CNDH) during its visits to the centers. However, we have found cases in which the INM does not submit migrants' complaints to the CNDH or inform the Commission of the human rights violations migrants report. We have also found that the INM sometimes denies the abuses reported in migrants' testimonies or discourages, threatens, and intimidates migrants if they file complaints.[7]

## THE ROLE OF THE INM BETA GROUPS IN CHANNELING COMPLAINTS AND REPORTS

The INM Beta Groups (*Grupos Beta*)[8] are tasked with protecting migrants in transit through Mexico by providing rescue services, humanitarian assistance, and legal assistance. There are currently 22 Beta Groups present in nine of the country's states—Baja California, Sonora, Chihuahua, Coahuila, Tamaulipas, Veracruz, Tabasco, Chiapas, and Oaxaca. Unlike other INM agents, they are not obligated to verify or report a migrant's status.

Agents from the Beta Groups can offer migrants legal assistance[9] by forwarding their reports to the appropriate authorities for investigation. These authorities can be public service ombudsmen (for example, the INM's Internal Control Office or the Ministry of Public Administration), human rights bodies (such as the CNDH or local public human rights bodies), or public prosecutor's offices in the case of potential crimes. However, several challenges exist in regards to the legal assistance the Beta Groups offer:

- **INCONSISTENCY WITH THE SITUATION OBSERVED BY MIGRANT SHELTERS:** According to the Ministry of the Interior (*Secretaría de Gobernación*, SEGOB)'s statistical bulletins,[10] the number of cases in which the Beta Groups provided legal aid decreased between 2014 and 2016, but while preparing this report, we noted that crimes and human rights violations increased during this period. In 2014, the Beta Groups reported having provided legal assistance in 358 cases; in 2015, 236 cases; and in 2016, 93. The majority of the legal advice was offered in Chiapas and Baja California, whereas in Oaxaca and Coahuila, there are no records of Beta Groups providing this type of assistance.

  Data obtained through an access to information request about the Beta Groups' legal aid services reveal several inconsistencies. For instance, some cases were submitted for investigation to authorities that do not investigate the activities of officials or protect human rights. Furthermore, the Beta Groups have not standardized their procedures for documenting crimes and abuses: while some reports are imprecise, others specify what kind of crime was committed (kidnapping, unlawful deprivation of liberty, threats, extortion, robbery, etc.) and contain a more detailed account of the crime. Some also document migrants' concerns about whether or not to file a report (for example, fear of retaliation), while others do not.

- **EFFECTIVENESS:** The data shows that many cases were not submitted to the proper officials because migrants were not willing to report them. This raises questions about migrants' trust in Mexican authorities and their fear of being retaliated against for having submitted a complaint.[11] Although local attorney general and public prosecutor's offices have received some cases, information on the results of the investigations is lacking.

- **LACK OF TRANSPARENCY:** Information regarding the cases of crimes and abuses received by Beta Groups is not public and there is no standardized procedure for reporting on the legal aid services they provide. This makes it difficult to gain a complete overview of the violence and crimes migrants suffer in Mexico, or to evaluate whether or not the Beta Groups are adequately equipped to carry out their important responsibilities.[12]

## ONLY MIGRANTS WHO ARE VICTIMS OF GRAVE CRIMES CAN REGULARIZE THEIR MIGRATION STATUS

Mexican law allows migrants who have been victims of or witnesses to grave crimes to regularize their migration status for "humanitarian reasons" so that they can follow up on their cases. To apply for regularization before the INM, migrants must present a copy or other form of documentation of the complaint they filed at the local or federal public prosecutor's office.

Regularizing someone's migration status is an important, yet underutilized, tool for public prosecutor's offices to be able to obtain vital information from migrants who are victims of or witnesses to grave crimes. It also allows them to continue their investigations into these cases regardless of whether or not the person stays in the country. In practice, however, the lack of results in the investigations causes migrants, even those who have regularized their status in order to collaborate with authorities, to distrust and have low expectations for Mexico's judicial system.

Pedro is an 18-year-old migrant from Guatemala who was kidnapped and raped by members of the Gulf Cartel (*Cártel del Golfo)*. He had never filed a report, nor did he want to submit one:

"My mother kept telling me to go back to Guatemala, to turn myself in to migration authorities. I didn't want to, but I got the courage to do so thanks to the people from the *Casa del Migrante* [in Saltillo]. I don't know if the authorities will do anything in terms of justice.... All I want is my humanitarian visa. Then, I would go back to my country to see my mother (she went to Belize to pay off the debt) and come back to Mexico. I have to help her pay off the debt. But yes, I would stay if more were offered to me."

According to information obtained through access to information requests, between 2014 and 2016, the regularization of migration status gained more importance for migrants who were victims of crimes in Mexico. The number of cases with positive outcomes increased 575 percent. Most migrants who benefited were from Guatemala, Honduras, and El Salvador. The INM did not specify whether the requests that were denied were victims of crimes or not, nor the reasons for rejection.

Several aspects of this regularization procedure restrict access to justice. For one, Mexico's immigration laws only permit the regularization of migrants that have been victims of "grave crimes".[13] This opens the door to violations of due process during regularization procedures and to arbitrary decisions as to whether the migrant is a victim of a grave crime or not, or that the authority receiving the complaint will make this determination. For example, in Oaxaca, public prosecutors are more willing to receive reports of grave crimes, whereas in Tabasco we found that authorities often minimize the seriousness

## TABLE 1
## NUMBER OF HUMANITARIAN VISAS APPROVED

| HUMANITARIAN VISAS | 2014 | 2015 | 2016 |
|---|---|---|---|
| Positive outcomes for victims / witnesses of grave crimes | 338 | 1,073 | 1,944 |
| Percentage of victims from Guatemala, Honduras, and El Salvador | 92% | 93% | 92.6% |

*Source: Responses to access to information requests.*

of the crimes migrants report. One Honduran migrant reported that he was detained, robbed, and sexually abused on the highway between Tenosique and the Guatemalan border. He applied for regularization, but his request was originally turned down by the INM because the special prosecutor's office in Tenosique did not classify these crimes as grave.

The visa card obtained by migrants who are victims or witnesses of grave crimes after they regularize their migration status is temporary and valid for only a year, sometimes less. They can renew the visa as long as the investigation is ongoing, but the renewal process is cumbersome. In Oaxaca and Sonora, we noted that migrants must go in person to the public prosecutor's office in charge of their case in order to obtain proof that the investigation of their case is still open. This affects migrants' mobility and makes renewal difficult.

The regularization procedure for these migrants is slow: at best it takes a month. Sometimes there are no officials in the public prosecutor's offices to receive migrants' complaints or the officials that are present are not familiar with the procedure for submitting cases to the INM. Furthermore, the regularization of status for migrants who are victims of crime does not guarantee that the investigation into their cases will be fruitful, especially when officials are unwilling to investigate or do not use the other means available to advance the cases, such as gathering evidence before a trial (*"pruebas anticipadas"*).

## BOX 1
## THE IMPORTANCE OF CONSULAR SUPPORT TO MIGRANTS WHO ARE VICTIMS OF CRIME IN MEXICO

Consular support for migrant victims of crime in Mexico is fundamental in a number of ways: 1) to provide information on a migrant's nationality and other data required for procedures such as the regularization of  migration status for victims of or witnesses to crimes, 2) to obtain important information needed for searches, for example, in cases of disappearance or kidnapping, and 3) to demand respect for migrants' rights when they are being investigated or detained in migrant detention centers or prisons.

In the states discussed here, we found that the scope of consular aid provided depends considerably on the disposition of diplomatic personnel (which is always subject to staff changes). The Honduran consul in Saltillo has been recognized for the strong support he provides to migrants who are crime victims. He cooperates with authorities to verify information about disappeared persons, keeps up-to-date on investigations involving Honduran citizens, and helps speed up procedures for Hondurans who are victims of crime. For example, Miguel, a 51-year-old Honduran national, received support from the consulate while being hospitalized in Monclova after having both of his feet amputated after being thrown off of a moving train by gang members. For the *Casa del Migrante de Saltillo*, the consul's attitude is very helpful, as "he gets very involved in the work and has a strong working relationship with the Attorney General's Office."

However, this level of commitment is not found in all of the country's consulates and embassies. In Sonora and other northern states, for example, there are no Central American consulates. In these cases, the consulates are located far from the places where their citizens require assistance and support when they suffer a crime. In Oaxaca, Central American consulates do not get involved in cases of crimes and abuses committed against their nationals; instead, they focus on administrative procedures. The Honduran Consulate in Oaxaca, however, did intervene in a case being investigated by the PGR's UIDPM which led to the identification of the smuggler of a girl who was a human trafficking victim.

# OBSTACLES TO INVESTIGATING CRIMES AGAINST MIGRANTS

*"[They] beat me up and we filed a complaint, but nothing happened. The PGJ [State Attorney General's Office] would only tell us that it would take a while." —Eduardo, 42-year-old migrant from El Salvador*

The creation of special prosecutor's offices or units dedicated to investigating crimes against migrants—a process that began at the state level with Chiapas in 2008—symbolized an important acknowledgment of migrants' vulnerability to crimes and abuses in the country. However, their creation alone has not been enough to guarantee justice. Once migrants denounce the crimes committed against them in Mexico, many obstacles hinder their investigation. We highlight the main ones below.



Migrants at La 72, Hogar—Refugio para Personas Migrantes in Tenosique, Tabasco

## BOX 2
## AUTHORITIES THAT INVESTIGATE CRIMES AGAINST MIGRANTS IN THE STATES COVERED IN THIS REPORT

Created in December 2015,[14] the Unit for the Investigation of Crimes for Migrants within the PGR is in charge of investigating federal crimes committed against or by migrants in Mexico, including those that take place along "The Beast" railway line, as it falls under federal jurisdiction,[15] and on the federal highways along which migrants frequently travel by bus. However, there are other PGR offices (units, deputy attorney general's offices, and prosecutor's offices) that could be given the power to investigate crimes against migrants. Examples include: the Deputy Attorney General's Office for Special Investigations on Organized Crime (*Subprocuraduría Especializada en Investigación de Delincuencia Organizada*, SEIDO), the Special Prosecutor's Office for Crimes of Violence against Women and Human Trafficking (*Fiscalía Especial para los Delitos de Violencia contra Mujeres y Trata de Personas*, FEVIMTRA), and the Special Prosecutor's Office for the Search for Disappeared Persons (*Fiscalía Especializada en Búsqueda de Personas Desaparecidas*, FEBPD). The UIDPM also investigates cases where migrants are the perpetrators of crimes, but these cases are exceptional.

The Tabasco State Prosecutor's Office has a Special Prosecutor's Office for Attention to Migrants in Tenosique, a common stop along the route of "The Beast", which passes through the city. The state of Oaxaca has also established a Special Prosecutor's Office for Attention to Migrants in Ixtepec. However, as more migrants turn to traveling by foot to cross the state of Chiapas to reach Ixtepec, Oaxaca (in order to avoid boarding the train), many crime reports are being filed at the prosecutor's office in the municipality of Chahuites, Oaxaca, as it is closer to this new route.

In Coahuila, a General Office for Serious Crimes Committed against Migrants (*Dirección General de Delitos de Alto Impacto y Cometidos en Agravio de Migrantes*) was set up within the State Attorney General's Office in 2016. Cases have been found where migrants in Coahuila have committed crimes against other migrants. In 2010, the *Casa del Migrante de Saltillo* reported a case, the case reached the PGR's office, and now the perpetrators are serving a 25-year term in prison. The percentage of migrants who have allegedly committed crimes is small (around five percent), according to the migrant shelter's legal team.

## INADEQUATE BACKGROUNDS OF SPECIAL PROSECUTORS AND THEIR TEAMS, LACK OF RESOURCES, AND LACK OF SENSITIVITY

According to the lawyer at the *Centro de Recursos para Migrantes* in Agua Prieta, Sonora ".... the person who heads [the investigation of crimes against migrants] determines whether there will be will [to investigate] or not. Continuing to create laws, regulations, and rules does not always help to achieve real justice. They can keep setting up units or prosecutor's offices, but if there is no real interest in investigating, detaining perpetrators, and sentencing them, things will stay the same. There are no tangible cases of justice."

In Oaxaca, the nomination of the prosecutor for attention to migrants (*Fiscal para la Atención al Migrante*) is political and it is not determined by victims' needs. As a result, whether or not the candidate has the right profile for the position, a background in migration issues, or experience working with victims, is often not taken into account. This—and the fact that the prosecutor changes with every administration—affects the continuity of policies for prosecuting crimes against migrants. Furthermore, the prosecutor's office's personnel often show a clear lack of will to investigate crimes and interact with victims while respecting their dignity and rights.

The staff at the special prosecutor's office in Tenosique is not adequately trained, and the office is not equipped with the human and financial resources it needs to conduct effective investigations. Its team is composed of only the prosecutor and around six employees. In February 2017, state authorities reported that they were making efforts to assign police officers to the special prosecutor's office, but resources were limited. In general, the treatment migrants receive is disrespectful and unprofessional. For example, in cases of sexual violence, agents laugh when certain body parts are mentioned (for example, the anus) and they describe poorly or minimize victims' descriptions of their experiences due to their discomfort in documenting them. Furthermore, *La 72* reported that the victims often have to remain standing while an employee takes their statement, as there are no private rooms available. This lack of professionalism and sensitivity results in the re-victimization of the migrant.

In Sonora, migrants know that to file a report "means going in the morning and coming back late in the afternoon. They take forever. That is why we now submit complaints in writing," collaborators of the Kino Border Initiative explained. For Ramón, a Honduran migrant who was kidnapped in Veracruz and is now in Nogales, lodging a complaint "takes a lot of time. I'd also have to talk to the other people who were kidnapped with me." What is more, local authorities have even gone as far as to threaten to report to the INM the irregular status of migrants who are victims of crimes.

Before the General Office for Serious Crimes Committed against Migrants was created in Coahuila, Saltillo municipal police would see migrants at a crossing, ask them for their documents, and bring them before the Coordinating Office of Qualifying Judges (a state administrative body). The judges would notify them that they did not have "papers" and send them to the INM for their "assisted return to their country." However, as a result of multiple training courses and awareness-building activities for officials, this practice is becoming less and less common.

The federal Attorney General's Office's Unit for the Investigation of Crimes for Migrants does not have sufficient human resources to investigate crimes involving transnational criminal networks.



*Migrants at the Casa del Migrante de Saltillo in Coahuila*

## CONFLICT OF JURISDICTION IN INVESTIGATIONS OF CRIMES AGAINST MIGRANTS

Another challenge to investigating crimes against migrants is the lack of coordination between federal and state authorities and between the various departments within the same institution.

### COORDINATION WITHIN THE PGR

The resolution that created the UIDPM establishes that all crimes against migrants should be submitted to the Unit for investigation; however, we found some cases where migrants are victims of organized crime-related offenses, kidnapping, and human trafficking, yet their cases continue to be processed by other prosecutor's offices or deputy attorney general's offices. There is also little communication and coordination on these cases between PGR offices. Moreover, some PGR offices in the states are unaware of the UIDPM's existence.

In Nogales, we accompanied Luis, a 34-year-old migrant from El Salvador, to the PGR's local office to report a federal crime. The head of the PGR's Immediate Attention Unit (*Unidad de Atención*

*Inmediata,* UNAI) in Sonora did not know that the UIDPM existed. A lawyer from the *Centro de Recursos para Migrantes* who knew about the case commented that the UIDPM was already aware of the case because of the references to crimes committed elsewhere.[16] The UIDPM took note of the case and helped coordinate on certain elements, but the criminal investigation began at the UNAI with Luis's complaint. The head of the UNAI forewarned that it was highly unlikely that the criminal investigation would continue because there was little evidence to prove the fraud or the unlawful deprivation of liberty.

Currently, the *Casa del Migrante de Saltillo* does not have knowledge of or accompany cases at the UIDPM. It only has cases at the PGR local offices, SEIDO, or FEVIMTRA. Although the Unit is supposed to "cover the entire migrant population, it continues to classify cases by crime, and not by group. It depends … on who is leading the investigation," the shelter's lawyer explained.

## COORDINATION BETWEEN STATES AND THE FEDERAL GOVERNMENT

When a crime report is filed in a state other than where the event occurred, there are difficulties in transferring the case from one authority or office to another.

The head of the General Office for Serious Crimes Committed against Migrants in Coahuila indicated that his office maintains relations with federal authorities through weekly meetings held by a public security coordinating group in which the Federal Police, the PGR, the INM, municipal preventative police, and all other state-level authorities involved in security issues participate.

In Sonora, federal and state level authorities evade the responsibility of addressing crimes against migrants by attempting to refer investigations to one another—that is, they transfer them from one jurisdiction to another. According to the Kino



FIGURE 5
### CASES DOCUMENTED BY THE HERMANOS EN EL CAMINO SHELTER IN IXTEPEC, OAXACA, 2014 AND 2017

Legend:
- Robbery, assault, injuries*
- Extortion
- Kidnapping and/or unlawful deprivation of liberty
- Rape
- Other

2014: 69
2017 (JAN–MAY): 178

* Cases from 2014 include: robbery; robbery with violence; assault; assault with violence; robbery to bystanders; injuries; and other. Cases from 2017 include: robbery; robbery with violence; assault; assault with violence; robbery to bystanders.
Source: Cases documented by the Hermanos en el Camino shelter.

Border Initiative, when the PGR takes on a case, the agents act more professionally and provide better treatment than the State Attorney General's Office (where there is no special prosecutor's office). In Oaxaca, the UIDPM has helped in some of the human trafficking cases the *Hermanos en el Camino* shelter is accompanying, but besides these cases, the shelter does not see the Unit participating much in cases under its jurisdiction.

In Tabasco, the majority of crimes against migrants, including kidnapping, are dealt with at the state-level. The special prosecutor for human trafficking mentioned that her office had worked with the UIDPM on a kidnapping case in which the father of the family was being blackmailed by individuals in the United States. Via the UIDMP, the U.S. Federal Bureau of Investigation (FBI) and the PGR were involved in the case.

## AUTHORITIES ARE UNWILLING TO INVESTIGATE CRIMES AGAINST MIGRANTS

Local prosecutor's offices have shown willingness to investigate crimes reported by migrants and to punish those responsible in only a few cases. While the head of the UIDPM demonstrates that she is willing to carry out investigations, the Unit's ability to investigate is limited by bureaucracy and a lack of communication within the PGR, a lack of capacity to investigate complex crimes that may involve transnational organized crime, and a lack of human resources.

Local prosecutors justify the lack of results in investigations by claiming that since migrants who are victims of crime do not stay in the areas where they file their complaints, investigations into their cases cannot move forward. For the Ministry of the Interior's Undersecretary of Population, Migration, and Religious Affairs, "migrants go and file reports, but do not stay in the country. If they go to the U.S. or return to their home country, the investigation is cut off. We cannot proceed." Similarly, according to the head of the General Office for Serious Crimes Committed against Migrants in Coahuila, the greatest difficulty the office faces is that "we cannot give continuity to the investigation files since migrants are just passing through and only want to make it to the border. But there have been cases where migrants



FIGURE 6
**CASES DOCUMENTED BY RED MIGRANTE SONORA, 2014–2016**

Legend: Human trafficking, Threats, Robbery, Abuse of authority, Kidnapping, Other

2014: 73; 2015: 73; 2016: 16

*Source: Cases documented by Red Migrante Sonora.*

stay for over a month in order to complete the file." In Sonora, organizations indicate that it is difficult for cases to advance because authorities require victims to appear before them even though they often do not remain in the place where they reported the crimes.

In a 2015 case involving the robbery of three victims—two Hondurans and one Guatemalan—that the *Hermanos en el Camino* migrant shelter in Ixtepec accompanied, the prosecutor's office asked for "the exact date they left the shelter, if they indicated where they were going, and if there was a telephone number where they could be reached." Since the shelter could not provide this information, the case did not move forward. In a 2016 case of assault, robbery, and aggravated sexual abuse involving four women and two men, including one minor, the prosecutor's office asked the shelter and the consulate how to locate the migrants.

Several interviews and testimonies reveal that Mexican authorities believe that in order for investigations of crimes against migrants to advance, the victims must remain in the place where they reported the crimes. For the *Hermanos en el Camino* shelter in Ixtepec, officials "do not understand the logic of migrants' travel and only pursue the investigation on the condition that the victims appear before them. How are you supposed to find them if they were only passing through here? If the victims do not appear, the investigations do not advance."

Despite Mexican officials' claims, investigations into crimes against migrants can indeed move forward even if the victim leaves the country. As mentioned above, migrants who are victims of or witnesses to grave crimes can regularize their migration status in order to remain in Mexico and contribute to investigations into their cases. Additionally, the Federal Code of Criminal Procedures (*Código Nacional de Procedimientos Penales*, CNPP),[17]

which took effect nationwide on June 18, 2016 and is applicable to the investigation of crimes against migrants, allows for prosecutors to gather evidence before trial ("*pruebas anticipadas*") when "it is likely that a witness will not be able to appear at the hearing because he or she lives abroad or has reason to fear for his or her life," and to "avoid the loss or alteration of evidence." In the case of crimes against migrants, this means that authorities can collect all necessary evidence at the time that a migrant reports a crime and can pursue the investigation even in their absence.

The head of the UIDPM stated that evidence has been used before trial in at least one kidnapping case. The Oaxaca State Attorney General's Office has also used this resource, recognizing that for crimes against migrants, it is sometimes difficult to gather the evidence needed to corroborate certain cases. However, we did not find any evidence of significant or constant use of producing evidence before trial by the PGR or local prosecutor's offices in the investigation of crimes against migrants.

Another consequence of authorities' belief that cases can only advance if the victims remain in the area where they reported the crime is that many cases are left open indefinitely due to the supposed lack of evidence to proceed with the investigation (investigative files put on hold). In Saltillo, we found evidence that authorities put cases on hold even when the victims stay in the area. For the *Casa del Migrante de Saltillo*, "it is not to [authorities'] advantage to say that they have already closed the case definitively, so they put them on hold."

Ideally, if authorities were willing to investigate these crimes, they could combine the use of producing evidence before trial and the strategic use of the regularization of victims' migration status to obtain information. We found no proof of this being done.

In the *Casa del Migrante de Saltillo*'s experience, in the rare cases where progress is made, investigations are not carried out with due diligence. The situation is similar in Sonora, where state authorities do not show any interest in these cases. On one occasion, the lawyer from the *Centro de Recursos para Migrantes de Agua Prieta* found negligence in the follow-up on a report of the kidnapping of a migrant: the case file went missing when it was sent from Agua Prieta to Nogales. "The Public Prosecutor's Office reprimanded its staff due to our insistence. Many case files were missing."

Miguel, a 51-year-old migrant who lost both of his feet when members of an organized crime gang threw him off of a moving train, was rescued by the Monclova police, close to Ciudad Frontera. Even though he feels that officials had enough material

to investigate, they let "the investigations cool off." Although they detained two people for the injuries they caused and for other homicides committed on the same route, they apparently let them go during the investigation phase, even before they went to trial. "It is not fair that they let them go. If they didn't want to do anything because they were foreigners, they could have at least handed them over to authorities and deported them so that they would be punished there. I think there are powerful people behind them."

In Oaxaca, cases in the two prosecutor's offices that investigate crimes against migrants (Ixtepec and Chahuites) are at a standstill. Officials limit themselves to only receiving complaints and when they do take action, "they do the investigation from their desks and offices." In other words, they do not go out on the streets to investigate. No



*Migrants at the Kino Border Initiative migrant aid center in Nogales, Sonora*

progress is made on the cases and the majority remain in impunity. In Tabasco, the situation is similar. *La 72* has noted authorities' indifference: they receive reports and open case files, but other than that, they do not take any further steps.

## THE WORK OF HUMAN RIGHTS COMMISSIONS (PUBLIC HUMAN RIGHTS BODIES) IN CASES OF ABUSE AGAINST MIGRANTS

The CNDH and local public human rights bodies (*organismos públicos de derechos humanos*, OPDH) are responsible for identifying and investigating potential human rights violations committed by federal and local authorities, respectively. As such, they play an important role in guaranteeing that migrants who are victims of crime in Mexico have access to justice. The recommendations that the CNDH and the local OPDH propose to authorities that have committed human rights violations are not binding until the authority in question accepts them. Even so, they can have a positive impact: due to their official nature, it is difficult for authorities to dismiss them.

The local OPDH in the states we investigated do not fulfill their duty to protect migrants' human rights when they are violated by state authorities. In Oaxaca, the CNDH assumes this responsibility. According to the *Hermanos en el Camino* shelter in Ixtepec, "the CNDH swallowed up the Ombudsman's Office." In Sonora, the Kino Border Initiative says, "the staff of the CEDH [State Human Rights Commission in Sonora] does not offer support to migrants." As a result, the CNDH is sometimes the one to follow up on the complaints of state-level crimes, although the CNDH's level of involvement depends a lot on the employee doing the work. In Sonora, only one employee offers comprehensive and broad support to migrants. In the majority of the cases, the CNDH's role is limited to accompanying the migrant in person and "paper-pushing", and it does not provide the legal advice and support needed to help victims with their complaints. According to the *Casa del Migrante de Saltillo*, the State Human Rights Commission only pretends to be doing something; its work is limited to "office work" and it does not conduct investigations. For example, in a case related to the torture of 47 migrants by the Saltillo municipal police, the State Commission classified the case as "abuse of authority" and finally issued a recommendation on the excessive use of force and abuse of authority. According to the lawyer, they did not want to prove that torture was used, as the State Commission said that "it cannot be deduced from the police's conduct that they tried to force them to make a statement."

The CNDH conducts visits to migrant detention centers, where it receives complaints, issues precautionary measures, and takes other actions. In October 2016, the CNDH released a report[18] by the National Mechanism for the Prevention of Torture (*Mecanismo Nacional de Prevención de la Tortura*) about several migrant detention centers and short-term detention centers. The report exposes numerous problems with the facilities, their medicinal supplies, and the certification of physical well-being of detainees, among other issues.[19] The CNDH in Ixtepec has documented cases in which INM agents mistreated migrants and cases where there were delays in taking migrants to detention centers. In this region, the CNDH observed that abuses take place from the time migrants are detained to the time they are brought to the centers. The SEGOB's Undersecretary of Population, Migration, and Religious Affairs claims that INM agents "cannot be the perpetrators of crimes and human rights violations against migrants." However, data obtained from the CNDH through access to information requests indicate that the INM

continues to be the authority migrants identify most in their complaints as being responsible for violating their rights.[20] The fact that the CNDH has not used these complaints to develop strong recommendations should not be interpreted as a sign that the complaints are unfounded or that authorities have been falsely accused.

The CNDH has documented numerous human rights violations committed by INM agents, but it has issued few recommendations to the Institute in recent years: three in 2015 and two in 2016. Two of these recommendations are in regards to the arbitrary detention of Mexican nationals who had their Mexican birth certificates and their Unique Population Registry Code (*Clave Única de Registro de Población*, CURP) with them. In the case of four Tzeltal Indigenous individuals in Chiapas that INM agents tried to claim were Guatemalans, there were signs that they had been tortured.[21]

## CRIMINALIZATION OF MIGRANTS AND MIGRANT RIGHTS DEFENDERS

The criminalization of the migrant population and the people who defend their human rights is another obstacle to guaranteeing access to justice for migrants in Mexico. The discourse of state officials and some groups in society is openly discriminatory and prejudiced towards migrants. This can be seen, for example, in comments made by the mayor of Chahuites, Oaxaca, who wants to close the *Casa del Migrante* shelter because he considers migrants to be "unruly" people who enter people's homes without permission, "spark fights amongst each other, and put other people's lives at risk."[22] Shelters, migrant centers, and human rights organizations play a fundamental role in documenting such discrimination.

The problems that migrants and their defenders have with the mayor of Chahuites are not the only obstacle they face in Oaxaca. At the shelter in Chahuites, shelter staff and the migrants staying there have suffered from several attacks and threats since it opened in 2014.[23] Father Alejandro Solalinde, founder of the *Hermanos en el Camino* shelter, has received multiple death threats in recent years. In May 2012, he decided to leave the country for a few months after receiving six death threats in two months.[24] The last threat against Father Solalinde was made in March 2017 in a video posted by a Twitter account.[25]

As for Coahuila, human rights defenders and migrants in the city of Saltillo have faced harassment for several years. The *Casa del Migrante de Saltillo* has been under the protection of the CNDH's precautionary measures since 2009 and under those of the Inter-American Commission on Human Rights (IACHR) since 2010.[26] Threats against the shelter's staff have been documented but have not received an adequate response from the state and federal governments. In 2015, after municipal police detained Central American migrants for begging for money on the street, the *Casa del Migrante* denounced the mayor of Saltillo for "publicly criminalizing poverty and migration and inciting discrimination against migrants."[27]

At the state level, the government of Coahuila maintains a "pro-rights" or "pro-protection" discourse on migrants. However, cases of torture exist, such as those that took place in 2013 and the years after, as well as cases where public prosecutors have violated migrants' presumption of innocence by pressuring them to confess to crimes in which their involvement has not been proven. While these incidences do not appear to occur often, they tend to increase in certain political contexts, such as during elections.

Prior to the 2013 mayoral election in Saltillo, there were cases of migrants being tortured and

having drugs "planted" on them. It was common to hear statements calling for the *Casa del Migrante* shelter to be stricter, to adopt more effective admission criteria for migrants, and to let authorities do their work. It was also common to hear the phrase, "As human rights defenders, they defend criminals." These comments feed a discourse that criminalizes the entire migrant population. For example, Daniel—a Honduran migrant—was arrested, tortured, and forced to confess to a murder he did not commit in 2009. In 2011, he was convicted for the murder. In response to his case, it was common to hear comments such as, "It's the migrant shelter's fault there is crime in the city."[28]

The criminalization of migrants and their defenders is also common in Sonora. Since 2016, in the municipality of Caborca, a place where migrants cross the border into the United States, the INM carried out several operations at the request of the mayor and the town's citizens.[29] This pressure from citizens, who claim that migrants are giving the city a "bad image", has led authorities to conduct migrant raids to arrest and impose penalties on migrants for administrative offenses.

Carried out by the INM, the Caborca municipal police, the state investigative police, and the Federal Police,[30] these operations have been widespread and have resulted in the detention of over 200 migrants.[31] Furthermore, the *Casa del Migrante de Caborca* has also been the target of harassment and threats, demonstrating again that this context of discrimination and xenophobia also affects migrants' rights defenders.

As a consequence of its migrants' rights work, the Kino Border Initiative experienced its first security threats in 2014:

"People from the mafia wearing hoods came up to our director and asked him for a light. Father felt it was a message to say, 'We're watching you.' On another occasion, they followed the sisters that were coming from the soup kitchen. And once, after we filed a complaint, a municipal police officer warned me that his boss wanted them to investigate me to find out what I was doing here. If this time they said, 'We're the police,' imagine what we can expect from the mafia."

Later, in 2016, the Kino Border Initiative suffered other incidents of harassment, which led the organization to request precautionary measures. The SEGOB is now responsible for providing protection for the Initiative's team members which it facilities under the Mechanism to Protect Human Rights Defenders and Journalists (*Mecanismo de Protección para Personas Defensoras de Derechos Humanos y Periodistas*).

In Tenosique, *La 72* team members have been threatened and harassed by criminal groups and state agents. Since April 2013, shelter staff and the migrants staying at the shelter have been under the protection of IACHR precautionary measures. Despite these measures, they continue to suffer attacks. In one incident in May 2014, three team members suffered injuries at the hands of INM, Federal Police, and state police officers during a police operation aimed at detaining illegal immigrants in Zapata. In October 2016, a nun who works in the shelter received two phone calls threatening her for her work to defend human rights.[33]

*La 72*, Fundar, and other rights defenders filed a complaint at the CNDH to denounce the physical abuse, which resulted in injuries, against migrants during an INM operation that took place in Tenosique in May 2015. In response to the complaint, the INM's Internal Control Office directly accused the shelter and the other organizations of assaulting INM agents. The CNDH, for its part, closed the file on the case.

Finally, shortly before the publication of this report, on June 26, 2017, *La 72* suffered the most recent act of harassment: the INM reported one of the

priests who works at the shelter, Father Bernardo Molina Esquiliano, to the PGR for alleged human trafficking. According to *La 72*, authorities— especially the INM—see providing shelter and assistance to migrants as human trafficking.[34]

## CONSPIRACY TO MAINTAIN IMPUNITY

For migrants' rights organizations, it is no surprise that crimes against migrants do not result in verdicts or sentences. For several years now, areas along Mexico's migration routes have been controlled by organized crime groups,[35] or the mafia, which integrate public officials from the police corps and the attorney general's offices into their structure. Under these circumstances, impunity for crimes committed against migrants is basically automatic. When the authorities in charge of watching over and protecting the rights of all people within the country are the ones committing crimes and protecting the perpetrators—for whatever reason—the outlook is bleak.

According to official data, from 2014 to 2016, of the 5,824 crimes against migrants reported in Chiapas, Oaxaca, Tabasco, Sonora, Coahuila, and at the federal level, there is evidence of only 49 sentences, leaving 99 percent of the cases in impunity.

In 2014, a lawyer from the *Centro de Recursos para Migrantes de Agua Prieta* commented that a person who had been repatriated in Agua Prieta got off at a bus stop to buy something less than 100 meters from the bus. A municipal police patrol car "came up and talked to him, put him in the car, and began to ask him questions, as if they were saying he was a criminal. They kept him in the car for one or two hours before they let him go." The person filed a complaint at the Municipal Comptroller's Office, where "they called the commander, who spoke very arrogantly to the migrant. The migrant felt belittled. We said

that that was not right." For the organizations, because of situations like this, there is no way to dialogue with the police or municipal authorities.

On another occasion, in 2016, the same organization in Agua Prieta documented the case of a migrant who was attacked on the train by armed guards, who opened fire on him and other people:

"We went to the federal Public Prosecutor's Office in the afternoon and they took me to see the head prosecutor. He asked why we were there. We answered that it was because of the Unit for Migrants. They told me it would be better to come back later so that they could investigate a bit. When we returned, they told us that there were no guards on the trains and that they could not take the report there, that we should denounce the crime at the state level. We did not want to insist."

This account reveals how in addition to the lack of will to investigate and the lack of coordination between crime investigation authorities, there is a tradition of collusion and complicity between authorities, leading to impunity. This is all the more serious when this complicity is between authorities and members of organized crime groups, which does indeed occur. "A lot of information is leaked to organized crime," staff from the Kino Border Initiative affirmed.

According to a CNDH official we spoke to in Nogales, not only do agents of the Public Prosecutor's Office not investigate crimes for fear of losing their lives at the hands of organized crime hitmen, but also because "there is a lot of corruption and apathy among authorities. When crimes are not reported, it generates more impunity."

## TABLE 2
## SENTENCES FOR CRIMES AGAINST MIGRANTS, 2014-2016*

|  | FEDERAL | SONORA** | COAHUILA | OAXACA | TABASCO | CHIAPAS | TOTAL |
|---|---|---|---|---|---|---|---|
| **2014** | NA | NA | 2 | 2 | 2 | 25 | 31 |
| **2015** | NA | NA | 2 | 3 | 1 | 8 | 14 |
| **2016** | NA | NA | 1 | 0 | 0 | 3 | 4 |

*\* It is possible that other sentences exist, but they were not reported in authorities' responses to the access to information requests. The breakdown of the sentences for each state are as follows: in Coahuila, of the 5 sentences, 3 are acquittals and 2 are convictions; in Oaxaca, of the 5 sentences, 3 are convictions and 2 are acquittals; in Tabasco, all 3 sentences are convictions; and in Chiapas, of the 36 sentences, 30 are convictions and 6 are acquittals.*
*\*\* The number of sentences in Sonora far exceeded the number of investigations. Given that the official data is inconsistent and does not clarify the reason for this discrepancy, it was not considered reliable and therefore not included in this table.*
*Source: Responses to access to information requests.*

Crimes committed by authorities—or rather, by criminals backed by authorities—are common on the migrants' routes north. Adolfo recalls that:

"After we got away from where they had kidnapped us, the police stopped us and asked us for money. We told them that we had been robbed. We asked them if they were going to turn us in to migration and we asked them to be understanding. We were scared, but at least we thought that they were going to deport us and we weren't going to die. They came to take us over to where migration officials were..."

In these situations it is not surprising that migrants who are victims of crimes do not trust Mexican authorities: "When I see a Mexican official, I hide.

If they stop me, I prefer not to take risks. When I went to file the report, I didn't know what was going to happen. I was very scared," said Alejandro, a 42-year-old migrant from El Salvador. Even after he filed his complaint in Saltillo, he was threatened by the police officer that he had submitted his report to:

"The police officer on the street said to me, 'Hey you! This isn't over,' and I regretted having filed the report. They can shoot me or beat me up, as if my life doesn't matter. I prefer to run away than to be shot. Justice is injustice. There is no justice. Very few people fight for justice. Only one person, a woman, really helped me—the one who recorded everything that happened."

# REPORTS OF CRIMES AGAINST MIGRANTS RECEIVED FROM ABROAD

In August 2010, 72 migrants were massacred in San Fernando, Tamaulipas. A year later, the remains of 193 migrants were discovered in 47 clandestine graves in San Fernando. Then, 49 bodies, the majority of which were migrants, were discovered in Cadereyta, Nuevo León in May 2012. All of these cases show that when migrants are victims of kidnapping, forced disappearance, unlawful deprivation of liberty, disappearance committed by individuals, extortion, or homicide, their families—the majority of which live in Central America or the United States—are the ones who have to denounce these crimes and demand justice from abroad.

The relatives of the migrants who were victims of the San Fernando and Cadereyta massacres faced many difficulties when they attempted to denounce the crimes and monitor the progress of the investigations being carried out in Mexico from their country of residence. Together with Central American groups whose family members had gone missing in Mexico and the organizations that represent and accompany them, these families demanded that the government create a mechanism that allows migrants and their families to report crimes and monitor the progress of investigations from abroad. In response, in December 2015, the PGR created the abovementioned Unit for the Investigation of Crimes for Migrants and the Mechanism for Foreign Support.

The MAE was created to receive reports of crimes committed against migrants from abroad via PGR representatives in Mexican embassies

TABLE 3

**CASES REPORTED THROUGH MEXICO'S FOREIGN SUPPORT MECHANISM**

| COUNTRY OF ORIGIN OF THE VICTIM | NUMBER OF DOCUMENTED CASES |
| --- | --- |
| EL SALVADOR | 21 CASES OF DISAPPEARANCE |
| HONDURAS | 20 CASES OF DISAPPEARANCE |
| GUATEMALA | 19 CASES OF DISAPPEARANCE |
| COLOMBIA, BRASIL, ECUADOR AND OTHER COUNTRIES | 8 CASES INVOLVING UNSPECIFIED CRIMES |
| TOTAL | 68 CASES |

*Sources: http://bit.ly/2hb2LhN; http://eluni.mx/2e4zXba; http://bit.ly/2lo7qNt; responses to access to information requests.*

(attachés) or PGR offices in Mexican consulates. It is also in charge of submitting the cases to the UIDPM for investigation, receiving evidence, and keeping families informed of progress made in the investigation in the country where they reside. The MAE eliminates, at least on paper, geographical, economic, and bureaucratic barriers so that the families of migrants who have been victims of crime in Mexico have direct contact with Mexican authorities, can report crimes, and are able to follow up on the investigation, without having to travel to the country.

As of July 2017, the MAE has received 68 reports of crimes perpetrated against migrants in Mexico.

Of these, at least 60 were cases of migrants from El Salvador, Guatemala, and Honduras who disappeared in Mexico between 1999 and 2014. Disappearances were at the highest level in 2011.

The MAE is one of the most important measures created to respond to the families of migrants residing in other countries. While major challenges persist in terms of operability and effective responses, there are some positive aspects of the MAE that open the door to reporting similar cases. For this to occur, authorities must resolve the following aspects.

## OBSTACLES TO REPORTING CRIMES FROM ABROAD

The resolution that created the UIDPM and the MAE highlight that PGR representatives located outside of the country are the doorway to reporting crimes to the Mexican justice system.[36] However, in practice, neither the Ministry of Foreign Affairs nor the PGR have made sufficient efforts to clarify—for instance, by issuing guidelines—the role of each institution in receiving reports of crimes against migrants and evidence, nor have they sought out effective ways to coordinate. This means that authorities' responses to victims are neither constant nor consistent, which often delays investigations. In Honduras, reports have been submitted directly to the consul, whereas in other cases, the embassies are only a physical space used by the head of the UIDPM traveling from Mexico to receive reports. Some complaints were received directly by the MAE, while others were received through traditional means of cooperation between countries (international legal assistance) that, contrary to the MAE, do not allow victims to participate. Moreover, the PGR has only one attaché in Guatemala, which makes it difficult for victims from Honduras or El Salvador to present reports. There are few PGR liaison offices and attachés in the United States to receive migrants' reports.

## OBSTACLES TO INVESTIGATING CRIMES REPORTED FROM ABROAD

Once a crime has been reported from abroad and investigations have begun in Mexico, there are no appropriate mechanisms for keeping families living in Central America or the United States informed about advances in their cases.

A more structured and formal procedure must be developed in order to enable victims' families to monitor progress made in their cases while still in their country of residence. In some cases, the official in charge of the MAE has informed families in person or via Skype of the state of the investigation into their case, but in others—for example, in 19 cases involving Guatemalan victims—review boards have not met to discuss cases because "there has been no progress

made." This is despite the fact that the cases were filed in late 2016 and January 2017, which means that enough time has passed to produce results. In light of this situation, authorities could take advantage of already existing means of collaboration, such as the Forensic Commission *(Comisión Forense)*, to report on progress made in investigating crimes reported through the MAE. The Forensic Commission is a working group created in 2013 to identify the remains of victims from the San Fernando and Cadereyta massacres. The PGR, organizations of families, the Argentine Forensic Anthropology Team *(Equipo Argentino de Antropología Forense)*, and human rights organizations that represent the victims all participate in the working group.[37]

Families in Central America also find it difficult to travel to Mexico when they have to participate in important proceedings, such as search-and-rescue efforts to find disappeared migrants. The lack of clarity on the procedures and criteria for granting visas in these cases forces the families to apply for tourist visas. However, the requirements for obtaining these visas are too strict and, in many cases, impossible to meet for those who do not have the economic resources required to obtain these visas. Maria, who lost a family member in the Cadereyta massacre, explained that:

> "I went to the consulate to apply for a visa. They asked me to meet many requirements, prove my financial situation, where I worked.... I proved all of this.... I took the letter of invitation that *Fundación para la Justicia* had sent me and on top of all this, they asked me to submit his bank statements.... I have the right to go and see with my own eyes how they are investigating my brother's assassination, since the authorities don't come to tell us what they are doing."

Finally, families' and victims' access to justice is also restricted when they do not have access to the files of the investigations underway in Mexico from their country of residence. The PGR has proved to be particularly opposed to the idea of exploring alternatives so that the families do not have to travel to Mexico to view the documents, files, and records related to their cases' investigations. The PGR affirms that it does not have an online system for consulting files and that Mexican law does not require it to digitalize files so that they can be accessed electronically. It also states that the families can only consult the files at the PGR's offices in Mexico City. This has forced the families' lawyers to file petitions for a writ of *amparo* (guarantee of protection for an individual's constitutional rights) to gain access to files. By responding in this way, the PGR ignores the fact that the MAE exists precisely so that the families of migrants who are victims of crime in Mexico—many of whom have scarce resources or cannot travel easily—do not have to travel to Mexico to find out the status of their case.[38]

# CONCLUSIONS AND RECOMMENDATIONS

The creation of special prosecutor's offices or units for investigating crimes against migrants and the Mechanism for Foreign Support (*Mecanismo de Apoyo Exterior*, MAE) to denounce crimes from abroad are an official acknowledgment of the need for concrete measures to guarantee access to justice for migrants who are victims of crime in Mexico. However, fundamental obstacles remain— most of them due to authorities' lack of will or negligence—that impede these bodies from fulfilling their duty. Currently, an overwhelming number of crimes against migrants in the country go uninvestigated or unpunished.

To address this situation, Mexican authorities must take bold measures to produce measurable and public results, including:

## ELIMINATE OBSTACLES SO THAT MIGRANTS CAN REPORT CRIMES COMMITTED AGAINST THEM IN MEXICO

- The special prosecutors or offices to investigate crimes against migrants and the Unit for the Investigation of Crimes for Migrants (*Unidad de Investigación de Delitos para Personas Migrantes*, UIDPM) of the federal Attorney General's Office (*Procuraduría General de la República*, PGR) should facilitate the reporting of crimes against migrants. Measures to do so could include conducting regular visits to migrant shelters or human rights organizations to receive crime reports and creating new special prosecutor's offices in other states where there is a high number of crimes against migrants, such as Sonora and Tamaulipas. Public officials should have presence in well-known transit points and migration detention centers to receive crime reports from migrants. Implementing mobile Public Prosecutor's units to be able to receive complaints where they are needed could contribute to addressing this situation.

- Reform Article 133 of the Migration Law, and Article 144, section 2 and Article 180, section 1, paragraph b) of the Regulations to the Migration Law that only permits the regularization of migrants that have been victims of "grave crimes". This requirement is an obstacle to justice and due process during regularization procedures, and opens the door to arbitrary decisions by authorities on who is or is not a victim of a grave crime. Keeping this requirement may also prevent officials from the Public Prosecutor's Office from gathering information from crime victims and witnesses that may be relevant to other investigations.

- Hold regular meetings with the National Migration Institute's (*Instituto Nacional de Migración*, INM) Beta Groups, federal and state-level prosecutors that investigate crimes against migrants, the CNDH, public human rights bodies, migrant shelters, and organizations that accompany cases, to discuss statistics and crime reports and ways to increase their capacity to receive crime reports from migrants, instead of waiting for them to go to

the authorities. The Ministry of the Interior (*Secretaría de Gobernación*, SEGOB) should produce and publicize annual statistics that concentrate data on crimes against migrants as a way to comply with the fifth objective of the Special Migration Program (*Programa Especial de Migración*) on security and access to justice for migrants and migrants' rights defenders.

- Because the Mechanism for Foreign Support permits reporting crimes committed against migrants in Mexico from abroad, Mexico's Ministry of Foreign Affairs (*Secretaría de Relaciones Exteriores*, SRE) and the PGR must officially clarify—for instance, by issuing guidelines—the role of each institution in receiving complaints and evidence. The Mexican government must have a sufficient number of trained and permanent staff in Central America and the United States—either legal attachés or officials from the Public Prosecutor's Office—to receive crime reports, channel them to authorities in Mexico, and to keep families informed in real time of progress in their cases in the countries where they reside, including a mechanism to consult relevant documents remotely. Furthermore, they must facilitate the visa process so that families and victims who are in Central America can travel to Mexico when their participation in investigations is required.

## CONDUCT SERIOUS INVESTIGATIONS INTO CRIMES AND HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS IN MEXICO AND DELIVER CONCRETE RESULTS

- Provide the UIDPM and the special state-level prosecutor's offices with the financial and human resources they need to carry out their work. To this end, federal and state congresses must allocate sufficient resources to the prosecutor's offices and units that investigate these cases. The attorney general and public prosecutor's offices must have autonomy to conduct investigations and to appoint or hire personnel with the necessary professional and technical capacities, including agents of the Public Prosecutor's Office, experts, and investigative police.

- The UIDPM and special prosecutor's offices should establish a policy to investigate and prosecute crimes against migrants. The plan should be made public, specify investigative priorities for each prosecutor's office, the cases under investigation, and the results, which should also be made public. The plan should also explicitly promote producing evidence before trial ("*pruebas anticipadas*") and the regularization of the migration status of migrants who have been victims of or witnesses to crimes so that criminal investigations can be pursued. These public policy documents will facilitate communication among prosecutors and among PGR offices that investigate crimes against migrants.

- The federal and state congresses should establish procedures with clear criteria for appointing and removing the heads of the prosecutor's offices specialized in investigating crimes against migrants. The nomination process should be public and transparent, with participation from civil society. The head of these prosecutor's offices should have a background relevant to

the position, with experience in providing adequate assistance to migrants who are victims of crime, and the appropriate professional experience for the position.

- The PGR should establish transparent and accessible procedures for keeping the families, or the migrants who are crime victims and who live abroad, up-to-date on the progress of their case in their country of residence. For example, authorities could take advantage of already existing working groups (such as the Forensic Commission created in 2013 to identify the remains of victims from the San Fernando and Cadereyta massacres) to report on progress made in investigating crimes reported through the Mechanism for Foreign Support.

- In addition to its important work to document the situation in migrant detention centers, the CNDH should make recommendations to the INM, the Federal Police, and other federal authorities based on migrants' complaints, including specific recommendations on crimes and irregular conduct that should be investigated. We also urge the CNDH to produce reports or general recommendations on the human rights of migrants in Mexico, such as on migration enforcement operations carried out by the INM together with other security forces and on access to justice for migrants who have been victims of crime. Furthermore, the Commission should publish reports on a regular basis with recommendations to the INM based on the CNDH's work in migrant detention centers.

## INCREASE REGIONAL COOPERATION

- Through their consular services, the Central American governments should increase their presence in places where crimes against their citizens are common, as well as the protection of their citizens when they are victims of crimes or human rights violations in Mexico. They should also strengthen dialogue with their Mexican counterparts on the transnational investigation of crimes against migrants.

- This may include enhancing communication with attorney general's offices and other bodies of the Mexican government, validating and issuing identity papers for victims of crimes, and providing legal advice. It is fundamental that they request information from the Mexican government on the progress of investigations or submit letters supporting migrants' complaints or reports on abuses, as the Honduran consul has done in Coahuila. The consulates must also provide information to migrants who live abroad on how to access and use the MAE to report crimes they suffered in Mexico from their countries of origin and the United States.

- The prosecutors from Mexico, Central America, and the United States as a destination country, should hold regular meetings to address from a regional perspective the crimes and human rights violations committed against migrants. They should also agree on efficient ways of collaborating and reducing impunity in these cases.

# NOTES

1   Pedro sought political asylum in the United States due to gender discrimination, as he had suffered persecution in Guatemala.

2   Interview with the head of the Ministry of the Interior's (*Secretaría de Gobernación*, SEGOB) Migration Policy Unit, April 2017.

3   In this report, we use the term "migrant" to refer to people from other nationalities who travel through or seek to reside in Mexico, for whatever reason, as well as Mexican nationals who returned or were deported. Migrants can become asylum seekers or refugees when they are granted this status.

4   In this report, we analyze crimes against migrants committed by state and non-state actors. In some cases, the crimes or abuses committed by authorities can also be classified as human rights violations.

5   The access to information requests submitted for this report, as well as authorities' responses, are available at: http://migracionytransparencia.org/.

6   Interview with the director of the COMI, March 2017.

7   Angélica Jocelyn Soto Espinosa, "INM y CNDH obstaculizan defensa de migrantes detenidos, acusan," *Cimacnoticias*, May 8, 2014, http://www.cimacnoticias.com.mx/2015/node/66424.

8   Ley de Migración, Art. 71. "The Ministry will create protection groups for migrants in national territory, whose purpose is to protect and defend their rights, regardless of their nationality or migration status. The Ministry will sign cooperation and coordination agreements with the agencies and bodies of the Federal Public Administration, federal states, or municipalities, with civil society organizations, or with individuals to ensure their participation in the creation and functioning of the migrant protection groups."

9   Instituto Nacional de Migración, Grupos Beta de Protección a Migrantes, http://www.gob.mx/inm/acciones-y-programas/grupos-beta-de-proteccion-a-migrantes.

10  Secretaría de Gobernación, Unidad de Política Migratoria, "Boletines Estadísticos," http://www.politicamigratoria.gob.mx/es_mx/SEGOB/Boletines_Estadisticos.

11  Request to the INM, folio number 0411100066117, responded to on May 30, 2017.

12  Secretaría de Gobernación, Unidad de Política Migratoria, "Boletines Estadísticos," http://www.politicamigratoria.gob.mx/es_mx/SEGOB/Boletines_Estadisticos.

13  Article 52 of the Migration Law (Ley de Migración) and Article 137 of the Regulation to the Migration Law (Reglamento de la Ley de Migración, RLM) do not distinguish between "grave crimes" and ones that are not. However, Article 133 of the Migration Law and Article 144, section 2, and Article 180, section 1, paragraph b) of the RLM does make this distinction, which also appears in Article 50, "Requirements" section, of the Guidelines for Migration Procedures and Formalities for Migrants in an Irregular Situation (Lineamientos para trámites y procedimientos migratorios, relativos a migrantes en situación irregular).

14  Secretaría de Gobernación, Diario Oficial de la Federación, *Acuerdo A/117/15*, December 18, 2015, http://www.dof.gob.mx/nota_detalle.php?codigo=5420681&fecha=18/12/2015.

15  Interview with the head of the UIDPM, April 2017.

16  One migrant had previously filed a report in Mexicali for similar acts carried out by the same perpetrator. Even though the UIDPM was already aware of the earlier cases, after two reports were filed and the migrant shelters were alerted, the perpetrator arrived in Altar, Sonora. The UIDPM, which is based in Mexico City, said to them that nothing could be done, as at the time, there was no evidence to prove any elements of the crime, and that the perpetrator would have to be caught in the act.

17  Cámara de Diputados del H. Congreso de la Unión, Secretaría General, Secretaría de Servicios Parlamentarios, Código Nacional de Procedimientos Penales, Artículo 304, June 17, 2016, http://www.diputados.gob.mx/LeyesBiblio/pdf/CNPP_170616.pdf.

18  Comisión Nacional de los Derechos Humanos, Informe 7/2016 del Mecanismo Nacional de Prevención de la Tortura sobre estaciones migratorias y estancias provisionales en los estados de Guerrero, Michoacán, Nuevo León, Quintana Roo, Sonora y Veracruz," September 29, 2016, http://www.cndh.org.mx/sites/all/doc/PrevTortura/7_2016.pdf.

19  Comisión Nacional de los Derechos Humanos, Dirección General de Comunicación, "Comunicado de Prensa DGC/263/16," October 14, 2016, http://www.cndh.org.mx/sites/all/doc/Comunicados/2016/Com_2016_263.pdf.

20  Request submitted to the CNDH with folio number 00002417, responded to on January 30, 2017.

21  The recommendations are available at: http://www.cndh.org.mx/recomendaciones.

22  "Apodan a alcalde como el 'Trump oaxaqueño' por su rechazo a migrantes," *Radio Fórmula, May* 13, 2017, http://www.radioformula.com.mx/notas.asp?Idn=683528&idFC=2017.

23  Roselia Chaca, "Agrede priista a responsable del albergue de migrantes en Ixtepec," *NVI Noticias*, May 24, 2016, http://www.nvinoticias.com/nota/12763/agrede-priista-responsable-del-albergue-de-migrantes-en-ixtepec.

24  Emir Olivares Alonso y Ciro Pérez Silva, "El sacerdote Alejandro Solalinde sale del país, amenazado de muerte," *La Jornada*, May 15, 2012, http://www.jornada.unam.mx/2012/05/15/politica/005n1pol.

25  "Amenazan de muerte al padre Alejandro Solalinde (Video)," *Proceso*, March 28, 2017, http://www.proceso.com.mx/479915/amenazan-muerte-al-padre-alejandro-solalinde-video.

26  "Casa del Migrante Saltillo," PBI México, http://www.derechoadefenderderechos.com/pbi-mexico-casa-migrante-saltillo.html#.

27  Leopoldo Ramos, "Denuncian por discriminación a migrantes al alcalde de Saltillo," *La Crónica de Chihuahua via La Jornada*, March 25, 2017, http://www.cronicadechihuahua.com/Denuncian-por-discriminacion-a,34647.html?PageSpeed=noscript.

28  Sanjuana Martínez, "Tras ser torturado, el hondureño Reyes Ardón aceptó haber asesinado a una mujer," *La Jornada*, September 11, 2011, http://www.jornada.unam.mx/2011/09/11/politica/010n1pol.

29  "Nueva redada en Caborca," *Código 07*, June 15, 2016, http://codigo07.com/web1/index.php/noticias-locales/item/6929-nueva-redada-en-caborca/6929-nueva-redada-en-caborca.

30  Ibid.

31  Ramón Eduardo Ortiz, "Redadas contra migrantes en Sonora," *Contra Línea*, January 18, 2017, http://www.contralinea.com.mx/archivo-revista/index.php/2017/01/18/redadas-contra-migrantes-en-sonora/.

32  Amnesty International, "Acción Urgente: Amenazas contra defensores y defensoras de los derechos humanos de las personas migrantes," July 19, 2011, https://www.amnesty.org/download/Documents/28000/amr410482011es.pdf.

33  La 72−Hogar-Refugio para Migrantes, "Nueva Intimidación Al Equipo de La 72," October 7, 2016, http://www.la72.org/wp-content/uploads/2017/03/Comunicado-061016.pdf.

34  La 72−Hogar-Refugio para Migrantes, "Nueva embestida del INM en contra del personal de la 72," June 26, 2017, http://redtdt.org.mx/?p=8872.

35  Open Society Justice Initiative, *Undeniable Atrocities: Confronting Crimes against Humanity in Mexico*, 2016, https://www.opensocietyfoundations.org/sites/default/files/undenialble-atrocities-2nd-edition-20160808.pdf.

36  The PGR's updated manual indicates that the regional and legal attachés and the liaison offices play an important role in receiving reports from abroad: http://www.dof.gob.mx/nota_detalle.php?codigo=5462599&fecha=25/11/2016.

The regulations of the Mexican Foreign Service Act, which regulates the operations of Mexican embassies and consulates, establishes that the consulates must assist the public prosecutor and other officials of the justice system: http://www.dof.gob.mx/nota_detalle.php?codigo=722171&fecha=23/08/2002.

37  Secretaría de Gobernación, Diario Oficial de la Federación, Convenio de Colaboración para la identificación de restos localizados en San Fernando, Tamaulipas, y en Cadereyta, Nuevo León, September 4, 2013, http://www.dof.gob.mx/nota_detalle.php?codigo=5312887&fecha=04/09/2013.

38  Secretaria de Gobernación, Diario Oficial de la Federación, "Acuerdo A/066/13," June 21, 2013, http://www.dof.gob.mx/nota_detalle.php?codigo=5303411&fecha=21/06/2013; ministerial agreement issued on PGR files in cases of disappearances that the *Fundación para la Justicia y el Estado Democrático de Derecho* is following.

39  Secretaria de Gobernación, Diario Oficial de la Federación, "Programa Especial de Migración 2014-2018," April 30, 2014, http://www.dof.gob.mx/nota_detalle.php?codigo=5343074&fecha=30/04/2014.

## ABOUT THE AUTHORS

Ximena Suárez is WOLA's Associate for Mexico. Andrés Diaz is a Researcher on Fundar's Human Rights and Anti-Impunity program. José Knippen is a migration project coordinator at Fundar. Maureen Meyer is WOLA's Senior Associate for Mexico and Migrant Rights.

## ACKNOWLEDGEMENTS

We would like to thank the following people for their contributions to this report: Hannah Smith, WOLA Program Officer, contributed to the research, writing, and production of this report. Kristel Muciño, WOLA's Communications Director, offered valuable suggestions to the text. José Benjamin Montaño, WOLA intern, contributed to the data and information analysis for this report.

*This report would not have been possible without the generous support of the Ford Foundation, the MacArthur Foundation, and CAMMINA-the Central America and Mexico Migration Alliance.*

## ABOUT THE ORGANIZATIONS

**CASA DEL MIGRANTE DE SALTILLO "FRONTERA CON JUSTICIA", AC,** in Saltillo, Coahuila, provides comprehensive humanitarian assistance as well as case documentation and legal services to migrants.

**LA RED MIGRANTE SONORA** is a network of five organizations based in the state of Sonora dedicated to defending and providing humanitarian assistance to migrants in Mexico.

- **Kino Border Initiative** is an organization based in Nogales, Sonora and Nogales, Arizona that works in support of migrants and refugees in the United States and Mexico.
- **Centro de Recursos para Migrantes (CRM),** in Agua Prieta, works to provide humanitarian assistance to migrants and document abuses.
- **Centro de Atención al Migrante Exodus (CAME)** provides shelter to traveling or deported migrants in Agua Prieta.
- **Centro Comunitario de Atención al Migrante y Necesitado (CCAMYN)** is a migrant shelter in Altar directed by the Church of Nuestra Señora de Guadalupe.
- **Centro Comunitario de Ayuda a Migrantes (C-CAM)** is a group of volunteers organized to help migrants crossing through the city of Caborca; they give out food along the train tracks and belong to the local parish of Nuestra Señora de Guadalupe.

**ALBERGUE DE MIGRANTES "HERMANOS EN EL CAMINO"**, in Ixtepec, Oaxaca, provides comprehensive humanitarian assistance to migrants in transit in Mexico.

**LA 72, HOGAR-REFUGIO PARA PERSONAS MIGRANTES** is a Franciscan project dedicated to providing comprehensive assistance to migrants and refugees traveling through Tenosique, Tabasco.

**FUNDACIÓN PARA LA JUSTICIA Y EL ESTADO DEMOCRÁTICO DE DERECHO** is an organization based in Mexico City with offices in Honduras, El Salvador, and Guatemala, dedicated to promoting access to justice and truth for victims of crimes and human rights violations as a way of strengthening the rule of law and combating impunity.

**FUNDAR, CENTRO DE ANÁLISIS E INVESTIGACIÓN, AC** is civil society organization based in Mexico City that works toward a substantive democracy.

**WASHINGTON OFFICE ON LATIN AMERICA (WOLA)** is a research and advocacy organization based in Washington, DC that promotes human rights in the Americas.

# EXHIBIT 5

# Mexico

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**hrw.org**/world-report/2022/country-chapters/mexico

December 10, 2021



Human rights violations—including torture, enforced disappearances, abuses against migrants, extrajudicial killings, gender-based violence, and attacks on independent journalists and human rights defenders—have continued under President Andrés Manuel López Obrador, who took office in December 2018. Impunity remains the norm. Legal reforms enacted in 2017 and 2018 have been slow and ineffective in addressing torture and impunity.

President López Obrador has greatly expanded the scope of the armed forces' activities, deploying them for law enforcement and customs enforcement, and to control irregular immigration, run social programs, and build and operate mega projects.

The National Search Commission (CNB) has increased transparency about the number of "disappeared" persons, but prosecutors make little effort to investigate disappearances or identify those responsible.

In November 2019, the Senate named Rosario Piedra Ibarra to head the National Human Rights Commission (CNDH). Many human rights defenders called her appointment unconstitutional, saying that, as a former senior member of the president's party, she is too close to the administration to be autonomous and apolitical.

In August 2021, President López Obrador held a referendum on whether "past political actors" since 1988 should be tried for "crimes" including electoral fraud, corruption, and loss of lives to neoliberalism. Low turnout invalidated the results.

The president has collaborated with the US in abusive anti-immigration policies, including illegal expulsion of migrants and asylum seekers by plane and bus to Central America.

## Criminal Justice System

The criminal justice system routinely fails to provide justice to victims of violent crimes and human rights violations. Only 5.2 percent of crimes committed in Mexico are solved, the nongovernmental group México Evalúa reports. Causes of failure include corruption, inadequate training and resources, and complicity of prosecutors and public defenders with criminals and other abusive officials.

The justice system regularly fails to ensure due process for those accused of crimes. Police and prosecutors commonly use torture to obtain confessions. Pretrial detention is mandatory for many offenses, violating international human rights standards. Prisons are notoriously unsanitary and overcrowded. Prosecutors continue to use *arraigo* detention, a mechanism allowing them to obtain judicial authorization to detain anyone for up to 40 days without charge, for interrogation.

The attorney general never properly implemented a 2018 reform intended to make the office more independent from the government and more accountable to victims and their families, human rights and rule-of-law groups report. In 2021, Congress repealed many of the human rights provisions of the 2018 reform.

In April 2021, pro-government legislators passed a law extending the terms of the Supreme Court Chief Justice and members of the Federal Judiciary Council, which controls hiring and firing of judges. In November, the Supreme Court overturned the law, declaring it unconstitutional.

## Military Abuses and Extrajudicial Killings

Mexico has relied heavily on the military to control drugs and fight organized crime, leading to widespread human rights violations. From 2013 through 2020, the CNDH received 3,799 complaints of military abuses.

President López Obrador has vastly expanded the scope of the military in public security, often supplanting civilian law enforcement. In 2019, he created the National Guard to replace the Federal Police as the government's principal law enforcement body. The National Guard is led by military officers, trained by the military, and composed largely of military troops. In May 2020, the president formally deployed the military to assist the National Guard in civilian law enforcement. The military can now legally detain civilians, take charge of crime scenes, and preserve evidence. Under past governments, charging the military with these tasks has contributed to serious cover-ups of human rights abuses. In July 2021, the president proposed formally placing the National Guard under military control.

In 2014, Congress reformed the Code of Military Justice, requiring abuses by members of the military against civilians to be prosecuted in civilian, not military, courts. However, pursuit of justice remains elusive.

In July 2020, 12 civilians were killed in a shootout with soldiers in Tamaulipas state. A video leaked to the press in August showed a soldier giving the order to kill a civilian. In September, the Secretary of Defense announced that only military police—no civilian prosecutors—were investigating. In March 2021, a lawyer for the families of victims told Reuters that no soldiers had yet been detained, despite the video evidence.

In September 2021, the Defense Ministry admitted that at least 47 people had been killed or injured by the armed forces during the López Obrador presidency, according to information obtained through transparency requests by Mexican journalists. The Defense Ministry has paid compensation to families but has not sanctioned any soldiers or reported the cases to police or prosecutors for criminal investigation.

## Torture

Torture is widely practiced to obtain confessions and extract information. It is most frequently applied after victims are detained, often arbitrarily, but before they are handed to civilian prosecutors. Victims are often held incommunicado at military bases or illegal detention sites. A 2017 law made it illegal to use confessions obtained through torture as evidence at criminal trials. However, authorities often fail to investigate allegations of torture.

In 2016—the last year for which data is available—Mexico's national statistics office surveyed more than 64,000 people incarcerated in 338 prisons. Almost two-thirds (64 percent) reported physical violence at the time of arrest, including electric shocks, choking, and smothering.

## Disappearances

Thousands of people disappear every year in Mexico. Police, the military, and criminal groups are responsible for many disappearances.

Prosecutors and police rarely attempt to find the disappeared or identify those responsible. Families of the disappeared have formed more than 130 "search collectives" to investigate disappearances, including, frequently, by digging up mass graves.

In 2019, a well-respected human rights defender was appointed to head the government's National Search Commission (CNB). The CNB searches mass graves across the country. It has also taken steps to determine and publish the true number of people disappeared, gathering information from authorities and creating an online platform to report disappearances anonymously and show real-time numbers of those disappeared, excluding personally identifying information.

As of September 2021, the platform had recorded over 90,000 people disappeared, mostly since 2006. Authorities have publicly acknowledged the real number is likely higher. The majority are between 15 and 30 years old, from lower income families, the CNB reports. More than 23,000 are listed as having disappeared since President López Obrador took office in December 2018.

From 2006 to 2020, at least 50,000 bodies passed through the custody of state and local forensic medical services without being properly identified. Most are now buried in mass graves. From 2006 to 2021, authorities reported having found at least 4,000 mass graves.

In August 2021, the government named a group of seven international forensic and legal experts to lead the Extraordinary Forensic Identification Mechanism, which will be tasked with identifying bodies recovered from mass graves.

In November, the UN Committee on Enforced Disappearances visited Mexico—its first visit to any country. The committee first requested permission to visit Mexico in 2013 but was denied access by the previous government. In August 2020, the López Obrador government recognized the committee's jurisdiction to consider cases from Mexico, allowing families of victims to submit cases to the committee once they have exhausted their legal options domestically.

## Attacks on Journalists and Human Rights Defenders

Journalists and human rights defenders—particularly those who criticize public officials or expose the work of criminal cartels—often face attacks, harassment, and surveillance by government authorities and criminal groups.

Mexico is one of the most dangerous countries in the world for journalists, on par with war zones like Syria and Afghanistan in number of journalists killed, according to the Committee to Protect Journalists and Reporters Without Borders. In 2020, journalists registered 692 threats, attacks, or other forms of aggression—reportedly the highest year on record. Article 19 reported five journalists killed in relation to their work from January to September 2021.

Authorities routinely fail to investigate crimes against journalists adequately, often preemptively ruling out their profession as a motive. Since its creation in 2010 through August 2021, the federal Special Prosecutor's Office to investigate crimes against journalists has opened more than 3,362 investigations, brought 265 charges for crimes, and obtained 25 convictions. In the face of uninvestigated violence, many journalists self-censor.

Mexico is also one of the most dangerous countries in the world for human rights defenders. From January through September 2021, the Mexico Office of the UN High Commissioner for Human Rights reported 10 human rights defenders killed. As with journalists, violence against human rights defenders is rarely investigated or prosecuted.

In 2012, the federal government established the Protection Mechanism for Human Rights Defenders and Journalists, which provides bodyguards, armored cars, and panic buttons, and helps journalists temporarily relocate in response to serious threats. A 2019 study by the Office of the United Nations High Commissioner for Human Rights documented the Mechanism's problems in coordinating protective measures, providing resources, and establishing clear procedures. Six journalists have

been killed under the program's protection, four since President López Obrador took office. In October 2020, the government eliminated the independent fund that paid for protection measures, putting the mechanism in a precarious financial situation.

## Women's and Girls' Rights

Mexican laws do not adequately protect women and girls, including those with disabilities, against gender-based and sexual violence. Some provisions, including those that peg the severity of punishments for sexual offenses to the "chastity" of the victim, contradict international standards.

Abortion access varies by state. All 32 states allow abortion in cases of rape. Six allow it for any reason up to 12 weeks of pregnancy. Women and pregnant people face many barriers when trying to access abortion, even when it is legal. Doctors and nurses regularly attempt to dissuade them from undergoing the procedure or refuse to perform it.

In September, the Supreme Court made three rulings that set important precedents for reproductive rights. The court found that absolute criminalization of abortion is unconstitutional and that women should not be criminally prosecuted for undergoing the procedure. It ruled that state governments do not have the authority to legislate that life begins at conception. And it ruled that medical staff's right to conscientiously object to performing abortions is subject to limits.

Women and girls continue to face alarming rates of gender-based violence. In 2020, the government reported nearly 1,000 femicides—killings of women because of their gender. Women's rights groups say femicide is likely under-reported.

## Migrants and Asylum Seekers

Criminal cartels, common criminals, and sometimes police and migration officials regularly target people migrating through Mexico to rob, kidnap, extort, rape, or kill them. These crimes are rarely reported, investigated, or punished.

The López Obrador administration has actively participated in abusive US immigration policies. It failed to provide police protection or access to justice, work, health care, and education for the over 71,000 asylum seekers, including many families with children, sent to Mexico under the "Remain in Mexico" policy. Many suffered abuses from criminal cartels or Mexican authorities. President López Obrador said the program had produced "very good results."

The López Obrador administration has been illegally expelling thousands of asylum seekers to Guatemala without due process, including many who were first expelled from the US into the custody of Mexican authorities.

In 2019, President López Obrador deployed the National Guard for migration enforcement. The government says soldiers only support migration officials. However, in a leaked audio recording from 2019, a senior migration official told her team they were now "under the instruction and supervision of

the National Guard." In September 2021, National Guard troops and Mexican immigration agents violently detained a series of caravans of asylum seekers in Chiapas state, leaving many injured.

Mexican immigration officials have refused to follow court rulings ordering them to prevent the spread of Covid-19 in immigration detention centers. Detained migrants have said they were not given masks or soap and were denied medical treatment when they had symptoms of Covid-19.

Mexico's asylum system is severely overstretched. Since 2013, the number of applications received has nearly doubled every year. Officials expect to receive more than 100,000 applications in 2021. From January through August 2021, Mexico received nearly 78,000 asylum applications but resolved just over 23,000.

## Sexual Orientation and Gender Identity

Twenty-four of 32 states have legalized same-sex marriage. Elsewhere, same-sex couples must petition for an injunction (*amparo*) to be allowed to marry. In 2019, the Supreme Court ruled that a lesbian couple from Aguascalientes state should be allowed to register a child born to one of the women as a child of both. The ruling was based on the best interest of the child and the principles of equality and non-discrimination.

Seventeen states have passed laws creating a procedure permitting transgender people to change their names and gender markers on birth certificates through a simple administrative process. In 2018, the Supreme Court ruled in favor of a transgender person from Veracruz who contended that in refusing to change their name and gender marker on their birth certificate, the municipal Civil Registry had violated their rights. In 2019, the Supreme Court issued a similar ruling arising from a case in Jalisco.

## Disability Rights

Under the López Obrador administration, serious gaps remain in protecting the rights of people with disabilities. They lack access to justice, education, legal standing, legal capacity, protection from domestic violence, and informed consent in health decisions. In 2019, Human Rights Watch documented cases of state-run hospitals and private individuals who shackled people with disabilities. They lack access to buildings, transportation, and public spaces. Women with disabilities suffer disproportionate violence.

The only policy to assist people with disabilities is a non-contributive disability pension that reaches only 933,000 people of the 6,179,890 who live in the country. Its distribution is opaque and discretionary.

In many states, people with disabilities have no choice but to depend on their families for assistance or to live in institutions, which is inconsistent with their right to live independently and be included in the community under the Convention on the Rights of Persons with Disabilities. People with

disabilities receive little government protection or support and are at higher risk of abuse and neglect by their families.

In October 2021, following a CRPD committee recommendation, the government publicly apologized to a man with intellectual and psychosocial disabilities who had been imprisoned for four years although there was no evidence he had committed a crime and a judge had found him unfit to stand trial, leaving him without the opportunity to defend himself.

Since President López Obrador took office, the National Council on People with Disabilities, the principal government body coordinating efforts to implement disability rights, has been effectively non-operational.

## Covid-19

The López Obrador administration has failed to take many of the basic steps recommended by global health authorities to limit the spread of Covid-19. The official leading Mexico's response has called large-scale testing "useless" and "a waste of time," despite the World Health Organization's insistence on the importance of testing. As a result, Mexico has one of the lowest rates of Covid-19 testing—and highest rates of positive test results—in the world. Officials and experts agree that the real number of Covid-19 infections and deaths is likely many times higher than the official count.

As of September 2021, 30 percent of Mexicans had been fully vaccinated against Covid-19 and 47 percent had received at least one dose of the vaccine. Mexico has made the vaccine eligible by regions and age groups, from older to younger people. Proof of address is required to receive the vaccine. Anyone over the age of 18 was eligible to receive at least the first dose of the vaccine by September.

Schools were closed in Mexico from March 2020 to August 2021, and classes were broadcast on television and radio. Although 94 percent of Mexican households have television, a lack of affordable internet access left many children, especially those in low-income households or with disabilities, unable to fully participate in education. Many teachers protested the re-opening, at the height of the third wave of reported Covid-19 deaths.

## Climate Policy and Impacts

As one of the world's top 15 emitters of greenhouse gases, Mexico is contributing to the climate crisis that is taking a growing toll on human rights around the globe.

López Obrador has openly opposed wind and solar energy production. He has promised to rescue Mexico's coal and oil industries and has introduced reforms that favor state-owned fossil-fuel power plants over renewable energy sources. He has vowed to amend the constitution to overcome legal challenges to these policies.

López Obrador's initiative "Sowing Life," which he touts as a major component of his strategy to cut greenhouse gas emissions, may have caused 72,000 hectares of forest loss, with inadequate monitoring enabling beneficiaries to clear forests and then be paid by the government to plant trees. (López Obrador falsely claimed in November 2021 that a deal to end forest loss by 2030 reached at the global climate summit in Glasgow was inspired by "Sowing Life".) Law enforcement actions to curb illegal deforestation drastically diminished in recent years.

In its December 2020 climate action plan, Mexico increased the baseline against which its emissions reductions are calculated but maintained its 2015 emissions reduction commitments. This will allow Mexico to increase its emissions while technically meeting its targets. The plan is "insufficient" to meet the Paris Agreement goal of limiting global warming to 1.5°C, according to the Climate Action Tracker. If all countries' commitments were in a similar range, warming would reach up to 3°C by the end of the century.

Climate change is expected to increase the severity of extreme weather events, requiring steps by the government to protect at-risk populations from their foreseeable harms, including food insecurity due to rising temperatures and droughts impacting crops. In August 2021, hurricanes Grace and Nora caused flooding, landslides, and power outages in multiple states, killing at least nine people.

## Key International Actors and Foreign Policy

Mexico's foreign policy regarding human rights under the López Obrador administration has been based on the principle of "non-intervention." In June, Mexico criticized other countries in the region that had condemned the jailing of critics and opposition candidates in Nicaragua, saying that they were intervening in Nicaragua's internal affairs.

In June 2020, Mexico was elected as a non-permanent member of the UN Security Council for 2021 to 2022. Mexico highlighted that one of its priorities on the council would be the protection of children. Mexico endorsed the Safe Schools Declaration in May 2021.

In October 2020, Mexico was re-elected to the UN Human Rights Council.

In 2020, Mexico appointed itself as one of 23 "Champion countries" of the Global Compact for Safe, Orderly and Regular Migration.

In August and September 2021, Mexico hosted negotiations between representatives from the Venezuelan government and opposition groups mediated by Norway.

Mexico endorsed the World Health Organization's Solidarity Call to Action for the Covid-19 Technology Access Pool, an initiative to "realize equitable global access to COVID-19 health technologies through pooling of knowledge, intellectual property and data."

EXHIBIT 6




<div style="background:#c0272d;color:white;padding:1em">

# Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021

</div>

## Introduction

In 2021, policies on both sides of the US-Mexico border negatively affected women seeking protection. As we head into 2022, marking the first year of the Biden administration, Trump-era restrictive policies remain in place at the US-Mexico border, exacerbating the situation for women forced to wait at Mexico's northern border for the opportunity to seek asylum in the US. In addition, under pressure from the Biden administration, the Mexican government continues to intensify enforcement to deter migrants and individuals seeking protection at Mexico's southern border, worsening the situation for women stuck there.

In the fall of 2021, the Instituto para las Mujeres en la Migración (IMUMI) and the Women's Refugee Commission (WRC) monitored events and carried out interviews with women seeking protection to understand the challenges and the dangers they face in Mexico.[1] This report outlines those challenges and provides recommendations for the US and Mexican governments.

## US Policies in 2021

Early on, the Biden administration committed to building a fair, orderly, and humane immigration system and reversing illegal Trump-era policies that endangered the lives of people seeking protection at the US-Mexico border. In its first few months in office, it made positive strides on several promises, including creating initiatives to provide reparative justice for those harmed by Trump-era policies. In February 2021, President Biden created the Interagency Task Force on the Reunification of Families to reunify the nearly 4,000 children who were separated from their parents under Trump's "zero tolerance" policy, which aimed to criminally prosecute all migrants crossing into the US between ports of entry. That month, the administration also announced the creation of a process—in collaboration with international organizations, regional task forces, and local NGOs—that would allow individuals returned to Mexico under the Trump-era "Remain in Mexico" (RMX) policy to return to the US and continue their immigration cases in the US rather than continuing to wait in Mexico. It also reversed the Trump-era legal decisions that made it nearly impossible for survivors of domestic and gang violence to qualify for asylum.

In addition, the administration's strategies included a focus on protection and a gender lens. In summer 2021, the administration launched a whole-of-government blueprint of strategies to reform the US immigration system. One of the strategies that aimed to address the root causes of migration in Central

---

1 This report draws on interviews from IMUMI and WRC, cases from IMUMI's legal clinic, as well as media reports and research publications. IMUMI interviewed women in shelters in Mexico City between September and December 2021. On November 2, 2021, WRC staff visited two shelters in Mexico City and interviewed individuals from Haiti, Venezuela, El Salvador, Guatemala, and other countries. On December 3, 2021, WRC staff visited two migrant shelters in Tijuana and interviewed individuals from Mexico, Honduras, El Salvador, Guatemala, Cameroon, and other countries. IMUMI and WRC obtained informed consent from all individuals interviewed.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

America included a pillar "to combat sexual, gender-based, and domestic violence."[2] Another strategy laid out a comprehensive approach to regional migration management. Yet, in practice, the Biden administration has largely focused on enforcement and deterrence in its engagement with countries in the region. Notably, it reportedly has requested that the Mexican government sign a "safe third country" agreement, requiring most non-Mexican individuals to first seek protection in Mexico before requesting asylum in the US.

The Biden administration's positive actions and strategies have been profoundly overshadowed by its failure to restore access to asylum at the border, including at ports of entry, for most arriving migrants and people seeking asylum. In December 2021, the Biden administration announced the reinstatement (pursuant to a court order) and expansion of RMX[3] and extended the Trump-era Title 42 CDC public health order that summarily blocks and expels people from the US-Mexico border, often repeatedly, to danger in Mexico and countries of origin. Since President Biden took office, people have been expelled more than 1.1 million times, including more than 187,000 expulsions of parents and children,[4] who were denied the opportunity to seek protection. In August 2021, the administration began expulsion flights to southern Mexico, where Mexican authorities forcibly returned people across the border to Guatemala or sent them on buses to Honduras, in an act of chain refoulement.[5] In clear violation of non-refoulement, the Biden administration also sent individuals on Title 42 expulsion flights directly to back to Haiti, Guatemala, Honduras, and other countries of origin, without screening them for risk of harm upon return or otherwise providing them an opportunity to seek protection.

## Mexican Policies in 2021

Over the course of 2021, under pressure from the White House, the Mexican government took a number of measures to step up its immigration enforcement to deter migrants and asylum seekers from accessing protection at the US-Mexico border. In 2021, authorities from Mexico's National Migration Institute (INM) worked with the Mexican National Guard and security forces to carry out a record number of migrant apprehensions; approximately 30 percent of those apprehended were women, and 27 percent were children. These figures include families and unaccompanied children who were initially apprehended by INM or the National Guard and then referred to state or civil-society shelters, a requirement of Mexico's new children protection reform implemented in 2021. The reform requires that after referral, the protection offices determine the child's best interests, whether that means deportation, remaining in Mexico with humanitarian legal status, or being reunited with family in another country. While this reform is a big step

---

2 In addition to its immigration blueprint, in November 2021, the administration launched the first National Strategy on Gender Equity and Equality. Through this whole-of-government approach, the administration committed to work to build "a fair and humane immigration system that welcomes immigrants [and] keeps families together" and create improved protection pathways for those fleeing persecution, including victims of gender-based violence.

3  The restart of Remain in Mexico was pursuant to a court order; however, prior to the ruling in early August 2021, the Biden administration reportedly was already considering implementing a supposedly more "humane" version of RMX. In August 2021, a Texas judge ordered the administration to restore RMX "in good faith." The administration appealed that order and issued a new memo terminating RMX in October 2021. The Biden administration has committed to ending RMX eventually, but said that it planned to comply with the court's order to restart RMX. In the new iteration, the administration expanded the program to all non-Mexicans from the Western Hemisphere.

4  This includes Customs and Border Protection Title 42 expulsion statistics from February to December 2021.

5  The principle of non-refoulement in international law prohibits countries that are receiving asylum seekers from removing them or returning them to a country where there is reason to believe that they would be at risk of irreparable harm or human rights violations. Chain refoulement occurs when individuals are sent back to a country that will not protect people from the onward transfer in violation of non-refoulement. In this case, the US expelled asylum seekers back to southern Mexico by plane and the Mexican government bussed them to Guatemala. This occurred with Guatemalan, Salvadoran, and Honduran nationals in 2021.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021




forward for the rights of families and children, implementation across Mexico has been uneven[6] and many challenges remain, including the need for better funding and training to ensure the best interests of children are consistently upheld.

The Andrés Manuel Lopez Obrador administration also took greater measures to restrict travel by migrants and individuals seeking protection, pushing many people to hire smugglers and risk dangerous travel routes. It also created new travel regulations requiring proof of immigration status to purchase a bus ticket, leading to discrimination and racial profiling of both migrants in transit and Mexicans, especially Indigenous and Afro-descendent Mexicans. In addition, the US requested that the Mexican government put into place new travel requirements to make it more difficult for the citizens of countries who have been arriving at the US southern border in high numbers to transit through Mexico. Since August 2021, the Mexican government announced new requirements that Ecuadorians, Brazilians, and Venezuelans, some of whom are fleeing danger, acquire a visa to travel to Mexico as tourists. Mexican immigration authorities also stepped up restrictive tactics at Mexican airports, where they denied entry to a record 72,895 foreigners in 2021, more than double the number of denials in 2019 (31,008). Officials at airports turned around individuals aiming to seek protection in Mexico, who were unlawfully denied the opportunity to present their claim to COMAR (Mexico's agency responsible for asylum processing and adjudications) and instead detained in isolation for weeks. Furthermore, Mexico continued to coordinate with the US on the Biden administration's expulsions under Title 42, agreeing to receive expelled individuals from Guatemala, Honduras, and El Salvador, and worked with the Biden administration to re-implement and expand RMX.

Meanwhile, as Mexican authorities increased enforcement and US restrictive policies persisted, last year Mexico became one of the top destinations worldwide for individuals seeking protection. In 2021, COMAR received a historic high of 131,448 applications, with women representing 41 percent of applicants[7] and children representing 24 percent. This record number of applicants is an 87 percent increase from the prior high of 70,351 applications in 2019. Underfunded despite the critical need, COMAR has been unable to keep up with the increase in claims, leaving many people in southern Mexico—where the vast majority submit their applications[8]—to wait for decisions on their protection claims in precarious conditions for months or even up to two years in some cases. Mexican refugee law requires that applicants remain in the jurisdiction where they applied throughout the adjudication process, which prevents individuals applying for protection from reuniting with family and community networks in safer regions of the country with better employment opportunities.

***Note that the following section of the report contains graphic descriptions of sexual violence.***

## The Impact of US and Mexican Policies on Women

Taken together, the US and Mexican governments' policies and practices forced women seeking protection to wait for extended periods, often in precarious and dangerous circumstances, at Mexico's northern and southern borders. Throughout 2021, IMUMI and WRC carried out interviews with women and monitored events to understand the challenges and dangers they were facing.

---

6  There has been less progress in some Mexican states on the reform implementation than others due to a lack of training, funding, and political will of local authorities. As a result, despite the reform, some children may continue to be detained by immigration authorities or deported without a proper best interest determination. In fall 2021, a panel featuring IMUMI and other civil society organizations discussed some of the challenges with implementation.

7  Since 2016, women have represented approximately 40 percent of applicants to COMAR.

8   Approximately 68 percent of applications were filed in the state of Chiapas and 5 percent in Tabasco.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

1. **Women seeking protection experience violence in Mexico that exacerbates prior traumas that forced them to flee their countries of origin in the first place.** A 2015 UN report found that approximately 60 percent of surveyed women seeking asylum from Honduras, Guatemala, and El Salvador were fleeing gender-based violence, which includes any form of sexual, physical, mental, and economic harm directed at an individual due to their gender. A recent 2021 report by Kids in Need of Defense (KIND) found that violence against women in Central America drastically increased during the COVID-19 pandemic due to lockdowns that confined women with their perpetrators and to gangs gaining greater control over local communities.

   The violence that women seeking protection experience in transit in Mexico and while waiting at Mexico's northern border cities—including kidnapping, rape, trafficking, and other forms of harassment—compounds their previous traumatic experiences. For example, a Guatemalan woman, Liliana,[9] shared with IMUMI that after fleeing from a violent relationship with her husband who served in the military, she was kidnapped by a group of men in Tijuana. While she was being held by her kidnappers, she heard the men making arrangements on the phone to sexually exploit her. This experience was so traumatizing that after Liliana was released, she decided to travel to Mexico City to seek asylum while staying in a safe shelter instead of waiting to request asylum at the US-Mexico border.

2. **Women seeking protection do not feel safe in Mexico's southern and northern border cities and worry that they can be tracked down by their persecutors.** IMUMI documented various cases of Central American women who have been tracked down by their perpetrators in Mexico. A Guatemalan woman, Cristina, traveling with her husband and three children, described to WRC staff the "terror of being forced to wait in Tijuana where our persecutors can find us." In southern Mexico, a Honduran woman, Sara, described to IMUMI that she and her family were kidnapped by members of the Mara Salvatrucha gang. After Sara fled Honduras, one of the perpetrators found her in Tapachula, Chiapas, forcing her and her family to flee to another city and give up their asylum claim in Mexico.

3. **Women seeking protection are subjected to violent gender-based crimes in Mexico, including rape and sexual assault, and face heightened barriers to report these crimes and receive support services.** Women who are returned to Mexico alone or with their families experience many types of violent attacks. A 2017 Doctors Without Borders survey found that 31.4 percent of women seeking protection had been abused during their transit through Mexico. Some women are kidnapped and raped by their captors, often in front of their children. Many assaults involve Mexican authorities. A Honduran woman, Jessica, in the Mexico City detention center described to IMUMI how she and a friend were detained by the National Guard in Ciudad Juarez after being expelled from the US. The agents sexually abused both women, who remained in detention in Ciudad Juarez for two months before being transferred to the Mexico City detention center. The women were deported from Mexico before they had the chance to file a complaint against the agents.

   In another case documented by IMUMI, a Honduran woman was offered a job in Chiapas, Mexico, that turned out to be a ploy to traffic her. After six months of being routinely sexually abused, she escaped, but despite her reporting the crime, authorities did not protect her or investigate the crime, forcing her to leave the state and look for protection on her own.

   Many sexual violence crimes are not reported or investigated in Mexico. According to the National Survey for Urban Public Security, between July and December 2020, 98.6 percent of sexual crimes were

---

9   All names have been changed to protect the privacy of the women interviewed.

Stuck in Uncertainty and Exposed to Violence: Case 1:24-cv-01587-DII   Document 30-5   Filed 01/12/24   Page 111 of 578
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

not reported or not investigated. Women who lack migration status and those detained face additional risks of being the victim of a sexual crime and heightened barriers to accessing justice and support services, including psychological support and medical care.

4. **Women seeking protection are separated from their children as a result of restrictive policies**. In some cases, parents are victims of crimes, such as kidnapping, and their children are left alone to cross to safety into the US. Several months after being returned to Mexico, Sandra, a Black woman from Honduras, went to look for a job in downtown Piedras Negras, where she was kidnapped and held for three days. Her four children crossed the border on their own because they did not know what had happened to their mother and were frightened. In other cases, due to the danger in Mexican border cities, coupled with US policies preventing many families and adults from seeking asylum, parents are forced to make the heartbreaking decision to send their children alone to safety in the US.

5. **Women continue to wait in squalid conditions in Mexican northern and southern border cities.** Limited shelter capacity in Mexico's northern border cities has left many women sleeping on the streets and in precarious conditions, including at the informal tent encampments in Tijuana and Reynosa. WRC staff spoke with a Honduran woman, Eleana, in Tijuana who tried to secure accommodations in Tijuana shelters after being expelled from the US, but was turned away due to limited capacity. She was forced to stay in squalid conditions in a house far away from the city center. A mere 15 days after Eleana and her family attempted to seek protection after crossing into the US and were expelled by Border Patrol to the streets of Tijuana, a rabid dog attacked and killed her 20-month-old toddler. In Tapachula, Chiapas, women asylum seekers and their families waited months for their Mexican asylum cases to be resolved while living in shelters, rented rooms on the outskirts of the city, or camped in the city's central plaza, with limited access to bathrooms or showers.

6. **Women seeking protection struggle to find child care and enroll their children in school in Mexico.** According to Mexican law, all children—regardless of their immigration status—should be able to enroll in public school. However, many barriers to enrollment in schools remain, such as discrimination and misinformation from local school administrators. One woman, Karina, recounted to WRC how she had not been able to enroll her two young children in local public schools because administrators (falsely) told her she would have to pay a sizable enrollment fee for each child. Women asylum seekers in Tapachula, Chiapas, told IMUMI that some schools require certified translations of birth certificates and vaccination records, making it impossible to enroll their children as they either do not have the documents, or cannot afford to have them translated.

Child care responsibilities and barriers enrolling children in school made it difficult for women to find part- or full-time work, while they wait to access asylum in the US or in Mexico. A number of women expressed to WRC fear of leaving their children alone due to the dangers in border cities, and worries over being unable to support themselves and their families since they could not work.

7. **Women seeking protection struggle to access vital health services, including reproductive health services.** Mexico's 2011 Migration Law guarantees access to health services to people regardless of their immigration status in Mexico. Despite this, pregnant people expelled to Mexico by US authorities under Title 42 have been turned away by local hospitals and denied medical care. A Salvadoran woman, Brenda, told WRC she was denied prenatal care in Tijuana, where local hospital workers told her, "We can't help you because you aren't Mexican." A Honduran woman, Marina, represented by IMUMI, was turned away from a public hospital because she did not have the required documents to prove financial

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 1:20-cv-01587-DLF   Document 30-5   Filed 01/12/24   Page 112 of 578




need. A lawyer resolved the situation, but shared with IMUMI that almost all of her clients require legal assistance to access basic reproductive health services in Mexico.

8. **LGBTQI+, Black, Indigenous, and non-Spanish speaking women seeking protection face additional dangers in Mexico.** In particular, Black asylum seekers face anti-Black racism, discrimination, and targeting from Mexican authorities. Several Haitian asylum seekers in Mexico City told WRC that they did not even try to look for employment opportunities because of the discrimination they were certain they would face by employers. Restrictive US border policies force individuals to wait in Mexico where they often are vulnerable to the same risks, discrimination, and dangers that they fled in their countries of origin. For example, Laura, a trans woman who fled Honduras due to death threats and her house being burned down, told WRC she was threatened at gunpoint by Mexican authorities during her journey to Tijuana. She did not feel safe in Mexico and struggled to secure housing due to discrimination. A Guatemalan asylum seeker in Mexico City, Karen, described to IMUMI staff that a teacher discriminated against her daughter for being "darker" and wearing Indigenous clothing.

9. **Due to Mexico's increased enforcement and travel restrictions, women seeking protection are forced to look for ways to evade immigration and military checkpoints by traveling in caravans for safety or relying on smugglers.** In 2021, the situation was particularly harrowing in Tapachula, Chiapas, where 89,668 asylum seekers (approximately 68 percent of all applicants) awaited adjudication of their protection claims. Many families attempted to move from Tapachula to other cities with better job opportunities and safer conditions. However, INM and National Guard checkpoints and increased enforcement in southern Mexico made transit difficult.

One Honduran woman, Veronica, told IMUMI that she and her family decided to join a migrant caravan in August 2021. INM officials stopped them, told them that the letter proving their pending asylum application was not valid, and tore up the documents. When she tried to film the incident with her telephone, agents took it away from her. During a press conference in September 2021, a Haitian woman in Tapachula described how Haitians are racially profiled by Mexican authorities and removed from buses. "We can barely get around Tapachula even though we are asylum seekers with a letter from COMAR. It is practically impossible to get on a bus to go to another city without paying smugglers a fee to get through the checkpoints."

In the bus terminals in Tapachula and throughout Mexico, private bus companies began checking immigration status as a prerequisite for buying a bus ticket. Two women in the Mexico City detention center told IMUMI in September 2021 that they had been detained in a Mexico City bus station even though they had letters proving their immigration status.[10]

10. **Women seeking protection are subjected to use of force and violence by Mexican and US authorities.** In August 2021, Mexican immigration authorities and the Mexican National Guard were filmed kicking migrants, violently pushing women and children into vehicles, and threatening family separation as tactics to break up large groups. In one video, a woman who had been detained could be seen screaming that she had been separated from her two-year-old son during the raid. While she screamed and tried to get out of the INM van, an agent could be seen pushing her on the breasts back into the van. In October 2021, a Haitian woman was found dead along a highway in Chiapas. Her clothes had

---

10  Since bus ticket agents have neither the authority nor the training to verify immigration status, they have begun sending anyone they deem suspicious to talk to INM officials stationed in the bus stations, who would then detain the individual.

Case 1:20-cv-01537-DHL   Document 30-5   Filed 01/12/24   Page 113 of 578

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021





been removed and she had been raped and strangled. Four municipal police officers were detained in relation to the crime. In September 2021, armed US Border Patrol agents in Del Rio, Texas were photographed abusing Black migrant families and driving them back across the border to Mexico.

**Many women seeking protection who transit through Mexico are subjected to more than one of the above risks during their stay, which often lasts months or even years due to restrictive policies**. A Honduran woman, Mariana, recounted to IMUMI her misfortunes over the past two years waiting in Mexico, and how the Biden administration's policies—following on the Trump administration's attacks on the asylum system—have resulted in her ongoing inability to seek asylum in the US:

*"I fled Honduras with my two children in 2019 because my husband beat us and he was involved in a criminal gang that protected him. After several months in Mexico, we arrived at the US-Mexico border to request protection and we were sent back under [Remain in Mexico] through Nuevo Laredo. Since I had my two small children, we made our way to Monterrey, Mexico [a city several hours to the south], where we were living on the street. I was raped and became pregnant.*

*"A kind Mexican woman took us in and allowed us to live with her until the baby was born in October 2020. My kids didn't go to school in all of 2020. I still had a dream to live with my sister in the US and be safe, but things were really difficult. Then in April 2021, I learned that I could sign up for the [RMX wind-down process] even though I had never had my hearing, so I signed up for Conecta.[11] I got help to register my baby so he would have a birth certificate. Then I got an email stating that Conecta had closed and that I would have to wait again.*

*"I don't understand what I am supposed to do, where I am supposed to go. I have been trying for two years to follow the rules, but my kids are two years older now, I have a baby, and I don't know what to do. I can't go back to Honduras, I am afraid to be in Mexico, and I'm not allowed to request protection at the border. I feel lost."*

## Conclusion and Recommendations

Both President Biden and President Andrés Manuel López Obrador recognize that many women are fleeing gender-based violence and persecution in their countries of origin and need access to protection in both countries. IMUMI and WRC are deeply concerned about practices by both governments that normalize human rights violations, including the violation of the right to request asylum. Instead of restrictive policies and enforcement actions that put women and children seeking protection in harm's way, the US and Mexican governments should strengthen asylum systems in both countries and broaden complementary pathways for protection. We urge the Biden and López Obrador administrations to implement the following recommendations to ensure that the rights of women—including the right to access protection—are upheld.

---

11   Conecta was a web platform run by the United Nations High Commissioner for Refugees (UNHCR) where individuals who were subjected to the first iteration of RMX could enroll to access the RMX wind-down process and continue their immigration cases within the US. This platform was operational between February and August 2021. It was suspended due to the court order regarding the reinstatement of RMX.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

## Recommendations for the Biden administration

» End the use of Title 42 to expel adults and families to Mexico and their countries of origin via land expulsions and expulsion flights.

» Restore access to asylum at ports of entry, so that individuals can approach a port of entry and request protection and other relief from inside the United States.

» Refrain from pressuring Mexico to increase enforcement by immigration and security forces or implementing new visa restrictions for nationalities arriving in large numbers. Focus the Collaborative Migration Management Strategy (CMMS) on expanding access to protection in the region and complementary pathways to protection, without sacrificing access to asylum at the US southern border.

» Reverse the expansion and stop further implementation of RMX.

» Release monthly Customs and Border Protection (CBP) data that is disaggregated by gender on encounters, expulsions, returns under RMX, and other statistics relating to US asylum processing.

## Recommendations for the Mexican government

» Allocate adequate funding to COMAR to decrease wait times, open more offices, and hire additional protection officers.

» Reform the Mexican Refugee Law to allow people to continue their asylum procedures from different parts of the country where they have family and community networks, better employment opportunities, and safer conditions.

» Ensure that women who have suffered or who remain in danger of violence in Mexico have access to relocation programs and services where they can safely wait for their asylum process.

» Expedite humanitarian visitor cards for asylum seekers, victims and witnesses of crimes, migrant children, and other vulnerable populations.

» Refuse to collaborate with the US government on the implementation of policies such as Title 42 and RMX that violate US, Mexican, and international law.[12]

» Eliminate the use of the National Guard and all armed forces in migration enforcement in compliance with the Mexican Constitution and international law.

» Eliminate unconstitutional internal enforcement revisions and checkpoints that result in illegal racial profiling.

» Rescind the provision that requires foreigners to show proof of migration status to purchase a bus ticket in Mexico.

» Ensure access to public education for all migrant and refugee children.

» Ensure access to health services for migrant and refugee women and girls, especially reproductive health services.

---

12  Mexican organizations have pending litigation and complaints with the National Human Rights Commission against the bus travel restrictions, Mexico's participation in Remain in Mexico 1.0 and Remain in Mexico 2.0, Mexico´s implementation of internal Title 42 expulsion flights, discriminatory enforcement practices at internal checkpoints, and the participation of the National Guard in migration enforcement. For additional information about the lawsuits: 1. RMX 1.0 (Instituto para las Mujeres en la Migración (IMUMI), A.C. vs. SEGOB, SRE, INM, INMUJERES) - Mexican Supreme Court - 302/2020. 2. RMX2 – Mexico City District Court - exp. 1887/2021 3. Tit. 42 Expulsions – Mexico City Circuit Court - 153/2021. 4. Bus Travel Migration Status Restriction - Mexico City District Court - 1647/21 5. Discriminatory Migration Enforcement Practices - Mexican Supreme Court (E, A y J VM vs. INM, Cámara de Diputados y otros) -- 275/2019 6. National Guard Participation in Migration Enforcement -- (Gretchen Louise Kuhner Vs. Congreso de la Unión y Presidente de los Estados Unidos Mexicanos), Mexican Supreme Court, 73/2020.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

» Increase access to housing for asylum seekers through ongoing support to civil society shelters, including safe spaces for vulnerable groups such as women, families, and LGTBQI+ individuals.

## Additional resources

» Analysis of Gender Violence: Women Seeking International Protection in Mexico, IMUMI, 2021.
» Asylum Denied: Remain in Mexico 2.0, Women's Refugee Commission, 2021.
» Dual Crises: Gender-Based Violence and Inequality Facing Children and Women During the COVID-19 Pandemic in El Salvador, Guatemala, and Honduras, KIND, 2021.
» Pathways to Justice: Gender-Based Violence and the Rule of Law, Wilson Center, 2021.
» Center for Gender and Refugee Studies (CGRS) Publications.

_____

This report was written by Gretchen Kuhner of the Instituto para las Mujeres en la Migración (IMUMI) and Savitri Arvey of the Women's Refugee Commission (WRC). It was reviewed by Katharina Obser, Ursula Ojeda, and Dale Busher from WRC. Patricia Arroyo reviewed statistics, Sara Velasco helped with fact checking, and Miriam Gonzalez reviewed the Spanish translation on behalf of IMUMI. It was edited by Joanna Kuebler and Diana Quick from WRC, and designed by Diana Quick.

IMUMI and WRC extend deep thanks to the women who generously shared their time and experiences, as well as the migrant shelters and organizations that provided information and facilitated the interviews with women.

This report was made possible by the generous support of the Open Society Foundations.

For additional information, please contact Gretchen Kuhner, director, IMUMI (gretchenk@imumi.org) or Savitri Arvey, policy advisor, WRC (SavitriA@wrcommission.org).

**Women's Refugee Commission**
The Women's Refugee Commission (WRC) improves the lives and protects the rights of women, children, and youth who have been displaced by conflict and crisis. We research their needs, identify solutions, and advocate for programs and policies to strengthen their resilience and drive change in humanitarian practice. Since our founding in 1989, we have been a leading expert on the needs of refugee women, children, and youth and the policies that can protect and empower them. womensrefugeecommission.org.

**IMUMI**
The Institute for Women in Migration, AC (IMUMI) is a civil society organization based in Mexico City that promotes the rights of women and their families in migration. IMUMI provides legal support to women and their families, collaborates with civil society organizations, academic institutions, and government bodies to ensure issues relevant to women are included in regional migration policy. imumi.org.

February 2022

# EXHIBIT 7



November 2023

# Asylum Ban Strands Asylum Seekers and Migrants in Mexico and Returns Them to Danger

*Over 1300 people have faced kidnapping, torture, rape, extortion, and other violence while waiting to seek protection in the U.S. since the asylum ban took effect in May 2023*

Six months after the Biden administration initiated its new bar on asylum (the "asylum ban"), the policy and its accompanying practices continue to strand vulnerable people in Mexico where they are targets of widespread kidnapping, torture, and violent assaults. People seeking asylum are forced to risk their lives waiting in danger for limited CBP One appointments. If they attempt to seek protection at a port of entry or cross outside ports of entry without a CBP One appointment, they risk suffering the ban's punitive asylum denials or wrongful returns to harm and persecution.

The Biden administration should commit to the effective, humane, and legal policies that it has already initiated or announced and reject those that punish and block people seeking asylum, contrary to core tenets of international refugee protection. Congress must reject any attempts to enact the asylum ban policy into law. Key steps include: uphold refugee law and maximize asylum processing at ports of entry, expand regional refugee resettlement, strengthen pivotal parole initiatives, and increase critical aid to address regional protection gaps.

Human Rights First has tracked over 1,300 reports of torture, kidnapping, rape, extortion, and other violent attacks on asylum seekers and migrants stranded in Mexico, including those struggling to secure CBP One appointments, since the asylum ban policy took effect six months ago. Given the under-reporting of kidnappings and other crimes in Mexico and substantial increase in kidnappings in parts of the northern Mexico border reported by aid workers and Mexican authorities, this figure represents the tip of the iceberg. For example:

- A Honduran woman was raped while waiting for a CBP One appointment in late May 2023 and turned away from a U.S. port of entry by Mexican officers despite the risk to her life;

- A Latin American[1] man seeking asylum suffered an enforced disappearance when he was kidnapped and tortured by men dressed as Mexican officials. As of July 2023, he was in hiding still trying to get a CBP One appointment;

- A Venezuelan mother was raped in June 2023 while waiting for a CBP One appointment when kidnapped with her minor child and sister. They were threatened with death and with the removal of their organs and forced to witness torture;

---

[1] To protect the safety of the family, Human Rights First is not identifying them by their specific nationality.



- Three Venezuelan men were kidnapped, tortured, and forced to witness torture while trying to obtain a CBP One appointment in September 2023;

- A Honduran mother kidnapped with her family survived a sexual assault in September 2023 while waiting to seek U.S. asylum;

- A Venezuelan seven-year-old child was drugged and sexually assaulted while kidnapped for three weeks with his mother in September 2023 while waiting to seek U.S. asylum;

- A Latin American[2] woman was kidnapped, trafficked, and raped. Upon her escape, she has been forced to wait at risk of harm in Mexico while trying to obtain a CBP One appointment as of July 2023, unable to seek U.S. asylum protection;

- Honduran teenage boys were kidnapped and sexually assaulted in September 2023 while waiting to seek asylum in the U.S.; and

- A Venezuelan family with minor children were kidnapped during which the mother was twice sexually abused while waiting for a CBP One appointment in June 2023. They shared:

> "We've been waiting for an appointment that doesn't arrive. [The CBP One app] doesn't care about the risk [we face] or our human rights."

Black, Indigenous, LGBTQ+, HIV+, women, children, and other vulnerable groups, including people with urgent medical conditions waiting in Mexico to seek U.S. asylum continue to face particular and egregious barriers, dangers, and disparities in seeking asylum due to the asylum ban. For example:

- Four Haitian people died in the border cities of Tijuana, Reynosa, and Matamoros and two Haitian pregnant women in Reynosa and Matamoros lost their babies due to medical emergencies and lack of access to medical care. All were blocked or were restricted access to U.S. ports of entry while waiting to seek U.S. asylum;

- An Ecuadorian Indigenous Shuar family suffered assaults and an attempted kidnapping while waiting to seek asylum in the United States;

- A Latin American[3] lesbian couple was sexually assaulted while waiting for a CBP One appointment in Reynosa;

---

[2] Id.
[3] Id.



- A trans Venezuelan woman was targeted for kidnapping in Reynosa on account of her CBP One appointment which she then missed;

- A trans Venezuelan woman was threatened with sexual exploitation in Ciudad Juarez;

- A gay Venezuelan couple was nearly kidnapped in Matamoros while waiting and trying to secure a CBP One appointment.

At present, there are 1,450 CBP One appointments available per day to access a U.S. port of entry across the southwest border through CBP's appointment request process, which operates like a lottery. Insufficient CBP One appointments and wait times of up to five months, highly limited processing by CBP at ports of entry of people without CBP One appointments, inadequate shelter and humanitarian assistance, and grave and escalating harms against those waiting in Mexico are among the factors pushing irregular crossings. Over the last months, the targeting of migrants and people stranded near the Mexican border waiting to seek protection in the United States, including those waiting for CBP One appointments, has risen sharply driving many to cross the border or attempt to enter at a port of entry without a CBP One appointment in urgent search of safety. Yet the Biden administration is using the asylum ban in combination with expedited removal and other punitive policies against those who cross the border or enter at ports of entry without CBP One appointments to summarily deport people without an opportunity to apply for asylum and present their case, regardless of whether they could establish eligibility for refugee protection. These wrongful deportations violate both U.S. and international law and return people to danger without access to the U.S. asylum system.

The asylum ban reduces protections designed to prevent non-refoulement – the return of refugees to persecution – and the cornerstone of refugee protection. It imposes a higher screening standard in expedited removal fear screenings, in violation of the credible fear standard created by Congress. As a result, people subject to the asylum ban are **more than three times as likely** to fail their screenings and be ordered deported without a chance to **apply for asylum** compared to those who are not subject to the ban, according to government data. This rigged process has resulted in deportation orders against nearly 23,000 people who were subjected to the ban between May 12 and September 30, 2023. This results in a heightened risk of refoulement, particularly as individuals denied a fear screening at the statutory standard are directly returned to countries of feared persecution. For example, a recent report found that dozens of Venezuelan uniformed police and intelligence agents awaited deportees – considered "traitors of the revolution" – at the airport upon their return to Venezuela.

People seeking protection who were deported through expedited removal under the ban include asylum seekers who testified to their fear of harm because of their race, Indigeneity, and disability. Others who were ordered deported through expedited removal under the ban but whose deportation was only narrowly averted due to intervention by legal service organizations or human rights advocates include:

- A Chinese pro-democracy activist who, before fleeing China, was imprisoned for several years and suffered continued surveillance and whose persecution was documented by Western media;



- An Egyptian man who was brutally beaten because he is Christian and fears he will be killed if he is returned to Egypt;

- A transgender Venezuelan woman living with HIV, who suffered years of physical abuse and was threatened with rape in Venezuela due to her sexual orientation and gender identity;

- An Indigenous family that was attacked in Ecuador because they are Indigenous and was nearly deported with two minor children.

Policies such as the asylum ban, Remain in Mexico, Title 42, and metering that act to block or restrict access to U.S. asylum and require people fleeing persecution to remain in Mexico where their lives are at risk are illegal and inhumane. In addition to extensive reporting on these policies, Human Rights First tracked more than 13,480 reports of murder, torture, kidnapping, rape, and other violent attacks against migrants and people seeking asylum blocked in or expelled to Mexico under Title 42.

Instead of blocking and punishing people seeking asylum protection, the Biden administration and Congress should work to restore asylum – a life-saving protection that many Americans deeply value. Congress must reject any attempts to enact the asylum ban policy into law. The Biden administration should maximize access to ports of entry for asylum seekers, including for those without appointments, increase appointment availability and access, properly staff asylum and immigration court adjudications, improve use of its new asylum processing rule to help adjudicate a greater number of asylum cases more efficiently and take other key steps previously outlined by Human Rights First in its recommendations.  The asylum ban - which was initiated as a temporary policy and has already proven both inhumane and counterproductive to refugee protection and migration policy - must be rescinded.

# EXHIBIT 8

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 2/16/2021 | threats | | A Honduran woman and her 4-year-old son, who had been returned to Mexico under MPP, were threatened by her ex-partner who is member of MS-13 in January and February 2021. He told her the gang is looking for her in Mexico. He threatened to kill her and kidnap her son. In late February 2021, CBP denied the family parole and refused to provide them an MPP fear of Mexico screening interview. | Human Rights First communication with Margaret Cargioli, Immigrant Defenders Law Center |
| 2/16/2021 | attempted kidnapping, assault | 2 | In February 2021, an asylum-seeking family returned to Mexico under MPP were attacked while buying diapers by men who tried to kidnap their 2-year-old child. The father managed to hold on to the son, and the kidnappers drove off. The father went to report the kidnapping to the police, but an officer told them not be out that late at night. | Human Rights First communication with Margaret Cargioli, Immigrant Defenders Law Center |
| 2/26/2021 | kidnapping | 3 | DHS expelled a Guatemalan woman and her son to Ciudad Juarez in mid-February 2021, where they had been kidnapped soon after arriving in early February. They had been held in a house for days without food or water. | Human Rights First interview with asylum seeker |
| 3/5/2021 | kidnapping | 2 | Un niño y su madre fueron privados de la libertad en el campamento migrante instalado en las inmediaciones del cruce fronterizo El Chaparral, acusó José Luis Pérez Canchola, director de Atención al Migrante en el ayuntamiento de Tijuana. | https://www.milenio.com/estados/reportan-secuestro-mujer-hijo-migrantes-campamento-tijuana |
| 3/22/2021 | kidnapping, rape | 1 | A woman expelled by DHS to Reynosa in February 2021, "who had tried to take a taxi to a friend's house [was] kidnapped and raped." | https://www.latimes.com/world-nation/story/2021-03-22/hundreds-of-migrants-cross-this-stretch-of-the-rio-grande-nightly |
| 3/23/2021 | assault, robbery | 1 | A Honduran asylum seeker who has been blocked in Tijuana with his family for months unable to seek protection at the port of entry was assault and robbed in Tijuana in February 2021. | Human Rights First interview with asylum seeker |
| 3/23/2021 | assault | 1 | A Haitian asylum seeker blocked from seeking asylum due to the Title 42 policy reported that he had been assaulted by a group of Mexican men in late January 2021. The men asked him for money and when he told them that he was a migrant and had no work, they beat him. | Human Rights First interview with asylum seeker |
| 3/23/2021 | assault | 3 | Dos menores de edad y un adulto, que viajaban como migrantes, resultaron heridos tras una agresión a balazos en la entrada a la ciudad de Reynosa, Tamaulipas, cuando iban de aventón en una camioneta. | https://www.excelsior.com.mx/nacional/atacan-a-balazos-a-migrantes-en-reynosa/1439435 |
| 3/26/2021 | kidnapping | 4 | DHS expelled a Salvadoran asylum-seeking family with two little girls to Tijuana after they crossed the border near Reynosa to seek asylum even though the family had previously been kidnapped in Mexico in early March 2021. The kidnappers threatened to kill the children and sell their organs, if they failed to pay the ransom demanded. | Human Rights First interview with asylum seeker |
| 3/27/2021 | kidnapping | 37 | Policías Estatales de Tamaulipas rescataron a 37 migrantes en Matamoros, que llevaban secuestrados 15 días. Entre los rescatados se encuentran 20 adultos y 7 niños, cuyas nacionalidades no fueron especificadas aunque todas son diferentes. | https://www.reporteindigo.com/reporte/rescatan-a-37-migrantes-secuestrados-en-tamaulipas/ |
| 4/2/2021 | threat, robbery | 1 | A Haitian asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that in late March 2021, a man threatened to hit with a rock and tried to steal a backpack of his personal belongings. | Human Rights First interview with asylum seeker |
| 4/3/2021 | assault | 1 | A Honduran asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that Mexican men he'd believed to be gang members had asked him to sell drugs in the camp and had beat him up when he refused. | Human Rights First interview with asylum seeker |
| 4/5/2021 | threats | 1 | An African asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that in response to the African asylum seeker speaking out about racism against Black migrants in the camp, a Mexican man took pictures of him and made threatening remarks to him on several occasions. | Human Rights First interview with asylum seeker |
| 4/6/2021 | threats | 1 | A Honduran asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that Mexican men he'd believed to be gang members threatened him multiple times; telling him they had "eyes on him," or "watch his back," and warning him not to talk to anyone outside the camp. | Human Rights First interview with asylum seeker |
| 4/8/2021 | kidnapping | 1 | Denuncia migrante de origen centroamericano secuestro de polleros en PN. Escapo de una casa de seguridad que polleros tienen en la zona centro de Piedras Negras | https://www.facebook.com/565075333903260/posts/113737935667285/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/8/2021 | rape, kidnapping, assault, extortion | 423 | Asylum seekers from Colombia, Cuba, El Salvador, Guatemala, Haiti, Jamaica, Nicaragua, Peru, Venezuela, and Yemen blocked from seeking U.S. asylum due to Title 42 reported having been the victim of an attack or attempted attack in Mexico in the last month in a survey by Al Otro Lado conducted between February 21 and April 8, 2021. | Human Rights First review of Al Otro Lado survey data |
| 4/8/2021 | kidnapping, threats | 2 | A Honduran asylum seeker and her 6-year-old child were kidnapped to Mexico by CBP in March 2021 even though the family had been kidnapped in Mexico in early March 2021. They managed to escape the kidnappers but were pursued by a man in a car after the escaped who threatened to kill them. | Human Rights First interview with asylum seeker |
| 4/9/2021 | kidnapping | 2 | Wilton and his mother, Meylin, 30, crossed the border into Texas last month to seek asylum after fleeing their native Nicaragua. But they were immediately sent back to Mexico under Title 42, a pandemic-era policy that expels migrants who cross the border without allowing them to apply for protection. Hours after being expelled to northern Mexico, they were kidnapped, according to Misael Obregon, Meylin's brother, who lives in Miami. Misael received a call from the kidnappers. They wanted $10,000 to release Meylin and Wilton. "They threaten to hurt them both, or worse," Misael Obregon said. "These people are capable of anything." Misael could come up with only $5,000. He sent the cash through a money transfer company. The kidnappers agreed to release Wilton, but not his mother. The smugglers then abandoned Wilton after leading him across the border, leaving him to wander through the arid farmland of South Texas looking for assistance, until he found the Border Patrol agent who recorded his encounter with the boy. Meylin remains in the custody of kidnappers. She called Misael Obregon on Friday morning, crying after seeing the video of her bleary-eyed son. The Nicaraguan government on Friday identified Wilton as being the boy in the video, but it did not mention the kidnapping. It said Nicaraguan police had interviewed the boy's father, who confirmed that Meylin had told him in their last conversation that she and Wilton were preparing to cross the border together because they were "in danger." | https://www.washingtonpost.com/world/2021/04/09/migrant-boy-found-wandering-alone-texas-had-been-deported-kidnapped/ |
| 4/18/2021 | threats | 1 | In one recent case, a man who turned up at the shelter said he had been pressured by drug traffickers to carry a load across the border. "The drug cartel was trying to force him to carry drugs, and he refused," Williams said. "He wanted to give the Border Patrol information." According to Williams, the man was told that would take too much time because it involved filing a police report. He was expelled. | https://theintercept.com/2021/04/18/biden-border-patrol-asylum-title-42/ |
| 4/18/2021 | assault, robbery, threats | 1 | Esmerelda was not a new arrival. She and her family came to Nogales in November 2019, fleeing violence and persecution in their home state of Guerrero... In the past couple months, la mafia has assaulted her husband twice, she told me, robbing him, stealing his phone, telling him that if speaks up he will be murdered. | https://theintercept.com/2021/04/18/biden-border-patrol-asylum-title-42/ |
| 4/20/2021 | kidnapping | 3 | Nine- and fourteen-year-old Honduran children were kidnapped with their asylum-seeking mother in Monterrey in March 2021 after CBP expelled them three times since December 2020. The family had relocated to Monterrey in hope of finding assistance while they waited to be able to seek asylum in the United States. Instead, they were kidnapped, held for ransom for days with other kidnapping victims who appeared to have been drugged, and eventually released near the border. Border Patrol agents, who found the family near McAllen, detained them for four days before transferring them to California where they were expelled to danger for a fourth time. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | rape | 1 | In February 2021, a Guatemalan woman who had been expelled by CBP to Mexicali after attempting to seek asylum was raped in Tijuana. The woman, who was fleeing severe domestic violence with her six-year-old daughter, had relocated to Tijuana to attempt to seek asylum at the San Ysidro port of entry, which she found closed to asylum seekers due to the Trump and Biden administrations' misuse of Title 42. The woman reported to Human Rights First that Border Patrol agents told her that "the new president isn't taking anyone" and that she should present herself "legally" even though ports of entry were, and remain, closed to asylum seekers in violation of U.S. law, which guarantees access to asylum to individuals who cross the border away from a port of entry. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 3 | In late February 2021, a Guatemalan family with a six-year-old child was abducted at a bus station in Piedras Negras shortly after Border Patrol agents expelled them to Mexico. They were held by their captors for five days while their family members in Guatemala and the United States were extorted. The couple had fled Guatemala with their child after the husband was attacked and nearly killed, according to an academic researcher who spoke with Human Rights First. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/20/2021 | kidnapping, assault | 3 | In February 2021, a Honduran man and two other expelled migrants were abducted at gunpoint, forced into a cemetery, and attacked immediately after the Border Patrol expelled them to Nogales at 11pm. According to Kino Border Initiative, the men were searching for shelter for the night when they were attacked. They had been expelled by the Border Patrol with a group of more than 40 people from Central America and Mexico. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 1 | Multiple asylum seekers reported that a woman flown from Texas and expelled to Mexico was kidnapped in March 2021 just outside of a shelter in Tijuana housing hundreds of expelled families. The pastor running the shelter has instructed families not to leave the shelter for their safety. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 2 | CBP expelled a 15-year-old Guatemalan boy and his asylum-seeking mother to Ciudad Juárez where they had been kidnapped in February 2021. The woman told Human Rights First researchers that when she tried to explain the danger she faced, U.S. immigration officers told her that they didn't care because "the president is not giving political asylum to anyone." CBP expelled the family to dangerous Ciudad Juárez at night during a snowstorm after they were held in CBP custody for days without food or water. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping, assault | 1 | A Honduran asylum seeker was expelled by CBP to Mexico in March 2021 even though he had just been kidnapped in Piedras Negras by masked men who brutally beat, drugged, and threatened him with decapitation. Two Honduran migrants were also attacked and beaten along with the man. One of them sought protection in the United States days after being released by the kidnappers, but was expelled by CBP, according to an academic researcher who spoke with Human Rights First. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 5 | In April 2021, CBP expelled a Honduran asylum-seeking family, including three children under the age of five, to Mexico even though they had been abducted in Reynosa by Mexican police officers who sold them to a cartel. While being held for ransom, a cartel member held a gun to the mother's head and demanded phone numbers of family members to pay the ransom. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 4 | In late March 2021, CBP expelled a Honduran asylum-seeking family with five- and six-year-old children to Tijuana where one of the men who kidnapped them in Reynosa has been prolling outside of their shelter. The family fears that a woman who had been kidnapped with them has been abducted again after she disappeared days after they were expelled together. They are terrified to leave the shelter. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping, robbery | 1 | In March 2021, Border Patrol expelled a Honduran asylum seeker at 2 a.m. even though he explained that he had been kidnapped and robbed in Mexicali after CBP turned him away from requesting asylum at the port of entry. The man had fled Honduras after authorities violently attacked him and tried to yank out his eye for filming illegal government acts. Border Patrol agents threw out the evidence he had brought with him in support of his asylum claim, according to Kino Border Initiative. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping, rape, torture | 1 | In February 2021, a young woman who was kidnapped in Mexico, held hostage for weeks, repeatedly raped and tortured by her captors, trafficked into the United States, and then dumped in Phoenix, was not found to have a fear of Mexico under the Title 42 torture screening. CBP expelled the woman to Mexico after she was taken to a hospital for evaluation of the sexual trauma she suffered, according to the Florence Immigrant and Refugee Rights Project. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault, threats | 1 | A Guatemalan asylum seeker who has been blocked from requesting asylum at a U.S. port of entry was attacked while pregnant in Tijuana in January and February 2021 by the gang that threatened to kill and dismember her in Guatemala if she refused their sexual demands. The woman narrowly escaped the gang while they ransacked the place in Tijuana where she had been staying and beat her partner, who subsequently disappeared, according to Margaret Cargioli, a lawyer with the Immigrant Defenders Law Center. The woman suffered a miscarriage in March 2021 because she was too terrified to leave her home to seek prenatal care after the attack. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault | 2 | In March 2021, a group of Jamaican LGBT asylum seekers in Tijuana were attacked while being thrown out of a restaurant; one man had his face cut with a broken bottle. In addition, an LGBT Jamaican man was assaulted in Cancun in front of his 8-year-old son. Both attacks were motivated by anti-LGBTQ and anti-Black prejudice. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/20/2021 | kidnapping | 1 | CBP expelled an 18-year-old Salvadoran asylum seeker, who attempted to cross into the United States after twice being kidnapped in Mexico, after he fell from the border wall and suffered a severe back injury. The young man was expelled in the middle of the night to dangerous Ciudad Juárez in a hospital nightgown, barely ambulatory, and in pain after spinal surgery. His mother and brother, who had also been kidnapped twice in Mexico, were separated from him and expelled to Mexico, leaving the young man alone in hospital, according to his lawyer Kenneth Mayeaux. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 8 | In April 2021, multiple asylum seekers informed Human Rights First that members of a violent gang that operates throughout Central America and Mexico forcibly abducted at least 8 individuals from the encampment in recent days, including some pulled from their tents at night. They remain missing. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 4 | A Mexican asylum seeker told Human Rights First that she witnessed a group of men kidnap a Salvadoran woman and her three children near the tent encampment in mid-March 2021. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | attempted kidnapping | 1 | A Salvadoran asylum seeker reported that in March 2021, her daughter was nearly kidnapped from the Tijuana encampment by a man who grabbed the girl and ran several blocks before the girl's uncle could stop him. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault | 1 | In February 2021, a man with a baton severely beat a Haitian asylum seeker in Tijuana in front of Mexican police, who did not intervene, according to a Haitian asylum seeker who witnessed the incident. She told Human Rights First: "We felt like we couldn't say anything because we don't have any power here and we were afraid for our own lives. Haitians are targeted here . . . the police don't care. We have to protect ourselves and look out for one another." | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault | 1 | In February 2021, a pregnant asylum seeker was brutally beaten by a Mexican official in retaliation for having filed a complaint against him for an immigration scam and suffered a miscarriage as a result of the attack. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | threats | 1 | In January 2021, a Haitian asylum seeker in Tijuana who confronted a hotel owner about money stolen from his room was threatened at gunpoint by the owner's son, a Mexican police officer. | https://www.humanrightsfirst.org/resource/fail ure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/21/2021 | kidnapping | 1 | Teresa, a Honduran woman, was kidnapped after DHS expelled her to Nuevo Laredo. The Mexican immigration officers who received Teresa turned her over to a cartel, who held her for ransom. | https://www.breitbart.com/border/2021/04/21 /exclusive-mexican-immigration-office-turned-me-over-to-a-cartel-says-migrant/ |
| 4/21/2021 | kidnapping | 25 | Agentes de la unidad especializada en el combate al secuestro de la fiscalía de justicia del Estado de Tamaulipas,  rescataron a una 25 personas migrantes entre ellos ocho menores de edad. | https://www.krgv.com/news/rescatan-a-25-migrantes-secuestrados-en-reynosa-tamaulipas/ |
| 4/23/2021 | kidnapping | 1 | La madre hondureña Patricia Estrada, radicada en Estados Unidos, denunció este viernes el secuestro de su hijo de 25 años en Nuevo Laredo, México. Detalló que los captores le solicitan 10 mil dólares (224 mil lempiras), los cuales no tiene, que serían entregados en dos pagos. | https://proceso.hn/madre-hondurena-denuncia-secuestro-de-hijo-en-mexico-piden-10-mil-para-su-liberacion/ |
| 4/27/2021 | kidnapping | 3 | One Honduran woman who reached the U.S. with her husband and one-year-old daughter was sent to Nuevo Laredo on April 6 under Title 42, and kidnapped the same day. "My daughter cried all night long and I think that's what saved us," she wrote in a text message. "They asked us if we had family in the U.S. and we said no. At 7 a.m. they let us go and dropped us off in front of the shelter. We are terrified of leaving here." | https://www.vice.com/en/article/k78abz/biden-is-still-sending-thousands-of-migrants-back-to-dangerous-border-cities-and-kidnappers |
| 4/27/2021 | kidnapping, extorsion | 4 | Desde que fue habilitado el gimnasio Kiki Romero como albergue migrante el pasado 5 de abril, se han reportado cuatro personas migrantes que sufrieron secuestro y extorsión por parte de los llamados "polleros" antes de llegar al albergue, a quienes les pidieron sumas de dinero para dejarlos en libertad. | https://www.elsoldemexico.com.mx/republica/ sociedad/migrantes-sufren-extorsiones-y-secuestros-por-polleros-en-juarez-noticias-ciudad-juarez-coronavirus-chihuahua-6647749.html |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/29/2021 | attempted kidnapping | 4 | Two Central American asylum-seeking migrant families including two young children were kidnapped while traveling by van from Ciudad Juarez to Tijuana, along with two service providers who were guiding them. They managed to escape their kidnappers. Another Salvadoran asylum seeker who was staying at the same Tijuana shelter told Human Rights First that the families had recalled the traumatic kidnapping incident to her after they had arrived there. | Human Rights First interview with asylum seeker |
| 4/29/2021 | kidnapping | 2 | Suspected gang members kidnapped two families from their tents in the Tijuana encampment near the San Ysidro port of entry, where some 2000 migrants and asylum seekers blocked from requesting U.S. protection due to Title 42 had been living, according to a Honduran asylum seeker living in the tent encampment who witnessed the kidnappings. | Human Rights First interview with asylum seeker |
| 4/29/2021 | kidnapping | 2 | On March 26, an advocate was contacted by a family member of a pregnant woman who was expelled under Title 42 with her 4-year-old son to Nuevo Laredo. Upon being expelled, they were kidnapped by one of the cartels in the area that was extorting their family member for over $20,000. The family reported that the 4-year-old had a fever and was vomiting for several days while they were kidnapped. | https://www.latimes.com/politics/story/2021-04-28/biden-title-42-policy-fueling-kidnappings-of-migrant-families-at-border-and-extortion-of-u-s-relatives |
| 4/29/2021 | assault | 2 | A Honduran asylum seeker told Human Rights First that on the night of April 28, 2021, suspected gang members set fire to the tent of a family they had specifically targeted in the Tijuana encampment near the San Ysidro port of entry, where some 2000 migrants and asylum seekers blocked from requesting U.S. protection due to Title 42 are living, and that nearby residents evacuated their tents and ran from the encampment in a panic. | Human Rights First interview with asylum seeker |
| 4/29/2021 | assault | 1 | A Central American child was assaulted outside the San Ysidro port of entry in Tijuana. A witness told Human Rights First that the child had been part of a group of asylum seekers and migrants protesting Title 42 border closures at the port of entry, and that the assailant was a vendor in the area. The video shows the man punching the child. | Video shared with Human Rights First by asylum seeker; https://zetatijuana.com/2021/05/comerciantes-de-la-linea-atacan-a-migrantes-que-se-plantaron-en-san-ysidro/ |
| 5/1/2021 | kidnapping | 9 | Un total de nueve migrantes que estaban secuestrados y encerrados en una casa de la colonia Insurgentes fueron rescatados por elementos de la Policía de Investigación, quienes detuvieron a dos mujeres que los custodiaban, reportó la Agencia Estatal de Investigaciones (AEI). | https://diario.mx/juarez/rescatan-a-9-migrantes-secuestrados-20210430-1789981.html |
| 5/3/2021 | kidnapping | 2 | Un niño y su madre fueron privados de la libertad en el campamento migrante instalado en las inmediaciones del cruce fronterizo El Chaparral. | https://www.milenio.com/estados/reportan-secuestro-mujer-hijo-migrantes-campamento-tijuana |
| 5/8/2021 | kidnapping | 17 | Fueron rescatados 17 migrantes procedentes de diferentes nacionalidades, que se encontraban secuestrados por presuntos narcos del Cártel del Golfo (CDG) quienes les exigían $2,000 dólares mientras los retenían en un domicilio en el municipio de Reynosa en el estado fronterizo de Tamaulipas en México. | https://laopinion.com/2021/05/08/rescatan-a-17-migrantes-secuestrados-por-cartel-del-golfo-les-pedian-2000-dolares-para-liberarlos/ |
| 5/10/2021 | kidnapping | 5 | Cinco migrantes estuvieron encerrados en una casa por casi dos semanas en Tamaulipas, ya que las personas que los llevarían a Estados Unidos, les pedían 8 mil dólares para cruzarlos y si no pagaban, serían entregados a integrantes de la delincuencia organizada. | https://www.milenio.com/policia/tamaulipas-migrantes-secuestrados-exigen-dinero-liberarlos |
| 5/12/2021 | kidnapping, assault, robbery | 3 | Dos de las cinco niñas migrantes que aparecieron solas cerca de la frontera sur de Estados Unidos el pasado domingo, habrían sido secuestradas en México junto a su madre y tuvieron que pagar miles de dólares para ser liberadas antes de lograr pasar hacia EEUU...Los encerraron en un cuarto sin ropa y les daban de latigazos...el rescate costó alrededor de 3,000 dólares y, una vez libre, Daisy decidió cruzar hacia EEUU, pero relató que en la frontera encontraron a policías que, a punta de pistola, le quitaron todo el dinero que llevaba. | https://www.univision.com/noticias/inmigracion/dos-de-las-cinco-ninas-que-aparecieron-en-la-frontera-habian-sido-secuestradas |
| 5/13/2021 | kidnapping | 4 | A family with two young daughters that had expelled to Tijuana after crossing into Texas in March 2021 was kidnapped in Tijuana in April 2021 by armed men who lined them up against a wall and told them they'd have to pay $1000 to be released. The family managed to escape when a police officer approached. | Human Rights First communication with asylum seeker |
| 5/15/2021 | kidnapping | 22 | La Policía Estatal rescata a 22 migrantes secuestrados en Tamaulipas. | https://www.elmanana.com/rescatan-a-22-migrantes-secuestrados-en-vivienda-autoridades-delitos-investigan/5346257 |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 5/17/2021 | kidnapping | 2 | Maribel shares a tent in Reynosa's main square with her teenage son and 10 other people. She left El Salvador to prevent her son from being recruited by criminal gangs. But her nightmare caught up with her at a hotel in Reynosa a few weeks ago. "We were kidnapped for five days. They took our phones and the money we had," she said. They were locked up in a house in one of the city's more humble neighborhoods along with about 90 other migrants, all Central Americans. | https://www.nbcnews.com/news/latino/kidnapping-onerous-fees-central-americans-returned-mexico-are-targets-rcna929 |
| 5/17/2021 | kidnapping, sexual assault | 3 | One family — a mother, father and their 12-year-old son from Honduras — recently came to Sister Horan for help. They said that a gang recently held them for ransom in a dark room for hours. The mother was sexually assaulted. | https://www.pri.org/stories/2021-05-17/many-asylum-seekers-are-returned-us-mexico-border-under-title-42-advocates-call |
| 5/18/2021 | kidnapping, assault | 4 | Two Honduran fathers and their young sons were expelled to Ciudad Juarez on the night of March 14, 2021. With churches and service providers closed for the night, they wandered the streets looking for a place to stay. A man who offered them a room kidnapped and assaulted them, and demanded $2000 ransom from their families for their release. | Human Rights First interview with asylum seeker |
| 5/18/2021 | kidnapping | 1 | Desde Honduras, una madre suplica a los secuestradores de su hijo en México que no lo lastimen y les pide un tiempo para pagar los 3,000 dólares que solicitaron a cambio de su liberación. | https://www.telemundo.com/noticias/noticias-telemundo-mediodia/inmigracion/video/les-pido-que-me-lo-regresen-con-vida-el-drama-de-la-madre-de-un-migrante-secuestrado-en-tmvo9823421 |
| 5/18/2021 | kidnapping | 1 | "Me decía que 'la señora' me iba a dar cuello", recuerda "Alejandro", un migrante mexicano originario de Guerrero, quien la semana pasada llegó a Ciudad Juárez en busca de asilo político en Estados Unidos, pero fue interceptado en la central camionera y secuestrado durante tres días. | https://www.eldiariodechihuahua.mx/estado/me-decia-que-la-senora-me-iba-a-dar-cuello-narra-migrante-como-lo-secuestraron-en-juarez-20210518-1796317.html |
| 5/18/2021 | kidnapping | 10 | Maribel, también salvadoreña y de 47 años, se refugia en la misma plaza junto a su hijo adolescente. Comparten una carpa con otras 10 personas. Salió de El Salvador para evitar que su hijo fuera reclutado por las pandillas criminales. Pero su pesadilla la alcanzó cuando estaban en un hotel de la misma ciudad, Reynosa, unas semanas atrás. "Fuimos secuestrados durante cinco días. Nos quitaron los teléfonos y el dinero que llevábamos", asegura. | https://www.telemundo.com/noticias/noticias-telemundo-mediodia/inmigracion/secuestros-de-3000-coyotes-que-se-aprovechan-y-violaciones-los-traficantes-abusan-de-los-tmna3882927 |
| 5/19/2021 | assault | 1 | A Haitian man living in the Tijuana encampment near the San Ysidro port of entry, where some 2000 migrants and asylum seekers blocked from requesting U.S. protection due to Title 42 are living, was attacked by men who hit him repeatedly, knocking him onto a tent and destroying it. While he was on the ground, one of the attackers attempted to strike his head with a large rock, but the Haitian man moved out of the way in time to avoid being hit, according to a Honduran asylum seeker who witnessed the attack. | Human Rights First interview with asylum seeker |
| 5/19/2021 | kindaping | 3 | "El grupo de padres lleva más de una semana caminando en medio del monte con el objetivo de volverse a reunir con las pequeñas que fueron abandonadas en un rancho en Texas. Los inmigrantes aseguran que fueron secuestrados luego de que sus hijas atravesaron la frontera. 'A las niñas las cruzaron primero y luego el balsero regresó por nosotros, pero ya nos tenían agarrados del mexicano', contó Daisy Sánchez, la madre de las dos menores guatemaltecas de 5 años y 11 meses." | https://www.univision.com/shows/noticiero-univision/es-algo-muy-dificil-el-drama-que-viven-los-padres-de-cuatro-de-las-cinco-ninas-abandonadas-en-la-frontera-video |
| 5/21/2021 | kidnapping | 2 | "Griselda a 23-year-old woman traveling with her 5-year-old daughter left Guatemala where she was extorted by gangs that demanded part of her paycheck for allowing her to work at a grocery store. She refused. They threatened to kidnap her young daughter. . . . In Mexico, she encountered the very same thing she was running away from. She said she was kidnapped by cartel gangs posing as police and was given three days to pay $6,000 or they threatened to kill her. Her family back in Guatemala had to scramble to get the money to free her." | https://www.nbcdfw.com/news/local/migrants-turned-away-at-el-paso-border-due-to-covid-19-concerns/2658893/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/1/2021 | kidnapping, attempted, kidnapping, forced disappearance, human trafficking | 7 | At least 10 migrants and asylum seekers interviewed in Ciudad Juárez in March 2021 were victims of violent crimes in Mexico. | https://sinmexico.org/wp-content/uploads/2021/11/Juarez_2021.pdf |
| 6/2/2021 | kidnapping | 2 | "On May 25, Anna and her 7-year-old son, Walter, sat sobbing on the curb. Anna and Walter, of El Salvador, had once again been caught by the Border Patrol trying to enter the U.S. undetected, and they feared a repeat of what happened the last time they were caught. In April, U.S. border agents had sent them back into the Mexican city of Nuevo Laredo, where, Anna said, they were kidnapped and held for $10,000 ransom." | https://www.nbcnews.com/politics/immigratio n/under-biden-crossing-u-s-border-has-become-lottery-migrants-n1269263 |
| 6/2/2021 | sexual assault | 1 | A trans woman from Honduras was sexually assaulted and then stalked and threatened with death by the attacker in Chiapas in May 2021. She had fled Honduras due to physical and verbal abuse on the basis of her sexual orientation and gender identity. | Human Rights First phone interview with asylum seeker |
| 6/3/2021 | kidnapping | 1 | A LGBTQ asylum seeker from Honduras was kidnapped in Nuevo Laredo in February 2021 after fleeing discrimination in his home country. He was held captive at gunpoint for 15 days with 23 other kidnapped people. He was forced to call his father at gunpoint and tell his father to pay a ransom. | Human Rights First phone interview with asylum seeker |
| 6/4/2021 | assault, robbery | 1 | A trans woman from Guatemala was assaulted and robbed in Piedras Negras in April 2021 while waiting for U.S. asylum processing to resume. | Human Rights First interview with asylum seeker |
| 6/7/2021 | assault, attempted kidnapping | 1 | In May 2021, a gay Honduran man who had fled death threats in his home country escaped a kidnapping attempt in a park in Piedras Negras, Mexico. The Honduran asylum seeker had been walking in a park when a man pulled his car up to him and demanded that the Honduran man get into his car and provide sexual services. When the Honduran man refused, the assailant jumped out of the car and grabbed him from behind, stabbing him in the arm, and tried to force him into the car. | Human Rights First interview with asylum seeker |
| 6/7/2021 | kidnapping, rape | 1 | A Honduran trans asylum seeker, who'd fled Honduras after she was attacked by the gang for her sexual orientation and her brother was beheaded, was raped multiple times in Mexico in Nuevo Laredo and Piedras Negras. In Piedras Negras, she was kidnapped and raped in May 2021 and had to escape her kidnappers by jumping out a window. She landed on a cactus plant and got thorns stuck all over her body. | Human Rights First phone interview with asylum seeker |
| 6/7/2021 | kidnapping, assault, rape, threats | 1 | In April 2021, an 18-year-old trans woman from El Salvador who'd fled death threats in her home country was assaulted and robbed in a border city by men who told her they'd "disappear" her. The woman managed to escape and remained in the same city as her assailants, blocked from requesting U.S. asylum due to Title 42 and terrified to leave her shelter. | Human Rights First phone interview with asylum seeker |
| 6/7/2021 | rape | 1 | An Indigenous Guatemalan transgender woman who had been trafficked for sexual exploitation was raped by Mexican police in Tijuana in early 2021 after having waited nearly a year to request U.S. asylum. | Human Rights First communication with Nicole Ramos, attorney at Al Otro Lado |
| 6/7/2021 | assault | 1 | In late May 2021, a Mexican lesbian couple was attacked and beaten for their sexual orientation while waiting in Tijuana for U.S. asylum processing to resume. | Human Rights First communication with Hollie Webb, attorney at Al Otro Lado |
| 6/8/2021 | kidnapping | 6 | Felicia Rangel-Samponaro runs Sidewalk School, a nonprofit that offers classroom instruction for asylum-seeking children in six cities across the border. She said two weeks ago at least six people were kidnapped from the plaza. Gang members "come into the plaza," Rangel-Samponaro said. "They drag a person away. You hear the person screaming for help. Everyone stands around and watches, which is understandable. No one wants to die." | https://www.nbcnews.com/news/latino/vp-harris-visits-mexico-city-migrant-tent-camp-grows-border-town-rcna1145 |
| 6/10/2021 | kidnapping | 2 | A woman fleeing with her seven-year-old daughter from violence in Honduras attempted to cross into the U.S. and ask for asylum several times. The first few times, she was hastily returned to Nogales, Sonora. On her final attempt, she and her daughter were kidnapped by their smuggler and held and tortured for over two weeks until her family could pay their ransom. | Communication from Kino Border Initiative |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/10/2021 | kidnapping | | In Mexico, with nowhere to go and few funds, she slept on the street and was kidnapped, according to a request to the U.S. government for a humanitarian exception to the order seen by Reuters. The kidnappers wanted to extort money from her family, Jasibi said. Jasibi - who asked Reuters not to publish her surname for fear of reprisals - called migrant advocate Ariana Sawyer at Human Rights Watch daily to check on her application for the exemption. But when Sawyer tried to call her last month with the good news that she would be allowed into the United States, she couldn't reach her – Jasibi had been kidnapped again. | https://www.reuters.com/world/americas/brui sed-by-border-politics-some-biden-officials-cling-trump-restrictions-2021-06-10/ |
| 6/10/2021 | kidnapping | 140 | Un total de 140 migrantes, entre ellos cuatro menores, fueron rescatados este miércoles de una vivienda de Ciudad Juárez, México, donde estaban secuestrados y hacinados en cuartos de madera. Los migrantes proceden, en su mayoría, del Triángulo Norte de Centroamérica: Guatemala, El Salvador y Honduras, según informó la Agencia Efe. | https://www.univision.com/noticias/inmigracio n/rescatan-en-mexico-a-140-migrantes-centroamericanos-secuestrados |
| 6/11/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 2,314 | Asylum seekers from Colombia, Cuba, El Salvador, Guatemala, Haiti, Nicaragua, Peru, and Venezuela blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review survey data received by Al Otro Lado between April 9 and June 11, 2021. |
| 6/13/2021 | kidnapping | 249 | Como fue previamente reportado, en primer rescate dio suceso en pasado miércoles 9 de junio, 140 personas fueron encontradas en una carpintería ubicada en las calles Caballos y Potros de la colonia Felipe ángeles, entre ellas 99 originarias de Guatemala, 17 de Nicaragua, 11 de El Salvador, 6 de Ecuador, 5 de Honduras y 2 mexicanos. De este grupo de migrantes, 117 son hombres, 12 mujeres y 11 menores de edad, quienes iba a ser ingresados de manera ilegal al vecino país por presuntos "polleros". Ese mismo día, se realizó la segunda intervención, en donde se localizaron a 66 migrantes de Honduras, Guatemala y Ecuador en una vivienda ubicada en el cruce de las calles Sinaloa y Cananea, en la colonia Ampliación Frontericia." | https://www.elheraldodechihuahua.com.mx/lo cal/juarez/rescatan-en-juarez-a-249-migrantes-secuestrados-noticias-de-ciudad-juarez-chihuahua-inseguridad-delincuencia-policiaca-6837679.html |
| 6/13/2021 | kidnapping, assault | 2 | "Rubi and her husband, Jorge left Honduras with their daughters in October after shuttering their business because they could not afford to pay taxes to gangs...she brought with her the death certificates of her murdered brothers, who were persecuted by criminal gangs, she said, to bolster their protection request. Their disappointment at the Eagle Pass, Tex., port of entry in January motivated the family to swim across the swift currents of the Rio Grande a few days later from Piedras Negras, Mexico. Rubi's two daughters, 9 and 5, made it. But as her husband came to help her, she was overtaken by attackers. He was beaten. Cartel members held Rubi for ransom for days, she said, but no one in her family had money to pay her captors. She went into labor shortly after her release. The birth was difficult and the baby was born with birth defects and an intestinal inflammation." | https://www.washingtonpost.com/immigration /fewer-migrant-families-being-expelled-at-border-under-title-42-but-critics-still-push-for-its-end/2021/06/13/422c702c-c7cc-11eb-81b1-34796c7393af_story.html |
| 6/14/2021 | kidnapping | 4 | "Familiares de cuatro hondureños de una misma familia que buscaban llegar a Estados Unidos (EEUU) fueron secuestrados por grupos criminales en México, según denunciaron familiares de las migrantes." | https://proceso.hn/cuatro-miembros-de-una-misma-familia-secuestrados-en-mexico-denuncian-sus-familiares/ |
| 6/14/2021 | attempted kidnapping | 5 | A Honduran family waiting in Nuevo Laredo for U.S. asylum processing to resume was kidnapped by a cartel and managed to escape. | Human Rights First interview with asylum seeker |
| 6/17/2021 | rape | 1 | An Indigenous Guatemalan transgender woman who had been trafficked for sexual exploitation was raped by Mexican police in Tijuana in early 2021 after having waited nearly a year to request U.S. asylum. | Human Rights First communication with Las Americas Immigrant Advocacy Center |
| 6/24/2021 | kidnapping | 20 | "la Secretaría de Seguridad Pública de Tamaulipas realizó en Río Bravo la liberación de 20 personas en condición de migrante que se hallaban en una casa de seguridad. De las 20 personas, 15 son de Honduras y cinco de México, uno del Estado de México, dos de Guerrero y dos de Tabasco. Entre los migrantes había una mujer y una menor de 2 años." | https://www.excelsior.com.mx/nacional/rescat an-a-20-migrantes-en-rio-bravo-tamaulipas/1456534 |
| 7/1/2021 | assault | 1 | A Mexican man fleeing gang threats was attacked and beaten in Tijuana in June 2021 by someone who grabbed him from inside a taqueria while he was waiting with his family for the opportunity to request U.S. asylum. | Human Rights First interview with asylum seeker |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/4/2021 | kidnapping | 53 | "Este sábado fueron rescatadas 53 personas indocumentadas en la colonia Rancho Anapra, Ciudad Juárez, en el estado de Chihuahua. Dentro de estas personas se encontraban dos menores de edad." | https://www.infobae.com/america/mexico/202 1/07/04/en-chihuahua-rescataron-a-53-migrantes-centroamericanosque-estaban-secuestrados/ |
| 7/4/2021 | kidnapping | 24 | "El rescate de los migrantes, se realizó tras un operativo derribado a un llamado al teléfono comunitario de la Estación de Policía del Distrito Valle, en una vivienda ubicada en el cruce de las calles Cordillera de Taurus y Monte Aragón, se encontraban encerrados varias personas de origen centroamericano. Al llegar, los agentes localizaron a 24 personas de origen hondureño, siendo 15 adultos y nueve adolescentes, quienes manifestaron tener varios días alojados en dicho sitio a la espera de ser internados de manera ilegal al vecino país." | https://www.elsoldeparral.com.mx/local/rescat an-24-migrantes-secuestrados-en-juarez-noticias-polleros-inseguridad-frontera-6924248.html |
| 7/8/2021 | kidnapping, attempted rape | 26 | A Central American asylum seeker and her six-year-old son had nowhere to sleep when DHS expelled them to Ciudad Juárez in April 2021. A man waiting near the port of entry who offered them a ride and place to stay for the night instead imprisoned them for two weeks and attempted to rape the woman. The family has been hiding for weeks at a migrant shelter in the city after managing to escape through a bathroom window in the house where they were held with other abducted women. | https://www.humanrightsfirst.org/sites/default /files/DisorderlyandInhumane.pdf |
| 7/8/2021 | kidnapping | (counted in Human Rights First/Hope Border Institute report total) | Armed men kidnapped a Honduran asylum seeker and her seven-year-old daughter just blocks from the port of entry while they were searching for a place to sleep for the night just after DHS expelled them via a lateral expulsion flight, discussed below, in April 2021. Mexican migration officials at the State Population Council (COESPO) of Chihuahua had told the woman that shelters were full and that the family had to find housing on their own. Held captive for two months in a house with dozens of other kidnapping victims, the woman and her daughter survived on potatoes and eggs. They managed to escape while being transported to another location but remain in danger in a Juárez migrant shelter, experiencing nightmares and difficulty sleeping due to the trauma they suffered. | https://www.humanrightsfirst.org/sites/default /files/DisorderlyandInhumane.pdf |
| 7/8/2021 | kidnapping | (counted in Human Rights First/Hope Border Institute report total) | In June 2021, DHS expelled a Salvadoran woman and her two children immediately after they had escaped from kidnappers who had forcibly held them for 10 days, extorted her sister for thousands of dollars, and fired shots at the family as they ran away. U.S. immigration officers mocked the woman as she begged them not to return the family to Ciudad Juárez just hours after they crossed the border to ask for protection in the United States. On their return, Mexican immigration officers robbed the woman of her cell phone, and her sister continues to receive threatening messages from the kidnappers. | https://www.humanrightsfirst.org/sites/default /files/DisorderlyandInhumane.pdf |
| 7/8/2021 | kidnapping | (counted in Human Rights First/Hope Border Institute report total) | An Indigenous Guatemalan woman from the Q'eqchi' community was held with her two young children in a hielera (freezing-cold cell) for three days after they crossed the border near Reynosa before U.S. immigration officials expelled them via lateral flight to Ciudad Juárez in April 2021. The woman's husband and 4-year-old daughter were kidnapped in Nuevo Laredo and held for ransom for more than a month. | https://www.humanrightsfirst.org/sites/default /files/DisorderlyandInhumane.pdf |
| 7/8/2021 | assault | (counted in Human Rights First/Hope Border Institute report total) | A Guatemalan asylum seeker who was transferred with her eight-year-old daughter from Yuma, Arizona to El Paso for expulsion in March 2021 was subsequently beaten and abused in Ciudad Juárez. | https://www.humanrightsfirst.org/sites/default /files/DisorderlyandInhumane.pdf |
| 7/14/2021 | assault, robbery | 1 | A Honduran woman fleeing domestic violence in Honduras to seek U.S. asylum was robbed and assaulted on a train near Piedras Negras in March 2021 | Human Rights First telephonic interview with asylum seeker. |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/15/2021 | kidnapping | 1 | "She says that after being kidnapped on the streets of Reynosa, Tamaulipas, in late February, the days started to blur together. Estefani's 8-year-old daughter Ashly was able to run away while men snatched Estefani off the streets—that much Estefani knew—but while the 27-year-old from El Salvador was held, she didn't know that Ashly had crossed the border into the U.S., where the government classified her as an unaccompanied minor along with thousands of other children and teens who have been processed into the U.S. since the start of the Biden Administration." | https://time.com/6073384/title-42-expel-mexico-kidnapping/ |
| 7/16/2021 | kidnapping | 4 | Antonia Machado González se mantiene postrada en una cama desde que se enteró que su hijo Julio Ampié Machado fue secuestrado presuntamente por un cártel en México, junto a su esposa y sus dos hijos, desde hace más de una semana, mientras intentaba buscar asilo en Estados Unidos. Julio Ampié fue secuestrado el 3 de junio en la ciudad fronteriza de Reynosa, en México cuando pretendía llegar a Estados Unidos de forma irregular y pedir asilo. Según relatan los familiares, unos hombres irrumpieron en el apartamento donde esperaban ser procesados al país vecino. | https://100noticias.ni/nacionales/108796-secuestros-nicaraguenses-nueva-oleada-migratoria/ |
| 7/19/2021 | kidnapping, threats | 1 | A Honduran man traveling alone was kidnapped in Monterrey in June 2021. His family in Honduras sold all their belongings to pay the ransom. When he was released, the kidnappers told him they'd kill him if they saw him again. | Human Rights First telephonic interview with asylum seeker. |
| 7/20/2021 | assault, robbery | 3 | A Honduran family was assaulted and robbed by an armed man in Tijuana in May 2021 while awaiting the opportunity to request US asylum. | Human Rights First telephonic interview with asylum seeker. |
| 7/20/2021 | kidnapping | 31 | "Dos personas fueron detenidas luego que Carabineros rescatara a 31 ciudadanos extranjeros, entre los que había 8 menores de edad, que se encontraban secuestrados en un domicilio en Pozo Almonte, en la Región de Tarapacá." | https://www.t13.cl/noticia/nacional/rescatan-migrantes-secuestrados-domicilio-pozo-almonte-20-07-2021 |
| 7/22/2021 | kidnapping | 37 | "En Tamaulipas se han liberado a 141 migrantes, se han rescatado a 37 personas privadas de su libertad y se han asegurado media tonelada de marihuana, cocaína, piedra y metanfetamina." | https://www.milenio.com/policia/tamaulipas-rescatan-141-migrantes-liberan-37-personas-secuestro |
| 7/26/2021 | kidnapping | 2 | A Honduran mother and her 9-year-old son were kidnapped in Reynosa in June 2021 and held for 10 days until the mother's sister paid ransom. | Human Rights First telephonic interview with asylum seeker. |
| 7/27/2021 | kidnapping | 43 | "En Chihuahua, fueron rescatados 43 centroamericanos que estaban presuntamente secuestrados en un domicilio ubicado en el municipio de Aldama. La Unidad de Secuestros de la Agencia Estatal de Investigación (AEI) realizó un operativo en el lugar, donde encontró a 38 hombres y cinco mujeres, entre ellos cuatro menores." | https://www.milenio.com/estados/en-chihuahua-rescatan-a-43-migrantes-secuestrados |
| 7/28/2021 | kidnapping | 3 | Three Mexican migrants intending to enter the United States were kidnapped and held hostage in Mexicali | https://www.elimparcial.com/mexicali/policiaca/Imputaran-secuestro-agravado-a-involucrados-en-caso-de-militar-20210727-0028.html |
| 7/29/2021 | kidnapping | 15 | "La Fiscalía General de Justicia del Estado (FGJE) de Tamaulipas a través de la Unidad Especializada en el Combate al Secuestro (UECS) realizó el rescate de 15 migrantes procedentes de Centroamérica, así lo informó la dependencia por medio de un comunicado este jueves 29 de julio." | https://www.infobae.com/america/mexico/2021/07/29/en-condiciones-deplorables-fiscalia-de-tamaulipas-rescato-a-15-migrantes-en-reynosa/ |
| 7/29/2021 | kidnapping | 1 | "Su huida al norte empezó en autobús para cruzar hasta Honduras y luego a Guatemala. Luego caminó tres días por las vías del tren con sus pies ampollados, hasta llegar a México, donde fue secuestrado por narcotraficantes. Tras pagar un rescate de 6.500 dólares que juntaron sus familiares, fue liberado tres días después. Cruzó el Río Bravo, que separa a Estados Unidos de México, y se entregó a la Patrulla Fronteriza en junio diciendo que quería pedir asilo." | https://www.latimes.com/espanol/eeuu/articulo/2021-07-29/perseguidos-nicaraguenses-huyen-eeuu-migrantes |
| 8/1/2021 | kidnapping | 18 | "A casi mes y medio de la presunta desaparición de 18 migrantes haitianos en Tampico, el Comité Ciudadano en Defensa de los Naturalizados y Afromexicanos teme hayan caído en manos de la delincuencia de Tamaulipas." | https://www.milenio.com/policia/haitianos-desaparecidos-en-tampico-pueden-estar-secuestrados |
| 8/4/2021 | kidnapping | 4 | A Nicaraguan family of four, intending to request U.S. asylum, was kidnapped in Reynosa and held for 29 days until they paid a $30,000 ransom | https://www.laprensa.com.ni/2021/08/04/nacionales/2860496-yo-tuve-ideas-de-escaparme-el-relato-de-la-familia-nica-que-viajaba-hacia-estados-unidos-y-fue-secuestrada-en-mexico |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/5/2021 | kidnapping | 3 | "Rescatan a mujer y dos menores migrantes hondureños de un domicilio en Reynosa." | https://www.hoytamaulipas.net/notas/464770/Rescatan-a-mujer-y-dos-menores-migrantes-de-un-domicilio-en-Reynosa.html |
| 8/6/2021 | kidnapping | 1 | "A su paso por México, Barralaga fue secuestrado. Así fue como conoció a José. Para que los liberaran, sus familiares en Estados Unidos tuvieron que pagar alrededor de 5,000 dólares por cada uno. Y aun así, cuenta el tío, tuvieron que escapar después de más de tres meses de captividad pues los secuestradores no los dejaban ir." | https://www.telemundo.com/noticias/noticias-telemundo/inmigracion/este-inmigrante-escapo-de-la-miseria-en-honduras-y-de-sus-secuestradores-en-mexico-pero-la-tmna3900466?cid=linknoticias |
| 8/7/2021 | kidnapping | 1 | "En redes sociales circula un video que muestra a un migrante (todo indica sudamericano) quien fue secuestrado presuntamente por narcotraficantes del Cártel del Noreste (CDN) en el municipio de Nuevo Laredo en el estado de Tamaulipas en México." | https://www.msn.com/es-us/noticias/estados-unidos/video-c%C3%A1rtel-del-noreste-secuestra-a-migrante-tienes-que-pagar-7-000-d%C3%B3lares-si-quieres-ver-a-tu-hermano-vivo/ar-AAN1oU2?amp%3Bocid=iehp |
| 8/10/2021 | kidnapping | 1 | A Honduran asylum seeker was kidnapped in Monterrey and held captive for four days in July 2021. | Human Rights First telephonic interview with asylum seeker. |
| 8/12/2021 | assault | 2 | "After moving to Nogales in October 2020, my client and his partner were constantly taunted for being gay by a group of men who regularly hung out outside a convenience store located near their home. In February 2021, the same group of men donned ski masks and chased after my client, who narrowly escaped into a nearby taxi." | https://www.aclu.org/legal-document/declaration-chelsea-sachau |
| 8/12/2021 | kidnapping, rape | 2 | "In February 2021 a Honduran woman and her young daughter were kidnapped immediately after DHS expelled her to Reynosa by armed men who grabbed them from the street, covered the mother's face with a black hat, and forced them into a car. The mother was raped multiple times in captivity and begged the kidnappers not to harm her daughter, who was released a month before the mother managed to escape. The mother did not know where her daughter was until a U.S. shelter eventually contacted her." | https://www.aclu.org/legal-document/declaration-savitri-arvey/ Human Rights First communication with Savitri Arvey, a lawyer with the Women's Refugee Commission. |
| 8/19/2021 | kidnapping | 2 | In February 2021, a Salvadoran mother and her eight-year-old daughter were expelled to Reynosa after attempting to seek asylum. Armed, masked men immediately pursued the family as they tried to run away. The mother was abducted, but the child managed to escape and eventually enter the United States, where she remained in ORR custody, deeply traumatized and believing for more than a month that her mother had been killed. | Human Rights First communication with Kate Lincoln-Goldfinch, an attorney assisting the family. |
| 8/12/2021 | kidnapping | (counted in Al Otro Lado survey data above) | "In Reynosa, one of our clients who had previously tried to seek asylum at the border but who was expelled under Title 42 was kidnapped shortly thereafter with her young son. The mother and child were held for days without food until they finally escaped." | https://www.aclu.org/legal-document/declaration-erika-pinheiro |
| 8/12/2021 | kidnapping | (counted in Al Otro Lado survey data above) | "In Nuevo Laredo, a client was waiting to be able to cross with her U.S. citizen daughter when they were kidnapped by armed men while walking down the street. The men took them to a house, shaved their heads, and beat them severely. The U.S. citizen daughter's face was slashed with a knife on both sides. She lost so much blood from her injuries that she had to be hospitalized. " | https://www.aclu.org/legal-document/declaration-erika-pinheiro |
| 8/12/2021 | rape, extortion | 2 | "In one case received by our organization, a mother and her 5-year-old daughter were expelled to Mexico from the United States after fleeing sexual assault and domestic violence in Guatemala. After being expelled to Ciudad Juarez this mother was raped. The family also faced ongoing extortion and death threats from smugglers in Mexico following their expulsion." | https://www.aclu.org/legal-document/declaration-linda-rivas |
| 8/11/2021 | kidnapping, rape | 2 | "I represented a Black Honduran family consisting of a mother and her 8-year-old daughter and 6-year-old son. The family was kidnapped in Mexico. The mother told me that she was "lucky" because even though the kidnappers gang-raped her repeatedly, they always did it in a separate room so that her children did not have to watch." | https://www.aclu.org/legal-document/declaration-taylor-levy |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/11/2021 | kidnapping, assault | 2 | "I represented a Honduran mother, father, and children ages 8 and 1. The mother was kidnapped and held for month before finally being released after her family in the U.S. paid a ransom. Later, the father was approached by the cartel in Nuevo Laredo who demanded that the work for them. He refused, and they beat him so badly that they broke his hip and told him that he was going to have to start working for him once he healed. The family was so terrified by this threat that they hid out in the migrant shelter rather than taking the father to the hospital; as such, he can no longer walk unassisted." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 3 | "I represented a father, mother, and their 6-year-old child seeking asylum from Honduras. They were kidnapped in Mexico and the mother was raped by the kidnappers. They also threatened to rape the 6-year-old, but stopped just before the actual rape." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 4 | "I represented a Honduran family consisting of a mother, father, and children ages 12 and 1. The family had been kidnapped and brutalized on three occasions by the same cartel. After escaping, they went to a migrant shelter in Nuevo Laredo. The cartel arrived at the shelter looking for them, and the pastors were able to help them narrowly-escape through a back door." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 1 | "I represented a father, mother, and their 12 and 11-year-old children seeking asylum from Honduras. The father was kidnapped by the cartel one day while he was working in Mexico. He was eventually able to escape, but lost part of his hand during the escape." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 2 | "Another client family, consisting of a mother and her seven-year-old son from El Salvador, were expelled into Mexico on several occasions trying to seek asylum in the United States. On their final attempt, they were kidnapped immediately upon expulsion to Nuevo Laredo and held for eightdays while their family gathered the money to pay their ransom. The mother reported that her son did not eat anything during the entire kidnapping and was deeply traumatized." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | attempted kidnapping | 1 | "... They crossed the river, but U.S. officials sent them straight back under Title 42, despite the grandmother's frailty. The grandmother fell gravely ill back in Reynosa, but the family, like so many other migrants, had a very hard time getting her admitted to a hospital given the local anti-migrant sentiments. She died shortly thereafter. C suffered a kidnapping attempt while she was with her mother at the hospital." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |
| 8/11/2021 | kidnapping, robbery | 1 | "...She fled north and tried to cross to Texas but was immediately sent back under Title 42 by U.S. officials. Mexican immigration officials stole $500 from her as she returned. She then tried to take a taxi at the foot of the bridge, but the driver kidnapped her. When she ran, he dragged her back by her hair, but she was later able to escape and make it to a shelter. Her shoulder then became badly infected, putting her life at risk." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |
| 8/11/2021 | murder | 1 | "A mother ("A") tried to save her young daughter when the gangs arrived to rape her.  The gangs beat A and kidnapped the girl, who did not return for nearly a year. When the mother received still more threats, she fled north with her mentally disabled 15-year-old son. The son had the functional development of a 5-year-old. The trip was terrifying. The family tried twice to cross the river, but U.S. officials sent them back both times under Title 42. In Reynosa, the mother realized she could not keep her son safe from the endless kidnappings and assaults going on around her.  If she tried to cross with her son again, they would both be sent back. If she crossed alone, he would be sent to her family in the United States because Title 42 did not apply to unaccompanied minors. Like so many other desperate parents, she finally sent him across again, this time on his own. He was found dead shortly thereafter. Initial reports suggest torture and mutilation. Based on my experience, I suspect the gangs approached the boat in which he was a passenger and asked for "claves," or passwords each traveler gets once they have paid the proper crossing "fees" to the gangs. If anyone attempts to cross without such payment, they are killed. Had the gangs asked this young man for his password, he would have been unable to answer and therefore killed." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |
| 8/11/2021 | assault, rape | 1 | "A young Trans woman ("F") went through hellish persecution in her homeland. The gangs beat her so severely that she fled in early 2019. She made it to Reynosa, but U.S. officials sent her back under the MPP program. F tried to go back to the border for her immigration court appointment in Laredo, but the local gangs pulled over the bus and dragged everyone off. Eventually she got away, but she had missed her hearing. A few months ago, she tried again to cross the Rio Grande but was sent back to Mexico. This time the gangs beat her and raped her. Worse yet, she now has HIV from her assailants." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/17/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 2,511 | Asylum seekers from Cameroon, Colombia, Cuba, El Salvador, Guatemala, Haiti, Jamaica, Nicaragua, Peru, Venezuela and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between June 12 and August 17, 2021. |
| 8/18/2021 | kidnapping | 7 | Un grupo de secuestradores autodenominado "Cartel del noroeste" se grabó exigiendo el rescate de guatemaltecos secuestrados en su intento de llegar a Estados Unidos. En el video, los plagiarios exigen US$7 mil a cambio de liberar a seis guatemaltecos y un hondureño, a quienes tienen encañonados con armas de fuego. | https://diariohoydexela.com/mundo/las-imagenes-de-guatemaltecos-secuestrados/ |
| 8/19/2021 | kidnapping | 2 | "La madre y las esposas de dos jóvenes hondureños clamaron este jueves por ayuda para liberar a sus hijos, secuestrados en México por bandas criminales cuando ellos buscaban cruzar tierras aztecas en su ruta hacia los Estados Unidos." | https://proceso.hn/denuncian-secuestro-de-otros-dos-hondurenos-en-mexico/ |
| 8/20/2021 | attempted kidnapping | 1 | We had a Guatemalan client that we assisted in entering the US via the Huisha process back in April. Our client was a single mother, and she had previously been expelled from the United States. During the expulsion she had been followed by a man who attempted to kidnap her and force her into sexual slavery, but she was able to get away from him, thankfully. | Human Rights First communication with Ella Rawls, Attorney with Arizona Justice for our Neighbors |
| 8/20/2021 | kidnapping | 4 | In March 2021, a family of four fleeing Honduras after experiencing attempted kidnappings and death threats were immediately expelled to Mexico after attempting to seek safety in the U.S. Once returned to Mexico, a taxi driver kidnapped the family and held them in a secluded house. After managing to escape, the family stayed at an encampment in a plaza in Reynosa where the family feared for their young daughters' safety due to threats of sexual violence. Men, including police officers, would photograph their daughters— a typical tactic used by human traffickers. | Human Rights First communication with Karla Vargas, an attorney with the Texas Civil Rights Project. |
| 8/20/2021 | attempted beatings, threats | 1 | In May 2021, a 22-year-old asylum seeker who fled Guatemala after facing intense discrimination based on his sexuality was immediately expelled to Mexico after attempting to seek safety in the U.S. Once in Mexico, he faced ongoing death threats, homophobic slurs and attempted beatings. His sexuality made him a target for the cartel and other criminal entities. | Human Rights First communication with Karla Vargas, an attorney with the Texas Civil Rights Project. |
| 8/20/2021 | threats, extortion | 2 | In March 2021, a 38-year-old mother and her 8-year-old daughter were expelled after attempting to seek safety in the US because they received threats against their lives and threats to kidnap the daughter. Once in Mexico, they were targeted for extortion and were stalked by men in vehicles— a typical tactic used by human traffickers. | Human Rights First communication with Karla Vargas, an attorney with the Texas Civil Rights Project. |
| 8/21/2021 | kidnapping, extortion | 15 | "El pasado lunes 16 de agosto, dos mujeres y un menor de 10 meses fueron liberados, tras permanecer privados de su libertad desde principios de este mes en un auto hotel ubicado sobre la autopista Córdoba-Orizaba...Un día después (el martes 17), 12 migrantes procedentes de Cuba y Haití fueron rescatados en la zona rural de Coatzacoalcos por elementos de Protección Civil, denunciaron ser víctimas de extorsión y abusos por parte de elementos policíacos, quienes los despojaron del dinero que traían consigo para intentar cruzar la frontera con Estados Unidos." | https://veracruz.lasillarota.com/estados/sur-de-veracruz-zona-mas-peligrosa-para-migrantes-en-veracruz/551887 |
| 8/23/2021 | kidnapping, assault | 1 | A Cameroonian asylum seeker, who was kidnapped in Cancun, beaten, and nearly raped by her abductors, is currently stranded in Reynosa. Because of the Biden administration's expulsion policy, she is blocked from seeking asylum at the Hidalgo port of entry. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, extortion | 1 | A gay Haitian asylum seeker was assaulted and extorted in Tijuana while waiting for the opportunity to request U.S. asylum. The man became severely depressed and attempted suicide in July 2021. As of mid-August 2021, he remains in danger in Tijuana. | https://www.humanrightsfirst.org/resource/hu man-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | attempted kidnapping | 1 | A Venezuelan man who was forced to flee Venezuela after refusing orders to harm protestors is waiting in dangerous Nuevo Laredo to request asylum at the Laredo port of entry after CBP officers turned him away in early August 2021. The man was nearly kidnapped at the Nuevo Laredo bus terminal when he arrived in the city. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 2 | Unable to find a shelter to assist them, a Honduran asylum-seeking couple are sleeping on a riverbank near Piedras Negras hiding from the men who kidnapped them and hoping for a chance to request protection in the United States. In August 2021, the couple were released by kidnappers who beat them so severely that the woman suffered a miscarriage. In addition, Coahuila state police robbed the couple of their belongings. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | A teenage Mexican asylum seeker, who was turned away with her family by CBP officers at the San Ysidro port of entry in July 2021, was assaulted by a group of men in the Tijuana tent encampment. The girl and her family had fled deaths threats in Michoacan. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | rape, assault | 1 | A lesbian asylum seeker who has been sleeping on the streets in Ciudad Acuña with her partner waiting to request asylum at the Del Rio port of entry told Human Rights First researchers in August 2021 that she has been raped and repeatedly attacked in Mexico. The young woman's broken arm was still in a cast and bruises visible on her face from an attack in which men beat her to steal the sweets she sells on the street to survive. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping, rape | 3 | A Honduran woman, her husband, and brother-in-law remain trapped in Ciudad Acuña where they have suffered repeated kidnapping attempts, unable to request U.S. protection. On one occasion in June 2021, they were forced to jump into a river to escape kidnappers. In addition, the woman was raped in Monterrey while in transit to seek asylum. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, attempted kidnapping | 1 | In July 2021, a Guatemalan man stranded with his 7-year-old child at the tent encampment in Reynosa hoping to seek U.S. asylum was assaulted, robbed, and nearly kidnapped when he went to a store to purchase medicine for his sick child. An armed man assaulted the asylum seeker and forced him into a car. The kidnappers released the man when they learned his son was ill, but the family remains in danger in Reynosa. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | A Honduran asylum seeker has been waiting for months in danger to seek U.S. protection after she was kidnapped and trafficked in Mexico. The abductors trafficked her for sexual exploitation and showed her graphic videos of migrants being tortured to intimidate her. The woman managed to escape in April 2021 but remains in hiding in a shelter, terrified to go outside. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | In July 2021, armed, hooded men kidnapped a 13-year-old Honduran boy and his asylum-seeking mother in Reynosa and kept them captive for three days without food until family members paid a ransom. The traumatized boy has nightmares and has been unable to sleep. The family remains in danger in Reynosa, where they are living in a tent in the encampment. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 1 | A Honduran asylum seeker stranded in Ciudad Acuña waiting for an opportunity to request asylum has been repeatedly kidnapped in Mexico. In early August 2021, he was kidnapped in Piedras Negras and pulled from a moving car to escape. He took a bus to Ciudad Acuña to avoid the kidnappers, but police officers dragged him off the bus to extort him, pulled him by his hair, and hit him in the face causing him to lose several teeth. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | A 13-year-old Honduran boy and his asylum-seeking mother, who were kidnapped in Reynosa in April 2021, are homeless in Piedras Negras waiting to request U.S. asylum. The family was held captive in horrendous conditions, sleeping the floor and barely fed for two months while desperate family members gathered ransom money. The kidnappers threatened to traffic the son, if they failed to pay. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 3 | A Salvadoran couple and their adult daughter who were repeatedly kidnapped in Mexico are trapped in the encampment near the San Ysidro port of entry. The family fled El Salvador after a gang that control large parts of the country raped and beat the daughter, causing her to suffer a miscarriage, according to attorney Luis Gonzalez with Jewish Family Service of San Diego. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 5 | A Honduran family with three children was kidnapped and severely beaten immediately after DHS expelled them to Nuevo Laredo in June 2021. Shortly after they managed to escape, the family witnessed people they believed to be gang members drag a boy from a house and shoot him in the street. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims (counted in Al Otro Lado survey data above) | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | (counted in Al Otro Lado survey data above) | In July 2021, CBP expelled a Honduran asylum seeker in the middle of the night to Nuevo Laredo, where gang members immediately kidnapped him and forced his family to pay a ransom. Shortly after his release a cartel kidnapped him again. He remains missing and his family has not heard from him since, according to the migrant legal services organization Al Otro Lado. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | In June 2021, an indigenous Honduran asylum seeker and his six-year-old son were kidnapped immediately after DHS expelled them to Reynosa. The kidnappers separated the family and trafficked the father for labor. When they were released, they again sought U.S. protection in the Rio Grande Valley, but this time DHS transferred them by bus for expulsion in Nuevo Laredo, where they narrowly escaped another kidnapping attempt, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | In August 2021, a Salvadoran man told Human Rights First that after Border Patrol agents expelled him to Piedras Negras at midnight the man was threatened and attacked. With migrant shelters closed by the city, he was forced to sleep in an abandoned house, but men – one armed with a bat – threatened to beat him and other stranded migrants, if they didn't leave. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping, assault | 2 | A Honduran father and son seeking U.S. asylum were shot during a kidnapping attempt after DHS expelled them to Reynosa in April 2021. The father suffered multiple bullet wounds, including a bullet that became lodged in his arm for months while he was unable to access medical care in Mexico, according to Karla Vargas, an attorney with the Texas Civil Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 1 | In June 2021, CBP officers turned away a Guatemalan man who tried to request protection at the international bridge to the Laredo port of entry even though he was covered in blood from having been tortured by the cartel that abducted him. The man had been held for days and repeatedly beaten by cartel because he could not provide the phone number of a family member in the United States to extort. The man told Human Rights First, "If I return to my country, I'll be killed. If I stay here, I'll be killed. I want an opportunity, for someone to hear my case." | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, rape | 2 | A Central American mother fleeing gang threats was expelled to Reynosa in spring 2021 with her minor daughter, who has an intellectual disability, even though they had been kidnapped in Mexico and the mother raped. After escaping the family crossed the Rio Grande to ask for U.S. protection but were immediately expelled, according to Jennifer Harbury, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | In July 2021, Border Patrol agents expelled a Honduran asylum seeker to Mexico just one day after he received surgery for injuries he suffered while escaping a kidnapping in Piedras Negras. The man was pushed from the train he climbed aboard to escape the kidnappers who held and beat him for days. He explained to Border Patrol agents who took him to a hospital for surgery on his severely broken leg that he had fled a near-fatal beating by the gang extorting his clothing business in Honduras as well as the abduction in Mexico, but they returned him to Mexico in a hospital gown, barely able to walk with his leg in a heavy brace. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | DHS twice expelled a Honduran asylum seeker to Mexico even though he had been kidnapped near Reynosa in March 2021 by a cartel that continues to hold his mother five months later. The man escaped the kidnappers but continues to receive videos and photos of his mother being tortured by her captors who are demanding a $10,000 ransom. The man told Human Rights First that cartel members are searching for him in Reynosa and that he fears that they will kill him for escaping. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, extortion | 1 | In August 2021, an LGBTI Venezuelan asylum seeker who had been kidnapped in Nuevo Laredo managed to enter the Laredo port of entry and attempted to request protection but was immediately turned back to Mexico by CBP officers. The day before attempting to seek protection, he had been kidnapped and extorted by a taxi driver while trying to find a place to stay. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, rape | 1 | In February 2021, DHS expelled a young Honduran woman who had been kidnapped in Mexico, held captive for weeks and repeatedly raped, and abandoned by her traffickers in Arizona. After she was treated in a US hospital for her injuries, the woman was expelled to Nogales, Mexico, according to Chelsea Sachau, an Equal Justice Works Fellow with the Florence Immigrant & Refugee Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | 1 | In late May 2021, DHS expelled a 23-year-old Honduran asylum seeker who was seven-months pregnant after escaping kidnappers who planned to sell her unborn child. The kidnappers had told her that "newborns are extremely expensive in Mexico." The woman was malnourished in captivity and experienced severe bleeding that made her fear for the health of her unborn child, according to Karla Vargas, an attorney with the Texas Civil Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 3 | In July 2021, a Mexican asylum seeker from Michoacán and two Nicaraguan asylum seekers disappeared from the shelter where they were staying in Tijuana while waiting for the opportunity to request U.S. asylum. All three men had been traveling alone. Another asylum seeker staying at the shelter reported concerns that the men had been kidnapped by Mexican cartel members. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | In June 2021, a transgender Honduran woman blocked from requesting protection was kidnapped in Tijuana by a man who had promised her a place to stay. He locked her inside a house with other captive migrants for two days before she managed to escape out of a window. As of July 2021 she was hiding at a Tijuana shelter, terrified to go outside for fear of reencountering the kidnapper, according to Emem Maurus, a lawyer with the Transgender Law Center. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 2 | In August 2021, a Honduran woman stranded in Ciudad Acuña unable to request protection was offered shelter by a man who violently beat her after she and her 11-year-old son moved in with him. The man forced the child to watch as he attacked his mother, including beating her with a machete. They eventually managed to escape and sought help at a shelter. The shelter supervisor told Human Rights First that this man had previously convinced other desperate migrant women to move in with him and then abused them as well. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | An asylum-seeking mother and her 15-year-old son were kidnapped almost immediately after being expelled by DHS to Reynosa. They were forced into a van at gunpoint where they were held for two weeks, denied food, and threatened with being killed, until family members paid ransom. According to the woman's attorney, Taylor Levy, the woman has developed severe anxiety and panic attacks as a result. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | Asylum seekers at a shelter in Nuevo Laredo told Human Rights First in August 2021 that a family apparently attempting to reach the shelter had been kidnapped just outside the shelter's security wall. They reported hearing the screams of children as the family was abducted. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | Asylum seekers at a local government-run shelter in Ciudad Acuña reported that a family had been forced into a car outside the shelter in early August 2021. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, assault | 2 | A Honduran woman fleeing domestic violence with her eight-year-old son was repeatedly abused by her employer in August 2021 after being expelled by DHS to Reynosa and accepting an offer to work and live with a local family out of desperation. After suffering abuse at the hands of the employer, she escaped to live in the encampment, where she and her son remain in danger. The mother and son had been previously robbed of all their belongings in Mexico before they requested U.S. protection. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 23 | Two Nicaraguan women reported that 23 Nicaraguan asylum seekers who had been traveling with them were kidnapped in Reynosa in July 2021. Police at a checkpoint handed the group, which included the women's partners, over to a cartel extorting family members in the United States for ransom. Some of the group remain kidnapped, while at least one of the 23 kidnapped asylum seekers has gone missing after his family paid ransom to secure his release. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 5 | Mexican police officers attacked a group of five Jamaican LGBTQ asylum seekers in downtown Tijuana in June 2021. They threw three of the asylum seekers to the ground and tased one of them. The asylum seekers reported that the police targeted them because of their race, sexual orientation, and gender identity, according to Emem Maurus, a lawyer with the Transgender Law Center. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | In Ciudad Acuña, Coahuila state police beat an Afro-Honduran asylum seeker, who had been expelled to Mexico by DHS, so severely that he is now blind in one eye. He said that the officers hit him in the head with a branch and stole all of his belongings. He did not attempt to report the incident to authorities for fear of further retaliation. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping, rape | 2 | Reynosa police refused to help a Black Honduran mother and her seven-year-old son after the family was kidnapped and the mother severely beaten and raped in spring 2021 in Reynosa. Instead, police taunted the mother, asking how much she would charge them for sex, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | In May 2021, Mexican police detained and beat a 16-year-old Salvadoran boy for more than ten hours in Saltillo, Coahuila. His mother told Human Rights First that the officers beat and robbed him. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, robbery | 1 | In August 2021, Coahuila police assaulted and robbed a Honduran woman who was waiting in Piedras Negras for an opportunity to request U.S. asylum. When she told the officers she would report them, they said, "that won't get you anything here. We are the law." | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, threats | 2 | In August 2021, Mexican police robbed and threatened a Guatemalan family outside a grocery store in Reynosa. The family is afraid to return to the store to buy medicine for their sick child for fear of encountering the police again. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | A Honduran asylum seeker expelled to Ciudad Acuña by DHS was beaten by Coahuila state police in early August 2021. The man still had a bruise on his forearm a week after being pistol whipped by officers who had stopped him as he walked to a store to buy food just blocks from the shelter where he is staying. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | A Honduran woman remains separated from her eight-year-old daughter, who crossed alone into the United States after the woman was kidnapped following the family's expulsion by DHS to Reynosa. The woman, who was fleeing death threats after witnessing a murder in Honduras, had left her daughter with a friend to beg for money to buy food when she was kidnapped just steps from the encampment in Reynosa. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | armed threats, extortion | 1 | A Honduran woman sent her nine-year-old son across the border alone after the family was threatened at gunpoint by the owners of the house in Ciudad Acuña where they had rented a room. The owners asked for phone numbers of their U.S. family members in order to extort them and tried to prevent the family from leaving. After they managed to escape, the woman sent her son to the United States to protect him from harm and fled to Piedras Negras, where she was sleeping on the street as of August 2021. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, robbery | 1 | A pregnant Afro-Honduran woman decided to send her six-year-old son across the border alone after DHS expelled the family in April 2021. The mother spent months in Monterrey waiting for the opportunity to request U.S. asylum and reunite with her son. Mexican police violently raided and robbed the apartment she shared with other migrants on multiple occasions. She suffered a miscarriage due to the stress of her living conditions and her son was deeply traumatized by the separation, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, attempted kidnapping | 2 | After DHS expelled a Central American family seeking U.S. protection twice in April 2021, the family decided to send their minor son, a human trafficking survivor, across the border alone to protect him from violent crime in Ciudad Juárez, where the adult family members were robbed by Mexican police officers and narrowly escaped a kidnapping attempt. After crossing alone, the child experienced severe psychological trauma in ORR custody worrying about his family's safety, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping | 2 | A Honduran mother sent her nine-year-old son, who had fled forcible gang recruitment in Honduras, over the border alone after the family narrowly escaped a kidnapping attempt in Mexico. As of August 2021, the boy remained in ORR custody without a sponsor, soon to be transferred to foster care, according to Taylor Levy. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, threats | 1 | Fearing for her teenage son's life, a Honduran mother sent him along across the border in May 2021 after gang members in Monterrey threatened, beat, and robbed him. The family had previously been turned away when they attempted to request asylum at the Eagle Pass port of entry, and relocated to Monterrey in search of work while they waited for U.S. asylum processing to resume. For months after the attack, gang members continued to appear outside the place where the family was staying in Monterrey, where the mother remains in danger. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | (counted in Al Otro Lado survey data above) | A Mexican asylum seeker remains missing after he attempted to cross the border between ports of entry in April 2021 because CBP turned him away from requesting asylum at the San Ysidro port of entry. His family told Al Otro Lado that they not heard from him since he attempted to cross the border and believe he was likely kidnapped by a cartel. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 2 | In June 2021, men armed with a bat and knives waiting near the border attacked a Honduran couple as they attempted to cross the border in Piedras Negras to request asylum – beating the husband with a bat and stabbing the wife in the stomach. The couple had fled attacks and death threats by gangs in Honduras and the woman had previously suffered a miscarriage on the traumatic trip through Mexico. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 3 | Kidnappers waiting near the border in Cuidad Acuña abducted a Honduran woman and her two young children in May 2021 as they approached the U.S. border to seek protection in the United States. The kidnappers beat and robbed the woman but released the family after they were unable to extract any of her family members to extort. The woman had previously survived an attack by gang members in Honduras that left her with a fractured skull. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault, robbery | (counted in Al Otro Lado survey data above) | In August 2021, Mexican immigration officials deported a Honduran asylum seeker to Guatemala. The man and his family had been approved for an exemption to the expulsion policy after having been kidnapped, assaulted, and robbed in Mexico. But Mexican immigration officials stopped and detained him in Ciudad del Carmen as he was traveling to join his family in Tijuana, where they were scheduled for an exemption appointment on August 19, according to Ginger Cline, an attorney with Al Otro Lado. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | In August 2021, asylum seekers in Nogales, Mexico attempting to request U.S. asylum were tricked into entering the vehicles of kidnappers promising to drive them to the Kino Border Initiative, which was helping asylum seekers access exemptions, according to accounts related to the Kino Border Initiative. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping | 1 | A Mexican woman told the Kino Border Initiative that people pretending to be her attorneys arranged a meeting to discuss the asylum process, but when she and her son arrived at the arranged location, a group of men attempted to kidnap her son. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, sexual assault | 3 | A Mexican family that had been approved for an exemption from the expulsion policy was kidnapped by a taxi driver who was supposed to drive them from their shelter to the Brownville port of entry for their parole appointment in August 2021. The driver sexually assaulted the mother, who has epilepsy and other serious medical issues, in front of her two young sons, then abandoned the family on a road far outside of Matamoros, according to Charlene D'Cruz, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping, threats | 3 | A Guatemalan asylum seeker told Human Rights First that when she intervened to stop the kidnapping of a young boy and his father, a man threatened to come back and cut her and her child into pieces. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, threats | 1 | Another asylum seeker said that in July 2021 a man who has been harassing and threatening her tried to set her tent on fire while she slept inside. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | A traumatized nine-year-old Honduran boy who was kidnapped with his mother and held captive in horrendous conditions for 10 days is suffering from the poor conditions in the encampment and has become lethargic and malnourished. His mother, who has an ovarian cyst, was in severe pain, but as of July 2021, neither could access medical care in Reynosa. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | (counted in Al Otro Lado survey data above) | According to Al Otro Lado, the burn and stab wounds of a Central American asylum seeker, who had been kidnapped and tortured, became infected due to poor sanitation and lack of medical treatment in the encampment in spring 2021. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | 1 | In April 2021, DHS expelled a 38-week pregnant woman diagnosed with multiple infections who had fled Guatemala after her abusive partner severely beat her to try to abort her pregnancy. The woman had entered the United States to ask for protection immediately after escaping armed traffickers who had kidnapped her in Nogales and held her captive for 10 days without enough to eat. Border Patrol agents transported her to an Arizona hospital where she had a contraction, which the doctor determined had been triggered by stress. He also diagnosed her with a urinary and a vaginal infection. The woman provided details about her traumatic kidnapping during a highly limited Title 42 fear screening, but DHS expelled her to Mexico. She gave birth several days later to a sick child who nearly died in the hospital, according to Chelsea Sachau, a fellow with the Florence Immigrant & Refugee Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 9/2/2021 | abuse | 1 | Un médico calificador de Nogales, Sonora, fue denunciado ante la Fiscalía General de Justicia del Estado (FGJE) por el delito de abusos deshonestos en contra de un migrante Centroamericano, de 24 años de edad. | https://eldiariodesonora.com.mx/notas.php?nota=170414 |
| 9/3/2021 | kidnapping | 2 | Honduran migrant Lesly Pineda, a factory worker, said she and her 11-year-old son Joan were kidnapped with eight other migrants in July and released only after she paid a $2,000 ransom. | https://www.latimes.com/world-nation/story/2021-09-03/biden-vowed-to-close-a-border-migrant-camp-then-under-his-watch-a-worse-one-emerged |
| 9/3/2021 | kidnapping | 1 | Torres and the half a dozen migrants in his group were rescued by Border Patrol agents, who later expelled them to Reynosa, he said. He had crossed the border after being kidnapped at a local shop where he had gone to buy food and was held with scores of others for a month until he paid $4,000 ransom. | https://www.latimes.com/world-nation/story/2021-09-03/biden-vowed-to-close-a-border-migrant-camp-then-under-his-watch-a-worse-one-emerged |
| 9/7/2021 | kidnapping | 489 | En el norte del país, en Ciudad Camargo, estado de Tamaulipas, el 5 de septiembre, autoridades federales rescataron a 162 migrantes que estuvieron abandonados durante cinco días, sin alimentos, en una bodega. . . . En Cadereyta, estado de Nuevo León, el 31 de agosto de 2021, el INM y policías estatales "rescataron a 327 personas migrantes, entre ellos, 120 menores de edad que permanecían hacinados y en condiciones insalubres al interior de una casa de seguridad", según informó el canciller. | https://actualidad.rt.com/actualidad/403151-mexico-anunciar-rescate-750-migrantes-centroamericanos |
| 9/11/2021 | kidnapping | 6 | "Rescatan de un taxi a seis migrantes secuestrados." | https://www.elmanana.com/rescatan-de-un-taxi-a-6-migrantes-secuestrados/5418719 |
| 9/13/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 363 | Asylum seekers from Cameroon, Colombia, Cuba, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, and Venezuela who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between August 18 and September 13, 2021. |
| 9/16/2021 | extortion | 4 | A Salvadoran asylum-seeking family was extorted by police in Tijuana who threatened them with deportation in August 2021. The same officers stopped the family and asked them for money on 5 separate occasions. | HRF communication with asylum seeker |
| 9/16/2021 | kidnapping | 1 | A Honduran man was kidnapped in Reynosa in May 2021 while awaiting the opportunity to request U.S. asylum. | HRF communication with asylum seeker |
| 9/16/2021 | attempted kidnapping | 2 | "Carolina (pseudonym) and her family fled southern Mexico and arrived in Nogales recently after a criminal group murdered two boys in their town, one of whom was a friend of Carolina's brother. After the murders, armed people entered Carolina's home and kidnapped her brother. She still hasn't heard anything from or about him. She continues receiving threatening phone calls, even after having changed her phone number. When they arrived in Nogales, they got into a taxi and soon noticed that the driver was not taking them where he was supposed to and was asking them intrusive questions. They managed to escape the taxi and called another one that took them to Kino." | Kino Border Initiative report |
| 9/16/2021 | threats | 3 | "A woman and her two children decided to leave their home to escape her abusive partner, whom she had just learned was involved in organized crime. She fled first to Tijuana, but noticed she was being followed by a mysterious car. Her partner sent her a message saying he had people everywhere following her. She quickly fled Tijuana and came to Nogales. On their first night in a local shelter, she saw a man standing outside the door of the shelter all night, and the shelter staff did not know who he was. She is afraid to stay in Nogales." | Kino Border Initiative report |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/20/2021 | kidnapping | 2 | "Chihuahua.- Dos personas migrantes de 14 y 15 años de edad, fueron rescatados por agentes de seguridad pública estatal y municipal, de dos captores adultos los cuales son de origen extranjero." | https://diario.mx/estado/rescatan-a-dos-menores-migrantes-secuestrados-por-hondurenos-20210920-1843378.html |
| 9/20/2021 | kidnapping | 3 | "El reporte de migrantes privados de la libertad, movilizó a elementos policiacos quienes confirmaron la situación y sitaron el domicilio donde estaban las víctimas. Trascendió que tres migrantes, al parecer de nacionalidad guatemalteca, fueron secuestrados desde la semana pasada y los tenían en contra de su voluntad en casa de lámina y cartón. Dos de las víctimas eran menores de 14 años de edad." | http://tiempo.com.mx/noticia/rescatan_a_tres_migrantes_secuestrados_tras_operativo_en_l_a_aeropuerto_noticias_chihuahua/ |
| 9/21/2021 | kidnapping, torture | 1 | An Ecuadoran man was kidnapped in Ciudad Juarez after the U.S. government expelled him under Title 42. The kidnappers sent family members a video of the man blindfolded with his hands and feet bound while some holds a knife to the man's face. After the Ecuadoran man's family sent ransom money, they never heard from the kidnappers or the Ecuadoran man again and he remains missing. | https://www.elcomercio.com/actualidad/seguri dad/testimonio-azuayo-secuestrado-frontera-eeuu-mexico.html |
| 9/24/2021 | kidnapping | 1 | Ecuadoran migrant Jose Luis Palate, 42, father of 2, disappeared in May 2021 after informing his family he intended to cross the U.S.-Mexico border near Ciudad Juarez. As of September 2021 he remains missing. | https://quenoticias.com/noticias/jose-luis-palate-migrante-desaparecido-frontera-mexico-estados-unidos/ |
| 9/27/2021 | kidnapping | 340 | 340 migrants, including 17 minors, who had been kidnapped and held captive in Chihuahua, Mexico were rescued by police on September 17, 2021. | https://lasillarota.com/estados/esto-suenan-algunos-de-los-340-migrantes-secuestrados-en-chihuahua/564724 |
| 9/27/2021 | kidnapping | 1 | "La fiscalía de Distrito Zona Norte obtuvo una vinculación a proceso dictada en contra de Roberto M. A., quien fue detenido en términos de la flagrancia como probable responsable del secuestro de una mujer [ecuatoriana] cometido la tarde del pasado 14 de septiembre en Ciudad Juárez." | http://puentelibre.mx/noticia/vinculacion_proc eso_secuestro_migrante_ecuador_ciudad_juar ez/ |
| 9/28/2021 | kidnapping | 2 | "That is what happened to Jorge Geovanni Diaz and his son hours after they were expelled from the U.S. to Tamaulipas...First, an armed group entered a warehouse where the coyotes kept them. "They attacked 182 people, they took us to the mountains, and there we were kidnapped for a month and 14 days," Diaz said. Once his family spent $6,000 and Diaz managed to get out, he fell into the hands of the taxi driver who had to return him to the Reynosa bus station. "They were connected to the taxi driver. They traded me to another cartel in Matamoros," he said. He suffered a double kidnapping and had to pay $6,000 more." | https://www.nbcnews.com/news/latino/migran ts-returned-mexico-describe-horror-kidnappings-torture-rape-rcna2300 |
| 9/28/2021 | kidnapping | 2 | "Months ago, during a sudden downpour, a Honduran man and his son disappeared [from the Reynosa tent encampment]. 'A man said that when he came out of the bathroom, he saw a truck stop, a man get out, pull them in and take them away,'" | https://www.nbcnews.com/news/latino/migran ts-returned-mexico-describe-horror-kidnappings-torture-rape-rcna2300 |
| 9/29/2021 | kidnapping | 2 | David Sanabria huyó de Honduras después de que lo perdió todo tras el paso de los huracanes Iota y Eta, pero nunca se imaginó que en su camino a Estados Unidos el coyote lo entregaría al crimen organizado en Reynosa, Tamaulipas. Aquí su historia | https://www.telemundo.com/shows/hoy-dia/crimen-y-violencia/video/puro-machete-los-desmembraban-dice-un-migrante-que-sobrevivio-un-secuestro-en-mexico-tmvo10139046 |
| 9/30/2021 | kidnapping, assault | 2 | "...Del otro lado de la línea, unos hombres le dijeron que tenían retenidos a su hermano David, de 32 años, y a su sobrina Ximena, de 4. Si quería volver a verlos con vida debía enviarles 7 mil 500 dólares en un plazo de ocho días...Cada vez que Denis decía que no tenía dinero, David se ganaba una golpiza. La niña, según el papá, lloraba al verte sangrando en el piso. David cuenta que cuando se cumplía el plazo y nadie pagaba los rescates de sus compañeros migrantes, los asesinaban ahí mismo, a un lado del campamento." | https://www.heraldousa.com/migracion/2021/ 9/30/secuestros-mutilaciones-este-es-el-infierno-que-viven-los-migrantes-en-camino-eu-8920.html |
| 10/1/2021 | kidnapping | 1 | "Un migrante fue secuestrado por personas desconocidas y sus familiares fueron extorsionados con engaños de que había cruzado la frontera y estaba en Phoenix, Arizona, cuando era privado de su libertad en una vivienda de la colonia Romanza de esta ciudad." | https://www.expreso.com.mx/seccion/sonora/ 358210-levantan-a-un-migrante-y-extorsionan-a-su-familia-en-nogales.html |
| 10/1/2021 | sexual assault | 2 | "Reports of sexual assault on young girls at the encampment reached Pastor Hector Silva, who allows migrant families living at the plaza to move into Senda de Vida when room is available." | https://myrgv.com/featured/2021/10/01/lights-out-electricity-shut-down-at-reynosa-migrant-encampment/ |
| 10/2/2021 | kidnapping | 2 | "Dos migrantes michoacanos fueron liberados en un operativo policíaco realizado en una casa de seguridad de Tijuana donde se logró la captura de cuatro secuestradores, entre ellos un adolescente." | https://www.jornada.com.mx/notas/2021/10/0 2/estados/liberan-a-migrantes-michoacanos-secuestrados-en-baja-california/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/2/2021 | kidnapping | 3 | "La Fiscalía de Distrito Zona Centro obtuvo la vinculación a proceso de dos hombres originarios de Honduras acusados por el delito de secuestro agravado, cometido en perjuicio de tres inmigrantes de nacionalidad guatemalteca y hondureña, uno de ellos menor de edad." | https://www.elheraldodechihuahua.com.mx/po liciaca/hondurenos-secuestraron-a-tres-migrantes-y-pedian-20-mil-dolares-extorsion-secuestro-migracion-vinculados-a-proceso-7286687.html |
| 10/4/2021 | kidnapping | 13 | "Autoridades mexicanas buscan a 13 migrantes que habrían desaparecido cerca de la frontera con Estados Unidos, después de haber sido retenidos por traficantes de personas, informó este lunes en un comunicado la fiscalía del estado norteño mexicano de Chihuahua." | https://www.eleconomista.com.mx/politica/Au toridades-mexicanas-buscan-a-13-migrantes-cerca-de-frontera-con-Estados-Unidos-20211004-0129.html |
| 10/6/2021 | kidnapping | 1 | A Salvadoran migrant, Luis David "N", was held hostage and tortured in Mexicali by kidnappers demanding ransom from his family. He managed to escape. | https://www.elimparcial.com/mexicali/policiac a/Rescatan-a-migrante-salvadoreno-secuestrado-20211006-0025.html |
| 10/7/2021 | kidnapping | 5 | "Cinco extranjeros en estado de migrante fueron rescatados en la ciudad de Reynosa, Tamaulipas, por elementos de la policía estatal y en la acción detuvieron a dos individuos que los llevaban secuestrados." | https://www.excelsior.com.mx/nacional/libera n-a-cinco-migrantes-nicaraguenses-secuestrados-en-reynosa/1475840 |
| 10/7/2021 | kidnapping, robbery | 1 | I.B. is a 35-year-old man from Ghana. He fled his home after an armed criminal group entered his home and murdered his uncle; I.B. had previously reported the criminal group to the police. I.B. fled to South America, ultimately journeying to Mexico. In Mexico, I.B. was kidnapped and held for three days. Mexican police have stopped and searched I.B. on two occasions and have stolen his wallet. I.B. has had difficulty finding a job in Mexico on account of his race and nationality, and he has been the victim of racist comments. | https://www.humanrightsfirst.org/sites/default /files/PrecautionaryMeasuresRequestUnitedSta tesTitle42.pdf |
| 10/7/2021 | kidnapping | 4 | N.I.C.B. is a 34-year-old mother from El Salvador. N.I.C.B. fled gang violence in El Salvador with her husband, J.I.B.B., and two children, K.I.B.C., who is 12 years old, and A.E.B.C., who is 8 years old. Gang members threatened to kill her and her family, and they beat her and her husband. In March 2021, the family tried to enter the United States from Reynosa, Mexico, to seek asylum. When they encountered U.S. officials at the border, the officials called N.I.C.B., her husband, and her children "a bunch of criminals." The officials expelled the family into Mexico in the middle of the night. They were kidnapped almost immediately after and kept in a locked storage room with insufficient food for 20 days. The kidnappers sexually harassed N.I.C.B. constantly. | https://www.humanrightsfirst.org/sites/default /files/PrecautionaryMeasuresRequestUnitedSta tesTitle42.pdf |
| 10/7/2021 | assault, attempted kidnapping | 3 | N.M.M.M. is a 35-year-old mother from Guatemala.11 She fled Guatemala with her 11-year-old son, C.A.M.M. and four-year-old daughter, D.L.M.M., due to threats made against her family by organized criminal gangs. N.M.M.M. has been the victim of crime in Mexico as well. Three men broke into the home where she was staying and assaulted her. Her son was the victim of an attempted kidnapping. | https://www.humanrightsfirst.org/sites/default /files/PrecautionaryMeasuresRequestUnitedSta tesTitle42.pdf |
| 10/9/2021 | kidnapping | 1 | He never intended to leave El Salvador – he lived "peacefully" in his home country and even had his own business. But everything changed for Martin when he was raped. "I am from the LGBTQ community, I am gay," Martin said. "And in my country, I suffered discrimination and violent because of that. "So, at that moment I had no choice but to take the savings I had and try to flee to a more liberal place, where they don't push you aside, where they don't see you badly." He left El Salvador on 5 March and managed to make it to Monterrey, Mexico – but his plans quickly disintegrated. He tried to cross into the United States on three separate occasions. Each time, he was sent to Reynosa in Mexico. "Then the last time, I was kidnapped as I was leaving the bridge," Martin said. "Someone told me that he could help me, made me get into a car and took me to a house where they locked me up for several days. | https://www.pinknews.co.uk/2021/10/09/el-salvador-doctors-without-borders-gay-refugee/ |
| 10/14/2021 | kidnapping | 3 | The vehicle in which four migrants and their alleged smuggler were traveling from Chihuahua City to Juarez was cut of by two other cars. A shooting in which the driver died, and a Honduran was injured, ensued; the assailants commandeered the migrants and drove away with them, according to the reports. | https://www.borderreport.com/hot-topics/border-crime/expert-worries-mexican-gangs-may-be-stealing-each-others-human-cargo-putting-migrant-lives-at-risk/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/21/2021 | kidnapping | 1 | In mid-October 2021, DHS expelled a Honduran asylum seeker who had sought protection near McAllen, Texas immediately after escaping kidnappers who had abducted him outside a grocery store in Reynosa, Mexico while he was buying tortillas and avocados for his wife. DHS turned him over to Mexican immigration authorities, who flew him to Villahermosa then bused him into Guatemala, where he remains stranded. He told Human Rights First he is sick with fear and desperate to reunite with his wife, who is still in the Reynosa tent encampment where the couple had been waiting together for U.S. asylum processing to resume at the port of entry. | https://www.humanrightsfirst.org/resource/ile gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 1 | A young Honduran woman who attempted to request asylum at a U.S. port of entry in July 2021 was kidnapped immediately after DHS turned her away. Members of a criminal organization who repeatedly raped her and trafficked her for sexual exploitation for three months, according to a humanitarian aid worker assisting her. She remains in danger in Mexico. | https://www.humanrightsfirst.org/resource/ile gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping, torture | 2 | A Central American couple blocked from seeking asylum at a U.S. port of entry was kidnapped and tortured in Tijuana in summer 2021. The kidnappers raped the wife repeatedly, beat the husband, and demanded ransom from their family members. The couple managed to escape but remains in danger in Tijuana as of mid-October 2021, when Human Rights First last spoke with them. | https://www.humanrightsfirst.org/resource/ile gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | assault | 2 | A 13-year-old Honduran girl and her asylum-seeking father were assaulted and robbed by gang members after DHS expelled them under Title 42. The family was forced to hide in a mountainous area for several days afraid of encountering the kidnappers who targeted them and other migrants on a train. They remain in danger in Mexico, according to Shoshana Kushner, an attorney with Immigrant Defenders Law Center. | https://www.humanrightsfirst.org/resource/ile gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | attempted kidnapping | 2 | Armed men tried to kidnap a Guatemalan asylum seeker and his three-year-old daughter immediately after DHS expelled them to a Mexican border city in August 2021. The family managed to escape, but others who had been expelled with them did not, according to a humanitarian aid worker assisting the family. | https://www.humanrightsfirst.org/resource/ile gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/19/2021 | kidnapping | 1 | A 59-year-old asylum-seeking grandmother from Honduras was kidnapped soon after DHS expelled her to Piedras Negras in summer 2021. When Human Rights First researchers last spoke to her in October 2021, she remained in danger in Mexico unable to request asylum. | https://www.humanrightsfirst.org/resource/ile gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape, kidnapping | 1 | An unaccompanied child who was unable to access the U.S. asylum process due to Title 42 was raped and kidnapped from the hostel where she was waiting to request protection by men who told her they were going to kill her, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/ile gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape | 1 | An asylum seeker fleeing gender-based violence as was raped at gunpoint in front of her son, causing her to develop an infection, after DHS expelled her under Title 42. She remains in danger in Mexico, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/ile gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping, rape | 1 | An INM officer kidnapped and raped a Honduran asylum-seeking woman near the border in Ciudad Juarez and sold her to a cartel that held her captive. Though she managed to escape, the woman has been unable to request U.S. asylum due to the Title 42 policy and remains in danger in Mexico, terrified the cartel members, who have photos of her, will find her again, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/ile gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | robbery | 3 | Three Nicaraguan political dissidents, whom DHS twice expelled to Mexico in August 2021, have been strip-searched and robbed by Mexican government officials on multiple occasions. In mid-August 2021, DHS turned them over to INM officers who verbally abused them and deprived them of food in detention, forced them to strip naked, and stole their money and valuables. In late August 2021, Mexican police boarded a bus that the three were riding near the border with Yuma, Arizona, forced them off the bus, strip-searched them, adn stole their money. The dissidents remain in danger in Mexico, unable to access the U.S. asylum process, according to Anaís Catalina, an advocate assisting them. | https://www.humanrightsfirst.org/resource/ile gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/21/2021 | rape | 1 | INM officers extorted and raped a Honduran asylum seeking woman immediately after the U.S. government expelled her to Reynosa in August 2021. She told Human Rights First that INM officers demanded payment from her and the others with whom she was expelled, threatening them with deportation, then locked the women in a separate room, forced them to remove their clothes, and raped them. "We did what they asked of us out of fear because they threatened to turn us over to a human trafficking network," she said. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 3 | An INM officer in Tijuana kidnapped a Honduran family of three who had made multiple attempts to request U.S. asylum. The officer offered the family a ride then held them at gunpoint demanding money and information about U.S. family members. The officer handed the family over to men who held them captive, sexually abused and beat them so severely that one family member lost consciousness. They managed to escape but remain in danger in Mexico, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | extortion | 3 | Since August 2021, police officers in Tijuana have repeatedly extorted and threatened a Salvadoran asylum-seeking family blocked from seeking U.S. protection because of Title 42. The family told Human Rights First that they are terrified of encountering the officers, who have also threatened to deport them. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape, sexual assault, beatings | (counted in Al Otro Lado survey data above) | In September and October 2021, CBP has denied more than 15 humanitarian parole requests submitted by Al Otro Lado on behalf of its clients to the Del Rio, Eagle Pass, and San Ysidro ports of entry. These requests include: a Honduran woman who was raped by Mexican police, sex trafficked, and forced to work in massage parlor; a Central American asylum seeker who was beaten by Mexican police … Mexican LGBTQ+ siblings who were sexually assaulted …. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 1 | A Mexican asylum-seeking woman committed suicide in October 2021 while stranded in Tijuana, unable to request U.S. asylum due to Title 42. Desperate for protection from cartels that had kidnapped, beaten, and tortured her in southern Mexico, the woman had attempted to cross the U.S. border between ports of entry twice, but was kidnapped near the border both times, according to Nicole Ramos, an attorney with Al Otro Lado. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape | 1 | A Central American child was raped at the Reynosa tent encampment in September 2021, according to Charlene D'Cruz, an attorney with Lawyers for Good Government. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape | 1 | A 14-year-old girl was raped in the Tijuana tent encampment in summer 2021. A Honduran asylum seeker who witnessed the rape told Human Rights First she had to flee the encampment because of further threats by the rapist. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | beating, attempted kidnapping | 3 | In late July 2021, armed men broke into the Tijuana shelter where a Honduran family was staying, beat the family, and attempted to kidnap the children. The family had fled death threats in Honduras by gang members who had violently raped the pregnant mother, causing her to miscarry. The family escaped but found that other shelters in Tijuana were full. They are now paying to rent a room and told Human Rights First they are terrified to go outside for fear of encountering the kidnappers. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 1 | An asylum-seeking woman from Honduras was denied medical attention in Matamoros after injuring her leg escaping kidnappers and contracting gangrene that was so severe that a bone in her leg was visible. A doctor at a volunteer-run clinic had informed the woman that her leg would need to be amputated or she would die, but a hospital in Matamoros turned her away, claiming they lacked sufficient bedspace, according to Charlene D'Cruz, an attorney with Lawyers for Good Government. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/27/2021 | kidnapping | 4 | Cuatro ciudadanos nicaragüenses fueron secuestrados por supuestos integrantes de la organización criminal Los Zetas en México. Los nicas pretendían cruzar la frontera con los Estados Unidos. Según información de medios oficialistas los nicas son originarios del municipio de Corinto, en Chinandega. | https://radio-corporacion.com/blog/archivos/119723/cuatro-nicaraguenses-secuestrados-por-organizacion-criminal-los-zetas/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/28/2021 | threats, assault | 3 | One family from Honduras arrived at KBI recently after attempting to unsuccessfully cross the border between Reynosa and McAllen. They were being followed by gang members in Honduras and could no longer stay. The mother and daughter were expelled separately from the father, and the father was beaten and robbed by alleged agents of Mexican immigration when he was expelled back into Reynosa. He was later threatened by the local mafia for walking in the wrong area. The family fled into southern Mexico because it was too dangerous for them to wait at the border. While they were there, they received threats from local organized crime and had to move again. They arrived in Nogales hoping to be able to stay safe here. They do not have the option to return, as they recently received news that the father's mother had been killed in Honduras after they had escaped, and several other family members had been threatened. | Communication from Kino Border Initiative |
| 10/31/2021 | kidnapping | 25 | Mexican military personnel liberated 25 kidnapped migrants from a house in Matamoros. | https://www.hoytamaulipas.net/notas/474405/Rescatan-a-25-migrantes-en-Matamoros.html |
| 11/8/2021 | kidnapping | 4 | In spring 2021, armed men kidnapped a group of Honduran women and children who had been waiting in Nogales for the opportunity to request U.S. asylum, forcing them into cars. One mother and her three-year-old daughter managed to escape and ran into a convenience store. Someone in the store escorted the family to a taxi, but the kidnappers followed the family until they arrived at the Kino Border Initiative office. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictions1it%2CBlockingAsylum SeekersContinues.pdf |
| 11/8/2021 | kidnapping, assault | 1 | A Guatemalan asylum-seeker was kidnapped soon after DHS expelled him and his seven-year-old daughter near the Lukeville port of entry at night in spring 2021. When the man went to buy food for his daughter, four men covered his face with a cloth, beat him, and held him captive for 15 days, during which time his daughter was forced to enter the United States alone. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictions1it%2CBlockingAsylum SeekersContinues.pdf |
| 11/8/2021 | attempted kidnapping, assault | 5 | A Mexican asylum-seeking family with three young daughters, ages eight, five, and two, who remain blocked from protection due to Title 42, narrowly escaped an attempted kidnapping in Nogales in October 2021. Three men dressed in black in a truck rushed the family, threatening to take the children. The mother and children managed to flee to a hotel while the father fought off the attackers, sustaining neck and back injuries for which he required hospital treatment. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictions1it%2CBlockingAsylum SeekersContinues.pdf |
| 11/8/2021 | kidnapping, assault | 1 | In fall 2021, for instance, an asylum-seeking teenage child told Florence Project that members of an organized criminal group had kidnapped and tortured him near Nogales. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictions1it%2CBlockingAsylum SeekersContinues.pdf |
| 11/8/2021 | assault, robbery | 2 | Florence Project has also assisted several Mexican teenagers who had been assaulted, beaten, and robbed in Nogales after CBP officers turned them away from the port of entry. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictions1it%2CBlockingAsylum SeekersContinues.pdf |
| 11/9/2021 | kidnapping | 49 | El Instituto Nacional de Migración Reynosa, de México, informó que rescataron a 49 migrantes secuestrados. Estaban en una casa a ocho kilómetros (km) de EE.UU. La Marina de México informó que localizó el lugar del secuestro gracias a una denuncia anónima. Había tres menores. | https://twitter.com/Sanchezmendieta/status/1458141287941492737 |
| 11/12/2021 | kidnapping | 2 | Cada segundo que pasa, incrementa la angustia en la familia Pravia Ruiz en la ciudad de Matagalpa, Nicaragua, porque Flor de María Pravia Ruiz y su sobrino Lesther Daniel Mejía Pravia, dos matagalpinos que están secuestrados en México y sus captores dieron un plazo de 72 horas, que vence este sábado 13 de noviembre, para que les envíen 13,000 dólares para liberarlos. | https://mosaicocsi.com/angustia-por-matagalpinos-secuestrados-en-mexico/ |
| 11/15/2021 | kidnapping, assault | 1 | Fabiola del Socorro Picado Cruz, a Nicaraguan woman, was kidnapped and held for ransom in Reynosa | https://www.facebook.com/1139797803345137/posts/4307567486674337 |
| 11/17/2021 | kidnapping | 54 | En Nogales, Sonora, una denuncia anónima permitió rescatar a medio centenar de migrantes originarios de Honduras, Guatemala y Nicaragua. En total fueron 54 los migrantes rescatados. | https://noticieros.televisa.com/ultimas-noticias/rescatan-migrantes-centroamericanos-secuestrados-en-nogales-sonora/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/18/2021 | kidnapping | 2 | Policías de Investigación adscritos a la Fiscalía de Distrito Zona Norte, llevaron a cabo un operativo para rescatar a dos personas originarias de Guatemala que supuestamente estaban privadas de la libertad, en una vivienda de la colonia Galeana | https://diario.mx/juarez/liberan-a-migrantes-secuestrados-y-torturados-en-la-galeana-arrestan-a-dos-20211118-1863976.html ; https://actualidad.rt.com/actualidad/410836-policia-mexicana-rescata-ciudad-juarez-migrantes-secuestrados |
| 11/18/2021 | rape | 1 | A mother and her daughter fled El Salvador after being abused by a public official. When the mother reported the crimes, her abuser attempted to imprison her, but she managed to escape and flee the country. With no access to asylum at ports of entry, she attempted to cross without inspection between Reynosa, Tamaulipas and McAllen, Texas so that she could turn herself in to immigration agents and request asylum while in their custody. She was kidnapped by her smugglers, held for several days without food, and raped before she was rescued by police. She managed to cross into the U.S. where she attempted to request asylum but was ignored. She was expelled into Nogales, Sonora and had no social support, putting her and her daughter in a state of homelessness while they waited for the border to open. | Communication from Kino Border Initiative |
| 11/19/2021 | kidnapping | 27 | Rescatan a 27 migrantes secuestrados en un hotel de Ciudad Juárez | https://www.telemundo.com/noticias/noticias-telemundo-en-la-noche/inmigracion/video/rescatan-27-migrantes-secuestrados-en-un-hotel-de-ciudad-juarez-tmvo10300754 |
| 11/19/2021 | kidnapping | 12 | Policías municipales de Ciudad Juárez y agentes de la Fiscalía de Chihuahua rescataron a 12 migrantes las últimas 24 horas, incluidas dos mujeres y un menor de edad, en tres operativos distintos en un hotel, una casa de seguridad y en la zona desértica entre los municipios del Valle de Juárez y Ojinaga colindante al río Bravo. | https://www.jornada.com.mx/notas/2021/11/19/estados/rescatan-a-12-migrantes-en-tres-operativos-en-chihuahua/ |
| 11/20/2021 | kidnapping | 3 | Ana Gabriela Nicaragua Lopez, a Nicaraguan political dissident, was kidnapped with her husband and son by the Cartel de Juarez. | https://noticieros.televisa.com/ultimas-noticias/liberan-a-opositora-de-nicaragua-secuestrada-en-mexico/ |
| 11/21/2021 | kidnapping, extortion | 12 | Julio Ampié, who had been a political prisoner in Nicaragua, was kidnapped in Nicaragua, was kidnapped in Reynosa with his wife and two children in July 2021. INM had previously extorted him for $600 in El Guasuale. Mexican police entered the hotel room where they were staying in Reynosa, loaded them into a van, and brought them to a small house where there were more migrants, then sold them to a cartel for $3,000. In October 2021, 7 Nicaraguan victims, including Gerlenis Jimenez and Maria Teresa Delgadillo, were freed after $70,000 of ransom was paid to the kidnappers. Melvin Francisco Martinez was kidnapped at the end of August 2021 and managed to escape after 10 days. | https://www.laprensa.com.ni/2021/11/21/suplemento/la-prensa-domingo/2913189-nicas-secuestrados-cuando-el-sueno-americano-se-convierte-en-pesadilla |
| 11/22/2021 | kidnapping | 5 | Al arribar al lugar del reporte, escucharon gritos de auxilio de varias personas provenientes de una de las habitaciones de la casa; procedieron al rescate de cinco indocumentados, quienes manifestaron que los propietarios de la vivienda los tenían privados de su libertad desde hacía más de cinco días, por lo que fueron resguardados y puestos a salvo. | https://diario.mx/juarez/liberan-a-migrantes-secuestrados-20211121-1865181.html |
| 12/3/2021 | kidnapping | 3 | Tras un reporte de personas privadas de su libertad en un domicilio ubicado en el cruce de las calles Isla Jasu y Ramón Aranda, en la colonia Chihuahua, elementos policíacos arribaron al lugar. Al llegar los oficiales escucharon gritos de ayuda provenientes del domicilio, por lo que de inmediato ingresaron y encontraron a tres hombres quienes argumentaron ser migrantes y que tenían una semana retenidos en contra de su voluntad en dicho inmueble, por dos sujetos, los cuales les pidieron dinero a sus familiares a cambio de su libertad, acumulando un total de 15 mil dólares. | https://www.anoticias.com.mx/pub/28734?utm_source=dlvr.it&utm_medium=twitter |
| 12/3/2021 | kidnapping | 2 | La Policía Municipal de Tijuana detuvo a Eduardo "N", pollero que mantuvo secuestrados a dos migrantes con engaños, prometiendo que los cruzaría a Estados Unidos sin documentos. | https://www.facebook.com/104805888231365/posts/305058074872811 |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/3/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 679 | Asylum seekers from Cuba, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, Venezuela and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between September 14 and December 2, 2021. |
| 12/5/2021 | kidnapping | 5 | Cinco migrantes procedentes de Guatemala y del estado de Veracruz fueron secuestrados por un chofer de taxi en el aeropuerto internacional Abraham González de Ciudad Juárez, estuvieron retenidos en una vivienda de la colonia Villas de Alcalá durante cinco días, hasta que policías municipales concretaron su rescate, informó este lunes la Secretaría de Seguridad Pública Municipal (SSPM). | https://www.jornada.com.mx/notas/2021/12/1 3/estados/autoridades-de-juarez-liberan-a-5-migrantes-de-guatemala-secuestrados/ |
| 12/7/2021 | kidnapping | 2 | Dos nicaragüenses más fueron secuestrados en México por uno de los carteles considerados como los más peligrosos: Los Zetas. Se trata de Bismarck José Contreras y Erling Francisco Tinoco, originarios de Estelí. Ambos huían del asedio. | https://nicaraguainvestiga.com/nacion/68655-cartel-mexicano-secuestra-a-nicas-que-huian-de-persecucion-politica/ |
| 12/9/2021 | kidnapping | 2 | A Nicaraguan asylum seeker and his adult son were kidnapped in December 2021 and held for 7 days until their family paid ransom after CBP expelled them to San Luis Colorado, Mexico under Title 42, according to the man's nephew, who is also seeking asylum. | HRF interview with asylum seeker |
| 12/11/2021 | kidnapping | 3 | La Fiscalía de Distrito zona Norte obtuvo la auto de vinculación a proceso en contra de Brayan Jasiel R.C., al acreditar su posible participación en el delito de secuestro, cometido en agravio de tres personas migrantes en Ciudad Juárez. Durante la audiencia inicial, el agente del Ministerio Público expuso ante el órgano jurisdiccional que el imputado realizó actos de violencia física y moral en contra de tres masculinos de origen extranjero, quienes fueron retenidos y amenazados para que familiares depositaran importantes cantidades de dinero a cambio de su libertad | https://www.elheraldodejuarez.com.mx/policia ca/procesan-a-imputado-por-secuestro-de-tres-personas-migrantes-ciudad-juarez-7596616.html |
| 12/12/2021 | kidnapping | 50 | Los municipales encontraron a 50 centroamericanos: 34 adultos y 16 menores de edad, entre ellos un bebé de un año y seis meses. En total, 35 mujeres y 15 mujeres. | https://jornadabc.com.mx/region/liberan-a-50-en-el/ |
| 12/18/2021 | kidnapping | 1 | La Fiscalía de Distrito Zona Norte en Chihuahua obtuvo un auto de vinculación a proceso en contra de los imputados José 'R' y Adaniber 'C' por el delito de secuestro agravado de una persona migrante, a quien mantuvieron en cautiverio en un domicilio de la colonia Del Carmen en Ciudad Juárez. | https://www.milenio.com/estados/chihuahua-vinculan-proceso-responsables-secuestro-migrante |
| 12/20/2021 | kidnapping/pot ential murder | 13 | Trece migrantes que fueron secuestrados en Chihuahua pudieron haber sido asesinados durante una guerra territorial entre cárteles de drogas, un señal más de un conflicto cada vez más violento entre bandas rivales por las rutas de contrabando en este estado del norte de México que colinda con Texas, según fuentes mexicanas y estadounidenses. | https://www.dallasnews.com/espanol/al-dia/inmigracion/2021/12/20/temen-que-13-migrantes-hayan-sido-asesinados-por-carteles-en-la-frontera-entre-texas-y-chihuahua/ |
| 12/21/2021 | extortion | 2 | Two migrants were held captive against their will in Tijuana by a man demanding ransom for their release. | https://www.facebook.com/1048058882313365/posts/3050580748728 11 |
| 12/21/2021 | kidnapping | 1 | De acuerdo a la información proporcionada por la víctima de origen peruano, los referidos detenidos lo mantuvieron en cautiverio en un domicilio de las calles Níquel y Joaquín Terrazas de la colonia Del Carmen, de donde logró escapar. | https://www.elheraldodejuarez.com.mx/policia ca/migrante-secuestrado-se-escapa-y-encuentra-a-policias-arrestan-2-polleros-7638283.html |
| 12/21/2021 | kidnapping | 5 | Dos hombres fueron vinculados a proceso por el secuestro de cinco migrantes en la colonia Villas de Alcalá, informó la Fiscalía Zona Norte. De acuerdo con el report, Juan de Dios H.S, y Jamie Daniel C.M. amenazaron a las víctimas con un arma y las mantuvieron en cautiverio, exigiendo a los familiares depositos dinero a cambio de su liberacion. | https://netnoticias.mx/juarez/los-vinculan-a-proceso-por-secuestrar-a-migrantes/ |
| 12/27/2021 | kidnapping | 27 | Noviembre no fue el mejor mes para intentar cruzar a Estados Unidos. Unos 27 nicaragüenses sufrieron secuestro, al menos cinco familias enteras entre ellos y sus familiares en el país en vez de recibir remesas tal y como lo esperaban al despedirlos, se vieron obligados a buscar dinero para salvar sus vidas. | https://nicaraguainvestiga.com/nacion/70633-nacion-al-menos-27-nicas-secuestrados-en-30-dias/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 1/1/2022 | murder | 1 | Un hombre haitiano, identificado como Casseus Franck, fue asesinado el fin de semana en Tijuana, Baja California, y su cuerpo identificado por el Servicio Médico Forense (Semefo), pero hasta ahora ningún familiar ha reclamado su cuerpo. Franck fue asesinado cerca de las 15:00 horas del sábado, cuando el o los agresores le dispararon en la cabeza al migrante. El ataque ocurrió en el puente peatonal "México", entre la calle Miguel Negrete y vía Rápida Poniente, en la zona centro de Tijuana. | https://www.reforma.com/aplicacioneslibre/preacceso/articulo/default.aspx?__rval=1&urlredirect=/identifican-a-haitiano-asesinado-nadie-lo-reclama/ar2325510?referer=--7d616166562f3a3a6262623b2267b60657a677073726f7874367678a-- |
| 1/4/2022 | kidnapping | 4 | Familiares de cuatro nicaragüenses que fueron secuestrados a mediados de diciembre de 2021 por una banda criminal en México, pagaron 12 mil dólares para lograr la liberación de los jóvenes que salieron del país para cumplir el sueño americano. | https://lpnicaragua.com/pagaron-12-mil-dolares-para-liberar-a-migrantes-nicaraguenses-secuestrados-en-mexico/ |
| 1/4/2022 | kidnapping | 30 | Alberto Xicoténcatl, director de la Casa del Migrante informó en el año 2021 se registraron alrededor de 15 secuestros de migrantes, sobre todo en municipios fronterizos como Acuña y Piedras Negras. No obstante, en cada uno de estos casos, hubo más de una víctima de secuestro. | https://www.elsiglodetorreon.com.mx/noticia/2022/en-2021-hubo-alrededor-de-15-secuestros-de-migrantes-en-coahuila.html |
| 1/10/2022 | kidnapping | 1 | A Honduran asylum seeker was kidnapped near the Reynosa tent encampment by men who forced him into a van and held him captive until his employer negotiated for his release. DHS had expelled the man to Reynosa under Title 42 in October 2021 after he had requested U.S. asylum. | HRF communication with asylum seeker |
| 1/13/2022 | kidnapping | 1 | In January 2022, a 19-year-old Honduran woman was kidnapped from an informal tent encampment in Reynosa while blocked from seeking asylum due to the Title 42 policy, according to Charlene D'Cruz, an attorney with Lawyers for Good Government. | https://www.humanrightsfirst.org/resource/sham-eful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | DHS used Title 42 to expel to Mexico an 18-year-old Nicaraguan political dissident who had twice been kidnapped there, leaving him stranded in danger. In November 2021, in the Mexican border city of Nogales, the young man managed to escape the second kidnapping and flee across the border to request asylum. But DHS officers expelled him back to Nogales using Title 42, where he remains in hiding from his kidnappers, according to KBI | https://www.humanrightsfirst.org/resource/sham-eful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | A Honduran asylum seeker is stranded in danger in Tijuana where Mexican immigration agents turned him over to a cartel that held him hostage in horrendous conditions for days following his expulsion under Title 42 to Mexico. He told Human Rights First that the kidnappers beat other migrants in front of him, killing one, and that he was only released after his family paid ransom. The man had fled threats in Honduras by gang members who murdered his father | https://www.humanrightsfirst.org/resource/sham-eful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping, assault | 2 | A transgender Honduran woman, who was expelled by DHS to Mexico under Title 42 even though she had been kidnapped there with another transgender woman who remains missing, is stranded in danger in Mexico. The woman managed to escape after being kidnapped in Ciudad Juárez in summer 2021 with her friend. When the woman, who had fled torture and threats in Honduras due to her gender identity, attempted to request asylum at the border, a DHS officer told her "the border is closed" and that the United States is "not giving asylum." After being expelled to Mexico, the woman was immediately beaten and robbed, and a Mexican police officer refused to take her complaint. She told Human Rights First that she does not know if her friend, who was unable to escape the kidnapping, is still alive | https://www.humanrightsfirst.org/resource/sham-eful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 2 | A Central American asylum-seeking woman and her children, who were kidnapped and held for ransom for eight days in August 2021, remain in danger in Reynosa due to Title 42 restrictions on asylum at the border. The woman told Human Rights First that uniformed men she believed to be Mexican police officers had forced her family off a bus and turned them over to the cartel that held them captive. | https://www.humanrightsfirst.org/resource/sham-eful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | attempted kidnapping | 2 | In November 2021, a Honduran woman and her five-year-old son escaped a kidnapping attempt by armed men who chased them soon after DHS returned the family to Reynosa under Title 42. The woman told Human Rights First that she had entered the United States to seek asylum after fleeing death threats by gang members who killed her relatives in Honduras. | https://www.humanrightsfirst.org/resource/sham-eful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping, rape, assult | (counted in Al Otro Lado survey data above) | A Haitian man reported in late November 2021 that he and his family were kidnapped, beaten, and robbed in Mexico, and his wife raped in front of their child. The man provided his account in a survey conducted by Al Otro Lado of migrants and asylum seekers stranded in Mexico due to current policies restricting access to asylum in the United States. | https://www.humanrightsfirst.org/resource/sham-eful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 1/13/2022 | assault, robbery | (counted in Al Otro Lado survey data above) | 196 Haitians reported abuse by Mexican police within the past month. A Haitian migrant wrote, "The police have threatened me at gunpoint many times, abused me, and stolen money from me and because of this I am afraid to walk in the street in Mexico." Other Haitian migrants targeted by Mexican authorities include a man robbed at gunpoint by Mexican police, a migrant robbed by knife-wielding police officers, and a migrant who could not afford food for days after uniformed Mexican officers robbed him. | https://www.humanrightsfirst.org/resource/sh ameful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | A 19-year-old Honduran woman with a high-risk pregnancy who was initially denied humanitarian parole in December 2021 went missing by the time CBP reconsidered its faulty decision. The woman who was eight-months pregnant and experiencing severe bleeding, had been denied medical treatment in Ciudad Acuña and attempted three times to enter the United States to seek protection. Each time she was expelled by DHS to Ciudad Acuña under Title 42. By the time CBP reversed its initial parole denial following advocacy by Charlene D'Cruz, an attorney with Lawyers for Good Government, the woman had disappeared and remains missing as of January 2022. | https://www.humanrightsfirst.org/resource/sh ameful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | In December 2021, a Nicaraguan asylum seeker who was kidnapped and tortured by electrocution and beatings for three weeks in Reynosa in November 2021 did not pass a RMX non-refoulment interview and was returned to Ciudad Juárez by CBP under RMX. The man reported to Human Rights First that photos and audio recordings of the kidnappers beating him were sent to his aunt in the United States, demanding a $5,000 ransom and threatening to "cut him to pieces" if she did not pay. | https://www.humanrightsfirst.org/resource/sh ameful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | A Nicaraguan asylum seeker, who had been kidnapped and held for ransom in Mexico after being expelled there under Title 42, did not pass a RMX non-refoulment interview and was returned to Ciudad Juárez by CBP in December 2021. The man told the asylum officer conducting the fear interview that the had been kidnapped near the border after being expelled by DHS under Title 42, held captive for eight days, and denied food for more than 24 hours until his family paid a $3,000 ransom. "They said, 'If you don't pay, we'll kill you,'" he told Human Rights First. Mexican police had also twice extorted the man. On one occasion, the Mexican police officers, who extorted and threatened him and other migrants on a bus, abducted two migrant girls. | https://www.humanrightsfirst.org/resource/sh ameful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 2 | A Honduran asylum seeker and her son, who were subjected to RMX 1.0, were kidnapped for a second time in Mexico in summer 2021 while waiting to be removed from the program and held in horrific conditions for months. The woman developed a painful neurological condition in captivity that caused half of her face to become paralyzed. The family had previously been kidnapped and held for ransom immediately after the Trump administration returned them to Mexico under RMX in 2019. | https://www.humanrightsfirst.org/resource/sh ameful-record-biden-administration-suse-trump-policies-endangers-people-seeking-asylum |
| 1/17/2022 | rape, kidnapping, human trafficking, armed robbery, beatings | 271 | Asylum seekers from Colombia, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, Venezuela and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in Mexico in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between December 3, 2021 and January 7, 2022. |
| 1/17/2022 | kidnapping | 120 | Law enforcement in Mexico discovered 120 migrants bound and blindfolded in a cartel stash house in Ciudad Victoria, Tamaulipas. On Sunday, authorities searched the house after receiving a tip from the Embassy of Guatemala.The migrants were determined by authorities to be mostly from Nicaragua, Guatemala, and El Salvador. | https://www.breitbart.com/border/2022/01/17 /120-kidnapped-migrants-rescued-by-mexican-authorities/ |
| 1/22/2022 | murder | 13 | Mexican police participated in a massacre last month that left 19 people dead, including at least 13 who appear to have been Guatemalan migrants on their way to the United States, a state prosecutor said late Tuesday. The victims were killed Jan. 22 in Camargo, close to the Texas border. | https://www.washingtonpost.com/world/the_a mericas/mexico-tamaulipas-police-migrant-killing/2021/02/03/32c2274-65c7-11eb-8468-21bc4807fe5_story.html |
| 2/3/2022 | kidnapping, attempted kidnapping | 2 | A Honduran man who came through KBI two weeks ago had passed through a city in the Mexican border state of Coahuila and was renting a room with other Honduran migrants when Mexican police entered their room and attempted to capture them. He managed to escape through a window, but one of his companions was taken. | Communication from Kino Border Initiative |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 2/3/2022 | kidnapping | 1 | Manuel,* a Nicaraguan man fleeing political persecution, was kidnapped by Mexican police officers in two different cities while traversing the country. He was held in a police station for over 24 hours until the police received a $500 USD ransom payment from his family. With no regard for the fact that Manuel suffered two separate kidnappings by Mexican authorities, CBP expelled him back to Mexico without ever screening him for fear of return. | Communication from Kino Border Initiative |
| 2/7/2022 | assault, robbery | 2 | Un grupo de pandilleros despojaron de sus pertenencias a dos migrantes, a uno lo hirieron con un machete y a otro con un arma de fuego, por lo que tuvieron que ser trasladados de emergencia a un hospital en las primeras horas del lunes. | https://eldiariodecoahuila.com.mx/2022/02/07/asaltan-con-violencia-a-migrantes/ |
| 2/10/2022 | kidnapping | 2 | El Ejército Mexicano rescató en Nuevo Laredo, Tamaulipas, a quince personas que se encontraban privadas de su libertad en una casa de seguridad entre los cuales había mexicanos, estadounidenses y centroamericanos. En total fueron 15 los rescatados de los cuales 12 son mexicanos, 2 hondureños y un americano. | https://www.milenio.com/estados/tamaulipas-ejercito-rescata-15-migrantes-laredo |
| 2/10/2022 | sexual violence | 2 | La Comisión de Derechos Humanos del Estado de Tamaulipas (Codhet) pidió apoyo a las autoridades del DIF estatal para que se investigue los casos de presunta violencia sexual contra las niñas que están en el campamento de migrantes en Reynosa. | https://www.milenio.com/politica/comunidad/investigan-presunta-violencia-sexual-ninas-migrantes-reynosa |
| 2/12/2022 | kidnapping | 5 | La Fiscalía de Distrito Zona Norte, ejerció acción penal en contra de María Lucero C. H. y Manuel C. C., por su presunta responsabilidad penal en el delito de secuestro cometido en perjuicio de cinco personas de origen guatemalteco y hondureño cometido en Ciudad Juárez. | https://www.elheraldodejuarez.com.mx/policiaca/vinculan-a-pareja-por-secuestro-de-cinco-migrantes-en-juarez-7855937.html |
| 2/14/2022 | kidnapping | 18 | Juárez- Dos sujetos fueron detenidos durante el rescate de 18 migrantes a los que tenían privados de la libertad... además de portar armas y cartuchos.. Siendo en ese momento que del interior del domicilio se escucharon gritos de auxilio por lo que al realizar una inspección localizaron a 18 migrantes, siendo 15 hombres y tres mujeres provenientes de El Salvador, Guatemala y del Estado de Chiapas, a quienes tenía retenidos en contra de su voluntad. | https://www.elheraldodejuarez.com.mx/policiaca/rescatan-a-18-migrantes-y-detienen-a-dos-sujetos-con-armas-y-cartuchos-7861674.html |
| 2/16/2022 | kidnapping | 3 | El ejército en coordinación con migración rescataron a varias personas migrantes de diferentes nacionalidades que estaban privadas de su libertad por estás personas pedían la cantidad de 5 y 10 mil dólares por cada una,estos hechos fueron reportados por vecinos ya que mediante una llamada anónima hicieron saber de autoridades que habían personas secuestradas en una casa en Tamaulipas. | https://www.facebook.com/permalink.php?story_fbid=1256346533217968&id=107636665121595 |
| 2/17/2022 | extortion, threats | 1 | One person reported that her bus was stopped at a checkpoint outside of Altar, Sonora, ... and a Mexican police officer threatened to take her kids unless she paid him. | Communication from Kino Border Initiative |
| 2/17/2022 | attempted kidnapping | 2 | El domingo pasado un hombre que se identificó como esposo y padre de una familia intentó raptar a dos menores de edad de un albergue de Tijuana. | https://www.elimparcial.com/tijuana/Tijuana/Temen-migrantes-denunciar-crimenes-20220216-0028.html |
| 2/28/2022 | kidnapping | 33 | Treinta y tres personas migrantes originarios de Guatemala, Nicaragua, Cuba y Panamá, fueron localizados y rescatados por agentes de la Fiscalía General del Estado, ya que se encontraban en condiciones inhumanas en una vivienda de la colonia Zaragoza, Chihuahua. | https://www.elsoldemexico.com.mx/republica/sociedad/rescatan-a-33-migrantes-que-estaban-encerrados-en-vivienda-7926650.html |
| 2/28/2022 | kidnapping | 2 | Esta banda criminal se caracterizó por ofrecerles a migrantes en Tijuana cruzarlos ilegalmente a EEUU, para luego secuestrarlos y exigirles a sus familiares que pagara los rescates en tiendas de California. Del 29 de marzo al 1 de junio de 2021, estos criminales utilizaron secciones específicas en Walmart y otras tiendas para reunirse con los familiares para cobrar los rescates. Los pagos oscilaron entre 12,000 y 30,000 dólares en efectivo. | https://www.univision.com/noticias/criminalidad/secuestro-migrantes-tijuana-frontera-rescates-mexico |
| 3/1/2022 | assault, robbery | 2 | A Mexican train worker was arrested in Piedras Negras for robbing migrants at gunpoint | https://www.facebook.com/permalink.php?story_fbid=1162879317802204&id=177665453990267 |
| 3/1/2022 | kidnapping | 150 | Más de 150 migrantes, víctimas de secuestro, abandonados por los "coyotes" o en espera de cruzar a Estados Unidos, han sido detectados en Ciudad Juárez durante 2022 por los elementos de la Secretaría de Seguridad Pública Municipal (SSPM) y la Fiscalía General del Estado (FGE). | https://diario.mx/juarez/liberaron-a-156-migrantes-en-dos-meses-20220228-1903248.html |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 3/5/2022 | kidnapping | 13 | Un grupo de 13 migrantes originarios de Guatemala, El Salvador, Nicaragua, Chiapas y Chihuahua fueron asegurados por elementos de la Secretaría de Seguridad Pública Municipal, luego de que fueron encontrados en condiciones insalubres en una vivienda en la colonia Infonavit Jurado. | https://www.elsoldeparral.com.mx/local/juarez/encuentran-a-13-migrantes-en-condiciones-insalubres-en-ciudad-juarez-7951919.html |
| 3/7/2022 | kidnapping | 2 | Un migrante hondureño fue rescatado de las garras de un grupo de secuestradores en Piedras Negras, Coahuila, México, durante un operativo policial. Al llegar al lugar lograron rescatar a varios migrantes | https://www.elheraldo.hn/hondurenoseneImundo/rescatan-hondureno-secuestrado-traficantes-personas-coyote-mexico-piedras-negras-AF6272727 |
| 3/7/2022 | kidnapping | 3 | Una mujer extranjera embarazada, quien llegó a la Central Camionera, en donde se le acercó una persona que le ofreció una vivienda y cruzaría a Estados Unidos. "La llevaron a una colonia en donde la tuvieron un mes secuestrada, le hablaron a su familia y les pidieron 10 mil dólares"... "Hace días dos menores centroamericanos, de aproximadamente 14 años de edad, llegaron a la Casa del Migrante, temblando, sin zapatos, sin camisa. Se les atendió y nos dicen: nosotros habíamos estado secuestrados, se les pagó desde equis lugar para traernos aquí, pero aquí nos tenían secuestrados desde hace un mes, nos pudimos escapar y nosotros queremos comida y poder comunicarnos con nuestra familia" | https://diario.mx/juarez/enganchan-a-migrantes-desde-redes-sociales-20220307-1905766.html |
| 3/9/2022 | kidnapping | 6 | A Nicaraguan family of 6 with 2 young daughters was kidnapped in Reynosa, Mexico en route to the United States, where they'd planned to turn themselves in to U.S. immigration authorities. | http://radioabcstereo.com/nota/21030_familia-jinotegana-es-secuestrada-en-mexico-los-delincuentes-piden-30-mil-dolares-para-liberarlos |
| 3/9/2022 | robbery, assault | 4 | A Honduran mother, her sister, and her two children were robbed and beaten in Piedras Negras while awaiting the opportunity to request U.S. asylum. | HRF communication with asylum seeker |
| 3/10/2022 | assault | 1 | A 62-year-old Colombian woman was shot near the Río Colorado at the border between Baja California and Sonora. | https://www.elsoldecuernavaca.com.mx/republica/sociedad/guardia-nacional-presuntamente-disparan-contra-mujer-migrante-en-san-luis-rio-colorado-7973571.html |
| 3/13/2022 | kidnapping, assault | 2 | Kidnappers abducted and tortured a pregnant Nicaraguan woman, Claudia Castro Andino, and her husband the day they were set to attempt to enter the United States in late February 2022. The woman was so severely beaten that she lost her baby. The couple remain in captivity. Castro Andino's husband sent an audio recording begging the family to meet the kidnappers demand for a $15,000 ransom: "If we don't pay, they're going to kill us." Castro Andino pled, "mommy, don't let me die." | https://www.despacho505.com/joven-de-diriamba-secuestrada-en-mexico/ |
| 3/14/2022 | rape, kidnapping, human trafficking, armed robbery, beatings | 534 | Asylum seekers from Colombia, Cuba, El Salvador, Ghana, Guatemala, Haiti, Honduras, Nicaragua, Venezuela, and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in Mexico in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between January 7 and March 13, 2022. |
| 3/16/2022 | kidnapping, rape | 2 | Junior Almendárez, un inmigrante hondureño de 23 años, fue engañado por malas amistades en Los Ángeles y sin saberlo terminó involucrado con una banda de secuestradores de Tijuana que tuvo en cautiverio a varias personas que esperaban cruzar sin autorización a California...Las víctimas de estos secuestros quedarán traumatizadas toda su vida... al menos dos mujeres víctimas fueron brutalmente violadas mientras estaban cautivas", describe un memorando de sentencia. "La conspiración de secuestro fue brutal y violenta, y se aprovechó de una población vulnerable". | https://www.univision.com/noticias/criminalidad/secuestro-migrantes-tijuana-frontera-rescates-mexico |
| 3/17/2022 | kidnapping, sexual assault | 1 | A humanitarian aid worker told Isacson that DHS had expelled to Nuevo Laredo a migrant woman even though she had previously been kidnapped and repeatedly sexually abused in captivity. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 3/17/2022 | robbery, assault | (counted in Al Otro Lado survey data above) | An LGBTQ asylum seeker stranded due to Title 42 in Ciudad Acuña reported through the Al Otro Lado survey in late February 2022 that police had stopped her and a female friend who were holding hands on the street, robbed, and groped them, threatening to rape them saying it would "take the lesbian out of them." | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | kidnapping, rape | (counted in Al Otro Lado survey data above) | A Honduran man blocked from seeking asylum because of Title 42 reported to the Al Otro Lado survey in January 2022 that Mexican migration officials in Reynosa sold him and his wife to a cartel for $500 each and that cartel members raped his wife. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | assault, robbery, threats | (counted in Al Otro Lado survey data above) | In late January 2022, a Haitian woman in Matamoros reported to Al Otro Lado that Mexican police threatened to kill her and her five-year-old daughter, beat her husband, and stole the family's money. The police left the wounded man on the street and dumped the woman and her daughter in another city at night. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | assault, robbery, rape | (counted in Al Otro Lado survey data above) | A Black transgender asylum seeker reported through the Al Otro Lado survey in late January 2022 that Mexican police officers beat, robbed, and raped him, and jailed him for three days without food. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | attempted kidnapping, abuse | (counted in Al Otro Lado survey data above) | Asylum seekers from the Afro-Honduran Garifuna ethnic group reported to the Al Otro Lado survey multiple incidents of kidnappings and racist attacks by Mexican police while stranded in Mexico due to Title 42 including, a Garifuna Honduran man who recounted that he was nearly kidnapped in Piedras Negras and that police had attacked and racially abused him. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | kidnapping | (counted in Al Otro Lado survey data above) | A Salvadoran asylum seeker reported to Al Otro Lado in January 2022 that when she attempted to cross the border near Piedras Negras with a group of other asylum seekers, men kidnapped the woman and her four-year-old daughter separating them from the woman's nine-year-old son who managed to reach safety in the United States. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | assault, extortion | 2 | A young Haitian man who arrived in Nogales with his girlfriend last week reported that on the bus ride northbound through Mexico, an organized crime group stopped them and ordered all Haitians to get off the bus. They then held them captive and ordered each one to pay $3,000 to be released and continue north. When he refused to pay, members of the organized crime group beat him. | Communication from Kino Border Initiative |
| 3/21/2022 | kidnapping | 1 | "Mexican immigration [in Nuevo Laredo] turned us over to some men who supposedly were going to help us but who instead kidnapped us. They took us to a hotel of theirs, supposedly of the cartel. They called my family for a deposit of $5,000... During this time I was held in a small house... It was horrible. In two rooms we were about 50 people with one bathroom. The rooms were about three or four meters squared. They required us to lay down like we were sleeping the whole time, not walking or stretching, because they were afraid we would run. They gave us to eat only sometimes, around one time a day a burrito. There were days when they didn't give us anything. There were three to four armed guards at all times." | Communication from Migrant Center for Human Rights https://twitter.com/AriMSawyer/status/150599 381411201843?t=qQNZw3i1an1lDL6-PFLz_wk&s=09 |
| 3/21/2022 | kidnapping | 1 | Statement of an asylum seeker who was pregnant and sick when Border Patrol expelled her to Tamaulipas where the Mexican police turned her over to the cartel. The cartel kidnapped her for 20 days during which she and her unborn baby nearly died. | |
| 3/26/2022 | kidnapping | 2 | Recupero aquí la historia narrada por una mujer con su hijo menor de edad, venidos de Guatemala, quienes llegaron a México en una de las varias caravanas de migrantes centroamericanos durante el año 2021. La solicitud de asilo de la mujer fue rechazada por el gobierno de Estados Unidos, por lo que ella decide aventurarse a cruzar de manera no documentada; posteriormente ella y su hijo fueron devueltos a México a través de la frontera tamaulipeca donde: "En Nuevo Laredo, de ahí en el puente dos fuimos secuestrados tres meses yo y mi hijo...Mi hermana pagó y [los malos] nos encerraron en una bodega, no comíamos casi nada, días que sí comíamos, días que no nos gritaba de cosas, nos trataba muy mal y a mi hijo igual" | https://www.milenio.com/opinion/varios-autores/corredor-fronterizo/la-violencia-que-no-vemos-contra-los-migrantes |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 3/28/2022 | attempted kidnapping | 2 | Ramiros and her family were among the people taken on a bus to a shelter from the camp. But after the bus arrived, she was told that the shelter was already full, she said. Someone gave her enough money to get to a park near downtown Tijuana, where she lived for a week until someone tried to kidnap her 2-year-old daughter…Pancho, a 21-year-old from Honduras…has been expelled from the United States 11 times after trying to cross to seek asylum along the Texas border, he said. The last time he tried, he ended up kidnapped for weeks before he was let go and made his way to Tijuana. | https://www.sandiegouniontribune.com/news/immigration/story/2022-03-27/asylum-seekers-tijuana-tent-camp |
| 3/29/2022 | kidnapping | 7 | Solamente en 2021, al menos unos 30 jóvenes de Lucerna emprendieron viaje rumbo a Estados Unidos, según los lugareños, y siete de esos migrantes fueron secuestrados en el norte de México. | https://www.agenciaocote.com/blog/2022/03/29/el-temor-al-secuestro-no-detiene-el-exodo-de-un-pais-atormentado/ |
| 3/29/2022 | kidnapping | | Tres migrantes originarios de Nicaragua, presuntamente fueron secuestrados cuando intentaban cruzar de manera irregular hacia los Estados Unidos (EE. UU.), por la frontera norte de México en el estado de Coahuila, por el Río Bravo. | https://trincheradelanoticia.com/2022/03/29/reportan-secuestro-de-tres-migrantes-nicaraguenses-en-la-frontera-norte-mexico-ee-uu/ |
| 3/31/2022 | rape | 1 | Border Patrol expelled a young Guatemalan woman to Nogales, Mexico last week despite the fact that she had been repeatedly raped by the guides that brought her across the border into the US. Her attackers threatened her life if she went to the authorities. One Border Patrol agent insinuated that the woman was lying about the attack, and tried to convince her not to undergo a forensic examination that would verify the abuse. When she showed paperwork from the hospital examination to a Border Patrol agent as proof of the attack, asking that he not send her back to Mexico, the Border Patrol agent confiscated the paperwork and did not return it to her. | Communication from Kino Border Initiative |
| 4/3/2022 | rape | 1 | Alrededor de las 12:00 horas del martes una mujer hondureña ingresó a hospital asegurando haber sido víctima de 6 hombres, a quienes identificó como migrantes que esperaban para cruzar el Río Bravo y alcanzar el sueño americano. De acuerdo a lo mencionado por la mujer afectada, quien asegura tener siete meses de embarazo, se encontraba con un grupo de migrantes esperando por cruzar cuando seis de ellos decidieron atacarla; tras escapar se dirigió de inmediato al nosocomio para su valoración médica y de su bebé. | https://noticiasnrt.com/2022/04/03/seis-hombres-la-atacaron-denuncia-migrante-hondurena-abuso-sexual-en-piedras-negras/ |
| 4/7/2022 | assault, robbery, attempted kidnapping | 20 | Once Haitians arrive in Tijuana, they continue to experience violence, harassment, and racism. 16.3% (20 total) of interviewees shared experiences of violence in Mexico, including robbery at knife point, assault, and attempted kidnapping. At least two individuals witnessed other asylum seekers murdered in front of them…Peterson was beaten in Brazil and in Mexico. In Brazil, his ear was bitten off after someone attacked him. In Tijuana, he called the police one day when he thought he was in danger, but when the police arrived, they beat him and knocked out his bottom teeth. | https://cgrs.uchastings.edu/sites/default/files/Tijuana%20Factsheet_2022.04.07%20FINAL%20v2_0.pdf |
| 4/18/2022 | armed threats | 1 | Reynosa, México – Los migrantes están ansiosos por que termine el Título 42…Un niño de 8 años le dijo a su madre que se quería morir, semanas después de que lo salvó de un pandillero armado. | https://www.dallasnews.com/espanol/al-dia/dallas-fort-worth/2022/04/18/aumentan-campamentos-de-migrantes-en-reynosa-a-semanas-de-fin-de-titulo-42/ |
| 4/19/2022 | rape, kidnapping, human trafficking, armed robbery, beatings | 265 | Asylum seekers from Colombia, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, and Venezuela who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between March 14, 2022 and April 18, 2022. |
| 4/20/2022 | rape | 2 | "Yesterday I spoke to a trans man from Honduras who has been waiting in MX for Biden to restore asylum in the US. While POTUS kept the border closed to asylum seekers, he and his girlfriend were raped by men who targeted them for their queerness and gender expression. Before raping them, the men taunted the couple by asking "who is the man and who is the woman." They asked my new acquaintance, "What are you?" Then they said they were going to teach them how to be women." | https://twitter.com/AriMSawyer/status/1516784901860720642 |
| 4/20/2022 | attempted kidnapping, extortion | 2 | A Central American woman and her 5-year-old daughter escaped an attempted kidnapping by a taxi driver in Piedras Negras while awaiting the opportunity to seek U.S. asylum. Coahuila police also beat and extorted her, threatening her with deportation. | Human Rights First communication with asylum seeker |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/25/2022 | assault, extortion | 1 | A gay asylum seeker fleeing Honduras told Human Rights Watch he was extorted by Mexican immigration officials several times. The Mexican police also once beat him while using anti-gay slurs. When he tried to seek asylum in March of 2021, he affirmatively told border agents that he is gay and was afraid to be returned to Mexico and his country of origin. They nonetheless expelled him in a matter of hours to Palomas, Chihuahua, a small town about two hours from Ciudad Juarez. | Human Rights First communication with Ari Sawyer, Human Rights Watch researcher |
| 4/25/2022 | kidnapping | 1 | A Honduran asylum seeker was kidnapped in mid-March 2022 in Piedras Negras by men in a vehicle that approached him on the street. He was held with other kidnapping victims and later released. | Human Rights First communication with Joy Olson of WOLA. |
| 4/25/2022 | kidnapping, rape | (counted in Al Otro Lado survey data above) | A lesbian asylum seeker from El Salvador, who is stranded in Tijuana due to Title 42, was kidnapped and repeatedly raped after DHS expelled her to Mexico. She reported the attack to Al Otro Lado in late March 2022. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | armed robbery | 1 | Because Title 42 is blocking access to asylum at ports of entry, a Haitian asylum seeker is stranded in danger with his wife and two-year-old child in Tijuana, where he was robbed at gunpoint in February 2022. He told Human Rights First that he is afraid to ask for asylum while Title 42 is still in place because afraid to be returned to Haiti, where he was shot at by an organized criminal group that been hired to kill him. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping, threats | (counted in Al Otro Lado survey data above) | A Nicaraguan asylum seeker was raped in Reynosa by men who had kidnapped her and her four-year-old daughter and threatened to harm the girl. The woman reported to Al Otro Lado in April 2022 that she is not safe in Ciudad Juárez where police have repeatedly robbed and extorted her when she leaves the shelter where the family stays to purchase food. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping, sexual abuse | (counted in Al Otro Lado survey data above) | An asylum-seeking woman from Guatemala and her six-year-old son were kidnapped by police in Ciudad Juárez who held them at gunpoint and sexually abused the woman. The family reported to Al Otro Lado in March 2022 that they remain stranded there unable to seek asylum due to Title 42, according to Al Otro Lado. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping | 4 | A Honduran family expelled to Mexico under Title 42, where they had been kidnapped at knifepoint, remains in danger in Tijuana unable to request asylum. After DHS returned the family to Mexico under Title 42 in January 2022, the woman saw armed men watching her daughters. Fearing they planned to kidnap the girls, the family fled the area and now remains in hiding in a Tijuana shelter, terrified of going outside. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping | (counted in Al Otro Lado survey data above) | A Salvadoran woman and three-year-old son, who are unable to seek asylum due to Title 42, were twice abducted in Mexico, denied food, and both were beaten by the kidnappers. The family reported through the Al Otro Lado survey that they remain stranded in Ciudad Juárez. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | assault | 1 | A Haitian man who had fled death threats in Haiti remains in danger in Tijuana, where he was attacked with a bat in February 2022 outside the Tijuana shelter where he is staying with his teenage daughter. The man told Human Rights First that people in the streets in Tijuana have made racist remarks to him and his daughter, including calling them "monkeys" and telling them to go back to their country. The family was previously expelled to Haiti under Title 42 in December 2021 and fears seeking U.S. asylum while Title 42 remains in place. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | robbery, extortion, threats | 2 | In March 2022 a Salvadoran mother and daughter, who had been expelled to Tijuana by DHS under Title 42 the prior month, were robbed, extorted, and threatened by Mexican officers in black uniforms. The woman told Human Rights First that the officers threatened to turn the family over to a cartel, if they refused to pay the extortion demand. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 5/10/2022 | kidnapping | 5 | An asylum-seeking family of five from Colombia was kidnapped and held for ransom in Reynosa by men who had promised to bring them to the United States. | https://www.debate.com.mx/migracion/El-Hueco-el-sitio-que-usan-los-migrantes-para-cruzar-de-Mexico-a-Estados-Unidos-20220510-0222.html |
| 5/11/2022 | kidnapping | 3 | 3 young Guatemalan women intending to enter the U.S. disappeared in Ciudad Juárez after leaving the shelter where they were staying. | https://lasilarota.com/estados/buscan-a-3-migrantes-adolescentes-salieron-de-un-albergue-en-cd-juarez-y-no-regresaron/648134 |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 5/20/2022 | shooting | 1 | In late May 2022, Ana, a 25-year-old Mexican asylum seeker, was hit in the neck by a stray bullet while shielding her children during a shootout near the shelter where she had been stranded due to Title 42. They reportedly had fled Michoacán to seek asylum in the United States after family members were kidnapped and killed. | https://www.elimparcial.com/tijuana/policiaca/Migrante-resulta-lesionada-por-bala-perdida-en-Tijuana-20220520-0013.html |
| 5/25/2022 | kidnapping | 2 | A Cuban man and his mother were kidnapped, tortured, and extorted by an organized criminal group in Ciudad Juárez. When they attempted to seek U.S. asylum, they were returned to Mexico under Title 42. | https://www.cnn.com/videos/spanish/2022/05/25/migrantes-secuestro-seguridad-violencia-perspectivas-mexico-titulo-42-caravana-crisis-migratoria-rey-rodriguez-pkg.cnn |
| 5/25/2022 | assault | 1 | A Honduran asylum seeker reported that the witnessed police in Piedras Negras punch another asylum seeker in the face until his nose was bleeding. | Human Rights First interview with asylum seeker |
| 5/25/2022 | kidnapping | 1 | "A Salvadoran man fleeing a gang that threatened to kill him because he had reported them to the police in El Salvador is stranded in Piedras Negras due to Title 42 where he was nearly kidnapped one night by men in a black truck who tried to grab him as he approached a shelter." | https://twitter.com/Kennijikuka/status/15296 11514885308419 |
| 5/25/2022 | assault | 1 | "Nearly every asylum seeker I spoke w/in Piedras Negras reported threats, beatings & extortion by local police. An older woman said she was thrown in a police car & hit in the back w/ a police stick." | https://twitter.com/Kennijikuka/status/15296 11517943025664 |
| 5/26/2022 | armed robbery | 2 | A Colombian asylum-seeking woman and her two daughters were robbed of their money and luggage at gunpoint in Ciudad Acuña in May 2022. | Human Rights First interview with asylum seeker |
| 5/28/2022 | kidnapping, threats | 2 | A Cuban woman and her son were expelled to Mexico under Title 42 after an organized criminal group had kidnapped them in Ciudad Juárez in April 2022, held them captive, and tortured them for 26 days until their family members paid a $30,000 ransom. "They pointed a gun at my neck and they kneeled him in front of me, and if I didn't say what they told me to say, they would kill my son in front of me," the mother told CNN. | https://cnnespanol.cnn.com/video/migrantes-secuestro-seguridad-violencia-perspectivas-mexico-titulo-42-caravana-crisis-migratoria-rey-rodriguez-pkg/ |
| 5/30/2022 | kidnapping, rape | 17 | Irene, a Salvadoran asylum seeker, was kidnapped and raped with her 9-year-old daughter in Ciudad Juárez in spring 2022 along with 15 other Central American migrants. When Mexican municipal police arrived at the house where the family was being held captive for more than a month, Irene thought she was being rescued. Instead, police transported the family to another house, where the same organized criminal group continued to hold them captive. After a month in captivity, Irene and her daughter managed to escape the kidnappers and cross the border to seek U.S. asylum. DHS expelled them back to Ciudad Juárez under Title 42, where they were kidnapped for a second time. | |
| 5/31/2022 | assault, kidnapping | 1 | One woman interviewed fled to the United States from Honduras, where she previously faced targeted violence for living openly as a lesbian woman, including one incident when someone cut her face, leaving a large scar. Near the US border, people she believed to be members of a Mexican cartel kidnapped her and forcibly took nude photos of her. She said that when she explained to US border officials that she was a lesbian seeking asylum from Honduras and that she had also experienced abuse in Mexico, agents laughed at her. She said one agent told her, "I don't care what's happening to you." She was expelled to Honduras, and immediately fled again to the US border, this time afraid to seek asylum for fear of being returned to Honduras again. | https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border |
| 5/31/2022 | assault, kidnapping | 1 | Mariana L., a lesbian woman who fled Honduras in 2021, said she was kidnapped for ransom in January 2021 and held for over a week near the US-Mexico border by people she believed to be cartel members. They took her to a house in Reynosa, Tamaulipas, where she saw several other kidnapped migrants. She said they stole her passport and forcibly photographed her naked until her sister returned to pay a ransom of US$3,000. Her kidnappers would hit her to make her cry when they called her sister for the ransom money. | https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border |
| 5/31/2022 | assault, kidnapping | 1 | Kayla K., the transgender woman who fled Guatemala, said that in July 2021 Mexican state police in Piedras Negras robbed her and beat her with batons so badly that she was ultimately hospitalized and vomited blood...after she reported the crime, Mexican immigration agents returned her to Guatemala, where she had experienced brutal violence. She immediately fled again. While she was making her way back to the US border in March 2022, criminals threatened her with a machete and robbed her. | https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border |
| 6/3/2022 | murder | 1 | Jocelyn Anselme, a 34-year-old Haitian asylum seeker, was murdered during an attempted assault and robbery in Tijuana in 1 May 2022 while blocked from seeking asylum due to Title 42. | https://www.latimes.com/world-nation/story/2022-06-12/haitian-migrants-tijuana |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/8/2022 | assault | 1 | Mario Alvarez González, un periodista que huyó de Guatemala tras amenazas, personifica las crisis de migración y de libertad de prensa en México, donde ha afrontado un secuestro y agresiones mientras espera en Ciudad Juárez que Estados Unidos le dé asilo. | https://lasillarota.com/nacion/periodista-trabajo-para-reuters-cm-ahora-vivio-abusso-en-mexico-como-migrante/657510 |
| 6/10/2022 | kidnapping | 14 | 14 migrantes indocumentados que estaban retenidos contra su voluntad por criminales fueron rescatados en un escondite, como resultado de una operación conjunta de diferentes corporaciones de seguridad en El Paso. | https://www.elheraldodejuarez.com.mx/local/el-paso/rescatan-a-14-migrantes-secuestrados-en-el-paso-8416230.html |
| 6/10/2022 | kidnapping | 3 | In early June 2022, a Nicaraguan couple and their nine-year-old son were kidnapped in Reynosa, according to family members in Nicaragua who are reportedly currently fundraising the $25,500 ransom demanded by the cartel that abducted them. | https://www.laprensani.com/2022/06/10/nacionales/3005629-cartel-mexicano-secuestra-a-familia-nicaraguaense-y-parientes-salen-a-las-calles-con-alcancias-para-pagar-su-rescate |
| 6/12/2022 | kidnapping, rape | 2 | "I went to Reynosa, in Mexico across the border from McAllen, Texas. One mother and daughter I met from Honduras: The daughter is 15. She was leaving class one day when she was kidnapped and raped by a local gang. Once girls hit their teens, they're not really safe; they're seen as fair game for these attacks. This mother and daughter, once they got to Mexico, were kidnapped again, probably by cartel members, and sexually assaulted for days before they escaped. It's devastating." | https://www.nytimes.com/2022/06/12/briefing/us-mexico-border-immigration.html |
| 6/15/2022 | assault | 2 | Coahuila state police detained and beat two Honduran asylum seeking women, one of whom was pregnant, while they were washing clothes at a river in Ciudad Acuña. Police turned the women over to Mexican immigration authorities, who deported them to Honduras, according to another Honduran woman who had been with them at the river and managed to escape. | Human Rights First interview with asylum seeker |
| 6/16/2022 | kidnapping | 1 | In May 2022, a Honduran asylum seeker witnessed a friend kidnapped from a store in Piedras Negras where the pair had gone after DHS expelled them to Mexico at 2 a.m. Men with their faces covered with ski masks who searched the women's phones for contacts in the United States abducted the other woman. The Honduran asylum seeker told Human Rights First that more than two weeks later the Honduran asylum seeker had not heard from her friend. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | kidnapping | 2 | In May 2022, DHS expelled a Guatemalan woman fleeing death threats by her abusive ex-husband and her five-year-old daughter to Nuevo Laredo, where a taxi driver immediately kidnapped them. She reported to Human Rights First that the driver delivered the family to the same organized criminal group that had previously kidnapped them and held them captive for nearly a month until the woman's relatives sold their car to pay the $9,000 ransom demanded by the kidnappers. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | sexual assault | 1 | In late May 2022, a Honduran woman was sexually assaulted in a Nuevo Laredo shelter after she and her children were turned away under Title 42 at the Laredo port of entry where they had attempted to seek asylum. She told Human Rights First she has been unable to sleep in the week since the attack, terrified the assailant would return. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | sexual assault | 1 | In May 2022, a Coahuila state police officer sexually assaulted a 12-year-old Honduran girl in Ciudad Acuña near the public plaza where her family sleeps because they are blocked from seeking asylum due to Title 42. The girl's mother told Human Rights First that a police officer on a motorcycle stopped the girl and groped her as she was returning from a nearby store. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | kidnapping | 1 | Coahuila state police kidnapped a Honduran asylum seeker in Piedras Negras in March 2022 and turned him over to an organized criminal group that held him captive for 15 days. His family were forced to pay the $15,000 ransom. The man told Human Rights First that police had also stolen his money and cell phone in a separate incident after the kidnapping. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | kidnapping | 3 | Coahuila state police kidnapped a Honduran asylum-seeking woman, her husband, and their young daughter in Piedras Negras in May 2022 while they were blocked from seeking U.S. asylum due to Title 42. The woman reported to Human Rights First that police held her family captive for three days with 15 other migrants and demanded an $800 ransom. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/14/022 | kidnapping | 80 | 2 buses carrying 80 migrants, including women and children, were kidnapped by a criminal group near the northern border of Coahuila, Mexico. | https://www.debate.com.mx/migracion/Queremos-que-nos-atienda-el-Gobernador-Reportan-secuestro-de-migrantes-en-Coahuila--20220614-0177.html |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/20/2022 | kidnapping | 2 | El Instituto Nacional de Migración (INM) desmintió esta mañana que dos personas de nacionalidad salvadoreña hayan sido secuestradas de la estancia provisional de Ciudad Juárez, Chihuahua. | https://www.lacapital.com.mx/noticia/90980-Desmiente INM secuestro de dos migrantes https://www.elsiglodetorreon.com.mx/noticia/2022/migrante-senala-presunta-desaparicion-por-la-policia-de-6-de-sus-familiares-en-nava.html |
| 6/21/2022 | beating | 1 | Kenia Herrera Castillo, una mujer migrante originaria de nicaragüense y que fue internada en el Hospital General de Allende, resultó lesionada al arrojarse junto a otros familiares de una patrulla en movimiento cuando era trasladada con otros extranjeros hacia el sur del estado de Coahuila por presuntos elementos de seguridad del municipio de Nava. | |
| 7/7/2022 | assault | 1 | "Rodrigo* left his native Colombia over a year ago. After he participated in marches in opposition to President Márquez's policies, the Colombian police detained and tortured him. Although he escaped, several of his friends who had also participated in the marches disappeared. Since the border was closed to travel, Rodrigo walked for five days through the Damien, the most dangerous jungle in the world, on foot. When he arrived in Mexico, he was detained by immigration officials and attempted to seek humanitarian protection, but was denied. As he traveled north through Mexico, he faced extortion at the hands of Mexican police at numerous checkpoints and at one point was assaulted by a group of armed men who stole everything he had. He arrived in Nogales, hoping to cross to safety and live with family members in the US." | Communication from Kino Border Initiative |
| 7/7/2022 | kidnapping | 2 | "Belén,* a young Guatemalan mother, arrived with her four-year-old son after the two of them had been kidnapped for days in Nogales. Belén had crossed into the US to seek protection after she fled threats from her son's father. When she and her son were deported to Nogales, Mexico, a man approached them offering help. Since she did not know the area or have any support, she went with him. He kidnapped the two of them and held them for four days until her partner paid extortion fees. She then fled with her son to a church where they recommended they come to Kino." | Communication from Kino Border Initiative |
| 7/11/2022 | rape | 1 | The situation of the migrant population on the northern edge of Mexico is distressing. As the immediate removals under Title 42 continue, hundreds of people continue to arrive from the south in search of entering the United States or to begin their asylum application processes from there. Testimony of Yaneth, a migrant from Honduras: "When they threw me to Reynosa, they raped me. They didn't care that I was pregnant, that affected me a lot, it affected my pregnancy. I looked for my husband in Monterrey, I felt very bad about my pregnancy, my delivery was early and my baby was born prematurely, with many health problems. | https://www.msf.org.ar/actualidad/mexico-mientras-continuan-expulsiones-desde-eeuu-se-agrava-situacion-personas-migrantes-frontera-norte |
| 7/21/2022 | kidnapping | 4 | "Under Title 42, Border Patrol also expels families directly into the hands of criminal groups. Mari*, her husband and her 2 sons, ages 7 and 9, fled Guatemala after her husband was beaten and threatened for his refusal to join the gang. Mari and her family tried to enter the US through Nuevo Laredo, Mexico, but were deported. Once in Mexico, the INM (National Migration Institute of Mexico) said they would take them to a shelter, but instead, turned them over directly to the cartel, los Zetas. Mari and her family were kidnapped and held hostage by los Zetas for 3 months, where they faced physical torture. They watched others who tried to escape be killed and were only able to leave after paying an extortion. " | Communication from Kino Border Initiative |
| 9/1/2022 | kidnapping | 3 | Juan* and his family fled from organized crime in Guerrero, Mexico. When they arrived in Nogales to attempt to seek asylum in the US, they were riding in a taxi when the mafia kidnapped the taxi driver, Juan and his entire family. The kidnappers shut Juan and his family in a room in a house, and they still don't know what happened to the taxi driver. The kidnappers said they had to pay 500,000 pesos per person to leave. They spent all day in the room until the person watching the door briefly left his post and they escaped, leaving all of their items behind. They arrived at Kino fearing for their lives. | Communication from Kino Border Initiative https://www.theguardian.com/us-news/2022/sep/08/title-42-covid-policy-migrants-mexico-us |
| 9/8/2022 | sexual assault | 1 | "Doña Murphey, a neurologist based in Houston, remembers a case of a disabled child with epilepsy living in an encampment with his mother after being ejected. When they were moved to a shelter, the boy was sexually assaulted there. ...He "stopped eating, was exhibiting depressive symptoms, was crying all the time and not engaging any more," Murphey said, which in addition made him more at risk of a fatal seizure." | |
| 9/9/2022 | assault | 1 | Its director said that some migrants have received threats due to the context of violence from which they are fleeing. He recalled that a couple of months ago a woman was injured by a bullet that came from outside, and a week ago they demonstrated in front of C2 because two armed men entered the shelter. | https://www.elsoldetijuana.com.mx/local/se-extiende-violencia-contra-alberques-de-migrantes-y-piden-seguridad-8864538.html |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/13/2022 | kidnapping | 4 | "La nicaragüense Kathy Smith Molina, de 26 años, su hermano Ricky Smith, y sus pequeños hijos Kyle y Danisha Smith, de 4 y un año respectivamente, fueron secuestrados por miembros de una banda criminal en México quienes están exigiendo 20 mil dólares a cambio de su liberación." | https://www.radiolavozdelnorte.com/2022/09/cartel-en-mexico-exige-20-mil-dolares.html |
| 9/13/2022 | kidnapping, extortion | 2 | "Dos migrantes fueron rescatados de la banda de secuestradores que privaron de la libertad a un dentista en Mexicali y que fue rescatado hace un par de semanas" | https://kvma.com/https-kvma-com-noticias-3/2022/09/13/operativo-antisecuestro-logro-rescate-de-dos-migrantes-en-mexicali-2/ |
| 9/14/2022 | kidnapping | 5 | "Elementos de la Fiscalía General del Estado en Ciudad Juárez, lograron liberar a cinco personas que se estaban privadas de la libertad en un domicilio…Los agentes lograron ubicar a cuatro personas de nacionalidad guatemalteca, dos mujeres y dos hombres de 39, 27 y 19 años así como a un mexicano de 22 años" | https://www.elheraldodechihuahua.com.mx/local/juarez/liberan-a-cinco-migrantes-secuestrados-en-juarez-8890922.html |
| 9/16/2022 | kidnapping | 2 | When López discovered that they had been kidnapped, she felt helpless. The kidnappers harassed her several times a day on WhatsApp asking her for $10,000 in ransom. "I told them that she was a single mother, that she lived in a house that was not mine, that I have a disability, that I am in a wheelchair. Where was she going to get the money from?" she relates. | https://www.eldiario.es/desalambre/secuestro-s-riesgo-enfrentan-migrantes-hondurenos-camino-eeuu_1_9266660.amp.html |
| 9/15/2022 | kidnapping, rape | 14 | Elementos de la Agencia de Investigación de Chihuahua rescataron a 14 migrantes que se encontraban secuestrados en una vivienda de Ciudad Juárez, entre ellos, al menos una persona oriunda de Ixmiquilpan, que recientemente se reportó como desaparecida junto a otros habitantes del municipio. | https://criteriohidalgo.com/regiones/rescatan-hidalguense-migrante-secuestrado-chihuahua |
| 9/26/2022 | kidnapping | 4 | "Una semana, 16 mil dólares y mucha incertidumbre tuvo que pasar una familia de migrantes venezolanos secuestrada en México para ser liberada y estar a salvo. Claudia Rivero y Carlos Ospina viajaron a Estados Unidos junto a sus hijas, Victoria de 12 años y Carla de 10, con la intención de solicitar asilo en la frontera y luego reencontrarse con familiares en Georgia." | https://eltiempolatino.com/2022/09/26/inmigracion/liberan-a-migrantes-venezolanos-secuestrados-en-mexico-despues-de-pagar-miles-de-dolares/ |
| 9/28/2022 | Kidnapping | 200 | "los llevaron a una bodega de Reynosa donde había casi 200 personas que también esperaban cruzar el río. Pero, de repente, unos hombres armados entraron y se los llevaron a todos violentamente. Para este padre y su niño, empezó un duro secuestro de 44 días." | https://www.telemundo.com/noticias/noticias-telemundo/inmigracion/asi-secuestraron-a-los-migrantes-capturas-mujeres-violadas-y-muerte-rcna2367 |
| 10/2/2022 | kidnapping | 399 | "In relation to migrants who suffer deprivation of their liberty by "polleros" and then request rescue, the Municipal Public Security Secretariat reported that from January to September 2022, 399 people have been rescued, detailing that: There are 171 from Guatemala, 30 from Ecuador, 105 from Venezuela, 68 from Mexico and 25 from Honduras." | https://www.elheraldodechihuahua.com.mx/policiaca/han-abierto-11-carpetas-de-investigacion-por-secuestro-este-ano-en-juarez-8972383.html |
| 10/16/2022 | kidnapping | 13 | "Ciudad Juárez.- A través de un comunicado la Subsecretaría de Despliegue Policial Zona Norte de la Secretaría de Seguridad Pública del Estado (SSPE) informó la localización y aseguramiento de 13 personas migrantes que estaban retenidos contra su voluntad dentro de una vivienda en Ciudad Juárez." | https://netnoticias.mx/juarez/rescatan-a-13-migrantes-secuestrados-en-juarez/ |
| 10/20/2022 | kidnapping, armed robbery, attempted kidnapping | 62 | "'Flavio', un venezolano de 33 años de edad, quien fue liberado durante la madrugada de ayer después de que su familia pagó un rescate a sus secuestradores, narró que antes de llegar a la estación de camiones en donde serían dejados, ya dentro de la ciudad, el camión en el que viajaba fue detenido por un grupo de hombres armados…Eran unas 50 personas las que detuvieron, era el camión completo", relató. Dijo que en el camión de turismo viajaban sólo migrantes, quienes al ser privados de la libertad fueron separados, y él fue trasladado a una casa, junto a un grupo de personas en donde antes de ser liberado vio llegar a grupo de cuatro migrantes secuestrados de Ecuador y Cuba. (54)…"Veníamos de Ciudad de México, en una guagua, en un camión, y cuando llegamos a Ciudad Juárez, después de que pasamos la revisión de Migración, en el segundo semáforo, estaba lloviendo esa noche, y se montaron dos jóvenes armados, pararon el camión en el que veníamos y pararon la guagua y había siete vehículos abajo esperando. Le quitaron el teléfono a todo el que venía, madres con sus hijos, su esposo, venían como tres o cuatro familias con niños pequeños y les quitaron los teléfonos, les quitaron el dinero que tenían y los obligaron a bajar del bus y a montarse en los vehículos que tenían ellos abajo", narró otra mujer migrante."(8) | https://diario.mx/juarez/narran-sudamericanos-secuestros-en-carreteras-20221020-1984034.html |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/20/2022 | kidnapping | 1 | In October 2022, Mexican police turned over Jenny, a Venezuelan woman, and other migrants to a cartel that abducted and forced Jeny into labor . Police had stopped Jeny and other migrants near Ciudad Juárez and turned them over to the cartel, which demanded ransom payment for their freedom. Because Jeny was unable to pay due to several previous extortions, the cartel forced her to cook and clean—an experience she describes as "hell," explaining that she feared she would be killed. | https://www.elheraldodejuarez.com.mx/local/juarez/harta-migrante-venezolana-secuestro-vivido-en-su-camino-a-la-frontera-9060560.html |
| 10/21/2022 | shooting | 1 | "Pese a que el Hospital General 'Dr. Salvador Chavarría Sánchez' de Piedras Negras es una unidad médica de segundo nivel, durante la tarde del miércoles se llevó a cabo una cirugía de emergencia y de suma dificultad; que en teoría solo debería practicarse en hospitales de tercer nivel y con la cual, lograron salvarle la vida al migrante originario de Venezuela herido de bala por un policía municipal." | https://www.elsiglodetorreon.com.mx/noticia/2022/salvan-vida-de-migrante-venezolano-herido-de-bala-en-piedras-negras.html?v=2022102115242 0 |
| 10/27/2022 | kidnapping | 53 | 2 Venezuelan men were kidnapped when they arrived at the border and held captive for three days. One said he was released when the kidnappers discovered he had no money. Another Venezuelan man was kidnapped in Ciudad Juarez along with 50 other migrants. He was held captive for two weeks and released after his family paid an $8,000 ransom payment. The man said that those who were unable to pay are still being held captive. | https://cnnespanol.cnn.com/video/venezolanos-migrantes-ciudad-juarez-estados-unidos-rev-rodriguez-conclusiones-perspectivas-mexico/ |
| 10/30/2022 | assault | 1 | After being turned away from a migrant shelter in Piedras Negras, a Honduran migrant was assaulted and severely injured by three attackers, requiring the migrant to be hospitalized. | https://rancherita.com.mx/noticias/detalles/13 0162/golpean-y-dejan-grave-a-migrante-en-asalto-en-el-centro-de-piedras-negras-html |
| 10/31/2022 | kidnapping | 15 | En un rancho del ejido "El Centinela", al norte del municipio de Piedras Negras, policías investigadores y estatales rescataron a grupo de 15 migrantes, la mayoría centroamericanos de Venezuela y Cuba, y al parecer algunos mexicanos, quienes estaban secuestrados y los polleros exigían por teléfono a sus familiares 10 mil dólares por cada uno para liberarlos. | https://www.eluniversal.com.mx/estados/resca tan-15-migrantes-centroamericanos-secuestrados-en-piedras-coahuila |
| 11/1/2022 | kidnapping | 2 | "Piedras Negras, Coah.- La Policía de Investigación Criminal realizaba las indagaciones en torno a la privación ilegal de la libertad en su modalidad de secuestro agravado. Estos sujetos exigían cantidades hasta los 10 mil dólares por la liberación de los centroamericanos que estaban en la casa de seguridad" | https://superchannel12.com/607067/Investigan-secuestro-de-migrantes--ped%C3%ADan-10-mil-d%C3%B3lares-de-rescate-por-cada-uno |
| 11/2/2022 | kidnapping | 4 | A Venezuelan family with two young daughters was kidnapped by two hooded, armed men from a hotel in Ciudad Juarez as they awaited the opportunity to seek U.S. asylum. The kidnappers held the family captive for 12 days until their relatives managed to pay a $30,000 ransom. | https://cnnespanol.cnn.com/video/migrante-venezolana-secuestro-mexico-asilo-hijos-frontera-eeuu-dusa-roa/ |
| 11/3/2022 | rape, attempted sexual assault, kidnapping, attempted kidnapping, armed robbery, beatings | 2,123 | Asylum seekers from Brazil, Colombia, Cuba, El Salvador, Guatemala, Guinea, Haiti, Honduras, Iran, Nicaragua, Syria, and Venezuela who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in Mexico in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between June 14, 2022 and November 3, 2022. |
| 11/6/2022 | kidnapping | 1 | En Tamaulipas, un hombre de origen ruso fue rescatado por la policía estatal en el municipio de Reynosa, tras ser secuestrado por sujetos desconocidos. | https://www.jornada.com.mx/2022/11/06/polit ica/010n2pol |
| 11/7/2022 | kidnapping | 6 | Six migrants who had been kidnapped were rescued in Ciudad Juárez. | https://www.debate.com.mx/policiacas/Rescat a-FGE-a-seis-migrantes-privados-de-la-libertad-en-Ciudad-Juarez-20221107-0002.html |
| 11/9/2022 | kidnapping | 23 | 23 migrantes were rescued after they were kidnapped in Piedras Negras. 15 migrants were from Honduras, 4 from El Salvador, 3 from Guatemala, 1 from Colombia. | https://noticiasnrt.com/2022/11/09/rescatan-a-23-migrantes-en-piedras-negras-estaban-secuestrados/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/10/2022 | kidnapping, extortion, attempted kidnapping | 5 | Service providers assisting migrants at the border reported to the Center for Gender and Refugee studies between July and September 2022 that 1) a mother and daughter whom DHS had expelled under Title 42 were kidnapped in Juárez and held captive or a couple of days and their family members extorted; 2) A mother and daughter whom DHS expelled under Title 42 had been kidnapped in Ciudad Juárez and held captive for 22 days; 3) a migrant woman reported that someone attempted to kidnap her son in Mexico before the family was expelled under Title 42. | Communication from UC Hastings Center for Gender and Refugee Studies |
| 11/20/2022 | kidnapping | 85 | 85 migrants, including at least 4 Venezuelans, were kidnapped and held for ransom while riding a bus near Ciudad Juárez. | https://100noticias.com.ni/migracion/119927-migrantes-nicas-bus-secuestro-mexico/ |
| 11/29/2022 | kidnapping | 2 | Asimismo, se registró un intento de secuestro en un albergue de migrantes ubicado en el bordo del Río Bravo, en el estado de Chihuahua. El hecho violento se presentó en las primeras horas de este martes. "Eran tres vehículos de reciente modelo, en cada uno venían tres hombres que dijeron que nos pondrían en carros diferentes, en uno a mujeres, en otro a niños y en otro a hombres", dijo a EFE un migrante que por cuestiones de seguridad pidió permanecer en el anonimato. Añadió que llenaron su cara con aceite, los empezaron a separar en fila. Sin embargo, los delincuentes se marcharon porque aparentemente se dieron cuenta de que llegarían las autoridades. | https://es-us.noticias.yahoo.com/crimen-organizado-ataca-albergues-campos-014332029.html |
| 12/7/2022 | attempted kidnapping | 1 | A Venezuelan man who fled political persecution and is stranded in Juárez due to Title 42 said he rode the "bestia" train through Mexico, where he could not sleep for days for fear of being targeted by criminals. He watched armed men rob another Ecuadorian man and throw him off the train, causing one of his legs to be run over and severed. 2 Venezuelan men and 1 woman he was with were raped on the train. When he arrived in Juarez, his phone was stolen at gunpoint. He has no money to buy a new one and without a phone, doesn't know how to contact legal services providers who might help him access the Title 42 exemption process. | Human Rights First interview with asylum seeker |
| 12/8/2022 | kidnapping | 23 | Policías de México rescataron a 23 migrantes, en su mayoría venezolanos, que habían sido secuestrados cuando se dirigían a la frontera con Estados Unidos, en una operación en la que fueron detenidos dos hombres, informaron este jueves las autoridades. | https://www.france24.com/es/minuto-a-minuto/20221208-rescatan-en-m%C3%A9xico-a-23-migrantes-secuestrados-en-su-mayor%C3%ADa-venezolanos |
| 12/8/2022 | attempted kidnapping | 1 | A Venezuelan asylum seeker stranded in Ciudad Juárez due to Title 42 said he began to get followed by cartel members who want to recruit him into their group because they learned about his training and familiarity with weapons. The Cartel tried to abduct him during daylight while he worked at a local car wash. He managed to escape but was forced to leave his employment and now fears to leave the shelter. | Human Rights First interview with asylum seeker |
| 12/14/2022 | kidnapping, extortion | 2 | Juarez, Mexico. The family of siblings Heysell Lineth Martínez and Julmer Martínez are desperately looking to raise $16,000 to pay the ransom demanded by a Mexican cartel that has been holding the young men hostage since last Saturday. "Please, dad, help us, get the money. If not, they are going to kill us. Get the money for both of us because if not, he says they are going to kill us or else they will cut off our fingers", pleads young Heysell Martínez, crying, in a video recorded by the kidnappers, where the brothers are seen seated and with a gun pointed at their heads. | http://www.borderlandbeat.com/2022/12/ciudad-juarez-chihuahua-siblings.html |
| 12/15/2022 | robbery, attempted kidnapping | 1 | In November 2022, a Venezuelan police investigator fleeing death threats for investigating cases of disappeared people was assaulted and robbed by armed men who bashed his head with the back of a gun, ordered him off the bus he was riding near Ciudad Juárez, and tried to kidnap him. He managed to escape, but when he arrived in Ciudad Juárez, police stopped him and stole his money. The man told Human Rights First he is terrified to stay in Juárez, where he remains stranded due to Title 42, because the cartel hunting him in Venezuela also operates there. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/15/2022 | sexual assault, robbery | 1 | In November 2022, a gay Venezuelan man was sexually assaulted and robbed in the public plaza where he had been sleeping in Ciudad Juárez. The man told Human Rights First that he had been staying in a makeshift tent encampment near the El Paso port of entry while blocked from seeking U.S. asylum due to Title 42 and moved to the plaza where he was attacked after Mexican authorities had forced him to leave the encampment. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | attempted kidnapping | 1 | A 13-year-old girl was nearly abducted at gunpoint in Juárez after her parents and sibling, who had fled political persecution in Venezuela, were denied the right to seek asylum and expelled to danger in Mexico in November by CBP under the Title 42 Venezuelan expansion. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | rape | (counted in Al Otro Lado survey data above) | In October 2022, a Guatemalan lesbian trans woman was violently raped by Mexican police officers in Piedras Negras soon after CBP officers turned her away from protection at the Eagle Pass port of entry. The woman reported to Al Otro Lado that she had sought protection due to her gender and sexual orientation. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | armed robbery | 1 | A Haitian asylum seeker, whom DHS had previously expelled to Haiti under Title 42, was robbed at gunpoint in Tijuana in summer 2022 while unable to seek U.S. asylum at a port of entry due to the continuation of Title 42. The armed assailants pulled the man's pants down and groped him looking for money, according to his cousin, another asylum seeker who spoke with Human Rights First. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | kidnapping | 2 | In October 2022, cartel members kidnapped a Honduran asylum seeker and her four-year-old daughter as they waited stranded in Tijuana due to Title 42. The kidnappers kept the woman in front of her daughter, beat the daughter, and held the family captive without sufficient food for 22 days. The woman, who remains stranded in Tijuana due to Title 42 as she awaits an opportunity to seek U.S. protection, reported the incident to Al Otro La | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | kidnapping | 3 | In August 2022, a Salvadoran woman and her two children were held captive for hours by members of an armed group who forced them to strip and robbed them of all their belongings, including their clothing, shoes, and water. The family had been attempting to enter the United States near Calexico to seek asylum when the armed group approached them. "They were asking their boss what to do with us…I thought they were going to kill us," the woman told Human Rights First. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | sexual assault | (counted in Al Otro Lado survey data above) | Juárez police sexually assaulted a Honduran mother and her four-year-old daughter after the family was blocked from seeking protection in Ciudad Juárez in August 2022, then turned them over to cartel members who held the family captive for 22 days, raped the mother in front of the daughter, and physically attacked the daughter. The mother reported the incident to Al Otro Lado. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | attempted kidnapping | (counted in Al Otro Lado survey data above) | A Mexican family of five was nearly kidnapped after DHS turned them away from seeking asylum at the San Ysidro port of entry in November of 2022. The mother reported to Al Otro Lado that her husband and son had been kidnapped, beaten and held for ransom in their home state in southern Mexico. After the expulsion, the family continued to receive death threats. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | sexual abuse | (counted in Al Otro Lado survey data above) | An indigenous Triqui woman from Oaxaca who had been beaten by police, threatened, and her family members murdered for her activism defending the indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 in Tijuana. She shared with Al Otro Lado that after the family was turned away, she sexually abused my Mexican police in Tijuana. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | assault, kidnapping, threats | 1 | In 2022 DHS expelled to Mexico a young Honduran man who had been living in the United States for nine years and had a pending immigration court hearing in Houston, Texas scheduled for December 2022, as his attorney reported to Human Rights First. After being expelled to Mexico, the man was beaten by Mexican police officers, kidnapped by a cartel, and threatened at gunpoint. He was only able to reenter the United States with assistance from his attorney. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| **Total victims of attacks:** | | 13,480 | | |

# EXHIBIT 9

**Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Stranded in Mexico Due to the Asylum Ban Since May 12, 2023**

**Last updated: November 2023**

| Date Reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 5/19/2023 | kidnapping, extortion | 49 | 49 migrantes que habían sido secuestrados por un cartel en el estado de Nuevo León fueron hallados por soldados mexicanos. Nueve migrantes fueron hallados el martes cerca de una carretera en el estado de Nuevo León. Otros 40 fueron hallados deambulando por otros caminos o refugiándose en casas entre el miércoles y el jueves. Entre los migrantes había 19 hondureños, 14 haitianos, siete venezolanos, seis salvadoreños, dos brasileños y un cubano. La compañía del autobús reportó inicialmente el secuestro el martes, diciéndole a la prensa local que había recibido una demanda de mil 500 dólares por migrante para dejarlos en libertad. | https://diario.mx/nacional/localizan-a-49-migrantes-secuestrados-20230518-2057030.html |
| 5/25/2023 | extortion | 1 | Reporting on May 25, 2023, the Nogales-based Kino Border Initiative (KBI), stated, "Organized crime and authorities in Mexico and the U.S. strip asylum seekers of their resources on the journey, exacerbating their suffering." They cited the case of Admiel [name changed to protect privacy], who faced extortion many times after fleeing Venezuela. In Guatemala, the police demanded 600 quetzales ($77 USD). In Mexico City, Mexican immigration agents took 3,200 pesos ($179 USD). | https://borderoversight.org/event/ |
| 5/31/2023 | attempted kidnapping | 5 | On May 31, 2023, two Haitian couples, traveling with an 11-month-old infant, survived an attempted kidnapping as they approached the DeConcini Port of Entry in Nogales, Sonora, waiting to seek U.S. asylum. "We were walking toward here. A truck with three men stopped and they got out and started coming toward us. 'RUN!' I shouted to my wife and baby. We managed to escape." | https://humanrightsfirst.org/library/a-line-that-barely-budges-u-s-limiting-access-to-asylum/ |
| 6/9/2023 | sexual assault, robbery, attempted kidnapping | 1 | A Colombian LGBTQI+ woman, who fled persecution in Colombia by the Colombian police on account of her sexual orientation and was displaced by an armed group, was waiting in line at the Nogales port of entry to seek asylum protection. She had been sexually assaulted by a Mexican female police officer while on a bus toward northern Mexico. The officer instructed her to enter the bus bathroom where she stripped her of her clothing and digitally penetrated her vaginally without use of a glove, alleging she was transporting cocaine, and then robbed her of her money. Upon arrival at a bus station in Sonora, she experienced an attempted kidnapping. "I'm afraid to be here. I'm afraid criminal groups will try to kidnap me again." | https://humanrightsfirst.org/library/a-line-that-barely-budges-u-s-limiting-access-to-asylum/ |
| 6/9/2023 | enforced disappearance | 2 | A group of Colombian migrants was kidnapped for a day by Mexican immigration agents in collusion with organized crime. Upon their release, the immigration agents told them to go to Nogales where they will be safe, but they do not feel safe. | https://humanrightsfirst.org/library/a-line-that-barely-budges-u-s-limiting-access-to-asylum/ |

| Date | Type | Description | Source |
|---|---|---|---|
| 6/9/2023 | robbery, threats | 2 In mid-May 2023, two young migrant men, who were waiting to seek asylum outside the Nogales port of entry, left the line to shower. On their way back, they were apprehended by an organized crime group and were searched, questioned, threatened, and robbed of their belongings. They reported the incident to the local police, but the police did not do anything. | https://humanrightsfirst.org/library/a-line-that-barely-budges-u-s-limiting-access-to-asylum/ |
| 6/24/2023 | Kidnapping, beatings, extortion | 19 In Sonoyta, Sonora, in June 2023, a group of Ecuadorean migrants consisting of nine adults and 10 children were rescued by Mexican authorities. They were kidnapped in an abandoned house and filmed while being beaten to demand ransom payment from relatives in the U.S. | https://www.milenio.com/estados/rescatan-19-migrantes-ecuatorianos-victimas-secuestro-sonora |
| 7/6/2023 | rape, threats | 2 Cindy, a 23-year-old from Honduras, hesitated for weeks to approach the U.S. border, even after she was raped repeatedly in the Matamoros camp and in a house nearby by men she believed to be part of a cartel. Cindy, who Reuters is identifying only by her first name due to the nature of the attacks, said the men threatened to "disappear" her 3-year-old son if she reported the assaults to Mexican authorities, according to interviews and a written report from the psychiatrist who evaluated and accounts from her attorney. Desperate after multiple assaults, and unable to secure an appointment on the CBP One app, she and her son walked up to the international bridge on May 21. She said they were allowed to enter and given a notice to appear in immigration court in Houston in August. | https://www.reuters.com/investigates/special-report/usa-immigration-asylum-border/ |
| 7/12/2023 | rape, attempted rape, threats | 1 A Honduran woman fleeing persecution, who was waiting for a CBP One appointment, was violently raped in a makeshift tent in the Matamoros encampment in late May 2023 and threatened with death if she told anyone. The rapist returned in early June 2023 and attempted to rape her again, but she managed to defend herself and escaped. After this, she received death threats by phone. "I am afraid for my life here. Afraid that I will be killed, kidnapped, or that they'll do something to me. In my country, I'm a professional. I had a career. I'm not coming to work. I came because my life was in danger. And something that had never happened to me – a rape – happened to me here." | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | beatings, robbery, enforced dissapearance | 1 A Latin American man seeking asylum was beaten unconscious and subjected to an enforced disappearance when he was kidnapped by men dressed as Mexican officials in Reynosa. He managed to escape after one night, but due to the extreme physical violence, he continues to suffer from severe headaches, gastrointestinal issues, and other symptoms. His kidnappers also robbed him of his phone. | https://humanrightsfirst.org/library/refugee-protection-travesty/ |

| Date | Categories | Narrative | Source |
|---|---|---|---|
| 7/12/2023 | kidnapping, rape, human trafficking | A Latin American woman, who was trying to obtain a CBP One appointment, was kidnapped, held captive, and abused for about a month and a half in Reynosa. She was able to escape her captors, only to be taken and held captive a second time. Her captors trafficked her to drug dealers who raped her on several different occasions.<br>She said: "I was held captive at this house for about two months and I thought the only way I would leave the house was if I were dead." 1 | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | kidnapping, rape, threats, beatings, torture | A Venezuelan woman, waiting for a CBP One appointment with her minor son and her adult sister, was kidnapped and held for 12 days in Reynosa in June 2023. Their abductors threatened to take their organs if their families did not pay a ransom. A cartel member raped the Venezuelan mother.<br>"He threatened to kill my son and sister and threatened me to stay quiet. We were terrified each time the door opened and our abusers entered. We prayed and prayed. We feel completely unsafe here in Mexico. We're terrified to go outside; afraid we'll be taken again."<br>They were placed in a room with 50 people from China, Cuba, Ecuador, Honduras, Mexico, and Russia, including kids as young as two years old, all on top of each other. Their kidnappers threatened and beat people, including the children.<br>"We witnessed them [the cartel] taser men with electricity who screamed in pain right in front of us and severely beat men if the transfer payment hadn't come through. My son cried a lot, begging to leave. They'd also give drugs to the teenage children." 50 | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | kidnapping, threats, assault, torture, extortion | Two Venezuelan young adults, one minor sibling, and their girlfriend who were waiting for a CBP One appointment were intercepted by a car while walking in Reynosa in June. They were kidnapped and held hostage for three days. During that time, they were all physically assaulted and the women were tortured for ransom.<br>The kidnappers threatened "[i]f you don't pay, we'll cut off your fingers." The family's relatives paid the ransom and they were released. Their kidnappers took their photos. Following the kidnapping, they escaped Reynosa and returned to Matamoros. In Matamoros, they were prevented from approaching the U.S. port of entry by Mexican immigration officers. 4 | https://humanrightsfirst.org/library/refugee-protection-travesty/ |

| Date | Categories | Narrative | Source |
|---|---|---|---|
| 7/12/2023 | kidnapping, rape, threats, robbery, extortion | A Venezuelan family with adolescent and preschool-aged children was kidnapped by a cartel in early June in Reynosa while waiting for a CBP One appointment and held for 10 days. During their kidnapping, the mother was twice sexually abused by a cartel member. They witnessed intense beatings of other migrant men.<br><br>"It was horrible. You don't know if you'll get out alive. My kids cried and cried. They wanted to leave, wanted to cross [to the U.S.]; they didn't want to be here."<br><br>Upon their release, they received threatening calls demanding payment of more money and had to register for CBP One again as the phone they had previously used to register was stolen by the cartel.<br><br>"We've been waiting for an appointment that doesn't arrive. It [the app] doesn't care about the risk [we face] or our human rights." "There is no authority here. There was no security. Even hotels aren't safe, they collaborate." "There is no sense of peace. I ask God to help us get out of here. My family is in danger here. At night you hear gunfire. We're terrified to go 4 out on the street. We aren't safe here in Mexico. At least, thank God, we are alive." | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | kidnapping, sexual assault, robbery | A Latin American family with two elementary-school-aged children was kidnapped in Reynosa in late May while waiting for a CBP One appointment and held for 13 days. The family's relatives with young children were also kidnapped with them. While kidnapped, the mother was sexually assaulted by cartel members. She prayed they wouldn't sexually abuse her daughter.<br><br>"It was a difficult experience for the children. They didn't eat. They cried. They wanted to escape, but we couldn't." The family was released but the cartel kept their phones and money, so they had no resources to buy a smartphone to use the CBP One app again. A few days after the family's relatives and their young children were released, they were 5 kidnapped again. | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | attempted kidnapping, robbery, threats | A Venezuelan family, including a teenage son and a young daughter, rented a room in Matamoros while waiting to obtain a CBP One appointment. One day at dawn, masked men identifying themselves as members of the cartel in charge in Matamoros, entered and ransacked the house, stealing the family's money, and attempted to grab the teenage son. The adult male in the family defended the son and the masked men threatened him, saying that if they find him in Matamoros, they will kill him. They fled the house and approached the 4 port of entry where Mexican immigration officers told them, "[I]t's not our problem." | https://humanrightsfirst.org/library/refugee-protection-travesty/ |

| Date | Category | Description | Link |
|---|---|---|---|
| 7/12/2023 | attempted kidnapping | A Venezuelan woman who was waiting for a CBP One appointment experienced an attempted kidnapping by a taxi driver in Reynosa. She escaped and joined a group of other women to walk to the bus terminal together, but a black truck circled them and tried to abduct two women. She traveled to Matamoros where she slept on the street outside a shelter and was informed that a man who had her photo was looking for her. She sought safety elsewhere and was told that two men who said they were her cousins had come the night before to look for her. She is in hiding. | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | assault | A Colombian elderly woman, travelling alone and waiting to seek protection in the U.S., was physically attacked and verbally assaulted in the Matamoros camp by a member of the cartel. | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | rape | "The terror I felt that night was the worst in my life. They [the cartel] don't respect if you're an older woman, a child, a pregnant woman. People are taken from the camp and disappeared, and no one can say anything." Two Venezuelan women who were waiting for a CBP One appointment in a makeshift encampment inhabited by asylum seekers in Matamoros reported that a friend of theirs had been raped in her tent. | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | enforced disappearance, extortion | A Venezuelan couple with their two-year old child had been waiting over 15 days sleeping outside the Ciudad Juárez port of entry without shelter, waiting to be processed to seek asylum. They recounted that while aboard a bus, Mexican authorities subjected them to an enforced disappearance: Mexican immigration police ordered them off the bus and handed them over to a cartel that kidnapped them for 15 days and demanded a $1,500 USD ransom per person to release them. "We wanted to file a police report, but you never know if the police are good or are one of them." "I want to try to pass [through the port of entry] as quickly as possible because the situation here is really bad – even the taxi drivers will sell you. From here on that way [signaling toward the city center], you run risk. We are safer staying here by the port." | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | robbery | An LGBTQ+ and HIV+ Venezuelan young adult waiting to seek U.S. asylum was traveling alone and living in a tent in Matamoros. The young adult's phone was stolen and they had no means to replace it to access the CBP One app. | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | assault, beatings, robbery | A Chinese man who spoke Mandarin and did not know English or any of the CBP One app languages, was attacked, beaten, and robbed while waiting in Matamoros to seek U.S. asylum. | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | sexual assault | A Haitian mother was traveling with her husband and young child while trying to obtain a CBP One appointment. While on a bus, a Mexican immigration officer targeted only them for a search of their belongings while on a bus and inappropriately groped her breasts and searched inside her pants. | https://humanrightsfirst.org/library/refugee-protection-travesty/ |

| Date | Category | | Source |
|---|---|---|---|
| 7/12/2023 | beatings, aggravated assault | A Venezuelan woman staying at a shelter in Tijuana said her husband witnessed Mexican police officers beating up Haitians across the street from the asylum seekers' shelter. He 2 intervened to defend them and the Mexican officers pulled a gun on him. | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | extortion, beatings | A Venezuelan mother, travelling with her two adult sons aboard a bus en route to Matamoros to seek protection in the U.S., was stopped by Mexican immigration officials who demanded money from passengers. One son gave the officer money, but the other son did not have any to give. The officer hit the son who did not provide payment and when the mother defended her son, the officer hit her on the mouth. 3 "The authorities treated me like trash. Psychologically, you feel like trash." | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/12/2023 | extortion | Ecuadorian Indigenous and non-Indigenous families in Ciudad Juárez reported that Mexican immigration officers at a bus terminal during their journey told them that their CBP One registration printout was "worthless" because they were Ecuadorian and not nationals of one of the four countries that can benefit from the process. The families were then extorted. "It's a daily reality," the Ecuadorian father fleeing threats to his life in Ecuador shared. "Those of us from Ecuador and Haiti are removed from the bus, our national identification cards are taken, and we're placed in their [Mexican immigration officers'] cars. We're threatened that if we don't pay them, they'll deport us. We're charged anywhere from 50 to 500 pesos. Because of 2 this, we've had to walk a lot to avoid the bus." | https://humanrightsfirst.org/library/refugee-protection-travesty/ |
| 7/24/2023 | kidnapping | In July 2023, a Colombian young woman, her Venezuelan partner, and their three-month-old baby were kidnapped for twenty days in Ciudad Juárez, causing them to miss their CBP One appointment. "They told us that they were going to kill my son, many things, so I left traumatized, I'm afraid 3 of a car stopping, I'm afraid of anything, that's why I want to cross now." | https://www.forbes.com.mx/inseguridad-crece-frontera-norte-mexico-secuestro-migrantes/ |

| Date | Categories | # | Text | Source |
|---|---|---|---|---|
| 7/24/2023 | kidnapping, torture, extortion | 1 | Omar,* a Kyrgyz asylum seeker, shared that Mexican immigration officials had first extorted him when he arrived at an airport in Oaxaca, Mexico. He was traveling with a group of eight other people from Kyrgyzstan and each of them had to pay $100 to be able to leave immigration detention. The Kyrgyz group traveled through Mexico and, as they approached Reynosa, cartel members pulled up in a pickup truck and tried to kidnap them. The eight people that Omar was traveling with were able to escape, but cartel members captured him and took him to a local safehouse where they tortured him by lighting his arms on fire with lighters. More than half of the skin from Omar's elbows to the tip of his fingers on both arms were covered with third degree burns. He did not have the money he needed for the ransom, but his fellow travelers managed to raise $4,000 to secure his release. Though Omar had been tortured in Reynosa, INM officers in Reynosa turned him away even after he showed them the third degree burns on his arms. He was not able to approach the Reynosa-McAllen/Hidalgo International Bridge to seek entry to the United States because he had not secured a CBP One appointment. | https://niplnlg.org/sites/default/files/2023-07/2023_Facing-An-Impossible-Choice.pdf |
| 7/24/2023 | kidnapping, extortion, beatings | 2 | Two young men from Honduras and Cuba in their early twenties were kidnapped from a bus stop in Reynosa by members of a cartel. The cartels held them hostage and badly beat them while they extorted their relatives in the United States for money for their release. | https://niplnlg.org/sites/default/files/2023-07/2023_Facing-An-Impossible-Choice.pdf |
| 7/24/2023 | kidnapping | 6 | A group of six Kyrgyz people were kidnapped by cartel members in Reynosa right outside the gates of a shelter that they were attempting to enter. | https://niplnlg.org/sites/default/files/2023-07/2023_Facing-An-Impossible-Choice.pdf |
| 7/24/2023 | kidnapping, assault | 1 | An advocate reported that an asylum seeker who had been held captive in Reynosa by the local cartel had managed to escape and make it onto the Reynosa-McAllen/Hidalgo International Bridge in the middle of the night. His arms were still bound, yet INM officials pulled him off the bridge and returned him to Reynosa, where he doubtlessly would be in danger of being kidnapped or killed by his former captors. | https://niplnlg.org/sites/default/files/2023-07/2023_Facing-An-Impossible-Choice.pdf |
| 7/26/2023 | kidnapping, extortion | 80 | El sacerdote de la Casa del Migrante de Ciudad Juárez, Francisco Javier Bueno, señaló que los migrantes también les han mencionado que antes de llegar a Villa Ahumada son extorsionados con 150 dólares para que puedan seguir su camino, por personas vestidas con el uniforme del Instituto Nacional de Migración (INM). También informó que sólo durante la primera quincena de julio, al menos 80 personas narraron a las agrupaciones locales que apoyan a los migrantes, que fueron víctimas de secuestro en su trayecto a esta frontera. | https://diario.mx/estado/repuntan-las-narrativas-de-secuestro-y-extorsionm-en-migrantes-20230726-2080323.html |
| 7/26/2023 | kidnapping | 11 | Un migrante venezolano fue testigo de cómo once migrantes Hondureños y Guatemaltecos que viajaban en el mismo camión que él fueron secuestrados por hombres armados y encapuchados. Esto ocurrió en camino hacia Ciudad Juárez, en Chihuahua. | https://diario.mx/estado/repuntan-las-narrativas-de-secuestro-y-extorsionm-en-migrantes-20230726-2080323.html |

| Date | Crime | Description | Count | Source |
|---|---|---|---|---|
| 7/27/2023 | attempted extortion | Pablo Doe is a citizen of Honduras attempting to apply for asylum after fleeing gang violence and extortion in April 2023. In early-July 2023, Pablo went to the Paso Del Norte Bridge in El Paso, Texas, to seek asylum. Before he arrived at the bridge, a group of armed men in a civilian car stopped him and told him he was not going to cross without paying them $600 to enter the bridge. He instead returned to Ciudad Juárez to wait. To date, Pablo has been unable to obtain a CBP One appointment or access the U.S. asylum process at a POE. | 1 | https://cgrs.uclawsf.edu/legal-document/complaint-2 |
| 7/27/2023 | aggravated assault | Elementos de la Guardia Nacional dispararon en contra de migrantes en calles de Ciudad Juárez, Chihuahua. En el video se observan al menos 20 migrantes en el campamento que fue atacado. "El tren se para aquí en está área, entonces vinieron los policías y les dijeron sálganse, sálganse de aquí, había personas que estaban dormidas. Entonces los agarraban a patadas y empujones, y ya después empezó a hacer la tirazón, a disparar. Hacían disparos al aire, hay muchas personas que las piedras que levantaron los tiros, les pegaron, salieron cortados, lastimados, la verdad es algo bien feo", dijo Eli H. B. C. originario de Honduras y quien lleva dos meses en Ciudad Juárez esperando poder cruzar a Estados Unidos. | 20 | https://laverdadjuarez.com/2023/07/27/guardia-nacional-dispara-contra-migrantes-en-ciudad-juarez-video-exhibe-la-agresion/ |
| 7/28/2023 | kidnapping | En Sonoyta, agentes del Instituto Nacional de Migración lograron rescatar a un total de 154 migrantes provenientes de Asia, África y Sudamérica. En una primera acción, personal del INM rescató de una casa en  Sonoyta a 46 personas migrantes: 24 de India, 19 de Mauritania y tres de Senegal. Ellos llevaban 4 días retenidos. La segunda acción se ubicó en los alrededores de la Central Camionera de Sonoyta. Se identificaron 108 personas de las siguientes nacionalidades: 41 de Egipto, 34 de Ecuador, 28 de Mauritania, cuatro de Senegal y uno de Angola. Entre ellos se encontraban 78 adultos (73 hombres y cinco mujeres), ocho núcleos familiares con 14 adultos y 12 menores y cuatro niños no acompañados. | 154 | https://www.excelsior.com.mx/nacional/rescatan-migrantes-asia-africa-en-sonora/1600304 |
| 7/29/2023 | kidnapping | Four Venezuelan young adults were kidnapped at gunpoint by armed men in Matamoros in late July 2023. | 4 | https://www.reforma.com/plagian-a-cuatro-migrantes-venezolanos-en-matamoros/ar2648888 |
| 8/4/2023 | kidnapping | Miembros de la Fuerza Especial Mexicana rescataron en la colonia Los Portales en Ciudad Juárez a cuatro personas víctimas de privación de la libertad. Una persona originaria de Brasil; y dos menores y un adulto de origen ecuatoriano. | 4 | https://laopcion.com.mx/juarez/rescatan-a-4-migrantes-secuestrados-en-ciudad-juarez-20230804-434943.html |
| 8/11/2023 | kidnapping | One hundred twenty-six migrants from Ecuador were kidnapped in Sonoyta, Sonora in August 2023, five kilometers from the U.S. border. | 126 | https://elpais.com/mexico/2023-08-11/hallados-126-migrantes-ecuatorianos-en-una-casa-de-seguridad-de-sonora.html |
| 8/17/2023 | extortion | Anabel* fled death threats in Ecuador. She is on her 2nd attempt to seek protection in the US. On this journey, Mexican police demanded 1,000 pesos to let her continue ($58 USD). She has been trying to get a CBP One appointment for over a month. | 1 | Communication from Kino Border Initiative |

| Date | Type | Count | Description | Source |
|---|---|---|---|---|
| 8/17/2023 | extortion | 1 | Emanuel* is fleeing Ecuador. In Mexico, the police and immigration agents extorted him 3 times each, taking $2,000 pesos ($117 USD). He described Mexican agents feeling under his clothes and inside his pants, searching for more money: "they nearly strip you naked." | Communication from Kino Border Initiative |
| 8/24/2023 | kidnapping | 9 | Nine migrants from Ecuador and Guatemala, including women and children, were taken by force from a hotel in Ciudad Juárez and kidnapped in August 2023. | https://www.uniradiosonora.com/sociedad/levantan-9-migrantes-hotel-ciudad-juarez-n690802 |
| 8/28/2023 | kidnapping | 46 | El 26 de julio fueron rescatados 46 migrantes que estaban secuestrados en una casa de seguridad en Sonoyta, Sonora. 19 migrantes provenientes de Mauritania, tres de Senegal, y 24 de la India, estuvieron secuestrados por cuatro días en un domicilio ubicado en el Boulevard Benemérito de las Américas. | https://www.milenio.com/estados/inm-rescatan-22-migrantes-africanos-secuestrados-sonora |
| 8/31/2023 | robbery, threats | 1 | Osvaldo* from Colombia, described an assault near Monterrey. In the middle of the night, an armed group stopped the bus he was traveling on and ordered all the non-Mexicans off the bus. The group forced them to turn over all their money, threatening to kidnap or kill them if they did not pay. | Communication from Kino Border Initiative |
| 9/6/2023 | kidnapping, extortion | 1 | "Juan" salió de Honduras en busca de una vida mejor para su familia, pero al llegar a Ciudad Juárez fue secuestrado, por lo que hace más de un mes su familia pide dinero en las calles de su país para reunir los más de 10 mil dólares que les están exigiendo a cambio de su liberación. "Estamos desesperados, tenemos el temor de que le hagan algo, ahí lo tienen", dijo ayer el padre del centroamericano. | https://diario.mx/juarez/aumentan-secuestros-de-migrantes-20230906-2095743.html |
| 9/6/2023 | kidnapping, threats, extortion | 6 | A principios de agosto personal de la Agencia Estatal de Investigación de la Unidad Modelo de Atención al Delito de Secuestro, perteneciente a la Fiscalía de Operaciones Estratégicas, logró el rescate de seis personas de origen colombiano, entre ellas dos menores de edad, quienes tenían 12 días secuestradas en la calle Centeno de la colonia Colinas de Juárez en Ciudad Juárez. Los secuestradores los amenazaban con armas de fuego mientras exigían a sus familiares 17 mil dólares por la liberación de cada una de las víctimas. | https://diario.mx/juarez/aumentan-secuestros-de-migrantes-20230906-2095743.html |
| 9/6/2023 | kidnapping | 21 | El 13 de agosto, policías municipales lograron el rescate de 21 personas en movilidad de México, Guatemala, Honduras, El Salvador y Nicaragua, quienes permanecían privados de la libertad en una vivienda de la colonia Parajes del Sol en Ciudad Juárez. | https://diario.mx/juarez/aumentan-secuestros-de-migrantes-20230906-2095743.html |
| 9/6/2023 | kidnapping, extortion | 7 | El 23 de agosto, siete migrantes de Guatemala y Ecuador, entre ellos una niña de 9 años de edad, fueron secuestrados cuando permanecían en el hotel Sanmiguel, ubicado en la avenida Tecnológico en Ciudad Juárez, por siete hombres armados y encapuchados, quienes les exigían a sus familiares hasta 15 mil dólares de rescate por cada uno de ellos; sin embargo, fueron liberados por las autoridades estatales. | https://diario.mx/juarez/aumentan-secuestros-de-migrantes-20230906-2095743.html |
| 9/8/2023 | kidnapping | 112 | El fiscal de Chihuahua puntualizó que en este periodo se han rescatado a 112 migrantes de secuestro. | https://www.nmas.com.mx/nacional/fiscalia-de-chihuahua-alerta-por-aumento-de-secuestros-a-migrantes/ |

| Date | Category | Count | Description | Source |
|---|---|---|---|---|
| 9/14/2023 | robbery | 2 | Thalia* and her partner, Ronal*, left Ecuador to escape government extortion. On the bus ride in Mexico, a police officer with her face covered boarded the bus and said, "you already know why I'm here; give me everything you have" and they had to turn over all their money. They eventually arrived in Monterrey and Ronal got a CBPOne appointment in Nogales, over 900 miles away. | Communication from Kino Border Initiative |
| 9/14/2023 | extortion, threats | 1 | Jesus* fled Cuba 1 year ago, after having participated in the July 11, 2021 protests against the government. He experienced abuses on his journey. In Mexico while aboard a bus, the driver made a call and shortly after a criminal group removed the foreign nationals from the bus at gunpoint and extorted them. | Communication from Kino Border Initiative |
| 9/14/2023 | robbery | 1 | Ricardo*, from Venezuela, suffered most on his journey through Mexico. At a train station in Sinaloa, a criminal group robbed him at gunpoint, taking his $2,000 pesos ($114 USD), his identification, and his cellphone. He already had a CBP One account and had been trying to get an appointment. He worked in Nogales until he could afford another phone, but CBP One won't let him enter as a new update to the app which is supposed to prevent fraud, also blocks users with more than one profile from requesting an appointment. | Communication from Kino Border Initiative |
| 9/20/2023 | kidnapping | 2 | El pasado sábado una familia cubana que estaba secuestrada en México fue liberada tras las presión mediática hecha por sus familiares en Estados Unidos. | https://www.cibercuba.com/noticias/2023-09-20-u1-e199894-s27061-crece-temor-cubanos-varados-tapachula-somos-victimas |
| 9/21/2023 | murder | 9 | Cuatro personas sin vida, al parecer migrantes, fueron localizados a la altura del kilómetro 13 de la carretera de cuota Tecate-Tijuana. Los cadáveres tenían disparos de arma de fuego en el cráneo y todos estaban atados de las manos por la espalda. Hace un mes en la misma zona localizaron a otros cinco migrantes sin vida. | https://www.milenio.com/politica/comunidad/hallan-cadaveres-de-cuatro-migrantes-en-tijuana |
| 9/22/2023 | kidnapping | 23 | Elementos de la Fiscalía General del Estado realizaron esta mañana un cateo a un domicilio en la Colonia Ampliación Aeropuerto en Ciudad Juárez, en la que lograron rescatar a 23 migrantes que estaban privados de su libertad. | https://laopcion.com.mx/juarez/catean-domicilio-y-rescatan-a-23-migrantes-secuestrados-detienen-a-3-plagiarios-20230922-440769.html |
| 9/28/2023 | murder, aggravated assault | 2 | A migrant man was killed by members of an organized criminal group in July 2023, five kilometers from the Otay port of entry in Tijuana, Baja California. The man and a friend were trying to cross into the U.S. through an opening in the border wall when they were attacked by four men who demanded to know who they paid to cross the border. Upon replying they paid no one, the two migrant men were taken to the side of a mountain, ordered to kneel, and one of them was shot dead. The other migrant escaped and sought help along the border wall from the California state authority, Cal Fire. | https://bajanews.mx/noticias/17066/buscan-pistas-para-resolver-secuestro-y-tiroteo-a-migrantes |

| Date | Category | Narrative | # | Source |
|---|---|---|---|---|
| 9/29/2023 | kidnapping, rape, extortion, human trafficking | A Venezuelan woman was raped in Reynosa in late May. Carolina's captors arrived at dawn to pull her out of the stash house. One of the men shoved her onto a broken-down bus parked outside and raped her. "It's the saddest, most horrible thing that can happen to a person," Carolina said. She said she was freed after family members paid $3,100 in ransom. Journalists interviewed eight sexual assault survivors and more than a dozen local aid workers. An Ecuadorian woman said that while in captivity in Reynosa, her kidnappers repeatedly allowed a drug dealer to rape her in exchange for his deliveries of a white powder which she suspected was cocaine. One night, she escaped through the window. "I still have nightmares," she said. | 10 | https://www.reuters.com/world/migrants-are-being-raped-mexico-border-they-await-entry-us-2023-09-29/ |
| 10/3/2023 | kidnapping, extortion | A Venezuelan migrant said he was kidnapped in May in Reynosa by a cartel while traveling to the border for his confirmed CBP One appointment. He could not raise the $800 ransom, so he was forced to work for two months to pay off the remaining $200, he said. Two other migrants who said they were held at the house during the same time period confirmed the man was forced to work against his will, and that they heard female migrants being raped. | 10 | https://www.eldiariodechihuahua.mx/estado/de-guerrero-a-tijuana-y-de-ahi-a-juarez-secuestradores-de-23-migrantes-20231003-2105224.html |
| 10/8/2023 | kidnapping, sexual assault, threats, extortion | Twenty-three migrants of various nationalities, including children, were kidnapped in Ciudad Juárez in October 2023. They were held for one week by a criminal group led by a former Mexican municipal police officer. The captor demanded a ransom of between two and three thousand dollars per individual kidnapped. | 23 | https://acn.com.ve/secuestrados-10-venezolanos-mexico/ |
| | | Un grupo de 10 ciudadanos venezolanos, originarios del estado Apure, fueron secuestrados por una mafia de sicarios en la ruta entre Monterrey y El Paso, México. Los secuestradores exigen un rescate de 7.000 dólares para liberar a sus víctimas; advirtiendo que, de no recibirse el pago, procederán con asesinatos. Una de las mujeres fue abusada sexualmente. | 10 | |
| 10/11/2023 | murder, aggravated assault | Dos migrantes fueron asesinados por miembros del Ejército Mexicano en el estado de Chihuahua, cerca de Ciudad Juárez. Las dos personas fallecidas son de origen guatemalteco y fueron asesinados a balazos. Se llamaban Elvis Enrique Barrientos de la Rosa y Margarito Canto Juárez. Tenían 27 y 45 años. Ellos se encontraban con 4 migrantes más que resultaron heridos. El fiscal Salas ha anunciado que sus agentes están tomando declaración a los migrantes heridos, que se recuperan en hospitales de la ciudad fronteriza. Sus nombres son Carlos Humberto Rodríguez López, de 19 años, Rigoberto González Chávez, de 28, y Selvin Eduardo García Paredes, de 19, originarios de Guatemala. El cuarto es Raúl Hernández Ramírez, tiene 18 años y es originario de Honduras. | 6 | https://elpais.com/mexico/2023-10-11/el-asesinato-a-balazos-de-dos-migrantes-en-chihuahua-pone-de-nuevo-en-el-punto-de-mira-al-ejercito.html?utm_source=substack&utm_med ium=email |
| 10/12/2023 | kidnapping, torture, extortion | A Venezuelan young adult, who was waiting to seek asylum in the US, was kidnapped when entering Reynosa by bus in September 2023. On the fourth day, the cartel cut off his finger and sent the images to his relatives demanding immediate ransom for his abduction. | 1 | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |

| Date | Category | Description | Source |
|---|---|---|---|
| 10/12/2023 | murder, kidnapping | Two Venezuelan young women and a Venezuelan young man survived a kidnapping by the cartel in Reynosa in September 2023. A fourth Venezuelan young man who was travelling with them was killed by the cartel during the kidnapping. They were waiting to obtain a CBP One appointment. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, torture, beatings, threats | Three Venezuelan men had been trying to obtain CBP One appointments when they were kidnapped in Reynosa in September 2023. The three men were held for five and six days, and their cousin was held for nine days. One of them described being tortured and beaten on his head and body. Another described being forced to stand the entire day in the middle of the room and tortured if he didn't. They witnessed another man threatened with cutting off his ear or finger. They witnessed another Venezuelan man who was told his release was conditioned on his Venezuelan female friend having sex with all the cartel members, which she refused. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | aggravated assault | In September 2023, in Reynosa, while waiting to seek asylum in the U.S.., a Venezuelan man was shot in the head after being pulled off a bus that had been taken by the cartel to kidnap passengers. He lost an eye. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, beatings, robbery, extortion, assault, threats | Two young male asylum seekers from Latin America were kidnapped by a Mexican cartel in Reynosa in August 2023 as they arrived at the border city to seek asylum in the U.S. Their captors beat them, stripped them of all their clothing, and robbed them of their phones and money. They were held captive for almost a week while the cartel extorted their families. Shortly after their kidnapping, the young men were assaulted and robbed again in Reynosa, this time by Mexican officials who threatened to kill them and mutilate their bodies. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, torture, threats | After trying for a month to obtain a CBP One appointment, a Venezuelan man and four other migrants were kidnapped in Reynosa upon arriving by cargo train and held captive in a room with other asylum seekers, mostly from Venezuela. "They torture you and beat you like an animal." The cartel tortured him with severe beatings and forced him and others to witness torture when they cut off the finger of another man whose family had not been able to pay the ransom. He was threatened by the cartel that if they saw him again, they would kill him. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping | A migrant who had been kidnapped in Reynosa was released at the bus terminal. There he saw the cartel kidnap a pregnant mother, father, and young child who also appeared to be migrants. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |

| Date | Category | Description | Source |
|---|---|---|---|
| 10/12/2023 | kidnapping, robbery, beatings, torture | A Venezuelan man traveling alone while attempting to obtain a CBP One appointment was kidnapped in September 2023 in Reynosa. Five armed men boarded his bus and asked him and another man if they had CBP One appointments and forced them off the bus. He was kidnapped for 10 days, deprived of food, and photographed. He was held together with adults and many children of other nationalities, including Hondurans and Guatemalans. He was beaten with a baseball bat for days and forced to witness these horrific harms and amputations with loss of blood. The children were forced to witness these horrific harms and amputations with loss of blood. The cartel kept his phone after releasing him, forcing him to start over in requesting a CBP One appointment. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, beatings, threats, torture | A Venezuelan couple trying to obtain a CBP One appointment was kidnapped from a bus in Reynosa in September 2023 by the cartel. They were held for five days. The male partner was beaten with a bat during the five days, forced to smoke marijuana and snort cocaine, and threatened that he would be shot or have his finger cut off. The couple was also forced to witness the torture and beatings of others. They were given only bread and water. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | attempted kidnapping | A group of young Venezuelan migrants waited in front of the Reynosa port of entry, struggling to obtain a CBP One appointment, but they were blocked by the Mexican migration authority from accessing the port. One of the young Venezuelan adults crossed the main thoroughfare to buy something to drink. He was quickly approached by a member of the cartel who asked him for the password that would allow him to escape a kidnapping. His companions shouted to him to run, and he escaped by sprinting back across the main avenue to the port of entry. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, robbery, threats, extortion | A group of four Venezuelans who had recently arrived in Matamoros were led to the river encampment told they could find help and somewhere to stay. Upon arrival, they were ordered to enter a tent by individuals identifying themselves as members of a cartel and held hostage for several days until family members paid ransoms. One Venezuelan man was only able to pay $100 USD. The cartel kept his passport and national identity card and told him he would be forced to work to repay them. He is still receiving threatening communications from them and fears for his life in Matamoros. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | assault, robbery, threats | A Venezuelan LGBTQ+ couple were in their tent in the Matamoros river camp in July 2023 when they overheard an assault against an Ecuadorian family in another tent nearby. Armed men struck the Ecuadorian man in the head and demanded the family to hand over their phones and money, or they would kill them. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | assault, robbery | A Venezuelan woman and her husband witnessed the assault and robbery of an older Chinese man by members of a cartel in the Matamoros camp in August 2023. The Chinese man was beaten and robbed of his phone, money and belongings. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |

| Date | Category | # | Description | Source |
|---|---|---|---|---|
| 10/12/2023 | kidnapping, assault, attempted kidnapping | 3 | Three Venezuelan men were kidnapped and beaten by the cartel in Reynosa in September 2023. After their release, they moved to a migrant shelter in Matamoros where they continued to be at risk of kidnapping. They experienced two attempted kidnappings near this shelter: the first, while looking for work one day, and the second, while outside a nearby supermarket. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | attempted kidnapping | 2 | A gay Venezuelan couple waiting to secure a CBP One appointment was nearly abducted while walking at night to buy food in August 2023 in Matamoros. A truck began following them and two men jumped out. Terrified, the couple ran and managed to hide. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | attempted kidnapping | 1 | A young Venezuelan adult waiting for his CBP One appointment in Matamoros was followed by a truck that appeared to be occupied by cartel members. He ran and luckily escaped. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping | 1 | At the Matamoros bus terminal in September 2023, several Venezuelan men who had just arrived observed a person they believed to be a migrant or asylum seeker being kidnapped from the bus terminal by men they believed to be cartel members, and then put into a truck. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, sexual assault, assault, extortion | 2 | A Venezuelan seven-year-old child, who identifies as LGBTQ and was traveling with his mother, was kidnapped by the cartel. They were waiting in Reynosa to seek asylum in the U.S. and were held captive for three weeks in September 2023. The cartel drugged the child and sexually assaulted him. The captors demanded a ransom to release them. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, attempted sexual assault, assault | 3 | A Honduran woman, her husband, and young daughter who were waiting to seek asylum in the U.S. were kidnapped in Reynosa in September 2023 by members of a cartel who also attempted to sexually assault the mother. As she fought and screamed, her husband attempted to defend her and was tied with cables, beaten, and seriously injured. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, sexual assault | 3 | Two 19-year-old and one 20-year-old Honduran male asylum seekers were kidnapped by the cartel in Reynosa in September 2023. They were sexually assaulted. Since being released, they are suffering from severe acute stress and trauma on account of the sexual violence they survived. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, sexual assault | 1 | In September 2023, a Latin American mother and her minor children were waiting to seek asylum in the U.S. They were kidnapped and sexually assaulted by the cartel in Reynosa. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | extortion, threats | 1 | A young trans woman waiting in Ciudad Juárez to seek asylum in the U.S. was targeted and forced by the cartel to pay them $1,500.00 Mexican pesos a week under threats of sexual exploitation. She is afraid she will be killed if she misses a payment. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |

| Date | Category | Description | Link |
|---|---|---|---|
| 10/12/2023 | sexual assault, beatings, assault | A Venezuelan man and his brother had been struggling to obtain a CBP One appointment. While transiting on the roof of a cargo train with three others toward northern Mexico, the train unexpectedly stopped in the middle of the night for an hour. A Mexican police officer climbed aboard the top of their train car, saw them, and left. Minutes later, they were ambushed and attacked on the train roof by many members of a cartel. The woman in their group was stabbed with a knife, one of the men was anally sexually assaulted, and another was hit in the face with a bat. They managed to escape, and a Mexican police car arrived, but it did not pursue the perpetrators. 5 | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, threats, extortion | In Monterrey, Nuevo Leon, a Venezuelan couple and their one-year-old child were kidnapped while waiting to seek asylum in the U.S. A cartel kidnapped them when their bus from Monterrey was stopped in transit in late September 2023. Their family members in Monterrey reported that they had been kidnapped for six days and were forced to call family expressing that their finger, ear, or eye would be cut off if ransom was not paid quickly. They had not been released. 3 | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, extortion | A Venezuelan woman, traveling alone, had been waiting to obtain a CBP One appointment and was kidnapped for ransom in Reynosa in June 2023. Upon her release, she returned to Mexico City where she waited for three months due to the trauma of her kidnapping. She still – after months of waiting – had not received a CBP One appointment despite trying. She left Mexico City and was kidnapped again in Monterrey while she was still trying to get an appointment. 1 | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | robbery, assault | A Haitian family, living in fear in Mexico City while trying to get a CBP One appointment, reported that in June 2023, a group of Haitians were attacked and robbed outside the building where they were staying. 2 | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | robbery, assault | A Venezuelan asylum seeker, trying to obtain a CBP One appointment, was attacked in Sinaloa, Mexico. He was attacked and robbed of his cellphone by a cartel at a train station. 1 | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | assault, attempted kidnapping, robbery | An Indigenous Shuar family, fleeing Ecuador, was assaulted, experienced an attempted kidnapping, and was robbed by a cartel in their transit to the northern Mexico border while waiting to seek asylum in the U.S. They were forced to walk for days along the highway. 2 | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | enforced disappearance | In late August or early September 2023, a Venezuelan family, trying to secure a CBP One appointment was walking in Reynosa when they were stopped by the Mexican police and subsequently turned over to a cartel. 2 | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | threats, extortion | A group of Venezuelan young adults was stopped by the police in Reynosa while waiting to secure a CBP One appointment. They were given an ultimatum: pay me now or I'll hand you over to the cartel. 2 | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |

| Date | Category | Count | Description | Source |
|---|---|---|---|---|
| 10/12/2023 | kidnapping, extortion | 22 | In September 2023 a group of 22 asylum seekers who had CBP One appointments and was travelling to the Matamoros port of entry was kidnapped by the cartel in Reynosa. Their buses were diverted there by their bus drivers in collusion with the cartel. One Venezuelan woman, husband, and four minor children described being held captive for five days during which they missed their CBP One appointments until their relatives were forced to pay for their freedom. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, extortion | 100 | A Venezuelan trans woman, fleeing persecution and violence, was en route to her CBP One appointment when she was kidnapped at the Reynosa bus terminal in August 2023. Two men with two-way radios boarded the bus and questioned her and others if they were foreigners and what they were doing. She replied she had a CBP One appointment and showed her appointment confirmation. Several other passengers on the bus also had CBP One appointments. The men removed them from the bus and held them for ransom with 100 other migrants. She missed her CBP One appointment during this time. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, assault, beatings | 15 | In September 2023, a Venezuelan family traveling by bus from Reynosa to Matamoros for their CBP One appointment witnessed another bus that had also departed from the terminal with a group of 15 Cuban asylum seekers, one of whom they had befriended, being taken. Later, in Matamoros, the family saw five of the Cuban asylum seekers who had been kidnapped from that bus, and they witnessed their bloodied wrists from having been forcibly handcuffed with cables. The Cubans described being brutally beaten on their backs while kidnapped. One of the Cuban men missed his CBP One appointment on account of the kidnapping. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, extortion | 1 | A Venezuelan man who survived a kidnapping in Reynosa in September 2023 explained how Mexican migration and law enforcement officers extort migrants with CBP One appointments for greater amounts than others during the numerous checkpoints along transit routes toward the U.S. ports of entry at the border. "If you have a [CBP One] appointment, it's worse. They'll demand more money. You can't show or say that you have an appointment. Instead, I people show their CBP registration confirmation." | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | sexual assault | 2 | A Latin American lesbian couple was sexually assaulted in Reynosa in September 2023 while waiting to secure CBP One appointments to approach the U.S. port of entry to seek asylum. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | assault | 2 | In September 2023, a Venezuelan gay man and his partner had been waiting in Matamoros for nearly five months trying to secure a CBP One appointment. They were witness to a violent assault on a family by the cartel and to other situations of danger, which motivated them to seek shelter elsewhere. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |

| Date | Category | | Narrative | Source |
|------|----------|---|-----------|--------|
| 10/12/2023 | extortion, enforced disappearance | 3 | A Venezuelan family arrived in Matamoros without a cent left, having been extorted by Mexican authorities at numerous checkpoints on their journey toward the border, including at the last checkpoint prior to entering Matamoros. At this last checkpoint a Mexican female police officer demanded $600 USD from them and threatened to detain them for ransom – a short-term enforced disappearance – if they did not pay. They lived in constant fear in the Matamoros encampment and could no longer wait for a CBP One appointment. Eventually, they crossed the river, explaining the mother was epileptic, and they had no food to feed their child. | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | kidnapping, torture | 1 | A Venezuelan asylum seeker who survived a kidnapping and torture in Reynosa and had been trying for one month to secure a CBP One appointment, shared with Human Rights First in September 2023: "Venezuela is also a country where police officers kidnap and extort people. How can we stay here in Mexico when we feel so insecure? The authorities are the first ones to rob us. If this were a safe country, we'd stay. Who wants to live with this insecurity? No one." | https://humanrightsfirst.org/library/inhumane-and-counterproductive-asylum-ban-inflicts-mounting-harm/ |
| 10/12/2023 | extortion, robbery | 4 | Chun* fled China with her husband and their 2 young boys. In Hermosillo, Sonora, Mexican Immigration officials stopped them and told her husband he could not continue and had to wait there. Mexican Immigration verbally abused them, extorted and robbed them, and separated Chun and her children from their father. She called 911 to ask for help and the police told her to travel to Nogales to be able to enter the US. | Communication from Kino Border Initiative |
| 10/12/2023 | threats, extortion | 1 | Emanuel* is fleeing violence in Ecuador. Mexican police threatened and extorted him on the journey and told him to stay quiet because he is a foreigner and he would only face worse if he reported the abuse. | Communication from Kino Border Initiative |
| 10/26/2023 | extortion | 3 | Javier*, Gerardo*, and Jaime* fled Venezuela after facing persecution as people opposed to the government. In Mexico, the National Guard stopped them at a checkpoint in Sonora. Even though they had CBP One appointments, the National Guard demanded $2,000 ($110 USD) pesos per person to allow them to continue. | Communication from Kino Border Initiative |
| 11/9/2023 | kidnapping | 11 | Elementos de la Policía del Estado rescataron a 11 migrantes de origen guatemalteco que se encontraban privados de su libertad, en una vivienda ubicada en la colonia Azteca en Ciudad Juárez. | https://laopcion.com.mx/local/rescatan-a-11-migrantes-privados-de-la-libertad-en-juarez-20231109-446473.html |
| 11/14/2023 | kidnapping, extortion | 22 | 22 Venezolanos que estaban a la espera de un permiso para entrar a los Estados Unidos fueron secuestrados mientras viajaban hacia Torreón, en el estado de Coahuila. Entre ellos había 6 menores de edad. Los secuestradores exigen a sus familias tres mil quinientos dólares por la liberación de cada uno. | https://elporvenir.mx/internacional/denuncian-secuestro-de-22-migrantes-venezolanos-en-mexico/654726 |
| 11/16/2023 | robbery | 2 | Jovana* and her family fled Venezuela and while in Mexico City, got a CBP One appointment in Nogales for mid-October. Mexican Immigration prevented them from boarding their flight in Mexico City and detained them, took their cellphones and returned them to Southern Mexico. They missed their CBP One appointment and had to transit through Mexico again to continue trying to seek entry and start the asylum process. | Communication from Kino Border Initiative |

| | | | |
|---|---|---|---|
| 11/19/2023 | aggravated assault, extortion | 1 | Guardias de Ferromex en Tabalaopa, Chihuahua, perseguían a un ladrón que se refugió entre un grupo de migrantes. Los guardias dispararon contra el grupo e hirieron a un migrante. El grupo denunció que han sido víctimas de extorsiones por parte de autoridades migratorias. | http://www.elfronterizo.com.mx/noticia/2947 22/guardias-de-ferromex-balean-a-migrante |
| 11/27/2023 | kidnapping | 165 | Elementos de la Guardia Nacional lograron rescatar este fin de semana a 165 migrantes que estaban privados de su libertad, en diferentes municipios de la frontera tamaulipeca. | https://expreso.press/2023/11/27/rescatan-a-165-migrantes-secuestrados-en-tamaulipas/ |
| **Total victims of attacks** | | **1308** | | |

# EXHIBIT 10

# AN UNCERTAIN PATH

## Justice for Crimes and Human Rights Violations against Migrants and Refugees in Mexico

By: José Knippen, Clay Boggs, and Maureen Meyer | **NOVEMBER 2015**



RESEARCH
**REPORT**












# TABLE OF CONTENTS

**KEY FINDINGS** .................................................................................................................. **3**

**ACRONYMNS** ..................................................................................................................... **4**

**INTRODUCTION** ................................................................................................................. **5**
- Methodology and collaboration with migrant shelters and defenders in the production of this report

**THE SOUTHERN BORDER PROGRAM AS A FRAMEWORK FOR INCREASING MIGRATION ENFORCEMENT** ............................................................ **8**
- The Southern Border Program
- The participation of security forces in migration enforcement operations
- Budget
- Cooperation with the United States

**HUMAN RIGHTS VIOLATIONS AND CRIMES AGAINST MIGRANTS** ............................... **18**
- Kidnappings
- Human trafficking
- Summary executions
- Enforced disappearances
- Sexual violence
- Robbery, assault, and extortion, accompanied by physical and psychological abuse
- Detention and access to the right to asylum

**INVESTIGATING AND SANCTIONING CRIMES AND HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS** .................................................... **34**
- Data on investigations into crimes against migrants
- Obstacles to reporting crimes and human rights violations
- Specialized prosecutors: An effective response?
- The National Human Rights Commission and State Human Rights Commissions
- The Responsibility of the National Migration Institute

**CONCLUSIONS AND RECOMMENDATIONS** .............................................................. **46**

**REFERENCES** ................................................................................................................... **49**

# KEY FINDINGS

- **THE SOUTHERN BORDER PROGRAM HAS SIGNIFICANTLY INCREASED MIGRATION ENFORCEMENT OPERATIONS, AS WELL AS MIGRANT DETENTIONS AND DEPORTATIONS.** From July 2014 to June 2015, detentions of migrants rose 73 percent compared to the same period the year before; between July 2013 and June 2014, 97,245 migrants were detained, while 168,280 were detained between July 2014 and June 2015. Furthermore, government data indicates there has been an increase in migration enforcement operations; however, more reliable data is needed.

- **THIS INCREASED ENFORCEMENT HAS PROMPTED AN UPTICK IN HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS.** Abuses have been documented in these migration operations, which are increasingly conducted in conjunction with security forces. Migrant shelters have documented kidnappings, extortions, robberies, and abuses throughout the country.

- **GIVEN THIS CONTEXT, THE MEXICAN GOVERNMENT'S EFFORTS TO STRENGTHEN ITS CAPACITY TO PROTECT MIGRANTS HAVE FALLEN SHORT OF WHAT IS NEEDED.** For example, the Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*, COMAR) only has 15 protection officers in the entire country to ensure access to international protection for the more than 100,000 migrants detained during the course of a year. Moreover, COMAR's budget did not increase in real terms from 2014 to 2015.

- **THERE IS NO EVIDENCE THAT VICTIMS OF CRIMES AND HUMAN RIGHTS VIOLATIONS HAVE EFFECTIVE ACCESS TO JUSTICE, DESPITE THE CREATION OF NEW SPECIALIZED PROSECUTORS' OFFICES.** There is a lack of conclusive data regarding justice for migrants in Mexico. The most detailed data are from the specialized prosecutor's office in Oaxaca, which reports that, of the 383 complaints received over four years, only 96 resulted in a preliminary investigation being opened and only four resulted in sentences for the perpetrators. Additionally, of the 1,617 complaints of human rights violations against migrants that the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH) received from December 1, 2012 to June 15, 2015, only four resulted in a formal recommendation issued to the institution implicated in the complaint.

- **THE SOUTHERN BORDER PROGRAM HAS FOCUSED ON ENFORCEMENT ACTIVITIES AND THIS FOCUS IS REFLECTED IN THE BUDGET OF THE NATIONAL MIGRATION INSTITUTE (*INSTITUTO NACIONAL DE MIGRACIÓN*, INM). INDEED, IN 2014 THE INM SPENT THE LARGEST BUDGET IN ITS HISTORY.** For its part, the United States government has offered the Mexican government political and financial support for migration enforcement, especially following the drastic increase in the number of unaccompanied minors and migrant families—primarily from Central America—arriving at the United States' southwest border.

# ACRONYMS

**CAIMFS**  Coordinating Office for Comprehensive Attention to Migration at the Southern Border (*Coordinación para la Atención Integral de la Migración en la Frontera Sur*)

**CCAMYN**  Centro Comunitario de Atención al Migrante y Necesitado

**CEDH**  State Human Rights Commission (*Comisión Estatal de Derechos Humanos*)

**CNDH**  National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*)

**COMAR**  Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*)

**CUSAEM**  Auxiliary and Urban Security Forces of the State of Mexico (*Cuerpos de Seguridad Auxiliar Urbana del Estado de México*)

**DHS**  Department of Homeland Security

**FEVIMTRA**  Special Prosecutor's Office for Crimes of Violence against Women and Human Trafficking (*Fiscalía Especial para los Delitos de Violencia contra las Mujeres y Trata de Personas*)

**GATES**  Saltillo Special Tactical and Weapons Group (*Grupo de Armas y Tácticas Especiales de Saltillo*)

**GROMS**  Saltillo Municipal Operational Reaction Group (*Grupo de Reacción Operativa Municipal de Saltillo*)

**IACHR**  Inter-American Commission on Human Rights

**INAI**  National Institute for Transparency, Access to Information and Personal Data Protection (*Instituto Nacional de Transparencia, Acceso a la Información y Protección de Datos Personales*)

**INCLE**  International Narcotics Control and Law Enforcement

**INM**  National Migration Institute (*Instituto Nacional de Migración*)

**OPI**  Child Protection Officer (*Oficial de Protección a la Infancia*)

**PEF**  Federal Expenditures Budget (*Presupuesto de Egresos de la Federación*)

**PEM**  Special Migration Program (*Programa Especial de Migración*)

**PGJE**  State Attorney General's Office (*Procuraduría General de Justicia del Estado*)

**PGR**  Federal Attorney General's Office (*Procuraduría General de la República*)

**PPTM**  Municipal Preventive and Transit Police (*Policía Preventiva y Tránsito Municipal*)

**REDODEM**  Documentation Network of Migrant Defense Organizations (*Red de Documentación de Organizaciones Defensoras de Migrantes*)

**SAT**  Tax Administration Service (*Servicio de Administración Tributaria*)

**SEDENA**  Army (*Secretaría de la Defensa Nacional*)

**SEGOB**  Ministry of the Interior (*Secretaría de Gobernación*)

**SEIDO**  Deputy Attorney General's Office for Special Investigations on Organized Crime (*Subprocuraduría Especializada en Investigación de Delincuencia Organizada*)

**SEMAR**  Navy (*Secretaría de Marina*)

**UNHCR**  United Nations High Commissioner for Refugees

**UPM**  Migration Policy Unit (*Unidad de Política Migratoria*)

# INTRODUCTION

On June 2, 2015, armed men opened fire on five vehicles that had stopped on a roadway close to Caborca, Sonora. Between 100 and 120 undocumented men, women, and children were inside the vehicles; they were traveling through Mexico with the hope of crossing the border into the United States. At least three people died in the attack and several migrants fled toward the United States.[1] Two days later, the state Attorney General's Office (*Procuraduría General de Justicia del Estado*, PGJE) in Sonora reported that it had rescued 15 survivors (two Mexicans and 13 Central Americans) and recovered three bodies. The 13 Guatemalans and Salvadorans were deported to their countries by the National Migration Institute (*Instituto Nacional de Migración*, INM) in mid-June. Prior to this, the survivors had told members of civil society organizations that likely between 30 and 40 migrants were murdered during the attack.[2]

This attack demonstrates the persistence of a pattern of crime and human rights violations against migrants in Mexico. The events in Caborca took place nearly a year after Mexican President Enrique Peña Nieto launched the Southern Border Program, which promised a comprehensive approach to promoting development, security, and human rights on the Mexican border with Guatemala and Belize.[3] The most obvious and consistent measure under the Southern Border Program has been the intensification of migration enforcement operations throughout Mexico, especially in the southern states of Chiapas, Tabasco, and Oaxaca. Authorities have taken measures to prevent migrants from traveling by train;[4] set up new checkpoints in the southern border region; relocated between 10 and 15 percent of INM personnel from their regular assignments to strengthen the southern border; and conducted more frequent raids on hotels where migrants are known to stay. Migrant detentions have skyrocketed: between July 2014 and June 2015, detentions of migrants rose 73 percent compared to the same period in the previous year; between July 2014 and June 2015, authorities detained 168,280 migrants, up from 97,245 detained between July 2013 and June 2014. In fact, from October 2014 to May 2015, the INM detained more Central American migrants than the US Border Patrol (the INM's 110,043 versus the Border Patrol's 85,131).[5]

## TERMINOLOGY

*This report uses the term "migrant" to refer to individuals traveling through Mexico en route to the United States. It is important to acknowledge that this is a mixed flow of migrants that includes persons who leave their countries principally to improve their living conditions, whether for economic reasons or for family reunification, as well as persons who are fleeing persecution and/or violence, and victims of human trafficking. Furthermore, although many are from Guatemala, El Salvador, or Honduras, Mexican migrants may also be victims of the same patterns of violence and human rights abuses, even when they are in Mexico.*

These migration enforcement efforts are significant, but they are not without precedent. For years authorities have conducted raids and set up checkpoints throughout the country—primarily in the south—and each year they have detained and deported thousands of migrants: Mexico deported 79,643 migrants in 2012; 80,902 in 2013; and 107, 814 in 2014.[6]

As of the writing of this report, the facts of the Caborca case and the whereabouts of all the victims had not been clarified. The case illustrates migrants' absolute defenselessness against the organized crime networks that control significant portions of Mexican territory. Policy changes like the Southern Border Program have not only failed to alter this situation, to a certain extent they have even exacerbated the patterns of crimes and human rights violations against migrants. Migration is more clandestine than ever, as migrants and smugglers have sought to avoid the checkpoints and raids that have proliferated in the southern states, and to some degree, all over the country. This has had an impact on the routes migrants use, inasmuch as they have had to look for alternatives, including traveling on foot, which makes them easy prey for criminal gangs. These new routes mean they have less contact with shelters, most of which are run by clergy, and which were established to assist migrants along the route of the cargo train, known as "The Beast" ("*La Bestia*").[7] As a result, the Southern Border Program has made it more difficult for human rights advocates and organizations to identify and report crimes and human rights violations against migrants.[8]

Although the Mexican government has spoken a great deal about the need to protect migrants crossing through the country, there is no meaningful evidence that authorities have made significant progress in investigating or punishing the criminal groups or the police officers, soldiers, and INM agents that take advantage of vulnerable migrants. Despite the creation of several state-level specialized prosecutors' offices whose principal duty is to investigate and

prosecute crimes against migrants, punishment for these crimes continues to be extremely rare. In the state of Oaxaca, there have only been four sentences handed down for crimes against migrants in four years. Likewise, the presence of human rights commissions (federal and state) in the states through which migrants travel has led to few recommendations being issued to the institutions involved in migration enforcement. For example, of the 1,617 complaints received by the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH) from December 1, 2012 to June 15, 2015, only four resulted in a formal recommendation issued to the institutions implicated in human rights violations.

While there has been little progress in fighting impunity, enforcement activities have escalated. Officials are detaining and deporting migrants rapidly; as a result, civil society organizations, human rights advocates, and asylum attorneys have few opportunities to hear migrants' stories about what they have experienced in Mexico or reasons why they have left their home countries. Furthermore, the increase in operations along train tracks and roadways has led to changes in traditional migration routes, especially for the most vulnerable migrants, who travel without human smugglers and are most dependent on the train to travel northward. Migrants and smugglers have gone back to clandestine routes that have now become more dangerous, including travel on foot or by sea. Therefore, a growing number of migrants that cross Mexico are practically invisible. If the Mexican government continues conducting migration enforcement under the same policy framework, using the same methods, and relying on the same corrupt and deficient authorities, it is likely we will know less and less about the migrant population's fate.

This report aims to assess the Mexican government's performance in investigating and punishing crimes and human rights violations against migrants traveling in an irregular situation, as well as against Mexican migrants crossing Mexico or who are deported from the United

States. Based on this analysis, the report sets out a series of recommendations for concrete and realistic policy changes that the Mexican government, and, where appropriate, the United States government, can make to prevent crimes and human rights violations against migrants.

In the long term, if the Mexican government truly intends to implement a migration policy that respects human rights, it is important that authorities more effectively investigate and sanction crimes and human rights violations against migrants, regardless of whether they have been committed by individuals, gangs, large organized crime networks, or public servants. Doing so would not only help protect one of the most vulnerable populations within Mexico's borders, but it would also strengthen the institutions responsible for enforcing migration policy in Mexico.

## METHODOLOGY AND COLLABORATION WITH MIGRANT SHELTERS AND DEFENDERS IN THE PRODUCTION OF THIS REPORT

This report is the result of close collaboration between the Washington Office on Latin America (WOLA), *Fundar, Centro de Análisis e Investigación*, and seven shelters and organizations that advocate for migrants' rights in five areas of Mexico:

- *Casa del Migrante de Saltillo "Frontera con Justicia," AC* in Saltillo, Coahuila;

- *Red Sonora*, a network of organizations located in the northern state of Sonora: Kino Border Initiative in Nogales, *Centro de Recursos para Migrantes* in Agua Prieta, and *Centro Comunitario de Atención al Migrante y Necesitado (CCAMYN)* in Altar;

- *Albergue de Migrantes "Hermanos en el Camino"* in Ixtepec, Oaxaca;

- *La 72, Hogar—Refugio para Personas Migrantes* in Tenosique, Tabasco;

- *Un Mundo, Una Nación* in Apizaco, Tlaxcala; and

- The migrants' rights advocate, Irazú Gómez.

The document is based on a series of visits to the abovementioned shelters and organizations, interviews with personnel and the migrant population, interviews with local authorities, and an exhaustive review of the shelters' case documentation. A total of 30 interviews were conducted during the research for this report.[9]

The work of migrant shelters in Mexico is of the utmost importance in advocating for and defending migrants' human rights. These shelters, most of which are run by or in coordination with the Catholic Church, operate with minimal funds and few personnel. They represent the first line of defense for vulnerable migrants. They provide food, temporary refuge, clothes, and medical attention, in addition to making it possible for migrants to contact their families. Furthermore, they take statements and report crimes and human rights violations to authorities. In many cases, migrant shelter personnel have directly confronted corrupt or indifferent officials, or even members of organized crime groups. All too frequently, migrant shelter personnel throughout Mexico have been harassed and threatened as a result of their work.[10]

# THE SOUTHERN BORDER PROGRAM
## AS A FRAMEWORK FOR INCREASING MIGRATION ENFORCEMENT

**THE SOUTHERN BORDER PROGRAM**

> *Under Peña Nieto, these agents are violating rights under the cover of law, operations have resumed, and INM agents are being implicated as perpetrators— now, together with the Federal Police. —Alberto Xicoténcatl, Casa del Migrante de Saltillo*

With the Southern Border Program (*Programa Frontera Sur*), Mexico appears to be responding to pressure from the U.S. government following the mid-2014 "humanitarian crisis" of migrant children arriving at the U.S. border. The statement from the Office of the President of Mexico announcing the program indicates that the program aims to "protect and safeguard the human rights of migrants who enter and pass through Mexico, as well as establish order at international crossings to boost development and security in the region."[11] However, in its implementation, the Southern Border Program has focused mostly on migration enforcement, and, at its outset, on preventing migrants from using the cargo trains, known as "The Beast," as a means of transportation. Since then, the number of checkpoints and operations has continued to climb, resulting in large numbers of detentions and deportations.

## TABLE 1
## DETENTIONS AND DEPORTATIONS IN MEXICO
### BEFORE AND AFTER THE SOUTHERN BORDER PROGRAM

|  | JULY 2013 TO JUNE 2014 | JULY 2014 TO JUNE 2015 | PERCENT INCREASE |
|---|---|---|---|
| **TOTAL DETENTIONS** | 97,245 | 168,280 | 73 |
| **DETENTIONS OF CENTRAL AMERICANS** | 91,905 | 156,992 | 71 |
| **DETENTIONS OF MINORS (FROM ALL COUNTRIES)** | 17,092 | 27,513 | 61 |
| **TOTAL DEPORTATIONS** | 86,692 | 141,290 | 63 |
| **DEPORTATIONS OF CENTRAL AMERICANS** | 84,457 | 138,451 | 64 |
| **DEPORTATIONS OF MINORS (FROM ALL COUNTRIES)** | 13,925 | 21,935 | 58 |

*Source:  Secretaría de Gobernación, Unidad de Política Migratoria, Boletines Mensuales de Estadísticas Migratorias 2013, 2014, 2015, http://bit.ly/1jMKo18.*

On July 8, 2014, one day after President Peña Nieto announced the Southern Border Program, the "Decree creating the Coordinating Office for Comprehensive Attention to Migration at the Southern Border" (*Decreto por el que se crea la Coordinación para la Atención Integral de la Migración en la Frontera Sur*) was published in Mexico's Official Federal Gazette (*Diario Oficial de la Federación*). This document revisits the 2014–2018 National Security Program's "consolidation of the Comprehensive Strategy for Attention at the Southern Border." Nevertheless, no public policy document exists to substantiate the Decree.[12]

The shelters and organizations involved in the production of this report are located in places that were traditionally "obligatory" on the route taken by migrants passing through Mexico, as they are locations through which the cargo train passes and where migrants may get off or on the train. Since late 2014, some shelters have seen a decrease in the flow of migrants arriving at their doors, as is the case of the shelters in Ixtepec and Saltillo. For example, the shelter in Ixtepec, which once received approximately one thousand migrants per month, now sees no more than an average of 100 migrants per week.[13] In Tlaxcala, an increase in the presence of security agents on the train (Auxiliary and Urban Security Forces of the State of Mexico, *Cuerpos de Seguridad Auxiliar Urbana del Estado de México*, CUSAEM), in addition to the barriers ("*barrotes*") put up on one side of the train tracks that traverse Apizaco mean fewer and fewer migrants are now using the train.[14]

In its first report, the Coordinating Office for Comprehensive Attention to Migration at the Southern Border (*Coordinación para la Atención Integral de la Migración en la Frontera Sur*, CAIMFS) notes that:

> The government of the Republic, via the different federal agencies responsible for handling migration, has taken actions designed to implement the provisions of that strategy; such is the case of the operations launched on August 1, 2014 to afford safety to migrants who were using the train from the Isthmus of Tehuantepec to travel within the country. This operation is being successfully coordinated by the National Migration Institute (*Instituto Nacional de Migración*, INM) (…). In it, the INM is joined by different federal government agencies such as (…) [the] federal Attorney General's Office (*Procuraduría General de la República*, PGR), the Army (*Secretaría de la Defensa Nacional*, SEDENA), the Federal Police, the Navy (*Secretaría de Marina*, SEMAR), in addition to the Government of the State of Chiapas and representatives of the Isthmus of Tehuantepec Railroad.[15]

One consequence of the Southern Border Program has been an escalation in human rights violations against migrants during operation, detention, and deportation processes, including in the methods used to detect undocumented migrants (particularly the use of allegedly discriminatory criteria, such as physical appearance), the use of force in arrests, the difficulty in accessing humanitarian visas and asylum, and poor conditions in the migration detention centers.

> *Many migrants report being chased by the INM for two hours through the woods, (with agents) running behind them, shouting things at them, physical aggressions, sometimes blows, sometimes they are robbed or their documents are taken from them, theft or extortion directly by the police and military, meaning they have to pay in order to pass through. —Emilie Viklund, La 72*

During migration enforcement operations, physical and psychological aggressions occur; in addition, migrants are stripped of their money and belongings. These operations have ironically been named "rescues" by the government, though most times this is not the case. Such operations have proliferated since mid-2014, but official figures about how often they occur are not consistent.

In response to an appeal for review of an information request filed with the National Institute for Transparency, Access to Information and Personal Data Protection (*Instituto Nacional de Transparencia, Acceso a la Información y Protección de Datos Personales,* INAI), the INM provided the following information about the number of migration enforcement operations carried out. In 2013, 14,246 operations were conducted nationwide. In 2014, the number of operations surged to 20,074, that is, it grew by 41 percent. The increases were concentrated in the states of Chiapas, Tabasco, Oaxaca, and Guerrero, but there were also significant increases in Baja California,

Baja California Sur, Coahuila, and Sonora.[16] However, in response to another appeal for review of an information request filed with the INAI, the INM provided different figures: 16,181 operations in 2013 and 27,992 in 2014 (a 73 percent increase). The increases appear to be concentrated in the same states, but the change in Chiapas is far more pronounced (rising from 1,297 to 8,192).[17]

According to statistics published on the Migration Policy Unit's (*Unidad de Política Migratoria,* UPM) website, the INM detained approximately 60,000 foreigners between August and December 2014. This figure comes close to the one mentioned by INM Commissioner Ardelio Vargas Fosado during a press conference on March 3, 2015: 64,215 individuals were purportedly "rescued" by the INM during that same period.  If the problems related to the operations and subsequent detentions and deportations were already known, it is likely that these problems have worsened due to the increase in operations, detentions, and deportations, and the speed with which they are occurring.

## THE PARTICIPATION OF SECURITY FORCES IN MIGRATION ENFORCEMENT OPERATIONS

Only the INM can verify the immigration status of foreigners in Mexican territory. The Migration Law, however, provides that other authorities may assist the INM in its control, verification, and enforcement functions (but they may not carry out such functions on their own).[20] In particular, the law states that the Federal Police shall act in support of and in coordination with the INM in its migration enforcement activities. The Migration Law Regulations specify that the INM should request the Federal Police's support when there is a presumed risk in the migration enforcement or verification operation to be conducted. The involvement of different security forces, such as the Federal Police and the Army (*Secretaría de la Defensa Nacional,* SEDENA), as well as the federal Attorney General's Office (*Procuraduría General de la República,* PGR), has become more frequent in migration enforcement operations since mid-

2014. From 2013 through July 2014—the month in which the Southern Border Program was announced—the average number of operations in which another authority participated alongside the INM was 125.8 per month. From July 2014 to April 2015, this number climbed to an average of 429 per month (see graphic 1).

Moreover, in June 2014, the INM and the Federal Police signed a cooperation agreement to provide support in the control, verification, search, and transfer of migrants, as well in securing the perimeters of migrant detention centers (Convenio de Colaboración para brindar apoyo en el control, verificación, revisión y traslado de migrantes, así como resguardo perimetral de Estaciones Migratorias); such agreement facilitates the involvement of the Federal Police in migration enforcement operations.[21]



GRAPHIC 1

# PARTICIPATION OF SECURITY AND JUSTICE AGENCIES IN MIGRATION ENFORCEMENT OPERATIONS

**Legend:**
- FEDERAL POLICE
- STATE POLICE
- MUNICIPAL POLICE
- FEDERAL ATTORNEY GENERAL'S OFFICE
- STATE ATTORNEY GENERAL'S OFFICE
- UNIFIED POLICE (*MANDO ÚNICO*)
- ARMY
- NAVY

*Source: Prepared by the authors with data from the Instituto Nacional de Migración's response to Infomex request 0411100035415, June 17, 2015, available on WOLA's website, http://bit.ly/1RA3kuy.*

*In the military zone in Tenosique, the local battalion has a hand in causing harm to migrants: at checkpoints they commit violations to the right of free transit, they ask for identification, commit sexual assault, we've also learned of the participation of soldiers in migrant smuggling, something that cannot be reported because of everything that it signifies.* —Brother Tomás González, La 72

In practice, it is very difficult to monitor the conduct of other authorities during migration enforcement operations with the INM because no clear regulations exist, nor are there control mechanisms in place. Statements from migrants and defenders reveal that the INM as well as other authorities, such as police and soldiers, commit human rights violations during the operations.

The operation conducted on May 1, 2015 in Tenosique, Tabasco illustrates a recurring pattern: agents used excessive force and threatened, pushed, and beat the migrants. Both INM and police agents were identified as perpetrators.

> The cargo train arrived at the Tenosique station at 6 p.m., where it stopped indefinitely; this made it possible for more than 100 migrants to climb aboard. Among this group of individuals were several families, women, children, and a 12 year-old girl. In this case, La 72 documented the presence of two vehicles, one from the Beta Group [Grupo Beta] and the other from the municipal police. Thereafter, you could hear how one of the train's operators said over the radio that [the train] was not going to move until the authorities arrived. At around 8 p.m. the federal assistant delegate and local delegate of the INM led an intense pursuit of the migrants who were on the train tracks and in the surrounding areas. Also involved were at least three Federal Police vehicles, two "volantas" [mobile checkpoints], two INM pickup trucks,

one Beta Group vehicle, and the federal assistant delegate's private vehicle. The La 72 team, exercising its right to observe, monitor, and document, witnessed the following: multiple detentions were made using verbal and physical aggression; one migrant who managed to escape the operation confirms that he was threatened with a firearm. The authorities involved in the operation used force to get people off the train by violently pulling them while the cargo train was in motion, thereby unnecessarily risking their physical integrity.[22]

The Migration Law and its regulations are not clear as to the objective and scope of the involvement of other authorities and there are no specific guidelines that regulate or limit the use of force. There are general agreements in place and the INM requests support for each operation through official letters. Nonetheless, all of the aforementioned authorities have their own different internal rules, practices, and issues. Hence, it is important that the Ministry of Interior (*Secretaría de Gobernación*, SEGOB) develop clear regulations for the conduct of such operations that take into account the complaints of excessive use of force by the INM and other authorities.

It is likewise important to point out that, in addition to the migration enforcement operations coordinated by the INM, other authorities also conduct migration enforcement operations separately, despite the fact that such operations fall exclusively within the jurisdiction of the INM.

This pattern is illustrated by the June 14, 2015 testimony from "Antonio" (pseudonym), a deported Mexican migrant:

> I was in the DeConcini [Nogales] station four days after the last time they deported me. I was seated on the benches in the hallway where you go into immigration. It was 7:00 in the morning. Two officers arrived by bike wearing green vests [tourist police] and asked me where I was from. I told them from Chihuahua. They didn't believe me, they handcuffed me, and took me away by force, kicking me in the shin; I wasn't drunk or high or anything, nothing. They called for a patrol car and put me in. The judge told me I wasn't Mexican, that I was from Honduras. He made me sing the national anthem to him three times and tell him the names of two presidents we've had. I did, and even so, he locked me up and told me they were going to keep me detained for 36 hours. I was locked up. After 15 hours I began to pound on the bars so the judge would come. They came and handcuffed me to the bars and started slapping me. They left me there and about five hours later, the judge arrived. And he told me he was going to let me go. And he did, but very beaten up.[23]

Operations that consist of pursuits on public streets jeopardize the lives and safety of migrants. We became aware of several cases in which this type of pursuit of migrants resulted in migrants getting hurt, or in some cases killed.[24]

It is clear that the number of migration enforcement operations conducted by the INM with the support of other authorities has increased very rapidly since the Southern Border Program was launched. Without clear guidelines to regulate and limit the use of force and the role of the different authorities involved, it is difficult to monitor whether the operations are being conducted properly. In light of the multiple reports of human rights violations committed during operations, and the documentation of several incidents in which migrants have been hurt or have lost their lives because of them, the intensification of operations aimed at enforcement and detention is concerning.



*INM van in Nogales, Sonora*

## BUDGET

The Mexican government executes its budget through budget programs. Proposed spending for a fiscal year is published in the Federal Expenditures Budget (*Presupuesto de Egresos de la Federación*, PEF). After the necessary adjustments and execution of the PEF, the Public Account is published the following year. It is revealing to see the amounts approved by Mexico's Chamber of Deputies for some budget programs related to migrants, in particular, those of the INM, the Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*, COMAR), the UPM,[25] and the CAIMFS (see table 2). This, bearing in mind that public policies without adequate resources for their implementation are nothing more than demagogy.

### TABLE 2
# FEDERAL EXPENDITURES BUDGETS (PEF)
### BY BUDGET PROGRAM AND RECIPIENT UNIT

| BRANCH / BUDGET PROGRAM (ADMINISTRATIVE UNIT IN CHARGE) | PEF 2012 | PEF 2013 | PEF 2014 | PEF 2015 |
|---|---|---|---|---|
| BRANCH: 04 INTERIOR | – | – | – | – |
| E006 REFUGEE ASSISTANCE SERVICES (COMAR) | 22,256,164 | 24,618,444 | 25,661,594 | 25,308,083 |
| E008 MIGRATION SERVICES AT BORDERS, PORTS, AND AIRPORTS (INM) | 1,997,490,727 | 2,024,924,785 | 2,173,783,360 | 1,966,084,661 |
| P019 COORDINATE MIGRATION POLICY (UPM) | 16,910,321 | 13,043,403 | 63,014,070 | 62,876,173 |
| P019 COORDINATE MIGRATION POLICY (CAIMFS) | – | – | – | 102,011,743 |

*Source:*  *Prepared by Rodolfo Córdova, Fundar researcher, using data from the Secretaría de Hacienda y Crédito Público. Data from 2015 can be found in the 2015 PEF: http://bit.ly/1L8WMCT. The values for 2012, 2013, and 2014 taken from the corresponding PEFs: http://bit.ly/1aEFG0g. However, they were adjusted for inflation (meaning that they are real, not nominal, amounts). 2015 is the base year (=100) and all of the amounts are in Mexican pesos.*

Table 2 shows the evolution of the budgets for COMAR (which has remained the same over the past three years), of the INM (which has remained high), and of the UPM (which shows a clear increase), and we can see the creation of the CAIMFS (which has a higher budget than that of the UPM).

It is worthwhile to note what was actually spent in the specific case of the INM (see table 3). What is striking is the difference between the approved budget and the actual expenditures by the INM.

This is because the Chamber of Deputies approves only current expenditures (salaries and wages) and operations costs for the first quarter.  The INM generates some of its own revenues, including from the collection of fees and fines. The actual expenditures by the INM have increased year after year and have never been as high as they were 2014: in that year, the difference between the approved budget and the INM's expenditures reached 70 percent.

## TABLE 3
# INM APPROVED BUDGET VS. EXPENDITURES

| YEAR | APPROVED BUDGET (PEF) | EXPENDITURES (PUBLIC ACCOUNT) | DIFFERENCE (EXPENDITURES VS. BUDGET) | PERCENT INCREASE |
|------|------|------|------|------|
| 2009 | 1,956,019,701 | 3,037,482,050 | 1,081,462,348 | 55 |
| 2010 | 2,096,784,055 | 3,312,537,612 | 1,215,753,558 | 58 |
| 2011 | 1,982,853,338 | 3,314,831,343 | 1,331,978,006 | 67 |
| 2012 | 1,996,619,411 | 3,358,490,502 | 1,361,871,091 | 68 |
| 2013 | 2,025,574,493 | 3,363,374,620 | 1,337,800,127 | 66 |
| 2014 | 2,173,783,360 | 3,701,746,413 | 1,527,963,053 | 70 |
| 2015 | 1,966,084,661 | – | – | – |

Source: Prepared by Rodolfo Córdova, Fundar researcher, with data from the Secretaría de Hacienda y Crédito Público. The 2015 data are available in the 2015 PEF: http://bit.ly/1L8WMCT. The amounts from 2009–2014 were taken from the corresponding PEFs, available at: http://bit.ly/1aEFG0g, and were adjusted for inflation (the amounts are real not nominal). 2015 is the base year (=100) and all amounts are in Mexican pesos.

When we study the expenditures authorized each quarter by the Ministry of Finance and Public Credit (*Secretaría de Hacienda y Crédito Público*), we see that as of the first quarter of 2014 expenditures rise in lock step with the increase in migrant detentions (see graphic 2).[26]



## GRAPHIC 2
# INM BUDGET VS. APPREHENSIONS

Source: Prepared by Rodolfo Córdova based on the quarterly reports of the Secretaría de Hacienda y Crédito Público, available at: http://bit.ly/1FLxfiM.

The parallel increase in the budget and the number of detentions confirms that the INM has indeed intensified its enforcement, despite the adverse impacts these processes have on migrants' human rights. In order to track such trends for the entire federal public administration, there must be progress in developing a cross-cutting annex in the PEF for migrants, a tool that would identify the resources allocated to migration-related agencies. This would increase transparency and could be a solid foundation for redistributing resources in order to protect human rights. In addition to the SEGOB, INM, and COMAR, it goes without saying that the Federal Police, the PGR, and the CNDH should also be included in said exercise. The annex is an important commitment included in the Special Migration Program (*Programa Especial de Migración*, PEM), a recently created program that was prepared with extensive involvement of civil society.  In contrast, neither the basic program budget nor the budgetary structure of the Southern Border Program and the CAIMFS is known, which casts a shadow over what the PEM could have achieved for migrants and their families.

## COOPERATION WITH THE UNITED STATES

Mexico's Southern Border Program followed a dramatic spike in the number of unaccompanied minors and families arriving at the United States' southern border from Central America. The Obama administration's response to this crisis is at least in part responsible for Mexico's new focus on migration enforcement, particularly the expedited deportation of Central American migrants, including unaccompanied minors. During the first months of 2014, the number of Central American children, whether accompanied or not, who arrived at the U.S. border grew markedly. In January 2014, the U.S. Border Patrol, an agency of the Department of Homeland Security (DHS), detained 3,711 children; in June 2014 that figure had reached 10,631, more than double the number of detentions in June 2013.[28]

The U.S. government has provided assistance to the Mexican government for border security and migration enforcement principally through the Merida Initiative, a security aid package. Congress has approved US$2.4 billion in Merida aid since 2008; approximately US$1.5 billion has been delivered.[29] As part of this support, the government of the United States delivered more than US$90 million to the INM through fiscal year 2012, primarily in equipment and training.[30]

The Merida Initiative is organized in four "pillars," the third of which is to "create a 21st century border structure," further described by the Department of State as facilitating "legitimate commerce and movement of people, while curtailing the illicit flow of drugs, people, arms, and cash."[31] While this third pillar of the Merida Initiative initially focused on the border between the United States and Mexico, much of the cooperation has clearly moved to Mexico's border with Guatemala and Belize. In July 2014, Ambassador Tom Shannon, Counselor of the State Department, revealed that the State Department was working with the government of Mexico on enforcement at its southern border, providing some US$86 million in funds already included in Merida through the International Narcotics Control and Law Enforcement (INCLE) account. Furthermore, Congress allocated up to US$79 million in additional funds in fiscal year 2015 for this same purpose.[32] It is important to keep in mind that U.S. assistance to Mexico for migration enforcement and border security has been provided not only to the INM, but also to Mexico's customs agency (*Servicio de Administración Tributaria*, SAT), Navy (*Secretaría de Marina*, SEMAR), Army, and the Federal Police. This support ranges from non-intrusive scanning equipment, to helicopters, patrol boats, information technology, biometric kiosks, workshops, and training sessions.[33]

It is clear that this type of assistance will continue and will likely be expanded due to the concern

about Central American migration expressed by members of the U.S. Congress and by executive branch officials. Such concern has continued to grow since the "surge" in the number of Central American children arriving at the United States' southern border in the summer of 2014. Members of the U.S. Congress have expressed their support for the Southern Border Program on several occasions over the past year. In fact, some members of Congress have made statements in which they call on Mexico—and in some cases on the countries of Central America—to take

additional measures to stem the flow of Central Americans through Mexico.[34]

Conversely, few members of Congress have expressed concern over how vulnerable migrants in Mexico are.[35] They have more often expressed doubts over whether Mexico is doing enough to detain migrants who cross through the country. Statements of that kind were heard particularly frequently in the months after the "crisis" of unaccompanied children reached its climax in the summer of 2014.[36]



*Fray Tomás González, Director of La 72, Hogar—Refugio para Personas Migrantes*

# HUMAN RIGHTS VIOLATIONS
## AND CRIMES AGAINST MIGRANTS

This section provides an overview of the current situation regarding human rights violations and crimes against migrants. Existing documentation makes clear that migrants in transit through Mexico are victims of multiple crimes and human rights violations, such as kidnapping, human trafficking, enforced disappearance, sexual violence, assault, and aggravated robbery. Despite various efforts to quantify these incidents, it is not precisely known how frequently they occur. As a result of the challenges mentioned in this section, there is likely a significant under-reporting of human rights violations and crimes against migrants.

There have been several studies on the subject of crimes and human rights violations against migrants, including two special CNDH reports on migrant kidnappings from 2009 and 2011[37] and two recent reports from the Documentation Network of Migrant Defense Organizations (*Red de Documentación de Organizaciones Defensoras de Migrantes*, REDODEM) from 2013 and 2015.[38] Additional data and information has been made available by Mexican authorities (the federal and state attorneys general offices) in their responses to several information requests. Nevertheless, all these sources have their own limitations. The CNDH data, for example, are limited to kidnappings and are from 2009 to 2011. The REDODEM data, for its part, only include the cases of migrants who arrived at one of the network's shelters and decided to share their experiences, while government data only include the few cases in which migrants made the decision to file a complaint.

This report does not seek to provide definitive estimates about the frequency of crimes against migrants in Mexico. However, it does include recent data and experiences documented by migrant shelters, alongside previously unreleased government data and data from other sources, underscoring the need to generate, systematize, and publically disseminate greater information about patterns of crimes and human rights violations against migrants.

## KIDNAPPINGS

The kidnapping of migrants was widely documented in the 2009 Special Report prepared by the CNDH, which included migrant testimony taken during a series of visits to migrant shelters and detention centers. In 2011, the CNDH updated this information in a second Special Report, which estimated that 20,000 migrants were kidnapped in a single year. It is not known whether kidnappings have increased or decreased since then; data from migrant shelters appear to indicate an increase from 2013 to 2014, but the evidence is not sufficient to draw definitive conclusions or to make projections about trends on a national level. (It should be further noted that the data from the shelters reflect cases documented in a single location, even though the events may have transpired elsewhere.) Other sources have broader geographic coverage (the CNDH reports are based on case documents that include information from the entire country).[39]

## TABLE 4
# MIGRANT KIDNAPPING CASES
## DOCUMENTED BY MIGRANT SHELTERS

| YEAR | LA 72, TENOSIQUE, TABASCO | CASA DEL MIGRANTE DE SALTILLO, COAHUILA | RED SONORA |
|---|---|---|---|
| 2013 | 10 | 7 | – |
| 2014 | 33 | 15 | 31 |
| 2015 (JAN–APR) | 3 | – | 3 |

Source: Cases documented by La 72, Casa del Migrante de Saltillo, and the Red Sonora.

Documentation carried out by migrant shelters and organizations also makes it possible to identify trends and changes in the pattern of kidnappings. Migrant kidnappings in Mexico have long been known to occur along the train route; organized crime groups have occasionally worked with corrupt train operators to stop the train and force the migrants off, sometimes in large groups. There have also been cases in which migrants have been taken off of buses or taken away from bus stations or hotels using force or deceit. Now that fewer migrants are traveling by train, migrant shelters report that this latter form of kidnapping appears to be more common. Mass kidnappings seem to occur less frequently; migrants tend to be abducted in small groups or one by one. In some cases, criminals force smugglers to turn migrants over to them once they reach a certain point along the route.[40]

Victims are taken to "safe houses" for several days and are forced, by means of threats, beatings, and sometimes even torture, to provide the phone numbers of their relatives in the United States or in Central America, who they then contact to request money, sometimes thousands of dollars, via money transfer services such as Western Union or MoneyGram. Once kidnapped, migrants may also be forced to work on an ongoing basis or until the criminals decide the migrants have worked enough to be taken across the border into the United States. In other cases, they may be killed if their relatives fail to pay the ransom.

The principal reason that criminal groups abduct migrants is to hold them for ransom, but there have also been reports of migrants who were kidnapped in an apparent attempt to deter them from traveling within a certain area that is important for drug trafficking.

*Regarding kidnappings, they've been happening in groups, with Central Americans. People were tortured not so much to demand money but to send a message. In two of the kidnappings, the messages were that they didn't want Central Americans passing through the area. —Perla Del Angel, Centro de Recursos para Migrantes*

## HUMAN TRAFFICKING

Migrants in Mexico, both Mexicans and foreigners, have been identified as being particularly susceptible to human trafficking. Most foreign victims of human trafficking in Mexico hail from the Americas, especially Guatemala, El Salvador, and Honduras.  In a number of cases, migrants become victims of human trafficking because they are unable to pay their smugglers and are therefore forced into labor or into performing sex work to pay off their debts. In other cases, criminal groups kidnap migrants not only to ask for ransom, but also to force the migrants to work in drug trafficking as "mules" or in marijuana or poppy fields.[42]

The testimony given by "Hugo" (pseudonym), a 23-year-old Mexican who was deported after living nearly all his life in the United States, provides a detailed description of the horror of experiencing human trafficking first hand.

> I was deported to Nogales, Sonora and started looking for work. A man offered me work and I went to work at his house. After a few days of work he refused to pay me and told me I had to work for him and if I didn't, that they were going to kill me. Several armed men arrived and beat me and put me in the trunk of a car where they kept me for 12 hours. They took me to a room where there were about 7 or 8 other people. They took us to work in a covered truck and made us dig tunnels.

> I would remove the bags of dirt and haul them to the truck. We would work all night long and they would take us back to the room in the morning. They wouldn't let us sleep. If we fell asleep they would throw cold water in our faces or kick us in the stomach. They beat us whenever we asked for food or water and threatened to kill us if we refused to cooperate. They took away some of the abductees when they became weak from hunger and had gone crazy, saying "their time has come." Twice they made me clean the bathroom and it was full of blood. I didn't know if they had killed the people they took away, but those people never returned. I was held hostage and forced to work for nearly a month. I was finally able to escape with some others and we came across the municipal police. We asked for their help, but they ignored us and drove away in their car. Since then, I have felt like they were after me.[43]

There have also been reports that some government officials are directly involved in human trafficking networks. For example, in 2013, the Special Prosecutor's Office for Crimes of Violence against Women and Human Trafficking (*Fiscalía Especial para los Delitos de Violencia contra las Mujeres y Trata de Personas*, FEVIMTRA) detained INM officials and other public servants in connection with human trafficking.[44]

## SUMMARY EXECUTIONS

The most infamous and horrendous crime committed against migrants in transit through Mexico is the massacre of 72 migrants on a ranch in the municipality of San Fernando in the state of Tamaulipas. The migrants, the vast majority of whom were from Central and South America, were taken off buses and murdered between August 22 and 23, 2010. Their bodies were discovered on August 24, 2010[45] after one of the three survivors—an Ecuadorian who had

been shot in the face and neck—escaped and walked several miles to alert the authorities, who, when they arrived at the ranch, found that the 72 migrants had been summarily executed and their bodies tossed in the ground.[46]

A number of theories exist as to why the migrants were killed: the most widely accepted is that they had refused to work for an organized crime group.[47] Declassified documents from the Mexican

government regarding the massacre include the testimony of a member of the *Los Zetas* criminal organization in which he alleges that the local municipal police were accomplices in the crime.[48] Less than one year later, in April 2011, the remains of 193 individuals were discovered in clandestine mass graves in that same town in Tamaulipas,

and in May 2012, the remains of 49 others were found in Cadereyta, Nuevo León. In the latter two cases, the victims were both Mexicans and Central Americans (though there continue to be unidentified remains) who were heading to the U.S.–Mexico border.[49]

## ENFORCED DISAPPEARANCES

The United Nations Committee on Enforced Disappearances, in its recommendations to the Mexican government in February 2015, expressed concern for the vulnerability of migrants in Mexico, especially minors, given the problem of enforced disappearances.[50] Several Mexican civil society organizations and migrant shelters work directly with committees of Central American families established to search for disappeared migrants. Furthermore, for the last ten years a caravan has been organized every year for Central American mothers searching for their children who disappeared in Mexico.[51]

Nevertheless, as is the case with other human rights violations , it is a challenge to quantify disappearances of migrants in Mexico. In the Inter-American Commission on Human Rights (IACHR) 2013 report on the human rights of migrants in Mexico, the IACHR highlights that there is no single registry of disappeared migrants and that authorities do not keep consistent figures. Furthermore, the *Fundación para la Justicia y el Estado Democrático de Derecho*, a civil society organization with expertise in the topic, underscores that there is no certainty about number of disappeared persons in Mexico, and even less so in the case of migrants.[52]

## SEXUAL VIOLENCE

According to the information collected by migrant shelters, migration flows through Mexico have always included women, even if male migrants remain the majority. The likelihood that women and girls will be victimized during their transit through Mexico is high. Sexual violence has become a part of the journey through Mexico, especially for female migrants; indeed, it is well known that Central American women inject contraceptives to avoid becoming pregnant from their potential rapists. It has also been reported that men have been victims of this kind of violence.[53] The IACHR, in its 2013 report, documented different cases of sexual violence, assaults during kidnappings, and sexual exploitation. It also reported on the case of a 15-year-old Honduran girl who was sexually assaulted by an INM official in Tenosique, Tabasco. With regard to this case, the CNDH issued "Recommendation No. 54/2012, On the sexual assault case involving the migrant minor V1," on

September 28, 2012, so that the INM would take measures against the local delegate and four other officials.[54]

It is difficult to document cases of sexual violence because the victims may be afraid, feel embarrassed, or have internalized what they suffered. In Tabasco, there has been an increase in the lesbian, gay, bisexual, and transgender population, which are also sometimes victims of sexual violence.[55]

"Natalia" (pseudonym), a Honduran woman who was staying at the *La 72* shelter decided to file a sexual assault complaint with the Specialized Prosecutor for Attention to Migrants (*Fiscalía Especializada para la Atención a Migrante)* in Tenosique, Tabasco. A month before, the young woman was threatened at gunpoint and forced to have sexual relations with a human smuggler in a hotel in Tapachula, Chiapas. Several days

after she managed to escape, she was detained by the INM and deported to Honduras without anyone confirming her status as a victim. When she crossed the southern border of Mexico for the second time and reached *La 72* in Tenosique, Tabasco, she was provided legal assistance and decided to report these events. The only result she obtained was that the prosecutor's office decided to give jurisdiction of the case to the state of Chiapas, so that it could be investigated there. Natalia is awaiting a decision on her application for a humanitarian visa.[56]

## ROBBERY, ASSAULT, AND EXTORTION, ACCOMPANIED BY PHYSICAL AND PSYCHOLOGICAL ABUSE

Robbery, assault, and extortion are among the most frequent crimes committed against migrants. The number of reported crimes indicates that there was an increase in robberies committed from 2014 to 2015 in the states of Chiapas, Oaxaca, and Tabasco. The Tabasco prosecutor's office, for example, reported that there were 26 reports of robbery between July 2013 and May 2014, while there were 35 in the same period from 2014 to 2015.[57] Documentation by migrant shelters reveals a proliferation of perpetrators since the implementation of the Southern Border Program. Common criminals and members of organized crime, as well as public officials, commit these offenses, which in the first place constitute property crimes, but are also routinely accompanied by torture, cruel treatment, or in the worst case, loss of life.

When public officials commit these crimes, however, they are also commiting human rights violations, as these authorities are harming an individual's security. Furthermore, it should be noted that, almost invariably, multiple violations are committed as part of what might seem to be a single incident: for example, a migrant may be threatened or beaten when robbed, just as a migrant that is kidnapped may be forced to work (trafficked).

In 2014 authorities participated in one out of every five crimes against migrants (20.16 percent) that were documented by REDODEM members. The most frequent crimes were robbery and extortion. Among the authorities who are most often implicated as perpetrators in these cases, the involvement of the Federal Police, in 41 percent of the cases, and of the municipal police, in 23 percent, is striking.[58]

It is important to distinguish between larceny, aggravated robbery, assault, and extortion. All of these acts involve taking possession of the victim's property. What changes is the seriousness of the crime according to the kind of harm inflicted on the victim and society. In cases of extortion, the migrants are forced (by intimidation, for example) to surrender their property. In cases of robbery or assault, property is taken violently and by force (the harm always goes beyond the victim's property and is therefore considered serious). Extortion also involves harm that surpasses property because it is an attack on the integrity and freedom of the victim who is forced to do something prohibited by law or to allow the official in question to omit doing something he or she should do in the performance of his or her duties. Article 164 of the Mexican Federal Criminal Code provides that extortion is aggravated when it is committed by public officials, particularly by law enforcement or the armed forces.[59]

Both robbery and extortion are committed by individuals, as well as by authorities, including the Federal Police, the INM, and local police. A common pattern in the case of migrants is that an individual or official will demand money in order to let migrants continue their journey. Thus, the journey carries a price above and beyond the fee that in many cases they have already paid to a coyote to leave their countries. These acts go hand in hand with threats and attacks which, when

committed by public officials, constitute cruel treatment, and in some cases torture.

We were having dinner in the Federal District, there in Lechería opposite the metro station. Some 10 minutes after dinner a Mexican man came and began to chat. He began asking whether we had crossed [the border], whether it was the first time, and we fell into the trap of listening to him and chatting. After 15 minutes of chatting a private passenger car—a Chevy—arrived. A screech of brakes could be heard. The driver got out, as well as the passenger, and came over to us and told us, "We are the state police and I'm going to take you in." He had a uniform on, but it was under his jacket. One of them had an earring. "Get in," he ordered. They were threatening me with an Uzi. They put me in the car. Another fellow traveler ran. In the truck there was a civilian and two police officers. The driver was not a police officer. They took me about a kilometer and a half south of the station. There they asked us for money; otherwise, they were going to kidnap us for a long time until we paid the ransom. They asked us to hand over what we had, otherwise the ransom would be US$10,000. Behind the car a seven-man patrol arrived in a state police car. They took our clothes, all of them, so we wouldn't escape. There were two of us. The third guy had run. We gave them the MXN$2,000 we had on us. They left us naked and without shoes, without anything. The police officers from the patrol car were guarding the area. My fellow traveler was from Durango. We saw a Federal Police car approaching. We took advantage of that moment to run and flee. We headed for the woods. I covered myself with a shirt that I found.

When a man saw that we were bound for the woods, he helped us. He took us to his house and gave us clothes and shoes because he said, "Here all the police rob you." And he told us to be very careful because if they did find us, they would kill us for having escaped. We waited until dawn and went to the train station. I filed a complaint in Guadalajara, Jalisco, at the FM4 [*FM4 Paso Libre*, a civil society organization] but I didn't want to wait six months to follow through on it.[60]

The shelters and organizations involved in this report have documented many cases and testimonies regarding robbery, assault, and extortion, and have established some clear patterns. In Tabasco and the Isthmus of Oaxaca, the pattern of assaults has changed since the end of 2014 because migrants can no longer reliably use the cargo train for transportation. Local authorities, as well as the staff of the migrant shelters *Hermanos en el Camino* in Ixtepec and *La 72* in Tenosique, have identified some very specific places where these attacks take place. The migrants recount in their testimonies that they are assaulted by groups of individuals with Mexican accents that seem to know the area well. Sometimes these individuals even offer food and lodging, only to later attack them with machetes or other weapons and take everything from them. In these cases, certain locations are repeatedly mentioned: the area between Arriaga, Chiapas and Ixtepec, Oaxaca (in particular Corazones), as well as the area surrounding Tenosique, Tabasco.

In Tenosique, the data from the shelter *La 72* shows that the majority (89 percent) of the cases documented in 2013 were assaults or extortions. In 2014, in addition to a high number of assaults and extortions, other crimes, including abuse of authority linked to migration raids, became increasingly common (see table 5).

## TABLE 5
# CASES OF ASSAULT AND EXTORTION OF MIGRANTS
## DOCUMENTED BY LA 72

| YEAR | VICTIMS (TOTAL) | ASSAULTS | EXTORTION | OTHER CRIMES |
|---|---|---|---|---|
| 2013 | 1,108 | 745 | 236 | 127 |
| 2014 | 1,497 | 595 | 218 | 684 |
| 2015 (JAN–APR) | 476 | 189 | 60 | 227 |

Source:  Documentation records from La 72. The column labeled "victims" refers to the number of cases La 72 documented and accompanied. The total number of crimes committed may actually be even higher.

Both shelters, as well as prosecutors from Ixtepec and Tenosique, mentioned in interviews that despite the frequency of the robberies, assaults, and extortion in the area, authorities' response to reports filed has been limited. Surveillance operations were conducted in the areas identified by migrants, but investigative police have not found any suspects. Three Honduran migrants identified the INM as the perpetrators of robbery and intimidation.

We filed a report of our robbery; it was committed by INM agents. We entered in Mexico via el Ceibo, and when we were 11 kilometers from Tenosique we were already tired and our feet were very sore. We encountered an INM patrol but we didn't run. Four migrants who were with us did run. Four INM agents got out of

the car, searched our bodies, our things, and then asked if we had dollars. They took the backpack and MXN$500 from one of us. Afterwards we went into the reed bed and an agent yelled: "Fire away at those bastards!" We took off. We hid for a while, and when we came out, we continued our journey. When we got to Tenosique, we filed a report with the PGR but it wasn't handled well.[61]

In the north of Mexico, in particular in Saltillo, Coahuila and the border zone of Sonora, cases of robbery and extortion committed by authorities have been documented and the involvement of police forces is striking. In 2014, the Federal Police was accused of being responsible in 37 of the 66 cases of extortion documented by the *Casa del Migrante de Saltillo.*

## TABLE 6
# CASES OF ROBBERY AND EXTORTION OF MIGRANTS COMMITTED BY AUTHORITIES
## DOCUMENTED BY THE CASA DEL MIGRANTE DE SALTILLO

| YEAR | TOTAL CASES | ROBBERY | EXTORTION | OTHER CRIMES |
|---|---|---|---|---|
| 2013 (JUL-DEC) | 113 | 26 | 38 | 49 |
| 2014 | 149 | 37 | 66 | 46 |

Source:   Documentation records from the Casa del Migrante de Saltillo.

The cases systematized by the three organizations that make up the *Red Sonora* reveal that the cases of extortion are crimes against property, but also against liberty. For example, State agents detain migrants for purposes of extorting them at a checkpoint on the road. Sometimes they put them in patrol cars, take them to other places, and bring them back by bus, in something akin to an express kidnapping. In Sonora, the cases of both extortion and robbery involve restrictions on free transit, arbitrary detentions, threats, and cruel treatment.

The authorities that are most frequently accused of being perpetrators are the Federal Police and the Municipal Preventive and Transit Police, but also noteworthy is the involvement of the State Security Police, Federal Protection, and the INM. Testimonies recount the collusion of some authorities in organized crime. These cases are difficult to document because migrants often fear reprisal.

## TABLE 7
# CASES OF ROBBERY, EXTORTION, TORTURE, CRUEL TREATMENT, AND THREATS AGAINST MIGRANTS
## DOCUMENTED BY THE RED SONORA

| YEAR | ROBBERY | EXTORTION | TORTURE | CRUEL TREATMENT | THREATS |
|---|---|---|---|---|---|
| 2014 | 35 | 49 | 15 | 43 | 11 |
| 2015 (JAN-JUN) | 8 | 25 | 6 | 18 | 9 |

Source:   Red Sonora case registry.

From the point of view of migrant rights advocates, robbery, assault, and extortion of migrants have always been frequent and persist to date. However, now that flows are not concentrated on trains, the places where the crimes occur and the perpetrators have proliferated. As highlighted previously, since the Southern Border Program was announced in July 2014, there has been a deployment of migration and security authorities nationwide and there seems to be greater coordination between the INM, Federal Police, and local police. The number of migration operations carried out has risen in general, as has the number of operations in which an authority other than the INM, like the Federal Police, is involved. This has led to an increase in migrant detentions. This same deployment and coordination, in addition to offending the dignity of those individuals subject to the verification and detention processes, may have led to a mushrooming of actors who abuse and take advantage of migrants. Furthermore, as will be described later, the fact that prosecutors' offices, in particular specialized prosecutors' offices, report meager results in investigating these cases, underscores an implicit message: it is extremely unlikely that those who rob, assault, extort, threaten, or torture a migrant will be punished.



*Mural at the migrant shelter Hermanos en el Camino in Ixtepec, Oaxaca*

## UNDER THE MICROSCOPE:

# DOCUMENTATION OF HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS IN SONORA

The organizations that make up the *Red Sonora* ("Sonora Network")—Kino Border Initiative in Nogales, *Centro de Recursos para Migrantes* in Agua Prieta, and *Centro Comunitario de Atención al Migrante y Necesitado* (CCAMYN) in Altar—have devoted themselves to providing assistance to migrants in the Sonora desert region that borders the state of Arizona. The migrants they help are mostly Mexicans and Central Americans. Having seen how violence and abuse committed by authorities was becoming increasingly common, these organizations decided to strengthen their documentation and advocacy efforts. About two years ago the organizations began documenting cases of human rights violations against migrants because clear patterns had emerged of authorities' involvement in the abuse of migrants in a context of almost complete impunity.

> *Abuses happen and nothing happens. The authorities then take advantage to diminish resources. There is no intention of wanting to help. The treatment we give our brothers is shameful. A trip from Hermosillo to Los Angeles by plane costs US$1,000 and migrants pay up to US$8,000 without any assurances and they are treated inhumanely. You can't even compare. —Father Prisciliano Peraza, Centro Comunitario de Atención al Migrante y Necesitado*

Documentation is a process by which the collection of key data about cases (in this instance, migrants and their experience during transit through or deportation to Mexico) enables the identification of patterns of abuse and the monitoring of cases. It entails the creation of a methodology and system that, in addition to recording migrants' personal data and the types of assistance provided to them, such as meals or lodging, includes variables about human rights violations and the authorities identified as responsible by the migrants. The system of the *Red Sonora* is special because it is shared in real time.

**THE MOST IMPORTANT FINDINGS THAT HAVE EMERGED FROM THIS EFFORT, WHICH INCLUDE 215 CASES (151 CASES DOCUMENTED IN 2014 AND 64 CASES FROM JANUARY TO JUNE 2015) ARE THE FOLLOWING:**

1. The Federal Police is the authority that is most frequently singled out as responsible for the human rights violations against migrants documented by the *Red Sonora*: 64 of the 215 cases (29.8 percent). It is followed by the Municipal Transit and Preventive Police (*Policía Preventiva y Tránsito Municipal*, PPTM) with 49 cases (22.8 percent). The

involvement of the PGR and the State Security Police also stands out (both at 16 cases or 7.4 percent). Finally, Federal Protection (which provides surveillance and security for federal government officials, assets, and buildings) is implicated in 15 cases (seven percent).

The patterns of human rights violations that the Federal Police and the PPTM commit against migrants are very similar. First of all, they violate the right to personal liberty (through the restriction of free transit, arbitrary detention, and kidnapping); secondly, they violate property rights (through extortion and robbery); and thirdly, they violate humane treatment (through cruel treatment, torture, and threats). This shows that these authorities first detain migrants and use excessive force or physical or psychological violence in order to then take their money and belongings. Although the patterns are similar, there are important differences.

## GRAPHIC 3
# AUTHORITIES IMPLICATED AS PERPETRATORS
## CASES DOCUMENTED FROM JANUARY 2014 TO JUNE 2015



MUNICIPAL TRANSIT AND PREVENTIVE POLICE 22.8%

STATE SECURITY POLICE 7.4%

FEDERAL ATTORNEY GENERAL'S OFFICE 7.4%

POLICE 7.0%

FEDERAL PROTECTION SERVICE 7.0%

INM 4.6%

OTHER ACTOR / GANG 4.2%

OTHER ACTOR / PRIVATE SECURITY 1.9%

STATE INVESTIGATIVE POLICE 1.9%

TOURISM POLICE 1.9%

OTHER ACTOR / SMUGGLER 0.9%

FEDERAL POLICE 29.8%

UNIDENTIFIED 0.5%
NAVY 0.9%
ARMY 0.9%
U.S. BORDER PATROL 0.9%

**215 CASES TOTAL**

*Source: Red Sonora case registry.*

2. Regarding the physical location where documented abuses occurred, there are differences in the authorities' conduct. In cases where migrants were assaulted during their journey by bus on the roadway, the involvement of the Federal Police is singled out in 36 of the 64 cases (56.3 percent, the majority in Sonora, close to where the organizations are located). While walking down the street, for example in Nogales, migrants are more often victimized by local authorities such as the PPTM (24 out of 49 cases, or 49 percent). Cases

of abuses also occurred frequently in specific places where authorities had identified the presence of migrants, including near government offices, on the train tracks, or in bus terminals. In these cases, which have been primarily documented in Nogales, both Federal Police and municipal police have been singled out as perpetrators.

3. The specific situation or circumstance that led to the human rights violation in 30.2 percent of all cases was a checkpoint on the roadway. In another 16.7 percent of the cases, the catalyst was that authorities identified an individual on the street as having "the appearance of a migrant." The latter reveals the problem of discrimination, especially on the part of the PPTM.

The importance of these findings lies in the identification of clear patterns of abuse on the part of authorities and in well-identified places. Nearly all migrants mention the same checkpoint on the roadway close to the Santa Anna crossroads in their testimony. There is also a strong presence of organized crime in the area, which may conceal even more abuses that migrants are reluctant to share. Collusion between organized crime and authorities is also a real possibility; as a result, the total number of abuses in which public officials have been involved is impossible to determine.

Finally, the Kino Border Initiative has discovered that migrants have suffered gross human rights violations at the Nogales train station. From April 2014 to February 2015, more than 60 migrants reported having suffered torture, cruel treatment (beatings, threats, and insults), as well as discrimination, at the hands of Federal Protection. For this reason, on February 18, 2015, the Kino Border Initiative filed a complaint with the CNDH, requesting an investigation and precautionary measures.



*Inside Centro Comunitario de Atención al Migrante y Necesitado in Altar, Sonora*

## DETENTION AND ACCESS TO THE RIGHT TO ASYLUM

Migrants, in their journey through Mexico, can be detained by the INM and "housed" at migrant detention centers or provisional holding facilities. Official Mexican government documents make no mention of migrant detentions, rather of "appearances" (*presentaciones*) and "housing" (*alojamiento*). Thus, the person detained is not immediately made available to the competent authority or brought before a judge. Detention is illegal if it is carried out without cause and it is arbitrary if, even where there is cause, it is carried out using methods that are inconsistent with human rights. It is important to point out that detained migrants must be immediately informed of the reason for their detention and the crimes they are accused of in simple language (only mentioning the legal grounds is insufficient), as well as their rights, including that of consular and linguistic assistance. It is likewise important that migrants be informed of their right to request asylum.[62]

The migrant population in Mexico comes mainly from countries in which conditions of generalized violence prevail, especially El Salvador, Honduras, and Guatemala. Indeed, of the 107,814 migrants returned by Mexican migration authorities in 2014, 104,269 (96.7 percent) came from those three countries.[63] In 2014, Honduras had a homicide rate of 68 per 100,000 people.[64] Meanwhile, the violence in El Salvador is increasing, and in the month of August there were 907 homicides, which is the highest figure on record since the end of the civil war in 1992.[65]

The INM has 32 migrant detention centers, where as general rule migrants are held for 15 days, although in some cases they are held for longer periods. There are 14 "Type A" provisional holding facilities, where migrants may be detained for up to 48 hours, and 12 "Type B" provisional facilities, where they can be held for up to seven days, although in practice these limits are frequently exceeded.[66] Although the focus of this report is not the human rights situation of individuals in migration detention, it is pertinent to note that detention should be used only as an exceptional measure, and alternatives should be applied as a rule. There is a wide array of documentation regarding conditions in detention centers, including the reports *La ruta del encierro* (2014) and *Derechos cautivos* (2015) by several civil society organizations, and the Inter-American Commission on Human Rights' 2013 report, *Human Rights of Migrants and other Persons in the Context of Human Mobility in Mexico*. These reports emphasize the lack of information provided to migrants, the excessive duration of detention, the lack of specialized assistance for children and adolescents, access to justice, and the poor conditions in migrant detention centers.

*Families with two to four children arrive from Honduras and El Salvador. Many of them are single mothers whose husbands have been killed and they are fleeing and seeking asylum. One girl married a former gang member who had distanced himself from the gang, but they killed his brother and his first wife. They requested asylum in Guatemala and obtained it, but when they found out he was a gang member they began to harass them and make their life hell. She decided to go to the U.S. to seek asylum. She entered through Tenosique but the INM detained her. —Alberto Donis, Albergue de Migrantes "Hermanos del Camino"*

It is important to reiterate that since the Southern Border Program began, the number of migrants detained and deported has risen dramatically; from July 2014 to June 2015, detentions rose 73 percent compared to the same period in the previous year. This new agility in the detention–deportation process means it is unlikely that during this process individuals obtain enough information and are provided with an opportunity to assert their right to asylum or their rights as victims of crime. Migrant testimonies documented by the organizations involved in this report make clear that when migrants do decide to file a complaint, it is not always done in their first attempt to cross Mexico, but rather after being deported or with support from shelter staff. It is therefore even more important to allow civil society organizations, legal counsel, and other trusted persons access to migrant detention centers and provisional holding facilities, and to make procedures to enter more flexible.

The Mexican government's refusal to recognize the detention of migrants as such and its insistence on using euphemistic terms puts detained migrants in legal limbo. Because they are not technically detained, migrants do not enjoy the same rights as detained persons, namely, access to legal representation; however, they are deprived of their liberty. This is particularly harmful for potential asylum seekers who are often detained and deported without being informed of their rights or afforded a fair opportunity to tell their stories to a competent authority. Mexico only recognized 451 individuals' refugee status in 2014, of which 413 were from the northern triangle, according to COMAR.[68] The number of individuals with recognized refugee status is very small when compared to the number of deportations.[69] It is likely that many of these individuals were potentially eligible for asylum. In 2014, the United Nations High Commissioner for Refugees (UNHCR) conducted a survey of 200 unaccompanied minors detained in Mexico City and Chiapas and found that nearly half (48.6 percent) could have qualified for international protection.[70]

## TABLE 8
## ASYLUM APPLICATIONS
### 2013–FIRST HALF OF 2015

|  | 2013 | 2014 | 2015 (FIRST HALF OF THE YEAR) |
|---|---|---|---|
| APPLICATIONS | 1,296 | 2,137 | 1,383 |
| GRANTED | 270 | 451 | 289 |
| DENIED | 455 | 840 | 618 |
| ABANDONED | 543 | 767 | 438 |
| COMPLEMENTARY PROTECTION | 28 | 79 | 37 |

*Source:   Comisión Mexicana de Ayuda a Refugiados, Estadísticas, www.comar.gob.mx/es/COMAR/Estadisticas_COMAR.*

It is important to highlight that Mexico has ratified the Cartagena Declaration on Refugees, which recognizes the right to asylum in cases of "generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order."[71] Furthermore, the Mexican government has enshrined this broader definition of "refugee" in the 2011 Law on Refugees, Complementary Protection, and Political Asylum (*Ley sobre Refugiados, Protección Complementaria y Asilo Político*).[72] Therefore, there are grounds for the government to recognize the status of a large number of refugees who are clearly fleeing Central America. In contrast, the United States has not ratified the Cartagena Declaration on Refugees; the U.S. government only grants asylum to those individuals who show that they "were persecuted or fear persecution due to race, religion, nationality, political opinion, or membership in a particular social group."[73]

Among the various reasons why Mexico has so many potential refugees and so few recognized refugees is that few migrants identify themselves as potential refugees and apply for asylum. In 2014, only 2,137 people applied for asylum in Mexico, including 1,769 Hondurans, Guatemalans, and Salvadorans.[74] The limited number of asylum applicants also reflects the fact that in many cases migrants do not know their rights or are poorly informed. According to the UNHCR report *Arrancados de Raíz*, only 27 percent of children interviewed at migrant detention centers in Tapachula and the Federal District knew of their right to asylum.[75] The problem is exacerbated by the lack of access to legal representation: there are few pro bono asylum attorneys in Mexico, and the civil society organizations that are involved in representing asylum seekers report difficulties in entering the detention centers.[76] *La 72*, which has provided assistance to asylum seekers, reports significant delays in obtaining interviews for asylum seekers with COMAR officials (the interviews must be requested through the INM), as well as delays throughout the asylum process. As a result, many asylum seekers abandon or desist from the process.[77]

It is likewise important to mention that the increase in detentions by the INM has not been accompanied by a significant increase in COMAR's capacity. This is significant because now that the INM has intensified its enforcement actions, it is in contact with a greater number of migrants who may be eligible to obtain refugee status.[78] Therefore, there is a growing need for agents who are trained to identify vulnerable individuals who require international protection, conduct asylum interviews, and process applications. Despite this uptick in detentions, COMAR's budget did not increase in real terms from 2014 to 2015,[79] and the agency only has 15 agents throughout the entire country to conduct asylum interviews.[80]

## SCAPEGOATS:
# THE CRIMINALIZATION OF MIGRANTS

It is true that some migrants commit crimes; in fact, in some cases, crimes against migrants have even been committed by other migrants. However, it is just as true that there is a worrisome pattern of falsely accusing migrants of having committed crimes. According to a 2014 report by the *Centro de Derechos Humanos Miguel Agustín Pro Juárez* (Centro Prodh), between May and October 2013, there were 1,219 people of Central American origin in Mexico's state and federal prisons.[81] They are far from their families and support networks and many lack legal representation. It is not known how many have been falsely accused, and/or how many have been victims of torture. Coverage in some media outlets of criminality in areas where migrants transit also fosters the perception that migrants are criminals or are a danger to residents.[82]

Between 2013 and 2014, the migrant shelter *Casa del Migrante de Saltillo* documented 35 cases of torture of migrants by municipal police and elite forces such as the Saltillo Municipal Operational Reaction Group (*Grupo de Reacción Operativa Municipal de Saltillo*, GROMS) and Saltillo Special Tactical and Weapons Group (*Grupo de Armas y Tácticas Especiales de Saltillo*, GATES). The case of "Carlos" (pseudonym), a young Honduran, is illustrative.

> On May 14, 2013, Carlos was traveling by taxi to a hotel in Saltillo, where he was to meet three fellow travelers from Honduras. As the taxi approached the hotel, there were several patrol cars surrounding it. A hooded officer came over to the taxi, detained him, and asked him what nationality he was. When Carlos said that he was Honduran, the officer took him out of the cab, put his t-shirt over his head, took him by the feet and cuffed him. He grabbed him by the shoulders and put him in the patrol car where his fellow travelers were. After 15 minutes they arrived at a place where the migrants were tortured. They destroyed Carlos' documents, pointed a weapon at him, and put it in his mouth. They ordered them to write out a list of drugs on a piece of paper while they had a dog that attacked them. When they arrived at the municipal jail, they placed Carlos in an area for children and adolescents. [However,] they forced him to say he was an adult so they would transfer him to the state prison [*Centro de Rehabilitación Social*, CERESO] (...) Before meeting with the medical examiner, officers threatened them and told them to say that they had fallen from the train. A policewoman took photos and video footage of them.[83]

The victims filed a complaint with the Coahuila State Human Rights Commission (*Comisión Estatal de Derechos Humanos*, CEDH) against the GROMS elite corps, in which they specified the kinds of threats and injuries received (blows to the hand with a bat, blows to the face, chest, back, and legs, electric shocks, and waterboarding). The CEDH issued "Recommendation No. 114/2014" on October 9, 2014 (a year and four months after receiving the complaint) for violation of the right to privacy due to the illegal searches and domiciliary visits, violation of the right to humane treatment and personal safety due to the injuries, and violation of the right to legality and legal certainty due to wrongful exercise of public duties. They refused to investigate additional acts, including torture or forced confession.[84]

# INVESTIGATING AND SANCTIONING
## CRIMES AND HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS

*Unfortunately, one thing is the facts, and another thing is the law. —Father Prisciliano Peraza, Centro Comunitario de Atención al Migrante y Necesitado*

The context in which crimes are committed against migrants requires special attention, as well as a forceful response from the State to investigate, sanction, and prevent the repetition of these acts. Such crimes constitute human rights violations when they are committed by public officials. The data we obtained regarding authorities' performance in investigating and sanctioning these acts, combined with the migrant shelters' firsthand accounts, indicate that efforts to address human rights violations and crimes against migrants continue to fall short.

## DATA ON INVESTIGATIONS INTO CRIMES AGAINST MIGRANTS

*There are no real investigative proceedings. I accompanied a complaint in 2014, a man was assaulted by municipal police; they beat him. Because he did not have any information on the patrol car's number or the names of individuals, the public prosecutor told him that the complaint would not move forward, that it was in vain. —Diana Castillo, Casa del Migrante de Saltillo*

Currently, there are several reasons why it is challenging to collect data on investigations of crimes committed against migrants in Mexico. One of them is that investigating such crimes involves many agencies, including the PGR—especially the Special Prosecutor's Office for Crimes of Violence against Women and Human Trafficking (*Fiscalía Especial para los Delitos de Violencia Contra Mujeres y Trata de Personas*, FEVIMTRA) and the Deputy Attorney General Specialized in Investigations on Organized Crime (*Subprocuraduría Especializada en Investigación de Delincuencia Organizada*, SEIDO)—as well as state attorneys general offices, including the offices of specialized prosecutors for crimes against migrants that have been created in several states. Furthermore, not all prosecutors and attorneys general offices record data on the results of investigations, including whether the cases were successfully prosecuted and whether there was a judgment handed down by the courts. The problem of data fragmentation is exacerbated by the inconsistent manner in which these different agencies document and categorize their data. In some cases, the crimes are not classified in the same way, and moreover, not all agencies specify whether the victim was a migrant.

Despite these challenges, the authors of this report requested and obtained data from some agencies that shed light on the frequency of investigations of crimes against migrants in Mexico and, in some cases, the stage of the investigative proceedings. These data reveal that despite multiple obstacles and dangers, there are indeed hundreds of migrants who have had the courage to file a complaint with federal and state

authorities. Nonetheless, the authors have not found information that points to a real effort on the part of Mexican authorities to ensure that these complaints lead to effective investigations, and even less, convictions of the perpetrators.

At a federal level, the data on crimes against migrants are especially sparse. In a response to an information request, the PGR stated that all its documents are in its Institutional System for Statistical Information (*Sistema Institucional de Información Estadística*), but that "its databases lack the variables that allow for knowing or identifying information involving migrants as victims and State agents as perpetrators of unlawful acts under federal jurisdiction."[85] If it is true that the PGR is currently unable to disaggregate its data according to victims or perpetrators, this lack of capacity

constitutes a fundamental obstacle to conducting a thorough assessment of the PGR's performance in investigating crimes against migrants.

The PGR stated that SEIDO does have some data about crimes against migrants in Mexico. Without providing a breakdown by offense, the PGR explained that between 2011 and 2014, it had initiated 397 preliminary investigations for crimes against migrants. Opening these investigations could be considered a positive step by the government to investigate the criminal networks that commit such crimes. However, the fact that SEIDO failed to provide information about the results of these preliminary investigations, particularly the number of convictions, makes it difficult to evaluate the seriousness or efficacy of such efforts.[86]

> *The PGJE does not have qualified personnel. For example, for sex crimes, they take statements in front of everyone, the doctor is a man, and they encourage the survivors to minimize the events. With regard to the expert analysis, practically the only thing they do is a reconstruction of the events; they take them to the scene; there are no technical elements.* — Salvador Leyva, La 72

## OBSTACLES TO REPORTING CRIMES AND HUMAN RIGHTS VIOLATIONS

Victims of crime in Mexico, whether they are Mexican citizens, migrants in transit, or other foreigners, are unlikely to see justice done in their cases. There are many obstacles in the long road to justice in Mexico, including a lack of trust in the authorities, the fear of retaliation, slow proceedings, and authorities' lack of investigative capacity. Such obstacles and dangers affect all victims regardless of their nationality; however, migrants, and particularly migrants in transit, face additional challenges.

It is important to recognize the critical role played by migrant shelters in informing migrants of their rights, including their right to initiate proceedings to regularize their migration status and/or file a report or complaint regarding crimes or human rights abuses to which they have been victim. Migrant shelter staff members draw on their significant experience accompanying cases to analyze the shortcomings of official investigations and procedures. Such analysis facilitates the identification of opportunities for improving the government's response to crimes and human rights violations against migrants.

*Violence has become normalized to such an extent that people cannot identify the violations of their rights or crimes. They take it as if it were a part of life, especially women [with regard to] sexual violence. So that violence is covered up with the economic argument. How you experience the violence determines whether you file a report or complaint. When they enter Mexico, they already know what lies ahead, that they may be robbed, kidnapped, raped. That is why they don't file a complaint and [think] it is better to just continue, otherwise their family will stop helping them. Out of 100 cases, only five stay behind to file a complaint. Those are the people who come by themselves and can wait for a humanitarian visa. This is increasing; more people are coming who have no one to help them, but they decide to take the risk and try it alone.* —Diana Castillo, Casa del Migrante de Saltillo

Migrants and their defenders underscore that one of the main problems is the scant probability that any given complaint will lead to results. These low expectations are due to the lengthy nature of the proceedings and the superficial nature of the investigations (forensic analysis is conducted in a perfunctory way and is not tailored to each case). The lack of protection for those who report authorities or organized crime is another significant hindrance to filing a complaint.

An obstacle to investigations that was mentioned repeatedly in interviews with local authorities is the inherent mobility of migrants. Also mentioned was the fact that migrants are rarely able to identify the perpetrators of the crime. All these challenges persist and combined, they complicate access to justice while also explaining the limited number of complaints.

*There is a great deal of fear about filing a report. Those who do decide to file a report don't believe in justice, they are not from Nogales and their plans are not to stay here and move forward with the proceedings. (...) Getting a response to the report takes a long time. In July 2014, we filed a complaint against the agency specialized in sex crimes and intra-familial violence. This week, after a year, they just closed the case because there was a change in personnel; it was another person who didn't do what they were supposed to, processing the cases. We have to pressure them to get a response to the reports and complaints. We need personnel to do this follow-up; to bolster this work we would need an attorney, a psychologist, a doctor, another social worker. This would help to document the cases and have time to devote to advocacy.* —Marla Conrad, Kino Border Initiative

When migrants who are victims of crime during their time in Mexico reach their destination or are deported to their countries of origin, it is difficult to file a complaint. They may not, for example, have any way to prove injuries and other damages. Although the overwhelming majority of migrants in Mexico come from El Salvador, Honduras, and Guatemala, there are no established mechanisms either for migrants who have already been deported, or family members who learn of the crime, to inform Mexican authorities about these crimes from their countries of origin.

Nor are there effective mechanisms for migrants who reach the United States to file a report with the Mexican authorities. Although U.S. authorities could exercise jurisdiction for crimes that involve individuals residing in the United States (for example, in a kidnapping, if the ransom is demanded from a family member in the United States), few cases are reported. This is due to the fact that few migrants are aware that this possibility, and many fear going to the authorities if they are undocumented in the United States.

After the hearing on "Access to Justice for Migrants" held on March 20, 2015, as part of the 154th Regular Session of the IACHR, the Mexican government committed to creating a transnational mechanism for the search for and investigation of crimes against migrants. There now is a definitive proposal for creating a Specialized Unit of the Transnational Mechanism and Investigation of Crimes against Migrants (*Unidad Especializada del Mecanismo Transnacional e Investigación de Delitos Contra Migrantes*) within the PGR. This unit would have the power to, *inter alia*, investigate and prosecute crimes committed against foreign and Mexican migrants. Nevertheless, as of the writing of this report, the PGR had not formalized the unit's creation.



*Crosses in Altar, Sonora represent migrants who have died in Arizona, Texas, and California*

## SPECIALIZED PROSECUTORS: AN EFFECTIVE RESPONSE?

When a migrant is victim to a crime that falls within state jurisdiction (*fuero común*), they should be able to seek recourse in the criminal justice system in the state where they are located, regardless of their immigration status. But state-level criminal justice systems in Mexico have failed to appropriately respond to crimes against migrants, and civil society organizations within Mexico and internationally have demanded that state governments redouble their efforts. In response to these demands, several state governments in Mexico created specialized prosecutors' offices for crimes committed against migrants. The first specialized prosecutor's office for providing assistance to migrants was established in 2008 in the state of Chiapas, with

offices in Tapachula and prosecutors from the Public Prosecutor's Office (*Ministerio Público*) in Arriaga, Palenque, Comitán, Huixtla, Tuxtla Gutiérrez, Suchiate, and Comalapa.

More recently, specialized prosecutors' offices were established in 2011 in Oaxaca and Veracruz, in 2014 in Tabasco and Coahuila, and in 2015 in Campeche and Quintana Roo. The prosecutor's office in Tenosique was created following the precautionary measures granted by the IACHR due to threats received by the staff of the shelter *La 72*, while the Saltillo prosecutor's office was created as part of the State Human Rights Program, which brings together civil society organizations, including the *Casa del Migrante de Saltillo*.

### TABLE 9
### SPECIALIZED PROSECUTORS' OFFICES FOR MIGRANTS

| STATE | NAME OF PROSECUTOR'S OFFICE | YEAR EST. |
|-------|------------------------------|-----------|
| CHIAPAS | *Fiscalía Especializada en Delitos Cometidos en contra de Inmigrantes* | 2008 |
| OAXACA | *Fiscalía de Atención al Migrante* | 2011 |
| VERACRUZ | *Fiscalía Especial de Atención al Migrante* | 2011 |
| COAHUILA | *Fiscalía Especializada para la Atención de Delitos Cometidos en agravio de Migrantes* | 2014 |
| TABASCO | *Fiscalía Especializada para la Atención al Migrante* | 2014 |
| CAMPECHE | *Fiscalía de Atención al Migrante* | 2015 |
| QUINTANA ROO | *Fiscalía Especializada en Delitos Cometidos en contra de Migrantes* | 2015 |

Source:  Website of the Chiapas State Attorney General's Office: http://bit.ly/1OcAnXA;
Website of the Oaxaca State Attorney General's Office: http://bit.ly/1OcAt1o;
Website of the Veracruz State Attorney General's Office: http://bit.ly/1OcAxhR;
Website of the Coahuila State Government: http://bit.ly/1OcC9rU;
Website of the Tabasco State Attorney General's Office: http://bit.ly/1OcAJxz;
Website of the Chiapas State Government: http://bit.ly/1OcBFlp.

It is too soon for a definitive assessment of the work of these state prosecutors' offices. In theory, designating an authority with the sole responsibility of addressing the issue of crimes committed against migrants, one that is properly trained and equipped with procedures that are tailored to the specific characteristics of these crimes, could lead to more effective investigations and better access to justice for migrants who are victims of crimes. However, initial data, particularly from the Oaxaca prosecutor's office, strongly indicate that the presence of specialized prosecutors' offices has not yet led to the intended outcome. The experiences of migrant shelters confirm that the creation of these specialized offices does not necessarily entail an effective response, unless such offices possess sufficient resources, personnel, capacities, and the political will to conduct timely investigations and ensure that cases reach a satisfactory resolution.

It bears mentioning that many migrants are frequently referred to the prosecutors' offices by the shelters and organizations advocating for their rights. Lack of trust and awareness of their undocumented status may prevent migrants from going to the specialized prosecutors' office on their own, so shelters provide legal assistance when there is no public legal assistance available. This can make a significant difference in terms of how seriously a complaint or report is taken. The experience shelters have had with these offices is quite varied, but there are some commonalities.

> *More than 110 complaints have been made since the Southern Border Program began, with 411 persons having filed reports. The prosecutor has not been able to arrest anyone. —Alberto Donis, Albergue de Migrantes "Hermanos en el Camino"*

In addition to the problems previously identified regarding the prolonged duration of investigations and proceedings, which is exacerbated for those cases that are referred to other states, we have also detected a lack of appropriate office settings for migrants to file complaints, particularly in the prosecutors' offices in Tenosique, Tabasco and Ixtepec, Oaxaca. These offices sometimes lack private rooms for individuals to provide sensitive testimony or personnel properly trained to take statements in sensitive cases, such as those that involve sexual violence. Authorities claim to be aware of the sensitive nature of these cases, but it is not clear how they have modified their actions to address these situations. Public areas should not be used to receive testimony in cases of sexual violence, and it is important that the prosecutor is sensitive to gender issues. Finally, public officials must know how to serve victims and have the appropriate level of sensitivity to ensure that victims do not unnecessarily relive painful experiences, and thus become re-victimized.

Specialized prosecutors' offices must have updated, accessible data on the results of their work. In interviews with some prosecutors, offices were ambiguous on the number of preliminary investigations initiated and the number of indictments. We therefore requested the information through the state governments' information transparency systems. The states of Chiapas, Tabasco, Oaxaca, and Veracruz have all stated they do indeed have a registry of crimes committed against migrants. In Chiapas, the specialized prosecutor's office for migrants reported that from the beginning of 2013 through April 2015, a total of 950 preliminary investigations had been opened for cases of crimes against migrants, including organized crime, homicide, human trafficking, rape, and the "smuggling of illegals." The office stated that

information regarding the number of sentences "was not available in the unit's files, as it was not their purview."[88] Although the prosecutor's office certainly does not have the jurisdictional authority to issue judgments in cases of crimes against migrants (that authority belongs to the judge under the jurisdiction of the judicial authority), it would be rather improbable for a prosecutor's office to have no knowledge of the matter. The fact that the Chiapas specialized prosecutor's office lacks information on convictions implies a worrisome indifference towards understanding and measuring the outcome of its work. Meanwhile, the specialized prosecutor's office for migrants in Tabasco reported having information on 209 crimes committed against migrants in the state, the most frequent crime being robbery (59 in 2013, 10 in 2014, and 31 in 2015).[89]

In contrast, the Oaxaca prosecutor's office did provide more comprehensive data for cases of crimes against migrants for 2011 through May 2015, including the number of reports (383 in total), preliminary investigations opened (96 in total), cases referred to other states (130 in total), and sentences (four in total). According to these numbers, 25 percent of the complaints led to preliminary investigations, which is approximately half national average for all crimes between 2010 and 2014 (a period that partially corresponds to Oaxaca's data and offers an approximate idea of how the results obtained by the prosecutors' offices compare to the national average). Only four percent of the preliminary investigations launched by the Oaxaca Attorney General's Office resulted in a sentence. This low percentage is indicative of the poor quality of the investigations.

## TABLE 10
# CASES OF CRIMES AGAINST MIGRANTS
## DOCUMENTED BY THE GOVERNMENT OF OAXACA

| | 2011 | 2012 | 2013 | 2014 | 2015 (JAN-MAY) | TOTAL |
|---|---|---|---|---|---|---|
| REPORTS | 22 | 52 | 103 | 123 | 83 | 383 |
| PRELIMINARY INVESTIGATIONS | 7 | 14 | 24 | 19 | 32 | 96 |
| CASES REFERRED TO OTHER STATES | 4 | 17 | 36 | 59 | 14 | 130 |
| SENTENCES | - | - | 3 | 1 | - | 4 |

Source:   Oaxaca State Attorney General's Office, response to information request 16795, July 22, 2015, document available on WOLA's website, http://bit.ly/1kaCVcs.

These paltry outcomes match the findings of other investigations. For example, in a response to an IACHR information request, the Mexican government reported that between 2008 and 2011, district courts in Mexico ruled on a mere 57 criminal cases involving migrants (and it is unclear how many cases involved migrants as victims and

how many cases involved migrants as defendants). Upon evaluating these statistics, the IACHR expressed its "deep concern at what is clearly the State's patently inadequate response in terms of the investigation, prosecution, and punishment of such crimes."[91]

The information obtained clearly shows that the majority of reports of crimes against migrants do not end in convictions. Advocates and some prosecutors agree that key problems occur during the investigations, particularly due to bureaucratic internal procedures, including the large number of official communications necessary to conduct investigations, carry out forensic analysis, and obtain evidence. Another challenge is the lack of economic resources available to prosecutors to travel to the site of the incident; expert examinations must be tailored to the intricacies of each case and must be conducted expeditiously. In many cases, it is difficult for migrants to identify their perpetrators, as they are not familiar with

the uniforms or vehicles of the authorities in a country through which they are transiting. This should be considered during the investigation.

Another recurring problem is when the crime occurred in one state, but is reported in another. In such cases, the prosecutors' offices should refer the complaint to the corresponding state. This, however, does not always happen in a timely fashion, further complicating efforts by migrants or their legal advisors to follow-up on the cases.

These problems, when compounded with migrants' aspiration to continue their journey and their lack of means to subsist while waiting for the case to be processed, perpetuate the cycle of impunity.[92]

*The local public prosecutor in Agua Prieta put up obstacles to avoid taking complaints for crimes committed in other states. It wanted migrants to travel to file the complaints there, for example to Veracruz. For cases from Nogales or Naco, they wanted the migrants to travel there, even though they're in Sonora. We talked to them and told them it wasn't their job to investigate, just to refer the case and then they agreed to take the complaint. The only other way is for the organization's attorney to write up a complete report of the events, print it, sign it; that way they only have to certify it. This can make it more accessible. —Perla Del Angel, Centro de Recursos para Migrantes*

Hence, despite the existence of specialized prosecutors' offices and the efforts of some prosecutors, the lack of capacity and resources combined with the lack of political will and sensitivity impedes effective investigations. Based on the experiences of the shelters and organizations involved in this report, we can conclude that, even though the prosecutors' offices receive the complaints and open preliminary investigations, they do not follow through on their primary duty of obtaining justice.

The government of Mexico should carefully assess the performance of existing prosecutors' offices, before promoting the creation of new

offices. The federal and state governments should work together to ensure that specialized prosecutors' offices possess the physical space and resources necessary to operate, and that staff are appropriately and effectively trained. The government should also acknowledge that prosecutors are limited in their capacity to fully resolve migrants' obstacles to justice. In particular, as will be described later, it is vital for the migrants who do report crimes to have access to humanitarian visas. Such visas are important not only because they are an incentive to report the crimes, but also because they enable migrants to remain in the country during the duration of proceedings.

# THE NATIONAL HUMAN RIGHTS COMMISSION AND STATE HUMAN RIGHTS COMMISSIONS

*Migrants continue to have more trust in the legal work of non-judicial bodies, like the CNDH and CEDHs; in many cases, they are the only mechanism that migrants can use for accessing justice. Nonetheless, they fail to respond to real needs: they are very bureaucratic, the victim has to provide all evidentiary exhibits, and they cannot investigate. —Alberto Xicoténcatl, Casa del Migrante de Saltillo*

When federal authorities violate migrants' human rights, the victims are entitled to file a complaint with the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH), which has various offices across the country. The State Human Rights Commissions (*Comisiones Estatales de Derechos Humanos*, CEDHs) takes cases in which the human rights violations were committed by local authorities. In some cases, both the CNDH and the CEDHs refer migrants to other bodies, including local attorneys general offices and shelters. Some migrant shelters and organizations believe the CNDH and CEDHs are most approachable for demanding justice, but their procedures and investigative capacities are not particularly expeditious or effective. It does appear that it is easier for migrants and their advocates to get in contact with the CNDH than with the CEDHs, as the latter (at least in the cases of Tabasco and Oaxaca, whose offices are in Tenosique and Ixtepec) reported having received very few migrants.

The recommendations that the CNDH and CEDHs can issue to authorities that have committed human rights violations are not binding; however, they can have a positive impact. Given their formal nature, it is difficult for authorities to ignore them entirely.

These commissions also have the authority to conduct conciliation efforts; however, the shelters report that, based on their experience, migrants who are victims have a limited role in this process.

To better understand the frequency and outcomes of the CNDH's interventions in cases

of human rights violations against migrants, we requested public information regarding such complaints received by the CNDH. According to the figures obtained, between December 1, 2012 and June 15, 2015, the CNDH reported having received 1,617 complaints, of which 1,220 were against the INM, followed by 143 complaints against the Federal Police, and 120 against the PGR. Only 18 complaints were officially initiated.[93]

The system that the CNDH utilizes to categorize human rights violations provides little insight into the nature of the acts themselves. The CNDH uses categories such as "inappropriately providing a public service" and "actions or omissions that infringe upon the rights of migrants and their family members."

Strikingly, only four out of the 1,617 complaints recorded led to the CNDH issuing recommendations. This figure highlights the limited capacities of the CNDH to investigate allegations of human rights violations and guarantee that they are not repeated.

Table 11 shows that most (73.7 percent) of the incidents for which formal complaint proceedings were initiated occurred in the southern states of Chiapas, Oaxaca, Tabasco, and Veracruz, in the Federal District, and in the northern state of Tamaulipas. The fact that there the CNDH offices in these states receive an even higher number of overall complaints is because some receive complaints of incidents that took place in another state. For example, in Ixtepec, Oaxaca, most of the complaints are related to human rights violations committed in Chiapas.

## TABLE 11
## DISTRIBUTION OF COMPLAINTS REGARDING HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS
### DECEMBER 1, 2012–JUNE 15, 2015

| STATE | NO. OF COMPLAINTS | CNDH OFFICE | NO. OF COMPLAINTS |
|---|---|---|---|
| CHIAPAS | 326 | TAPACHULA | 210 |
| FEDERAL DISTRICT | 279 | GENERAL DIRECTORATE FOR ATTENTION TO MIGRANTS (*DIRECCIÓN GENERAL DEL PROGRAMA DE ATENCIÓN A MIGRANTES*) | 498 |
| VERACRUZ | 241 | COATZACOALCOS | 127 |
| OAXACA | 132 | IXTEPEC | 265 |
| TAMAULIPAS | 116 | REYNOSA | 159 |
| TABASCO | 98 | VILLAHERMOSA | 135 |

Source:   *CNDH, response to information request 00036515, document available on WOLA's website, http://bit.ly/1kaBL0D.*

We heard a variety of perspectives during the interviews at CNDH field offices in Villahermosa, Tabasco; Ixtepec, Oaxaca; and Nogales, Sonora. In Villahermosa, most of the complaints of violations stemmed from migration enforcement operations; others were attributed to the municipal police. However, we noted that the response to these operations was limited to rudimentary procedures such as interviewing detained migrants, and ensuring the minors spoke with one of the INM's Child Protection Officers (*Oficial de Protección a la Infancia*, OPI).[94] In Saltillo, most of the cases were police abuse from police officers at various levels and mistreatment in migrant detention centers. Similiarly, the cases in Ixtepec mostly involved treatment at migration detention centers and police abuse of authority. According to the director of the CNDH field office in Ixtepec,

Oaxaca, there has been an uptick in cases since the launch of the Southern Border Program.

The CNDH is equipped with a rather sound infrastructure to service migrant cases through its various offices with resources from the Fifth General Inspection Unit (*Quinta Visitaduría*). It bears noting, however, that specializing in migration issues should not be limited merely to knowledge of the Migration Law or the INM's obligations during enforcement operations or migrant detention, or the internal regulations of other authorities; specialization also requires understanding international human rights standards to ensure that their intervention truly prevents repetition. This could entail, for example, recommending changes in regulations or resource allocation.

# THE RESPONSIBILITY OF THE NATIONAL MIGRATION INSTITUTE

The INM is often singled out by migrants, shelters, and the CNDH for perpetrating human rights violations during operations and at migrant detention centers. Excessive use of force during migration enforcement operations figures prominently in reported cases of abuse and such cases have multiplied since the Southern Border Program began. Inside migrant detention centers, the INM is the authority charged with informing migrants of their rights, including their right to seek asylum and request a humanitarian visa if they have been victims of a crime. However, testimonies confirm that INM agents often fail to inform migrants of their rights or they tell migrants that applying for asylum will result in prolonged detention, in order from discourage potential asylum seekers.[95]

These problems are at least partly due to the lack of internal and external oversight for INM operations. Although the INM has an Internal Control Body (*Órgano Interno de Control*) that can impose administrative sanctions on agents for failing to fulfill their duties, it does not yet have an Internal Affairs Unit able to open investigations against agents for alleged criminal activities or serious misconduct or disciplinary infractions. Such a unit, however, is provided for in the SEGOB's internal regulations.[96] The INM does possess a Citizen Council, but the conditions for conducting internal oversight could be bolstered further.[97] As for external oversight, civil society organizations have limited access to migrant detention centers, and procedures for determining entrance remain opaque. According to the "Agreement issuing operating procedures for the National Migration Institute migrant detention centers and provisional holding facilities," civil society organizations must apply to be included in an access registry, but there are no clear standards for authorization.[98] This procedure

should not be discretional and must be flexible in order to ensure that organizations can assist migrants by informing them of their rights, as well as monitor detention conditions.

While there are few incentives for reporting crimes, Mexican legislation allows for migrant who are victims of crime to apply for "visitor resident status for humanitarian reasons" (Migration Law, Article 52, paragraph V).[99] Such a permit would grant temporary residence to migrant who are victims of a crime that is committed in Mexico and that the authorities recognize. Nonetheless, the INM has issued few humanitarian visas in recent years, and organizations report that only a few of the applications that they have accompanied have been successful. This number, however, is increasing, according to government data (see table 12).[100]

The support provided by the shelters and organizations in the procedures to obtain a humanitarian visa greatly increases the probability of a favorable outcome. One of the hurdles that migrant shelters have identified in obtaining humanitarian visas is the requirement that the crime must be a felony, as provided for in Article 50 of the regulations of the Migration Law. However, whether or not a given crime is considered a felony depends on the particular state's criminal procedure legislation. This determination could also depend on the opinion and willingness of the prosecutor to consider the context of the migrant's vulnerability. If the complaint does not clearly specify the degree of the crime, it is up to the INM's discretion to interpret the crime. That decision, however, technically belongs within the purview of the justice system. The small number of visas granted could, thus, be increased by standardizing the procedures for determining the severity of crimes.

## TABLE 12

# HUMANITARIAN VISAS* ISSUED BY THE INM

|  | 2012 | 2013 | 2014 | 2015 (JAN-JUN) |
|---|---|---|---|---|
| TOTAL | 108 | 277 | 623 | 527 |
| CENTRAL AMERICA | 103 | 208 | 501 | 461 |

*Tarjetas de Visitante por Razones Humanitarias (TVRH)
Source:  Secretaría de Gobernación, Unidad de Política Migratoria, Boletines Mensuales de Estadísticas Migratorias
2012, 2013, 2014, 2015, http://bit.ly/1jMKo1.

Although filing a report is a requirement for accessing a humanitarian visa, this visa has become a prerequisite for migrants to access justice. It is impossible for migrants to remain present for the duration of criminal proceedings without it. It is, therefore, important for the process to be clear, simple, and leave no leeway for discretion.

The information in this section demonstrates that, despite the obstacles migrants face in reporting crimes, there have indeed been complaints in recent years filed by migrant victims of crimes or human rights violations, many of whom have been accompanied by migrant shelters. In light of problems documented, it is necessary to improve the number of reports filed as well as the number of investigations carried out and sentences and recommendations issued. It would seem that the creation of specialized prosecutors' offices has not succeeded in incentivizing migrants to report crimes, nor has it led to successfully prosecuting criminals. Advocates and some prosecutors agree that the results obtained by these specialized prosecutors leave room for improvement, and also that the criteria for granting humanitarian visas to migrant who are victims of crime must be clarified.

This section has made clear that migrants face greater obstacles in accessing justice than others; the next section proposes feasible changes that would help to reduce that discrepancy.

# CONCLUSIONS AND RECOMMENDATIONS

A review of official data, reports, and documented cases has given us a picture of the crimes and human rights violations committed against migrants, as well as important clues as to what specific obstacles lie in the way of access to justice. In addition, we have identified a direct relationship between the intensification of migration enforcement under the Southern Border Program and a number of violations of specific rights. Current policies have led to more frequent violations of the rights to humane treatment, liberty, and access to asylum.

Serious crimes against migrants, including kidnappings, trafficking, disappearances, and murders continue to occur; the June 2015 attack against a group of migrants in Caborca, Sonora and the possible disappearance of some members of that group is emblematic. Federal, state, and municipal police rob and extort money from migrants, and those acts are frequently accompanied by physical and psychological abuse.

Migrant shelters and civil society organizations produce the most reliable data on this subject through their documentation, but we have not found any information that enables us to assess the State's intervention in these cases.

Despite the existence of some specialized prosecutors' offices for assisting migrants and focused efforts by migrant shelters and civil society organizations to report and document cases, most cases go unpunished. When migrants go to the authorities to file reports, cases are often hampered, primarily during the investigation stage. Humanitarian visas available to certain migrants who have been victims of crimes are granted by the INM almost solely when the migrant has the legal assistance of a civil society organization. In addition, given the situation of human rights violations migrants face, the CNDH's intervention in cases of complaints and recommendations falls short.



*Mural in La 72, Hogar—Refugio para Personas Migrantes*

# RECOMMENDATIONS

**WE BELIEVE THE FOLLOWING RECOMMENDATIONS TO THE GOVERNMENTS OF MEXICO AND THE UNITED STATES ARE BOTH IMPORTANT AND FEASIBLE.**

## TO THE NATIONAL MIGRATION INSTITUTE (INM):

**STRENGTHEN INTERNAL OVERSIGHT AND ACCOUNTABILITY TO PREVENT HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS FROM OCCURRING WITHIN THE FRAMEWORK OF MIGRATION ENFORCEMENT ACTIVITIES,** specifically through the establishment of an Internal Affairs Unit equipped with the necessary financial and human resources and the political will to investigate allegations of crimes and human rights violations perpetrated by INM agents.[101]

## TO THE MINISTRY OF THE INTERIOR (SEGOB):

**PROMOTE A NATIONAL STRATEGY FOR IMPLEMENTING AND MONITORING THE 2014-2018 SPECIAL MIGRATION PROGRAM (PEM) THAT INCLUDES, AS A CORE ELEMENT, SUFFICIENT FUNDING.** Rather than creating new programs that further duplicate responsibilities, such as the Southern Border Program, the 2014-2018 PEM should be held up as the primary public policy document regarding migration by all federal government agencies and should be implemented as such. To this end, there must be a transparent allocation of sufficient funding for the PEM.

**CREATE AN ASYLUM AND INTERNATIONAL PROTECTION POLICY THAT UPHOLDS MEXICO'S VALUES.** COMAR's budget must be increased so that it is proportional to the increased needs of the migrant population and so that each individual who so desires may have the opportunity to tell his or her story to an official specialized in asylum. Specifically, there is an urgent need to hire and train more COMAR protection officers to conduct eligibility interviews, as well as to evaluate the possibility of opening new COMAR offices at key points along the migration route, such as on the border between the state of Tabasco and Guatemala.

It is also necessary to build institutional capacity and enhance mechanisms for coordination between the INM and COMAR in order to inform all migrants in Mexican territory about their right to asylum and international protection, as well as facilitate cooperation with civil society organizations that provide legal assistance in order to increase the number of requests and reduce the rate of desisted or abandoned cases.

In addition, cooperation agreements should be reached with university law schools nationwide in order to encourage attorneys to provide pro bono assistance to migrants eligible for refugee status in Mexico.

**DEVELOP CLEAR REGULATIONS FOR MIGRATION ENFORCEMENT OPERATIONS, SPECIFICALLY REGARDING APPROPRIATE PLACES AND CIRCUMSTANCES IN WHICH TO CONDUCT THEM, COOPERATION BETWEEN THE INM AND OTHER**

**AUTHORITIES, THE RESPONSIBILITIES OF EACH OF THESE AUTHORITIES, AND CLEAR LIMITS ON THE USE OF FORCE.** Such regulations should include a protocol that regulates and limits the use of force during migration enforcement operations, ensures the training of all agents on such guidelines, and establishes oversight and sanctions. The UPM's website should post up-to-date information on the number of migration enforcement operations, broken down by month and state.

It is also necessary to develop a clear protocol on the procedure for granting humanitarian visas, including explicit and consistent definitions of eligibility requirements in order to eliminate discretion, and mechanisms for coordination between the PGR, the PGJEs, the INM, and civil society organizations.

## TO THE FEDERAL ATTORNEY GENERAL'S OFFICE (PGR):

**IMPLEMENT THE SPECIALIZED UNIT OF THE TRANSNATIONAL MECHANISM AND INVESTIGATION OF CRIMES AGAINST MIGRANTS** (*Unidad Especializada del Mecanismo Transnacional e Investigación de Delitos contra Migrantes*). Create a protocol for investigating crimes against migrants that facilitates cooperation between the PGR and state attorneys general offices. Such a protocol should include travel provisions for prosecutors and agents, so they can receive reports in places such as consulates, migrant detention centers, and shelters.

Work with the states to standardize and systematize data collection on investigations and prosecutions in connection with crimes against migrants, including case outcomes, and make such data available on a monthly basis on the PGR's website.

## TO THE GOVERNMENT OF THE UNITED STATES:

**PROMOTE THE INVESTIGATION OF CRIMES AND HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS IN MEXICO.** Provide technical assistance to the Mexican government and to the countries of Central America on the investigation and sanctioning of crimes against migrants that are transnational in nature. Through the Department of Justice, broaden technical assistance to Mexico's specialized prosecutors' offices, including training staff on investigative techniques.

Through the Merida Initiative, the Department of State should work with the Mexican government to determine ways to support the INM in strengthening oversight mechanisms, such as through the establishment of an Internal Affairs Unit.

The Department of State's Bureau of Population, Refugees, and Migration must continue to support efforts to strengthen the Mexican government's capacity to identify, protect, and assist vulnerable migrants in Mexico.

## TO THE GOVERNMENTS OF MEXICO AND THE UNITED STATES:

**EXPLORE THE CREATION OF PROSECUTOR EXCHANGE PROGRAMS REGARDING THE STRATEGIC USE OF HUMANITARIAN VISAS AS AN INCENTIVE FOR REPORTING CRIMES COMMITTED AGAINST MIGRANTS, AS WELL AS TO SHARE SUCCESSFUL PRACTICES IN INVESTIGATING CRIMES AGAINST MIGRANTS.**

# REFERENCES

[1] Angélica Jocelyn Soto Espinosa, "Más de 100 migrantes desaparecidos tras ataque de grupo armado," *Cimacnoticias*, July 2, 2015, accessed September 25, 2015, http://bit.ly/1LvYfDl.

[2] Amnesty International, "México debe investigar el atroz aumento de los ataques y homicidios de migrantes", June 18, 2015, accessed September 25, 2015, http://bit.ly/1OcDSNK; Testimony and information received by the authors; Comisión Nacional de los Derechos Humanos, *Investiga la CNDH la probable ejecución de tres migrantes centroamericanos, cuyos cuerpos fueron hallados en Caborca, Sonora*, June 9, 2015, accessed September 25, 2015, http://bit.ly/1OcDUoX.

[3] México: Presidencia de la República, "Pone en marcha el presidente Enrique Peña Nieto el Programa Frontera Sur," July 7, 2014, accessed September 25, 2015, http://bit.ly/1OcDVck.

[4] México: Presidencia de la República, "Pone en marcha el presidente Enrique Peña Nieto el Programa Frontera Sur," July 7, 2014, accessed September 25, 2015, http://bit.ly/1OcDVck.

[5] In some places like Apizaco, Tlaxcala, the company Ferrosur has placed barriers next to the train tracks, which have already caused seven serious accidents, including one that was fatal.

[6] For years, images of Central American migrants riding as stowaways on trains were used to demonstrate the serious risks that migrants face when crossing Mexico, as well as the Mexican government's apparently permissive approach to transmigration. In this regard, the Southern Border Program was a great success (although some migrants continue to travel by freight train, the numbers have decreased and it is only happening in some parts of the country). WOLA, "Mexico Now Detains More Central American Migrants than the United States", June 11, 2015, accessed September 25, 2015, http://bit.ly/1MlQy2U. Boletines Mensuales de Estadísticas Migratorias 2012, 2013, 2014, 2015. Migration Policy Unit, Secretariat of the Interior, http://bit.ly/1jMKo18.

[7] Lupita Thomas and Xóchitl Álvarez, "Abren 16 rutas más peligrosas para migrantes", *El Universal*, June 14, 2015, accessed September 25, 2015, http://eluni.mx/1OcE0wG.

[8] The areas of concern with respect to migrants' human rights include: lack of access to asylum (only 270 refugees recognized in 2013 and 451 in 2014); the excessive use of force by migration officials; detention of children; prolonged detention of asylum-seekers; and failure to provide protection or effective access to justice for victims of crimes and human rights violations. The United Nations Special Rapporteur on the Human Rights of Migrants, Jorge Bustamante, visited Mexico in 2008, and expressed concern about migrants' victimization by gangs and government officials, and about the government's detention and deportation practices. For its part, the Inter-American Commission on Human Rights (IACHR) published an extensive report on migrants' human rights in Mexico in 2013, based on a visit made in 2011: Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, 2013, accessed October 27, 2015, http://bit.ly/1KBsgMU.

[9] When conducting research for this report, the authors also consulted a wide array of secondary sources, including a series of reports from Mexican civil society organizations on the situation of migrants, government reports, and reports from NGOs on crime and victimization, as well as several evaluations on Mexico's law enforcement and criminal justice institutions. We have also analyzed official documents, including migration data regularly published by SEGOB, as well as a series of information requests made to the federal and state government through the service *Infomex*.

[10] Many migrant rights advocates have had to resort to national and international protection mechanisms, including the CNDH, the federal Protection Mechanism for Human Rights Defenders and Journalists, and the IACHR, in order to obtain basic protection from authorities: Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 106. Even when protection measures are granted, the implementation has been poor. WOLA and Peace Brigades International, *The Mechanism to Protect Human Rights Defenders and Journalists in Mexico: Challenges and Opportunities*, February 3, 2015, accessed September 25, 2015, http://bit.ly/1OcE3ZB.

[11] México: Presidencia de la Republica, "Pone en marcha el presidente Enrique Peña Nieto el Programa Frontera Sur".

[12] Diario Oficial de la Federación, "Decreto por el que se crea la Coordinación para la Atención Integral de la Migración en la Frontera Sur,"  July 8, 2015, accessed October 15, 2015, http://bit.ly/1Lw0ir2

[13] According to the *Red de Documentación de Organizaciones Defensoras de Migrantes* (REDODEM), the flow of migrants assisted by its 15 member organizations dropped abruptly in mid-2014. In the first half of the year, 21,000 people passed through their shelters and soup kitchens. In the second half of the year, the number was not even half that, but records show there were still 10,000 migrants. REDODEM, *Migrantes invisibles, violencia tangible*, Jesuit Migration Services, July 29, 2015, accessed September 25, 2015, http://bit.ly/1OcE4wx.

[14] It is worth noting that migrants often pay in installments from their place of origin to a "*pollero*" or "*coyote*" to cross the border.

[15] Secretaría de Gobernación, *Coordinación para la Atención Integral de la Migración en la Frontera Sur, Informe de Actividades Julio de 2014—Julio de 2015*, document obtained via Infomex request number 0000400282715, available on WOLA's website, http://bit.ly/1kay9LQ.

[16] Instituto Nacional de Migración, Resolución del Comité de Información, Infomex request 0411100011515, April 16, 2015, accessed September 25, 2015, http://bit.ly/1OcEnHN.

[17] Instituto Nacional de Migración, Respuesta a la solicitud de información pública, Infomex request 0411100035415, June 17, 2015, available on WOLA's website, http://bit.ly/1KBwKDh.

[18] According to figures from SEGOB, in 2013 the INM detained 86,298 foreigners. In 2014, the number of foreigners detained increased to 127,149. Secretaría de Gobernación, Unidad de Política Migratoria, *Boletines Mensuales de Estadísticas Migratorias 2013 y 2014*, http://bit.ly/1jMKo18.

[19] Ardelio Vargas, "Combate el Gobierno de la Republica Delitos Cometidos en Contra de Migrantes" Press Conference, March 3, 2015, document obtained via Infomex request 0411100024215, June 17, 2015, available on WOLA's website, http://bit.ly/1kaQUPk.

[20] Diario Oficial de la Federación, "Decreto por el que se expide la Ley de Migración y se reforman, derogan y adicionan diversas disposiciones de la Ley General de Población, del Código Penal Federal, del Código Federal de Procedimientos Penales, de la Ley Federal contra la Delincuencia Organizada, de la Ley de la Policía Federal, de la Ley de Asociaciones Religiosas y Culto Público, de la Ley de Inversión Extranjera, y de la Ley General de Turismo" May 25, 2011, accessed October 6, 2015, http://bit.ly/1VBUpPO.

[21] Policía Federal, *Convenio de Colaboración para brindar apoyo en el control, verificación, vigilancia, revisión y traslado de migrantes, así como resguardo perimetral de las estaciones migratorias*, document obtained via Infomex, request 0413100043715, May 27, 2015, document available on WOLA's website, http://bit.ly/1kaRAV3.

[22] La 72, CODEMIRE, COMPA, and Movimiento Migrante Mesoamericano, "INM y PF realizan operativo violento en Tabasco contra migrantes y defensores de derechos humanos," May 3, 2015, accessed October 6, 2015, http://bit.ly/1VBSWJf.

[23] Case documented and followed by the Kino Border Initiative, a civil society organization based in Nogales that is a member of the *Red Sonora.*

[24] "*Federales y personal del INM dejan morir ahogado a un joven migrante centroamericano*", Sin Embargo, March 18, 2015, accessed September 25, 2015, http://bit.ly/1OcEqDq; Carlos Marí, "*Perseguían policías a migrantes accidentados*", *Reforma*, June 28, 2015, accessed September 25, 2015, http://bit.ly/1OcEtz0.

[25] The UPM was created in August 2012 and its mission is: "To develop and propose strategies, programs, and actions to establish a comprehensive, consistent, and well-founded Mexican migration policy that respects and safeguards human rights, facilitates the documentation of migration, and helps to preserve national sovereignty and security, taking into account the branches of government, government orders, and civil society in a framework of shared responsibility with the governments of other countries and of contributing to national development." See: http://bit.ly/1OcEtPB.

[26] The Mexican public administration tends to spend most of the budget at the end of the year, which explains the expenditure increases shown in the last quarters of 2013 and 2014.

[27] The Special Migration Program (*Programa Especial de Migración*, PEM) was published in the Mexico's Official Federal Gazette (*Diario Oficial de la Federación*) on April 30, 2013. The PEM is a cross-cutting multi-sectoral instrument that sets forth the Mexican government's priorities with regard to migration. Its preparation stems from the 2013-2018 National Development Plan (*Plan Nacional de Desarrollo*). The PEM, which consists of five objectives and several strategies and courses of action, seeks to coordinate the work between different bodies and government levels with the aim of ensuring migrants' well-being, taking into account the origin, transit, destination, and return processes. Diario Oficial de la Federación, "Programa Especial de Migración 2014-2018," April 30, 2014, accessed September 25, 2015, http://bit.ly/1OcEzXv.

[28] United States Border Patrol, "Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions by Month – FY 2010-2014," data updated September 2014, accessed September 25, 2015, http://1.usa.gov/1OcECCJ.

[29] Clare Seelke and Kristin Finklea, *U.S.-Mexican Security Cooperation: The Mérida Initiative and Beyond*, Congressional Research Services, May 7, 2015, accessed October 1, 2015 http://bit.ly/1OcEDq8.

[30] *Presupuesto priorizado de los Proyectos para INM en los FY10 y FY 11*, document provided to WOLA in 2012.

[31] U.S. Embassy – Mexico, "The Merida Initiative – An Overview", May 2015, accessed September 25, 2015, http://1.usa.gov/1OcEEue.

[32] Thomas A. Shannon, "Testimony to Senate Foreign Relations Committee," July 17, 2014, accessed September 25, 2015, http://1.usa.gov/1OcEIdq; Congressional Research Service, "Mexico's Recent Immigration Enforcement Efforts," April 29 2015, accessed September 25, 2015, http://bit.ly/1OcEItV. Congress allocated funds totaling USS79 million for border security and/or judicial reform, without specifying amounts.

[33] Adam Isacson, Maureen Meyer, and Gabriela Morales, Mexico's Other Border: Security, Migration, and the Humanitarian Crisis at the Line with Central America, WOLA, June 2014, accessed September 25, 2015, http://bit.ly/1OcEJ0R.

[34] For example, during a budget hearing on U.S. assistance to Central America in March 2015, Rep. Kay Granger, Chairwoman of the State, Foreign Operations and Related Programs Subcommittee of the House Appropriations Committee stated that, "Our neighbor, Mexico is on the front lines of combatting the illegal migration issue and we must do all we can to help Mexico strengthen its borders." Office of Congresswoman Kay Granger, "Granger Opening Statement: Budget Hearing – Assistance to Central America," March 24, 2015, information accessed September 25, 2015, http://1.usa.gov/1OcEHpV.

[35] For example, Rep. Albio Sires, Ranking Member of the Western Hemisphere Subcommittee of the House Committee on Foreign Affairs, stated during a June 25, 2014 Subcommittee hearing that "reports indicate that the migrants are increasingly citing widespread incident[s] of extortion, kidnapping and other abuses committed by both criminal groups and Mexican federal, state and local police officials. Mexico must work together with the Central American neighbors to address security concerns along the southern border." House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, "Subcommittee Hearing: Children Migrating from Central America: Solving a Humanitarian Crisis," June 25, 2014, information accessed October 27, 2015, http://1.usa.gov/1O67YD1. In another rare instance of dissent, during an April 30, 2015 Western Hemisphere Subcommittee hearing, Representative Joaquín Castro raised questions about Mexico's Southern Border Plan: "Many folks have been cut off from riding what is known as the Beast—the train that ultimately leads them on the path toward the United States. But what I would like to see going back through the testimony that you all give is an understanding of how we are doing that with respect for human rights or understanding the cost of human life." House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, "Subcommittee Hearing: Migration Crisis: Oversight of the Administration's Proposed S1 Billion Request for Central America," April 30, 2015, information accessed September 25, 2015, http://1.usa.gov/1OcEHGy.

[36] For example, Congressman Jeff Duncan, Chairman of the Western Hemisphere Subcommittee of the House Committee on Foreign Affairs, asked Deputy Assistant Secretary Palmieri the following question during the aforementioned June 25, 2014 hearing: "What has changed within the country of Mexico that it has allowed 60,000 children to transit that area? Whether they are Honduran or Guatemalan or El Salvadorean [sic], they crossed that border and they came through Mexico to get to the United States. They didn't get on an airplane. They walked or they rode a train or in a car or something and we are talking about, what, 3-year-olds?" House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, "Subcommittee Hearing: Children Migrating from Central America: Solving a Humanitarian Crisis."

[37] Comisión Nacional de los Derechos Humanos, Informe Especial Sobre los Casos de Secuestro en Contra de Migrantes, June 15, 2009, accessed September 25, 2015, http://bit.ly/1L4VR2W; Comisión Nacional de los Derechos Humanos, Informe Especial Sobre Secuestro de Migrantes en México, February 22, 2011, accessed September 25, 2015, http://bit.ly/1L4VW6D.

[38] The 2015 REDODEM report is *Migrantes invisibles, violencia tangible* information accessed on October 15, 2015, http://bit.ly/1Lw2Aqd; while the 2013 report is *Narrativas de la transmigración centroamericana en su paso por México,* accessed October 7, 2015, http://bit.ly/1VEUkW6.

[39] Other reports include: Centro de Derechos Humanos Miguel Agustín Pro Juárez (Centro Prodh) and Casa del Migrante de Saltillo, *Cuaderno de Secuestros de Migrantes,* December 2011, information accessed September 28, 2015, http://bit.ly/1OcELGa; Latin America Working Group, *Perilous Journey,* October 2014, information accessed September 28, 2015, http://bit.ly/1OcEMK6; and Maureen Meyer and Stephanie Brewer, A Dangerous Journey Through Mexico: *Human Rights Violations against Migrants in Transit,* WOLA and Centro Prodh, January 2011, information accessed October 7, 2015, http://bit.ly/1VEUMUj.

[40] Interview with Brother Tomás González, Director of La 72, conducted by Gabriela Morales on April 29, 2015.

[41] U.S. Department of State, *Trafficking in Persons Report 2014,* "Mexico," information accessed October 6, 2015, http://1.usa.gov/1OcEPpu.

[42] The IACHR indicated in its 2013 report that "During its visit to Reynosa, Tamaulipas, the Commission was told of cases of Mexican migrants who, after being deported, were abducted by criminal organizations like the Los Zetas Cartel or the Gulf Cartel, who locked them in safe houses, cemetery vaults and elsewhere. During their captivity the migrants are beaten severely and their entry into the United States will at times depend on whether they are willing to carry drugs into United States territory. This problem is particularly severe in the state of Tamaulipas." Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico,* p. 61.

[43] Case documented by members of the Red Sonora.

[44] Silvia Otero, PGR liga a agentes del INM con trata", *El Universal,* September 24, 2013, information accessed September 28, 2015, http://eluni.mx/1OcERxq.

[45] Salvador Camarena, "*Hallados 72 cuerpos de inmigrantes 'sin papeles' en un rancho en México,"El País,* August 26, 2010, information accessed September 28, 2015, http://bit.ly/1OcEUcH.

[46] "Presidente de El Salvador dice que hay un tercer sobreviviente de masacre," CNN México, September 5, 2010, information accessed September 28, 2015, http://cnn.it/1OcEXVM.

[47] Reference is made in survivors' statements, Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico,* p. 68.

[48] The National Security Archive, "Mexico: Los Zetas Drug Cartel Linked San Fernando Police to Migrant Massacres," December 22, 2014, information accessed September 28, 2015, http://bit.ly/1L4Wae4.Nick Miroff and William Booth, "Mass graves in Mexico reveal new levels of savagery," *Washington Post,* April 24, 2011, information accessed September 28, 2015, http://wapo.st/1OcEXFj; Alberto Nájar, "*México: ¿quiénes son los muertos de Cadereyta?"*,BBC, May 22, 2012, information accessed September 28, 2015, http://bbc.in/1OcF43H; "*Identifican a ocho migrantes hondureños entre víctimas de masacre en México*", *El Heraldo,* December 22, 2013, information accessed September 28, 2015, http://bit.ly/1OcF4AX. In its report on the situation of Central American migrants in transit through Mexico, the IACHR noted that it had received documents that contain "testimony given by migrants who said they had witnessed mass killings in which several dozen people were murdered and that they had been held in captivity with upwards of 400 people. Some migrants told of having witnessed mutilations, decapitations, migrants who were hammered to death;

there were even stories of bodies being dissolved in barrels of acid." IACHR, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 70.

[49] Case documents compiled on the website of the organization Foundation for Justice and the Democratic Rule of Law (*Fundación para la Justicia y el Estado Democrático de Derecho*), http://bit.ly/1OcF8R7, information accessed October 1, 2015.

[50] "Concluding observations of the United Nations Committee on Enforced Disappearances (CED) review of Mexico," February 13, 2015, accessed September 28, 2015, http://bit.ly/1OcFbfF..

[51] For example, the regional network Truth and Justice for Migrants (*Verdad y justicia para migrantes*) is made up of family members of disappeared migrants from Honduras and El Salvador, along with civil society organizations, http://bit.ly/1M6ChTG. The Central American mothers' convoy is organized every year by the Mesoamerican Migrant Movement (*Movimiento Migrante Mesoamericano*), http://bit.ly/1FN4T7J.

[52] See, *Informe alternativo presentado al Comité contra la Desaparición Forzada en vista del examen del informe de México durante la 8ª sesión del Comité, de 2 a 13 de febrero de 2015* (Alternative report submitted to the UN Committee on Enforced Disappearances in light of the review of Mexico's report during the Committee's 8th session from February 2 to 13, 2015), December 2014, p. 16, 2015, accessed October 7, 2015, http://bit.ly/1LztU8X. It is noteworthy that in February 2015 the CED concluded that in much of Mexico there is a grave crisis of generalized disappearances. Enforced disappearance is understood as "the act of depriving a person or persons of his or their freedom, in whatever way, perpetrated by agents of the state or by persons or groups of persons acting with the authorization, support, or acquiescence of the state, followed by an absence of information or a refusal to acknowledge that deprivation of freedom or to give information on the whereabouts of that person, thereby impeding his or her recourse to the applicable legal remedies and procedural guarantees." Article 2, Inter-American Convention on Forced Disappearance of Persons, adopted at Belém do Pará, Brazil, June 9, 1994, at the Twenty-fourth Regular Session of the General Assembly (to the Organization of American States), accessed October 7, 2015, http://bit.ly/1LztkYF.

As a result of the CED's review, the Mexican government began a process of preparing a law on enforced disappearance. While this law was being drawn up, groups of victims and organizations expressed concern about having their experiences included in the new legislation.

In multiple cases the Inter-American Court of Human Rights has defined disappearance as: "Involuntary or enforced disappearance constitutes a multiple and continuing violation of a number of rights protected by the Convention, because not only does it produce an arbitrary deprivation of liberty, but it also endangers personal integrity, safety and the very life of the detainee. Moreover, it places the victim in a state of complete defenselessness, resulting in other related crimes." Case of Bámaca-Velásquez v. Guatemala, Judgment of November 25, 2000, para. 128. See also, among others, IACHR. Report 53/96. Case 8.074. Francisco José Antonio Pratdesaba Barillas (Guatemala); Report 54/96. Case 8.075. Luis Gustavo Marroquín (Guatemala); Report 55/96. Case 8.076. Axel Raúl Lemus García (Guatemala); Report 56/96. Case 9.120.  Ana Lucrecia Orellana Stormont (Guatemala); Report 3/98. Case 11.221. Tarcisio Medina Charry (Colombia); Report 51/99. Cases 10.471; 10.955; 11.014; 11.066; 11.070; 11.067; 11.163 (Perú); IACHR Case 10.247 et al., para. 178, Peru, Report N° 101/01, October 11, 2001, Extrajudicial Executions and Enforced Disappearances of Persons, Considerations relating to enforced disappearances.

[53] Alma Gudiño, *"Consignan a policía de Ramos Arizpe por violar a migrante", Excelsior*, February 23, 2015, accessed September 28, 2015, http://bit.ly/1OcFc3h.

[54] National Human Rights Commission, Recommendation No. 54/2012 *Sobre el caso de agresión sexual a la menor migrante V1*, of September 28, 2012, accessed September 29, 2015, http://bit.ly/1OcFcQP.

[55] Interview with staff from La 72, conducted by Gabriela Morales from April 29 to May 1, 2015.

[56] Natalia's (pseudonym) complaint, reviewed with her explicit authorization.

[57] Manu Ureste and Yosune Chamizo, "*Plan Frontera Sur: un año después, los robos a migrantes se disparan 81% en los estados del sur*", *Animal Político*, July 7, 2015, accessed September 28, 2015, http://bit.ly/1OcFdnN.

[58] REDODEM, *Migrantes invisibles, violencia tangible*, Jesuit Migrant Services, July 29, 2015, accessed September 25, 2015, http://bit.ly/1OcE4wx

[59] Mexican Chamber of Deputies, *Código Penal Federal – Ultima reforma (Federal Criminal Code – Latest reform)*, December 26, 2013, accessed October 7, 2015, http://bit.ly/1RkI6Bm. .

[60] Documentation of case assisted by Kino Border Initiative, a civil society organization and member of the Sonora Network.

[61] Testimony taken by the authors at La 72, April 30, 2015.

[62] It is easy to confuse the different terms related to asylum and refugees. The organizations that have collaborated on this report prefer to refer to the right to asylum in a broad sense and individuals who are migrants and refugees, based on the idea that an individual's status does not depend on an administrative decision. Indeed, governments are the ones who confer or fail to confer refugee status on an individual. "Asylum seekers" are what people are called when the danger they are fleeing from has yet to be evaluated. Many countries have a specific legal framework for cases of political persecution (thus distinguishing between humanitarian and political asylum). In Mexico, Article 13 of the Law on Refugees, Complementary Protection, and Political Asylum  provides that an individual will be granted refugee status under the following conditions:

> They are outside of the country of which they are nationals, to which they cannot return for well-found fears of being persecuted for reasons of race, religion, nationality, gender, membership in a given social group, or their political opinions;

> They have fled from their country of origin because their lives, security, or liberty have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights, or other circumstances that have gravely disturbed public order, and

> For circumstances that have emerged in their country of origin or as a result of activities undertaken during their time on domestic territory they have well-found fears of being persecuted for reasons of race, religion, nationality, gender, membership in a given social group, or their political opinions, or their lives, security, or liberty may be threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances that have gravely disturbed public order.

Law on Refugees, Complementary Protection, and Political Asylum, 2011, accessed October 7, 2015, http://bit.ly/1GoSuSk.

[63] *Boletín Estadístico de SEGOB*, 2014, accessed October 15, 2015 http://bit.ly/1jMKhm0.

[64] National Autonomous University of Honduras (*Universidad Nacional Autónoma de Honduras*) and the University Institute for Democracy, Peace and Security (*Instituto Universitario en Democracia, Paz, y Seguridad*), *Observatorio de la Violencia (Observatory of violence)*, February 2015, accessed September 28, 2015, http://bit.ly/1OcFhEe..

[65] *"El Salvador confirma a agosto como el mes más violento desde la guerra civil"*, BBC, September 2, 2015, accessed September 28, 2015, http://bbc.in/1OcFkzT.

[66] Communiqué from INM to members of its Citizen's Council, dated June 23, 2015.

[67] *La Ruta del Encierro Sin Fronteras*, 2014, accessed September 28, 2015, http://bit.ly/1OcFlUk *"Derechos Cautivos", Sin Fronteras*, 2015, accessed September 28, 2015, http://bit.ly/1OcFmHR.

[68] Secretariat of the Interior, "*Estadísticas Comar*", September 22, 2015, accessed September 28, 2015, http://bit.ly/1OcFo2D. For reasons that are unclear, the Secretariat of the Interior provides a much lower figure—296—for the number of refugees documented as permanent residents in 2014; Secretariat of the Interior, Migration Policy Unit, and the National Migration Institute, 2014 Monthly Migration Statistics Report, 2014, accessed October 10, 2015 http://bit.ly/1OcFuap.

[69] Ibid.

[70] United Nations High Commissioner for Refugees, *Arrancados de Raíz*, accessed September 28, 2015, http://bit.ly/1Kl0Qv4. .

[71] Chamber of Deputies of the Honorable Congress of the Union, *Law on Refugees, Complementary Protection, and Political Asylum*, October 30, 2014, accessed September 28, 2015, http://bit.ly/1OcFwPu

[72] Ibid.

[73] U.S. Citizenship and Immigration Services, "Refugees", accessed September 28, 2015, http://1.usa.gov/1OcFzef

[74] Secretariat of the Interior, "Estadísticas COMAR", September 22, 2015, September 28, 2015, http://bit.ly/1JBst5L..

[75] United Nations High Commissioner for Refugees (UNHCR), *Arrancados de Raíz: Causas que originan el desplazamiento transfronterizo de niños, niñas y adolescentes no acompañados y separados de Centroamérica y su necesidad de protección internacional*  2014, accessed October 1, 2015, http://bit.ly/1OcFBTb

[76] IACHR, Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico, p. 227–228

[77] Interview with Salvador Leyva, attorney for La 72, conducted by Gabriela Morales on April 29, 2015. It is worth noting that in 2015, investigators from the Human Rights Institute of Georgetown Law School conducted a week-long investigative mission to Tapachula, Chiapas, and the capital of Guatemala. They conducted interviews with 45 migrants and found that children were not appropriately interviewed to identify their need for international protection nor were they informed about their right to seek asylum. Furthermore, investigators found that the conditions, as well as the length, of detention dissuade children

from applying for asylum. Georgetown Law Human Rights Institute, *The Cost of Stemming the Tide: How Immigration Enforcement Practices in Southern Mexico Limit Migrant Children's Access to International Protection*, April 2015, information accessed on October 27, 2015. http://bit.ly/1O6ajOk.

[78] Clay Boggs, Carolina Carreño y Diana Martinez, "New Data Show that Mexico has Intensified Its Immigration Operations Without Building an Adequate Refugee Protection System," Washington Office on Latin America, June 24, accessed September 28, 2015, http://bit.ly/1Lzsxae.

[79] Secretariat of Finance, "Presupuesto de Egresos de la Federación" ("Federal Expenditures Budget"), September 9, 2015, accessed September 28, 2015, http://bit.ly/1OcFEyk.

[80] Manu Ureste, *"México recibe 67% más solicitudes de refugio, pero sólo tiene 15 oficiales para atender 2 mil casos", Animal Político*, June 19, 2015, accessed September 28, 2015, http://bit.ly/1OcFEyz.

[81] Miguel Agustín Pro Juárez Center for Human Rights (*Centro de Derechos Humanos Miguel Agustín Pro Juárez*) and the Migrant Affairs Program of the Ibero-American University, Mexico City Campus (*Programa de Asuntos Migratorios de la Universidad Iberoamericana Campus Ciudad de México*), *Migrantes en prisión: La incriminación de migrantes en México*, September 2014, accessed September 28, 2015, http://bit.ly/1OcFgQt.

[82] The phenomenon of falsely accusing migrants of crimes became evident thanks to the case of Ángel Amílcar Colón Quevedo, an indigenous Garífuna man from Honduras, who in January 2009 left his country headed for the United States. Detained in a house where he was awaiting a "coyote" to take him to the US, Ángel was falsely accused of participating in organized crime. Following his detention he was assaulted and tortured by the army and federal police agents, who above all made reference to the color of his skin and his origins as a foreign migrant. He was jailed at the Federal Social Readaptation Center No 4 Northwest (*Centro Federal de Readaptación Social No. 4 Noroeste*), in Tepic, Nayarit. The Miguel Agustín Pro Juárez Center for Human Rights took charge of his legal defense and undertook a publicity campaign to gain his release. Five years, six months and seven days later on October 16, 2014 he was released after the PGR presented its decision to not indict.

[83] Cases documented by the Saltillo Migrant Shelter (*Casa de Migrante de Saltillo*).

[84] Ibid.

[85] Federal Attorney General's Office, Deputy Attorney General's Office for Legal and International Affairs, General Directorate of Legal Affairs, Official Letter SJAI/DGAJ/08863/2015, response to Infomex request, number 0001700224815, July 14, 2015, document available on the WOLA website, http://bit.ly/1kaC0bS.

[86] Procuraduría General de la Republica, Subprocuraduría Jurídica y de Asuntos Internacionales, Dirección General de Asuntos Jurídicos, Oficio SJAI/DGAJ/08863/2015, respuesta a solicitud de información folio 0001700224815, July 15, 2015, available on WOLA's website, http://bit.ly/1kaC0bS.

[87] Organization of American States, "Report on the 154th Session of the IACHR", June 19, 2015, accessed September 28, 2015, http://bit.ly/1OcFE1w.

[88] This information was taken from the four responses to requests for information from the Chiapas Government. The first three requests were made independently of this report by journalist Manu Ureste of *Animal Político* to the Government of Chiapas, the State's Attorney General's Office, the Specialized Prosecutor's Office on Crimes against Immigrants (responses to requests for information, number 12855

(data for 2013); 12856 (data for 2014); and 12857 (data for 2015), June 5, 2015). Documents available on WOLA's website, http://bit.ly/1kayxdl (2013); http://bit.ly/1kayBdb (2014); and http://bit.ly/1kayFJK (2015). However, the aforementioned request did not make reference to the number of sentences handed down. As such, it was necessary to consult the response to the request submitted by the authors of this report (the Government of Chiapas, the State's Attorney General's Office, and the Specialized Prosecutor's Office on Crimes against Immigrants (response to request for information, number 12960, June 18, 2015), available on WOLA's website, http://bit.ly/1kazoe8.

[89] Response from the Tabasco Attorney General's Office to the request for information, number 00993815, June 10, 2015, as part of an investigative journalism report. See Manu Ureste and Yosune Chamizo, *"Plan Frontera Sur: un año después, los robos a migrantes se disparan 81% en los estados del sur", Animal Político.* July 7, 2015, accessed September 28, 2015: http://bit.ly/1OcFdnN. Documents available on the WOLA website, http://bit.ly/1kaBnPt (2013); http://bit.ly/1kaBryW (2014); and http://bit.ly/1kaBvP7 (2015). For 2014 and 2015, the document refers to "information pertaining to migrants (injured party)," while for 2013 it only refers to "information pertaining to migrants (injured party) [sic]." This creates confusion as to whether the 2013 data include cases with migrants who are perpetrators or only victims. The IACHR criticizes this same lack of precision in its report, when analyzing the response given by the Mexican state to its request for information on cases of crimes against migrants (Inter American Commission on *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 136).

[90] National Statistics and Geography Institute (Instituto Nacional de Estadística y Geografía), National Survey of Victimization and Perception of Safety (*Encuesta Nacional de Victimización y Percepción sobre Seguridad Pública*, ENVIPE) 2015, "Principales Resultados," accessed October 16, 2015 http://bit.ly/1Mu3y2L, p. 27.

[91] Ibid.

[92] The case of Beylin Sarmiento, a Honduran murdered while crossing Mexico in August 2014, shows that the lack of communication among state Attorney General's Offices can have serious consequences. John Washington, "Who Killed Beylin Sarmiento?" T*he Nation*, August 11, 2015. Accessed September 28, 2015. See http://bit.ly/1OcFG9F.

[93] National Human Rights Commission, in response to request for information, number 00036515, July 1, 2015, document available on WOLA's website, http://bit.ly/1kaBOJK.

[94] OPIs are Federal Migration Agents whose duty it is to guarantee respect of child migrant rights, particularly unaccompanied minors. The INM currently has 543 OPIs in its 32 regional delegations. OPIs are selected to receive ongoing specialized training. Their duties are to: (1) protect the physical and mental integrity of children; (2) immediately provide basic health, food, clothing, and shelter services; (3) facilitate contact between minors and their families via free telephone calls; (4) keep minors apprised of their migratory status, using a kind, age-appropriate language; and (5) assist child migrants throughout their repatriation process. INM website. Accessed October 7, 2015, http://bit.ly/1LztuiV.

[95] Interview with Alberto Xicoténcatl, conducted by Gabriela Morales. May 14, 2015.

[96] Diario Oficial de la Federación, *"Reglamento Interior de la Secretaria de Gobernación"* ("Internal Regulations for the Secretariat of the Interior), February 4, 2013. Accessed September 28, 2015: http://bit.ly/1OcFGGy.

[97] See, Rodolfo Córdova, *"Transformar construyendo: dos años de Presidencia del Consejo Ciudadano del Instituto Nacional de Migración, informe rendición de cuentas", Fundar,* August 2015. Accessed October 7, 2015, http://bit.ly/1LzvJCB; and Adam Lane, Bryan Maekawa, Manuel Ruiz and Ricardo Vázquez, *"Mejores prácticas para los consejos consultivos ciudadano en México"*, May 11, 2015.

[98] Diario Oficial de la Federación, "Acuerdo por el que se emiten las Normas para el funcionamiento de las Estaciones Migratorias y Estancias Provisionales del Instituto Nacional de Migración", August 11, 2012. Accessed September 28, 2015: http://bit.ly/1OcFIhL.

[99] Migration Law, http://bit.ly/1OiZaZ0.

[100] See Articles 178 through 184 of the Migration Law Regulations. Diario Oficial de la Federación, "Decreto por el que se expide el Reglamento de la Ley de Migración y se reforman, derogan y adicionan diversas disposiciones del Reglamento de la Ley General de Población y del Reglamento de la Ley de Asociaciones Religiosas y Culto Público, September 29, 2012. Accessed September 28, 2015: http://bit.ly/1OcFJ5n.

[101] SEGOB's internal regulations provide for an Internal Affairs Unit within the INM, but no such unit has yet been established. The functions, objectives, and goals of such Unit should be consistent with best practices on this matter and approved by the INM's Citizen's Council.

## ABOUT THE ORGANIZATIONS

**CASA DEL MIGRANTE DE SALTILLO "FRONTERA CON JUSTICIA", AC,** in Saltillo, Coahuila, provides comprehensive humanitarian assistance as well as case documentation and legal services.

**FUNDAR, CENTRO DE ANÁLISIS E INVESTIGACIÓN, AC** is a civil society organization based in Mexico City, Mexico that works toward a substantive democracy.

**ALBERGUE DE MIGRANTES "HERMANOS EL CAMINO,"** in Ixtepec, Oaxaca, provides comprehensive humanitarian assistance to migrants in transit in Mexico.

**LA 72, HOGAR—REFUGIO PARA PERSONAS MIGRANTES,** is a Franciscan project dedicated to providing comprehensive assistance to migrants and refugees traveling through Tenosique, Tabasco in Mexico.

**WOLA (WASHINGTON OFFICE ON LATIN AMERICA)** is a leading research and advocacy organization that promotes human rights in the Americas.

**LA RED SONORA** is a network of three organizations based in Sonora, Mexico dedicated to defending and providing humanitarian assistance to migrants in Mexico.
- **Centro Comunitario de Atención al Migrante y Necesitado,** in Altar, is a migrant shelter run by the local Nuestra Señora de Guadalupe Church.
- **Centro de Recursos para Migrantes,** in Agua Prieta, works to provide humanitarian assistance to migrants and document abuses.
- **Kino Border Initiative** is an organization based in Nogales, Sonora and Nogales, Arizona that works in support of migrants and refugees in the United States and Mexico.

**UN MUNDO, UNA NACIÓN, AC** is an organization dedicated to providing humanitarian assistance and promoting the human rights of migrants in Apizaco, Tlaxcala.

## ABOUT THE AUTHORS

José Knippen is a migration project coordinator at Fundar. Clay Boggs was a Program Officer at WOLA until October 2015. Maureen Meyer is WOLA's Senior Associate for Mexico and Migrant Rights.

## ACKNOWLEDGMENTS

We thank the following people for their contributions to this report. Gabriela Morales worked with WOLA and Fundar in the research for this report and made a series of field visits to migrant shelters and organizations to gather documentation and conduct interviews. Irazú Gómez has worked as a migrant rights advocate in Puebla for many years. Rodolfo Córdova, a researcher at Fundar, and Kristel Muciño, WOLA's Communications Director, offered valuable suggestions to multiple versions of the report. Hannah Smith, WOLA Program Assistant, and Andrés Díaz, a researcher at Fundar, edited the text of the report. We also want to thank Mike Evans of the National Security Archive for advice on the process of requesting information through the Infomex system. This report would not have been possible without the generous support of the Ford Foundation, the MacArthur Foundation, and CAMMINA–the Alliance for Migration in Central America and Mexico.

# EXHIBIT 11



**WOMEN'S REFUGEE COMMISSION**
Research. Rethink. Resolve.

**Migrant and Refugee Caravans:**
**Failed Responses to Women and Children in Need**
**of International Protection and Humanitarian Aid**

**May 2019**

The Women's Refugee Commission (WRC) improves the lives and protects the rights of women, children, and youth displaced by conflict and crisis. We research their needs, identify solutions, and advocate for programs and policies to strengthen their resilience and drive change in humanitarian practice.

## Acknowledgements

This study was made possible by generous funding support from CAMMINA, Hispanics in Philanthropy, and Oak Foundation.

This report was written by Tatiana Brofft and reviewed by Michelle Brané, Leah Chavla, Ursela Ojeda, and Dale Buscher of the Women's Refugee Commission. It was edited by Lauren Wolkoff and designed by Diana Quick.

The author thanks Omar Robles and Jimmy McDonough for their valuable contributions in the research process.

The Women's Refugee Commission extends deep thanks to the research participants, particularly the refugees and migrants, who generously shared their time and experiences, as well as: Al Otro Lado, Albergue Jesús el Buen Pastor, Albergue Madre Asunta, Albergues YMCA, Alma migrante, Asylum Access, Catholic Legal Immigration Network, Centro de Derechos Humanos Fray Matías de Córdova, Comisión Mexicana de Ayuda a Refugiados, Comité Estratégico de Ayuda Humanitaria, Consejo Nacional para Prevenir la Discriminación, Desarrollo Integral para la Familia, Doctors Without Borders, El Colegio de la Frontera Norte , Futbol Más, Grupo Beta, Human Rights First, Human Rights Watch, Instituto para las Mujeres en la Migración, Instituto Nacional de Migración , International Organization for Migration, Jesuit Refugee Service, Secretaría de Relaciones Exteriores, Tech Palewi, Servicio Nacional de Empleo, Sistema de Desarrollo Integral de la Familia (DIF), Una mano amiga en la lucha contra el SIDA, United Nations Children's Fund, United Nations High Commissioner for Refugees , and US Customs and Border Protection.

Cover photo: Girls who traveled with the 2018  caravans at the Benito Juárez sports complex shelter. © Michelle Brané

© 2019 Women's Refugee Commission

# Contents

Background ............................................................................................................................... 1

Objectives and Methodology ................................................................................................. 3

Map of the Region and Main Route of the 2018 Caravan ................................................ 4

Mexico: Protection Gaps and Risks ...................................................................................... 4

United States: Closing Borders ............................................................................................. 8

Heightened Tensions against Immigrants in Mexico and the US ................................... 11

Recommendations ................................................................................................................. 11

Acronyms and Abbreviations .............................................................................................. 13

Endnotes ................................................................................................................................. 14

*"We left Honduras in July, before the caravans started. The Maras were after us.*

*"We moved slowly through Mexico. We were taking temporary jobs to have enough money to feed the kids and for a smuggler for the most dangerous parts of the journey. When the caravan arrived, we were already in San Luis Potosi, but we decided to go back and join it in Guadalajara. It would be safer. We were constantly afraid of being deported, extorted, robbed, or having a child kidnapped … you know, the usual. In that, I do feel the caravan was safer than traveling alone. Also, people were nicer, they gave us food and clothes. Even a police officer helped me when my boy was dehydrated.*

*"But I never felt safe."*

—Lili,[1] a woman from Honduras in her early 20s who joined the caravans in Mexico, traveling with her husband and four children. (Interviewed by the Women's Refugee Commission in Tijuana on November 30, 2018)

# BACKGROUND

Over the last decade, an increasing number of Hondurans, Salvadorans, and Guatemalans have been forced to flee their countries of origin due to widespread criminal violence, life-threatening gender and domestic violence, and extreme economic hardship.[2] In recent years, particularly in the first months of 2019, the number of unaccompanied children and families forced to flee has sharply increased.[3] The levels of violence and human rights violations Central Americans experience resemble those of people in war-torn countries.[4] Notwithstanding, this humanitarian crisis has largely evolved in the shadows. It has been neglected by the US and Mexican governments, which—failing to recognize the refugee nature of the displacement—have turned a blind eye to the lack of safe and legal channels to claim asylum, as well as to the deadly risks and systematic abuses faced by Central Americans in their journey to safety.[5]

On October 12, 2018, a group of 160 people left San Pedro Sula, Honduras,[6] one of the most violent cities in the world.[7] The dire living conditions of people from Central America, paired with the well-known dangers of the migrant trail, proved fertile ground for turning the rumors of a historically large caravan into a self-fulfilling prophecy.[8] By the time it reached the Mexican border with Guatemala, more than 7,000 refugees and migrants were moving north at the same time.[9] Four additional smaller groups followed, bringing the estimated total to more than 17,900 caravan members traveling through Mexico between October and December 2018.[10] Central Americans saw in caravans a traveling strategy to render themselves and their plight visible and thus obtain safe passage to Mexico and the US.[11]

**Migrant and Refugee Caravans:**
**Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid**

Case 1:23-cv-01537-DII   Document 30-5   Filed 01/12/24   Page 248 of 578



*Drawing made by Salvadoran boy in psychosocial support activity. When asked to share his drawing and memories about his house in his hometown, he referred to violent incidents.*

The size, cohesion, and organization of the 2018 caravan fueled constant monitoring and reporting by journalists and human rights defenders.[12] In the case of this group, putting the spotlight on people on the move generally deterred large-scale criminal activities and human rights violations. Moreover, it rallied humanitarian aid and highlighted the need for policy responses. To a certain extent, the 2018 caravans delivered on the expectation of reducing costs, granting protection, and facilitating transit through Mexico.[13]

However, a risk assessment conducted by the Women's Refugee Commission (WRC) found that the protection offered by caravans is extremely narrow. People who follow this traveling strategy still face myriad risks and protection gaps. Furthermore, WRC is concerned that, due to heightened xenophobia and immigration control, members of the caravans that traveled Mexico in the first four months of 2019 were more exposed to ever-present dangers such as police abuse and criminal activities[14] and received less humanitarian support.[15] Caravans had unintended consequences on public opinion and policy decisions that will affect refugees and migrants adversely over the long term.

# OBJECTIVES AND METHODOLOGY OF THE ASSESSMENT

From November 26, 2018 to January 25, 2019, WRC assessed the protection risks faced by women, children, and families traveling in caravans through Mexico.

WRC engaged in semi-structured interviews with members of the caravan to learn about why they were fleeing their countries of origin and traveling in large groups, their needs, the risks they face during the journey, and their intended destination. Individuals were informed that they could refuse to participate or to answer questions they deemed sensitive. The team also met with relevant authorities and key stakeholders, such as international organizations, nongovernmental organizations (NGOs), and faith groups, to map their capacities and share concerns regarding the rights and well-being of caravan members.

WRC began the assessment in Tijuana because asylum seekers and migrants in this border city with the US had completed their journey through Mexico, which allowed them to report on the whole route. Additionally, it was the locality were the largest group concentrated for the longest time. This situation multiplied the needs and challenges in terms of service provision and protection. In Tijuana, WRC visited shelters run by civil society for families, women, and children, as well as the temporary shelters set up by the government at the Benito Juarez sports complex and the Barretal concert venue. Additionally, WRC visited the job fair offered by the Mexican National Employment Service (SNE) to learn about who was availing themselves of the option to regularize their immigration status in Mexico, how they were doing so, and why. WRC also visited the Mexican side of El Chaparral port of entry to document the dynamics that obstruct access to international protection in the US.

WRC returned to Tijuana to assess the evolution of the situation and follow up with persons interviewed in the first visit. The team identified the impact of having transferred refugees and migrants to Barretal as well as of the policies of the incoming Mexican administration of Andrés Manuel López Obrador.

Following the research conducted in Tijuana, WRC traveled to Tapachula to identify the needs and risks faced by the caravan when they arrived to Mexico, as well as of women, children, and youth who separated from the main group. In this border city with Guatemala, the team made a field visit to the immigration station Siglo XXI, the largest in Mexico; visited shelters run by civil society and UNHCR; and participated in psychosocial activities for refugee children.

To have a comprehensive perspective, WRC met with representatives of the Mexican federal government in Mexico City and of national headquarters of international organizations and NGOs that have provided services and protection to the 2018 Caravans and inquire about their preparedness for future caravans. Additionally, WRC conducted media monitoring and desk research.

This initial evaluation is a snapshot of a moving target and constantly changing dynamic and political context.


**Migrant and Refugee Caravans:**
**Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid**

Case 1:23-cv-01537-DII   Document 30-5   Filed 01/12/24   Page 250 of 578

# MAP OF THE REGION AND MAIN ROUTE OF THE 2018 CARAVAN



# MEXICO: PROTECTION GAPS AND RISKS

WRC was particularly troubled by the fact that neither the caravan itself nor the Mexican government response to it provided adequate protection to women and children. The caravans provided unaccompanied children and single women the option to link themselves with a family, friends, or partner for the journey north. While these relationships offer some protections, WRC identified a significant number of cases in which they created problematic situations that led to violence and abuse. A service provider shared a story of a 12-year-old Mexican girl who joined the caravan to look for her mother, who lived in northern Mexico. On the journey, she met a family with whom she stayed for protection but eventually they restricted her movement and prevented her from speaking to or approaching authorities, service providers, and even other children. When her real identity was discovered and she was rescued and referred to Mexico's child services agency (DIF),[16] authorities found her real family had been looking for her.[17]

Overall, pressure to stay with the caravan in a group put the most vulnerable populations at high risk by preventing them from seeking assistance and support when needed and rendering them and their specific needs invisible. WRC spoke with women and children who were unwilling to go to specialized shelters that could provide better care and services. They said they would rather sleep on the streets or stay in the overcrowded, unsafe, and unhygienic temporary shelters set up by the government than split from the larger group. A pregnant woman told the WRC that she crossed the Suchiate river just after a threatened miscarriage of her seven-month pregnancy because she did not want to be left behind in Guatemala while the rest of the group advanced into Mexico.[18]



*Women and children told the WRC that they would rather sleep on the streets or stay in the overcrowded, unsafe, and unhygienic temporary shelters set up by the government than split from the larger group.*

Despite the pressure and efforts to stay together, the caravan left women and children behind, in both a metaphorical and a literal sense. Structural barriers, such as security considerations and having to care for the children, prevented them from participating in decision-making meetings.[19] Those who followed the caravan, such as humanitarian workers, human rights and international organizations, reported that, as the group advanced, the presence of women and families reduced. They pointed out that contingents composed mostly of young single men who could move faster took the lead.[20] WRC met a boy in southern Mexico who was unable to keep up with the caravan because his prosthetic leg broke.[21] He is only one example. Many women, families, and people with disabilities who could not maintain the pace lagged or stopped along the route, were left behind, or opted for voluntary repatriation. Women who traveled in the caravan, service providers, and government officials expressed outrage that women and children were pushed to the front of the caravan whenever there was confrontation with authorities. Otherwise, they were left behind.[22]

Furthermore, the humanitarian response, both from Mexican authorities and nongovernmental actors, was lacking and had few or no age and gender considerations, reproducing systemic obstacles that hamper women and children's access to information and services, as well as their ability to exercise their rights. WRC did not identify any safe space for women or child care services to assist them. In Tijuana, the Mexican government set up a job fair featuring representatives from the agencies that process asylum claims and humanitarian visas. Due to the lack of services that addressed women's needs, women interviewed by WRC were often unaware of the job fair because this information did not reach them or did not attend because they assumed that having to care for their children meant they would not qualify for a job, or because accessing those locations with children was a challenge.

Migrant and Refugee Caravans:
Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid

Case 1:23-cv-01537-DII   Document 30-5   Filed 01/12/24   Page 252 of 578

Service provision was intermittent, placed a heavy reliance on overburdened civil society organizations and inexperienced volunteers, and was distributed without engaging beneficiaries. WRC spoke with women and children who had gone days without eating and who reported that water was scarce or not potable. Mothers and humanitarian aid workers expressed concerns that children were at risk of malnutrition.[23] People on the move slept on the streets or were housed in overcrowded, unsanitary shelters. The WRC team observed how unhygienic conditions and lack of protection against the elements resulted in widespread sickness.

Privacy and safety considerations geared to prevent sexual and gender-based violence were substandard. When WRC visited Benito Juarez and Barretal, the two temporary shelters the Mexican government set up in Tijuana to hold caravan members, the team observed that overcrowding resulted in insufficient designated space for families, women, and children. There was only one space for these three populations, which implied that even single women, women with their children, and unaccompanied girls in a so-called safe space were placed together with men they did not know. Moreover, while these shelters claimed to offer sex-separated toilets, in most cases they were rows of portable toilets that were used interchangeably and had broken locks. Showers had no privacy barriers; at best they were separated by improvised sheets and blankets.

WRC learned of instances of domestic violence, sexual harassment, physical assaults, transactional sex, forced prostitution, and rape, and yet there was no clear referral network for survivors. Assistance services were bureaucratic and cumbersome, rendering them practically inaccessible. The absence of prevention and response to sexual and gender-based violence was stark. There were no safe spaces for women to privately report abuse. When people would raise questions about post-rape care, they were met with silence and frozen looks by health care providers at Barretal, even though by law they should be available.[24]

Access to protections in Mexico is not always meaningful. The asylum system has considerable shortcomings, including prolonged or unnecessary use of immigration detention, proceedings that last for years with restrictions on geographical mobility that force applicants to remain in insecure and underdeveloped areas, limited integration options, and underdeveloped and under-resourced refugee status determination procedures.[25] In the case of unaccompanied children, these shortcomings are compounded by flawed or nonexistent best interests determinations. In Mexico, children in need of international protection are inadequately screened, or not screened at all, and are often returned to places where they fear irreparable harm,[26] violating the principle of *non-refoulement* —a cornerstone of refugee protection that prescribes that no one should be returned to a country where his or her life or freedom would be threatened by persecution, other ill-treatment, or torture.[27] Furthermore, since the Mexican and US child protection services do not communicate with each other, the Mexican protection service does not consider protection or family reunification in the US as an option.[28]

The glaring lack of information, coupled with the troubling widespread misinformation, heightened risks. WRC spoke in Tijuana and Tapachula[29] with refugees and migrants who were making ill-informed decisions—such as abandoning their asylum applications, rejecting moving to safer spaces, or hiring a smuggler—that increased their vulnerability and in some cases put them at grave danger. The inability of the Mexican government, international organizations, legal service providers, and humanitarian agencies to fill the information void facilitated dangerous power dynamics that led to manipulation and abuse. Both in Tapachula and in Tijuana, WRC spoke to numerous people who were deeply confused and misinformed about immigration procedures both in Mexico and the US. An accredited humanitarian worker shared that, while they gave accurate information about asylum in Mexico, people in the caravan with megaphones accused them of being untruthful.[30]

Protection gaps were compounded by the indisputable fact that parts of Mexico are not safe.[31] WRC learned of cases of child labor, forced prostitution, forced recruitment, kidnapping, forced drug dealing, and trafficking, as well as misconduct and human rights violations by authorities. Service providers shared stories of an accusation of sexual assault against a government official in Tapachula,[32] men in Benito Juárez shelter being tricked into jobs and having been forced to clean blood from cars,[33] and girls and trans women being forcibly prostituted.[34] The two places where caravan members waited the longest—Tapachula and Tijuana— have a large presence of criminal organizations and are hubs of the illegal sex industry.[35]

> "A man offered me and some friends a job. He also offered to bring us to a safe shelter; that is how we got here. We did not follow up with the job offer because I noticed he had a Barrio 18 tattoo.[36] I have not left the shelter since we arrived. I do not want to run into him and I'm scared of gangs and organized crime operating in the city."
> —Adriana, a woman in her 40s from El Salvador who traveled in the caravan with some friends. Interviewed by WRC in Tijuana on December 19, 2018.

All service providers interviewed by WRC agreed that institutional challenges were aggravated by the Mexican government's lack of leadership and preparedness in responding to the caravans. Even though the advance of the 2018 caravan was widely reported, when it reached Mexico there was no protocol in place to grant humanitarian assistance nor to process the arrival of large numbers of people seeking protection. Federal authorities at the time decided that local governments would be responsible for providing basic needs and social services. This resulted in poor planning, for example the government of Tijuana opening a temporary shelter with capacity for 2,000 persons that, two weeks later, held over 6,000 persons in precarious conditions. This shelter later closed, and the people still housed there at the time had to be transferred to a new shelter.[37] Additionally, the avenues available to caravan members to seek legal status in Mexico were constantly changing—ranging from strict border enforcement to a two-week pilot program of documenting all caravan members with humanitarian visas.[38]



Migrant and Refugee Caravans:
Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid

Case 1:23-cv-01537-DII   Document 30-5   Filed 01/12/24   Page 254 of 578



*Shelters set up for migrants soon became severely overcrowded and unsanitary.*

To date, no long-term policy has been outlined or implemented by the Mexican government. As a result, since mid-March there is a mounting administrative and humanitarian crisis at Mexico's southern border. More and more people are stranded in precarious conditions because Mexico's National Institute of Migration (INM) increased immigration enforcement against caravans and temporarily suspended immigration procedures in Tapachula, where the immigration station is at capacity and people are being held in detention-like temporary shelters.[39]

One reason for the Mexican government's insufficient response for the 2018 caravans was the fact that, in the last third of that year, a significant number of authorities at all levels of government, including the president, were in a lame duck period.[40] While the synchronized displacement of more than 10,000 people would naturally create challenges, Mexico has the capacity to offer an adequate humanitarian response.[41] Once the new government came into power, it has struggled to reconcile its seemingly contrasting objectives of avoiding a confrontation with the US government[42] and fulfilling its promise of a new immigration policy that follows a human rights approach and leaves behind its deterrence and contention approach.[43]

Improvisation, lack of clarity regarding responsibilities, changing strategies, informal procedures, and overreliance on volunteers have prevented the government from mitigating risks and left basic needs unsatisfied.

## UNITED STATES: CLOSING BORDERS

Caravan members were trapped in one of Mexico's most dangerous cities[44] as a direct consequence of a preexisting US practice of turning back and regulating the number of asylum seekers that can present themselves at a port of entry (a practice known as "metering").[45] Everything about this illegal

practice, which is currently under litigation,[46] jeopardizes the rights and integrity of people in need of international protection. WRC observed on its visits to Tijuana that asylum seekers are asked to register on an unofficial list with an average two-month waiting time to present their claim. This practice was confirmed by a Customs and Border Protection (CBP) officer in San Diego[47] and is also occurring at ports of entry across the border.[48] Given that neither the US nor Mexico accept their evident participation in this ad hoc process, the list is run by migrants themselves. As it has no clear guidelines, regulations, oversight, or accountability, the process prevents the most vulnerable populations from being identified, jeopardizes people's privacy, and opens the floodgates for corruption and abuse. On the day after WRC spoke with list managers— questioning what oversight existed to prevent exploitation—the team learned of a migrant who came forward to report demands for sex and/or money in exchange for getting on the list.[49] Since then, interviews with migrants have revealed numerous instances of extortion.[50]

Even more problematic, WRC identified that metering is leaving unaccompanied children with no avenue to present themselves at a US port of entry, systematically ignoring their best interests and denying their right to seek asylum or be granted protection under US laws. Unaccompanied migrant children are not only turned back by Mexican authorities when they approach a US port of entry, they are also not allowed on the list.[51] CBP confirmed to WRC that unaccompanied children who approach the border without authorization are turned back and told to get in line unless they are with an attorney.[52] Migrants managing the list in Tijuana told WRC that children must be with an adult in order to get on the list or go the border once their name is called. This practice denies children access to their right to claim protection in the US independent of related adults, in violation of the Trafficking Victims Protection Reauthorization Act, US immigration and asylum law, and the 1951 Refugee Convention.[53]



*The border.*



**Migrant and Refugee Caravans:**
**Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid**

Case 1:23-cv-01537-DII   Document 30-5   Filed 01/12/24   Page 256 of 578

Mexican and US immigration officials are aware of the illegalities of this practice. WRC directly informed them of our findings and concerns.[54] Nonetheless, CBP continues to accept children only reluctantly in some cases where they are escorted by Members of Congress, lawyers, or advocacy organizations.[55] These exceptions, while lifesaving for those children who find assistance, do not address the illegality of turning away unaccompanied children. Accompaniment is not a legal requirement for seeking protection. At the time of this writing, unfortunately only a handful of the more than 100 unaccompanied children in Tijuana have been identified and assisted.[56]

WRC observed that unaccompanied children who have not found representation or assistance through volunteers are living in unhealthy and dangerous conditions. Children hesitate to approach Mexico's child services agency (DIF),[57] because it will not allow them to claim protection in the US—even if doing so is in their best interests. In fact, the WRC team was told repeatedly that children run from and avoid DIF, and that they are often distrustful of adults approaching them to offer assistance.[58] Left with no other option, unaccompanied children must make impossible choices between the dangers of:

A. staying stranded in Tijuana indefinitely;
B. entering the US without inspection between ports of entry;
C. looking for a smuggler or another adult to accompany them across the border (thereby creating an opportunity for those who wish to traffic or otherwise harm a child to prey upon them by exploiting this practice); or
D. submitting to voluntary return (even when it means returning to a place where their life and freedom are at risk, amounting to *refoulement*).

All these are situations the US government should aim to prevent rather than encourage. In December 2018, three Honduran children in Tijuana who traveled with the caravan and had not presented themselves at a port of entry due to metering, were tortured—and two of them were brutally murdered. At least two of them had already been identified as having a strong case for accessing protection in the US.[59] This was a painful confirmation that the caravan, Mexico, and especially the US are failing to protect children on the move. In the words of the director of the shelter where the children were staying: "It was Mexican criminals who killed them, but it was the US government who sent them to the slaughterhouse."[60]

Furthermore, the 2018 caravan had the unintended consequence of giving the US government pretext to move forward with its plans to extra-territorialize the waiting time of asylum procedures to Mexican territory by expanding the interpretation of section 235(b)(2)(C) of the US Immigration and Nationality Act (INA).[61] This expanded interpretation allows for the return to Mexico of asylum seekers—arriving at a port of entry or entering the US from Mexico between ports of entry—for the duration of their immigration proceedings.

This policy, officially named "Migrant Protection Protocols," also known as "Remain in Mexico," has created insurmountable barriers to due process, access to counsel, and the ability to present meaningful defenses to removal before US courts. Remain in Mexico disrupts the right to family unity for those with loved ones already residing in the US and traps asylum seekers in a potentially dangerous environment. On April 8, 2019, a federal court issued an injunction on these returns.[62] However, this policy has not yet been ruled out. On May 7, 2019, an appeal court overturned the injunction. Remain in Mexico and metering are examples of how the US an Mexican governments are blocking access to protection and endangering migrants.[63]

# HEIGHTENED TENSIONS AGAINST IMMIGRANTS IN MEXICO AND THE US

While the visible forced displacement of large numbers of Central Americans—and the precarious, dangerous conditions in which they traveled—rallied altruistic and humanitarian support among some sectors of Central American, Mexican, and US societies, in others it fueled xenophobic sentiments that led to calls for increased border and immigration enforcement.[64]

In January 2019, a new caravan began its journey in search of a safe haven.[65] Mexico's incoming administration expressed its intention to offer a comprehensive response following a human rights approach—seeming to signal a positive step to safeguard the rights of migrants, guarantee adequate humanitarian response, and address root causes by promoting regional development.[66] For two weeks in January, Mexico offered humanitarian visas to more than 12,500 caravan members arriving at Mexico's southern border.[67] However, six months in, no long-term policy has been put in place and service provision to members of caravans in Mexico still has considerable shortcomings.[68] President Trump's strong criticism of Mexico's immigration policies[69] seems to be contributing to a shift in Mexico's policy back to its old deterrence and containment approach.[70] WRC is concerned that, if implemented without adequate oversight or human rights considerations, immigration enforcement in Mexico will continue to violate people's rights and put them in extremely dangerous situations.

Heightened xenophobia, Mexico's inconsistent policies, and the US decision to continue narrowing avenues to protection suggest that future caravans might face even grimmer conditions than the 2018 caravan.

To prevent another humanitarian disaster and the loss of more lives, the US, Mexico, and Central American countries need to come together to offer a comprehensive regional response— not only to caravans but also to address the underlying refugee situation and its root causes.

# RECOMMENDATIONS

## Design and implement a comprehensive regional strategy

- El Salvador, Guatemala, Honduras, Mexico, and the US should **design and implement a comprehensive,** rights-based, gender- and age-sensitive **regional strategy** that honors domestic and international obligations to refugees and migrants, ensures adequate humanitarian relief to people on the move, and addresses the root causes of displacement.

## Honor domestic and international law

- The US should **allow asylum seekers**—particularly unaccompanied children—**to present themselves immediately at ports of entry,** and should **stop metering** asylum seekers and implementing the Migrant Protection Protocols, also known as **Remain in Mexico.**

- Mexico should oppose **US actions that limit access to protection** in violation of international **law,**

**Migrant and Refugee Caravans:**
**Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid**

Case 1:23-cv-01537-DII   Document 30-5   Filed 01/12/24   Page 258 of 578

including the Migrant Protection Protocols and safe third-country declarations.

- Mexico and the US should **establish** communication, collaboration, and referral **mechanisms to respect the best interests of the child** where appropriate.

- Mexico and the US should **streamline** their **asylum systems**—while still ensuring due process, family unity, and non-refoulement—**and enhance reception capacity.**

- All relevant actors should actively **counter growing anti-immigrant rhetoric and practices.**

## Ensure adequate humanitarian relief

- All relevant actors[71] should **prioritize planning and preparedness** for large displacements of people, and **meaningfully engage refugees and migrants.**

  - Mexico should comply with international standards and guidelines for shelter sites and service provision.
- **International humanitarian agencies should offer technical expertise, and capacity.**
- All actors should **ensure availability of and access to information.**
- **Human rights defenders** should continue to **monitor and take adequate measures when abuse is identified.**

## Address root causes

- All governments should continue to advance initiatives that **promote human security, rule of law, accountability, and prosperity in the region.**



# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| CBP | US Customs and Border Protection |
| COMAR | Mexico's Commission for Refugee Assistance |
| DHS | Department of Homeland Security |
| DIF | National System for Integral Family Development |
| IACHR | Inter-American Commission on Human Rights |
| IOM | International Organization for Migration |
| INM | Mexico's National Institute of Migration |
| KIND | Kids in Need of Defense |
| NGO | Nongovernmental organization |
| SEGOB | Mexico's Ministry of the Interior |
| SNE | Mexico's National Employment Service |
| SRE | Mexico's Ministry of Foreign Affairs |
| UNICEF | United Nations Children's Fund |
| UNHCR | United Nations High Commissioner for Refugees |
| WOLA | Washington Office on Latin America |
| WRC | Women's Refugee Commission |

# ENDNOTES

1 All names have been changed to protect the privacy and identity of the persons interviewed.

2 Abdel Camargo, *Arrancados de Raíz: Causas que originan el desplazamiento transfronterizo de niños, niñas y adolescentes no acompañados y/o separados de Centroamérica y sus necesidades de protección internacional,* UNHCR, 2014. UNHCR, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection,* March 13, 2014; UNHCR, *Women on the Run: First-hand accounts on Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico,* October 26, 2015. UNICEF, *Desarraigados en Centroamérica y México: Los niños migrantes y refugiados se enfrentan a un círculo vicioso de adversidad y peligro;* August 2018. Sandra Albicker, et al., *La caravana de migrantes centroamericanos en Tijuana 2018: diagnóstico y propuestas de acción,* El Colegio de la Frontera Norte, 2018, pp. 2-4.

3 U.S. Customs and Border Protection Commissioner, Kevin McAleenan, El Paso Press Conference, March 27, 2019, https://www.cbp.gov/newsroom/speeches-and-statements/el-paso-press-conference-transcript. CBP, *Agency Experiences Record Number of Apprehensions/Inadmissible Family Units,* March 5, 2019, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-fiscal-year-2019-southwest-border-migration-stats. Kristen Bialik, "Border apprehensions increased in 2018—especially for migrant families," Pew Research Center, January 16, 2019, http://www.pewresearch.org/fact-tank/2019/01/16/border-apprehensions-of-migrant-families-have-risen-substantially-so-far-in-2018/. Cristobal Ramón, "2018 Border Apprehensions Confirm Longer-Term Shift to Families and Children," Bipartisan Policy Institute, November 7, 2018, https://bipartisanpolicy.org/blog/2018-border-apprehensions-confirm-longer-term-shift-to-families-and-children/.

4 Doctors without Borders, *MSF Pulse: Violence and migration from Central America—why are people seeking asylum in the US?,* October 19, 2018, http://www.doctorswithoutborders.ca/article/msf-pulse-violence-and-migration-central-american-—-why-are-people-seeking-asylum-us.

5 Doctors without Borders, *MSF Pulse.* See also, Adam Isacson, Maureen Meyer, and Hannah Smith, *Increased Enforcement at Mexico's Southern Border: An Update on Security, Migration, and US Assistance,* WOLA, November 2015.

6 Sandra Albicker, et al., p. 6.

7 Christopher Woody, "These were the 50 most violent cities in the world in 2017," *Business Insider,* March 6, 2018, https://www.businessinsider.com/most-violent-cities-in-the-world-2018-3.

8 IACHR, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico,* OEA/SER.L/V/II:, Doc. 48/13, December 30, 2013. WOLA, "Migrant Shelters and Organizations Denounce That 99% of Crimes Against Migrants in Mexico Remain in Impunity," July 28, 2017, https://www.wola.org/2017/07/99-crimes-migrants-mexico-remain-impunity/. Doctors without Borders, *MSF Pulse.*

9 UNHCR, *Guatemala protection monitoring report: large mixed movements* (October 15–November 21), https://acnur.org/5c2417894.

10 9,400 persons reported to remain in Mexico and 8,500 returned to Honduras and El Salvador. UNHCR, IOM and UNICEF, *Inter-Agency Response: Mixed Movements from the North of Central America 15 October— December 15, 2018,* https://www.acnur.org/op/op_fs/5c241d274/mixed-migration-flows-from-the-north-of-central-america-inter-agency-response.html.

11 Sandra Albicker, et al., pp.5- 6.

12 News outlets that covered the Caravans included: ADN40, Al Jazeera, Animal Político, Buzzfeed, CNN, El Universal, Fox News, Reforma, Reuters, Televisa, *The Guardian, The Intercept, The LA Times, The New York Times, The Washington Post,* TV Azteca, Vox. Human rights organizations included, among others: Amnesty International, Centro de Derechos Humanos Fray Matías de Córdova, Human Rights First, Human Rights Watch, Jesuit Migrant Service, Kids in Need of Defense, and Programa de Asuntos Migratorios de la Universidad Iberoamericana. Among the international organizations: IACHR, IOM, UNICEF, and UNHCR.

13 Sandra Albicker, et al., pp.5-6, 16-29.

14 Ariadna García, "Encinas detalla que son 44 los desaparecidos en Tamaulipas," *El Universal,* March 12, 2019, https://www.eluniversal.com.mx/nacion/seguridad/son-44-desaparecidos-en-tamaulipas-confirma-alejandro-encinas. Antonio Hernández, "Publican fotos de migrantes reportados como desaparecidos en Tamaulipas", *Milenio,* March 29, 2018, https://www.milenio.com/policia/fgr-publica-imagenes-migrantes-reportados-desaparecidos-tamaulipas. Jesuit Network, *Denunciamos el hostigamiento, uso de la fuerza y la detención arbitraria de migrantes y personas que acompañan el caminar de las Caravanas del Éxodo Centroamericano por parte de la Policía de la Ciudad de México,* February 15, 2019, http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/7521843add620334e0e9c447695fac64.pdf. lena Reina, "La frontera Sur de México es una olla de presión", *El País,* April 19, 2019, https://elpais.com/internacional/2019/04/17/mexico/1555463562_198481.html. Joint press conference between the Mexican Ministry of the Interior and the Mexican Ministry of Foreign Affairs on April 23, 2019. Letter to President Andrés Manuel López Obrador condemning actions taken by authorities against migrants on April 22, April 26, 2019, http://cdhfraymatias.org/web/

wp-content/uploads/2019/04/26.04.19_Comunicado.pdf?fbclid=IwAR0k53uphlLxt1Z4NLSt_cp-ZZLvi4-NyNsKWQ8xj0-iPopktGqYmKRv0_g.

15 Monitoring conducted by the Jesuit Network with other organizations. Reports available at: http://caravanamigrante.ibero.mx.

16 National System for Integral Family Development (DIF).

17 Phone interview with service provider on December 30, 2018.

18 Interviewed by WRC on November 30, 2018.

19 Interview with a humanitarian worker in Tapachula on January 10, 2019.

20 Dynamic referred by service providers interviewed in Tijuana on December 18, 2018 and in Tapachula on January 10, 2018.

21 Interview in Tapachula on January 9, 2019.

22 "Migrantes colocaron al frente a mujeres y niños para empujar la reja: Navarrete," *Vanguardia*, October 19, 2018, https://vanguardia.com.mx/articulo/navarrete-descarto-utilizar-violencia-vs-caravana-de-migrantes. Dynamic also referred by women interviewed in Tijuana on November 30, 2018, service providers (interviewed in Tijuana on December 18, 2018, in Tapachula on January 10, 2018), a researcher on Tijuana (interviewed in Tapachula on January 9, 2018), Mexican official (interviewed in Mexico City on December 10, 2018), and officers from an international organization interviewed in Mexico City on January 7, 2018.

23 Coordination meeting of service providers in Tijuana on November 28, 2018 and women interviewed in Tijuana on November 30, 2018.

24 Official Mexican Norm on Domestic and Sexual Violence and Violence against Women (NOM 046-SSA2-2005), April 16, 2009.

25 UNHCR, A*genda para la protección de las personas refugiadas en México: 2019-2024*, http://www.acnur.org/fileadmin/Documentos/RefugiadosAmericas/Mexico/Agenda_proteccion_Mexico_2019-2024.pdf. Mark Manly, "Hacia una nueva agenda sobre refugiados en México," *El Universal,* May 18, 2018, https://www.eluniversal.com.mx/articulo/mark-manly/nacion/hacia-una-nueva-agenda-sobre-refugiados-en-mexico.

26 Phone interview with child service provider who worked in Tijuana on December 17, 2018. Interview with child service provider in Tijuana on December 19, 2018. Interview with child service provider in Tapachula on January 8, 2019. Georgetown Law Human Rights Institute Fact-Finding Project, *The Cost of Stemming the Tide: How immigration enforcement practices in southern Mexico limit migrant children's access to international protection*, April 13, 2015. Human Rights Watch, *Closed Doors: Mexico's Failure to Protect Central American Refugee and Migrant Children,* March 2016.

27 Enshrined, among others on: Art. 33 (1) of the 1951 Convention relating to the Status of Refugees; Article 22 (8) of the American Convention on Human Rights and Article 3 of the 1984 Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment; Section III(5) of the 1984 Cartagena Declaration on Refugees; Art. 5 and 6 of Mexico's Law on Refugees, Complementary Protection and Political Asylum.

28 Jennifer Podkul, *The Protection Gauntlet: How the United States is Blocking Access to Asylum Seekers and Endangering the Lives of Children at the US Border*, Kids in Need of Defense (KIND), December 21, 2018, https://supportkind.org/wp-content/uploads/2018/12/Protection-Gauntlet_12-21-18-FINAL.pdf.

29 Tapachula is where those who claimed asylum when they arrived in Mexico awaited their refugee status determination, and Tijuana is where most of the caravan was stranded once they reached the US border.

30 Interview in Tapachula on January 10, 2019.

31 InSight Crime, "Balance de InSight Crime sobre los homicidios en 2018," January 22, 2019. https://es.insightcrime.org/noticias/analisis/balance-de-insight-crime-sobre-los-homicidios-en-2018/.

32 Interview with an official of a humanitarian agency in Mexico City on January 7, 2019.

33 Email for human rights defender in Tijuana on December 6, 2018.

34 Interview with human rights defender in Tijuana on December 18, 2018. Interview with health service provider in Tapachula on January 8, 2019.

35 Laura Sánchez, "Lujuria, Sexo, las 24 horas del día en Tijuana," *El Universal*, March 24, 2016, https://www.eluniversal.com.mx/articulo/estados/2016/03/25/lujuria-sexo-las-24-horas-del-dia-en-tijuana#imagen-7. , Sheldon Zhang, *Sex trafficking in a border community: a field study on sex trafficking in Tijuana, Mexico,* University of California, San Diego, 2012. Jimena Duarte, "Migración y prostitución en Chiapas, de la necesidad al placer," February 12, 2018, https://www.excelsior.com.mx/nacional/2017/02/17/1146931.

36 Barrio 18 is one of the largest gangs in the Americas. It operates in Central and North America.

37 Sandra Albicker, et al., p. 8.

38 *Medidas del gobierno de México ante la eventual llegada a la frontera sur de la caravana de migrantes hondureños,* SEGOB, October 17, 2018, https://www.gob.mx/segob/prensa/medidas-del-gobierno-de-mexico-ante-la-eventual-llegada-a-la-frontera-sur-de-la-caravana-de-migrantes-hondurenos-178838?idiom=es. *El Presidente Enrique Peña Nieto anuncia el Plan "Estás en tu casa" en apoyo a los migrantes centroamericanos que se encuentran en México,* SRE, October 26, 2018, https://

**Migrant and Refugee Caravans:**
Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid

Case 1:23-cv-01537-DII   Document 30-5   Filed 01/12/24   Page 262 of 578

www.gob.mx/sre/prensa/el-presidente-enrique-pena-nieto-anuncia-el-plan-estas-en-tu-casa-en-apoyo-a-los-migrantes-centroamericanos-que-se-encuentran-en-mexico?idiom=es. Jorge Alejandro Medellín, "Cierra INM registro de migrantes; entregará 12,600 visas humanitarias," January 30, 2019, https://lasilarota.com/cierra-inm-registro-de-migrantes-entregara-12600-visas-humanitarias/268836. Interview with humanitarian worker in Mexico City on January 25, 2019. Óscar Gutiérrez, "Caravana de migrantes es detenida a su entrada por Chiapas," *El Universal*, February 2, 2017, https://www.eluniversal.com.mx/estados/caravana-de-migrantes-es-detenida-su-entrada-por-chiapas.

39 lena Reina, "La frontera Sur de México es una olla de presión", *El País*, April 19, 2019, https://elpais.com/internacional/2019/04/17/mexico/1555463562_198481.html. Letter to President Andrés Manuel López Obrador condemning actions taken by authorities against migrants on April 22, April 26, 2019, http://cdhfraymatias.org/web/wp-content/uploads/2019/04/26.04.19_Comunicado.pdf?fbclid=IwAR0k53uphlLxt1Z4NLSt_cp-ZZLvi4-NyNsKWQ8xj0-iPopktGqYmKRv0_g.

40 Carina García, "Elección 2018. La más grande de la historia", *El Universal*, July 1, 2018, https://www.eluniversal.com.mx/elecciones-2018/eleccion-2018-la-mas-grande-de-la-historia. Lexica, "El proceso de transición más largo del mundo," *Animal Político*, September 12, 2018, https://www.animalpolitico.com/el-blog-de-lexia/el-proceso-de-transicion-mas-largo-del-mundo/.

41 Mark Manly, "Las lecciones de las caravanas," *El Universal*, January 18, 2019, https://www.eluniversal.com.mx/articulo/mark-manly/nacion/las-lecciones-de-las-caravanas.

42 Misael Zavala y Alberto Morales, "No me voy a enganchar en debates con Trump: AMLO", *El Universal*, April 24, 2019, https://www.eluniversal.com.mx/nacion/no-me-voy-enganchar-en-debates-con-trump-amlo. Trudy Rubin, "Mexico has a strategy to deal with Trump's wall and rejection of migrants", *The Philadelphia Inquirer*, March 13, 2019, https://www.philly.com/opinion/commentary/mexico-trump-amlo-migrants-braceros-andres-manuel-lopez-obrador-20190313.html. Misael Zavala, "Por muro, no me voy a pelear con el presidente Trump:AMLO", *El Universal*, September 22, 2018, http://www.eluniversal.com.mx/nacion/politica/por-muro-no-me-voy-pelear-con-el-presidente-trump-amlo.

43 Roberto Velasco, "Mexico stands with migrants. The new US asylum policy must respect their rights", *The Washington Post*, January 28, 2019, https://www.washingtonpost.com/opinions/2019/01/28/mexico-stands-with-migrants-new-us-asylum-policy-must-respect-their-rights/?utm_term=.5b1dfcbb0ccc. Joint press conference between the Mexican Ministry of the Interior and the Mexican Ministry of Foreign Affairs on April 23, 2019. Letter to President Andrés Manuel López Obrador condemning actions taken by authorities against migrants on April 22, April 26, 2019, http://cdhfraymatias.org/web/wp-content/uploads/2019/04/26.04.19_Comunicado.pdf?fbclid=IwAR0k53uphlLxt1Z4NLSt_cp-ZZLvi4-NyNsKWQ8xj0-iPopktGqYmKRv0_g

44 "En Tijuana, uno de cada 10 homicidios en el país," *La Jornada Baja California*, October 25, 2018, https://www.jornada.com.mx/ultimas/2018/10/25/en-tijuana-uno-de-cada-10-homicidios-en-el-pais-7122.html.

45 We are 'metering', which means that if we don't have the resources to let them [asylum-seekers] in on a particular day, they are going to have to come back. They will have to wait their turn and we will process them as we can, " DHS Secretary, Kirstjen Nielsen, interview on Fox News (May 15, 2018), quoted by Amnesty International, USA: *'You Don't Have Any Rights Here.'* Stephanie Leutert, Ellie Ezzell, et. al., *Asylum Processing and Waitlists at the US-Mexico Border*, Strauss Center at UT Austin, Center for US-Mexican studies at UC San Diego, and the Migration Policy Center at the European University Institute, December 2018.

46 *Al Otro Lado, Inc. v. Nielsen*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.)

47 Meeting with CBP officer in San Diego, California, on November 29, 2018.

48 Stephanie Leutert, Ellie Ezzell, et. al., *Asylum Processing and Waitlists at the US-Mexico Border*, Strauss Center at UT Austin, Center for US-Mexican Studies at UC San Diego, and the Migration Policy Center at the European University Institute, December 2018.

49 Interview with legal service providers on November 29, 2018.

50 Stephanie Leutert, Ellie Ezzell, et al. and Emily Green, "Exclusive: Mexican officials are extorting thousands of dollars from migrants applying for asylum," *Vice*, March 13, 2019, https://news.vice.com/en_us/article/kzdy4e/exclusive-mexican-officials-are-extorting-thousands-of-dollars-from-migrants-to-apply-for-asylum.

51 Adolfo Flores, "Mexican Authorities are Stopping Unaccompanied Kids from Seeking Asylum in the US at Every Turn," *BuzzFeed News*, February 13, 2019, https://www.buzzfeednews.com/article/adolfoflores/children-unaccompanied-asylum-immigration-mexico-border. "Upon approaching the port of entry, the delegation was stopped by Mexican authorities who refused to allow the children to proceed any further to present their asylum claims. The authorities claimed that asking for asylum at the port of entry is against proper procedure and advised the children to get on the asylum waitlist. The authorities also claimed that the asylum waitlist is kept in an informal notebook managed by the asylum seekers themselves ... In any case, minors are not allowed to put their names on the list. Children have no choice but to present their claims at the port of entry." @amnestyusa, December 29, 2019. Twitter.

52 Meeting with CBP officer in San Diego, California, on November 29, 2018.

53 Zuzana Cepla, *Trafficking Victims Protection Reauthorization Act Safeguards Children,* National Immigration Forum, May 23, 2018, https://immigrationforum.org/article/trafficking-victims-protection-reauthorization-act-safeguards-children/.


54 Meeting with CBP officer in San Diego, California, on November 29, 2018. Telephone conversation with CBP high level official on December 7, 2018. Meetings with high-level Mexican officer from the Ministry of Foreign Affairs, National Institute of Migration, and Mexican Commission for Refugee Assistance in Mexico City on January 15, 2019.

55 John Bowden, "Dem lawmaker says she helped group of migrants enter US, apply for asylum," *The Hill,* December 12, 2018, https://thehill.com/latino/419287-dem-lawmaker-to-join-group-of-migrants-applying-for-asylum. *Reps. Jimmy Gomez and Nanette Barragán Travel to Southern Border to Investigate Conditions of Asylum Seekers,* December 18, 2018, https://gomez.house.gov/news/documentsingle.aspx?DocumentID=431. "Last night, a delegation of our senior leadership joined partners @NIJC, @AlOtroLado_Org, and @TransLawCenter in accompanying three LGBT minors fleeing violence and persecution in Central America. Here's what we found ...The delegation refused to leave until the children were allowed to present their claims. In order to discourage the delegation to leave, Mexican authorities asked everyone with proper documents to proceed through the port of entry while the delegation stood to the side. Over an hour later, our director @ MargaretLHuang was able to negotiate an agreement w/ Mexican authorities. She & an interpreter would accompany the children onto US soil to ask for asylum if the rest of the delegation left. The children were then processed & made it into the US. Yesterday's standoff with Mexican officials validates reports that authorities there are cooperating with the US to dissuade people from asking for asylum. It demonstrates the lengths Mexico and the US will take to violate the human rights of people, including children, desperately seeking safety." @amnestyusa, December 29, 2019. Twitter.

56 Per the information provided by service providers on the ground, estimates of UMC in Tijuana varied from 120 to 200. The estimates include all unaccompanied children in Tijuana in December 2018 and January 2019, not only those who traveled with the caravans.

57 National System for Integral Family Development (DIF).

58 Interviews with children in Tijuana on November 29, 2018 and on December 17, 2018. Interview with child service provider in Tijuana on November 29, 2018. Phone interview with child service provider who worked in Tijuana on December 17, 2018. Interview with child service provider in Tijuana on December 19, 2018. Interview with child service provider in Tapachula on January 8, 2019.

59 Interview with director of shelter for unaccompanied minors in Tijuana on December 18, 2018. Ed Vulliamy, "Tricked, abducted and killed: the last day of two children migrants in Mexico," *The Guardian,* February 16, 2019, https://www. theguardian.com/world/2019/feb/16/tijuana-migrant-child-murders-mexico-us-asylum. Julia Gavarrete and Heather Gies, "Honduran teen fled gangs at home only to be murdered while stranded at the US-Mexico Border," *The Intercept,* February 23, 2019, https://theintercept.com/2019/02/23/unaccompanied-minor-migrants-us-border-policy/.

60 Interview with director of shelter for unaccompanied minors in Tijuana on December 18, 2018.

61 Exec. Order No. 13767, 82 FR 8793 (2017), Sec. 7. "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration" Department of Homeland Security, December 20, 2018, https://www.dhs.gov/news/2018/12/20/ secretary-nielsen-announces-historic-action-confront-illegal-immigration.

62 Order granting motion for preliminary injunction filed on April 8, 2019. *Innovation Law Lab v. Nielsen,* No. 3:19-cv-00807-RS. Document 73.

63 Miriam Jordan, "Trump Administration Can Keep Sending Asylum Seekers to Mexico, Court Rules", New York Times, May 7, 2019, https://www.nytimes.com/2019/05/07/us/asylum-seekers-trump-mexico.html.

64 Redacción, "Agreden en Guatemala a caravana migrante y los obligan a entrar a México", *SDPnoticias,* January 28, 2019, https://www.sdpnoticias.com/internacional/2019/01/28/agreden-en-guatemala-a-caravana-migrante-y-los-obligan-a-entrar-a-mexico. Mary Lee Grant y Nick Miroff, "Milicias esperan en Texas a la caravan migrante que busca cruzar la frontera", *El Economista,* November 4, 2018, https://www.eleconomista.com.mx/internacionales/Milicias-esperan-en-Texas-a-la-caravana-20181104-0072.html. Elías Camhaji, "La xenophobia sale a las calles de Tijuana", *El País,* November 19, 2018, https://elpais.com/internacional/2018/11/18/mexico/1542511725_499305.html.

65 UNHCR, *Monitoreo de protección en Ciudad Hidalgo, México,* February 4, 2019, https://www.acnur.org/op/op_ fs/5c59d76e4/monitoreo-de-proteccion-en-ciudad-hidalgo-mexico.html.

66 *Derechos humanos y cooperación con Centroamérica, base de política migratoro 2018-2014: Sánchez Cordero,* SEGOB, December 19, 2018, https://www.gob.mx/segob/prensa/derechos-humanos-y-cooperacion-con-centroamerica-base-de-politica-migratoria-2018-2024-sanchez-cordero?idiom=es.

67 @INMI_mx, "Informativo 28 enero 2019, El Salvador: 231; Guatemala: 470; Haití: 1; Honduras: 2,238; Nicaragua: 35; Brasil:2; Angola: 1," January 28, 2018. Twitter. @INMI_mx," Informativo 28 enero 19, registró 12,574 solicitudes de visitante por razones humanitarias de adultos migrantes," January 28, 2018. Twitter.

68 Monitoring conducted by the Jesuit Network with other organizations. Reports available at: http://caravanamigrante. ibero.mx.

69 "... Mexico must stop illegals from entering the U.S ... /... through their country and our Southern Border. Mexico has for many years made a fortune off the U.S., far greater than Border Costs. If Mexico doesn't immediately stop ALL illegal immigration coming into the United States through our southern Border, I will be CLOSING.../...the Border, or large section of the Border, next week. This would be so easy for Mexico to do, but they just take our money and 'talk'". @ realDonaldTrump, March 29, 2019, Twitter. "We have a National Emergency at our Southern Border. The Dems refuse to do what they know is necessary - amend our immigration laws. Would immediately solve the problem! Mexico, with the

Migrant and Refugee Caravans:
Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid

Case 1:23-cv-01537-DII   Document 30-5   Filed 01/12/24   Page 264 of 578

strongest immigration laws in the World, refuses to help with illegal immigration & drugs!" ". @realDonaldTrump, March 28, 2019, Twitter. "Mexico is doing NOTHING to help stop the flow of illegal immigrants to our Country. They are all talk and no action. Likewise, Honduras, Guatemala and El Salvador have taken our money for years, and do Nothing. The Dems don't care, such BAD laws. May close the Southern Border!" @realDonaldTrump, March 28, 2019, Twitter.

70 Fabiola Martínez, "Frontera sur de México está 'desbordada', advierte Sánchez Cordero," *La Jornada*, March 27, 2019, https://www.jornada.com.mx/ultimas/2019/03/27/frontera-sur-de-mexico-esta-desbordada-sanchez-cordero-671.html.

71 Governments of all countries in the region, international organizations, humanitarian agencies, civil society organizations, human rights defenders, shelters, community-based organizations, service providers, and faith groups.



**Women's Refugee Commission | 15 West 37th Street | New York, NY 10018**

**212.551.3115 | info@wrcommission.org | womensrefugeecommission.org**

# EXHIBIT 12

# US: LGBT Asylum Seekers in Danger at the Border

----------------------------------------------------------------

■ **hrw.org**/news/2022/05/31/us-lgbt-asylum-seekers-danger-border

May 31, 2022



At a rally in Tijuana, Mexico, people hold placards reading "Stand for Asylum" and "Stop Title 42 Now." The US policy often called "Title 42" allows border agents to expel people summarily to Mexico or their countries of origin with no opportunity to apply for asylum. © 2022 Aimee Melo/picture-alliance/dpa/AP Images

(Ciudad Juárez) – Lesbian, gay, bisexual and transgender (LGBT) people and other asylum seekers fleeing persecution in their home countries experience abusive and dangerous conditions in Mexico when not allowed to cross the border to seek asylum, Human Rights Watch said today.

Two policies implemented by the administration of former President Donald J. Trump – the Migrant Protection Protocols, commonly known as "Remain in Mexico," and the Title 42 summary expulsion policy – continue to be used under the Biden administration to block access to the asylum system for most people who try to cross into the US to seek safety. This includes people at a greater risk of harm in Mexico because of their particular conditions or identities, including gender identity or expression, disability, and age who should be entitled to an exception from expulsion. US authorities should stop sending asylum seekers to Mexico or expelling them to their countries of origin and should quickly process people waiting at the border to seek asylum who are at particular risk of abuse.

"The United States should restore access to asylum for all, but so long as Biden is blocked from doing so, he should at the very least immediately use existing exceptions for at-risk asylum seekers, including LGBT people," said Ari Sawyer, US border researcher at Human Rights Watch. "Continuing to summarily expel LGBT and HIV-positive asylum seekers to Mexico or their country of origin places their lives at serious risk."

US government protocols include exceptions for asylum seekers at a greater risk, and President Joe Biden has promised US agents will apply them. But border agents have broad discretion to grant or deny exceptions, and there are no clear consequences for agents who fail to do so or checks to ensure that exceptions are being handled properly, Human Rights Watch found.

Despite a recognition by the US Department of Homeland Security (DHS) that LGBT people may face "increased risk of harm in Mexico due to their sexual orientation or gender identity," Human Rights Watch documented cases in which border officials returned LGBT asylum seekers, including those with HIV, to Mexico under both abusive anti-asylum policies.

Human Rights Watch conducted 29 interviews with asylum seekers, migrants' rights groups, and United Nations agency officials in April and May 2022, in person and by phone, in Ciudad Juárez and Mexico City, and in El Paso, Texas. Human Rights Watch undertook research in coordination with Casa de Colores, a US-Mexican organization working to provide shelter and legal services to LGBT asylum seekers.

LGBT asylum seekers told Human Rights Watch they had been expelled even after expressing their fear of returning and telling border agents they identified as LGBT, had HIV, or had experienced abuse related to their gender identity, gender expression, or sexual orientation. They also described serious abuse during their journeys to the border, including by Mexican officials.

One woman interviewed fled to the United States from Honduras, where she previously faced targeted violence for living openly as a lesbian woman, including one incident when someone cut her face, leaving a large scar. Near the US border, people she believed to be members of a Mexican cartel kidnapped her and forcibly took nude photos of her.

She said that when she explained to US border officials that she was a lesbian seeking asylum from Honduras and that she had also experienced abuse in Mexico, agents laughed at her. She said one agent told her, "I don't care what's happening to you." She was expelled to Honduras, and immediately fled again to the US border, this time afraid to seek asylum for fear of being returned to Honduras again.

Previous Human Rights Watch research has highlighted the risk of illegal and arbitrary arrest, torture, extrajudicial execution, sexual assault, and enforced disappearance for LGBT people in Central America.

Although the Biden administration has moved to terminate both Title 42 and Remain in Mexico, several US state officials have filed suits in federal court, resulting in orders to keep the programs in place during the litigation.

A federal district court judge has temporarily blocked the Biden administration from ending the expulsion policy, which was first issued at the start of the Covid-19 pandemic against the recommendation of top public health experts. There is no evidence that people seeking asylum pose a public health threat to the United States, and the expulsion policy cannot be justified on public health grounds.

Though the initial Title 42 was issued without "notice and comment" procedures, allowing a period for the public to comment, the judge found that the Biden administration should have gone through these administrative consultation processes to end Title 42. Some US lawmakers have proposed legislation that would keep summary expulsions in place until pandemic public health measures are terminated.

Asylum seekers and other migrants sent to Mexico are often unable to support themselves or access basic services such as shelter, food, water, safe transportation, or health care, and have no meaningful recourse for abuses from criminal cartels or Mexican authorities. In the Mexican state of Tamaulipas, Human Rights Watch found that asylum seekers and other migrants are systematically targeted for kidnapping, extortion, rape, and other violence, by both government officials and criminals.

LGBT people constitute one particularly at-risk group of asylum seekers, among others, including people with disabilities and chronic health conditions, Black and Indigenous asylum seekers, asylum seekers who do not speak Spanish as a first language, and families traveling with children.

LGBT asylum seekers and asylum seekers with HIV described additional discrimination and abuse as well as barriers to accessing essential services, including life-saving antiretroviral therapy and gender-affirming health care, services that include medical and mental health services, continuation of hormonal treatment, and other services for transgender and nonbinary people that are crucial to their health and well-being.

National Institute of Migration Response to HRW 5.31.22

Human Rights Watch asked Mexico's National Migration Institute for more information on allegations made against immigration agents. The agency responded on May 31 and said they were unaware of any reports of such abuses, were not able to investigate them, and that the Mexican constitution prohibits such behavior.

The United States has an obligation to protect refugees from returning to a threat of persecution, ill-treatment, and threats to life and safety, Human Rights Watch said. President Biden should ensure that the United States complies with its domestic and international legal obligations to respect the right to seek asylum.

"LGBTQ+ and HIV-positive asylum seekers face grave risks to their health and safety from the time they flee their countries, often after years of targeted abuse, to when they arrive at the US border," said Susana Coreas, director of Casa de Colores. "Biden has rightly committed to protecting LGBTQ+ refugees. He should follow through on that promise and ensure all asylum seekers are welcomed with dignity at the border."

**Abuse at the US Border**

Human Rights Watch spoke with 20 LGBT asylum seekers in Ciudad Juárez, Mexico, who hoped to cross into the United States and be allowed to seek protection. Nearly all reported they were not approaching the border or trying to ask US officials for asylum because they feared they would be expelled to Mexico or their country of origin. They said they preferred to wait for the Biden administration to restore access to asylum or for legal aid to make a request for exemption from the expulsion policy. Four asylum seekers reported that they had previously been expelled to Mexico or their country of origin without an asylum screening.

When Adolfo H. and Gerardo C., a gay couple fleeing Cuba and El Salvador, respectively, who like others interviewed are not identified by their real names for their protection, tried to seek asylum at the US border in February 2022, they were expelled by US Customs and Border Protection (CBP) agents to Mexico. They had previously experienced extortion several times by Mexican immigration agents, who stopped them at various points along their journey and demanded payment to continue. At the time, they were not yet married. US officials told the couple that Adolfo could stay and seek asylum in the United States because he is from Cuba but that his partner would be expelled, even though border officials had the authority to allow both men in. Instead, they gave them the option of being separated or of being expelled together. They said that while they were in custody, US officials told them to stop holding hands or touching one another. Faced with the prospect of being separated again, they got married in Mexico, hoping that given another chance, they would be allowed to seek asylum together.

José M., a gay man who fled death threats in Honduras based on his sexual orientation, said he had tried to cross the border in March 2021. He was afraid to stay in Mexico, where he said he has experienced extortion and violence at the hands of Mexican police and discrimination at shelters. On his way to the border, Mexican immigration agents stopped the bus he was on and made everyone get off, he said, forcing each migrant to pay a bribe of about US$25 each or be expelled from the country. He also said that because of his gender expression and sexual orientation, some shelters did not allow him to stay there, leaving him to sleep on the streets. In Ciudad Juarez, the shelter operators told him it was a sin to be gay and said that if he and other LGBT asylum seekers didn't go to religious service, they would be forced to leave. He said he had told US border officials that he is gay and that he was afraid to be sent to Mexico, but hours later CBP agents sent him to Mexico. Before expelling him, US officials made him throw away everything he had, including the few clothes he had. US border agents typically throw away migrants' possessions, including items such as medicine, baby blankets, important identity documents, documents needed to prove an asylum claim, and memorabilia that hold sentimental value, claiming the practice is for health and safety reasons.

The Biden administration has also recently placed some LGBT people in the Remain in Mexico program, officials with the International Organization of Migration (IOM) told Human Rights Watch, sending them to Ciudad Juárez despite the exemption for LGBT people and others at particular risk of abuse. IOM operates a shelter for newly expelled or returned asylum seekers to test them for

Covid-19 and provide quarantine before they move on to other shelters. IOM officials said LGBT asylum seekers had been sent to Mexico even after they explicitly told US border agents about their gender identity or sexual orientation.

**Abuses in Country of Origin**

LGBT asylum seekers interviewed reported serious abuses in their countries of origin, including rape, assault, death threats, extortion, and forced disappearances or killings of romantic partners and friends.

- Juan C., a transgender man, fled Honduras after he received death threats related to his gender identity and activism in an LGBT rights organization. He said that several LGBT people he has known have been killed or disappeared there. He said that the police detained him without charges on several occasions. In 2021, two men raped him and his girlfriend after saying, "Who is the man and who is the woman in the relationship?" and saying that the couple were transgender and lesbian only because they had not had sex with a man. "They said, 'We are going to make you women,'" Juan said.
- Eduardo O., a gay man from Honduras, said he fled the country shortly after gang members beat his romantic partner to death. Gang members had previously threatened to kill Eduardo. Then in June 2021, the same gang members attacked him and his partner while they were together. While Eduardo was able to escape, he said, his partner could not. He said he reported his partner's murder to the police, who did not investigate.
- Kayla R., a transgender woman from Guatemala, said she had to flee and seek asylum after the gangs who were extorting the business where she worked beat her when she and the store owner couldn't pay, leaving prominent scars on her face. On another occasion, gang members beat her in the street while using anti-LGBT slurs. They left a large gash and scar on her head.

**Discrimination and Abuse in Mexico**

Human Rights Watch also documented serious abuse and discrimination against LGBT asylum seekers in Mexico. Several LGBT asylum seekers said that Mexican immigration agents, police, and National Guard soldiers targeted them for extortion. Other asylum seekers experienced kidnapping, sexual assault, robbery, and other physical violence by both Mexican government officials and criminals.

- Brenda F., a transgender woman, fled El Salvador in 2017 after gang members who wanted her to sell drugs beat and threatened to kill her. After applying for protection and living for a few years in Mexico, she said she was riding a bus from Monterrey to Matamoros in the Mexican state of Tamaulipas in May 2020 when, at a checkpoint, immigration agents pulled her off the bus and took her into an office about 25 meters away. While another immigration agent stood watch outside the office, the agent questioned her about her destination and reason for traveling, she showed him an order from a doctor for laboratory tests. He accused her of lying and of wanting to cross into the United States and grabbed his genitalia, saying if she wouldn't "give me what I want," he could have two police officers expel her to Guatemala. Afterward, he told her that if she reported him, he had already taken a photo of her identification and would come after her. She said she knows other trans women who have experienced sexual assault at the hands of Mexican immigration agents.

- Mariana L., a lesbian woman who fled Honduras in 2021, said she was kidnapped for ransom in January 2021 and held for over a week near the US-Mexico border by people she believed to be cartel members. They took her to a house in Reynosa, Tamaulipas, where she saw several other kidnapped migrants. She said they stole her passport and forcibly photographed her naked until her sister managed to pay a ransom of US$3,000. Her kidnappers would hit her to make her cry when they called her sister for the ransom money.

- When Erika L., a lesbian woman, and Samuel B. and Martin G., gay brothers from El Salvador, arrived at the Mexico-Guatemala border in January 2022, a group of men kidnapped them. On the Mexican side of the border, the men raped Erika while beating her friends and forcing them to watch. They went to the Mexican Commission for Refugee Assistance (COMAR), Mexico's refugee authority, in Tapachula, Chiapas, where they applied for asylum in Mexico. COMAR gave them a document confirming that they were in the process of seeking asylum in Mexico, giving them legal status in Mexico. An immigration agent apprehended them outside the COMAR office as they left. When he saw their application documents, he tore them up, saying they were meaningless and sent them to a detention center. They were released and then took a bus to the US-Mexico border. They said Mexican immigration agents periodically stopped the bus and boarded it to extort them and other migrants, saying they had to pay if they wanted to continue their journey to the US border.

- Kayla R., the transgender woman who fled Guatemala, said that in July 2021 Mexican state police in Piedras Negras robbed her and beat her with batons so badly that she was ultimately hospitalized and vomited blood. The police detained her and another transgender woman she was traveling with for two days without food and water and then turned them over to immigration agents, who sent them to an immigration detention facility. There, she said, a Mexican immigration agent told her she should report the crime, which would make her eligible for a one-year humanitarian visa, giving her legal status in Mexico. She said she would like to do so, and that the agent took down her information but never gave her any paperwork or began any immigration process. Instead, after she reported the crime, Mexican immigration agents returned her to Guatemala, where she had experienced brutal violence. She immediately fled again. While she was making her way back to the US border in March 2022, criminals threatened her with a machete and robbed her.

Six asylum seekers and migrant rights workers reported that some of the shelters in Ciudad Juárez that accepted LGBT asylum seekers subjected them to discriminatory treatment, including the shelter where LGBT asylum seekers were forced to go to Christian religious services. Shelters in Ciudad Juárez are at capacity, meaning they would be homeless if they did not agree to go to the service. Some migrant shelters in Ciudad Juárez would not accept LGBT asylum seekers at all, migrant rights workers there said.

Accessing lifesaving health care for asylum seekers with HIV or other chronic illnesses was also difficult, asylum seekers said. All five HIV-positive asylum seekers interviewed, and one asylum seeker with diabetes and hypertension, said they had gone periods ranging from a few weeks to four months, without their necessary medication because they did not have any money or support.

Mari R., a transgender woman who is HIV positive and who fled Honduras after she refused to sell drugs for a gang whose members had raped and threatened to kill her, went without her antiretroviral medication in Mexico for four months. In April, with the support of Derechos Humanos Integrales en Acción (DHIA), a local migrant rights organization, she was finally able to see a doctor, who told her that her condition had significantly worsened. The day after Human Rights Watch spoke to her, she was hospitalized.

Four transgender asylum seekers, as well as IOM officials and a local trans rights organization called Red Solidaria Trans, said that transgender asylum seekers have not had access to gender-affirming health care in Ciudad Juárez.

Brenda F., a transgender woman who fled after facing an attempted gang recruitment and death threats in El Salvador, said she had previously been taking hormones but that in Ciudad Juárez, she has not been able to access to gender-affirming hormone care, though she has repeatedly tried. "They always say they don't offer that care, they can't, or they don't know how," she said. Transgender people who take hormones to develop secondary sex characteristics consistent with their gender identity and expression experience a reversal of these physical traits when hormone therapy is stopped, which can cause distress among other symptoms. Brenda said she hasn't had access to hormone care since October 2021 and that she is suffering from depression as a result. "I have asked for help getting my hormones and they have said they don't offer that kind of support here [in Ciudad Juárez]," she said. "We are suffering marginalization in that way – hormone treatment is necessary, and they are denying us."

## Recommendations

### To the Biden Administration

- Continue and redouble efforts to end the Remain in Mexico program and Title 42 summary expulsions, including by initiating a "notice and comment" rulemaking process to end Title 42.
- While these abusive policies remain in place, ensure that border agents do not to return at-risk asylum seekers under the Remain in Mexico program or expel them under the Title 42 summary expulsion policy. People at particular risk of harm include LGBT asylum seekers; those with HIV, disabilities, and chronic health conditions; Black and Indigenous asylum seekers; those who do not speak Spanish as a first language; and families traveling with children.
- Take immediate steps to parole into the United States all LGBT asylum seekers and other asylum seekers at particular risk of harm who have previously been subjected to the Remain in Mexico program or the Title 42 summary expulsion policy.
- Review regulations, Board of Immigration Appeals and Attorney General decisions, and policies and other guidance, rescinding or amending as appropriate to ensure consistency with the right to seek asylum and the right to protection from return to harm or threat of harm as defined in the Refugee Convention, the Convention against Torture, and the International Covenant on Civil and Political Rights.
- Continue to increase the number of appropriately trained personnel – asylum officers, doctors, child-care specialists, mental health services professionals and other first responders – at the border using funds currently allocated toward immigration enforcement and detention.
- Beyond initial screening of migrants, transfer humanitarian reception, including migrant processing and asylum functions, from CBP to a separate government agency, such as the Federal Emergency Management Agency (FEMA), or groups with trauma-informed training and whose mission is to perform humanitarian services.

- Take steps to ensure that LGBT asylum seekers and asylum seekers with HIV feel safe enough to self-identify while in the custody of CBP, including by ensuring that US officials affirmatively explain a policy of nondiscrimination and ask each migrant if they would like to share their gender identity and sexual orientation.
- Investigate and discipline US border agents who wrongfully send LGBT asylum seekers and other particularly at-risk asylum seekers to Mexico or their countries of origin.
- Work with Mexico and other governments to implement a holistic regional plan for access to protection and safe and dignified migration.

**To the US Congress**

- Reject proposed <u>legislation</u> introduced by Sens. James Lankford (R-Oklahoma) and Kyrsten Sinema (D-Arizona) to keep Title 42 in place until after the government's Covid-19 emergency declaration is terminated.
- Enact legislation to end the Title 42 summary expulsion and Remain in Mexico policies.

**To the Mexican Government**

- End the practice of accepting non-Mexican nationals sent to Mexico by US authorities under the Remain in Mexico and Title 42 summary expulsion policies.
- Investigate abuses by Mexican immigration agents, including reports of extortion at immigration checkpoints, and take disciplinary action against any found to have been involved in such conduct.
- Ensure that Mexican immigration agents do not expel people who may need international protection without due process and screening for fear of return to potential harm.

# EXHIBIT 13



# HUMAN RIGHTS STAIN, PUBLIC HEALTH FARCE

**Evasion of Asylum Law
and Title 42 Abuse Must End—
and Never Be Revived**

December 2022

Introduction

For nearly two years, the Biden administration has wielded the Trump administration's Title 42 policy to block people from seeking asylum at official ports of entry, expel to grave dangers asylum seekers and migrants who cross the border, and evade the due process and refugee protection provisions of U.S. immigration and asylum law. Though efforts to force continuation of this cruel and counterproductive policy continue, after a federal district court in Washington DC vacated it in November for violating U.S. law, it is scheduled to end on December 21, 2022.

The misuse of Title 42 has been a public health, border management and human rights fiasco. Human Rights First has, as of the date this report was issued, tracked over 13,480 reports of murder, torture, kidnapping, rape, and other violent attacks on migrants and asylum seekers blocked in or expelled to Mexico under Title 42 since President Biden took office. It is a staggering number that will continue to mount every day that Title 42 or similar policies that evade refugee law are in place.

The Centers for Disease Control and Prevention (CDC) attempted to end the Title 42 policy in May 2022, but in the wake of a court order issued by a federal judge in Louisiana forcing the policy's continuation in a case brought by state attorneys general aligned with the former Trump administration, the Department of Homeland Security (DHS) continued to use it. In October 2022, in a disturbing step backwards, the Biden administration announced it would expand use of the policy to expel Venezuelans seeking refuge at the southern U.S. border without allowing them to apply for asylum, attempting to justify this abrogation of asylum law by pairing it with a limited parole program available to some Venezuelans. Since then, DHS has expelled thousands of Venezuelans to dangerous conditions in Mexico where they are also at risk of *refoulement, i.e.* illegal return, to persecution in Venezuela. In response to the October parole announcement, the U.N. Refugee Agency (UNHCR), IOM and UNICEF immediately warned that such efforts "cannot come at the expense of the fundamental human right to seek asylum."

The targeted, expanded use of Title 42 against Venezuelans again confirms that this policy has no basis in public health. As medical and public health experts have repeatedly affirmed and recently-revealed Congressional testimony of a top CDC scientist confirms, the Title 42 policy has no scientific basis. It was adopted at the behest of Stephen Miller and other Trump administration officials as yet another discriminatory effort to restrict immigration and block asylum. As leading epidemiologists and public health experts warned President Biden in November, the continued and expanded use of Title 42 is "a travesty" that manipulates, misuses and undermines trust in public health, and "feeds and propagates racially-based tropes that falsely paint migrants as vectors of disease, fostering stigma and heightening the vulnerability of already marginalized groups in a manner that is antithetical to the tenets of good public health practice."

Some members of Congress have attempted to force continuation of Title 42 or a similar suspension of asylum at the border – a codification of failed Trump policy that would eviscerate U.S. refugee law and subvert international refugee law globally. At the same time, the Biden administration is considering replacing Title 42 with other inhumane Trump policies or versions of them, including an asylum transit ban – an illegal policy that, when in effect, turned refugees away to danger and deprived other refugees of a path to family reunification, stability and citizenship, as Human Rights First detailed in a 2020 report.

Senior Biden administration officials are reportedly planning to impose other harsh policies as Title 42 ends, as well as use the notorious migrant detention center at Guantánamo Bay or other third country detention facilities to hold Haitians interdicted at sea. The United States recently returned 180 men, women and children – who had attempted to reach safety in the United States by boat – to Haiti despite multiple U.N. authorities' calls for states to halt returns to Haiti given the life-threatening conditions there.

A ruling by the U.S. Court of Appeals for the D.C. Circuit that took effect in May 2022 prohibits DHS from using Title 42 to return asylum-seeking families "to places where they will be persecuted or tortured." As the policy's scheduled end date approaches, DHS retains clear authority, consistent with the various court rulings, to except individuals from Title 42. It also remains obligated under U.S. refugee law and binding treaty commitments, and a November D.C. Circuit Court decision, not to return anyone—family, adult, or child—to persecution or torture, consistent with the legal rationale of the D.C. Circuit Court. In his November ruling concluding that the Title 42 policy violated the Administrative Procedure Act, the D.C. District Court judge who vacated the Title 42 policy cited Human Rights First's prior research documenting violent attacks against people impacted by the policy and emphasized the "harms Plaintiffs face if summarily expelled to countries [where] they may be persecuted or tortured" as well as the earlier finding by the Court of Appeals for the D.C. Circuit that "the record is replete with stomach-churning evidence of death, torture, and rape." The Trump-aligned state attorneys general who initiated the Louisiana litigation are now seeking to intervene in the separate case before the D.C. District Court and also seeking to stay that court's November ruling requiring the Title 42 policy to end on December 21. Their stay request is now pending before the D.C. Circuit Court after the District Court denied it.

It is far past time to end this illegal, inhumane, and ineffective policy and all attempts to force its continuation. After nearly two years in office, the Biden administration should institute a more effective and humanitarian response to the reception, identification, and processing of refugees seeking protection in the United States – a response that upholds U.S. refugee and immigration laws, as Human Rights First has outlined in its recommendation papers. The Biden administration should not replace one failed and illegal Trump policy with another by embracing, supporting or employing the ineffective, inhumane, xenophobic and racist immigration policies of the prior administration.

This report is based on in-person interviews Human Rights First conducted with asylum seekers in Tijuana in September 2022 and Ciudad Juárez in December 2022; and interviews by telephone and in-person with attorneys, other humanitarian workers, and additional asylum seekers in Mexico conducted from October to December 2022; reports of attacks drawn from an ongoing

survey of asylum seekers in Mexico conducted by Al Otro Lado between mid-June and early November 2022; open-source information identified by students from the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles); review of U.S. government data; and media and other human rights reporting.

Human Rights First published prior research on the Title 42 policy in June 2022, April 2022 (with Al Otro Lado and Haitian Bridge Alliance), March 2022, February 2022, January 2022, December 2021, November 2021 (with Florence Immigrant and Refugee Rights Project), October 2021, August 2021, July 2021 (with Hope Border Institute), June 2021, May 2021 (with RAICES and Interfaith Welcome Coalition), April 2021 (with Al Otro Lado and Haitian Bridge Alliance), December 2020, and May 2020.

## Key Findings

- **The use of the Trump-initiated Title 42 policy over the nearly two years since President Biden took office, its forced continuation through court order, and its recent expansion by the administration have inflicted terrible human rights abuses.** Human Rights First has tracked 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021. These numbers are likely just the tip of the iceberg as many victims have not spoken with investigators, journalists, or attorneys. Some recent examples include: Mexican officers kidnapped a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo, and turned them over to a cartel that held them hostage for three months and tortured them; a Honduran asylum seeker and her four-year-old daughter were kidnapped, the daughter beaten and the mother raped in front of her daughter as they waited in Tijuana due to Title 42; a 13-year-old girl was nearly abducted at gunpoint in Juárez after her family fled political persecution in Venezuela but was expelled under Title 42; and a Guatemalan lesbian trans woman was raped by Mexican police in Piedras Negras after CBP turned her away from protection at the Eagle Pass port of entry. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in Mexico.

- **The Biden administration's expansion of Title 42 to Venezuelans in October 2022 has denied thousands access to the U.S. asylum process in flagrant violation of U.S. refugee law. The expansion has stranded adults, families, and children in dangerous Mexican border cities where they are targets of kidnapping, torture, and brutal attacks. It has subjected others to onward *refoulement* to persecution and torture. It has also separated many families.** In some cases, this expansion has resulted in the separation of married couples and the delivery of mothers, wives, teenage daughters, and other family members to grave dangers in Mexico. CBP has subjected many Venezuelans to "lateral expulsions," transporting them to areas far from where they entered the United States and to locations where they have no knowledge of the specific dangers or local refugee shelters. In many cases, asylum seekers appear to have been transported to cities that lack shelter capacity.

- **Mexican asylum seekers fleeing persecution and torture have been trapped in or expelled by CBP to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations.** They include: a woman who was decapitated by the cartel that had threatened her after DHS, citing Title 42, would not let her

seek asylum; a lesbian women who had suffered multiple attacks, rape, and threats due to her sexual orientation and was refused the right to seek asylum at the San Ysidro port of entry; a gay man who had suffered beatings, sexual assaults, and an attempted kidnapping due to his sexual orientation and was turned away from asylum at the El Paso port of entry; and an Indigenous woman who had been attacked by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 and subsequently suffered sexual abuse by Mexican police.

- **Faith-based, humanitarian, and legal workers assisting asylum seekers stranded in Mexico by the Title 42 policy face acute and mounting threats and attacks from violent cartels that exercise widespread control over territory in Mexico.** Recent threats and attacks include the June 2022 kidnapping and November 2022 threats against a Baptist pastor in Nuevo Laredo, the armed raiding of a shelter in Ciudad Juarez in late November 2022, the forced closure of a Nuevo Laredo shelter after threats demanding that the shelter pay a "protection fee," and the robbery at gunpoint of a staff member of a legal organization in a Tijuana plaza near the San Ysidro port of entry while the staff member accompanied asylum seekers instructed by CBP to appear at 6 a.m. to be processed for a Title 42 exemption.

- **CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that make them even more vulnerable to harm in Mexico and undermine their ability to seek asylum in the United States** – including by sometimes expelling asylum seekers in the middle of the night, depriving them of necessary medical care, or taking their passports or other identity documents, religious items, medical items, or other documents necessary for their asylum cases. Many were expelled to deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity.

- **The Title 42 policy has continued to inflict disorder at the border, triggering multiple border crossings, artificially inflating CBP border statistics,** pushing dangerous crossings away from ports of entry, and facilitating exploitation. With Title 42 spurring dangerous attempts to cross into the United States outside of ports of entry, at least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began record keeping on border crossing deaths in 1998.

---

## Recommendations

- **Congress:** Reject any efforts to codify or legislatively extend the Title 42 policy or similar policies that suspend refugee law or improperly block refugees from seeking asylum, direct sufficient appropriations for asylum adjudications and to community-based, non-profit organizations providing temporary housing, transportation, and other assistance to people seeking refuge at the border, and continue to conduct oversight of the disorder and human rights abuses caused by the Title 42 policy and any similar policies that deny access to asylum.

- **Biden Administration:** Take all steps to ensure a final end to the Title 42 policy, restore compliance with U.S. refugee law and treaties, continue to request appropriations to conduct timely asylum adjudications and address backlogs, oppose any efforts to force continuation or resurrection of the Title 42 policy or similar policies, and reject any proposals to replace Title 42 with other policies that block, ban or prevent refugees from seeking asylum in the United States and/or turn them away to danger. Never again use an actual or purported pathway to the U.S. as an excuse to evade refugee law or abrogate the right to seek asylum.

- **Department of Homeland Security:** As Title 42 ends, uphold U.S. refugee law at U.S. ports of entry and along the border, ramp up asylum adjudication capacity and end attempts to replace it with other illegal and inhumane Trump-era policies, and during the time Title 42 is still in place, take all legally available actions to restore asylum access at and between ports of entry and mitigate the harms of Title 42, including through the use of exceptions to Title 42 and by affirmatively screening individuals subjected to Title 42 for fear of return to persecution and torture, as U.S. law and international treaty obligations require.

- **Centers for Disease Control and Prevention:** Publicly identify steps to ensure public health authority is never again misused to evade refugee law and endanger the lives and safety of people seeking protection, and if the Title 42 policy should be prolonged yet again, take any additional steps necessary to help ensure its firm and final termination.

- **The Government of Mexico**: End cooperation with U.S. policies that violate international law and/or result in human rights violations, and take steps to end Mexican police and other officers' perpetration of and complicity or acquiescence in attacks, extortions, kidnappings, rape and other harms inflicted on migrants and asylum seekers.

**Title 42 expansion returns Venezuelans fleeing persecution and humanitarian catastrophe to danger, deplorable conditions**

On October 12, 2022, the Biden administration announced it would expand the use of Title 42 to expel Venezuelans to Mexico, through a "New Migration Enforcement Process," pairing the expansion with a new limited humanitarian parole program that would enable some Venezuelans to enter the United States. The parole program's requirements actually preclude many refugees from accessing it, including due to its identification, sponsorship, and airline ticket purchase requirements, as well as its numerical limitations. The Hope Border Institute, which interviewed expelled asylum seekers in October, concluded that the program "left no path for relief for the people in the most vulnerable situations" and left thousands of Venezuelans in Mexico "in a cruel state of limbo."

While UNHCR and other U.N. agencies welcomed efforts to provide safe pathways for displaced persons, they warned that such pathways "cannot come at the expense of the fundamental human right to seek asylum." In their statement, these U.N. authorities specifically reminded the United States that: "**Access to safe territory for asylum seekers is a cornerstone of the 1951 Refugee Convention and of international refugee law. We remain concerned by asylum restrictions that are inconsistent with international law standards, including those imposed through Title 42 public health action, and reiterate the call for their urgent termination.**" Days after the Biden administration's decision to expand Title 42 to expel Venezuelans seeking U.S.

asylum, CBP again acknowledged in an October 21, 2022 statement that recent arrivals at the southern border included "an increased number of asylum seekers fleeing [the] authoritarian regime[] in Venezuela."

Venezuelans expelled to or blocked in Mexico due to Title 42's expanded use are now stranded in highly dangerous Mexican border cities as well as other locations in Mexico that lack capacity to safely accommodate them. Many are also at risk of onward *refoulement* – illegal return - to persecution and torture, with some Venezuelans pushed across the border into Guatemala and others flown directly back to Venezuela by Mexican authorities. Title 42 expulsions of Venezuelans by DHS are also separating families at the border.

The expanded use of Title 42 has already resulted in thousands of Venezuelans expelled to Mexico without access to the U.S. asylum process. Between October 12 and mid-November 2022, more than 8,000 Venezuelans were expelled by DHS to Mexico. As of November 7, more than 2,100 Venezuelans had been expelled to Ciudad Juárez alone since the policy was expanded less than a month prior. Human Rights First researchers interviewed multiple sources who indicated that around December 1, 2022, DHS in the El Paso region began conducting lateral expulsions of Venezuelans to Matamoros and other cities and appeared to have halted direct expulsions to Ciudad Juárez.

As it has wielded Title 42 to expel Venezuelans to Mexico, CBP has separated some families at the border and turned away mothers, daughters, wives, partners, and other family members to danger in Mexico. For example:

- **In October 2022, DHS released Miguel Peñaranda, a Venezuelan man, and his 18-year-old stepson into the United States but expelled to Mexico Peñaranda's wife, Heyllyn Yepez, and his 18-year-old stepdaughter.** The family members, who had entered the United States in El Paso, were separated and flown to other parts of the border within Texas: Peñaranda and his stepson were flown to Brownsville, where they were released, while Yepez and her daughter were flown to Laredo, where they were expelled at the border and then bused to Acapulco, Mexico. Yepez told *The New York Times*, **"I never, ever could have imagined this happening…How can they do this to families? It's so inhuman."**

- **DHS separated a Venezuelan family of four in October 2022, releasing the father and son into the United States to pursue their asylum claims while expelling the mother and daughter to Mexico under Title 42,** according to a migrant shelter director in Austin, Texas.

- **A young Venezuelan woman was separated from her mother at the border in October 2022, and while she was processed into the United States, her mother was expelled to Mexico,** according to a migrant shelter director in Austin, Texas.

- **DHS has separated numerous Venezuelan married couples since October 2022.** A woman who was returned to Ciudad Juárez without her husband in October 2022 told *Reuters*, "I am alone in a country where I have no one to help me. He was my only companion, my only help, my only support."

- **In October 2022, DHS expelled a mother to Mexico while her 20-year-old son was permitted to seek asylum in the United States.**

- **DHS separated** Luis Alexander Bonilla **from his mother, sister, and nine-year-old nephew at the border, detained Bonilla for 11 days, and expelled him to Tijuana, Mexico in October 2022.** Bonilla told Milenio his mother had been expelled to Ciudad Juárez, Mexico. Two weeks after the family had entered the United States, Bonilla was unaware of the whereabouts of his sister and nephew.

Venezuelans who are stranded after expulsion or are unable to seek asylum at ports of entry due to Title 42's continuation face grave dangers in Mexico. As UNHCR, IOM and UNICEF publicly warned the United States after it announced this Title 42 expansion in October, "[m]any people subject to this measure since its implementation in March 2020 have been sent to border communities with significant security challenges, limited support networks and inadequate shelter capacities, making their return to Mexico both dangerous and unsustainable." Many Venezuelan asylum seekers have already been targeted by cartels and corrupt officials in Mexico for kidnappings and other violent attacks in the wake of this Title 42 expansion. Some recent examples include:

- **In November 2022, a Venezuelan police investigator fleeing death threats for investigating cases of disappeared people was assaulted and robbed by armed men who bashed his head with the back of a gun, ordered him off the bus he was riding near Ciudad Juárez, and tried to kidnap him.** He managed to escape, but when he arrived in Ciudad Juárez, police stopped him and stole his money. The man told Human Rights First he is terrified to stay in Juárez, where he remains stranded due to Title 42, because the cartel hunting him in Venezuela also operates there.

- **In November 2022, a gay Venezuelan man was sexually assaulted and robbed in the public plaza where he had been sleeping in Ciudad Juárez.** The man told Human Rights First that he had been staying in a makeshift tent encampment near the El Paso port of entry while blocked from seeking U.S. asylum due to Title 42. After Mexican authorities forced him to leave the encampment, he moved to the plaza where he was then attacked.

- **A 13-year-old girl was nearly abducted at gunpoint in Juárez after her parents and sibling, who had fled political persecution in Venezuela, were denied the right to seek asylum and expelled to danger in Mexico in November 2022 by CBP under the Title 42 Venezuelan expansion.** They were detained by CBP for 10 days without blankets or access to showers. A CBP officer told them "You should have stayed in your country," confiscated and kept their documents, and lied to the family, telling them they were being transferred to a U.S. shelter only to then laugh at them as they were instead subjected to a lateral expulsion and sent to Sonora. The family made their way back to Juárez only to face the attempted abduction and a cartel shooting outside their shelter, as the mother explained to Human Rights First researchers.

- **A Venezuelan family with two young daughters stranded in Mexico due to Title 42 was** kidnapped **from a hotel in Ciudad Juárez by two hooded, armed men.** The family had been waiting for an opportunity to seek asylum in the United States. The kidnappers held the family captive for 12 days until their relatives were forced to pay a $30,000 ransom.

The U.S. government's expulsion of Venezuelans to Mexico violates U.S. *non-refoulement* legal obligations not only by exposing them to serious harm in Mexico but also because returned individuals are at high risk of onward or so-called chain *refoulement* to countries where they would face persecution or torture. Mexican officials ordered some expelled Venezuelans to

depart Mexico through the southern border within 15 days, while others were provided Mexican migration documents (*forma migratoria múltiple* or FMM) leaving them with temporary status in Mexico for reportedly as little as one week in some cases.

Expelled Venezuelans are at risk of detention and potential deportation by Mexican authorities without access to the asylum process in Mexico. For instance, a video posted online in October 2022 appears to show hundreds of Venezuelans and other nationals detained in a Mexican National Migration Institute (*Instituto Nacional de Migración* or INM) facility near the U.S.-Mexico border, reporting they had been held in crowded, unsanitary conditions for weeks. Venezuelans, as well as other asylum seekers and migrants in Mexico often report that Mexican police and other government officials routinely extort them by threatening them with deportation. In Ciudad Juárez, Mexican National Guard officers have reportedly entered hotels where Venezuelans are staying, demanded their documents, and detained those without valid visas, according to a witness account in a video posted to social media.

In early November 2022, INM began flying some Venezuelans, who supposedly agreed to be repatriated, directly to Venezuela – though there is no indication that any international or independent authorities observed these returns to confirm that they were voluntary. Concerningly, displaced Venezuelans transiting through Mexico reported in October 2022 that Mexican migration officials forced them to sign false documentation stating that they had voluntarily requested to leave Mexico through the southern border to Guatemala. In late September 2022, just prior to the Title 42 expansion, hundreds of Venezuelans were reportedly deceived by Mexican authorities into boarding buses that transported them to the land border with Guatemala. These incidents reflect a well-documented history of failures by Mexican immigration officers to inform detained migrants of their right to seek asylum and failure to forward their requests to the Mexican asylum agency.

Displaced Venezuelans in Guatemala may face further chain expulsion. In 2022, with support from the U.S. government, Guatemalan authorities expelled more than 9,000 Venezuelans across the border into Honduras without consistently administering protection screenings.

Many Venezuelans expelled by DHS to Mexico have been stranded in deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities have transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity. For instance:

- **DHS has expelled hundreds of Venezuelans to Tijuana since October 2022, including some who were flown from the Texas border and expelled to Tijuana without being provided any information about what was happening to them.** Mexican immigration officers also reportedly abandoned at a bus station in Tijuana 60 Venezuelans whom DHS had expelled. With Tijuana shelters full, some spent several nights sleeping on the ground. A fitness center was later prepared to provide temporary shelter for 300 Venezuelans expelled to Tijuana from the United States.

- **On a Saturday in October 2022, Mexican migration officers bused approximately 100 displaced Venezuelans whom DHS had expelled to Mexico City, abandoning them without food, accommodation, or basic support outside an office of the Comisión Mexicana de Ayuda a Refugiados (COMAR), the Mexican refugee assistance agency, which was closed for the weekend.** As of December 2022, migrant shelters in Mexico City are full beyond their capacity as Venezuelans expelled from the United States continue to be bused there, resulting in hundreds sleeping in city streets. Shelters are operating at double capacity with many sleeping on mattresses in common spaces, according to Gretchen Kuhner, director of the *Instituto para las Mujeres en la Migración* (IMUMI). Kuhner said IMUMI and other nonprofit organizations in

Mexico City have had to provide food, shelter, medications, and other supplies to Venezuelans arriving in the city.

- **The Mexican government has bused at least 600 Venezuelans whom DHS had expelled from the United States to the central Mexican city of Hermosillo, where shelters struggling to meet their needs are requesting food and clothing donations.** Those bused to Hermosillo include 24-year-old Juan Carlos García, who reported that he could not afford to travel to Mexico City to reunite with his relatives, from whom DHS separated him at the border.

- **Thousands of Venezuelans, including many who had been expelled from the United States under Title 42, have been sleeping in dangerous conditions in makeshift tent encampments.** Approximately 12,000 migrants and asylum seekers, most of whom are Venezuelan, have been sleeping in a makeshift tent encampment on a muddy sports field in San Pedro Tapanatepec in Oaxaca state, Mexico. In Ciudad Juárez, in November 2022, as many as a thousand Venezuelans were staying in a tent encampment on the Rio Grande near the El Paso port of entry, where temperatures had dropped below freezing and many fell ill. In November 2022, members of an organized criminal group attempted to kidnap residents of the encampment, rt thm into separate lines for men, women, and families, and instructed them to enter nearby vehicles, but the kidnappers retreated when law enforcement intervened. Ciudad Juárez government officials cleared the camp in late November 2022, citing safety concerns.

The Hope Border Institute in El Paso concluded based on its interviews with asylum seekers and migrants that the expanded expulsions of Venezuelans "separated family units and placed individuals, including vulnerable people such as young children, single mothers and elderly people on the streets, lacking access to food, shelter and medical support."

---

**Court-ordered Title 42 continuation condemns asylum seekers and migrants expelled to or blocked in Mexico to grave dangers**

The continued implementation of Title 42 is causing mounting human rights abuses against asylum seekers and migrants blocked in or expelled to Mexico. Individuals and families who are expelled or blocked from protection due to Title 42 are targeted for attacks in Mexico by corrupt officials as well as powerful cartels that exercise control throughout the border region and profit from kidnapping, torturing, and extorting asylum seekers turned away by the United States. These attacks often target asylum seekers and other migrants on account of their race, gender, sexual orientation, gender identity, and nationality. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in or transiting through Mexico.

**As of the date this report was published in December 2022, Human Rights First has tracked at least 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021.** This count is likely just the tip of the iceberg since many asylum seekers have not spoken with investigators, journalists, or attorneys. Some recent attacks on people stranded in or expelled to Mexico due to Title 42's court-ordered continuation and recent expansion by DHS include:

- **Ibrahima Gueye, a 39-year-old Senegalese man, was shot and killed in a Tijuana park in broad daylight on October 18, 2022.** Police believe Gueye, who was carrying a backpack with clothing and personal belongings, was attacked by members of the violent "de la Castillo" group, which is engaged in criminal migrant smuggling in the area. With asylum seekers unable to approach ports of entry to request asylum, some have attempted to cross into the United States, unaware of danger from violent groups that control access to the border.

- **In October 2022, a Guatemalan lesbian trans woman was violently raped by Mexican police officers in Piedras Negras soon after CBP officers turned her away from protection at the Eagle Pass port of entry.** The woman reported to Al Otro Lado that she had sought protection due to her gender and sexual orientation.

- **A Haitian asylum seeker, whom DHS had previously expelled to Haiti under Title 42, was robbed at gunpoint in Tijuana in summer 2022 while unable to seek U.S. asylum at a port of entry due to the continuation of Title 42.** The armed assailants pulled the man's pants down and groped him looking for money, according to his cousin, another asylum seeker who spoke with Human Rights First.

- **A Guatemalan woman and her four-year-old son were kidnapped in Nogales and held captive for four days after DHS expelled them under Title 42. The family had sought U.S. protection to escape threats from the son's father.** The man who kidnapped the family had approached them offering help after DHS expelled them to Nogales, where they had no support and were unfamiliar with the area, according to Kino Border Initiative, who spoke with the woman in July 2022.

- **Mexican immigration (INM) officers kidnapped and turned over to the Zetas cartel a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo.  The cartel held the family hostage for three months, tortured them, and extorted their relatives.** The mother told Kino Border Initiative in July 2022 that the family had watched as their captors killed other migrants who attempted to escape.

- **An Indigenous Guatemalan woman and her three young children were kidnapped and extorted after CBP officers turned them away from asylum protection at the Nogales port of entry.** The woman told Kino Border Initiative in September 2022 that after the family was expelled, a woman approached them offering to bring them to a free shelter, but instead led them to a house where they were held captive for ransom.

- **In August 2022, a Salvadoran woman and her two children were held captive for hours by members of an armed group who forced them to strip and robbed them of all their belongings, including their clothing, shoes, and water.** The family had been attempting to enter the United States near Calexico to seek asylum when the armed group approached them. "They were asking their boss what to do with us…I thought they were going to kill us," the woman told Human Rights First.

- **Juárez police sexually assaulted a Honduran mother and her four-year-old daughter after the family was blocked from seeking protection in Ciudad Juárez in August 2022, then turned**

**them over to cartel members who held the family captive for 22 days, raped the mother in front of the daughter, and physically attacked the daughter.** The mother reported the incident to Al Otro Lado.

With Title 42 still in place, Mexican asylum seekers fleeing persecution and torture are trapped in or expelled by DHS to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations. Mexican asylum seekers stranded in Mexico or turned away from U.S. protection due to Title 42 have been brutally attacked and threatened, including:

- **A young asylum-seeking woman was decapitated by cartel members who had previously threatened her in southern Mexico after DHS turned her and her children away and would not allow them to seek asylum at a port of entry, citing Title 42.** The woman's brother-in-law, who is also seeking asylum, told Human Rights First in September 2022 that the family had been unable to find space in Tijuana shelters and after spending several nights in the streets, had no choice but to return to their hometown where they had been threatened.

- **In late October 2022, DHS used Title 42 to turn away a transgender woman from southern Mexico who had sought protection at a port of entry near Tijuana, Mexico, after an assailant had tried to kill her.** She reported to Al Otro Lado that she had suffered violence and discrimination based on her gender and sexual orientation, including multiple rapes, in Mexico.

- **A trans woman from the south of Mexico and her Indigenous partner remain stranded in Ciudad Juárez after fleeing death threats based on their race, gender, and sexual orientation by a criminal group who disappeared the woman's gay cousin and warned her not to look for him.** The woman told Human Rights First, "I am harassed every day of my life. I am afraid to go outside. There is so much hate. Even churches won't help us."

- **A woman from Michoacán who travelled to the Calexico port of entry in August 2022 with her infant and her younger brothers, ages 10 and 13, was threatened by cartel members after DHS officers turned them away due to Title 42.** The cartel members shot and killed the woman's husband in front of the family while they were eating lunch together, then threatened the woman after she reported the murder to police. The family had attempted to seek asylum at the Calexico port of entry, but U.S. officers turned them away because of Title 42. The woman told Human Rights First they fled to another city after receiving messages from neighbors warning them that the cartel members who had threatened them knew they were in Mexicali.

- **A Mexican lesbian woman who had suffered multiple attacks in her hometown due to her sexual orientation, including being kidnapped, raped, and threatened with death by police officers, was turned away from asylum protection at the San Ysidro port of entry in October 2022.** The woman reported her experience to Al Otro Lado.

- **A gay man from southern Mexico who had suffered beatings, sexual assaults, and an attempted kidnapping in his hometown due to his sexual orientation was turned away from**

**asylum at the El Paso port of entry in October 2022.** The man reported to Al Otro Lado that the people threatening him had killed his nephew to intimidate him.

- **A Mexican family of five was nearly kidnapped after DHS turned them away from seeking asylum at the San Ysidro port of entry in November of 2022.** The mother reported to Al Otro Lado that her husband and son had been kidnapped, beaten, and held for ransom in their home state in southern Mexico. After the expulsion, the family continued to receive death threats.

- **An Indigenous Triqui woman from Oaxaca who had been beaten by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 in Tijuana.** She shared with Al Otro Lado that after the family was turned away, she was sexually abused by Mexican police in Tijuana.

The broad reach of cartels and other organized criminal groups in Mexico, which often have ties to government authorities (including Mexican military collusion with cartels that was recently confirmed by data leaks), can make relocation within Mexico impossible for Mexicans fleeing persecution and torture. For instance, at least three Mexican asylum seekers reported to Kino Border Initiative in October 2022 that the organized criminal groups persecuting them had pursued them to multiple cities within the country where they had moved in an attempt to escape these threats, confirming the national reach of these organizations.

In addition, humanitarian, faith, and legal workers assisting asylum seekers stranded in Mexico continue to face threats, as Human Rights First has previously documented, including:

- **In June 2022, cartel members kidnapped Baptist Pastor Lorenzo Ortiz, who has long provided humanitarian aid to asylum seekers in Nuevo Laredo and Monterrey, including those expelled or blocked under Title 42.** In July 2022, the U.N. Special Rapporteur on human rights defenders condemned the kidnapping, indicating that the cartel who kidnapped Ortiz accused him of stealing their business and refused to believe he aids migrants free of charge. The Special Rapporteur said, "Ortiz's case shows the extraordinary risk that human rights defenders run to provide basic support in the region. This is not an acceptable state of affairs." In November 2022, the Special Rapporteur continued to express grave concern that Pastor Ortiz was being "threatened, surveilled and harassed for his work in defence of the rights of migrants," and that asylum seekers and migrants "in his shelters are being abducted, harassed and extorted, with the alleged acquiescence of local police."

- **Another shelter in Nuevo Laredo was forced to shut down after a violent cartel demanded the shelter pay a "protection fee,"** according to a migrant who had been staying there and who reported the incident to Kino Border Initiative in October 2022. The migrant said that when the shelter closed, their family and other shelter residents were forced onto Nuevo Laredo streets, where members of a cartel photographed and threatened them.

- **In August 2022, an Al Otro Lado staff member was robbed at gunpoint in Tijuana in a plaza near the San Ysidro port of entry while accompanying asylum seekers who had been**

        **instructed by CBP to appear at the port at 6 a.m. to be processed under an exception to Title 42.**

- **Members of organized criminal groups have threatened numerous staff and residents of several Tijuana shelters, including Ágape Misión Mundial and Espacio Migrante, in connection with their work assisting migrants with the Title 42 exemption process.** In November 2022, Embajada Migrante, a migrant shelter in Tijuana, was forced to close due to threats by members of an organized criminal group. A director of Embajada Migrante told EFE that members of an organized criminal group that controls the area have been harassing shelter staff for months, and at one point forcibly entered the shelter at night, demanding $200 from each of the migrants as a fee for crossing the border.

- **In November 2022, members of a violent cartel attacked a migrant shelter in Ciudad Juárez, plowing down its gate with a truck.** The cartel members forced the migrants to line up against a wall and ordered them to turn over their cell phones. The cartel retreated after realizing the space was a faith-based migrant shelter.

**Triggering Multiple Crossings, Artificially Inflating CBP's Border Encounters Statistics**

The continued and now expanded use of Title 42 is, while in place, trampling on U.S. refugee and immigration laws, preventing them from being upheld, prolonging disorder at the border, and inflating Customs and Border Protection (CBP) encounter statistics due to repeat entry attempts. Due to Title 42, the percentage of individuals who have attempted to repeatedly cross the southern border has increased, according to government data. Information released by CBP shows that in FY 2019 repeat crossings made up 7 percent of Border Patrol encounters, but with Title 42 in place since March 2020, repeated crossings rose to 27 percent of Border Patrol encounters in FY 2021, were 22 percent in August 2022 and 19 percent in September and October 2022 (the last months with data available).

Repeat crossings triggered by Title 42 expulsions have artificially inflated CBP's border apprehension statistics. CBP has concluded that the number of border encounters "was partly driven by high recidivism rates (repeat encounters) among individuals processed under the CDC's Title 42 public health authorities, meaning the actual number of unique individuals attempting to cross the border was substantially lower than total encounters." For example, in September 2022, government data shows that at least 43,000 encounters with Border Patrol were with individuals who had crossed the border multiple times, such that CBP acknowledged that its encounters statistics "overstate the number of unique individuals arriving at the border." Recent analysis by Syracuse University's Transactional Records Access Clearinghouse emphasizes the need for more accurate CBP data on repeat entry attempts. The American Immigration Council estimates that there were over 1.2 million repeat border encounters from August 2021 to September 2022 with Title 42 in place – inflating CBP's border apprehension data.

**Pushing dangerous crossings, resulting in record deaths as asylum remains blocked at ports of entry**

As Title 42 continues to block asylum at ports of entry, tens of thousands of migrants and asylum seekers are waiting in border cities for the opportunity to enter the United States through a limited exemption process. The exemption process requires nonprofit organizations and service providers, including migrant shelters, to refer migrants and asylum seekers with particular vulnerabilities in Mexico to DHS for consideration for Title 42 exemptions. Border cities in Mexico lack capacity to serve the thousands of migrants and asylum seekers stranded in Mexico awaiting the opportunity to request Title 42 exemptions. For example, shelters are full beyond capacity in Reynosa, forcing many migrants and asylum seekers to sleep in tent encampments or on the streets, often in sweltering heat or freezing temperatures. In September 2022, Haitian migrants frustrated by the slow Title 42 exemption process protested outside Reynosa shelters. Likewise, small tent encampments have emerged outside shelters in Tijuana, where tens of thousands of migrants and asylum seekers remain stranded as they await the opportunity to request Title 42 exemptions.

For people seeking refuge from persecution, the denial of access to asylum at U.S. ports of entry leaves them stranded in dangerous border cities and pushes some to attempt risky and sometimes life-threatening border crossings. These crossings result in severe injuries, dehydration, starvation, and drownings as well as kidnappings and other violent attacks by cartels and organized criminal groups that control border crossings. At least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began tracking and recording border crossing deaths in 1998. The true number of deaths is likely much higher, as Border Patrol only counts deaths of individuals the agency identifies.

Some of the people who have died or were seriously injured while attempting to cross the U.S.-Mexico border to reach refuge in the United States include:

- **Dozens of migrants and asylum seekers have drowned since July 2022 attempting to cross the Rio Grande to enter Texas from the Mexican state of Chihuahua.** They include a five-year-old Guatemalan girl who drowned after a strong current ripped the girl from her mother's arms in August 2022, a 3-year-old boy who died in August 2022, nine individuals whose bodies were recovered on a single day in September 2022, and 12 people whose bodies were recovered on a single day in July 2022. Eagle Pass fire chief Manuel Mello said, "it's basically a drowning a day that you're seeing."

- **Twenty-two migrants and asylum seekers have drowned in the river and in the agricultural canals of the El Paso, Texas region in 2022 while attempting to cross the U.S.-Mexico border.** They include a young Colombian man whose body was recovered from the Rio Bravo in Reynosa, Mexico in November 2022.

- **In December 2022, a Russian man and another migrant drowned in the Pacific Ocean while attempting to swim across the U.S. border from Tijuana.**

- **In August 2022, Mexican brothers Carlos Enrique Mendoza and Edgar Mendoza died from dehydration, and were found with their bodies embracing,** in the Arizona desert after a criminal smuggling organization abandoned them.

- **A Guatemalan asylum seeker fleeing death threats in his country who had previously been expelled under Title 42 was hospitalized after he became lost in the desert in the Arizona border region as he attempted to seek U.S. protection** for the second time in September 2022. He was expelled again after recovering, according to Kino Border Initiative.

- **In December 2022, an Indian man and his 3-year-old son died after falling off the border wall** attempting to enter the United States from Tijuana, Mexico. An Indian woman also fell off the border wall and sustained injuries.

**CBP misconduct exacerbates danger for people subjected to Title 42**

CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that increase their vulnerability to danger and violent crime in Mexico. Some Border Patrol agents have failed to provide medical attention to people with injuries, carried out Title 42 expulsions in the middle of the night, and expelled migrants and asylum seekers without their personal belongings. These practices exacerbate the risks migrants and asylums seekers face in Mexico after expulsion.

For example, CBP has endangered the lives of migrants at the Arizona border by carrying out expulsions in the middle of the night. Kino Border Initiative reported that CBP expelled at least sixteen migrants and asylum seekers to Nogales between the nighttime hours of 12:00 and 3:00 a.m. in August 2022. The organization also reported that some migrants were expelled in the rain, at times when shelters and services were closed, and had to sleep in the streets. After these CBP expulsions, some migrants were then robbed by Mexican police and other individuals. Those expelled at night include a Mexican mother and daughter fleeing sexual violence, who were expelled to Nogales at 3:00 am in August 2022.

CBP also continues to separate families subjected to Title 42 expulsions. In addition to the many examples of Venezuelan family separations detailed in a previous section, CBP separated a Mexican family fleeing death threats by cartel members in Guerrero who burned their house and killed a relative. CBP allowed the mother and younger brother to seek U.S. asylum but expelled the 18-year-old sister to Ciudad Juárez alone, according to a shelter director who assisted the young woman.

In its research, Human Rights First heard numerous accounts of instances where Border Patrol and CBP agents engaged in abusive conduct or failed to provide necessary medical attention for migrants and asylum seekers with serious medical conditions or injuries before expelling them to Mexico, including:

- **Border Patrol agents refused to provide medical attention to a woman who was eight months pregnant and who requested aid for complications with her pregnancy.** The woman

told Kino Border Initiative in October 2022 that she had requested a medical examination on three occasions while in Border Patrol custody after she had not felt the baby move in hours, but Border Patrol officers expelled her to Nogales, Mexico without allowing her to see a doctor. The following morning, the woman experienced severe pain and went to a hospital, where she learned the baby had died.

- **In July 2022, a Border Patrol officer beat an asylum seeker who requested water in the Arizona desert and told him "if you want water, go get it in your own country,"** The man told Kino Border Initiative that the officer had shoved his face into the ground, kicked him repeatedly, and stood on the back of his head, causing the man to bleed and lose consciousness. Officers eventually took the man to the hospital after repeated requests but expelled him to Mexico without any of his medical paperwork. He said, **"I'm trying to escape death in my country, only to nearly die here [in the US]."**

- **Border Patrol agents denied medical attention to a migrant who was stung on his hip by a venomous scorpion and was having difficulty breathing.** A Border Patrol agent told him to "sit down and be quiet" when he asked for medical attention for the sting. He was only brought to the emergency room and provided an anti-venom shot many hours later, after his condition had worsened while he waited in a holding cell. The man told Kino Border Initiative in October 2022 that Border Patrol agents later expelled the man to Mexico without returning his personal belongings.

- **Border Patrol agents ignored the pleas for medical attention of a man who had been severely beaten by members of an organized criminal group before seeking U.S. protection.** The man told Kino Border Initiative in October 2022 that Border Patrol agents expelled him to Mexico without providing medical attention and instructed him to ask Mexican authorities for help for his injuries.

CBP and Border Patrol officers also seize and fail to return migrants' personal property. In October 2022, ACLU of Arizona and other nonprofit organizations assisting migrants at the Arizona border sent a letter expressing concern about the practice to CBP Commissioner Chris Magnus. They wrote: "Border Patrol agents in Arizona are forcing migrants they apprehend to discard all their belongings into on-site dumpsters, the only exceptions being a single layer of clothing and certain items that can fit into a 7-by-7-inch plastic bag…The mass dispossession of migrants' belongings by Border Patrol agents is not new, yet the problem has now reached unprecedented levels of magnitude and severity." Personal belongings migrants have been forced to discard include "**items of religious, sentimental, medical, and legal significance.**" The letter indicates that in some cases, Border Patrol has provided claim tickets that would supposedly enable migrants to reclaim seized belongings, but the agency expelled those individuals to Mexico under Title 42 without providing them an opportunity to reclaim their property.

In November 2022, members of Congress Bennie Thompson, Joaquin Castro, Raúl Grijalva and Nanette Barragán requested that the Government Accountability Office "conduct a review of [CBP's] activities, policies, and procedures regarding the handling of personal property belonging to individuals in its custody."

During the course of its research, Human Rights First also heard reports of CBP and Border Patrol taking personal possessions from asylum seekers or migrants, or forcing them to discard passports, religious items, money, and other essential personal items. For example:

- **Several Venezuelan asylum seekers told Human Rights First in December 2022 that CBP expelled them without their personal possessions.** One family was expelled in November 2022 without any of the documents they had brought that were critical to their asylum case, including identification documents, birth certificates, and evidence for their asylum cases.

- **In October 2022, CBP expelled dozens of migrants and asylum seekers, including many Venezuelans, to Tijuana without any of their personal possessions, including their passports and clothing.** Nicole Ramos, Al Otro Lado's Border Rights Project director, said Al Otro Lado has had to purchase clothes and other basic supplies for individuals whose personal belongings had been seized by CBP.

- **At least thirty migrants and asylum seekers have reported to Kino Border Initiative that Border Patrol or CBP destroyed or failed to return their personal possessions from September to November 2022.** One man said Border Patrol agents confiscated his cash, a diamond ring his father had given him, a bible, the keys to his home, his cell phone with all his contacts, and his identity documents, including his birth certificate.

- **Another person reported to Kino Border Initiative that Border Patrol officers seized the SIM card from his cell phone, pocketed the cash and credit cards from his wallet, and tore up his birth certificate in front of him.** Another individual observed a Border Patrol agent rip up $3,000 pesos from a migrant they had apprehended. The officer said, "this is trash, this is of no value to you here" before disposing of the ripped bills in a trash can.

---

**Expansive use of Title 42 further undermines specious public health rationale, violates U.S. refugee obligations**

The increasingly expansive use of Title 42 and the calls to further prolong its use as a tool – albeit an ineffective and counterproductive one – for border management have completely undermined the already flimsy pretense that the Title 42 policy is justified on public health grounds. Indeed, Marty Cetron, the director of the CDC's Division of Global Migration and Quarantine, told congressional investigators in May 2022 that the CDC order issued by the Trump administration to expel asylum seekers and migrants under Title 42 "did not originate from CDC." It has long been confirmed that the White House pressured the CDC to issue the order after the CDC's medical experts objected to its lack of justification as a public health measure. Cetron noted that he had refused to sign the CDC order, asked to be "excused" from the policy, and warned of the "significant harms" that could arise from its use. In addressing a statement he had reportedly made to colleagues at the time, Cetron confirmed to congressional investigators that this statement was consistent with some of his concerns about the order: "**to use public health authority that has never, ever been used this way, it's to keep Hispanics out of the country and it's wrong**."

The Biden administration's decision to expand use of Title 42 to Venezuelans, which was clearly a decision based on migration management considerations, was additional confirmation that the

policy has nothing to do with public health. Following the announcement of this expansion, which made no mention of public health in the context of Title 42 expulsions and repeatedly described the expansion as part of a migration management strategy, leading epidemiologists and public health experts wrote to President Biden emphasizing that the continued and expanded use of Title 42 is a "travesty" and that the Biden administration was "manipulating and misusing public health to advance immigration control objectives."

Not only has DHS expanded its misuse of Title 42 public health authority by adding a new nationality to its expulsion list, but some DHS officers appear to be using the supposed public health policy to expel people who have been in the United States for weeks or years, evading the (minimal but critical) due process protections of U.S. immigration law. Some DHS officers have used Title 42 as cover to expel individuals who have long resided in the United States to Mexico without due process, in some instances in coordination with Texas state officers. For example:

- **In 2022 DHS expelled to Mexico a young Honduran man who had been living in the United States for nine years and had a pending immigration court hearing in Houston, Texas scheduled for December 2022, as his attorney reported to Human Rights First.** After being expelled to Mexico, the man was beaten by Mexican police officers, kidnapped by a cartel, and threatened at gunpoint. He was only able to reenter the United States with assistance from his attorney.

- **DHS also expelled a middle-aged Mexican man who had been in the United States for at least several weeks after a Texas state sheriff pulled over the trailer truck he was driving in a small Texas town in July 2022.** The sheriff demanded to see the man's permit to drive the truck, which he produced, and then asked for his work permit, which the man did not have. The sheriff detained the man in an isolated area where the man was provided no opportunity to speak with U.S. officials or to make any phone calls before DHS expelled him to Mexico, according to Kino Border Initiative.

The U.S. government is also using Title 42 to expel asylum seekers and migrants to Mexico after they have been arrested, jailed for weeks or months, and subjected to state prosecution under Texas' illegal Operation Lone Star. These prosecutions violate Article 31 of the Refugee Convention which generally prohibits the penalization of asylum seekers for their entry or presence in a country to seek refugee protection. DHS's expulsion of asylum seekers subject to Operation Lone Star also interferes with their ability to defend themselves against pending state criminal charges and to challenge abusive and discriminatory treatment by state and local authorities. Examples of these wrongful expulsions include:

- **In August 2022, DHS expelled to Honduras a 22-year-old Honduran asylum seeker who had spent three weeks in Texas state custody after he was charged with criminal trespass under Operation Lonestar.** The young man had posted bond so that he could be released to challenge the criminal charges against him, but Texas authorities immediately turned him over to CBP upon release from custody. Though the man was visibly distressed and expressed his fear of returning to Honduras on multiple occasions, DHS expelled him to Honduras, where he remains in hiding from individuals who threatened his life, according to a South Texas legal services provider.

- **The same legal services office assisted two other Honduran individuals whom DHS expelled to Mexico under Title 42 after they had spent two months in Texas state custody on pending criminal charges under Operation Lonestar, which were dismissed.**

The expansive and expanded misuse of Title 42 is additional confirmation that the Title 42 policy has nothing to do with public health but has instead been wielded to punish people for migrating or for exercising their human right to seek asylum from persecution.

**Acknowledgements**

This report was written and researched by Julia Neusner, Kennji Kizuka, Eleanor Acer, Ana Ortega and Alejandra Aguilar Ruiz. Rebecca Gendelman, Ruby Ritchin, Robyn Barnard, Licha Nyiendo, and Jim Bernfield contributed edits to the report. Camille Chabot, Crystal Choi, Rosie Foulds, Lauren Good, Leslie Herrera, Hannah Ismael, Akif Khan, Diana Padilla Legaspi, Ana Linares, Valeria Gerber Mariscal, Chris Mathrua, Neeka Mirpour, Samantha Navarrete, Semantha Norris, Ivette Orozco, Jemma Paradise, Ashley Quezada, Kathleen Quinn, Rachel Raps, Gwenyth Rodriguez, Cole Seither, and Syeda Shagufta of the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles) contributed additional research for this report. Our thanks to the many colleagues, including those from Al Otro Lado, Las Americas Immigrant Advocacy Center, Hope Border Institute, Immigrant Defenders Law Center, Instituto para las Mujeres en la Migración, Kino Border Initiative, UC Hastings Center for Gender and Refugee Studies, and other attorneys, law firms, and service providers who provided case examples and assisted in referring asylum seekers for interview. Human Rights First thanks the donors and foundations who provide invaluable support for the organization's research on access to asylum and representation of asylum seekers. We thank the numerous asylum seekers who bravely shared their stories in hopes of bettering the system for all those who seek protection and refuge in the United States.

**Mission Statement**

Human Rights First works to create a just world in which every person's intrinsic human rights are respected and protected, to build societies that value and invest in all their people. To reach that goal demands assisting victims of injustice, bringing perpetrators of abuse to justice, and building institutions that ensure universal rights.

Human Rights First is a nonprofit, nonpartisan international human rights organization based in Los Angeles, New York, and Washington D.C.

© 2022 Human Rights First All Rights Reserved.

This report is available online at humanrightsfirst.org

# EXHIBIT 14

# METERING UPDATE

## AUGUST 2022



**BY STEPHANIE LEUTERT AND CAITLYN YATES**



The University of Texas at Austin

Strauss CENTER
for International Security and Law

# INTRODUCTION

In April 2018, U.S. Customs and Border Protection (CBP) leadership issued guidance that allowed officers to limit asylum seekers' access to ports of entry. This guidance permitted CBP officers stationed at the United States' international boundary with Mexico to inform arriving asylum seekers that U.S. ports of entry were full. Simultaneously, CBP officers also began accepting a specified number of asylum seekers each day, in a process that is known as metering. Two months later, in June 2018, then-DHS Secretary Kirstjen Nielsen signed a memo that authorized port directors to begin metering at all U.S. ports of entry.[1]

As metering spread across the border and a subsequent backlog of asylum seekers grew in Mexico's border cities, Mexican authorities and civil society groups responded by providing humanitarian assistance and creating informal waitlists. Since November 2018, the Robert Strauss Center for International Security and Law at the University of Texas at Austin—at times in collaboration with the Center for U.S.-Mexico Studies at the University of California San Diego and the Migration Policy Centre at the European University Institute—has documented these informal lists through quarterly updates.

As the Covid-19 pandemic began in March 2020, CBP stopped processing asylum claims at ports of entry. This change took place via a Center for Disease Control's (CDC) regulation based on Title 42 authority and an order that blocked entry for individuals—including asylum seekers—attempting to enter the United States through Mexico without valid travel documents.[2] On April 1, 2022,  the CDC announced that it would terminate its Title 42 public health order on May 23, 2022, which would restart asylum processing at U.S. land ports of entry. However, just before the stated deadline, a federal judge in Louisiana blocked the CDC's termination of Title 42, and the public health order currently remains in place.[3]

Despite the Title 42 public health order blocking asylum processing at ports of entry, a number of individuals continue to enter the United States through various pathways. One of these pathways is Title 42 exceptions, which is a process that allows vulnerable individuals in Mexican border cities to enter the United States and request asylum. Over the past three months, the number of individuals seeking to be processed as Title 42 exceptions has exceeded CBP's daily slot allowance for this pathway. In response, the individuals and groups facilitating these exceptions have created waitlists.

In a shift from past metering reports, this August 2022[1] update also includes numbers from Title 42 exception waitlists. In many cities, Title 42 exception waitlists have replaced the asylum waitlists that were closed or dissolved in March 2020, when Title 42 began. By including these Title 42 exception lists, this report aims to provide a more accurate picture of the number of individuals waiting in Mexican border cities. Title 42 waitlists are similar to the asylum waitlists documented in previous metering updates, as both reflect individuals waiting to claim asylum in the United States.

However, there are also differences between Title 42 exception waitlists and previous asylum waitlists. For example, all of the earlier asylum waitlists were ordered chronologically by registration date and there were generally no restrictions on who could add their name. By contrast, Title 42 exception waitlists are structured

---

1. A special thanks to Taylor Levy for her assistance and support during this August 2022 metering update.

at the list managers' discretion, and may be restricted to those who are deemed to be vulnerable due to security, medical, or other concerns.

In practice, there are a wide range of Title 42 exception waitlist structures. Some lists are organized by registration dates and others are based on list managers' determination of migrants' vulnerabilities. Additionally, some lists include only those individuals who are slotted to cross into the United States in the coming days or weeks, while other lists include all potential individuals who may qualify for Title 42 exceptions in the future.

This report provides an update on all waitlists, asylum seekers, and migrant shelters along the U.S.-Mexico border. It documents 55,445 individuals on waitlists in eleven Mexican border cities. This is an approximately 104 percent increase from May 2022, when there were 27,135 asylum seekers on waitlists. However, this increase does not necessarily point to a large spike in the number of people waiting at the border. Rather, it reflects the inclusion of a more diverse range of waitlists.

**Figure 1: Number of People on Asylum Waitlists (November 2018 - August 2022)**



*Author's elaboration. Data collected from November 2018 to August 2022.*

Similar to previous metering updates, the number of individuals on waitlists should not be taken as the definitive number of asylum seekers at the border. Some asylum seekers registered on lists have entered the United States between ports of entry, been returned or removed to their countries of origin, or moved to other cities in Mexico. Additionally, some individuals waiting in Mexican border cities may not have been able to place their name on a Title 42 waitlist because list managers may not consider them to be vulnerable or because the Mexican city where they are currently waiting does not have Title 42 exception processing. Finally, other asylum seekers may be registered on multiple lists.

**Figure 2: Number of People on Asylum Waitlists by City (August 2022)**



*Author's elaboration. Data collected from August 4, 2022 to August 12, 2022.*

In August 2022, Title 42 exceptions were not standardized across the border. Figure 3 shows the status of Title 42 exceptions by Mexican border city. Green circles indicate cities where Title 42 exceptions are currently being processed and red circles indicate cities without Title 42 exception processing.

**Figure 3: Mexican Border Cities By List Status (August 2022)**

*Author's elaboration. Data collected from from August 4, 2022 to August 12, 2022.*

Asylum seekers—both on and off waitlists—continue to face unstable living conditions and security risks in Mexican border cities. Many shelters are full, and some shelters continue to operate at a reduced capacity due to Covid-19 restrictions. In San Luis Río Colorado, shelters are still operating at 50 percent capacity at night. Along the border, a number of individuals are renting rooms, staying in hotels, or sleeping on the street.

Certain groups of asylum seekers continue to experience additional challenges. Civil society organizations report that Black, LGBTQ+, and Indigenous asylum seekers have faced targeted discrimination by local authorities while waiting in Mexican border cities. In addition, parents have also reported difficulties enrolling their children in schools or finding childcare that would enable them to work and earn a salary.

The August 2022 metering update draws on phone and WhatsApp interviews with asylum seekers, government officials, civil society organizations, and legal service providers on both sides of the border from August 4, 2022 through August 12, 2022. It also relies on local news articles to fill in any gaps.

**Metering & Asylum Waitlists: August 2022**

| Mexican City<br><br>*List Administrator* | Waitlist<br>Status | # of Asylum<br>Seekers on List<br><br>*Date Recorded* | Recent Changes |
|---|---|---|---|
| **Matamoros,<br>Tamaulipas**<br><br>*Civil society organizations and legal service providers* | Open:<br><br>Title 42 Exception Processing | ~1,200 people<br><br>*August 8-12, 2022* | Civil society organizations in Matamoros are facilitating Title 42 exceptions based on security and medical vulnerabilities. Eligible individuals sign up in Matamoros and wait up to several months before being able to cross.<br><br>There have been significant changes for shelters in the city. In June 2022, the Mexican federal government opened its third shelter along the border: the "Valentina Ramírez Avitia" Centro Integrador para Migrantes (CIM). The CIM has an initial capacity for 676 people but is currently housing around 400 people.[4] The Mexican government's other two federal shelters are located in Ciudad Juárez and Tijuana.<br><br>Additionally, in July 2022, the Casa Paz Shelter closed, and in August 2022, the Dulce Refugio Shelter closed. The remaining individuals from Dulce Refugio Shelter were sent to the new CIM. Local civil society members are planning to open an additional "Casa de Migrantes" shelter for 200 people. This was in response to a perception that migrants believe the new CIM is located too far from the border and because other shelters in the city are closing.[5]<br><br>Currently, the city's shelters are full and migrants who are unable to find space in a shelter are staying in rented rooms and motels.<br><br>The majority of migrants in Matamoros are from Mexico's southern states (particularly Oaxaca, Guerrero, and Chiapas), as well as Nicaragua, Honduras, and Guatemala. |
| **Reynosa,<br>Tamaulipas**<br><br>*Senda de Vida migrant shelter, civil society organizations, and legal service providers* | Open:<br><br>Title 42 Exception Processing | ~10,000 people<br><br>*August 9-11, 2022* | The Senda de Vida migrant shelter manages a Title 42 exception waitlist for asylum seekers in Reynosa. The wait time for the Senda de Vida Title 42 exception list is several months.<br><br>Legal service providers and civil society organizations are also assisting individuals with medical emergencies or security concerns as part of separate Title 42 exception waitlists in the city. |

**Metering & Asylum Waitlists: August 2022 (continued)**

| Mexican City<br><br>*List Administrator* | Waitlist Status | # of Asylum Seekers on List<br><br>*Date Recorded* | Recent Changes |
|---|---|---|---|
| **Reynosa, Tamaulipas** *(continued)* | | | The true number of asylum seekers in Reynosa may be fewer than the number noted on the lists, with one civil society estimate of around 5,000 people. The majority of the asylum seekers in Reynosa are from Haiti.<br><br>As of August 3, 2022, the Senda de Vida I shelter (the original shelter) and the Senda de Vida II shelter were both at capacity. The other migrant shelters in Reynosa, such as Nuestra Señora de Guadalupe and Kaleo Internacional, were also at capacity.<br><br>Individuals have set up tents outside shelter walls to wait for a space to open. Other people have set up tents outside in public areas and are sleeping on the streets, as temperatures consistently reach 100°F (38°C). |
| **Nuevo Laredo, Tamaulipas** *Network of migrant shelters managing separate lists (one per shelter)* | Open:<br><br>Title 42 Exception Processing | ~3,450 people<br><br>*August 9-11, 2022* | In Nuevo Laredo, nine migrant shelters manage separate waitlists for Title 42 exceptions. Some of the shelters get two days every two-week-cycle to present migrants at the port of entry and other shelters get one day per cycle.<br><br>Additionally, legal service providers also process Title 42 exceptions each day for those individuals who are deemed to be particularly vulnerable.<br><br>The shelters in Nuevo Laredo are at or past capacity. In July 2022, the shelter Casa Nazareth announced that they would begin construction on a second expansion of their shelter.[6]<br><br>The majority of the migrants in the city are from Honduras, Haiti, El Salvador, and Mexico with smaller numbers of people from Venezuela and Cuba. Most of the shelters primarily house people from just one nationality. |

**Metering & Asylum Waitlists: August 2022 (continued)**

| Mexican City<br><br>*List Administrator* | Waitlist Status | # of Asylum Seekers on List<br><br>*Date Recorded* | Recent Changes |
|---|---|---|---|
| **Piedras Negras, Coahuila**<br><br>*Municipal government in coordination with local shelters* | Open:<br><br>Title 42 Exception Processing | ~400 people<br><br>*August 8, 2022* | In May 2022, the Piedras Negras municipal government opened a Title 42 exception waitlist. The list is operated in coordination with local shelters. As of August 8, 2022, there were 90 adults and 60 families (an estimated 330 people in total) on the municipal waitlist.<br><br>Civil society organizations, including those based in other cities, also assist in processing Title 42 exceptions in Piedras Negras for individuals who are deemed vulnerable but are not on the municipal government list.<br><br>Local groups estimate that there are between 2,000 and 3,000 migrants in the city. However, this number includes individuals who are not participating in the Title 42 exception process.<br><br>In May 2022, the shelters in Piedras Negras reopened after being closed for more than two years under the municipal government's COVID-19 guidelines. Since reopening, the shelters have been at or past capacity. Migrants are also sleeping in abandoned houses and on the street despite temperatures consistently reaching 100°F (38°C).<br><br>The majority of people arriving to Piedras Negras are from Honduras, El Salvador, and Guatemala, with fewer individuals also arriving from Venezuela and Nicaragua.[7] |

**Metering & Asylum Waitlists: August 2022 (continued)**

| Mexican City<br><br>*List Administrator* | Waitlist Status | # of Asylum Seekers on List<br><br>*Date Recorded* | Recent Changes |
|---|---|---|---|
| **Ciudad Acuña, Coahuila**<br><br>*Civil Protection (Protección Civil)* | Closed | 4,497 people<br><br>*August 9, 2022* | There is no Title 42 exception processing in Ciudad Acuña.<br><br>Civil Protection (Protección Civil) continues to maintain two asylum waitlists in Ciudad Acuña that are organized by registration date. One list is for families and one is for adults. Civil Protection closed both of these lists on January 18, 2022, and no additional names have been accepted. When the lists closed, there were approximately 4,497 people on the lists, including 1,125 individuals and 843 families.<br><br>Asylum seekers continue to arrive in the city. The majority of these new individuals are from El Salvador and Guatemala. Migrants in Ciudad Acuña report staying in shelters and sleeping on the street.[8] |
| **Ciudad Juárez, Chihuahua**<br><br>*State Population Council (Consejo Estatal de Población, COESPO) in coordination with local shelters, and a civil society organization* | Open:<br><br>Title 42 Exception Processing | ~700 people<br><br>*August 10, 2022* | Local groups are processing Title 42 exceptions in Ciudad Juárez. The State Population Council (Consejo Estatal de Población, COESPO) facilitates Title 42 exceptions for vulnerable individuals through referrals from local shelters. A local civil society organization also processes additional vulnerable individuals through a separate waitlist.<br><br>Title 42 exception waitlists in Ciudad Juárez only capture some vulnerable individuals and do not reflect the total number of migrants living in the city. Currently, there are close to 3,000 people staying in the 26 shelters across Ciudad Juárez. Although, these include individuals who are not participating in the Title 42 exception process. Estimates suggest that thousands more people may also be living outside of the shelters.<br><br>The migrants in Ciudad Juárez are mainly from Mexico (particularly Michoacán, Guerrero, Zacatecas, and Jalisco), as well as Honduras, Guatemala, Haiti, and El Salvador. |

**Metering & Asylum Waitlists: August 2022 (continued)**

| Mexican City<br><br>*List Administrator* | Waitlist Status | # of Asylum Seekers on List<br><br>*Date Recorded* | Recent Changes |
|---|---|---|---|
| **Agua Prieta, Sonora**<br><br>*CAME migrant shelter* | Closed | 2,500 people<br><br>*August 9, 2022* | In August 2021, the CAME migrant shelter closed its asylum waitlist in Agua Prieta with approximately 2,500 names on it.<br><br>There is no Title 42 exception processing in Agua Prieta. The CAME migrant shelter refers vulnerable families to Nogales for Title 42 exception processing. As of August 8, 2022, only four families that the shelter had referred to Nogales had been processed into the United States.<br><br>The CAME shelter is not currently at capacity. The majority of the asylum seekers arriving to Agua Prieta are from Mexico and Central American countries. |
| **Nogales, Sonora**<br><br>*Civil society organizations and legal service providers* | Open:<br><br>Title 42 Exception Processing | ~750 people[9]<br><br>*August 12, 2022* | Civil society organizations and legal service providers facilitate Title 42 exception processing in Nogales for migrants who are deemed to be vulnerable.<br><br>Migrants are arriving in Nogales from other Mexican states (primarily Guerrero, Michoacán, and Chiapas), Guatemala, and Honduras. More than three fourths of individuals recently arriving in the city have told the Kino Border Initiative (KBI), a local civil society organization, that they were migrating due to violence.<br><br>Migrants in Nogales continue to report that they face high rent prices, denial of medical care, difficulties enrolling their children in school, and discrimination in the job market. |

**Metering & Asylum Waitlists: August 2022 (continued)**

| Mexican City<br><br>*List Administrator* | Waitlist Status | # of Asylum Seekers on List<br><br>*Date Recorded* | Recent Changes |
|---|---|---|---|
| **San Luis Río Colorado, Sonora**<br><br>*Casa del Migrante La Divina Providencia* | Closed | 1,798 people<br><br>*August 8, 2022* | There is no Title 42 exception processing in San Luis Río Colorado.<br><br>In mid-November 2020, the Casa del Migrante La Divina closed its asylum waitlist with approximately 1,798 names on the list.<br><br>Local civil society reports that asylum seekers continue to arrive in the city. These asylum seekers are primarily from Honduras, El Salvador, Guatemala, Colombia, Venezuela, Cuba, Haiti, various African countries, and Mexico.<br><br>The Casa del Migrante La Divina is generally operating at a 50 percent overnight capacity. However, the shelter is operating at full capacity for daily activities, such as providing meals, clothing, and daytime stays. |
| **Mexicali, Baja California**<br><br>*Grupo Beta* | Closed | 150 people<br><br>*August 10, 2022* | In March 2020, Grupo Beta closed the asylum waitlist with 150 asylum seekers on the list.<br><br>There is currently no Title 42 exception processing in Mexicali. Individuals in Mexicali who are eligible for Title 42 exceptions are processed in Tijuana. On average, about 20 people are leaving Mexicali each week to participate in the Title 42 exception process in Tijuana.<br><br>The number of people arriving in Mexicali's shelters has increased in recent months. The majority of these individuals are from Haiti, along with people from Mexico (mostly from Guerrero and Michoacán), Honduras, and Guatemala.<br><br>Mexicali's shelters are open and have some capacity to receive more people. Shelters have noted that the high temperatures (more than 100°F or 38°C) have pushed people in the city to seek relief in the shelters.[10] |

**Metering and Asylum Waitlists: August 2022 (continued)**

| Mexican City<br><br>*List Administrator* | Waitlist Status | # of Asylum Seekers on List<br><br>*Date Recorded* | Recent Changes |
|---|---|---|---|
| **Tijuana, Baja California**<br><br>*Civil society organizations* | Open:<br><br>Title 42 Exception Processing | ~30,000 people[11]<br><br>*August 12, 2022* | Various civil society organizations facilitate Title 42 exception processing in Tijuana.<br><br>The primary Title 42 exception list in Tijuana is run by a civil society organization through a survey form. This form has garnered tens of thousands of submissions since it was created in 2020. Individuals are selected from this list based on vulnerability, but there is also processing based on registration date. Currently, the individuals being processed off of this list have been waiting for more than a year.<br><br>Additional civil society organizations facilitate Title 42 exception processes in collaboration with local migrant shelters.<br><br>Many Tijuana shelters have turned into long-term residences, which means that there is less space for newly arrived individuals.[12] People who are not staying in shelters are renting rooms and, at times, sleeping on the street. Additionally, water prices have recently increased in the city and some shelters have reported limited or no water supply.[13]<br><br>Migrants in Tijuana are primarily from Haiti, Mexico, Honduras, and Guatemala. Smaller numbers of individuals are arriving from other countries across Latin America, Asia, Africa, and Europe. |

*\*The numbers should be interpreted as a general range rather than an exact figure.*

# ENDNOTES

1.  Department of Homeland Security Office of the Inspector General, "CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry," October 27, 2020, https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf.

2.  The order allows Border Patrol agents to immediately expel all apprehended individuals, including asylum seekers, to the near-est Mexican city or to their home countries. U.S. Department of Health and Human Services, "Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes," March 24, 2020, https://www.federalregister.gov/documents/2020/03/24/2020.-06238/control-of-communicable-dis-eases-foreign-quarantine-suspension-of-introduction-of-persons-into.

3.  The lawsuit was brought by state attorneys from Missouri, Arizona, and Louisiana.

4.  Alfredo Peña, "Abre en Matamoros albergue para migrantes que solicitan asilo en EU," *Excelsior*, July 6, 2022, https://www.excel-sior.com.mx/nacional/abre-en-matamoros-albergue-para-migrantes-que-solicitan-asilo-en-eu/1525040.

5.  Ángel Arias, "Habria nueva Casa del Migrante en Matamoros," *Hoy Tamaulipas*, July 7, 2022, https://www.hoytamaulipas.net/notas/501534/Habria-nueva-Casa-del-Migrante-en-Matamoros.html.

6.  "Crearán nuevo refugio para migrantes en Nuevo Laredo," *Milenio*, July 8, 2022, https://www.milenio.com/videos/politica/comuni-dad/crearan-nuevo-refugio-para-migrantes-en-nuevo-laredo.

7.  Karina Andrew Herrera, "Migrantes continúan llegando a Piedras Negras, Coahuila, para cruzar a EEUU; buscan asilo," *Televisa*, July 18, 2022, https://noticieros.televisa.com/ultimas-noticias/migrantes-llegan-piedras-negras-coahuila-cruzar-eeuu-buscan-asilo/.

8.  Elliot Spagat, "Asylum wait lists at US border frustrate, confuse migrants," *Associated Press*, July 13, 2022, https://apnews.com/article/biden-covid-health-donald-trump-united-states-1456bf91a33ccfd1c97b6f12474a1070.

9.  This number reflects the estimate of the number of individuals in Nogales who are waiting for the Title 42 exception process, rather than a specific number on waitlists.

10.  Yuriria Sierra, "Migrantes en Mexicali padecen las altas temperaturas," *Imagen TV*, July 28, 2022, https://www.imagentv.com/no-ticias/imagen-noticias-con-yuriria-sierra/migrantes-en-mexicali-padecen-las-altas-temperaturas.

11.  This includes people who signed up on the Spanish and Creole-language forms and who have not yet been processed through Title 42 exceptions. While some of these names may be duplicates, the true number on the list could be even higher since many of the people who submitted their information are traveling with family members.

12.  Sofía Mejías-Pascoe, "Migrantes que se quedan más tiempo en Tijuana tensan la capacidad en los albergues," *iNews Source*, June 21, 2022, https://inewsource.org/2022/06/21/migrantes-que-se-quedan-mas-tiempo/.

13.  Yolanda Morales, "Albergues sin agua en Tijuana," *KSDY*, July 22, 2022, https://ksdy50.com/albergues-sin-agua-en-tijuana/.

# EXHIBIT 15

# Mexico's Asylum System: Good in Theory, Insufficient in Practice

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

⭐ immigrationforum.org/article/mexicos-asylum-system-good-in-theory-insufficient-in-practice

Updated on May 10, 2023 to reflect the start of the implementation of the Circumvention of Lawful Pathways Rule.

On May 11, 2023, the Biden administration started implementing a rule that creates a presumption of asylum ineligibility that would severely restrict U.S. asylum eligibility for most migrants crossing the U.S.'s southwest border. Among its provisions, the proposed rule creates a presumption of asylum ineligibility — with limited exceptions — for migrants who travel through a third country unless they apply for and are denied asylum before reaching the United States. Considering that most asylum seekers travel through Mexico to reach the United States, this paper explores Mexico's asylum system to determine whether it is an efficient, functional, and viable alternative for migrants to apply for asylum.

Mexico is a country whose asylum legal framework, in theory, is among the world's most inclusive and protective of asylum seekers. In recent years, Mexico has made significant legislative improvements to adapt to the new hemispheric migration patterns.[2] In addition, around 70% of asylum applications in Mexico are resolved favorably, granting refugee status to most applicants.[3] However, despite the good intentions of Mexican legislators and the high approval rate of asylum applications, the administrative authorities in charge of reviewing asylum applications are underfunded and face a growing number of asylum applications.

In addition, Mexico's economic and demographic circumstances are not ideally positioned to absorb large numbers of refugees. Finally, Mexico itself has systemic problems with gang and gender-based violence, undermining it as a destination country for asylum seekers fleeing gang and gender-based violence.

## Mexico's Asylum System

Asylum seekers looking for protection in Mexico have, in theory, a simple three-step path to being recognized as refugees:

1. Travel to Mexico;
2. Apply for asylum before the Mexican Commission for Refugee Help (COMAR); and
3. Wait 45 business days for COMAR to resolve their case.

### Step 1: Travel to Mexico

Except for political figures[4] and family members of refugees — who can apply for asylum abroad[5] — asylum seekers must travel to Mexico to apply for asylum.[6] Once in Mexico, migrants are eligible for asylum regardless of how they enter the country:

1. By commercial flight;
2. By land or sea at ports of entry; or
3. Between ports of entry.

Traveling commercially to Mexico can be fairly easy for nationals of some countries and very difficult for citizens of others.[7] Mexico does not require visas for citizens or permanent residents of the United States, Canada, Japan, the United Kingdom, the European Union, and the Schengen Area. In addition, nationals from any country member of the Pacific Alliance — namely Colombia, Chile, and Peru[8] — as well as Argentina, Australia, Bahamas, Belize, Bolivia, Costa Rica, Hong Kong, Iceland, Israel, Jamaica, Monaco, New Zealand, Panamá, Paraguay, and Uruguay can enter Mexico without a visa.[9] Moreover, individuals with valid visas from the United States, regardless of their nationality, do not require Mexican visas.[10]

Those who do not meet the criteria listed above must obtain a Mexican visa before traveling to Mexico through a commercial flight or cruise. In order to get a Mexican visa, foreign nationals must demonstrate their economic solvency by showing a bank account statement with an average balance of around $3,200 USD over the last three months. [11] They must also show proof of employment, with approximately $1,000 USD monthly earnings for the previous three months.[12]

If migrants are denied Mexican visas, they can travel by land or sea to Mexico — either through ports of entry or between them — and apply for asylum.

## Step 2: Apply for asylum before the Mexican Commission for Refugee Help (COMAR)

Once in Mexico, all migrants can apply for asylum at no cost within 30 days[13] of their arrival at any of the ten locations[14] of the Mexican Commission for Refugee Help (COMAR).[15] To apply for asylum in Mexico, applicants must demonstrate a reasonable fear of being persecuted, imprisoned, or tortured due to their race, religion, nationality, gender, membership of a particular social group, or political opinion.[16] In addition, asylum seekers are eligible for refuge in Mexico if they demonstrate that their liberty or life could be placed in danger by armed conflicts, systemic violence, or substantial human rights violations in their countries of origin.[17] The latter criterion makes Mexico's definition of refugee one of the most inclusive in the world and in line with the Cartagena Declaration on Refugees.[18]

## Step 3: Wait for COMAR's resolution

Once migrants apply for asylum, COMAR provides applicants with a certificate that demonstrates that their asylum process is ongoing.[19] COMAR will also assign a Refugee Unique Code (CUR) that will allow applicants to access all public services, including healthcare and education.[20] With the certificate and the CUR, asylum seekers can obtain a Visitor Card for Humanitarian Reasons (TVRH), which allows them to work while the application is processed. [21] As a general rule, COMAR must

complete the asylum process and notify the applicant within 45 business days from the date the process started.[22] However, due to backlogs related to the Covid-19 pandemic and an increasing number of asylum applications, some COMAR resolutions are taking up to 100 days.[23]

If COMAR denies asylum, applicants have 15 business days to appeal the decision.[24] If, after the appeal, COMAR denies asylum again, the agency must consider whether the applicant is eligible for complementary protection.[25] Complementary protection – equivalent to "withholding from removal"[26] in the United States – provides relief from deportation to asylum seekers who have failed in their claim for refugee status but whose lives would be in danger if sent back to their countries of origin.[27] The status of complementary protection grants access to all public services in the country.

## Rights of Refugees in Mexico

If COMAR grants asylum, the applicant immediately becomes a refugee.[28] Refugees in Mexico[29] have the right to apply for refugee status for their family members abroad.[30] Even after Mexico recognizes the refugee status of an individual, they have the right to apply for asylum in another country. In that case, Mexico suspends their refugee status while the process in a third country is under consideration. However, that refugee status can resume when they return to Mexico.[31]

### *Access to public benefits and right to travel*

Refugees in Mexico have the right to access all public benefits, including free healthcare and education.[32] They also have the right to settle anywhere in the country as long as they notify COMAR of any change of residence.[33]

### *Specific protections for migrant children*

Notably, the Mexican asylum framework has specific provisions that protect migrant children, regardless of whether they are unaccompanied or traveling with a legal guardian.[34] All children who arrive in the country as migrants, and their legal guardians, are automatically granted humanitarian parole.[35] Once they are granted humanitarian parole, they can apply for asylum. Mexican law forbids the separation of migrant families when children are involved.[36] Moreover, the law forbids the detention of migrant children for reasons related to their migration status.[37]

## Obstacles to the Asylum Process in Mexico

While the asylum system in Mexico seems easy to navigate on paper, there are multiple obstacles hindering the asylum process in the country:

**There are only 10 locations of COMAR across the country:** Asylum seekers can only apply for asylum before COMAR authorities. However, there are only 10 locations across the country, and most have been overwhelmed by the growing number of petitions in recent years.[38]

**As a general rule, asylum seekers must remain in the state where they filed their asylum application:** Asylum seekers must present themselves every week at the COMAR location where they filed their application. The asylum process automatically ends if the applicant fails to appear before COMAR for two consecutive weeks.[39] Among the many problems derived from the lack of sufficient locations is that many of COMAR's offices are situated in some of the country's poorest states where labor opportunities are scarce. For instance, the busiest COMAR location is the one in Tapachula, Chiapas — Mexico's poorest state, where 76% of the population lives in precarious conditions below the poverty line.[40]

**COMAR is overwhelmed with the growing number of applications it receives:** Between 2014 and 2019, Mexico registered a 5,325% increase in the number of asylum applications — from 1,296 in 2014 to 70,314 in 2019. Asylum applications decreased in 2020 due to the Covid-19 pandemic, falling to 40,914. However, the number skyrocketed in 2021 to 129,791 applications, dipping slightly to 118,478 in 2022.[41] According to recent estimates, COMAR has been expecting a similar number of asylum applications in 2023. However, it is expected that the Biden administration's proposed rule will significantly increase the number of asylum applications filed in Mexico. Because applicants would be required to show an asylum denial in third countries they have transited through, thousands of migrants will presumably file for asylum in Mexico just to receive an initial denial permitting them to head north to the U.S.

**COMAR is an underfunded agency with a massive backlog:** Due to the increasing number of asylum applications, COMAR's annual budget has increased from $1.1 million USD in 2017[42] to $10.3 million USD in 2023.[43] However, that budget remains insufficient to provide adequate asylum services and handle the massive increase in the number of people applying for asylum.[44]

**Mexico's economic and demographic circumstances are not well-situated to absorb large numbers of refugees:** Mexico has the 15th-largest economy in the world, with a GDP of $1.2 trillion USD.[45] Compared to the United States' $23.3 trillion USD economy, Mexico's capacity to absorb refugees is limited. In addition, unlike America's aging population, Mexico's younger population generates excess workers[46] leading a considerable portion of its population to seek labor opportunities abroad.[47] These realities pose challenges to Mexico as it now attempts to absorb thousands of asylum seekers into its workforce.

**Mexico has a systemic problem of gang and gender-based violence:** Gender-based violence in Mexico is systemic. Over 70% of women in Mexico have experienced gender-based violence, [48] with an average of 6 women disappearing every day in the country.[49] Moreover, gang violence in Mexico took the lives of over 26,000 people in 2022 in Mexico.[50] Asylum seekers in Mexico have increasingly been victimized by gang violence and are regularly targeted by cartels and other transnational criminal organizations who take advantage of their vulnerability, with scores of those seeking protection being extorted, robbed, assaulted, and even killed.[51] The threat of violence makes Mexico an unsuitable option for many, particularly the thousands of asylum seekers fleeing violence in their countries of origin.

# Conclusion

In recent years, Mexico's asylum system has made significant legislative improvements to adapt to the new hemispheric migration patterns. The country's definition of 'refugee' is among the world's most inclusive, and its asylum agency – COMAR – has made real progress in recent years. As a consequence, the approval rate of asylum applications has improved considerably. However, problems remain – Mexico's asylum system is overwhelmed and underfunded.

Despite some recent strides, Mexico's asylum system is struggling to keep up with the massive uptick in hemispheric migration over the past half-decade, and Mexican economic and demographic numbers pose challenges to absorbing large numbers of asylum seekers. Persistent struggles with domestic violence and gang violence also pose a challenge in serving as refuge for those fleeing similar violence in their countries of origin.

Across the U.S.-Mexico border, the Biden administration's new rule that will force many U.S. asylum seekers to first apply for asylum in Mexico will only further strain the Mexican asylum system. The expected new surge of applications would likely overwhelm a system that is already struggling to operate under less-than-optimal conditions. While Mexico's asylum system has demonstrated progress and may eventually serve as an important hemispheric receiving country for those fleeing danger, it currently is not ready for the likely influx of asylum seekers it faces in the coming months and years.

## Sources:

[1] Homeland Security Department and the Executive Office for Immigration Review; Notice of Proposed Rulemaking: Circumvention of Lawful Pathways; Federal Register. February 23, 2023. Available at  https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways

[2] See transitory articles of Ley de Migracion. Available at https://www.diputados.gob.mx/LeyesBiblio/pdf/LMigra.pdf

[3] Comisión Mexicana de Ayuda a Refugiados (COMAR); La COMAR en numeros: Estadistica enero 2023. February 16, 2023. Available at https://www.gob.mx/comar/articulos/la-comar-en-numeros-327441?idiom=es

[4] Political asylees are public figures who have a reasonable fear of persecution due to their opinions expressed in their role. See Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 2-I.

[5] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 61.

[6] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 11.

[7] Viajeros en Ruta; Paises que necesitan visa para Mexico; https://www.viajerosenruta.com/paises-necesitan-visa-mexicana/; Last Updated January 4, 2023.

[8] Alianza del Pacifico; Available at https://alianzapacifico.net/

[9] Consulado General de Mexico en Atlanta; Personas exentas de presentacion de visa para viajar a Mexico; Available at https://consulmex.sre.gob.mx/atlanta/index.php/visafee/247-personas-exentas-de-presentacion-de-visa-para-viajar-a-mexico#:~:text=Nacionales%20de%3A%20Argentina%2C%20Australia%2C,Uni%C3%B3n%20Europea%2C%20Uruguay%20y%20Venezuela.

[10] Secretaria de Relaciones Exteriores de Mexico; Visas; Available at https://consulmex.sre.gob.mx/boston/index.php/component/content/article/8-documentos-de-identidad/62-visas-ingles?Itemid=122; Last Updated March 1, 2023.

[11] Economic Commission for Latin America and the Caribbean (CEPAL); Requisitos para ingresar a Mexico; Available at https://conferenciaelac.cepal.org/5/sites/default/files/pages/files/REQUISITOS%20PARA%20INGRESAR%20A%20MEXICO.pdf

[12] Economic Commission for Latin America and the Caribbean (CEPAL); Requisitos para ingresar a Mexico; Available at https://conferenciaelac.cepal.org/5/sites/default/files/pages/files/REQUISITOS%20PARA%20INGRESAR%20A%20MEXICO.pdf

[13] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 18.

[14] COMAR has ten locations in the country: Mexico City, Acayucan in the state of Veracruz, Tenosique in the state of Tabasco, Tapachula and Palenque in the state of Chiapas, Guadalajara in the state of Jalisco, Saltillo in the state of Coahuila, Monterrey in the state of Nuevo León, Tijuana in the state of Baja California and Ciudad Juárez in the State of Chihuahua. *See* UNHCR, Contact COMAR. Available at https://help.unhcr.org/mexico/en/where-to-seek-help/contacta-a-la-comar/

[15] Comision Mexicana de Ayuda a Refugiados; Available at https://www.gob.mx/comar

[16] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 13, I-II

[17] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 13, III

[18] Cartagena Declaration on Refugees, 1984; UNHCR. Available at https://www.unhcr.org/en-us/about-us/background/45dc19084/cartagena-declaration-refugees-adopted-colloquium-international-protection.html

[19] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 22.

[20] UNHCR; How to Apply for Refugee Status in Mexico; Available at
https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/

[21] Instituto Nacional de Migracion; Cambio a visitante por razones humanitarias; Available at
https://www.gob.mx/tramites/ficha/cambio-a-visitante-por-razones-humanitarias/INM827

[22] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 24.

[23] UNHCR; How to Apply for Refugee Status in Mexico; Available at
https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/

[24] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 25.

[25] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 29.

[26] American Immigration Council; The Difference Between Asylum and Withholding of Removal;
October 6, 2020. Available at https://www.americanimmigrationcouncil.org/research/asylum-
withholding-of-
removal#:~:text=Individuals%20who%20have%20been%20banned,United%20States%20and%20wo
rk%20legally.

[27] Ruma Mandal; Protection Mechanisms Outside of the 1951 Convention ("Complementary
Protection"); UNHCR; June 2005; Available at https://www.unhcr.org/435df0aa2.pdf

[28] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 26.

[29] Asylum seekers, refugees, and political asylees are three different concepts under Mexican law.
An asylum seeker is a person who has left their country and is seeking protection from persecution
and serious human rights violations in another country, but who hasn't yet been legally recognized as
a refugee and is waiting to receive a decision on their asylum claim. A refugee is a person whose
asylum claim was resolved favorably. Political asylees are public figures who have a reasonable fear
of persecution due to their opinions expressed in their role.

[30] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 58.

[31] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 35 BIS.

[32] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 44.

[33] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 49.

[34] Ley de Migracion; Art. 11

[35] Ley de Migracion; Art. 52-V-b

[36] Ley de Migracion; Art. 99

[37] Ley de Migracion; Art. 6

[38] UNHCR; How to Apply for Refugee Status in Mexico; Available at
https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/

[39] Reglamento de la Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 24.

[40] Consejo Nacional de Evaluacion de la Politica de Desarrollo Social (CONEVAL); Informe de
evaluacion y pobreza Chiapas 2020; Available at
https://www.coneval.org.mx/coordinacion/entidades/Documents/Informes_de_pobreza_y_evaluacion
_2020_Documentos/Informe_Chiapas_2020.pdf

[41] Diego Badillo; Éxodo a Estados Unidos, sin precedentes, convierte a México en sala de espera
de migrantes; El Economista; January 15, 2023. Available at
https://www.eleconomista.com.mx/politica/Exodo-a-Estados-Unidos-sin-precedentes-convierte-a-
Mexico-en-sala-de-espera-de-migrantes-20230113-0069.html

[42] Dan Kosten; Mexico's Asylum System is Inadequate; National Immigration Forum; October 29,
2019. Available at https://immigrationforum.org/article/mexicos-asylum-system-is-inadequate/

[43] Alejandro Gomez; Presupuesto para Comar este 2023 superará los 196 millones de pesos;
Diario del Sur; January 8, 2023. Available at https://www.diariodelsur.com.mx/local/presupuesto-para-
comar-este-2023-superara-los-196-millones-de-pesos-9434246.html

[44] Jorge Butron, Comar admite crisis; "nos ven como agencia de viajes", La Razon, January 10,
2023. Available at https://www.razon.com.mx/mexico/comar-admite-crisis-ven-agencia-viajes-513107

[45] Georank; Mexico vs the United States: Economic Indicators Comparison. Available at
https://georank.org/economy/mexico/united-states

[46] United Nations Population Fund (UNFPA); Mexico: Population Pyramid; Available at
https://www.unfpa.org/data/demographic-dividend/MX

[47] Emma Israel and Jeanne Batalova; Mexican Immigrants in the United States; Migration Policy
Institute; November 5, 2020. Available at https://www.migrationpolicy.org/article/mexican-immigrants-
united-states-2019

[48] INEGI; Violencia contra las mujeres en Mexico. April 29, 2022. Available at
https://www.inegi.org.mx/tablerosestadisticos/vcmm/

[49] Secretaría de Seguridad y Protección Ciudadana; En México desaparecen 6 mujeres por cada
día del año; El Economista; April 21, 2022. Available at https://www.eleconomista.com.mx/politica/En-
Mexico-desaparecen-6-mujeres-por-dia-del-ano-SSPC-20220420-0166.html

[50] Oscar Lopez; As Mexico's epidemic of violence rages on, authorities seem powerless to stop it; The Guardian; December 8, 2022. Available at https://www.theguardian.com/world/2022/dec/08/as-mexicos-epidemic-of-violence-rages-on-authorities-seem-powerless-to-stop-it

[51] Miriam Jordan; Smuggling Migrants at the Border Now a Billion-Dollar Business; New York Times; July 25, 2022. Available at https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html

Author: Arturo Castellanos-Canales

# EXHIBIT 16

| | Caution<br>October 19, 2023 | Worldwide Caution |
|---|---|---|
| | Update<br>December 21, 2023 | Information for U.S. Citizens in the Middle East |

Home | Travel Advisories | Newsroom | About Us | Contact Us | Careers | MyTravelGov |

Find U.S. Embassies & Consulates

## Travel.State.Gov
U.S. DEPARTMENT of STATE — BUREAU of CONSULAR AFFAIRS

Search

Legal Resources    U.S. Passports    U.S. Visas    Intercountry Adoption    International Parental Child Abduction    Replace or Certify Documents

Travel.State.Gov > Travel Advisories > Mexico Travel Advisory

**Share this page:**

Print    Email    Facebook    Twitter

# Mexico Travel Advisory

| Travel Advisory<br>August 22, 2023 | See State Summaries  |
|---|---|

***Reissued after periodic review with general security updates, and the removal of obsolete COVID-19 page links.***

**Country Summary:** Violent crime – such as homicide, kidnapping, carjacking, and robbery – is widespread and common in Mexico. The U.S. government has limited ability to provide emergency services to U.S. citizens in many areas of Mexico, as travel by U.S. government employees to certain areas is prohibited or restricted. In many states, local emergency services are limited outside the state capital or major cities.

U.S. citizens are advised to adhere to restrictions on U.S. government employee travel. State-specific restrictions are included in the individual state advisories below. U.S. government employees may not travel between cities after dark, may not hail taxis on the street, and must rely on dispatched vehicles, including app-based services like Uber, and regulated taxi stands. U.S. government employees should avoid traveling alone, especially in remote areas. U.S. government employees may not drive from the U.S.-Mexico border to or from the interior parts of Mexico, except daytime travel within Baja California and between Nogales and Hermosillo on Mexican Federal Highway 15D, and between Nuevo Laredo and Monterrey on Highway 85D.

Read the [country information page](#) for additional information on travel to Mexico.

## Travel Advisory Levels



## Assistance for U.S. Citizens

**U.S. Embassy Mexico City**
Paseo de la Reforma 305
Colonia Cuauhtemoc
06500 Ciudad de Mexico
Mexico

Telephone

Emergency
U.S. Citizen Services:
From Mexico 800-681-9374 or 55-8526-2561.

**Do Not Travel To:**

- [Colima state](#) due to **crime** and **kidnapping**.
- [Guerrero state](#) due to **crime**.
- [Michoacan state](#) due to **crime** and **kidnapping**.
- [Sinaloa state](#) due to **crime** and **kidnapping**
- [Tamaulipas state](#) due to **crime** and **kidnapping.**
- [Zacatecas](#) state due to **crime** and **kidnapping**.

**Reconsider Travel To:**

- [Baja California](#) state due to **crime** and **kidnapping**.
- [Chihuahua state](#) due to **crime** and **kidnapping**.
- [Durango state](#) due to **crime**.
- [Guanajuato state](#) due to **crime** and **kidnapping**.
- [Jalisco state](#) due to **crime** and **kidnapping**.
- [Morelos state](#) due to **crime**.
- [Sonora state](#) due to **crime** and **kidnapping**.

**Exercise Increased Caution When Traveling To:**

- [Aguascalientes](#) state due to **crime**.
- [Baja California Sur state](#) due to **crime**.
- [Chiapas state](#) due to **crime**.
- [Coahuila state](#) due to **crime**.
- [Hidalgo state](#) due to **crime**.
- [Mexico City](#) due to **crime**.
- [Mexico State](#) due to **crime**.
- [Nayarit state](#) due to **crime.**
- [Nuevo Leon](#) state due to **crime** and **kidnapping**.
- [Oaxaca state](#) due to **crime**.
- [Puebla state](#) due to **crime** and **kidnapping**.
- [Queretaro state](#) due to **crime**.
- [Quintana Roo state](#) due to **crime**.
- [San Luis Potosi state](#) due to **crime** and **kidnapping**.
- [Tabasco state](#) due to **crime**.
- [Tlaxcala state](#) due to **crime**.
- [Veracruz state](#) due to **crime**.

**Exercise Normal Precautions When Traveling To:**

- [Campeche state](#)
- [Yucatan state](#)

Visit our website for [Travel to High-Risk Areas](#).

If you decide to travel to Mexico:

- Keep traveling companions and family back home

From the United States
1-844-528-6611

Fax

Email
Contact Form

Website
[https://mx.usembassy.gov/contact/](https://mx.usembassy.gov/contact/)



Mexico Map

View Larger Map

**Search for Travel Advisories**

Country or area

informed of your travel plans. If separating from your travel group, send a friend your GPS location. If taking a taxi alone, take a photo of the taxi number and/or license plate and text it to a friend.

- Use toll roads when possible and avoid driving alone or at night. In many states, police presence and emergency services are extremely limited outside the state capital or major cities.

- Exercise increased caution when visiting local bars, nightclubs, and casinos.

- Do not display signs of wealth, such as wearing expensive watches or jewelry.

- Be extra vigilant when visiting banks or ATMs.

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.

- Follow the Department of State on Facebook and Twitter.

- Follow the U.S. Embassy on Facebook  and Twitter .

- Review the Country Security Report for Mexico.

- Mariners planning travel to Mexico should check for U.S. maritime advisories and alerts, which include instructions on reporting suspicious activities and attacks to Mexican naval authorities.

- Prepare a contingency plan for emergency situations. Review the Traveler's Checklist.

- Visit the CDC page   for the latest travel health information related to your travel.

### Aguascalientes state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Aguascalientes state.

### Baja California state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Transnational criminal organizations compete in the border area to establish narco-trafficking and human smuggling routes. Violent crime and gang activity are common. Travelers should remain on main highways and avoid remote locations. Of particular concern is the high number of homicides in the non-tourist areas of Tijuana. Most homicides appeared to be targeted; however, criminal organization assassinations and territorial disputes can result in bystanders being injured or killed. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the noted restrictions:

- **Mexicali Valley:** U.S. government employees

should avoid the Mexicali Valley due to the heightened possibility of violence between rival cartel factions.  The boundaries of the restricted area are: to the east, the Baja California/Arizona and Baja California/Sonora borders; to the south, from La Ventana (on Highway 5) due east to the Colorado River; to the west, Highway 5; and to the north, Boulevard Lazaro Cardenas/Highway 92/Highway 1 to Carretera Aeropuerto, from the intersection of Highway 1 and Carretera Aeropuerto due north to the Baja California/California border, and from that point eastward along the Baja California/California border.

- Travelers may use Highways 2 and 2D to transit between Mexicali, Los Algodones, and San Luis Rio Colorado during daylight hours. Travelers may also use Highways 1 and 8 to transit to and from the Mexicali Airport during daylight hours.  Travel on Highway 5 is permissible during daylight hours.

There are no other travel restrictions for U.S. government employees in Baja California state. These include high-traffic tourism areas of border and coastal communities, such as **Tijuana**, **Ensenada**, and **Rosarito**.

### Baja California Sur state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Baja California Sur state.

### Campeche state – Exercise Normal Precautions

Exercise normal precautions.

There are no restrictions on travel for U.S. government employees in Campeche state.

### Chiapas state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Chiapas state.

### Chihuahua state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Violent crime and gang activity are common. Most homicides are targeted assassinations against members of criminal organizations. Battles for territory between criminal groups have resulted in violent crime in areas frequented by U.S. citizens and U.S. government employees, including restaurants and malls during daylight hours. Bystanders have been injured or killed in shooting incidents. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employee travel is limited to the following

areas with the noted restrictions:

- **Ciudad Juarez:** U.S. government employees may travel to the area of Ciudad Juarez bounded to the east by Bulevar Independencia; to the south by De los Montes Urales/Avenida Manuel J Clouthier/Carretera de Juárez; to the west by Vía Juan Gabriel/Avenida de los Insurgentes/Calle Miguel Ahumada/Francisco Javier Mina/Melchor Ocampo; and to the north by the U.S.-Mexico border.  Direct travel to the Ciudad Juarez airport (officially called the Abraham González International Airport) and the factories located along Bulevar Independencia and Las Torres is permitted. Travel to San Jerónimo is permitted only through the United States via the Santa Teresa U.S. Port of Entry; travel via Anapra is prohibited.

U.S. government employees may only travel from Ciudad Juarez to the city of Chihuahua during daylight hours via Federal Highway 45, with stops permitted only at the Guardia Nacional División Caminos station, the Umbral del Milenio overlook area, the border inspection station at KM 35, and the shops and restaurants on Federal Highway 45 in the city of Ahumada.

- U.S. government employees may travel between Ciudad Juarez and Ascension via Highway 2.

- **Nuevo Casas Grandes Area (including Nuevo Casas Grandes, Casas Grandes, Mata Ortiz, Colonia Juárez, Colonia LeBaron, Paquimé and San Buenaventura):** U.S. government employees may travel to the Nuevo Casas Grandes area during daylight hours via Mexico Federal Highway 2, and subsequently Federal Highway 10, to Nuevo Casas Grandes.  Employees are permitted to stay overnight in the cities of Nuevo Casas Grandes and Casas Grandes only.

- **City of Chihuahua:** U.S. government employees may travel at any time to the area of the city of Chihuahua bounded to the north by Avenida Transformación; to the east by Avenida Tecnológico/Manuel Gómez Morín/Highway 16/Blvd.José Fuentes Mares; to the west by the city boundary; and to the south by Periférico Francisco R. Almada.

- U.S. government employees may travel on Highways 45, 16, and 45D through the city of Chihuahua and to the Chihuahua airport (officially called the General Roberto Fierro Villalobos International Airport).

- U.S. government employees may travel to Santa Eulalia to the east of the city of Chihuahua, as well as to Juan Aldama via Highway 16 to the northeast.

- U.S. government employees may travel south of the city of Chihuahua on Highway 45 to the southern boundary of Parral, including each town directly connected to Highway 45, including Lázaro Cárdenas, Pedro Meoqui, Santa Cruz de Rosales, Delicias, Camargo, Ciudad Jiménez, and Parral

itself.

- U.S. government employees may only travel on official business from the city of Chihuahua on Highway 16 to Ciudad Cuauhtémoc bounded by Highway 21 to the north and east, Highway 5 to the west, and Bulevar Jorge Castillo Cabrera to the south.
- **Ojinaga:** U.S. government employees must travel to Ojinaga via U.S. Highway 67 and enter through the U.S. Port of Entry in Presidio, Texas.
- **Palomas:** U.S. government employees may travel to Palomas via U.S. highways through the U.S. Port of Entry in Columbus, New Mexico, or via Highway 2 in Mexico.

U.S. government employees may not travel to other areas of Chihuahua, including **Copper Canyon**.

## Coahuila state – Exercise Increased Caution

Exercise increased caution due to crime.

Violent crime and gang activity occur in parts of Coahuila state.

U.S. government employees must adhere to the following travel restrictions:

- **Zaragoza, Morelos, Allende, Nava, Jimenez, Villa Union, Guerrero, and Hidalgo municipalities**: U.S. government employees may not travel to these municipalities.
- **Piedras Negras and Ciudad Acuña:** U.S. government employees must travel directly from the United States and observe a curfew from midnight to 6:00 a.m. in both cities.

There are no other restrictions on travel for U.S. government employees in Coahuila state.

## Colima state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime and gang activity are widespread. Most homicides are targeted assassinations against members of criminal organizations. Shooting incidents between criminal groups have injured or killed bystanders. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with noted restrictions:

- **Manzanillo:** U.S. government employee travel is limited to the tourist and port areas of Manzanillo.
- Employees traveling to Manzanillo from Guadalajara must use Federal Toll Road 54D during daylight hours.

U.S. government employees may not travel to other areas of Colima state.

### Durango state – Reconsider Travel

Reconsider travel due to crime.

Violent crime and gang activity are common in parts of Durango state.

U.S. government employees must adhere to the following travel restrictions:

- **West and south of Federal Highway 45:** U.S. government employees may not travel to this region of Durango state.

There are no other restrictions on travel for U.S. government employees in Durango state.

### Guanajuato state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Gang violence, often associated with the theft of petroleum and natural gas from the state oil company and other suppliers, occurs in Guanajuato, primarily in the south and central areas of the state.  Of particular concern is the high number of murders in the southern region of the state associated with cartel-related violence. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

- **Areas south of Federal Highway 45D:** U.S. government employees may not travel to the area south of and including Federal Highway 45D, Celaya, Salamanca, and Irapuato.

There are no other restrictions on travel for U.S. government employees in Guanajuato state, which includes tourist areas in: **San Miguel de Allende**, **Guanajuato City**, and **surrounding areas.**

### Guerrero state – Do Not Travel

Do not travel due to crime.

Crime and violence are widespread. Armed groups operate independently of the government in many areas of Guerrero. Members of these groups frequently maintain roadblocks and may use violence towards travelers. U.S. citizens and LPRs have been victims of kidnapping in previous years.

Travel for U.S. government employees is limited to the following area with the noted restrictions:

- **Taxco:** U.S. government employees must use Federal Highway 95D, which passes through Cuernavaca, Morelos, and stay within downtown tourist areas of Taxco. Employees may visit Grutas de Cacahuamilpa National Park during the day with a licensed tour operator.

U.S. government employees may not travel to other areas of the state of Guerrero, including to tourist areas in **Acapulco**, **Zihuatanejo**, and **Ixtapa**.

### Hidalgo state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Hidalgo state.

### Jalisco state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Violent crime and gang activity are common in parts of Jalisco state. In Guadalajara, territorial battles between criminal groups take place in tourist areas. Shooting incidents between criminal groups have injured or killed innocent bystanders. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

- **Jalisco-Michoacan border and Federal Highway 110:** U.S. government employees may not travel to the area between Federal Highway 110 and the Jalisco-Michoacan border, nor travel on Federal Highway 110 between Tuxpan, Jalisco, and the Michoacan border.
- **Federal Highway 80:** U.S. government employees may not travel on Federal Highway 80 south of Cocula.

There are no other restrictions on travel for U.S government employees in Jalisco state which includes tourist areas in: **Guadalajara Metropolitan Area**, **Puerto Vallarta (including neighboring Riviera Nayarit)**, **Chapala**, and **Ajijic**.

### Mexico City (Ciudad de Mexico) – Exercise Increased Caution

Exercise increased caution due to crime.

Both violent and non-violent crime occur throughout Mexico City. Use additional caution, particularly at night, outside of the frequented tourist areas where police and security patrol more routinely. Petty crime occurs frequently in both tourist and non-tourist areas.

There are no restrictions on travel for U.S. government employees in Mexico City.

### Mexico State (Estado de Mexico) – Exercise Increased Caution

Exercise increased caution due to crime.

Both violent and non-violent crime occur throughout Mexico State. Use additional caution in areas outside of the frequented

tourist areas, although petty crime occurs frequently in tourist areas as well.

There are no restrictions on travel for U.S. government employees in Mexico State.

### Michoacan state – Do Not Travel

Do not travel due to crime and kidnapping.

Crime and violence are widespread in Michoacan state. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Federal Highway 15D:** U.S. government employees may travel on Federal Highway 15D to transit the state between Mexico City and Guadalajara.
- **Morelia:** U.S. government employees may travel by air and by land using Federal Highways 43 or 48D from Federal Highway 15D.
- **Lazaro Cardenas:** U.S. government employees must travel by air only and limit activities to the city center or port areas.

U.S. government employees may not travel to other areas of the state of Michoacan, including the portions of the **Monarch Butterfly Reserve** located in Michoacan.

### Morelos state – Reconsider Travel

Reconsider travel due to crime.

Violent crime and gang activity are common in parts of Morelos state.

There are no restrictions on travel for U.S. government employees in Morelos state.

### Nayarit state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout Nayarit state.

There are no restrictions on travel for U.S government employees in Nayarit state.

### Nuevo Leon state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state. U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in Nuevo Leon state.

### Oaxaca state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence occur throughout the state.

U.S. travelers are reminded that U.S. government employees must adhere to the following travel restrictions:

- **Isthmus region:** U.S. government employees may not travel to the area of Oaxaca bounded by Federal Highway 185D to the west, Federal Highway 190 to the north, and the Oaxaca-Chiapas border to the east.  This includes the cities of Juchitan de Zaragoza, Salina Cruz, and San Blas Atempa.
- **Federal Highway 200 northwest of Pinotepa:** U.S. government employees may not use Federal Highway 200 between Pinotepa and the Oaxaca-Guerrero border.

There are no restrictions on travel for U.S. government employees to other parts of Oaxaca state, which include tourist areas in: **Oaxaca City**, **Monte Alban**, **Puerto Escondido,** and **Huatulco**.

### Puebla state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state.  U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in Puebla state.

### Queretaro state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Queretaro state.

### Quintana Roo state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur in any location, at any time, including in popular tourist destinations.  Travelers should maintain a high level of situational awareness, avoid areas where illicit activities occur, and promptly depart from potentially dangerous situations.

While not directed at tourists, shootings between rival gangs have injured innocent bystanders.  Additionally, U.S. citizens have been the victims of both non-violent and violent crimes in tourist and non-tourist areas.

There are no restrictions on travel for U.S. government employees in Quintana Roo state. However, personnel are advised to exercise increased situational awareness after dark in downtown areas of Cancun, Tulum, and Playa del Carmen, and to remain in well-lit pedestrian streets and tourist zones.

### San Luis Potosi state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state.  U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in San Luis Potosi state.

### Sinaloa state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime is widespread. Criminal organizations are based in and operating in Sinaloa. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Mazatlan:** U.S. government employees may travel to Mazatlan by air or sea only, are limited to the Zona Dorada and historic town center, and must travel via direct routes between these destinations and the airport and sea terminal.
- **Los Mochis and Topolobampo:** U.S. government employees may travel to Los Mochis and Topolobampo by air or sea only, are restricted to the city and the port, and must travel via direct routes between these destinations and the airport.

U.S. government employees may not travel to other areas of Sinaloa state.

### Sonora state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Sonora is a key location used by the international drug trade and human trafficking networks. Violent crime is widespread. U.S. citizens and LPRs have been victims of kidnapping. Travelers should maintain a heightened level of awareness of their surroundings in all their travels in Sonora.  Security incidents may occur in any area of Sonora.

U.S. government employees must adhere to the following travel restrictions:

- **Travel between Hermosillo and Nogales:** U.S. government employees may travel between the U.S. Ports of Entry in Nogales and Hermosillo during daylight hours via Federal Highway 15 only. U.S. government employees may not use ANY taxi services, public buses, nor ride-share applications due to a lack of secure vetting and/or dispatching procedures. Travelers should exercise caution and avoid unnecessary stops as security incidents, including sporadic, armed carjackings, and shootings have been reported along this highway during daylight hours. Travelers should have a full tank of gas and inform friends or family members of their planned travel.
- **Nogales:** U.S. government employees may not travel

in the triangular area north of Avenida Tecnologico, west of Bulevar Luis Donaldo Colosio (Periferico), nor east of Federal Highway 15D (Corredor Fiscal). U.S. government employees also may not travel in the residential and business areas to east of the railroad tracks along Plutarco Elias Calle (HWY 15) and Calle Ruiz Cortino, including the business area around the Morley pedestrian gate port-of-entry. U.S. government employees may not use ANY taxi services, public buses, nor ride-share applications in Nogales due to a lack of secure vetting and/or dispatching procedures and the danger of kidnapping and other violent crimes.

- **Puerto Peñasco:** U.S. government employees may travel between Puerto Peñasco and the Lukeville-Sonoyta U.S. Port of Entry during daylight hours via Federal Highway 8 only. They may not travel on any other route to Puerto Peñasco. U.S. government employees may not use ANY taxi services, public buses, nor ride-share applications in Puerto Peñasco. due to a lack of secure vetting and/or dispatching procedures and the danger of kidnapping and other violent crimes.

- **Triangular region near Mariposa U.S. Port of Entry:** U.S. government employees may not travel into or through the triangular region west of the Mariposa U.S. Port of Entry, east of Sonoyta, and north of Altar municipality.

- **San Luis Rio Colorado, Cananea, and Agua Prieta**: U.S. government employees may travel directly from the nearest U.S. Port of Entry to San Luis Rio Colorado, Cananea (via Douglas Port of Entry), and Agua Prieta, but may not go beyond the city limits. Travel is limited to daylight hours only. Travel between Nogales and Cananea via Imuris is not permitted. U.S. government employees may not use ANY taxi services, public buses, nor ride-share applications in these cities due to a lack of secure vetting and/or dispatching procedures and the danger of kidnapping and other violent crimes.

- **Eastern and southern Sonora (including San Carlos Nuevo Guaymas and Alamos):** U.S. government employees may not travel to areas of Sonora east of Federal Highway 17, the road between Moctezuma and Sahuaripa, and State Highway 20 between Sahuaripa and the intersection with Federal Highway 16. U.S. government employees may travel to San Carlos Nuevo Guaymas and Alamos; travel to Alamos is only permitted by air and within city limits.  U.S. government employees may not travel to areas of Sonora south of Federal Highway 16 and east of Federal Highway 15 (south of Hermosillo), as well as all points south of Guaymas, including Empalme, Guaymas, Obregon, and Navojoa.  U.S. government employees may not use ANY taxi services, public buses, nor ride-share applications in these areas due to a lack of secure vetting and/or dispatching procedures and the danger of kidnapping and other violent crimes.

U.S. government employees may travel to other parts of

Sonora state in compliance with the above restrictions, including tourist areas in: **Hermosillo**, **Bahia de Kino**, and **Puerto Penasco**.

### Tabasco state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Tabasco state.

### Tamaulipas state – Do Not Travel

Do not travel due to crime and kidnapping.

Organized crime activity – including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault – is common along the northern border and in Ciudad Victoria. Criminal groups target public and private passenger buses, as well as private automobiles traveling through Tamaulipas, often taking passengers and demanding ransom payments.

Heavily armed members of criminal groups often patrol areas of the state and operate with impunity particularly along the border region from Reynosa to Nuevo Laredo.  In these areas, local law enforcement has limited capacity to respond to incidents of crime. Law enforcement capacity is greater in the tri-city area of Tampico, Ciudad Madero, and Altamira, which has a lower rate of violent criminal activity compared to the rest of the state.

U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Matamoros and Nuevo Laredo:** U.S. government employees may only travel within a limited radius around and between the U.S. Consulates in Nuevo Laredo and Matamoros, their homes, the respective U.S. Ports of Entry, and limited downtown sites, subject to an overnight curfew.

- **Overland travel in Tamaulipas:** U.S. government employees may not travel between cities in Tamaulipas using interior Mexican highways. Travel between Nuevo Laredo and Monterrey is limited to Federal Highway 85D during daylight hours with prior authorization.

U.S. government employees may not travel to other parts of Tamaulipas state.

### Tlaxcala state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Tlaxcala state.

### Veracruz state – Exercise Increased Caution

Exercise increased caution due to crime.

Violent crime and gang activity occur with increasing frequency in Veracruz, particularly in the center and south near Cordoba and Coatzacoalcos. While most gang-related violence is targeted, violence perpetrated by criminal organizations can affect bystanders. Impromptu roadblocks requiring payment to pass are common.

There are no restrictions on travel for U.S. government employees in Veracruz state.

### Yucatan state – Exercise Normal Precautions

Exercise normal precautions.

There are no restrictions on travel for U.S. government employees in Yucatan state, which include tourist areas in: **Chichen Itza**, **Merida**, **Uxmal**, and **Valladolid**.

### Zacatecas state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime, extortion, and gang activity are widespread in Zacatecas state. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Zacatecas City**: U.S. government employee travel is limited to Zacatecas City proper, and employees may not travel overland to Zacatecas City.

- U.S. government employees may not travel to other areas of Zacatecas state.

## Travel.State.Gov

Travel.State.Gov
U.S. Passports
International Travel
U.S. Visas
Intercountry Adoption
International Parental Child
Abduction
Records and Authentications

## Popular Links

Home
Travel Advisories
Newsroom
About Us
Contact Us
Careers
    MyTravelGov
Find U.S. Embassies & Consulates

## Stay Connected

## Legal Resources

Legal Information
Info for U.S. Law Enforcement

Privacy | Copyright & Disclaimer | FOIA | No FEAR Act Data | Office of the Inspector General | USA.gov | USA.gov/espanol |
This site is managed by the U.S. Department of State. External links to other Internet sites and listings of private entities on this page are provided as a convenience and should not be construed as the U.S. Department of State or U.S. government endorsement of the entity, its views, the products or services it provides, or the accuracy of information contained therein. The order in which names appear has no significance, and the listings or links may be removed at any time at the discretion of the Department.

# EXHIBIT 17

# "This Hell Was My Only Option"

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**hrw.org**/report/2023/11/09/hell-was-my-only-option/abuses-against-migrants-and-asylum-seekers-pushed-cross

November 9, 2023



## Summary

November 9, 2023 News Release

### Americas: Migrants Pushed to Cross Darién Gap, Abused

Over the last year, over half a million people have crossed the Darién Gap, a swampy jungle at the Colombia-Panama border, on their journey north, often to the United States. Venezuelans, Haitians, and Ecuadorians, but also people from other regions like Asia and Africa, risk their lives in this difficult terrain, where they are exposed to unchecked abuses by criminal groups, including sexual violence, and receive little protection or humanitarian assistance.

Human Rights Watch visited the Darién Gap four times between April 2022 and June 2023 and interviewed almost 300 people to document the drivers of, and responses to, this crisis. We documented why migrants and asylum seekers flee their own countries and are reluctant to stay in other countries in South America; how criminal groups abuse and exploit them on the way; and where Colombia's and Panama's responses fall short in assisting and protecting them, and in investigating abuses against them.





© 2023 Human Rights Watch

This report, the first in a series of Human Rights Watch reports on migration via the Darién Gap, documents how a lack of safe and legal pathways has pushed migrants and asylum seekers fleeing human rights crises in Latin America to risk their lives crossing the Darién Gap. It suggests that restrictions on movement from South American countries to Mexico and Central America, often promoted by the United States government, have contributed—in combination with an increase in migration from South America to the United States—to sharp increases in numbers of people crossing the Darién Gap, exposing them to abuses, including sexual violence, and empowering organized crime in the area.

Between 2005 and 2020, the number of migrants in Latin America and the Caribbean more than doubled, from around 7 million to 15 million, according to the International Organization for Migration (IOM), making it the region with the highest growth globally of international migrants during that time.

Over 440,000 Venezuelans have crossed the Darién Gap since January 2022—the largest number for any nationality. They flee an ongoing humanitarian emergency in their country, which has undermined access to food and medicine, as well as abuses and persecution by security forces, armed groups, and gangs.



▶ Read a text description of this video

Ecuadorians and Haitians are also crossing the Darién Gap in large numbers. Many of the over 80,000 Ecuadorians who have crossed the gap since January 2022 flee increased violence in their country, marked by unprecedented homicide and extortion rates.

Haiti suffers a long-standing political, security and humanitarian crisis that has left all government branches inoperative, allowing overwhelming impunity for crimes committed by the brutal 300 criminal groups that control parts of the country. Over 63,000 Haitians have crossed the Darién Gap since January 2022.

On the Colombian side of the Darién Gap, the Gulf Clan, an armed group involved in drug trafficking, regulates the routes that migrants and asylum seekers can use, decides who can assist them on the way, extorts people who benefit from migrant flows, and establishes rules of conduct for locals and migrants alike, at times enforcing them through violence. The Colombian military estimates that the Clan collects, on average, US$125 per person crossing the Darién Gap. If the estimate is accurate, the armed group may have made a total of US$57 million between January and October 2023 from its control over this migration route, due in part to restrictive policies pushing migrants and asylum seekers through the Darién Gap to head north.

Criminals and bandits abuse migrants and asylum seekers as they cross the many routes across the jungle, especially on the Panamanian side. People are routinely robbed, sexually abused, and at times raped. Médecins Sans Frontières (MSF) has assisted 950 people, most of them women, who reported sexual violence crossing the Darién Gap since April 2021.

What is happening in the Darién Gap is the result of a range of failed policies across the hemisphere —and the urgent need for a rights-respecting response to protect people fleeing human rights crises in the region.

Governments in the Americas should take steps towards ensuring rights-respecting immigration policies building on the Los Angeles Declaration on Migration and Protection, signed by 21 states in the region in 2022. They should also seize the December 2023 Global Refugee Forum and the upcoming 40th anniversary of the 1984 Cartagena Declaration—a landmark international instrument on refugees' rights in Latin America—to respond to the increasing migration challenges in the region.

These governments should implement a region-wide temporary protection regime that would grant all Venezuelans and Haitians legal status for a reasonably timed and renewable term. Mexico and Central American governments, in particular, should ensure that their visa requirements do not effectively prevent access to asylum and push people to resort to dangerous crossings including the Darién Gap.

Hundreds of thousands of migrants and asylum seekers are fleeing human rights crises in the Americas and beyond, while many are also escaping poverty. Whether seeking international protection or economic opportunities, asylum seekers and migrants deserve safe, orderly, and dignified paths to make their claims or to offer their skills. In all cases, they are entitled to basic safety and respect for their human rights during their journey.

# Related Content

November 9, 2023 News Release

## Americas: Migrants Pushed to Cross Darién Gap, Abused

Lack of Safe and Legal Pathways Risks People's Lives, Empowers Organized Crime



## Methodology

This report is part of a series of Human Rights Watch reports on migration in the Americas and the Darién Gap. Later reports are expected to focus on the drivers of migration in the region—including the situations in Venezuela, Haiti, and Ecuador, as well as the limited integration and regularization policies in other countries in South America—and on Colombia's and Panama's efforts to protect and assist people crossing the Darién Gap and to ensure accountability for crimes committed against them.

In researching the situation in the Darién Gap, Human Rights Watch visited the Colombian side of the Darién in April 2022 and June 2023 and the Panamanian side in May 2022 and March 2023. In total, researchers interviewed over 160 migrants and asylum seekers who had or were about to cross the Darién Gap. Some people—including a few who had reached the US, Costa Rica, or Mexico—were interviewed by phone. Interviews were conducted in Spanish, Portuguese, French, and English.

During its visits and by phone, Human Rights Watch also interviewed some 50 humanitarian workers from UN agencies and humanitarian organizations, as well as Colombian and Panamanian authorities within the national Ombudsperson's Offices, Attorney General's Offices, Ministries of Foreign Affairs, and migration offices, among others.

Human Rights Watch also interviewed by phone migration experts, as well as international, regional, and local organizations and legal clinics working with migrants and asylum seekers throughout the region, including in Brazil, Chile, Colombia, Ecuador and Peru.

Most migrants and asylum seekers and some humanitarian workers spoke to researchers on condition that we withhold their names and other identifying information. Interviewees' details have also been withheld when Human Rights Watch believed that publishing the information would put someone at risk. Human Rights Watch uses pseudonyms to identify migrants and asylum seekers interviewed during its research.

Human Rights Watch informed all participants of the purpose of the interview, its voluntary nature, and how the information would be used. Each participant orally consented to be interviewed. They did not receive any payment or other incentive. Where appropriate, Human Rights Watch provided migrants and asylum seekers with contact information for organizations offering healthcare, legal, social, or counseling services.

Human Rights Watch took care when interviewing survivors of abuses, particularly of sexual violence. When possible, Human Rights Watch received information from humanitarian workers supporting survivors to minimize the risk that recounting their experiences could further traumatize the survivors.

Human Rights Watch reviewed academic studies regarding migration flows in Latin America, as well as data and reports by the Colombian, Panamanian and US governments; UN agencies; international, regional, and local human rights and humanitarian organizations; local legal clinics; and media outlets.

Most significantly, Human Rights Watch obtained access and analyzed anonymized data from 1,382 surveys of migrants and asylum seekers conducted by the Office of the UN High Commissioner for Refugees (UNHCR) in the Darién Gap between July 2022 and June 2023.[1]

As part of the research on migration in the Americas and the Darién Gap, Human Rights Watch sent multiple information requests to government authorities. Some of their responses will be also reflected in later publications. The information requests included:

- In July 2022 and July 2023, Human Rights Watch sent information requests to the following Colombian authorities regarding the departure of migrants and asylum seekers from Colombia and authorities' response: the Foreign Affairs Ministry, the Defense Ministry, the Interior Ministry, the national police, the national migration office (Migración Colombia), the Attorney General's Office, the Ombudsperson's Office, the Colombian Family Welfare Institute (Instituto Colombiano de Bienestar Familiar, ICBF), and the mayor's offices in Necoclí, Turbo, Acandí and Juradó. As of October 31, 2023, Human Rights Watch had received partial or complete responses from all Colombian authorities with the exception of the mayor's offices in Necoclí and Acandí and the national migration office.

- In July 2022 and March 2023, Human Rights Watch sent information requests to the following Panamanian authorities regarding the arrival of migrants and asylum seekers to Panama and authorities' response: the Foreign Affairs Ministry, the Ministry of Public Safety, the Ministry of Health, the National Migration Service (Servicio Nacional de Migración, SNM), the National Border Service (Servicio Nacional de Fronteras, SENAFRONT), the Attorney General's Office, the Ombudsperson's Office, the National Service for Children, Adolescents and Families (Secretaría Nacional de Niñez, Adolescencia y Familia, SENIAF), and the National Office for Refugee Care (Oficina Nacional para la Atención de Refugiados, ONPAR). As of October 31, 2023, Human Rights Watch had received partial or complete responses from all Panamanian authorities. The Health Ministry and the Attorney General's Office had not provided updated information corresponding to events occurring in 2023.

# I. The Darién Gap Crossing

The Darién Gap is a swampy jungle that lies between the Colombian state of Chocó and the Panamanian province of Darién, forming a natural border not only between those countries, but between South and Central America. The Pan-American Highway, which connects Alaska (in the US) and Ushuaia (in Argentina), is interrupted only for the 66 miles of dense jungle.

The terrain is steep and slippery, the rivers rushing, especially during rainy season. Most routes follow paths that crest a rugged mountain range with ridges as high as 6,000 feet—where flags mark the Colombian-Panamanian border. People crossing call the highest pass "Death Hill" (Loma de la Muerte) and the Turquesa river "Death River" (Río de la Muerte), for the large number of dead bodies in its waters.[2] Temperatures range from 20 to 35 degrees Celsius (75 to 95 degrees Fahrenheit), with heavy rainfall and flooding from May to December.

The Colombian side of the border is mostly at the Urabá region, named after the Urabá Gulf. Four Colombian municipalities directly border the Darién jungle: Juradó, Riosucio, Unguía and Acandí, all in Chocó state. The latter three are considered among Colombia's most affected by decades of armed conflict, poverty, and a weak state presence.[3] The four encompass a total population of roughly 99,000,[4] including people living in Indigenous Embera Katío and Embera Dobida reserves,[5] as well as people living in Afro-Colombian communities that, under Colombian law, are governed by "community councils" (consejos comunitarios).[6] Acandí, from which most migrants and asylum seekers launch toward Panama, has three main community councils: *Consejo Mayor de Comunidades Negras de la Cuenca del Río Acandí y Zona Costera Norte* (COCOMANORTE), *Consejo Mayor de Comunidades Negras de la Cuenca del Río Tolo y Zona Costera Sur* (COCOMASUR) and *Consejo Mayor de Comunidades Negras de La Cuenca del Río Acandí Seco, El Cedro y El Juancho* (COCOMASECO). Many migrants start the journey through the Darién in Necoclí, Antioquia state, a roughly 45,000-person coastal town near the Caribbean Sea.[7]

In Panama, the Darién jungle extends through a province with the same name. Indigenous Kuna, Emberá and Wounaan people live within the Darién province in "comarcas," territories under Indigenous jurisdiction recognized by Panamanian law.[8] More than 13,000 people from 40 different communities—including Bajo Chiquito and Canaán Membrillo—live in the 4,383-km Emberá-Wounaan comarca in the Darién,according to Panama's National Institute of Statistics and Census (Instituto Nacional de Estadísticas y Censos, INEC).[9]

## Migration through the Darién Gap

For decades, migrants and asylum seekers migrating northward from South America have used the Darién Gap, generally with the intent of entering the US. Thousands of people, with more than 70 nationalities,[10] have made the journey through "one of the most dangerous migration routes," according to the International Organization for Migration (IOM).[11] That number has increased dramatically in recent years.

In 2010, Panama began officially registering migrant crossings. From 2010 through 2014, Panama averaged fewer than 2,500 crossings per year. The first real peak of people crossing through the Darién Gap took place in 2015 and 2016 with roughly 30,000 registered arrivals each of those two years. Those crossings were mainly by Cubans and Haitians, Panamanian data shows, followed by nationals of other countries in Africa and Asia.[12] Between 2010 and 2019, more than 109,000 people crossed.

## Numbers of Migrants and Asylum Seekers Crossing the Darién Gap



Source: Panama's National Migration Service, "Statistics. Irregular Transit in the Darién" ("Estadísticas. Tránsito irregular por Darién"), n.d., https://www.migracion.gob.pa/inicio/estadisticas (accessed October 27, 2023).

Despite a significant drop from in 2020, caused by border closures and quarantine measures adopted in response to the Covid-19 pandemic, the number of people crossing the Darién Gap soared by almost 4,000 percent between 2020 and 2022.[13] More than 130,000 migrants, particularly Haitians and Cubans, crossed the Darién Gap in 2021.[14] In 2022, the number of crossings increased to 250,000, with a surge of Venezuelans and Ecuadorians.[15] Between January and October 2023, more than 457,000 people crossed the Gap, a record number that has already surpassed estimates made by the Panamanian government for the entire year.[16]



Source: Panama's National Migration Service, "Statistics. Irregular Transit in the Darién" ("Estadísticas. Tránsito irregular por Darién"), n.d., https://www.migracion.gob.pa/inicio/estadisticas (accessed September 27, 2023).

Through 2018, migrants and asylum seekers crossing the Darién were mainly adult men. Since 2019 this has changed.[17] Families with children are crossing, as are women—at times pregnant or breastfeeding—alone with their children, and unaccompanied or separated girls, boys, and adolescents.[18] Around 22 percent of those crossing between January and September 2023 were children.[19]

## The Gulf Clan's Role

Armed groups have been present in Urabá since the 1970s. These have included the Revolutionary Armed Forces of Colombia (Fuerzas Armadas Revolucionarias de Colombia, FARC) guerrillas and paramilitary groups, which at times engaged in fighting.[20]

The Gulf Clan, also known as Gaitanist Self-Defense Forces of Colombia (Autodefensas Gaitanistas de Colombia, AGC), has been the main armed group in the region since the FARC's 2016 peace accord with the Colombian government.[21] In 2020, the Clan defeated the National Liberation Army (Ejército de Liberación Nacional, ELN), which had also been present in the Urabá municipalities of Juradó, Riosucio and Carmen del Darién.[22]

The Clan, with approximately 9,000 members nationwide,[23] has "hegemonic control" over the Urabá, according to the Ombudsperson's Office.[24] It engages in criminal activities, including drug and arms trafficking, and extortion, and imposes rules to control people's daily life and economic activities.[25]

"Everything that happens in Necoclí occurs under the supervision of the Clan," a man who had worked in a boat company moving migrants and asylum seekers told Human Rights Watch.[26]

For example, for five days in May 2022, the Clan declared an "armed strike" restricting civilians' movements in over 190 municipalities across 13 states.[27] These included the Urabá region, where people were forced to stay home and schools, offices and stores were closed.[28]

When the Clan's then-leader Dairo Antonio Úsaga, known as "Otoniel," was arrested, in October 2021, the group increased its involvement in the flow of migrants and asylum seekers across the Darién.[29] Today the Clan performs three main roles in connection with the flow of migrants and asylum seekers in the Darién Gap:

- The Gulf Clan regulates the routes that migrants and asylum seekers can use and decides who can assist them on the way.[30] As described below, the Clan has closed several routes, including apparently by killing a community leader involved in the movement of migrants. The Community Councils, which organize the routes, ask the Clan for permission to use certain routes, a prosecutor said.[31] The group wants to avoid migrant flow on the land routes it uses for drug trafficking, according to a prosecutor and officials with the Ombudsperson's Office.[32]

  The group also uses the migrant flow to divert attention from the movement of cocaine by sea.[33] Two people who help migrants and asylum seekers in Necoclí, for example, told Human Rights Watch that Gulf Clan members summoned them to a meeting in March 2022 and told them to take migrants and asylum seekers to boat companies that operate unlawfully out of Totumo, a small town inside Necoclí, to Carreto, in Panamá.[34] These boats often travel parallel to boats carrying cocaine.[35] When the Navy intervenes, the boatmen throw the migrants and asylum seekers into the sea and flee, several sources said.[36]

  The Clan has also set up systems to track migrants' and asylum seekers' payments to cross the Darién Gap. These included giving out bracelets to those who paid and, more recently, putting stickers on their passports or IDs.[37]
- The Gulf Clan extorts everyone who benefits from the migration flow on the Colombian side.[38] The Clan's internal "bylaws" establish that its income comes, among others, from "taxes from the illicit activities."[39] These include people who rent their homes, sell boat trips, or provide services as "guides" across the jungle. A prosecutor estimated that the Clan gets 20 percent of all the income related to migration activities.[40] Colombia's Ministry of Defense told Human Rights Watch that the Gulf Clan obtains approximately US$125 for each migrant or asylum seeker crossing the Gap.[41]
- The Gulf Clan establishes rules on the local population and migrants and asylum seekers—and at times enforces them through threats and killings.[42] These include prohibitions on harming migrants and asylum seekers.[43] For example, in November 2021, the Clan apparently killed a "guide" who had sexually abused migrants.[44] "They conduct 'social cleansing,'" a man who worked in a boat company said, referring to the killing of alleged criminals. They maintain a lower level of violence and abuses to avoid drawing the attention of security forces, he and others said.[45]

## Journey through the Darién Gap

Transit routes through the Darién Gap have changed, over the years, in response to the needs of migrants and asylum seekers and restrictions imposed by Panamanian authorities as well as by the Gulf Clan.

The journey is a profitable business for many, including the Gulf Clan, communities in Colombia, and Indigenous groups in Panama. Tens of millions of dollars can circulate through the Darién each year due to activities related to migrants and asylum seekers.[46]

Migrants and asylum seekers often pay high fees to cross the gap, with prices depending on the routes they take. This includes fees for the people known as "guides," who show migrants and asylum seekers the routes and often accompany them part of the way. The level of risk to which migrants and asylum seekers are exposed during the journey depends in large part on the route they can afford.[47]

UNHCR estimates that almost 70 percent of the people crossing between July 2022 and January 2023 paid for a guide.[48] A member of the Colombian Ombudsperson's Office told Human Rights Watch that guides operate in a "relay system."[49] At the border, Afro-Colombian guides in Colombia hand off travelers to Indigenous Panamanian guides across the border.[50]

Some migrants and asylum seekers told Human Rights Watch that guides helped them carry their bags—and even their children—during the first part of the journey. Others said guides abandoned them at the border or even handed them over to criminal groups that abused them.[51]

The first part of the journey, approaching the Darién from Colombia, is generally accomplished by sea, which is easier than land. By September 2023, around 1,000-1,700 people were departing from Necoclí every day to cross the Gap, according to the Interagency Group for Mixed Migration Flows (Grupo Interagencial de Flujos Migratorios Mixtos, GIFMM), a coordination platform for humanitarian actors and government agencies in Colombia.[52]

Most people arriving in Panama started their journey from one of two Necoclí docks authorized by Colombian authorities.[53] The boats traditionally departed from Necoclí to take tourists to Acandí beaches, but the arrival of migrants and asylum seekers shifted their business purpose. Migrants and asylum seekers buy the same boat tickets as tourists but pay twice the price[54]—over US$40, compared to US$18.[55]

Boats from the authorized docks provide lifejackets, formal tickets, and established departure times.[56] Colombian authorities do not keep their own register of the people leaving. They rely on boat companies to register the names and passport number of every person they are transporting.[57]

Other migrants and asylum seekers start their journeys in the city of Turbo, a port district an hour south of Necoclí, with 133,430 inhabitants.[58] The route through Turbo turned popular again in 2023 after being largely unused for several years.[59] The GIFMM and the Mayor's Office estimated that

around 500-1,000 people were departing each day from Turbo by September 2023.[60] Departing from Turbo is cheaper, and the route appears to be used by migrants and asylum seekers with fewer financial resources, particularly Venezuelans and Ecuadorians.[61]

Humanitarian workers and Colombia's Ombudsperson's Office told Human Rights Watch there are also unauthorized boats departing from other beaches in Necoclí and Turbo.[62] Between 2021 and 2022, the Colombian Navy intercepted "approximately seven illegal boats carrying approximately 106 people," according to the Ombudsperson's Office. These boats navigate "at late hours, often overcrowded, and some lacking basic safety measures," the Office said.[63]

Passengers generally debark in Acandí or Capurganá, Colombian territory on the other side of the Gulf of Urabá.Once there, migrants and asylum seekers are taken—reportedly on motorcycles—to organized camps, commonly called "albergues" (the Spanish word for "shelters"), that are established or controlled by Afro-Colombian community councils or private actors. Government officials are not present in any of the shelters and one humanitarian organization, the Colombian Red Cross, is present in one of them.[64]

In 2022, COCOMASECO managed two shelters in Acandí, one in the urban area and another one in Las Tecas.[65] In 2023, COCOMASECO lost control of these shelters to a Neighborhood Action Committee (Junta de Acción Comunal, JAC) in Capurganá, a unit of social organization.[66] According to some interviewees, this change, was influenced by the Gulf Clan and the Neighborhood Action Committee is formed by members of COCOMANORTE.[67]

The Neighborhood Action Committee controls two more shelters. One is located in Capurganá, in the area of El Platanal, and is known as Abel Pacheco, according to the Ombudsperson's Office.[68] The Colombian Red Cross operates there.[69] In February 2023, the Inspector General's Office said the shelter had "no investment or support from local or national authorities."[70] The other one is located in the town of Astí, further into the jungle. It is in "precarious" conditions, a person who visited said.[71]

To access the shelters and guiding services, migrants and asylum seekers pay around US$100-300 before leaving Necoclí. Migrants and asylum seekers receive evidence that they have paid—previously, a bracelet; more recently, a sticker on their passport or ID.[72] People controlling shelters do not allow migrants or asylum seekers to start their journey without paying.[73] Armed men have threatened some migrants and asylum seekers who did not pay.[74]

After staying in for a couple of hours or overnight, migrants and asylum seekers start their several-days-long journey through the jungle, sleeping in their tents along the way. Interviewees describe climbing steep hills until reaching a summit, where a flag marks the border with Panama.[75] While UNHCR estimates that, on average, it takes people four days to cross the Darién Gap, some migrants and asylum seekers said it took them up to 12 days.[76]

Once crossing the border into Panama, migrants and asylum seekers descend along the river, passing by Indigenous settlements Tres Bocas and Cañas Blancas before arriving at Comegallina. While crossing this area, criminals attack many migrants and asylum seekers, including by

committing robberies and sexual violence, according to their statements and information provided by Panama's Ombudsperson's Office and humanitarian organizations.[77] (See section II below regarding abuses against people crossing the Darién Gap.)

Arriving at Comegallina, migrants and asylum seekers employ Indigenous people in small wooden canoes, known as "piraguas," to transport them to the Indigenous community of Bajo Chiquito and then to the Migrant Reception Station (Estación de Recepción Migratoria, ERM) of Lajas Blancas.[78]

During the second half of 2021, most migrants heading to the gap were coming through Acandí. The flow diminished for a while after Fredy Pestana, the leader of the community council of COCOMANORTE, was killed in December 2021, apparently at the hands of the Gulf Clan, according to several sources.[79] Since the end of 2022, the flow through Acandí has picked up again.

Some migrants and asylum seekers take a longer route passing through different Panamanian Indigenous settlements like Punta Carreto, Dos Bocas, and El Abuelo, arriving at the Indigenous community of Canaán Membrillo. From there piraguas take them to the ERM of San Vicente.[80] This was mostly unused for several months after the end of 2022, but numbers of arrivals seem to be increasing again.[81]

The following map depicts these routes, as well as others that Human Rights Watch identified as less popular or that have lost their popularity in recent years. These include a route starting in Unguía, in Colombia's Chocó state, and ending in the Guna Indigenous communities of Paya and Payita, in Panama;[82] and the route between Juradó, a Pacific-coast municipality in Colombia, and Jaqué, in Panama.[83]



© 2023 Human Rights Watch

## The Role of Misinformation

Reliable information about the Darién Gap is hard to obtain. In February 2023, Panama, Colombia, and the US announced coordinated efforts to, among other things, "combat misinformation."[84]

According to Human Rights Watch interviews, migrants and asylum seekers often rely on social media and word-of-mouth from friends and family for information.[85] In October 2023, UNHCR said that seven out of ten people surveyed learned about the journey through family and friends. Another 35 percent used TikTok and 29 percent Facebook.[86] Misinformation, especially coming from social media, benefits smugglers, who can spread erroneous information, humanitarian workers said; inaccurate information obtained from these sources can also be difficult to counter.[87]

Humanitarian organizations strive to inform migrants about the risks, abuses, and available services at the other side of the border, and about new migration policies and practices, such as the CBP One app in the US.[88]

But given the lack of safer routes and the human rights situations they flee, many people are unlikely to be dissuaded.[89] "The answer we get from them is 'yes, I know it is difficult, but with God's help I will continue,'" a humanitarian worker said.[90]

Some migrants and asylum seekers interviewed on the Panamanian side said they regretted risking their lives in a journey that was more dangerous than they expected. But others said they would do it again if it was necessary to seek protection and opportunity.[91]

Human Rights Watch interviewees appeared to be more knowledgeable about the risks and abuses of crossing the Darién, such as robberies and sexual violence, than about US immigration policies.[92]

## II. Abuses and Risks in the Darién Gap

During their days-long walk across the gap, migrants of all nationalities frequently experience robbery and serious abuses, including sexual violence.[93] They also face rushing rivers, mosquito-borne diseases, and venomous pit vipers.[94]

Some 97 percent of the 219 people interviewed in Costa Rica by the global network Mixed Migration Center, between July and September 2022, said that the Darién crossing had been the most dangerous part of their journey so far. Migrants and asylum seekers reported trauma, illness and deaths, assaults related to theft and sexual violence, and other physical violence.[95]

Similarly, over 30 percent of the around 1,380 people interviewed by UNHCR in the Darién Gap between July 2022 and June 2023 suffered some type of abuse in the jungle, including theft (20 percent), fraud (14 percent), and threats or other acts of "intimidation" (11.3 percent).[96]

## Thefts, Robberies and Threats

Many migrants are threatened or robbed when they cross the Gap.

The Panamanian Attorney General's Office told Human Rights Watch they had opened 43 investigations into "crimes against property" (such as armed robbery) in the gap in 2021 and 65 from January through July 2022.[97]

Most robberies appear to take place on the Panamanian side of the border. Migrants and asylum seekers told Human Rights Watch of being robbed after they passed a Panamanian flag that allows them to identify the border or a couple of days or hours before arriving in Comegallina.[98] "The majority of the cases occur when migrants are descending the hill on the Panamanian side," one Panamanian prosecutor said.[99]

Several migrants and asylum seekers described being ambushed in the jungle by groups of about 8 to 15 armed men. Some said the perpetrators wore plain clothes. Others described military-style clothes, such as camouflage.[100]

Some victims said the robbers used pistols; others described hunting rifles and machetes. A Panamanian prosecutor confirmed that these are the common weapons.[101]

The dynamics of the robberies are often the same, according to those interviewed by Human Rights Watch. Perpetrators ambush a group at gunpoint and make people kneel or lie on the ground, then demand their money. Generally, they ask for US$100, but they open bags and backpacks, taking the scarce belongings that migrants are carrying or even wearing: food, clothes, and shoes or boots. In some cases, criminals separate the migrants by nationality or gender.[102]

---

**Louis Gerard** (pseudonym), a 38-year-old Haitian and his wife, sister, and 4-year-old son came north from Brazil.[103]It took them five days to cross the Darién jungle from Necoclí to Bajo Chiquito, he said. Some six to eight men ambushed them midway, wielding "short and long guns." The bandits asked if they were Haitians, demanded US$100 per person, and rummaged through their bags, taking all their clothes and food. Most worrisome to Louis was that his son had nothing to eat "for days."

**Samson Noel** (pseudonym), 30, left Cameroon after the Cameroonian government killed his father, he said.[104] Two months later, his group of people, mostly Haitians, took the route from Capurganá to Canaán Membrillo across the Darién Gap. They made it over the steep, slippery, exposed slopes of the "Death Hill," but on their second day of wending through the jungle, they were ambushed. Nine armed men with their faces covered, some wearing military-style clothes, made them lie on the ground, asked for US$100, and emptied the migrants' bags. From Samson, they took US$500, along with his cellphone, toiletries, and shoes. The men hit and threatened to kill those who had little or no money, Samson said.

**Luciana**, 31, and **Juan Herrera** (pseudonyms), 32, left Venezuela, leaving their three children, ages 2, 6, and 11, behind, with the hope of sending them money from the US. [105] "I used to say I would never leave, but the situation was impossible to sustain and I was forced to leave to be able to ensure a future for my children," Juan said. They walked for five days, along with others, between Capurganá and Bajo Chiquito.

A group of six men, wearing hoods and black clothes, assaulted them, demanding US$100 from each person in the group. The men had rifles, guns, and machetes, Juan and Luciana said. "Look straight or we will kill you," one said. The armed men took a young woman aside, letting her go once her brother paid. Frightened, she ran away and almost fell off a cliff, Juan recalled. Those in the group who did not have money were forced to turn back.

---

## Sexual Violence

Hundreds of people, most of them women, have suffered sexual violence while crossing the Darién in recent years, according to humanitarian organizations.

The Panamanian Attorney General's Office told Human Rights Watch that it had opened 99 investigations into "crimes against sexual liberty and integrity" (which includes rape and other types of sexual abuse) against migrants and asylum seekers in the Darién in 2021 and 32 between January and July 2022.[106] However, significant underreporting of such crimes to authorities is likely.

Médecins Sans Frontières (MSF) assisted 328 people who reported sexual violence while crossing the Darién between April and December 2021;[107] 232 in 2022; and 390 between January and October 2023.[108] MSF considers the total number of victims is likely higher.[109]

Victims, humanitarian workers, and Panamanian authorities told Human Rights Watch that in most cases of sexual violence, armed men ambushed groups of migrants and asylum seekers, separated them by gender, and forced the women to take off their clothes. Women said that the men sexually assaulted them, often under the pretext of searching for hidden money, and in some cases raped them.[110]

**Rita Mendes**, a 39-year-old Angolan woman, crossed the Darién as part of a group, with her husband **José**, 49, and their daughter **Ana**, 12.[111] They said they were robbed twice after leaving Colombia. Two days before they reached Armila, on the Panamanian side, a group of eight or nine men ambushed them, Rita said, making them kneel, at gunpoint, and robbing them of the belongings in their bags. "Before asking us for money, they divided us by nationality," José added. The assailants' faces were covered, he said, some wore jeans, while some wore military-style clothes with camouflage. Two days after the migrants passed Armila, another group of armed men ambushed them, holding them around six hours. This time, the assailants separated the women. José said that he was beaten when he tried to stop them. Two men held a machete to Rita's neck, then hit her with a rifle butt, knocking her to the ground, and raped her. Afterwards, the two held the machete against Ana and raped her. The Panamanian SENAFRONT officers to whom Rita and Ana tried to report the rapes the next day "showed no empathy," Rita said. Humanitarian organizations provided them with medical care.

**Beatrice Mathieu** (pseudonym), a 35-year-old Haitian, crossed the Darién with her husband, as part of a group of 16 migrants.[112] Six men with their faces covered ambushed the group, shooting their guns in the air, she said. The men separated the women. One forced Beatrice, at gunpoint, to take off her clothes, she said, and sexually assaulted her. "I thought they were going to rape me," she said. The armed men did the same to another five women from her group, she said.

**Jean Baptiste Devon** (pseudonym), a 42-year-old Haitian man, crossed the Darién Gap with his wife **Marie Claire** (pseudonym), 30, and their 6-month-old daughter.[113] A group of six to eight armed men ambushed them, he said. The men sexually assaulted her while asking where the money was. "They threatened they were going to rape my wife and daughter." Jean Baptiste gave them US$50 he had hidden in his sock, and the armed men let them go.

Armed men ambushed **Fabiola Moise** (pseudonym), a 22-year-old Haitian woman travelling as part of a group, with her husband and 1-year-old son, on their third day in the jungle.[114] The men separated her and other two women from the group. One man shoved her against a tree and sexually assaulted her, she said. A second man joined in the assault, asking her where the money was. She pointed to her boots. They took all the money she had stored there and let her go.

While most survivors of sexual violence in the Darién are women and girls, survivors also include men and boys, according to survivors, humanitarian organizations, and the Colombian and Panamanian Ombudsperson's Offices.[115]

**Ernesto Borja** (pseudonym), a 34-year-old Venezuelan man crossed the Darién as part of a group.[116]He said that a couple of hours before arriving in Comegallina, people armed with machetes ambushed the group. They asked all the migrants for US$100 and hit Ernesto, including with rocks, and kicked him in the knee and head with their heavy boots. They made all the migrants take off their clothes. They sexually assaulted all the men and women in the group, saying they were looking for money. After finding US$200 that Ernesto was hiding, they let the group go.

## Deaths, Disappearances, and Missing People

Many migrants have lost their lives or disappeared trying to cross the Darién Gap.

SENAFRONT told Human Rights Watch that its officers recovered 65 bodies in 2021 and 51 in 2022. Between January and April 2023, SENAFRONT's First Oriental Brigade, which operates in the Gap, reported recovering eight more bodies.[117] The Panamanian Attorney General's Office told Human Rights Watch of 72 investigations arising from bodies found in the Darién between January 2021 and July 2022.[118]

The IOM's Missing Migrants Project reported that at least 229 people had disappeared in the Darién between January 2021 and September 2023.[119] It also said that "anecdotal reports" suggested that figure represented "only a small fraction of the true number of lives lost."[120] Current practices for counting missing migrants only cover a portion of those who are missing, mainly relying on information from state officials.[121]

Panamanian Ombudsperson Eduardo Le Blanc told Human Rights Watch that, because Colombia does not register people leaving, there is no way to know who is missing or establish what proportion of migrants and refugees make it to Panama.[122]

Many migrants and asylum seekers told Human Rights Watch that they saw human bodies, sometimes more than a dozen, along the way.[123] Similarly, in October 2023, UNHCR reported that almost 50 percent of the over 114 migrants and asylum seekers surveyed said they saw between 1 and 15 bodies.[124]

The causes of death include drownings and, in some cases, homicides. In many cases, authorities have not determined the cause of death. Of 124 bodies that SENAFONT has recovered since 2021, they listed 74 as drownings, one as a homicide (of a Venezuelan child), and 28 as "unknown." As of April 2023, authorities had failed to identify the gender of 30 bodies and the nationality of 77.[125]

Human Rights Watch received credible reports that armed men decapitated and dismembered people.[126] Colombia's and Panama's Ombudsperson's Offices, as well as a humanitarian worker, recounted stories of bodies thrown off cliffs or burned.[127]

The Panamanian Attorney General's Office and SENAFRONT told Human Rights Watch they collaborate to find and bring back bodies for identification.[128] The Attorney General's Office performs autopsies and collects evidence, to notify embassies or consulates or to create a genetic profile for a database for future comparisons.[129] But Panamanian prosecutors reported difficulties in identifying bodies and causes of death, due to their decomposition.[130]

Drownings are the most frequently reported causes of death, particularly during rainy seasons. Several migrants told Human Rights Watch they crossed rivers by holding ropes tied to trees on either side of the river. Young men helped carry children and personal belongings. "I tied a little Chinese girl to my body and crossed the river," a young Venezuelan said. "My feet did not touch the riverbed." The girl's frail mother was swept away, he said, and two young men jumped in to save her. "Luckily, they could," he said. "Not all survive."[131]

**Alejandro and Jasmin Velez** (pseudonym), both 36, lost their 6-year-old son Isaac (pseudonym) in the Darién. The couple, originally from Venezuela, had headed north from Quito, Ecuador. They set out across the Darién from Acandí, in October 2022 with Isaac and their other sons, ages 10 and 4 years.[132]They travelled with a group of Venezuelans, including colleagues Alejandro met in Quito. As they struggled through the dense jungle, a man in their group, whom they did not known before their journey north, offered to help with Isaac, they told Human Rights Watch, to allow them all to move faster. Reluctantly, they accepted his help. The man carrying Isaac and some other members of the group moved fast, eventually leaving them behind. The river was in flood, and they made camp on its banks, hoping the flow would abate by the next day.

Early the next morning, Alejandro, Jasmin and their two children managed to cross the river. They walked fast, hoping to catch up with the man and Isaac. When they arrived at the first, improvised camp in Panama, their friends said that Isaac had been taken by the river, probably drowned.

Alejandro and Jasmin tried to file a complaint in Bajo Chiquito, but there was no prosecutor there. Two days after the alleged drowning, they were able to file a complaint in Santa Fe, a town 30 minutes away by car from the ERM San Vicente. The prosecutor's office found and spoke to the man who carried Isaac and his friends, who confirmed that Isaac drowned in the river. That group left Panama shortly after.

It took the authorities eight days, after receiving the complaint, to send search parties to the river. Interpol, the international police organization, published a yellow notice—a global alert for a missing person—on November 30, about a month-and-a-half after Isaac's disappearance.

As of October 26, 2023, he had not been found.

Sometimes families or groups get separated in the Darién and never learn what happened to the others. Likewise, family members in countries of origin or destination lose contact with a migrant and never learn what happened.[133]

**Eduardo González** (pseudonym), a 35-year-old Venezuelan, lost track of his wife Rosario (pseudonym) in the Darién.[134] He had asked a man in the group to hold their 3-year-old son Lucas (pseudonym) so that he could help his wife, who was falling behind on the steep trail. But she implored him to leave her and catch up with the man who was holding Lucas. He did so. When Human Rights Watch spoke to him, at the San Vicente ERM, Eduardo and Lucas had been there two days, waiting for her. "She disappeared," Eduardo said.

The UN Committee on Enforced Disappearances reported, in November 2021, receiving allegations of "disappearances of migrants apparently committed by criminal groups" and "mass graves of unidentified migrants"in the Darién jungle.[135] The committee noted a "lack of investigations into such allegations." Panamanian authorities have dismissed reports of mass graves.[136]

## Dangerous Natural Conditions and Diseases

The dangers of the Darién jungle are notorious, ranging from flash floods and mosquito-borne dengue fever and malaria to falls from cliffs. The steep, slippery climb to the border saps the strength of many migrants and asylum seekers. On the Panamanian side, river crossings, always treacherous, may be deadly during rainy season. Migrants sleep in makeshift camps, exposed to storms, and their food supplies often run low.[137]

Some of the bodies recovered in the Darién Gap have shown evidence of cardiopulmonary arrest or other health problems, SENAFRONT told Human Rights Watch.[138] SENAFRONT officers rescued 143 people, between January 2021 and April 2023, suffering health emergencies including seizures, dehydration, fever, vomiting, fractured bones, and risk of miscarriage.[139]

The Panamanian Ombudsperson's Office notes gastrointestinal and respiratory diseases and skin conditions from mosquito and other insect bites as risks to migrants' and asylum seekers' health.[140] Of the over 35,900 migrants and asylum seekers who received health care from MSF between January and July 2023, around 26 percent had issues in their muscles and bones, followed by skin conditions (21 percent), diarrhea (19 percent) and respiratory conditions (15 percent).[141]

## III. How a Lack of Legal Pathways Pushes People to Cross the Darién Gap

Between 2005 and 2020, the number of migrants in Latin America and the Caribbean more than doubled, from around 7 million to 15 million, according to the IOM, making this the region with the highest growth globally of international migrants during that time.[142]

In June 2022, 21 countries, including the United States, Mexico, Costa Rica, Panama, and Honduras, signed the Los Angeles Declaration on Migration and Protection at the Summit of the Americas in Los Angeles.[143] The declaration, spearheaded by US President Joe Biden, includes commitments to strengthen and expand ways for people to safely and legally migrate and seek asylum and to pursue accountability for those who commit abuses against migrants.

However, a growing number of Latin American governments have imposed restrictions, often promoted by the US, on people trying to enter their countries, at times violating their human right to seek asylum.[144] Recently imposed visa requirements, for example, are preventing migrants and asylum seekers from several Latin American countries from flying to Mexico and Central American countries.[145]

Instead of effectively reducing the flow of migrants and asylum seekers, these policies force people on the move to take irregular and dangerous routes.[146] As shown below, data suggests that the visa requirements implemented by Mexico and Central America governments are one factor contributing to the increase of migrants crossing the Darién Gap. Venezuelans and Ecuadorians have migrated to the southern US border in large numbers in recent years but have used routes other than the Darién Gap. Following the implementation of visa requirements for Venezuelans and Ecuadorians, the numbers of people of both nationalities crossing the Darién Gap have skyrocketed, suggesting a relationship between the policy and increased crossings.

## Venezuelans

Since 2014, a devastating humanitarian crisis and repression and persecution in Venezuela have been causing its people to leave, with some unable or unwilling to return.[147] The Venezuelan exodus represents one of the largest displacement crises in the world, with some 7.7 million living abroad.[148]

At first, people fleeing the country headed mostly to South American countries, such as Colombia, Ecuador, Perú, Chile, and Brazil.[149] But the Covid-19 pandemic and related lockdowns increased poverty and inequality and undermined employment opportunities across South America, prompting many Venezuelans to travel north.[150] These problems were compounded by increased xenophobia in the region, with Venezuelan migrants being scapegoated for problems like insecurity, job losses, and inadequate responses to the pandemic.[151]

Visa restrictions in Mexico and Central America have prevented Venezuelans from bypassing the Darién Gap by flying north. In early 2022, Mexico, Costa Rica, and Belize imposed visa requirements on Venezuelans.[152] Additionally, Panama and Honduras have required visas for Venezuelans since 2017; and Guatemala since 2018.[153] In fact, visa requirements for Venezuelans are common in the Americas; most recently, in May 2023, Suriname began requiring visas for Venezuelans, the 24th country to do so in the Americas.[154]

Despite these restrictions, Venezuelans continue to travel, many to the north. As the graph below shows, the establishment of visa requirements by Mexico, in January 2022, initially coincided with a decrease in encounters of Venezuelans at the US southern border but was soon followed by a drastic increase in the number of people crossing the Darién Gap. Since then, the number of Venezuelans apprehended in Mexico and at the US southern border has mirrored the number crossing the Darién Gap. [155] (The number of people crossing the Darién Gap decreased significantly in October 2022 when the US government announced a humanitarian parole program for Venezuelans, described below, but subsequently increased as many Venezuelans discovered they were not eligible.)



**Venezuelan Migration Trends**

Source: Panama's National Migration Service, "Statistics. Irregular Transit in the Darién" ("Estadísticas. Tránsito irregular por Darién"), n.d., https://www.migracion.gob.pa/inicio/estadisticas (accessed October 27, 2023); U.S. Customs and Border Protection, "Nationwide Encounters," n.d., https://www.cbp.gov/newsroom/stats/nationwide-encounters (accessed October 27, 2023); Mexico's Government, "Statistical Bulletins" ("Boletines Estadísticos"), n.d., http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/Boletines_Estadisticos (accessed October 27, 2023).

Many Venezuelans told Human Rights Watch that visa requirements had limited their ability to take safer routes.

**Sofía Correa** (pseudonym) crossed the Darién Gap in 2022 with her teenage son.[156] She decided to leave Venezuela after struggling to "get food on the table," she said. As a single mom, she worked multiple jobs to ensure her son had everything he needed to keep studying, but the country situation made it "really hard." In late 2021, she decided it was time to leave Venezuela, but visa restrictions for Venezuelans went into effect soon after in Mexico and Central American countries. "I would have taken a plane, but who is going to give me a visa? This hell was my only option," she told Human Rights Watch while trying to dry her wet documents on the ground of an Indigenous community in Panama. As she crossed the Darién Gap, she fell into a river. "I thought I was going to die in there," she said.

When 32-year-old **Veronica Pérez** (pseudonym) realized she was pregnant in late in 2021, she cried, she said, knowing she would not be able to afford sufficient food, much less doctors and medicines in Venezuela.[157]She needed to take some vitamins and nutritional supplements, but they were too expensive. Her partner, **Marco,** told Human Rights Watch "it would be impossible for us to obtain the documentation to travel to Mexico," referring to the passport and visa. They spent days without food, as they crossed the jungle. A group of men assaulted them, taking the few belongings they had. By the time they arrived in Panama, Veronica was bleeding, and she feared she had suffered a miscarriage. She sought medical treatment from humanitarian workers.

The visa requirements are impossible to meet for many Venezuelans. In Venezuela, a passport costs roughly US$200,[158] and some officials or illegal services reportedly charge more.[159] This fee is unaffordable for most Venezuelans, in a country where most people earn a minimum wage of VED$130, around US$4-5 a month.[160]

Passports are hard to obtain even for those who can afford them. Authorities often lack basic materials to issue the documents, such as paper and ink, and sometimes their website does not work.[161] Long suspensions in the issuance of national IDs and difficulties in obtaining birth certificates also hinder access to travel documents and visas.[162]

For Venezuelans who have already left the country, consular services abroad are scarce and unaffordable, making it hard to obtain or renew passports and other official documents, including marriage and birth certificates.[163]

This problem was aggravated in 2019 when many countries in the region recognized Juan Guaidó, the then-president of the National Assembly, as the "legitimate president" of Venezuela, cutting diplomatic and consular ties with the Nicolás Maduro administration. Subsequent consular confusion aggravated legal problems for people on the move.[164] Although Guaidó formally extended the validity of expired passports,access to other documents, such as national IDs, remained a challenge.[165]

Of the 773 Venezuelans surveyed by UNHCR between July 2022 and June 2023 in the Darién Gap, roughly 8 percent travelled with a valid passport. Some 14 percent had an expired passport while more than half (54 percent) had an ID card but no other document, such as passport or residence permit. Around 6 percent had no documents at all.[166]

## Venezuelans Possessing Documents When Crossing the Darien Gap

Percentages surveyed by UNHCR (n = 773) grouped by country of residence prior to crossing



Source: Information obtained by Human Rights Watch via UNHCR's Microdata Library, August 28, 2023 (on file with Human Rights Watch).

## Haitians

Haiti faces a long-standing political, security and humanitarian crisis that has left all government branches inoperative, allowing overwhelming impunity for human rights abuses, pushing Haitians to flee the country.[167]

After a devastating earthquake in 2010 and with the opening of job opportunities in the lead-up to the 2014 World Cup and the 2016 Olympic Games in Brazil,[168] Haitians began moving south, particularly to Brazil and Chile, which they saw as an alternative to the US and Canada, which had dauting migration restrictions.[169]

Haitians face more visa requirements in Latin American countries than people of any other nationality in the Americas.[170] At least 24 governments in the region, including countries in Central and South America, have visa requirements for Haitians, according to the Inter-American Development Bank.[171]

**Louis Gerard** (pseudonym), lived in Porto Alegre, Brazil, for six years prior to crossing the Darién Gap with his wife, sister, and 4-year-old son.[172]In 2016, Louis left Haiti, leaving his parents and brothers behind. He chose Brazil because "even if it was far, they received migrants well," he said. In Brazil, Louis worked several jobs to send money back home and to raise his son, a Brazilian national. Things got hard after the Covid-19 pandemic, Louis said, and his boss did not pay him for his work for several months. "There is labor abuse against us. They pay us less," he said. They left in February 2023 because "Brazil left us with no options." "We could stay in Mexico, but we cannot get there on a plane because of the visa," he said. Bandits robbed them as they crossed the Gap, leaving them without money or food.

**Antoine Petit** (pseudonym), 28, left Haiti in 2017 to go to Chile.[173]"I got there by plane, with my passport because [Chile] did not request a visa then," he said. Antoine had a work permit for one year, but then it became hard to renew it, and the pandemic also hit him hard financially. He also had a hard time speaking Spanish, so he was frequently discriminated against, he said. With the few savings he had, Antoine started his journey north. This time, he travelled by land because he lacked a visa. Some individuals stole his passport and other belongings at the border between Ecuador and Colombia. "I am aware of the dangers of the crossing," he said, "but I do not have any other option."

Visas and passports are often hard for Haitians to obtain. In recent months, media outlets have described people clutching documents and fighting their way through crowded government office buildings in Port-au-Prince to apply for passports.[174] Requests for passports went from 1,500 to 5,000 a day after the US opened a humanitarian parole program for Haitians in January 2023.[175] "Corrupt officials are selling them to women in exchange for sex," Nicole Philipps, of the Haitian Bridge Alliance, an NGO, told Human Rights Watch.[176]

## Ecuadorians

In a context of fragile democratic institutions, Ecuador has seen a sharp increase in crime and violence by organized crime, which took homicide and extortion rates to unprecedented levels. The insecurity, combined with a depressed economy and longstanding, unaddressed structural problems impacting people's enjoyment of economic and social rights, haspushed a growing number of migrants and asylum seekers to leave Ecuador and head north.[177]

Since late 2021, several countries in the region, including Mexico and Guatemala, have imposed new visa requirements for Ecuadorians.[178] Ecuadorians must obtain visas to travel to at least 14 countries in the Americas.[179]

**Javier Prieto** (pseudonym), a 48-year-old carpenter, crossed the Darién in March 2023 with his daughter, 25, and his 7-year-old grandson.[180] In November 2022, criminals had murdered Javier's brother to steal his phone. The police arrested them, but Javier said one of his friends received a call threatening to kill Javier and the friend once they were released from jail. "Obtaining a visa to the United States is difficult for Ecuadorians; they don't grant it to us," Javier said. So, they took a bus and left for Colombia. "It's heartbreaking to leave the family and witness so much death in the jungle. There were many bodies," Javier said. He carried his grandson on his shoulders to cross a river in the gap.

Since 2023, Mexico has increased its "economic solvency" requirement for Ecuadorians, requiring that they show that they've had a stable job for over a year, or a pension, with monthly income during the last three months of the equivalent of at least US$1,050.[181]

From a young age, **Irina Ortega** (pseudonym), 27, had to help her mother take care of her six brothers and sisters in Ambato, a city south of Quito.[182]Irina had an informal job in a restaurant for a while. She looked in vain for more secure work to keep helping her family, but eventually, heading north out of Ecuador seemed the only option. "The Darién was my only option because obtaining a visa to travel would have required money that someone without a job [like me] cannot prove," Irina said. She traveled to Quito in late February, boarding a bus with another 23 people. The journey was not only grueling but more expensive than she had expected, because the people who earn a living moving migrants charge "for everything," she said.

As the graph below shows, the imposition of visa requirements in Mexico, in September 2021, coincided with an initial decrease in the number of Ecuadorians encountered at the US southern border. However, this decrease was followed by an increase in the number of Ecuadorians crossing the Darién Gap, then an increase in the number of Ecuadorians apprehended in Mexico and encountered at the US-Mexico border. The flow through the Darién Gap increased after the visa requirements were imposed.

## Ecuadorian Migration Trends



Source: Panama's National Migration Service, "Statistics. Irregular Transit in the Darién" ("Estadísticas. Tránsito irregular por Darién"), n.d., https://www.migracion.gob.pa/inicio/estadisticas (accessed October 27, 2023); U.s Customs and Border Protection, "Nationwide Encounters," n.d., https://www.cbp.gov/newsroom/stats/nationwide-encounters (accessed October 27, 2023); Mexico's Government, "Statistical Bulletins" ("Boletines Estadísticos"), n.d., http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/Boletines_Estadisticos (accessed October 27, 2023).

©

The visa requirements are hard to meet for many Ecuadorians. Since early 2022, the country's Civil Registry has struggled to produce the large number of passports being requested by people trying to leave the country. In February 2023, the Director of the Civil Registry said that while Ecuador had issued 485,000 passports in 2019 and 586,000 in 2022, he estimated that that the office would issue over one million in 2023.[183] In early 2022, the Civil Registry declared an "institutional emergency" due to a shortage of the physical materials required to issue documents, including passports.[184] According to media reports, people could wait up to three months to obtain an appointment for a passport.[185]

Of 135 Ecuadorians surveyed by UNHCR in the Darién between July 2022 and June 2023, roughly 26 percent had a valid passport. Over 74 percent had an ID card and 3 percent had no official documents.[186]



**Ecuadorians Possessing Documents When Crossing the Darien Gap**

Percentages of those surveyed by UNHCR (n = 135)

Source: Information obtained by Human Rights Watch via UNHCR's Microdata Library, August 28, 2023 (on file with Human Rights Watch).

## US Influence and Restrictive Migration Policies

US immigration policies affect the migration flow through the Darién Gap and the rights of people who cross it in different ways.

The United States has sought agreements with many Latin American governments, including Mexico and Guatemala, aimed at deterring migration, which, combined with an increase in migration from South America to the United States, appear to have contributed to an increase in the number of people crossing the Darién Gap.[187] In a May 2022 US Senate hearing, an official from the US Department of State said that, when the US sees an increase in people of a certain nationality arriving at the southern border, it communicates that information to governments in the region to "look for areas of partnership." Countries may then decide "through their own sovereign decision-making process … to impose visas on those nationalities to make sure that those who are arriving by air are not intending … [to immigrate] to the United States," the official said. The Biden administration then continues "working in partnerships" with other countries "to ensure that route is not diverted" through another country, she said.[188]

The Biden administration has created some new legal pathways for people to seek protection in the United States, which would not require those eligible to cross the Darién. However, these pathways have serious shortcomings that make them inaccessible for large numbers of people.

Since late 2022 and early 2023, Venezuelans, Haitians, Cubans, and Nicaraguans who have a valid passport and a financial sponsor in the United States may apply for a program called humanitarian parole.[189] Those granted parole are given permission to travel to the US by plane and to remain there for a limited amount of time—potentially up to two years. Once in the US, they may apply for permission to work. They may also apply for asylum, which, if granted, could allow them to remain in the country.[190]

Obtaining a passport is difficult for people from Cuba, Nicaragua, Venezuela, and Haiti and may be dangerous or nearly impossible for those who fear being persecuted by their governments.[191]

In June of 2023, the Biden administration also announced that it would create a "Safe Mobility" program to allow people of certain nationalities in Colombia, Costa Rica, and Guatemala to apply for refugee resettlement in the US and to provide migrants and asylum seekers with information about other legal pathways like family reunification, humanitarian parole, and temporary work visas.[192] In October, the Biden administration announced it would establish a "Safe Mobility" office in Ecuador. [193]

Access to the program in Colombia has been extremely limited. The online application portal opened for less than a day in June and again briefly in August. Each time it was shut down after receiving thousands of applications in just a few hours, according to news reports.[194] Only Cubans, Haitians, and Venezuelans who entered Colombia before June 11, 2023, and who have already applied for legal status in Colombia are eligible to use the platform. In September, IOM and UNHCR said the platform would re-open once the 11,000 applications that had been received were processed.[195]

While the Safe Mobility offices in Colombia and Ecuador will be open to Haitian applicants, and while 34 Haitian refugees were admitted to the US in fiscal year 2023, the US Refugee Admissions Program has essentially been closed to Haitians for the previous twelve years (FY 11-FY 22), during which a total of four Haitian refugees were admitted to the United States.[196]

Around 40,000 applications had been received in total between June and September in the three countries where the program operates, and around 3,600 people were "on a path to be allowed into the United States," according to news reports.[197] The Biden administration set a global refugee resettlement cap of 125,000 people for fiscal year 2023, which ended September 30, 2023. That cap reserved 15,000 spots for refugees from Latin America and the Caribbean, but only 6,312 were admitted, of whom roughly 3,600 came from Central American countries north of the Darién Gap.[198]

These policies take place against a backdrop of US border policies restricting the right to seek asylum in the US. In 2016, the administration of then-US President Barack Obama began limiting the number of asylum seekers allowed per day at certain border crossings, a policy known as "metering." The administration of subsequent US President Donald Trump expanded this policy and in 2019 began sending asylum seekers back to Mexico to wait while their claims were processed.[199] In 2020, the United States began misusing a public health rule, known as Title 42, to almost entirely shut down access to asylum by rapidly expelling nearly all asylum seekers without hearing their claims.[200]Mexico agreed to receive many non-Mexican asylum seekers the US rapidly removed.

Human Rights Watch consistently found that migrants sent to Mexico under these policies were exposed to serious abuses and harms including rape, kidnapping, extortion, assault, and psychological trauma.[201]

In May 2023, the Biden administration implemented a new rule critics call the "Biden asylum ban."[202] The ban severely limits access to asylum by forcing asylum seekers to wait for months in Mexico to obtain one of a limited number of appointments at a US border crossing through a CBP One, a mobile application developed by the US government.[203] The mobile application is inaccessible to many asylum seekers due to financial, language, technological, and other barriers that disproportionately affect Black and Indigenous asylum seekers, including due to racial bias in CBP One's facial recognition technology.[204] If non-Mexicans seek asylum at or between a port of entry without having secured an appointment through CBP One, they face a number of harsh penalties, including expedited deportation to Mexico or their country of origin with a 5-year bar on return to the United States.[205]

In July 2023, a federal judge concluded that the asylum ban had been improperly imposed and should not be enforced, although he stayed his order pending appeal. This means the ban is likely to remain in effect while an appellate court considers the case.[206]

The principle of nonrefoulement under international human rights law forbids governments from sending people to a country where they would be threatened by torture, persecution, or other serious harms. However, the Biden administration continues to send some asylum seekers back to countries in violation of this principle, including Haitians and, since October 2023, Venezuelans who are not eligible for temporary protection status.[207]

# Recommendations

The increasing scale and complexity of migration in the Americas requires a collective and concerted response. A carefully designed, rights-respecting regional approach would offer a fair and efficient way to determine which states are responsible for examining asylum claims and protecting refugees. As a practical matter, such a mechanism could and should distribute costs equitably and offer participating states other incentives for sharing responsibility. Legal representation, accommodation, and work authorization while asylum claims are pending should be included as critical common elements of this mechanism. Additionally, the essential elements of this collective approach should be reflected in a new regional agreement that builds on the Cartagena Declaration.

At the same time, states need not and should not wait for the development of a regional approach. They should act now in line with 2022 Los Angeles Declaration on Migration and Protection to reverse existing laws, policies, and practices that effectively prevent access to asylum and force people into dangerous crossings. In line with recommendations by UNHCR and the Inter-American Commission on Human Rights, each state in the region should ensure that its legislation, policies,

and practices safeguard access to asylum, including by guaranteeing legal representation, accommodation and other assistance, and access to work for those who seek asylum, and include robust protections against refoulement.

Human Rights Watch calls on states and international actors to undertake the following specific steps to address the abuses identified in this report.

## To all governments in the Americas

- Seize the upcoming 40th anniversary of the Cartagena Declaration to discuss the increasing immigration challenges in the region, as reflected in the Darién Gap, and establish specific commitments to ensure the rights of migrants, asylum seekers, and refugees in the hemisphere, including:
  - Implementing a region-wide temporary protection regime that would grant all Venezuelans and Haitians temporary legal status for a reasonable, and renewable term, even if they may not qualify for refugee status under domestic law.
  - Applying the Cartagena Declaration's expanded refugee definition for individual asylum seekers to enable the granting of asylum to people who have fled generalized violence, internal conflicts, foreign aggression, massive violation of human rights, or other circumstances which have seriously disturbed public order.
  - Creating an equitable and rights-focused regional mechanism to determine states responsible for examining asylum claims and protecting refugees. The mechanism should include incentives to encourage asylum seekers and refugees to stay, such as legal representation, accommodation, and swift access to the right to work while asylum claims are pending. Criteria for determining the country responsible for examining asylum claims should consider individual factors, like social or family ties and individual choices, to the extent possible. Additionally, it should distribute costs equitably and offer member states incentives for sharing responsibility.
  - Establishing a regional agreement, building on the Cartagena Declaration, that unifies processes and standards for seeking and obtaining legal status, right to work, and refugee status, among others.
  - Improving domestic asylum systems by, when relevant, removing impediments to presenting asylum claims, increasing the number and competency of national staff analyzing asylum claims, ensuring that procedures are both fair and efficient, providing physical protection, accommodation, work authorization, and other social support to applicants while their asylum claims are pending, and ensuring the implementation of the Cartagena Declaration when recognized under domestic law.
  - Increasing efforts to integrate migrants and refugees, particularly in the workforce, including by easing requirements to recognize their education certificates and diplomas obtained abroad and developing voluntary local and regional relocation plans that match migrants and refugees with job opportunities in the private and public sector.
  - Increasing efforts to fight xenophobia and discrimination, including through programs directed at changing the national and regional perception about migrants, asylum seekers, and refugees.

- Reversing measures that effectively prevent access to asylum and push people into dangerous crossings, in line with the 2022 Los Angeles Declaration on Migration and Protection, including through a progressive liberalization of visa requirements imposed by Mexico and Central American governments to Venezuelans, Haitians, Cubans, and Ecuadorians and by creating easily accessible visa facilitation regimes or other measures for people legally staying in the country, taking into account the need for these mechanisms to be economically accessible and ensuring access to people who may not have all required documentation for reasons beyond their control.
- Work within the Organization of American States, including its Inter-American Commission on Human Rights, and domestic human rights experts and organizations to ensure a prompt and rights-respecting response to emerging human rights crises in the region that could trigger new migration waves.

# To the US Government

## Ensure Safe and Legal Pathways and Respect the Right to Asylum

- Expand legal, orderly, and safe pathways for people to migrate to the United States, including by:
  - Incorporating into the Immigration and Nationality Act the expanded definition of refugees contained in the Cartagena Declaration or a comparable standard of complementary protection that includes individuals fleeing violence or other exceptional situations that expose them to a real risk of serious harm.
  - Eliminating requirements that make humanitarian parole inaccessible to many mostly low-income Venezuelans, Cubans, and Haitians, including the need to have a financial sponsor in the United States and a valid passport.
  - Considering expanding the humanitarian parole program to people from other nationalities, including Ecuadorians.
  - Working with Colombia, Guatemala, Costa Rica, and other countries to significantly expand the capacity of the Safe Mobility Offices, increasing the number of appointments and reducing waiting times.
  - Meeting the 125,000 refugee admissions target for fiscal year 2024, including 25,000 to 50,000 refugees from Latin America and the Caribbean.
  - Extending and re-designating Temporary Protected Status (TPS) for Venezuelans and Haitians, as needed.
  - Considering other safe and legal avenues, such as family reunification visas; expanded temporary work visas; and temporary visas for witnesses of serious crimes as enumerated in the eligibility criteria for U visas.
- Rescind the asylum ban, restore access to asylum, and reform the immigration system so that it regulates migration effectively while protecting fundamental rights.
- Suspend deportations or expulsions to Haiti because of the general risk of serious or irreparable harm to returnees.

- Do not press Mexico, Central American, and other governments to establish additional visa requirements that undermine the right to seek asylum and force people to use dangerous crossings, such as the Darién Gap.

## Help Address Root Causes of Migration

- Provide financial support to meaningful efforts by South American governments to expand access to asylum, carry out processes to regularize migration status, implement integration strategies, especially to ensure enjoyment of economic rights, and support campaigns and public policies directed at reducing xenophobia and discrimination.
- Ensure that financial or technical assistance provided to other countries for the purpose of strengthening border control and combating people-smuggling respects for the rights of migrants, asylum seekers, and refugees and local communities and does not establish abusive restrictions on movement.

## To the UN Office of the High Commissioner for Refugees and the International Organization for Migration

- Establish an inter-agency coordination mechanism in Panama to respond to the challenges of increased migration flows, following the example of the GIFMM in Colombia and ensuring that the mechanism has the capacity to identify gaps in assistance and where available donor funds should be directed.
- Building on the experience of the Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V), ensure monitoring, documentation, and analysis of migration of people of other nationalities, including Haitians, Cubans, and Ecuadorians.
- Analyze country-of-origin conditions and provide guidance to states on Ecuadorians' asylum claims.
- Increase information available to migrants and asylum seekers in the Darién Gap about regional immigration policies and asylum systems, including in the US, as well as information about the journey north before and after migrants and asylum seekers cross the Darién Gap.
- Continue to support the Quito Process and other regional initiatives aimed at ensuring safe and complementary pathways, regularization, and integration programs.
- Increase technical and economic support to migration authorities and asylum systems throughout the region.

## To all international donors

- Fund credible efforts to improve the humanitarian response in the Darién Gap, including to ensure dignified migration centers and other shelters, increase humanitarian aid, improving the conditions in Bajo Chiquito and Canaán Membrillo, and help prevent and investigate abuses, particularly sexual violence, against migrants.

- Increase funding for the 2023-24 Regional Refugee and Migrant Response Plan (RMRP) and ensure similar efforts for Haitian and other migrants and refugees in South America.
- Support credible efforts to increase government presence and the enjoyment of economic and social rights in Colombia's Urabá and Panama's Darién regions.

## To Members of the United Nations Human Rights Council

Support establishment of a mechanism to monitor rights abuses at borders, as called for by civil society and the Special Rapporteur on the human rights of migrants at the 53rd session of the Human Rights Council.[208]

## To the UN High Commissioner for Human Rights

Closely monitor and publicly report on the human rights situation in the Darién Gap, publicly express concern about restrictive immigration policies and protection gaps that put the rights of migrants and refugees at risk and call on states to end those policies and practices.

## To the UN Special Rapporteur on the human rights of migrants

Conduct visits to the Darién Gap, as in principle permitted under Panama's and Colombia's standing invitation to Special Procedures, to document the impact of restrictive immigration policies and protection gaps on migrants' and refugees' rights, and report to the Human Rights Council on the situation.

## To the Inter-American Commission on Human Rights

Closely monitor and publicly report on the human rights situation in the Darién Gap, publicly express concern about restrictive immigration policies and protection gaps that put migrants' and refugees' rights at risk and call on states to end those policies and practices.

## Acknowledgments

This report was written by Martina Rapido Ragozzino, Americas senior research assistant; and Juan Pappier, Americas deputy director.

The report is based on research conducted by a team of Human Rights Watch research staff members: Stephania López, Americas research assistant; Nathalye Cotrino, Crisis and Conflict researcher; Maya Shack, consultant; Martina Rapido Ragozzino; and Juan Pappier.

It was reviewed and edited by Juanita Goebertus, Americas director; Margaret Knox, senior editor/researcher; Bill Frelick, director, Refugees and Migrants Rights Division; Alison Leal Parker, managing director, US Program; Vicki Gaubeca, associate director, US Program; Nicole Widdersheim, deputy director, Washington advocacy; Lucy McKernan, deputy director, Geneva advocacy; Brian Root, senior quantitative analyst; Cristian González, researcher, LGBT Rights Program; Cristina Quiroz, researcher, Women's Rights Division; and Tyler Mattiace, Mexico researcher. Maria McFarland Sánchez-Moreno and Michael Bochenek provided program and legal review, respectively.

Americas Division associate Johan Romero contributed to the report production. The report was prepared for publication by Travis Carr, publications officer; Fitzroy Hepkins, administrative manager; and José Martínez, senior administration coordinator.

Human Rights Watch would like to thank human rights, migrants' rights, humanitarian, and UN organizations that provided important information for this research. We are also grateful to Patricia Fagen and Caitlyn Yates for reviewing an earlier version of this report.

Above all, we are deeply grateful to the migrants and refugees who, despite their perilous and uncertain journey, have generously shared their stories with us.

# EXHIBIT 18

## The Darién Gap: "A nightmare with 1,001 demons"

doctorswithoutborders.org/latest/darien-gap-nightmare-1001-demons



Panama 2021 © MSF/Sara de la Rubia

> I saw at least 10 dead bodies in the jungle… You see people sitting down, injured, who might have been there for days, waiting for death.
>
> Angel, 19, from Venezuela

In May, Doctors Without Borders/Médecins Sans Frontières (MSF) opened programs in Bajo Chiquito —the first village that migrants reach in Panama—and at the migrant reception stations in Lajas Blancas and San Vicente to respond to the crisis. Since then, our teams have provided medical and mental health care to more than 14,000 people who have crossed The Darién Gap. In July alone, our small team of 15—including medical, mental health, and logistical personnel—provided 6,000 consultations. Most people require treatment for trauma wounds, skin conditions, and foot injuries caused by the treacherous journey across wet, muddy, and steep terrain.

## "I thought we were going to die"

"We thought it would take four days to cross the Darién, but it took 11," says Nadine, a 40-year-old woman from the Dominican Republic who was living and working as an undocumented migrant in Chile with her six-year-old daughter, Ania, and her partner. They were barely a day and a half's trek from escaping the Darién Gap when Nadine and Ania ran out of strength and could not take another step. Their feet were badly swollen. Nadine's partner decided to seek help. Nadine and Ania were alone for three days. "I thought we were going to die. Many people die there." Fortunately, with the help from the Bajo Chiquito community, her partner rescued them in canoes.

Panama 2021 © MSF/Sara de la Rubia

> I saw a child get dragged down the river when he let go of his parents' hands. I've seen dead bodies... I've smelt corpses decomposing in the ravine.
>
> Oscar, 40, from Colombia

Many of the people who survive the journey across the Darién Gap are haunted by the thought of those who were left behind—those with injured feet or broken bones, too exhausted and too weak to continue, who wait for rescue or aid that may never arrive.

"I saw at least 10 dead bodies in the jungle," recalls 19-year-old Angel. "But the worst is the people who get left behind—people who cannot climb the mountains or who slip in the rain and mud. It is a route where nobody waits. You see people sitting down, injured, who might have been there for days, waiting for death." Angel left Venezuela four years ago and has been working in Cali, Colombia. Like many migrants who have arrived in Panama since the start of the pandemic, Angel could no longer work and decided to head towards the US.



Watch Video At: https://youtu.be/KMqn2cI9DFI

## "We were assaulted twice"

MSF psychologists help migrants cope with the traumatic incidents they witness or experience in the Darién Gap. Since May, we have provided 411 individual and 154 group mental health consultations. Patients often tell our staff about finding the corpses of people who have suffered fatal falls or drowned in swollen rivers.

"This is a nightmare with 1,001 demons," says 40-year-old Oscar, who is from Colombia but was living in Bolivia. "I saw a child get dragged down the river when he let go of his parents' hands. I have seen dead bodies, drowned, four of them. I have smelled corpses decomposing in the ravine." Oscar was lost for 14 days in the Darién Gap but managed to escape after following the tracks of previous groups.

MSF patients also report being targeted by criminal gangs who assault and rob them, stealing their belongings and even their food. "Some were dressed in black, with shotguns, others wore balaclavas and had rifles and knives," says Oscar. "They raped three of the seven women in our group. We were assaulted twice by different gangs."

Panama 2021 © MSF/Sara de la Rubia

MSF also provides care to survivors of sexual violence—88 women have reported being sexually assaulted or raped during robberies. "You see dead bodies, you go hungry and you get raped," says 21-year-old Solange from Cuba. Solange narrowly escaped assault by running away when she realized her group was about to be attacked. "Those in the group, they heard the screams of those who were raped."

## "Don't do it, it's terrible"

The future is uncertain for everyone in Bajo Chiquito, where access to clean water, showers, and decent toilets is limited or, for some, nonexistent. Eventually everyone will be transferred to the reception stations in San Vicente and Lajas Blancas, but from there they will have to make their own way forward. Some migrants can afford to buy a bus ticket north, but many cannot. And certain nationalities—including Colombians, Ecuadorians, and Bolivians—are held for processing and then deported.

Those who have pending administrative or judicial processes—for example, if they are seeking refugee status in Panama or are witnesses in a case against traffickers—are held at migrant reception stations for weeks or months. Detained people describe inadequate food and shelter, a lack of clean water and showers, and no way to communicate with their families.

But despite the risks, people continue to attempt the journey. By the end of July, around 8,000 migrants were waiting in Necoclí, Colombia, to start their trek through the Darién Gap. "They warn you from the US: 'Don't do it, it's terrible," says Juan, whose group was assaulted by a group of men with rifles and machetes. They took their money, mobile phones, and food, and raped the women in the group. "But you have to. And you think, 'If he did it, why can't I do it?' But honestly, don't do it, it's terrible."

*A lack of safe and legal routes for migrants forces them to take dangerous ones where they are exposed to violence and trauma. MSF repeats its demand that the governments of Colombia and Panama establish safe alternative routes between the two countries and deploy the necessary protection mechanisms in their territories to prevent more needless death and suffering.*

# EXHIBIT 19

**MSF** **MEXICO CITY** / **NEW YORK** / **RIO DE JANEIRO** / **BARCELONA**          MAY 2017



© ANNA SURINYACH

# FORCED TO FLEE CENTRAL AMERICA'S NORTHERN TRIANGLE:

## A NEGLECTED HUMANITARIAN CRISIS



**When you have no strength left, when you no longer have anyone around to help you keep going, when you have lost all hope, when fear and distrust are your only travel companions, when you can't take another hit, when you have lost your identity, when you feel that your dignity has been missing since the last time you were assaulted, or the last time they forced you to undress —it is during these moments when you need to take a seat, regain your strength, and build the confidence to talk to people and let them help you.**

**Carmen Rodríguez**
MSF Mental Health Referent in Mexico



Cover: Migrants and refugees cross
the Suchiate River to enter
Mexico from Guatemala in 2014.
© ANNA SURINYACH

EDITOR'S NOTE: This report was updated on June 14, 2017, to include the following corrections and clarifications: On pp. 5 and 21, we noted the number of people detained and deported based on data from 2016, not 2015 as reported earlier. On p. 6, we corrected the list of places where MSF has worked along the migration route to properly identify the respective states. And on p. 27, we changed the final sentence to clarify that the humanitarian crisis is a regional issue involving countries of origin, transit, and destination.

# CONTENT

## 4



**EXECUTIVE SUMMARY**

## 6



INTRODUCTION:
**CARING FOR REFUGEES
AND MIGRANTS**

## 8



**NORTHERN TRIANGLE
OF CENTRAL AMERICA:
UNPRECEDENTED LEVELS
OF VIOLENCE OUTSIDE
A WAR ZONE**

## 13



**MSF PROJECT DATA 2015-2016:
EXPOSURE TO VIOLENCE
AND ITS IMPACT ON HEALTH**

## 18



**BARRIERS TO HEALTH CARE**

## 20



**LIMITED ACCESS TO
PROTECTION IN MEXICO**

## 22



**LIMITED ACCESS
TO PROTECTION
IN THE UNITED STATES**

## 26

CONCLUSION:
**ADDRESSING THE GAPS**

**28**
ANNEX 1
**RISK FACTORS**

**29**
ANNEX 2
**REACTION SYMPTOMS**

**30**
ANNEX 3
**SURVEY METHODOLOGY**

**31**
ANNEX 4
**LIST OF ACRONYMS**



Migrants travel through Mexico on a cargo train, known locally as "The Beast."

# 1

## EXECUTIVE SUMMARY

An estimated 500,000 people cross into Mexico every year[1]. The majority making up this massive forced migration flow originate from El Salvador, Honduras, and Guatemala, known as the Northern Triangle of Central America (NTCA), one of the most violent regions in the world today.

Since 2012, the international medical humanitarian organization Doctors Without Borders/Médecins Sans Frontières (MSF) has been providing medical and mental health care to tens of thousands of migrants and refugees fleeing the NTCA's extreme violence and traveling along the world's largest migration corridor in Mexico. Through violence assessment surveys and medical and psychosocial consultations, MSF

teams have witnessed and documented a pattern of violent displacement, persecution, sexual violence, and forced repatriation akin to the conditions found in the deadliest armed conflicts in the world today[2].

For millions of people from the NTCA region, trauma, fear and horrific violence are dominant facets of daily life. Yet it is a reality that does not end with their forced flight to Mexico. Along the migration route from the NTCA, migrants and refugees are preyed upon by criminal organizations, sometimes with the tacit approval or complicity of national authorities, and subjected to violence and other abuses —abduction, theft, extortion, torture, and rape— that can leave them injured and traumatized.

1_ Source: UNHCR MEXICO FACTSHEET. February 2017. Last visited 18 April 2017. Data compiled by UNHCR based on SEGOB and INM official sources.

2_The Geneva Declaration on Armed Violence and Development. Global Burden of Armed Violence 2015: Every Body Counts, October 2015, Chapter Two, http://www.genevadeclaration.org/fileadmin/docs/GBAV3/GBAV3_Ch2_pp49-86.pdf

Despite existing legal protections under Mexican law, they are systematically detained and deported-- with devastating consequences on their physical and mental health. In 2016, 152,231 people from the NTCA were detained/presented to migration authorities in Mexico, and 141,990 were deported.

The findings of this report, based on surveys and medical programmatic data from the past two years, come against the backdrop of heightened immigration enforcement by Mexico and the United States, including the use of detention and deportation. Such practices threaten to drive more refugees and migrants into the brutal hands of smugglers or criminal organizations.

From January 2013 to December 2016, MSF teams have provided 33,593 consultations to migrants and refugees from the NTCA through direct medical care in several mobile health clinics, migrant centers and hostels —known locally as albergues— across Mexico. Through these activities, MSF has documented the extensive levels of violence against patients treated in these clinics, as well as the mental health impact of trauma experienced prior to fleeing countries of origin and while on the move.

Since the program's inception, MSF teams have expressed concern about the lack of institutional and government support to the people it is treating and supporting along the migration route. In 2015 and 2016, MSF began surveying patients and collecting medical data and testimonies. This was part of an effort by MSF to better understand the factors driving migration from the NTCA, and to assess the medical needs and vulnerabilities specific to the migrant and refugee population MSF is treating in Mexico.

The surveys and medical data were limited to MSF patients and people receiving treatment in MSF-supported clinics. Nevertheless, this is some of the most comprehensive medical data available on migrants and refugees from Central America. This report provides stark evidence of the extreme levels of violence experienced by people fleeing from El Salvador, Honduras, and Guatemala, and underscores the need for adequate health care, support, and protection along the migration route through Mexico.

In 2015, MSF carried out a survey of 467 randomly sampled migrants and refugees in facilities the organization supports in Mexico. We gathered additional data from MSF clinics from 2015 through December 2016. Key findings of the survey include:

**Reasons for leaving:**

— Of those interviewed, almost 40 percent (39.2%) mentioned direct attacks or threats to themselves or their families, extortion or gang-forced recruitment as the main reason for fleeing their countries.
— Of all NTCA refugees and migrants surveyed, 43.5 percent had a relative who died due to violence in the last two years. More than half of Salvadorans surveyed (56.2 percent) had a relative who died due to violence in this same time span.
— Additionally, 54.8% of Salvadorans had been the victim of blackmail or extortion, significantly higher than respondents from Honduras or Guatemala.

**Violence on the Journey:**

— 68.3 percent of the migrant and refugee populations entering Mexico reported being victims of violence during their transit toward the United States.
— Nearly one-third of the women surveyed had been sexually abused during their journey.
— MSF patients reported that the perpetrators of violence included members of gangs and other criminal organizations, as well as members of the Mexican security forces responsible for their protection.

**According to medical data from MSF clinics from 2015 through December 2016:**

— One-fourth of MSF medical consultations in the migrants/refugee program were related to physical injuries and intentional trauma that occurred en route to the United States.
— 60 percent of the 166 people treated for sexual violence were raped, and 40 percent were exposed to sexual assault and other types of humiliation, including forced nudity.
— Of the 1,817 refugees and migrants treated by MSF for mental health issues in 2015 and 2016, close to half (47.3 percent) were victims of direct physical violence en route, while 47.2 percent of this group reported being forced to flee their homes.

The MSF survey and project data from 2015-2016 show a clear pattern of victimization—both as the impetus for many people to flee the NTCA and as part of their experience along the migration route. The pattern of violence documented by MSF plays out in a context where there is an inadequate response from governments, and where immigration and asylum policies disregard the humanitarian needs of migrants and refugees.

Despite the existence of a humanitarian crisis affecting people fleeing violence in the NTCA, the number of related asylum grants in the US and Mexico remains low. Given the tremendous levels of violence against migrants and refugees in their country of origin and along the migration route in Mexico, the existing legal framework should provide effective protection mechanisms to victimized populations. Yet people forced to flee the NTCA are mostly treated as economic migrants by countries of refuge such as Mexico or the United States. Less than 4,000 people fleeing El Salvador, Honduras, and Guatemala were granted asylum status in 2016[3]. In addition, the government of Mexico deported 141,990 people from the NTCA. Regarding the situation in US, by the end of 2015, 98,923 indiviudals from the NTCA had submitted requests for refugee or asylum status according to UNHCR[4]. Nevertheless, the number of asylums status granted to individuals from the NTCA has been comparatively low, with just 9,401 granted status since FY 2011[5].

As a medical humanitarian organization that works in more than 60 countries, MSF delivers emergency aid to people affected by armed conflict, epidemics, disasters, and exclusion from health care. The violence suffered by people in the NTCA is comparable to the experience in war zones where MSF has been present for decades. Murder, kidnappings, threats, recruitment by non-state armed actors, extortion, sexual violence and forced disappearance are brutal realities in many of the conflict areas where MSF provides support.

The evidence gathered by MSF points to the need to understand that the story of migration from the NTCA is not only about economic migration, but about a broader humanitarian crisis.

While there are certainly people leaving the NTCA for better economic opportunities in the United States, the data presented in this report also paints a dire picture of a story of migration from the NTCA as one of people running for their lives. It is a picture of repeated violence, beginning in NTCA countries and causing people to flee, and extending through Mexico, with a breakdown in people's access to medical care

and ability to seek protection in Mexico and the United States.

It is a humanitarian crisis that demands that the governments of Mexico and United States, with the support of countries in the region and international organizations, rapidly scale up the application of legal protection measures —asylum, humanitarian visas, and temporary protected status— for people fleeing violence in the NTCA region; immediately cease the systematic deportation of NTCA citizens; and expand access to medical, mental health, and sexual violence care services for migrants and refugees.

# 2

INTRODUCTION:
## CARING FOR REFUGEES AND MIGRANTS

MSF has worked with migrants and refugees in Mexico since 2012, offering medical and psychological care to thousands of people fleeing the Northern Triangle of Central America (NTCA). Since the MSF program started, the organization has worked in several locations along the migration route: Ixtepec (Oaxaca State); Arriaga (Chiapas); Tenosique (Tabasco); Bojay (Hidalgo); Tierra Blanca (Veracruz State); Lechería-Tultitlán, Apaxco, Huehuetoca (State of Mexico); San Luis Potosí (San Luis Potosí State); Celaya (Guanajuato State); and Mexico City. Locations have changed based on changes in routes used by migrants and refugees or the presence of other organizations. MSF's services have mainly been provided inside hostels, or albergues, along the route. In some locations, MSF set up mobile clinics close to the rail roads and train stations.

In addition, MSF teams have trained 888 volunteers and staff at 71 shelters and hostels in "psychological first aid"—in which patients are counseled for a short period of time before they continue their journey. Health staff and volunteers in key points along the transit route, at 41 shelters and 166 medical facilities, received training on counseling related to sexual and gender-based violence (SGBV).

From January 2013 to December 2016, MSF teams carried out 28,020 medical consultations and 5,573 mental health consultations. More than 46,000 individuals attended psychosocial activities organized

---

3_ Source: UNHCR MEXICO FACTSHEET. February 2017.

4_ Regional Response to the Northern Triangle of Central America Situation. UNHCR. Accessed on 01/02/2017 at http://reporting.unhcr.org/sites/default/files/UNHCR%20-%20NTCA%20Situation%20Supplementary%20Appeal%20-%20June%202016.pdf

5_ Source: MSF calculations based on information from US Homeland Security. Yearbook of Immigration Statistics 2015.

*Migrant and refugee patients attended*
*by MSF from 2013-2016*



by our teams to address the following topics:  stress on the road, violence on the road, mental health promotion and prevention, myths and truths about the migration route, and developing tools to deal with anxiety.

Some of the people treated by MSF report extreme pain and suffering due to physical and emotional violence inflicted on them on the migration route. In 2016, MSF, in collaboration with the Scalabrinian Mission for Migrants and Refugees (SMR), opened a rehabilitation center for victims of extreme violence and other cruel, inhuman or degrading treatment. Since then MSF has treated 93 patients who required longer-term mental health and rehabilitation services.

Torture is inflicted by governmental security actors, while criminal organizations inflict extreme degrees of violence on these already vulnerable populations. Migrants and refugees are often easy prey, and they face severe difficulties in making any formal legal complaint. Some patients reported having been kidnapped, repeatedly beaten for days or even weeks for the purposes of extortion and ransom, or sometimes to frighten or intimidate other migrants and refugees. Attacks often include sexual assault and rape.

● Center Route: From Tierra Blanca to Querétaro
● Northeast Route: From Querétaro to Ciudad Acuña
● Northwest Route: From Querétaro to Tijuana
● North Route: From Querétaro to Puerto Palomas
● Southeast Route: From Tenosique to Tierra Blanca
● Southwest Route: From Tapachula to Tierra Blanca

■ Capital City
● Transmigrant project, town of interest
⊕ Health facities
--- International boundary
— Coastline



© GUSTAVO GRAF.

After disembarking a train, migrants traveling from Central America to the United States walk to a shelter in Ixtepec, Oaxaca, Mexico, in 2014.

# 3

## NORTHERN TRIANGLE OF CENTRAL AMERICA: UNPRECEDENTED LEVELS OF VIOLENCE OUTSIDE A WAR ZONE

The violence experienced by the population of the NTCA is not unlike that of individuals living through war. Citizens are murdered with impunity, kidnappings and extortion are daily occurrences.  Non-state actors perpetuate insecurity and forcibly recruit individuals into their ranks, and use sexual violence as a tool of intimidation and control. This generalized and pervasive threat of violence contributes to an increasingly dire reality for the citizens of these countries. It occurs against a backdrop of government institutions that are incapable of meeting the basic needs of the population.

The global study on homicide carried out by the United Nations Office on Drugs and Crime (UNODC) in 2013, placed Honduras and El Salvador first and fourth respectively on the list of countries with the highest murder rates in the world[6]. In the last ten years, approximate 150,000 people have been killed in the NTCA[7]. Since then, the situation has only worsened, with a particularly worrying situation in El Salvador, where 6,650 intentional homicides were reported in 2015, reaching a staggering murder rate of 103 per 100,000 inhabitants in 2015, while Honduras suffered 57 per 100,000 (8,035 homicides) and Guatemala 30 per 100,000 (4,778 homicides).

---

6_ UNODC, *Global Study on Homicide 2013: Trends, Contexts, Data*, 10 April 2014, https://www.unodc.org/documents/gsh/pdfs/2014_GLOBAL_HOMICIDE_BOOK_web.pdf, p. 126

7_ International Crisis Group calculation of total homicides since 2006 based on data from "Crime and Criminal Justice, Homicides counts and rates (2000-2014)"

Data from the UNODC report shows that homicidal violence in the NTCA resulted in considerably more civilian casualties than in any other countries, including those with armed conflicts or war[8]. Rates of violent death in El Salvador have lately been higher than all countries suffering armed conflict except for Syria[9].

In this context, an estimated 500,000 people from the Northern Triangle of Central America (NTCA) enter Mexico every year fleeing poverty and violence, according to the UN High Commissioner for Refugees (UNHCR). As an organization treating patients in Mexico fleeing these violent contexts, MSF teams witness the harrowing stories that have pushed people to make the urgent decision to flee their homes. Lack of economic opportunities are mentioned by a significant number of individuals interviewed by MSF, however, they systematically describe personal exposure to a violent event that triggered their decision to emigrate. The cycle of poverty and violence creates an untenable setting for many, and drives them toward the treacherous path through Mexico.

Due to MSF's experience treating migrants throughout Mexico, the organization sought to better understand the realities of life for individuals making the journey north, first to assess how to improve services to this marginalized population, and second to raise awareness about the conditions they face. This information is often missing from national statistics or publicly available data. This led to the development and implementation of a survey tool to measure an individual's reasons for fleeing, and the health impacts experienced before and after embarking on the route through Mexico. These findings, along with medical project data from the past two years, illustrate that the insecurity they fled at home and the violence they experience on the route north have significant physical and emotional impact.



© MARTA SOSZYNSKA

Art adorns the front of the men's dormitory building at a shelter for migrants in Mexico.

### The VAT Background & Methodology

As a Victimization Assessment Tool (VAT), a survey was conducted among 467 refugees and migrants in September 2015 in the albergues along the migration route in Mexico where MSF was providing health and mental care at the time: Tenosique, Ixtepec, Huehuetoca, Bojay and San Luis Potosí (see Annex 3 for methodology).

The findings from this survey paint a detailed picture of the violence migrants faced at home and as they made their way through Mexico. This aggregated information allows MSF to identify avenues for further medical programming or to modify existing approaches in reaching this population. Although demonstrative of the harrowing realities faced by many people on the route north, this study is a snapshot in time and included a selective population accessible to MSF. Interviews were conducted in albergues, where migrants seek out food, shelter, information, and health care. These interviews are not necessarily representative of the entire migrant population traveling through Mexico. MSF avoids drawing sweeping conclusions, however the survey provides valuable information about the realities that many people on this route experienced, in a specific time period, as reported to MSF teams.

---

8_ ACAPS. Other Situations of Violence in the Northern Triangle of Central America. Humanitarian Impact July 2014.

9_ International Crisis Group. Mafia of the Poor: Gang Violence and Extortion in Central America Latin America Report N°62 | 6 April 2017.

**Who was interviewed**

Most of the people interviewed—88 percent—were male and 12 percent were female. Of those interviewed 4.7 percent were minors, 59 percent of them unaccompanied. Most interviewed, 67.6 percent, were from Honduras, while 15.7 percent were from El Salvador, 10.5 percent from Guatemala and 6.2 percent represented other nationalities. The average person surveyed was 28 years old, with 79 percent under 35.

*Nationalities of people surveyed*

|  | Number Surveyed | Percentage of Total |
|---|---|---|
| Honduras | 315 | 67.6% |
| El Salvador | 73 | 15.7% |
| Guatemala | 49 | 10.5% |
| Nicaragua | 15 | 3.2% |
| Mexico | 11 | 2.4% |
| No Response | 1 | 0.2% |
| Dominican Republic | 1 | 0.2% |
| Suriname | 1 | 0.2% |

The majority of respondents—65 percent— confirmed that they have children and 52 percent of them lived in large households (with five or more people). A majority said that their family had financially supported them to help them make their way north.

**Violence in countries of origin**

Respondents were asked several questions about their experience with direct and generalized violence in their home countries. Collectively, their individual stories show a population continuously exposed to some degree of violence or targeted threats, and, depending on their nationality, that experience can vary greatly.

— According to the survey, 57 percent of Honduran and 67 percent of Salvadoran migrants reported that they never feel safe at home, whereas only 33 percent of Guatemalans and 12 percent of Nicaraguans felt the same way.

— One third (32.5 percent) of the population from NTCA entering Mexico has been exposed to physical violence perpetrated by a non-family member (mainly members of organized crime) in the previous two years.

— Half of the population (48.4 percent) from NTCA entering Mexico received a direct threat from a non-family member (61.6 percent for Salvadorans alone). Of this group, 78 percent said that the threat seriously affected their social and professional activities.

— 45.4 percent of Hondurans and 56.2 percent of Salvadorans entering Mexico have lost a family member because of violence in the last two years before they migrated. 31 percent of the Central Americans entering Mexico knew someone who was kidnapped and 17 percent know someone who has disappeared and not been found.

— The vast majority —72 percent of Hondurans and 70 percent of Salvadorans interviewed— heard regular gunshots in their neighborhoods. Respectively, 75 percent and 79 percent had witnessed a murder or seen a corpse in the previous two years.

**Reasons for leaving country of origin**

Half (50.3 percent) of those interviewed from the NTCA entering Mexico leave their country of origin for at least one reason related to violence. For those fleeing violence, a significant 34.9 percent declared more than one violence-related reason.

*Reasons given for leaving country of origin*



● Reasons exclusively related to violence
● Combination of violence and non violence reasons
● Reasons unrelated to violence
● Not answered

Direct attacks, threats, extortion or a forced recruitment attempt by criminal organizations were given as main reasons for survey respondents to flee their countries, with numbers significantly higher in El Salvador and Honduras. Of the surveyed population, 40 percent left the country after an assault, threat, extortion or a forced recruitment attempt.

*Migration related to direct violence*



- Direct threats against me or my family
- Direct attacks against me or my family
- Forced recruitment by gangs
- Victim of extortion

## Regarding exposure to violence along the migration route through Mexico

The findings related to violence in the survey are appalling: more than half the sample population had experienced recent violence at the time they were interviewed: 44 percent had been hit, 40 percent had been pushed, grabbed or asphyxiated, and 7 percent had been shot.

Of the migrants and refugees surveyed in Mexico, 68.3 percent of people from the NTCA reported that they were victims of violence during their transit. Repeated exposure to violence is another reality for the population from NTCA crossing Mexico. Of the total surveyed population, 38.7 percent reported more than one violent incident, and 11.3 percent reported more than three incidents.

*Number of violent incidents experienced per person during migration*



- 1 Incident
- 2 Incidents
- >3 Incidents
- 0 Incidents
- NR

In a migration context marked by high vulnerability like the one in Mexico, sexual violence, unwanted sex, and transactional sex in exchange for shelter, protection or for money was mentioned by a significant number of male and female migrants in the surveys. Considering a comprehensive definition of those categories, out of the 429 migrants and refugees that answered SGBV questions, **31.4 percent of women and 17.2 percent of men had been sexually abused during their transit through Mexico**. Considering only rape and other forms of direct sexual violence, 10.7 percent of women and 4.4 percent of men were affected during their transit through Mexico.

The consequences of violence on the psychological well-being and the capacity to reach out for assistance are striking: 47.1 percent of the interviewed population expressed that the violence they suffered had affected them emotionally.

**Honduran—Male—30 years old—** "I am from San Pedro Sula, I had a mechanical workshop there. Gangs wanted me to pay them for "protection", but I refused, and then they wanted to kill me. First they threatened me; they told me that if I stayed without paying, they would take my blood and one of my children. In my country, killing is ordinary; it is as easy as to kill an animal with your shoe. Do you think they would have pitied me? They warn you, and then they do it, they don't play, and so they came for me. Last year in September, they shot me three times in the head, you can see the scars. Since then my face is paralyzed, I cannot speak well, I cannot eat. I was in a coma for 2 months. Now I cannot move fingers on this hand. But what hurts most is that I cannot live in my own country, is to be afraid every day that they would kill me or do something to my wife or my children. It hurts to have to live like a criminal, fleeing all the time."



© MARTA SOSZYNSKA

A woman and her granddaughter attend an MSF support session for women at the Tenosique migrant shelter in Mexico in 2017.

# 4

## MSF PROJECT DATA 2015-2016: EXPOSURE TO VIOLENCE AND ITS IMPACT ON HEALTH

Through MSF project data of more than 4,700 medical consultations in 2015 and 2016, a picture of an often harrowing and traumatic journey emerges. Crossing Mexico from the NTCA is a constant challenge for survival which can take a severe toll both physically and psychologically. Migrants and refugees walk for hours in high temperatures, on unsafe and insecure routes to evade authorities. They risk falling from the cargo trains that transport them along the route, or ride on overcrowded trucks without food, water or ventilation for hours. In addition to these challenges, migrants and refugees do not have access to medical care or safe places to eat and sleep, and must constantly be on guard against the threat of violence or sexual assault by criminal groups or deportation and detention by authorities.

The symptoms managed in MSF clinics inside shelters or in mobile clinics close to railways are directly related to the conditions associated with the route itself: exposure to violence, days spent outdoors in harsh conditions on the train or in the forest, and long walking hours that cause dehydration, foot lesions, muscle pain, and other morbidities. Contaminated and/or scarce food found on the route result in gastro-intestinal problems or diarrheal disorders and parasites.

### Main Morbidities Treated by MSF

From 2015 through December 2016, **one fourth of MSF medical consultations in the migrants/ refugee program were related to physical injuries and intentional trauma**. A morbidity analysis based on MSF consultations during 2015 and 2016 showed that most common health issues affecting migrants and refugees were intentional traumas and wounds (24 percent). Other common health issues included acute osteomuscular syndromes affecting 20 percent of respondents, upper respiratory tract infections (18 percent), skin diseases (11 percent) and unintentional physical traumas (3 percent).

*10 main morbidities in MSF Clinics*
*in 2015 and 2016*



Some patients treated by our teams reported extreme pain and unbearable suffering due to physical and emotional violence inflicted as an extortion strategy. Patients tell of being tortured and abused in order to force migrants and refugees to reveal contact information for family members in order to demand a ransom payment, or as punishment for delay in ransom payment. Others report that violence is used to psychologically terrorize other migrants and refugees to ensure that they not report crimes to authorities or try to escape.

The mental health and physical consequences of this cruel, inhumane and degrading treatment are devastating. Their functionality is severely reduced, making survivors unable to continue their journey or take care of themselves. Secondary and tertiary levels of care (including surgery, psychiatry, and neurology) are often required for patients to make a more complete recovery, and these are not always available in the areas where this violence took place or where albergues are located.



M. fled domestic and gang violence in Honduras. In early 2017, she and her nine-year-old son were living in a shelter in Mexico, where she is filing for asylum.

**Sexual Violence**

During 2015 and 2016, a total of 166 sexual violence survivors were treated by MSF. Among them, 60 percent were raped and 40 percent were exposed to sexual assault and other types of humiliation, including forced nudity.

**Honduran—Female—35 years old—** "I am from Honduras, it's the fourth time that I try to cross through Mexico, but this had never happened before. This time, I came with my neighbor, and we were both seized by a group of delinquents. A federal police officer was their accomplice, and each one of us was handed over to gang members. I was raped. They put a knife on my neck, so I did not resist. I am ashamed to say this, but I think it would have been better if they had killed me."

**Honduran—Male—19 years old—** "Today, in the early morning, hooded men assaulted us. I was traveling with my wife and my son. They beat us, and they hit me with a machete--look at my arm [there are bruises and wounds]. They took my wife to the mountain, took her away. They threatened me and told me not to turn around. They wanted us to give them information about our family to ask for ransom. But I told them we had nothing. I thought they were going to kill us. She says they did not do anything to her, but I know they abused her".

## Mental Health

An important facet of MSF's work in Mexico is to provide support for the mental health needs of migrants and refuges. The data collected by the mental health teams of the project during 2015 and 2016 reveals a worrying situation. Out of 1,817 refugees and migrants treated by MSF for mental health issues over the last two years, 92.2 percent have lived through a violent event in their country of origin or during the route that threatens their mental health and well-being. A large number of MSF patients presented more than one risk factor directly linked to their exposure to violence as a precipitating factor for their mental health condition.

The graphic below portrays the fifteen risk factors most commonly identified by our teams. A detailed list of risk factors in 2015-2016 may be found in Annex 1 of the report.

*Risk factors identified in mental health consultations during 2015 and 2016*



Of the 1,817 refugees and migrants seen by MSF in 2015-2016, 47.3 percent of patients survived "physical violence" as a precipitating event for the mental health consultation. Injuries included gunshot wounds, blunt force trauma from kicks and punches, mutilation of body parts during kidnappings, wounds from machete attacks, breaking of bones by blows from baseball bats, and wounds from being thrown out of a running train. In most cases, incidents registered under "physical violence" by MSF occurred along the migration route in Mexico.

The "precipitating event" most frequently mentioned during consultations was "Forced to flee/internally displaced/refugee/migrant" —registered by 47.2 percent of patients. This covers the period before people made the decision to flee.

Being a "victim of threats" (44.0 percent) and having "witnessed violence or crime against others" (16.5 percent) are the third and fourth most common risk factors. Witnesses to violence included patients forced to watch while others were tortured, mutilated, and/or killed —often in scenarios where they were deprived of their liberty, such as during a kidnapping for extortion.

The anguish and stress that migrants and refugees face both in their home countries and along the migration route make this population particularly vulnerable to anxiety, depression and post-traumatic stress disorder. The following graphic shows the main categories of symptoms presented by the 1,817 MSF patients seen in mental health consultations during 2015 and 2016.

*Symptoms identified in mental health consultations during 2015 and 2016*



More than half of patients who receive a mental health consultation (51.7 percent) report anxiety-related symptoms. Anxiety is described as an immediate, biological, physiological and psychological alarm reaction when faced with an assault or a threat. Migrants and refugees are under constant threat and risk along the migration route, and a heightened state of alert is an appropriate adaptive response to survive in a legitimately dangerous context. Problems arise when a person's reaction is exaggerated or out of proportion with the risk, making the individual incapable of adapting to new situations.

Nearly one-third (32.9 percent) of the migrants and refugees counseled by MSF in Mexico have symptoms associated with depression. Migration involves situations of psychological and social loss that trigger mourning processes, which begin at the moment of departure, are experienced on the route and continue at the place of destination. These elements represent significant psychological distress and suffering with an impact on a person's life.

In 11.7 percent of the cases, mental health teams are seeing manifestations of post-traumatic stress disorder. This rate documented in MSF programs in 2015 and 2016 are well above rates in the general population, which range from 0.3 percent to 6.1 percent. The PTSD rate among migrants and refugees that MSF is documenting in Mexico is much closer to the rates in populations affected by direct conflict (15.4 percent)[10, 11]. PTSD is a serious form of mental illness, which is usually caused by devastating life events and generally associated with impaired daily functioning in those affected. Individuals suffering from PTSD face greater risks to survival along the migration route, due to the multiple challenges associated with the journey.

Migrant and refugee women deserve special attention when it comes to mental health as data clearly show a particular vulnerability in this population. During migration, 59 percent of the women involved in the MSF study reported symptoms of depression, and 48.3 percent reported symptoms of anxiety. Other vulnerable groups—such as unaccompanied minors and LGBTQ people—are often specifically targeted by criminal groups and need greater support and protection.

The complete and detailed list of reaction symptoms presented by migrants and refugees during the mental health consultation can be found in Annex 2. Although these symptoms might be explained by the violence and the conditions of the route and do not always lead to depression or anxiety, they show how difficult the conditions for the patients can be and the importance of adapted case-detection strategies for mental health. If not addressed properly, these mental health issues can be a significant barrier during migration, interfering with daily functioning and putting their lives at risk.



**MSF psychologist tells the story of a 43-year-old Honduran woman—**This woman decided to leave Arriaga [Chiapas] out of fear, and walked with a group of Hondurans who would make their way along the train tracks to the town of Chahuites. However, when they slept in the mountains, they attempted to sexually abuse her. She managed to escape and arrived at the Chahuites shelter, where the patient again met her alleged assailants. She decided to flee that night to the city of Ixtepec. She was attended at the Ixtepec shelter by an MSF mental health team. She arrived with a high level of anxiety and presented post-traumatic symptoms such as flashbacks, auditory hallucinations, and sleep problems.

10_ Kessler, R.C. & Üstün, T. B. (eds). (2008). The WHO World Mental Health Surveys: global perspectives on the epidemiology of mental disorders. New York: Cambridge University Press, 1-580.

11_ Steel, Z., Chey, T., Silove, D., Marnane, C., Bryant, R.A., van Ommeren, M. (2009) Association of torture and other potentially traumatic events with mental health outcomes among populations exposed to mass conflict and displacement. Journal of the American Medical Association, 302(5), 537-549.



A patient receives a medical consultation inside an MSF mobile clinic in Mexico State in 2014.

# 5

## BARRIERS TO HEALTHCARE

Through its constitution and subsequent ratifications of international human rights treaties, Mexico has several legal instruments in place that protect the human rights of its citizens and all people within its borders, including provisions for adequate access to health care. Recently, Mexico has instituted laws that protect the passage of migrants through its country, ensuring that their entry into Mexico is not deemed as a criminal offense, and guaranteeing certain protections, with special attention to minorities, including women, children, indigenous

people and the elderly.[12] In December 2014, the federal government instituted the *Seguro Popular* plan, entitling undocumented immigrants to receive health care coverage for a period of three months, without discrimination.[13]

Despite these legal protections, the recognition of basic rights, and programs that are supposed to guarantee access to health care, migrants and refugees have restricted access to health services. Across health structures in the country, there is a lack of clear, standardized regulations regarding the provision of health services to migrants and refugees seeking care. Additionally, there is a lack of training or understanding by the staff at these health facilities regarding the rights of migrants and refugees to receive care and, according to testimonies delivered to MSF, there is persistent discrimination of migrants

---

12_ Ley de Migración – Op.Cit. – Article 2 - http://cis.org/sites/cis.org/files/Ley-de-Migracion.pdf and Refugee Law.

13_ Presidential Decree December 2014 – National Commission of Social Health Protection Mexico DF 28.12.2014 http://www.gob.mx/salud/prensa/otorgan-seguro-popular-a-migrantes-7519

and refugees who seek out care. The right to be informed of the duties and rights as well as the criteria for admission, request of asylum is clearly stated in the Mexican Law,[14] however in practice, there is a lack of information for migrants and asylum seekers regarding their rights and the means available to them regarding health services at public health facilities. According to some testimonies of MSF patients, those refugees and migrants who do manage to access a health facility are often confronted with additional obstacles —including delays in granting appointments, even for absolute emergencies, resistance to providing care free of charge, or the filing of a complaint before judicial authorities as a prerequisite to the provision of care. There is also a risk at the health facilities that they will be handed over to migration authorities directly. In addition, the three-month limit on access to the Seguro Popular plan might not be enough to cover the current waiting period to get asylum status.

As described above in the findings of the MSF VAT, 59 percent of migrants affected by violence did not seek any assistance during their transit through Mexico despite self-identified needs, mainly due to concerns for their security, fear of retaliation, or deportation.

In providing free health care to migrants along the route north from the border with Guatemala, MSF has itself encountered barriers to providing urgent and effective care to its patients. In Tenosique, for example, MSF teams have encountered several administrative or organizational obstacles when they needed to urgently refer victims of sexual violence for Post-Exposure Prophylaxis (PEP). The lack of knowledge regarding protocols for the treatment of sexual violence by Ministry of Health providers, and the lack of availability of treatment or PEP kits, continues to represent a significant obstacle preventing appropriate treatment of survivors of sexual violence. In areas where sexual violence against migrants is widespread, such as Tenosique, or the corridor between the Guatemalan border and Arriaga, there is limited understanding of the population needs in the area. Furthermore, the needs of marginalized minorities, including migrants and refugees, who are at higher risk of violence and sexual abuse, are ignored.

Accessing mental health support and treatment is even more challenging for refugees and migrants. The scarcity of psychologists led MSF to systematically provide mental health consultations in all the albergues where it works throughout the country.

Survivors of sexual violence (SSV) who can reach medical facilities (including MSF's) to receive comprehensive care are just a tiny part of the total affected population. There are a considerable number of reasons that help explain why many survivors do not access medical care, including stigma and fear of being judged by hospital professionals; lack of knowledge about their medical needs and rights; fear

that they will increase their risk of being abandoned or further abused; and a normalization of sexual violence as part of what's expected from men and women in order to reach their destination, in exchange for "payment" or for protection and guidance.

MSF has tried to overcome these barriers using a strategy that combines direct health care provision in migrant and refugee hostels and mobile clinics, sensitization and education of migrant and refugee populations, and additional training and staffing. Over the past two years, MSF has designed and implemented a training program to raise awareness and to provide training to health care workers, volunteers in the migrant hostels and key civil society actors on the right of migrants and refugees to health care, care protocols, mental health first aid and sexual violence case detection and management.

**Honduras—Male—** "I fell off the train and hit my knee so hard, but, at that moment, I did not [think I] hurt anything. They [doctors] told me it was a sprain. I fell on some very large stones. The backpack I wore was completely destroyed, and that was what saved my back. If I did not have it, I would have killed myself when I fell. I screamed as hard as I could to tell my cousin: 'Run, run, do not stop, faster. They are coming for us.' I could swear I saw them behind us. I was very scared. I felt the most intense fear of my life. Then, we arrived at a street where there was light, and I realized that my cousin was bathed in blood. I stopped a taxi, and asked the driver to take us to the hospital. He said that he could take us, but we would have to pay. I did not think twice. He left us at the hospital door. I asked for help, but no one helped me to get my cousin to the hospital. Nobody wanted to attend to my cousin. I asked for help, and I told everyone who saw that he was dying.

A doctor told us, 'Look, I cannot do anything until I call immigration.' I told him it does not matter if they deport us, if they want. All we want is for them to take care of us, and we do not want to be here anymore. They just sewed him up. We spent a few hours there. Two people came from the ministry. When I tried to explain what happened, one told me: 'Sure, they are thieves and that's why it happened to you. Do not tell me lies. I'm going to speak to immigration and they are going to take you.' A person who was in the adjoining bed got us the address of the migrants shelter and gave us money to get there.

---

14_  Ley de Migración – Op.Cit. – Article 13  - http://cis.org/sites/cis.org/files/Ley-de-Migracion.pdf



A group of transgender women pose for a picture in the Tenosique migrant shelter in 2017. LGBTQ people are often at the highest risk of harassment and abuse both in their countries of origin and on their routes as migrants. Some shelters provide separate living spaces for greater security and support.

# 6

## LIMITED ACCESS TO PROTECTION IN MEXICO

### Legal framework applicable to the protection of refugees in Mexico

The Americas region already has relatively robust normative legal frameworks to protect refugees: the countries of Central and North America either signed the 1951 convention on refugees or its 1967 protocol and all have asylum systems in place.  Furthermore, Mexico has been at the forefront of international efforts to protect refugees: its diplomats promoted the 1984 Cartagena Declaration on Refugees, which expands the definition to those fleeing "generalized violence".

In 2010, UNHCR established a guideline[15] for the consideration of asylum and refugee status for victims of gang violence, inviting concerned countries to apply broader criteria to the refugee definition of the 1951 Convention. In relation to these specific patterns of violence, the UNHCR concluded that direct or indirect threats (harm done to family members) and consequences (forced displacement, forced recruitment, forced "marriage" for women and girls, etc.) constituted "well-founded grounds for fear of persecution" and bases for the recognition of the refugee status or the application of the non-refoulement principle, the practice of not forcing refugees or asylum seekers to be returned to a country where their life is at risk or subject to persecution. Mexico integrated those recommendations and the right to protection stated in Article 11 of Mexico's constitution in its 2011 Refugee Law[16]. This law

---

15_ UNHCR Guidance Note on Refugee Claims Related to Victims of Organized Gangs – March 2010. Available at:http://www.refworld.org/cgi-bin/texis/vtx/rwmain?page=search&docid=4bb21fa02&skip=0&query=organized%20gangs

16_ Available in spanish at http://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP_301014.pdf

considers broad inclusion criteria for refugees —stating, alongside the internationally recognized definition from the 1951 Convention, the eligibility of persons fleeing situations of generalized violence, internal conflict, massive violations of human rights or other circumstances severely impacting public order.

After Brazil Declaration of December 2014 and in line with its 2010 recommendations, the UNHCR established specific guidelines for the access to international protection mechanisms for asylum seekers from El Salvador and Honduras.

Nevertheless, despite the relatively adequate legal framework and the goodwill expressed in regional and international forums, the reality at the field level is extremely worrying: seeking asylum, getting refugee status, or even securing other forms of international protection, such as complementary measures in Mexico and the United States, remains almost impossible for people fleeing violence in the NTCA.

### Detentions and deportations from Mexico

The number of undocumented migrants from the NTCA detained[17] in Mexico has been growing exponentially for the last five years, rising from 61,334 in 2011 to 152,231 in 2016. Migrants from NTCA account for 80.7 percent of the total population apprehended in Mexico during 2016. The number of minors apprehended is extremely worrying as it nearly multiplied by 10 in the last five years, from 4,129 in 2011 to 40,542 in 2016[18]. Of children under 11 years old, 12.7 percent were registered as travelling through Mexico as unaccompanied minors (without an adult relative or care taker).

Despite the exposure to violence and the deadly risks these populations face in their countries of origin, the non-refoulement principle is systematically violated in Mexico. In 2016, 152,231 migrants and refugees from the NTCA were detained/presented to migration authorities in Mexico and 141,990 were deported[19].The sometimes swift repatriations (less than 36 hours) do not seem to allow sufficient time for the adequate assessment of individual needs for protection or the determination of a person's best interest, as required by law.

### Refugee and asylum recognition in Mexico

In 2016, Mexican authorities processed 8,781 requests for asylum from the NTCA population[20]. Out of the total asylum requests, less than 50 precent were granted. Despite the fact that Mexico appears to be consolidating its position as a destination country for asylum seekers from the NTCA, and that the recognition rate improved from last year's figures, people fleeing violence in the region still have limited access to protection mechanisms. Many asylum seekers have to abandon the process due to the conditions they face during the lengthy waiting period in detention centers.

### Protection for refugee and migrant victims of violence while crossing Mexican territory

Foreign undocumented victims or witnesses of crime in Mexico are entitled by law to regularization on humanitarian grounds and to get assistance and access to justice[21]. In 2015, a total of 1,243 humanitarian visas were granted by Mexico for victims or witnesses of crime from the NTCA[22]. These numbers might seem implausible, however the vast majority of patients (68.3 percent) in MSF's small cohort of migrants and refugees report having been victims of violence and crime.

Lack of access to the asylum and humanitarian visa processes, lack of coordination between different governmental agencies, fear of retaliation in case of official denunciation to a prosecutor, expedited deportation procedures that do not consider individual exposure to violence: These are just some of the reasons for the gap between rights and reality.

Failure to provide adequate protection mechanisms has direct consequences on the level of violence to which refugees and migrants are exposed. The lack of safe and legal pathways effectively keeps refugees and migrants trapped in areas controlled by criminal organizations.

17_ SEGOB. Mexico. Boletín Estadístico Mensual 2016. Eventos de extranjeros presentados ante la autoridad migratoria, según continente y país de nacionalidad, 2016. Accessed on 06/09/2017. http://www.politicamigratoria.gob.mx/work/models/SEGOB/CEM/PDF/Estadisticas/Boletines_Estadisticos/2016/Boletin_2016.pdf

18_ Ibíd.

19_ Ibíd.

20_ Source: UNHCR MEXICO FACTSHEET. February 2017.

21_ Ley General de Migración – Article 52 Section V-a. See also Article 4 for a definition of the "victims" covered by the law.

22_ Source: Boletín Mensual de Estadísticas Migratorias 2015. Secretaría de Gobernación. Gobierno de México. Accessed on 01/02/2017.



At Tenosique migrant shelter in 2017, an MSF psychologist checks on a patient who became pregnant as a result of rape in Honduras. She fled her country out of fear that her attacker would find out about the pregnancy.

# 7

## LIMITED ACCESS TO PROTECTION IN THE UNITED STATES

### Legal framework and mechanisms for the recognition of refugees and asylum seekers in the United States

The US Immigration and Nationality Act (INA)[23], the main body of immigration law, does not embrace as broad a criteria for eligibility as the Mexican legal system. The definitions of asylum seeker and refugee reflect the one stated in the 1951 Convention, and, on paper, the law does not take into consideration contextual changes in the NTCA, recommendations formulated through the UNHCR or regional mechanisms such as the Inter American Convention on Torture or the UN Convention against Transnational Organized Crime.

Under the existing procedure, it is extremely difficult for those fleeing violence in the NTCA to obtain asylum or refugee status in the United States. Success depends on many factors, including good

23_ Available at: https://www.uscis.gov/ilink/docView/SLB/HTML/SLB/act.html. Section 101 (a)(42) and Acts 207, 208 and 209 of specific interest for the question of asylum and refuge.

legal representation, something that many asylum and refugee applications simply do not have. NTCA refugees may not be granted recognition on the grounds that they are not fleeing a country at war. Those who are not able to demonstrate physical consequences of violence —for example because they cannot provide forensic or legal documentation to prove specifics of their case, or were not "rescued" by authorities— will face insurmountable obstacles on the road to refuge/protection. According to UNHCR, by the end of 2015, 98,923 individuals from the NTCA had submitted requests for refugee or asylum status in the US[24]. Nevertheless, the number of asylum grants to individuals from the NTCA has been comparatively low, with just 9,401 granted asylum status since FY 2011. Out of the 26,124 individuals granted asylum status in the United States during FY 2015, 21.7 percent came from the NTCA: 2,173 were from El Salvador, 2,082 were from Guatemala, and 1,416 were from Honduras[25].

During FY 2015, out of the 69,920 arrivals to the United States with refugee status, not one was from an NTCA country. The United States does not have an effective system in place to facilitate refugee recognition of individuals from NTCA when they are in their country of origin or during the transit process in Mexico.

The Central American Minors Refugee/Parole Program (CAM[26]) was created in 2014 to reduce the exposure to transnational crime and trafficking, and more generally to the dangers and violence encountered by minors of age while trying to reach the US alone. The program, currently under threat of being dissolved under current US administration, has specific quotas and is reachable through US Embassies in Guatemala, El Salvador and Honduras. The program may also be accessed through a specific request from a child's family in the United States, provided that the eligible minor can prove that she or he is in the process of reuniting with close relatives legally residing in the United States. The program does not ensure adequate protection of these minors pending the analysis of their request (according to the US Department of State, this process can take up to 18 to 24 months). It is therefore not adequate for safeguarding the lives of minors at risk. Individuals who do not have direct family members legally residing in the United States have little option but to try to reach US territory by any means. The CAM program is not accessible through a third country like Mexico, where the US embassy does not have a dedicated office or department. As a result, thousands of unaccompanied minors have no other choice but to continue their journey alone or through organized crime networks, hoping to reach US soil.

## Border control, detention, and deportation from the United States to the NTCA

US Customs and Border Protection (CBP) **apprehended** 337,117 people nationwide in FY 2015[27], compared to 486,651 in FY 2014, a 31 percent decrease. Of those, 39,970 were unaccompanied children[28]. From the total apprehended, 134,572 were from the NTCA—43,564 of whom were from El Salvador, 57,160 from Guatemala, and 33,848 from Honduras. Among other factors, the decrease in 2015 could be partly due to the shift of border control from US territory to Mexican territory under the Plan Frontera Sur joint effort. Apprehension of people from the NTCA is declining in the United States in the same proportion as it is climbing in Mexico.

In FY 2015, US Immigration and Customs Enforcement **removed/deported**[29] 21,920 people from El Salvador, 33,249 from Guatemala, and 20,309 from Honduras.

Many returnees who fled violence fear returning to their neighborhood. Upon return, women are often targeted and experience direct threats from gang members, often the same individuals who drove the families to flee. These threats include pressure to join criminal groups, pay money or "rent" to them, or sell drugs. Most of the women interviewed for this report revealed that upon return they were forced to live in hiding as a way to protect themselves from violent groups[30].

According to UNHCR, some returnees remain identifiable by gang members near the reception centers and elsewhere, and some returnees have been killed by gangs shortly after return[31].

---

24_ Call to Action: Protection Needs in the Northern Triangle of Central America. UNHCR. Discussion Paper A Proposal for a Strategic Regional Response.

25_Source: MSF calculations based on information from US Homeland Security. Yearbook of Immigration Statistics 2015.

26_ https://www.uscis.gov/CAM

27_ Fiscal Year 2015 CBP Border Security Report December 22, 2015. https://www.dhs.gov/sites/default/files/publications/CBP%20FY15%20Border%20Security%20Report_12-21_0.pdf

28_ U.S. Custom and border protection. Official website of the Department of Homeland Security. https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2015

29_ Source: ICE Enforcement and Removal Operations Report. Fiscal Year 2015. U.S. Immigration and Customs Enforcement. https://www.ice.gov/sites/default/files/documents/Report/2016/fy2015removalStats.pdf

30_ American Immigration Council, DETAINED, DECEIVED, AND DEPORTED. Experiences of Recently Deported Central American Families.

31_ Call to Action: Protection Needs in the Northern Triangle of Central America. UNHCR. Discussion Paper A Proposal for a Strategic Regional Response.

**Honduran—Male—24 years old—**

"I decided to leave my country due to threats of death and persecution by criminal groups. I did not know what to do because my family does not support me because of my sexual preference. I made the decision to leave my country because I was afraid and I did not know where to go. We arrived here at Tenosique, where they stopped us.  They asked me for my documents and told me that if I did not have papers, I would be deported.

I started to remember [the past] and said that I did not want to go back to Honduras. I started to cry. I felt the world crumbling down over me. Then we arrived at the station, and they interviewed me. I discussed my case with a migration officer and started talking about the shelter, but he told me that I had to be in a migration station for three to four months and asked if I could manage this. This is nothing compared to everything I have lived through in Honduras. He told me to think about it, and I told him that I had nothing to think about--that I want to ask for refuge even if I am at the station for three months. I spent a month in the migration station.

I arrived here [Albergue la 72] and spent two months. The refugee [application] process lasted three months, and then they gave me the answer denying me refuge. So I was very sad, and I did not know what to do. I said I wanted to appeal, because I do not want to return to Honduras."

**Salvadoran—Female—36 years old—**

"I requested asylum through the US embassy in San Salvador in 2011. My husband was a police officer, and [also] worked with the Mara [criminal gang]. I was threatened several times by the other gangs, because they wanted to retaliate against my husband for being a spy. I survived this, but then they started to threaten my children. I thought I should leave. My sister lives in the USA. I thought I could go there and join her. But I never received an answer to my request. I had no other choice but to stay and try to survive. My husband was killed in 2015. Then they came, they raped my kid and chased me from my house. They said I should leave, or they would take my kids. I had no other choice. The little money I had, I gave to the pollero [smuggler] to help us. I heard there were stories of rape and kidnapping along the road, but I thought: God will help me through it."



Central American migrants travel by train in Mexico in 2014. Many fall victim to violence along the journey.

© ANNA SURINYACH



© CHRISTINA SIMONS

A Central American migrant in Tenosique shows the identification card issued by Mexico's National Institute of Migration, which enables him to stay in Mexico with legal protections.

# 8

## CONCLUSION: ADDRESSING THE GAPS

As a medical humanitarian organization providing care in Mexico, in particular to migrants and refugees, since 2012, MSF staff has directly witnessed the medical and humanitarian consequences of the government's failure to implement existing  policies meant to protect people fleeing violence and persecution in El Salvador, Guatemala and Honduras, as described in the report.

As of 2016, MSF teams have provided 33,593 consultations through direct assistance to patients from NTCA with physical and mental traumas. People tell our staff that they are fleeing violence, conflict and extreme hardship. Instead of finding assistance and protection, they are confronted with death, different forms of violence, arbitrary detention and deportation. The dangers are exacerbated by the denial of or insufficient medical assistance, and the lack of adequate shelter and protection.

Furthermore, the findings of this report – the extreme levels of violence experienced by refugees and migrants in their countries of origin and in transit through Mexico -- comes against a backdrop of increasing efforts in Mexico and the United States to detain and deport refugees and migrants with little regard for their need for protection.

Medical data, patient surveys, and terrifying testimonies illustrate that NTCA countries are still plagued by extreme levels of crime and violence not dissimilar from the conditions found in the war zones. Many parts of the region are extremely dangerous, especially for vulnerable women, children, young adults, and members of the LGBTQ community. As stated by MSF patients in the report, violence was mentioned as a key factor for 50.3 percent of Central Americans leaving their countries. Those being denied refugee or asylum status or regularization under humanitarian circumstances are left in limbo. Furthermore, being deported can be a death sentence as migrants and refugees are sent back to the very same violence they are fleeing from. The principle of non-refoulement must be respected always, and in particular for people fleeing violence in the NTCA.

A stunning 68.3 percent of migrants and refugees surveyed by MSF reported having been victims of violence on the transit route to the United States.

Mexican authorities should respect and guarantee —in practice and not only in rhetoric— the effective protection and assistance to this population according to existing legal standards and policies.

There is a longstanding need to strengthen the Refugee Status Determination System (RSD). It must ensure that individuals in need of international protection and assistance are recognized as such and are given the support —including comprehensive health care, to which they are all entitled. Access to fair and effective RSD procedures must be granted to all asylum-seekers either in Mexico, the US, Canada and the region.

Governments across the region—mainly El Salvador, Guatemala, Honduras, Mexico, Canada and the United States—should cooperate to ensure that there are better alternatives to detention, and should adhere to the principle of non-refoulement. They should increase their formal resettlement and family reunification quotas, so that people from NTCA in need of protection and asylum can stop risking their lives and health.

Attempts to stem migration by fortifying national borders and increasing detention and deportation, as we have seen in Mexico and the United States, do not curb smuggling and trafficking operations. Instead, these efforts increase levels of violence, extortion and price of trafficking. As described in the report, these strategies have devastating consequences on the lives and health of people on the move.

The impact of forced migration on the physical and mental well-being of people on the move—in particular refugees and migrants, and, among them, the most vulnerable categories represented by women, minors, and LGBTQ individuals—requires immediate action. The response should ensure strict respect of the law and the adequate allocation of resources to provide access to health care and humanitarian assistance, regardless of the administrative status of the patient (as enshrined by Mexican law).

Addressing gaps in mental health care, emergency care for wounded, and strengthening medical and psychological care for victims of sexual violence by ensuring the implementation of adequate protocols, including provision of and access to the PEP kit, is fundamental to treating refugee patients with dignity and humanity.

As witnessed by MSF teams in the field, the plight of an estimated 500,000 people on the move from the NTCA described in this report represents a failure of the governments in charge of providing assitance and protection. Current migration and refugee policies are not meeting the needs and upholding the rights of assistance and international protection of those seeking safety outside their countries of origin in the NTCA. This unrecognized humanitarian crisis is a regional issue that needs immediate attention and coordinated action, involving countries of origin, transit, and destination.



© CHRISTINA SIMONS

An MSF psychologist meets with a young patient in Mexico in 2016.

**ANNEX 1**
RISK FACTORS

*Precipitating events identified in mental health consultations during 2015 and 2016*

| Precipitating Events and percentage of MSF patients affected | 2015 | 2016 | TOTAL | % |
|---|---|---|---|---|
| Violence as precipitating event: Other physical violence | 517 | 342 | 859 | 47.2% |
| Violence as precipitating event: Forced to flee/IDP/refugee/migration | 552 | 305 | 857 | 47.1% |
| Violence as precipitating event: Received threats | 516 | 284 | 800 | 44.0% |
| Violence as precipitating event: Witnessed violence/killing/threats | 202 | 97 | 299 | 16.4% |
| Violence as precipitating event: Domestic violence | 96 | 103 | 199 | 10.9% |
| Violence as precipitating event: Hostage/Kidnapping/Forced recruitment | 97 | 81 | 178 | 9.7% |
| Separation/Loss as precipitating event: Loss of family income | 108 | 45 | 153 | 8.4% |
| Violence as precipitating event: Marginalization/target of social stigma/discrimination | 93 | 56 | 149 | 8.2% |
| Violence as precipitating event: Sexual violence outside family | 82 | 64 | 146 | 8.0% |
| Violence as precipitating event: Deportation | 94 | 40 | 134 | 7.3% |
| Separation/Loss as precipitating event: Family member(s) killed / missing | 75 | 40 | 115 | 6.3% |
| Violence as precipitating event: Sexual violence inside family | 28 | 41 | 69 | 3.7% |
| Violence as precipitating event: Incarceration / Detention | 35 | 25 | 60 | 3.3% |
| Separation/Loss as precipitating event: Family member died | 28 | 20 | 48 | 2.6% |
| Separation/Loss as precipitating event: Unaccompanied minor/orphan | 28 | 19 | 47 | 2.5% |
| Medical condition as precipitating event: Severe medical condition | 31 | 14 | 45 | 2.5% |
| Medical condition as precipitating event: Highly stigmatized diseases | 32 | 13 | 45 | 2.5% |
| Disaster/Catastrophes as precipitating event: Accidents | 31 | 14 | 44 | 2.4% |
| Medical condition as precipitating event: History of psychological or psychiatric disorder | 19 | 10 | 29 | 1.6% |
| Violence as precipitating event: Combat experience | 17 | 9 | 26 | 1.4% |
| Violence as precipitating event: Victim of human trafficking/smuggling | 8 | 16 | 24 | 1.3% |
| Violence as precipitating event: Torture | 3 | 14 | 17 | 0.9% |
| Separation/Loss as precipitating event: Property destroyed or lost | 11 | 5 | 16 | 0.9% |
| Medical condition as precipitating event: Unwanted pregnancy | 9 | 6 | 15 | 0.8% |
| Other event/risk | 13 | 0 | 13 | 0.7% |
| Separation/Loss as precipitating event: Family member(s) arrested/detained | 0 | 12 | 12 | 0.7% |
| Separation/Loss as precipitating event: Caretaker neglected | 3 | 6 | 9 | 0.5% |
| Disaster/Catastrophes as precipitating event: Natural disaster | 0 | 2 | 2 | 0.1% |
| Violence as precipitating event: home incursion | 0 | 1 | 1 | 0.1% |

## ANNEX 2
### REACTION SYMPTOMS

*Reaction symptoms identified in mental health consultations during 2015 and 2016*

| Reaction symptoms and percentage of MSF patients affected | 2015 | 2016 | TOTAL | % |
|---|---|---|---|---|
| Anxiety-related reaction: Anxiety / stress | 732 | 295 | 1027 | 56.50% |
| Anxiety-related reaction: Constant worry | 666 | 312 | 978 | 53.82% |
| Depression-related reaction: Sad mood | 586 | 294 | 880 | 48.43% |
| Anxiety-related reaction: Excessive fear/Phobia/Feeling threatened | 209 | 118 | 327 | 17.99% |
| Psychosomatic reaction: Sleeping problems | 245 | 78 | 323 | 17.77% |
| Psychosomatic reaction: General body pain and other psychosomatic complaints | 206 | 75 | 281 | 15.46% |
| Depression-related reaction: Irritability/anger | 180 | 74 | 254 | 13.97% |
| Depression-related reaction: Guilt/Self-blame/Feeling worthless/Low Self-esteem | 105 | 60 | 165 | 9.08% |
| Depression-related reaction: Hopeless | 89 | 68 | 157 | 8.64% |
| Post-traumatic reaction: Intrusive feelings, thoughts | 99 | 56 | 155 | 8.53% |
| Post-traumatic reaction: Hyper vigilance/Exaggerated startle response | 87 | 40 | 127 | 6.98% |
| Post-traumatic reaction: Flashbacks | 68 | 43 | 111 | 6.10% |
| Depression-related reaction: Loss of interest/anhedonia | 47 | 41 | 88 | 4.84% |
| Behavioral problems reaction: Alcohol/substance abuse | 62 | 23 | 85 | 4.69% |
| Post-traumatic reaction: Avoidance | 39 | 37 | 76 | 4.18% |
| Behavioral problems reaction: Impulsiveness | 28 | 23 | 51 | 2.80% |
| Psychosomatic reaction: Eating problems | 33 | 10 | 43 | 2.36% |
| Behavioral problems reaction: Aggressiveness | 23 | 19 | 42 | 2.31% |
| Behavioral problems reaction: Social/inter-personal isolation | 23 | 12 | 35 | 1.92% |
| Behavioral problems reaction: Reduction of family attachment / involvement | 25 | 10 | 35 | 1.92% |
| Depression-related reaction: Suicidal thoughts | 19 | 15 | 34 | 1.87% |
| Cognitive problems reaction | 21 | 10 | 30 | 1.65% |
| Anxiety-related reaction: Compulsive or repetitive behavior | 20 | 10 | 30 | 1.65% |
| Psychosis-related reaction: Disorganized thoughts/speech | 20 | 6 | 26 | 1.43% |
| Psychosis-related reaction: Bizarre behavior | 16 | 8 | 24 | 1.32% |
| Depression-related reaction: Suicidal intention/attempts | 14 | 8 | 22 | 1.21% |
| Psychosis-related reaction: Hallucinations | 15 | 4 | 19 | 1.04% |
| Psychosomatic reaction: Hypo/hyper-activity | 14 | 3 | 17 | 0.93% |
| Post-traumatic reaction: Dissociation | 10 | 5 | 15 | 0.82% |
| Psychosis-related reaction: Delusions | 9 | 2 | 11 | 0.60% |
| Depression-related reaction: Self-harm | 5 | 3 | 8 | 0.44% |
| Behavioral problems reaction: Delinquent behavior | 3 | 5 | 8 | 0.44% |
| Other reaction | 1 | 6 | 7 | 0.38% |
| Psychosomatic reaction: Enuresis and/or encopresis | 5 | 2 | 7 | 0.38% |
| Psychosomatic reaction: Sexual problems | 3 | 3 | 6 | 0.33% |
| Psychosomatic reaction: Psycho-motor changes | 5 | 0 | 5 | 0.27% |
| Behavioral problems reaction: Regression in development | 2 | 3 | 5 | 0.27% |
| Psychosomatic reaction: Verbal expression changes | 3 | 0 | 3 | 0.16% |

## ANNEX 3
### SURVEY METHODOLOGY

The victimization survey technique measures violence actually "experienced" by people and not only the violence known through police and other official reports. The survey consists of asking questions directly to people about the acts of violence they have suffered and how they felt about them. The protocol has been adapted for MSF's specific purpose, with a focus on medical/physical health and mental health consequences of violence. It includes three parts:

1) What is the violence actually experienced by people?
2) What did people do about what they experienced (focus on health)?
3) What direct or indirect impacts did violent experiences have on medical/physical health and mental health?

The cluster sampling method was used. Four clusters corresponding to the MSF attention points in the migrants' hostels were selected. Representativeness of the survey population is therefore significantly above the normal statistical level, guaranteeing a margin of error less than the 3 percent generally tolerated in this kind of study. The survey provides an accurate picture, but it is nevertheless a snapshot of the situation for these migrants and refugees at a specific moment in time. By no means are the results representative over the long term, especially given the nomadic nature of the population, the rapid changes in immigration policy, and the volatility of organized crime.

The acceptance rate was a main initial concern, given the subject of the survey (explicit violence) and the population it was applied to (migrants in irregular situations). People were actually quite eager to talk about their situation. The final acceptance rate was a satisfying 74.3 percent. 120 migrants rejected participation, 73 of whom (61 percent) were in Tenosique alone. The rejection rate in Tenosique was 49.6 percent, and fell down to 15 percent in Ixtepec, 9.8 percent in San Luis Potosí, and 22.2 percent in Huehuetoca/Bojay.

The investigators and data manager were trained and controlled during the entire process by a BRAMU survey coordinator. Each questionnaire has been checked and eventually returned to the investigator in the event of incoherence.

The study design and adapted questionnaire was submitted to OCBA medical department for feedback and approval. Approval was solicited by a Mexican ethical review board. The questionnaire was fine-tuned in collaboration with the surveyor's team and members of the project to avoid or rephrase potentially risky questions. Albergues staff and coordination members were previously informed. No smart-phones, cameras, or recording devices were allowed.

Terms of consent were presented to all participants orally (in this context of migration, anonymity was crucial for participation and accuracy, so no signatures were collected). Participants were informed that they were entitled to psychological support during and after the survey. At all survey points and during all working hours, a clinical psychologist was present with the survey teams, along with MSF social workers in two albergues. 12.6 percent of the survey participants were referred to mental health services provided by MSF staff.

A dedicated email was established for participants wanting more information on the survey and results restitution.

No security incident was reported during the survey.

## ANNEX 4
LIST OF ACRONYMS

**CAM:** Central American Minors

**COMAR:** Comisión Mexicana de Ayuda a Refugiados

**CPSB:** Comprehensive Plan for the Southern Border (most known in Spanish as "Plan Frontera Sur")

**FY 2015:** Fiscal Year 2015

**INGO:** International Non-Governmental Organization

**INM:** Instituto Nacional de Migración

**LGBTQ:** Lesbian-Gay-Bisexual-Transgender-Queer

**MSF:** Médecins Sans Frontières /Doctors Without Borders

**NTCA:** Northern Triangle of Central America

**OC:** Organized Crime

**PEP:** Post-Exposure Prophylaxis

**PTSD:** Post-Traumatic Stress Disorder

**RSD:** Refugee Status Determination

**SEGOB:** Secretaría de Gobernación de México

**SSV:** Survivors of Sexual Violence

**SV:** Sexual Violence

**TCO:** Transnational Criminal Organizations

**TPS:** Temporary Protected Status

**UN:** United Nations

**UNHCR:** United Nations High Commissioner for Refugees

**UNODC:** United Nations Office on Drugs and Crime

**USA:** United States of America

**VAT:** Victimization Assessment Tool

**WHO:** World Health Organization



# EXHIBIT 20

# A Journey of Hope:
## Haitian Women's Migration to Tapachula, Mexico







A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico

© 2021, Center for Gender and Refugee Studies
All rights reserved.

This Report is published in its original version on the websites of the Center for Gender and Refugee Studies, Instituto para las Mujeres en la Migración, and Haitian Bridge Alliance, and may be published elsewhere only with permission. Please contact cgrs@uchastings.edu for more information.

**ISBN** 978-1-7362004-0-7

Center for Gender and Refugee Studies
University of California, Hastings College of the Law
200 McAllister Street
San Francisco, CA 94102
http://cgrs.uchastings.edu

This Report should be cited as:
S. Priya Morley et al., *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico* (2021)

# A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico



## ACKNOWLEDGEMENTS AND ABOUT THE AUTHORS

**PRIMARY INVESTIGATORS & AUTHORS**
S. Priya Morley, Arthur Helton Global Human Rights Fellow, NYU School of Law
Nicole Phillips, Legal Director, HBA

**CO-INVESTIGATORS & AUTHORS**
Blaine Bookey, Legal Director, CGRS
Molly Goss, Transnational Family Case Manager, IMUMI

**CONTRIBUTING AUTHORS**
Isaac Bloch, Legal Program Associate, CGRS
Brynna Bolt, Legal Intern, HBA & Member, Hastings to Haiti Partnership

**CONTRIBUTING RESEARCHERS**
Yusuf Abdulkareem, Legal Intern, IMUMI
Franceska Konner, Intern, HBA
Katherine La Puente, Volunteer, IMUMI

The interviews outlined in this report were conducted in March 2020 in Tapachula, Mexico with the support of the following UC Hastings students: Susana Aguilera, Irella Blackwood, Brynna Bolt, Carlisle Englehart, Christina Ennis, Shayda Golshan, Emma Hyndman, and Alison Steffel.

The Authors are grateful for the advice and other assistance provided by: Sophie Breen, Lorena Cano Padilla, Moira Duvernay, Elizabeth Fulton, Ellie Happel, Lizeth Margarita García Ríos, Guerline Jozef, Staveline Julien, Helen Kerwin, Gretchen Kuhner, April J. Mayes, Enrique Vidal Olascoaga, Kimberly Osias, Nicole Elizabeth Ramos, and Valeria Scalisse García.

Editing and cite checking support was provided by: Susana Aguilera, Brynna Bolt, Nina Harris, Emma Hyndman, Franceska Konner, Felipe Navarro-Lux, and Alison Steffel.

Interpretation and translation support was provided by: Victor Adame, Susana Aguilera, Isaac Bloch, Blaine Bookey, Nadege Cherubin, Jeremy Dupin, S. Priya Morley, and Nicole Phillips.

Formatting and publication was done by: Miriam González Sánchez.

Design: Isaac Ávila, Ramón Arceo.

IMUMI's design and publication work on this Report would not have been possible without the generous support of Open Society Foundations, Heinrich Böll Foundation and Foundation for a Just Society.

**El Instituto para las Mujeres en la Migración, A.C.** ("Institute for Women in Migration" or "IMUMI") is a Mexican NGO that advocates for women migrants and their families within the region of Mexico, the U.S., and Central America. IMUMI addresses issues important to migrant women through legal strategies, research, communication, and advocacy. IMUMI collaborates with other civil society organizations, academic institutions, and governments to advocate for gender-specific migration and human rights policies.

**Haitian Bridge Alliance** ("HBA") is a nonprofit community organization that advocates for fair and humane immigration policies and connects migrants with humanitarian, legal, and social services, with a particular focus on Black migrants, the Haitian community, women, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. Since 2015, HBA has provided services to asylum seekers and other migrants at the U.S.-Mexico border, in U.S. detention, and during U.S. immigration proceedings. As HBA Co-Founder and Executive Director Guerline Jozef says, "We went to the U.S.-Mexico border to help our Haitian brothers and sisters, but we saw Africans and Central Americans in need as well. We stayed for everyone else."

**The Center for Gender & Refugee Studies** ("CGRS"), based at the University of California Hastings College of the Law, protects the fundamental human rights of refugee women, children, LGBTQ individuals and others who flee persecution in their home countries. The Center's core programs include training and technical assistance, litigation, and policy and advocacy. Since its founding in 1999, CGRS has participated in UC Hastings initiatives advancing human rights and the rule of law in Haiti through academic exchange, human rights fact-finding, and other advocacy.

# Contents

*A JOURNEY OF HOPE: HAITIAN WOMEN'S
MIGRATION TO TAPACHULA, MEXICO*                                    12

CHAPTER 1: INTRODUCTION                                            14

CHAPTER 2: STUDY DESIGN AND METHODOLOGY                            18

    **A.** ***Mujeres Negras Migrantes en México*** **& Interview Guide Design**   20

    **B.** **Objectives of the Study**                              21

    **C.** **Data Collection**                                      21

    **D.** **Data Analysis**                                        23

    **E.** **Ethical Considerations**                               23

    **F.** **Sexual and Gender-Based Violence ("SGBV")**            23

CHAPTER 3: MIGRATION IN MEXICO                                     25

    **A.** **History of Migration in Mexico**                       27

    **B.** **Mexican Immigration Law**                              27
        1.  Asylum/Refugee Law                            27
        2.  Procedure for Making Asylum/Refugee Claims    29
        3.  Humanitarian Status                           30
        4.  *"Salvoconducto"*                             31

    **C.** **"The Mexican Wall": Immigration
        Enforcement in Mexico Since December 2018**       31

    **D.** **Situation as of Summer 2020**                          33

CHAPTER 4: RECENT MIGRATION FROM HAITI                             35

    **A.** **Economic and Political Context**                       37

    **B.** **Disproportionate Impact of Poverty
        and Political Violence on Haitian Women**         39

CHAPTER 5: HISTORICAL PATTERNS
OF HAITIANS WHO ARRIVED TO MEXICO                                  41

    **A.** **Wave of Haitian Migrants in 2015-2018**                43

    **B.** **Brazil: A Destination for Haitians
        After the January 2010 Earthquake**               44
        1.  Migration and Legal Context of Migration to Brazil Before 2016   44
        2.  Economic Recession, Xenophobia, and
           Anti-Black Racism Forced Haitians to Leave Brazil   45

3.  New Legal Restrictions Put in Place Against Haitian Migration    45

C.  **Response of Mexico's Immigration Authorities
to the 2015-2018 Wave of Haitian Migration**    46

CHAPTER 6: RECENT MIGRATION
ROUTE–TRAVEL TO/THROUGH CHILE    47

A.  **Situation in Chile**    49

1.  Chile as a Destination for Haitians    49

2.  Chilean Immigration Law Applicable to Haitians Before 2018    50

B.  **The Experience of Haitians in Chile**    51

CHAPTER 7: U.S. IMMIGRATION POLICIES UNDERMINE
PROTECTIONS FOR HAITIAN ASYLUM SEEKERS    55

CHAPTER 8: FINDINGS: THE VULNERABILITY
OF HAITIAN MIGRANTS IN TAPACHULA    59

A.  **Traumatic Journey from South America to Mexico:
"The voyage here will mark my life forever"**    61

B.  **Life of Isolation and Misery in Mexico:
"All I do is take care of my children at the house and go
to the immigration office to follow up on news of our case"**    62

1.  Medical Care    63

2.  Housing    63

3.  Schools    63

4.  Work    64

5.  Lack of Community Center    64

6.  Isolation and Fear    65

C.  **Barriers to Asylum and Other Forms of Legal Protection**    65

1.  COMAR: Delays and Procedural Violations with
Asylum Claims, Including Lack of Language Access    66

2.  INM: Delays in Issuing TVRH cards and Arbitrary Detention    68

3.  Xenophobia, Racism, and Discrimination
Against Haitian Migrants    70

D.  **COVID-19 and Migrants in Mexico**    71

1.  Migration to Mexico    72

2.  Mexico: Closure of Migrant Shelters and
Lack of Health Care During COVID-19    72

3.  Delays in Processing Asylum Claims    73

CHAPTER 9: RECOMMENDATIONS    75

**Recommendations for the Mexican government
and its agencies, including INM and COMAR**    77

**Recommendation for civil society organizations**    79

APPENDICES                                                                                    81

    **I.**   **Statistics of Haitian Migration in Mexico**                              83

       References                                                               91

    **II.**  **Statistics of Haitian Migration in Chile**                               93

       References                                                               101

    **III. Overview of Anti-Asylum Policies**
        **Implemented in the U.S. Southern Border**                          102

ANNEXES: PROFILES OF SELECTED INTERVIEWEES                                                     104

    **Profile One**                                                                  106

    **Profile Two**                                                                  107

    **Profile Three**                                                                108

    **Profile Four**                                                                 109

NOTES                                                                                          110

## LIST OF ENTITIES INTERVIEWED FOR THE STUDY

*Al Otro Lado*, Tijuana, Mexico

*Centro de Derechos Humanos Fray Matías de Córdova A.C.* ("Fray Matías Human Rights Center" or "Fray Matías"), Tapachula, Mexico

*Centro National de Derechos Humanos* ("National Center of Human Rights" or "CNDH"), Tapachula, Mexico

*Clínica de Migrantes y Refugiados, Facultad de Derecho, Universidad Diego Portales*, Santiago, Chile

*Clínica Jurídica de Migrantes, Facultad de Derecho*, Universidad Alberto Hurtado, Santiago, Chile

*Programa Casa Refugiados* ("Casa Refugiados"), Mexico City, Mexico

*Servicio Jesuita a Migrantes* ("Jesuit Refugee Services" or "JRS"), Tapachula, Mexico

*Sin Fronteras* IAP ("Sin Fronteras"), Mexico City, Mexico

## TABLE OF ACRONYMS

ACNUR: Alto Comisionado de las Naciones Unidas para los Refugiados
CERD: Committee on the Elimination of Racial Discrimination
CEDAW: Committee on the Elimination of Discrimination against Women
CGRS: Center for Gender & Refugee Studies
COMAR: Comisión Mexicana de Ayuda a Refugiados
CNDH: Centro National de Derechos Humanos
HBA: Haitian Bridge Alliance
IMUMI: Instituto para las Mujeres en la Migración, AC
INM: Instituto Nacional de Migración
MPP: Migrant Protection Protocols
SGBV: Sexual and Gender-Based Violence
TVRH: Tarjetas de visitante por razones humanitarias
UNHCR: United Nations High Commissioner for Refugees
UN: United Nations
NGO: Non-governmental organization
LGBTQIA+: Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Asexual, plus
CONARE: National Committee for Refugees SSA: Secretary of Health
INDH: National Human Rights Institute

## DEFINITIONS

The Authors use the umbrella term **"migrant",** defined as "a person who moves away from his or her place of usual residence, whether within a country or across an international border, temporarily or permanently, and for a variety of reasons."[1] In certain contexts, such as discussing immigration law, the Authors use the term "foreign national" instead of "migrant."

The Authors use the term **"refugee"** to describe someone who, it has been recognized, "has been forced to flee his or her country because of persecution, war or violence." "Asylum seeker" describes someone who is applying for refugee status but has not yet been determined to be a refugee.[2]

The Authors use the term **"Black"** to describe all peoples of African descent who are in Mexico as migrants, except where specifically referring to Haitians or Africans. When referring to Black Mexicans, the Authors use the term "Afro-Mexican" but recognize that individuals and communities in Mexico may identify otherwise, for example as "Afro-descendant" or "Black".

The Authors use the term **"sexual and gender-based violence"** or **"SGBV"** to describe "any act that is perpetrated against a person's will and is based on gender norms and unequal power relationships. It encompasses threats of violence and coercion. It can be physical, emotional, psychological, or sexual in nature, and can take the form of a denial of resources or access to services."[3]

## *A Journey of Hope: Haitian Women's Migration to Tapachula, Mexico*

*"When I try to go out, cars will not stop even though I'm pregnant. If I have to go to the health center, I walk. We do not have rights here."*

This is the experience of a Haitian woman living in Tapachula, Mexico, where she and thousands like her have voyaged through seven to eleven different countries, either via Brazil or Chile after fleeing Haiti, only to find themselves isolated, unsupported and marginalized in profound ways. A city near the border with Guatemala, Tapachula is an in-between place for Haitian migrants as they wait for their papers to travel elsewhere, some aiming to seek asylum in the United States.

This Report documents the daily indignities to which Haitian migrant and refugee women are subjected on their journeys in search of refuge, and also offers insight into their astounding resilience against all odds. Among the greatest strengths of the Report is its intersectional approach, highlighting the impact of overlapping structures of patriarchy and racial and xenophobic subordination on Haitian women. Not only must these women navigate the legal and social challenges of being foreign nationals in Mexico and the other countries through which they travel, but they must also navigate intolerance and exclusion based on racial and gender identity, which has been heightened by racist intolerance in the regions through which they move and attempt to settle. As the report highlights, among others, the racist and xenophobic politics of the United States are enforced even beyond the territories of that country because they are outsourced for enforcement by Mexican and other officials long before refugees and migrants even approach the U.S. border.

Although there is a large human rights and humanitarian literature on violations experienced by migrants and refugees in the Americas (and elsewhere), few do the work this Report does of highlighting the specific operation and effects of anti-Black racism as experienced by Haitians, and which they describe as resulting in treatment as though they were animals, rather than human beings. In order for advocacy on behalf of refugees and migrants to make a true difference, it must first name the structures of oppression they face, including anti-Blackness.

Interwoven with interviews and analysis, this Report not only situates migration from Haiti in the broader context of the Americas, but as already mentioned, also zooms in on the distinct, intersectional challenges Haitian migrant women face in Tapachula. Following the earthquake in 2010, persistent political and economic instability coupled with widespread human rights violations drove tens of thousands out of Haiti. Especially for women and girls, life was unsustainable under a dysfunctional government, longstanding patriarchy and vulnerability to violence. While many found initial haven in Brazil or Chile, since 2015 with tightening immigration policies, failing economies and rising discrimination there, Haitian women left, this time for Mexico with the hope of reaching the U.S. border. This route, traumatic as it is expensive, involves traversing thousands of miles through Peru, Colombia, across the Darien Gap into Panama, then Costa Rica, Nicaragua, Honduras and Guatemala over the course of several months.

Once in Tapachula, Haitian women must navigate an immigration system that has neither received nor was prepared to process tens of thousands of non-Spanish-speaking migrants. The lack of Spanish-*Creyol* interpreters makes the asylum process more difficult for Haitian migrants to understand their rights, make their case and check the status of their application. Language difference is also a critical barrier to finding work, benefitting from social services, and accessing legal and humanitarian assistance. This lack of meaningful support is further intensified by anti-Black racism and xenophobia from Mexican authorities, resulting in delays and arbitrary decisions against Haitian claims. The Mexican populace also perceives that Haitian migrants are there for economic reasons, instead of recognizing them as *bona fide* refugees.

This Report highlights myriad legal and social challenges to integration for Haitian women, and racial and xenophobic discrimination including through structures, policies and practices that on their face seem neutral. Of equal importance, the Report also identifies concrete recommendations that government officials and non-governmental actors such as humanitarian and human rights organizations can take to address the conditions of suffering and injustice highlighted. The women represented in the pages of this Report deserve no less than the implementation of these recommendations.

E. Tendayi Achiume
UN Special Rapporteur on Contemporary Forms of Racism,
Racial Discrimination, Xenophobia and Related Intolerance
October 2020

CHAPTER

# 1 INTRODUCTION





## Introduction

"Fabiola"[4] and her family arrived in Tapachula – a small Mexican city near the country's border with Guatemala – in October 2019. A nurse in Haiti, Fabiola had fled her home country two years earlier after her family received death threats. After spending almost two years in South America, she knew that her family had to migrate again in order "to seek a better life" in the United States. They spent two months traveling overland to Mexico. On the route, they were robbed and sometimes went without food or shelter for days. Since arriving in southern Mexico, Fabiola has been waiting for months for her family's case to be processed by Mexican immigration officials. Although she has tried to advocate for herself and her family, she feels that Mexican authorities do not understand or, in some cases, discriminate against Haitians. In her words: "It's like the blood that runs through their veins is not the same as the blood in our veins. They look at you like you are nothing because you're Black."

In recent years, Mexico has become a country of transit not only for Central American migrants and "migrant caravans" traveling north, but also for thousands of Haitians who – like Fabiola – made the long journey from Haiti into South America and, eventually, overland to Mexico or the United States. Haitians have been fleeing their country in droves since a 7.0 magnitude earthquake devastated Port-au-Prince and the surrounding areas in January 2010. Although many Haitians initially went to Brazil or Chile, immigration policies in those countries have become more restrictive in the last five years, leading to many Haitians traveling overland to Mexico. However, with the current Mexican Administration militarizing immigration enforcement in collaboration with the United States, it has become increasingly difficult for migrants arriving in southern Mexico to continue their journey north to the Mexico-U.S. border. Haitians – one of the most vulnerable migrant groups in Mexico – have been particularly impacted by these recent developments and, as non-Spanish speakers, are often unable to navigate the situation they are in.

In March 2020, IMUMI partnered with CGRS and HBA (together, the "Research Team") to travel to Tapachula and interview Haitian women about their experiences of migration to Mexico. The Research Team wanted to learn what barriers Haitian women face in obtaining humanitarian assistance and legal protection, as well as the connection between these barriers and the intersectional discrimination they experience as Black migrants. In addition to interviewing 30 Haitian women, the Research Team spoke with several service providers and other stakeholders in Tapachula and throughout Mexico.

This Report outlines the findings of those interviews, which highlight the numerous obstacles that Haitian women must overcome in order to access legal and other services, and to successfully move through the Mexican immigration system. The findings also outline the gender-based and anti-Black racial discrimination these women have faced not only in Mexico, but also on their route through South America. Similar to Fabiola's story, the findings suggest that many of the Haitians arriving to Mexico's southern border had left Haiti years earlier and already lived in Chile and/or Brazil for a significant period of time before reaching Mexico.



Photo: S. Priya Morley. Los Angeles neighborhood, Tapachula.

The Report contextualizes these findings within the broader context. First, the Report provides an overview of the Mexican immigration system and how the humanitarian situation of migrants has deteriorated under President Andrés Manuel López Obrador. Next, in order to better understand Haitian women's migration journey, the Report outlines the conditions in Haiti that caused them to flee; the political, legal and economic context in South America that caused them to migrate to, and subsequently leave, Brazil and Chile; and the immigration framework in the United States, where many hope to live. Finally, the Report provides recommendations for how to improve Mexico's response to Haitian migrant women and other similarly situated vulnerable groups.

# 2 STUDY DESIGN AND METHODOLOGY





# Study design and methodology

## A. *Mujeres Negras Migrantes en México* & Interview Guide Design

This Study forms part of *Mujeres Negras Migrantes en México* ("Black Migrant Women in Mexico"), a research project on the experiences of Black migrant women entering, transiting through, and/or settling in Mexico. This project was initiated in 2019 and is supervised by S. Priya Morley (NYU School of Law) and Molly Goss (IMUMI). From fall 2019 to early 2020, S. Priya Morley conducted preliminary desk research and outreach with experts and stakeholders, including: UN agencies, international organizations, academia, Mexican and U.S. civil society organizations, and members of the Afro-Mexican community.

As a result of these consultations, the project's initial focus was on Black African and Caribbean migrant women that had entered Mexico via its southern border. S. Priya Morley, a human rights lawyer, drafted a survey with primarily semi-structured questions and a few structured questions regarding demographic data. This format allowed interviewees to tell their stories in their own words except where specific information was required. The survey was reviewed by Mexican and U.S. immigration lawyers, a psychologist specialized in sexual and gender-based violence ("SGBV"), and advocates supporting Haitians (including HBA). The survey was revised after each review and again after interviews began in response to feedback from interviewers and interpreters.

The survey questions addressed the following topics:

- The demographics, countries of origin, reasons for leaving, and migration routes of the Black African and Caribbean migrant women arriving in Mexico

- The experiences these women and their families had with Mexican immigration authorities, what legal options they exercised to stay in or move through Mexico, and what support they received to exercise these options

- The intersectional discrimination that these women and their families experienced due to their race, gender, ethnicity, language, and countries of origin, and how this informed their interactions with Mexican immigration authorities, service providers, Mexican society, and other migrants

- The barriers to accessing legal and humanitarian services that these women and their families encountered

As described below, IMUMI partnered with CGRS and HBA – who have expertise working in Haiti, with Haitian migrants, and in Haitian *Creyol* ("Creole") – to conduct interviews with Haitian migrant women in Tapachula in March 2020 (the "Study") and write this Report. IMUMI had planned to conduct further interviews with African and Caribbean migrant women in Tapachula and Mexico City in spring 2020, with the support of various partner organizations, but was unable to proceed due to the COVID-19 pandemic. For more information about the intersectional dis-

crimination faced by Black migrants in Mexico, see *There is a Target on Us – The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border,* another publication arising from *Mujeres Negras Migrantes en México.*

## B.  Objectives of the Study

The purpose of this collaborative Study was to investigate, using empirical evidence: (1) the barriers, if any, that Haitian migrant women face in seeking humanitarian assistance and legal protection in Tapachula, Mexico; and (2) what links, if any, exist between these barriers and discrimination, including on the bases of gender, anti-Black racism, and xenophobia.

In relation to (1), the Study used quantitative data from interviews with Haitian migrant women in order to determine distinct trends and patterns of barriers, as well as qualitative data in the form of interviews with experts, service providers, academics, immigration lawyers, and other Haitian migrants to understand and contextualize the data from the survey responses. In relation to (2), the Study used qualitative data shared in the interviews with Haitian women, as well as interviews with experts, service providers, academics, immigration lawyers, and other Haitian migrants.

In addition to the interviews, the Authors used a number of secondary sources to supplement their understanding, including: Mexican, Brazilian, Chilean, and U.S. immigration law; domestic and international human rights law; migration statistics published by the Mexican and Chilean governments; studies and reports published by academics, human rights organizations, and the UNHCR and other UN agencies; and media coverage on relevant issues.

## C.  Data Collection

IMUMI, HBA and CGRS (together, the "Research Team") interviewed Haitian migrant women, experts and service providers in Tapachula from March 1 – March 7, 2020.[5] In addition, Nicole Phillips from HBA visited Tapachula from February 10 – 15, 2020, to conduct preliminary interviews and lay the groundwork for the Research Team's anticipated March trip. HBA had participated in six prior trips to Tapachula in 2019 to provide legal trainings and investigate the human rights crisis facing Haitian and other Black migrants from Africa, including from Cameroon, Democratic Republic of the Congo, Ethiopia, Eritrea, and other countries. HBA planned this investigation and data collection trip in consultation with the *Centro de Derechos Humanos Fray Matías de Córdova A.C.* ("Fray Matías Human Rights Center" or "Fray Matías") and several Haitian migrant activists in Tapachula based on knowledge and contacts acquired from prior trips.

The Research Team collected survey data from 29 Haitian migrants and one minor who was 17-years old, all of whom self-identified as "women," in Tapachula the week of March 1 – 7. To find interviewees, the Research Team traveled to four locations where Haitian migrant communities were known to live and convene, which included the *Los Ángeles* and *Insurgentes* residential neighborhoods of Tapachula, *Parque Central Miguel Hidalgo* ("Central Park of Miguel Hidalgo") – Tapachula's main square, and the migrant shelter *Jesús el Buen Pastor del Pobre y Migrante* ("Jesus the

Good Shepherd of the Poor and Migrant"). Members of the Research Team explained the research project to Haitian women in those locations and asked whether they would like to participate. In addition, members of the Research Team met some other interviewees at the office of *Servicio Jesuita a Migrantes* ("Jesuit Refugee Services" or "JRS") in Tapachula and were invited to the women's homes in the Insurgentes neighborhood to conduct interviews (see description below).

Interviews were conducted in front of or inside interviewees' homes, generally sitting on sparse concrete floors. Each interview was conducted by a team of 2-3 students and a *Creyol* to English interpreter (though in one case, the interviewee was fluent in Spanish and was interviewed in Spanish). Interviewees did not receive any compensation or other form of material benefit, except water, during the interview. Interviews lasted between 60-90 minutes, and were often emotional for both the interviewee and members of the Research Team.

In addition, the Research Team spoke informally with dozens of other Haitian migrants, both men and women, who lived in the communities with the interviewees in order to get additional perspectives on the context in Mexico. The Research Team also interviewed lawyers and advocates with the *Centro National de Derechos Humanos* ("National Center of Human Rights" or "CNDH") and JRS about their work with Haitian migrants and knowledge of the legal, social, and political context.

In the months following the March 2020 research trip, IMUMI conducted further interviews with JRS, as well as Mexico City-based *Programa Casa Refugiados* ("Casa Refugiados") and *Sin Fronteras* IAP ("Sin Fronteras") about the legal situation of Haitian migrants in Mexico. IMUMI also interviewed two immigration law clinics in Santiago, Chile – *Clínica Jurídica de Migrantes* ("Migrant Legal Clinic" at the Universidad Alberto Hurtado Law Faculty) and *Clínica de Migrantes y Refugiados* ("Migrant and Refugee Clinic" at the Universidad Diego Portales Law Faculty) – about Chilean immigration law and the barriers to integration faced by Haitian migrants in Chile. HBA conducted an interview with *Al Otro Lado* in Tijuana, Mexico, about the treatment of Haitian migrants in Mexico during the COVID-19 pandemic.

CNDH was created by the Mexican government in 1992 with the goal of collaborating with international organizations and national institutions that promote and defend human rights. CNDH receives complaints of human rights violations, investigates violations of human rights, and formulates recommendations, legal complaints, and complaints to the appropriate Mexican authorities. *Fray Matías*, JRS, *Casa Refugiados*, and *Sin Fronteras* are non-profit human rights organizations that provide legal, psycho-social, and other services to migrants. *Fray Matías* was created in 1994 in response to the constant abuses and violations of human rights in the region of Chiapas, Mexico. They provided assistance to more than 18,600 migrants in 2019, a quarter of them Haitian.[6] JRS, affiliated with Jesuit Refugee Services, provides service to people in transit through Mexico as they migrate to the United States and those who have decided to settle in the southern area of Mexico. *Casa Refugiados* is a Mexican non-profit, non-partisan, and secular Mexican civil society organization that operates in collaboration with ACNUR. *Sin Fronteras* is a civil society organization founded by social activists and academics in 1995 to respond to international migration from a human rights perspective.

## D. Data Analysis

Members of the Research Team typed up their notes for the 30 interviews with Haitian migrant women. The Authors summarized data from each interview and identified general trends of experiences, which are the basis for the structure of the findings in this Report. Illustrative quotations from interview responses were pulled and integrated into this Report to include, to the extent possible, the interviewees' voices.

While 30 interviews reflect a small sample size, these women's stories were remarkably similar to each other and tracked information the Research Team received from interviews with service providers and advocates as well as secondary sources. In sum, these women's stories seem to reflect the experiences of the Haitian women population in Tapachula more broadly.

## E. Ethical Considerations

The Research Team designed and implemented informed consent and identity protection protocols to protect the interviewees. Each interview team read the informed consent to the interviewee in *Creyol* and made sure that they understood the purpose of the interview and gave consent. Anonymity of participants was preserved through the use of coded numbers. Participants were also permitted to decline to give their full name, if they preferred. Other interviewees – such as experts or service providers – were also given the opportunity to explain how they would like to be identified in the Report or whether they wished to remain confidential. As a result, the Research Team met or spoke with entities that have not been identified in this Report.

## F. Sexual and Gender-Based Violence ("SGBV")

The Research Team intentionally did not ask specific questions about whether the interviewee had been a victim of SGBV, either in Haiti or since leaving Haiti, such as sexual assault or intimate partner abuse. Nor did the Research Team probe with intrusive follow-up questions if incidents of violence were mentioned. First, the Research Team wanted to limit the potential for re-traumatization of survey interviewees for the purpose of this Report. The Research Team did not want to open wounds without being able to offer legal or psychosocial support, which they were unable to provide given the limited length of their stay, their lack of training, and the lack of *Creyol*-language resources available in Tapachula. Second, while the Research Team tried to keep the interviews as private as possible, they could not maintain full privacy. Neighbors and family members often overheard the interviews through open windows and doors. In some cases, the interviewee's male partner insisted on being present during the interview.

The survey contained a few open-ended questions that could have solicited responses of SGBV, such as "Did you or anyone you were traveling with experience any violence, attacks or robberies during your transit to Mexico? If so, what happened?" and "Why did you leave Haiti? What caused you to leave when you did?" Although all of the interviewees stated that SGBV was rampant on the voyage from South America to Mexico, none of them admitted violence, sexual or otherwise, committed against themselves. Similarly, none of the women admitted that they personally were a victim

of SGBV in Haiti. But when one woman was asked why she left Haiti, she responded in graphic detail, "They were kidnapping people in Haiti and if you didn't have any money, they would rape you in your vagina, in your anus, until you pass out. That's why I left."[7]

The lack of candidness on this topic was expected. SGBV can be accompanied by stigma in Haitian culture, and women often do not report incidents of abuse to their friends, family members, or law enforcement.[8] The Research Team did not anticipate that the interviewees would report these incidents to strangers who had been clear that they could not offer any assistance with their asylum claims or otherwise to pursue justice. However, based on dozens of interviews that CGRS and HBA have conducted or observed with Haitian women seeking asylum in the United States, acts of SGBV are common reasons given for why they left Haiti.[9] (*see* Chapter 4, Section B below).

As a result, this Report does not detail incidents of SGBV, but the lack of incidents reported should not be read to imply that the women interviewed did not experience such violence.



Photo: S. Priya Morley. Interviewee's home.

CHAPTER

# 3 MIGRATION IN MEXICO





## Migration in Mexico

This section provides an overview of the immigration system in Mexico, which contextualizes the subsequent discussion of Haitians migrating to the country. In addition to outlining the relevant immigration law, this section illustrates how Mexico's restrictive approach to immigration enforcement, under the current Administration and under pressure from the United States, has negatively impacted Haitian and other migrants entering the country through its southern border.

### A.  History of Migration in Mexico

Mexico is often recognized as a country of origin and transit for migrants seeking safety and means of survival. Mexico's northern border has long been instrumental in facilitating human migration to the United States and Canada from Mexico and the rest of Latin America, the Caribbean, and other continents. In recent years, there has also been a dramatic increase in the number of migrants settling, by desire or necessity, in Mexico. This change is most evident in the over 5000 percent increase in applications for recognition of refugee status from 2013 to 2019.[10]

Mexico has a long history of accepting refugees, including Spaniards fleeing the Francoist regime in the 1930s and Latin Americans fleeing dictatorships in the 1970s.[11] The most significant migration movement into Mexico, with arguably the greatest impact on Mexico's modern asylum system, was the influx in the 1980s of Central American asylum seekers fleeing civil war and state violence. At the time, Mexico had no formal system for accepting refugees and was not prepared for the hundreds of thousands of Central Americans coming into the country.

In 1980, to address this new reality, the government created the *Comisión Mexicana de Ayuda a Refugiados* ("Mexican Commission for Refugee Assistance" or "COMAR") within the *Secretaría de Gobernación* ("Ministry of the Interior" or "SEGOB"). Shortly after COMAR was created, the United Nations High Commissioner for Refugees ("UNHCR" or "ACNUR" in Spanish) established a presence in the country.[12] From 1982 until 2003, the UNHCR was responsible for refugee status determination in Mexico and COMAR focused on providing aid.[13] COMAR took over the lead role in refugee status determination in 2003, but continued to receive guidance and assistance from the UNHCR until significant changes were made to Mexico's immigration system in 2011, as discussed below.

### B.  Mexican Immigration Law

#### 1.  Asylum/Refugee Law

The 1951 Convention Relating to the Status of Refugees ("The 1951 Convention") and the 1967 Protocol Relating to the Status of Refugees ("The 1967 Protocol") were key treaties that established refugee rights and protections. Most notably, the treaties defined a refugee as someone who, "owing to a well-founded fear of being persecuted" on the basis of race, religion, nationality, membership in a particular social group, or political opinion, cannot return to her home country.[14] Mexico became a party to the

1951 Convention and the 1967 Protocol in 2000, and incorporated the frameworks established in these treaties into its own laws in 2011.[15]

In 2011, Mexico passed an earlier version of the current *Ley Sobre Refugiados, Protección Complementaria y Asilo Político* ("Law on Refugees, Complementary Protection and Political Asylum" or "Law on Refugees").[16] This law codifies the protections outlined in the 1951 Convention and, notably, goes further by explicitly recognizing gender as a protected ground, allowing for refugee claims on the basis of sexual and other forms of gender-based violence.[17] The Law on Refugees also provides for political asylum, a specific and long-recognized protection within Latin America, which falls under the jurisdiction of the *Secretaría de Relaciones Exteriores* ("Secretariat of Foreign Affairs").[18] In addition, the Law on Refugees offers broader protections than the 1951 Convention by providing safe haven even if an individual is not recognized as a refugee (for example, because she is unable to establish a nexus between the harms and a protected ground) if she would experience other serious human rights violations if returned to her home country. The inclusion of "complementary protection", as it is referred to in Mexican law, made Mexico a pioneer in Latin America for broadening protection rights of refugees.

In the Law on Refugees, Mexico also codified the protections under the Cartagena Declaration.[19] The Cartagena Declaration is specific to Latin America and outlines broader grounds for refugee status, including in contexts of generalized violence and the disturbance of public order.[20] A 98-100 percent annual grant rate for Venezuelan asylum seekers since 2016 can be attributed to this expansion.[21] Central Americans constitute the majority of asylum seekers in Mexico, but in practice have not historically benefitted from the protections.[22] However, the Mexican government has recently begun applying the Cartagena Declaration to Honduran and Salvadoran asylum seekers, in addition to Venezuelans.[23] This reflects the government's "*prima facie* recognition that these [three] countries are plagued by generalized violence and/or massive human rights violations."[24] As outlined in Chapter 4 below, these conditions of generalized violence and/or massive human violations are prevalent in Haiti as well.

Mexico's Constitution also provides a constitutional right to political asylum and refugee status.[25] Article 11 states that: "[e]very person has the right to seek and receive asylum. Recognition of refugee status and granting of political asylum will be carried out in accordance with international treaties."[26]

## 2. Procedure for Making Asylum/Refugee Claims

### Steps to apply for asylum in Mexico

The process lasts 45 business days, starting from the submission of your application to the resolution of your case.

**01.**

**Submit Application**
Submit application to the Mexican Commission for Refugee Assistance (COMAR) or to the National Institute for Migration (INM), no later than 30 business days after your entry into the country.

**02.**

**COMAR**
COMAR will issue a receipt as proof that you submitted your application.

**03.**

**Applicant**
As the applicant, you should go on a weekly basis to COMAR or INM to continue processing your case.

**04.**

**COMAR**
Through a protection officer, COMAR will interview you. Take your time to recount everything, it is your case.

**05.**

**Verify Country Conditions**
COMAR will seek an opinion from the Secretariat of Foreign Affairs (SRE) about the conditions in your country of origin (15 business days).

**06.**

**Resolution**
COMAR will issue the resolution for your case, well-founded and substantiated. COMAR will notify you of their decision.

*If the decision is positive, you will be given legal status as a permanent resident. If the decision is negative, your case will be analyzed to see if you qualify for complementary protection, otherwise you may file an administrative appeal to COMAR (15 business days).

Since 2011, COMAR has been responsible for refugee status determination in Mexico. The INM also has jurisdiction to receive refugee claims, although COMAR still processes them.[27] The INM has many more offices throughout Mexico than COMAR. However, because the INM is also charged with immigration detention and deportation, some migrants are deterred from instigating claims with them unless they have already been detained.[28]

An asylum seeker must initiate a claim with COMAR or the INM within 30 business days of entering Mexico.[29] COMAR will issue a *constancia de trámite* ("proof of procedure"), an official ID document that identifies the recipient as an asylum seeker who should not be deported while the claim is still being processed.[30] This document allows the asylum seeker to apply for another official ID, *clave única de registro de*

*población* ("unique population registry code" or "CURP"), which is often necessary to work or access public healthcare, education, and government services.

By law, COMAR must process the claim within 45 business days.[31] This deadline may be extended to 90 days in exceptional circumstances, including where COMAR requires additional information to process the claim or language interpretation is required.[32] In practice, COMAR often misses these deadlines and can take months or a year to process claims.[33] The asylum seeker will often be required to check in with COMAR each week while her claim is being processed.[34] While the claim is ongoing, she is not permitted to leave the state in which it was initiated except where authorized.[35] In practice, she may face difficulties with immigration authorities or the *Guardia Nacional* ("National Guard"), a civilian-led security force that, since 2019, has been conducting immigration enforcement, even when attempting to travel within the state.

In order to adjudicate the claim, COMAR may conduct one or more interviews with the asylum seeker.[36] Where she does not speak Spanish, COMAR must provide her with support from a translator, interpreter, or other specialist that will facilitate communication.[37] She also has a right to bring her own legal representation.[38] The asylum seeker must give truthful information about her personal history, reasons for leaving her country of origin, and well-founded fear, as well as provide any proof she has that substantiates her claim. COMAR will also ask the Secretariat of Foreign Relations to provide an opinion on the conditions in the asylum seeker's country of origin.[39]

After making a determination on the asylum seeker's claim, COMAR must provide her with a written decision and reasons within 10 business days.[40] If the claim is granted, and the asylum seeker is recognized as a refugee, she obtains permanent residency in Mexico.[41] Where the claim is denied, the asylum seeker has 15 business days to request a reconsideration by COMAR, but this is generally restricted to the legality of the process rather than re-assessing the merits of the claim.[42] Additional options include judicial review or, where applicable, challenging the decision in the context of a human rights complaint.[43]

## 3. Humanitarian Status

Mexico's *Ley de Migración* ("Migration Law"),[44] also passed in 2011, provides for the granting of humanitarian status with *tarjetas de visitante por razones humanitarias* ("visitor cards for humanitarian reasons" or "TVRH", colloquially referred to as "humanitarian visas"). Humanitarian status may be granted to an asylum seeker whose claim is still being processed, to a foreign national who has been a victim of or witness to a crime in Mexico, to an unaccompanied child or adolescent migrant, or in other circumstances where it is determined to be in the public interest or for a humanitarian purpose.[45] Humanitarian status is intended to be temporary and is initially only granted for one year.[46]

It has been suggested that the use of temporary humanitarian status into Mexico's domestic policy was influenced by the increase in Haitian nationals arriving to Mexico after the 2010 earthquake.[47] As a result of discussions in the international community, Mexico provided Haitians with temporary status for humanitarian reasons, as did many other countries in the region. Humanitarian status-holders are legally entitled to work but often face barriers in accessing the documentation required to

work.[48] Practitioners have noted that Mexican authorities do not always issue a CURP to humanitarian status-holders, although they are entitled and this official ID is required to work. Further, employers do not always recognize the employment status of humanitarian status-holders, either discriminating against them on the basis of their immigration status or simply because they do not understand that they are legally entitled to work in Mexico.

### 4.  *"Salvoconducto"*

Apart from the aforementioned legal pathways to stay in Mexico, some migrants have been able to transit through Mexico to the Mexico-U.S. border after receiving an *oficio de salida del país*[49] ("exit permit from the country").[49] Migrants and practitioners alike often call this document a "*salvoconducto*"[50] ("safe passage") referring to a now defunct legal document allowing safe passage through Mexico.[51] Under the regulations to the Migration Law, the INM has discretion to authorize the departure from Mexican territory of foreign nationals without immigration documentation (or with invalid or expired documentation), and to issue them an *oficio de salida del país* that permits them to leave the country within an amount of time determined by the INM (often 20 days).[52] These "documents have typically been granted to citizens from countries that lack consular representation in Mexico, or that did not accept the return of their citizens."[53]

Practitioners have observed that the INM in Tapachula has been more inclined to issue *oficios de salida del país* at times where an influx of migrants into southern Mexico has led to an overflow in immigration detention and/or a backlog in processing claims.[54] The INM's exercise of discretion is also influenced by the country's overall approach to immigration at that time. Until Mexico's approach to immigration became more restrictive in 2019, as discussed below, the INM office in Tapachula regularly issued *oficios de salida del país* to many Haitian migrants, as well as Cuban, African, and Asian migrants who were transiting through Mexico in order to reach the United States.[55]

## C.  "The Mexican Wall": Immigration Enforcement in Mexico Since December 2018

Before he took office on December 1, 2018, President Andrés Manuel López Obrador signaled that he would take a more permissive approach to immigration than his predecessor.[56] His Administration vowed to move away from viewing migrants through a national security lens, an approach that had led to an aggressive clamp-down on migrant caravans in October 2018 by former President Enrique Peña Nieto.[57] Instead, President López Obrador's rhetoric focused on protecting the human rights of migrants, particularly those arriving in waves from Central America.[58] Some Mexican civil society groups, including IMUMI, were cautiously optimistic that a more progressive approach to migration was imminent. They submitted proposals to the incoming Administration about how to implement a human rights-based approach, such as increasing the funding and institutional capacity of COMAR.[59]

For a few months after he took office, President López Obrador took some actions that aligned with his rhetoric. He selected Dr. Tonatiuh Guillén López, an academic experienced in migration, as head of the INM, and former UNHCR official, Andrés

Ramírez Silva, to lead COMAR.[60] The López Obrador Administration also took some measures to support development in some Central American countries and thereby address root causes of migration from the region.[61] In early 2019, Mexico's deportation rates were low compared with recent years.[62] At the same time, the INM began issuing TVRH cards on an expedited basis (i.e. actually issuing them within the 30 days prescribed by law)[63] to foreign nationals, primarily from Central America.[64] Some recipients used this authorization to stay and work in Mexico for a year, while others continued towards Mexico's northern border.[65] Mexican authorities issued a total of 11,282 TVRH cards in January and 7,159 in February 2019,[66] before quickly announcing that it would no longer issue TVRH cards on an expedited basis because the program had been "too successful."[67] The number of TVRH cards issued significantly decreased in subsequent months.[68]

As economic pressure mounted from the United States, Mexico's approach to immigration enforcement became increasingly restrictive. The decision to stop expediting TVRH cards on a humanitarian basis coincided with the U.S. government's initial implementation of the Migrant Protection Protocols ("MPP") in late January 2019.[69] Despite initially expressing concerns about MPP that echoed those raised by IMUMI and other organizations, the Mexican government agreed to participate in a pilot phase of the program and, subsequently, to expanding it.[70] In late May 2019, in the context of free trade negotiations with Mexico and Canada, U.S. President Donald Trump threatened (by tweet) to impose tariffs on imported Mexican goods until undocumented migrants stopped entering the United States through Mexico.[71] A week later, the U.S. and Mexican governments issued a joint declaration on migration which committed Mexico to "take unprecedented steps to curb irregular migration," including sending the National Guard to Mexico's borders and further expanding MPP.[72] Around this time, Dr. Guillén López resigned from his position leading the INM. He was swiftly replaced by Dr. Francisco Garduño Yáñez, who previously led Mexico's penitentiary system, signaling a harsher approach to migration going forward.[73]

In compliance with Mexico's agreement with the United States, the López Obrador Administration deployed thousands of National Guard officers to conduct immigration enforcement.[74] The National Guard is meant to be a civilian-led security force with a mandate to address crime and maintain public security, but in reality it has been comprised in part by Mexican military officers and federal police.[75] International human rights groups have argued against this militarization of public security, which violates international law.[76] IMUMI and other Mexican civil society groups have posited that it is unconstitutional for the National Guard to exercise public security functions in the context of migration, and that this reflects a return to viewing migration as a national security – rather than a human rights – issue.

The National Guard's involvement in immigration enforcement has led to increased apprehension and detention of migrants, and violations of their human rights at levels not seen for years.[77] From January to June 2019, 100,861 detentions were registered in Mexico. An estimated 31,416 detentions occurred in June 2019 alone, which is "the highest monthly total in all publicly available data going back to 2001".[78] From January to June 2019, COMAR received 30,000 asylum/refugee requests, three times more than over the same period in 2018.[79] In late June 2019, the CNDH condemned the extreme overcrowding in detention that was making it difficult to treat migrants with dignity.[80] In Chiapas, there were 66 percent more migrants apprehended be-

tween January and September 2019 than over the same period in 2018.[81] The increased apprehension, and resulting overcrowding in immigration detention, was particularly prevalent at the *Siglo* XXI detention centre in Tapachula, which at times held twice as many migrants as its maximum capacity.[82] This facility has been criticized as a "prison city," where migrants have reportedly experienced violence, including torture, and have been detained without due process.[83] In 2019, a Haitian man died after being ignored for hours despite asking for medical attention.[84]

In addition, in the context of a more restrictive approach to immigration in both Mexico and the United States (*see* Chapter 7 below), the practices of the INM office in Tapachula changed with regard to *oficios de salida del país*. First, in summer 2019, the INM began specifying on the document that the recipient must exit the country from the southern border.[85] This meant that Haitians and other migrants who were hoping to travel to the northern border no longer had official documentation that supported this journey. If they attempted to travel north, they risked being apprehended by the National Guard and deported. According to practitioners in Tapachula, it appears that since late 2019 the INM is no longer issuing *oficios de salida del país*.[86] The INM's new practices coincided with a significant jump in asylum/refugee claims by Haitians in 2019.[87]

With the increased crackdown on migrants in 2019, apprehensions of Haitians across Mexico increased by 2,330 percent, when comparing January and September 2019 to the same period in 2018.[88] Comparing the same nine-month period, deportations by Mexico of Haitians increased from two (in 2018) to 1160 (in 2019).[89] Mexico returned or deported 281 people to Haiti in January and February of 2020, compared with 262 Haitians returned or deported in all of 2019 (representing more than a 600 percent increase).[90]

## D. Situation as of Summer 2020

Recent developments suggest that the López Obrador Administration will continue to prioritize its economic relationship with the United States over a human rights-based immigration policy.[91] In September 2019, the government constituted an inter-secretarial commission to coordinate the government's response to migration.[92] The commission is led by the *Secretaría de Relaciones Exteriores*.[93] IMUMI and other organizations are concerned that this is an attempt by the government to further tie immigration to foreign policy. Further, President López Obrador continues to emphasize that Mexico and the United States need to work together on immigration, and must not "paralyze" commercial activity between them.[94] Most recently, in July 2020, President López Obrador visited the United States, which was his first official state visit since taking office.[95] In advance of the November 2020 elections, President Trump returned to his script about Mexico 'paying for' the border wall.[96] However, many Mexican immigration advocates would argue that, due to the current Mexican Administration's policies, Mexico has already become the wall.[97]

With the above overview of the Mexican immigration system, and the current situation facing Haitian and other migrants arriving to Mexico, the next section focuses on Haitian migration.



Photo: S. Priya Morley. Parque Central Miguel Hidalgo, Tapachula, Chiapas.



CHAPTER

# 4 RECENT MIGRATION FROM HAITI



# Recent migration from Haiti

Political and economic instability, as well as increased political violence, gang criminal activity, and widespread impunity, have forced Haitians to flee their country. The next section will provide context as to why many Haitians, particularly women, felt they had no choice but to leave their homes for Brazil, Chile, Mexico, or the United States.

## A.  Economic and Political Context

Haiti won its independence from France in 1804, and is the world's only nation founded through a slave revolt.[98] In 1825, however, France demanded more than today's equivalent of US$21 billion from the new country as compensation for its "property" (slaves) lost through emancipation.[99] Haiti's subsequent crippling debt and interest rates took 122 years to repay (until 1947), which prevented investment in public infrastructure.[100] In 1915, the U.S. Marines invaded Haiti. During the 19-year occupation, the United States took financial control of the country and forced Haiti to put 40 percent of its national income towards foreign debt repayment.[101] Haiti has never fully recovered financially from the debt, and subsequent natural disasters, unstable governments, and foreign meddling, including forced tariff reductions on rice so that U.S. products could flood the market, have worsened the situation.[102] As a result of these many factors, today Haitian people suffer from the worst living standards in the Americas and amongst the worst worldwide.[103]

After approximately 33 *coups d'états* since 1804, violence is engrained in Haiti's political culture. For 30 years, the Duvaliers led a repressive regime devoid of respect for human rights that stifled popular political mobilization.[104] After the fall of the Duvaliers' successive dictatorships in 1987, political groups strengthened and saw the inception of a human rights movement.[105] Democratic elections took place for the first time in Haiti's history in 1990, but the election results were obfuscated by a paramilitary *coup d'état* in September 1991 that led to 3,000–5,000 political deaths.[106] Members of the Haitian military and paramilitary forces systematically employed killing, torture, and sexual assault as tools of political repression against pro-Aristide supporters.[107] Sadistic methods—repeated rapes, gang-rapes, and forcing family members to watch—maximized the terror.[108] A second *coup d'état* in February 2004 led to at least 5,000 political killings.[109] Since 2006, in which less-than-perfect elections marked the end of the 2004 coup government, politically-motivated killings are not uncommon.[110]

Haiti



In 2010, a 7.0 magnitude earthquake devastated Port-au-Prince and the surrounding areas and left Haiti vulnerable to other natural and manmade disasters. The 2010 earthquake cost an estimated 200,000–300,000 lives and between US$7-14 billion in damage.[111] Over a million people were left homeless, and most moved to nearby camps for internally displaced persons ("IDP"). Nearly 33,000 earthquake victims remain in IDP camps today.[112] United Nations Peacekeepers introduced cholera to Haiti in 2010, causing an epidemic that killed well over 10,000 people and sickened over a million others.[113]

Haiti is one of the most vulnerable countries in the world to climate change.[114] Scientists believe climate change has already increased the intensity of storms such as Hurricane Matthew in 2016, which took 1,000 lives, left an additional 175,000 people homeless, and destroyed the national food supply.[115] As a result of a combination of climate change, poverty, and unstable governance, Haitians will increasingly be vulnerable to devastation from natural disasters.[116]

The Haitian Gourde today holds about 25 percent of its January 2010 value,[117] which has sharply increased inflation. Greater than 60 percent of Haitians survive on less than US$2 a day, and more than two and a half million fall below the extreme poverty line of US$1.23 per day.[118] The unemployment rate in Haiti is 40 percent, and two out of three Haitians do not have consistent work.[119] One in three people is in need of food assistance.[120]

Political instability has further plagued Haiti since the 2010 earthquake. The 2010-2011 elections that brought Michel Martelly into the presidency were marred by fraud, voting irregularities, and the exclusion of Haiti's largest party, *Fanmi Lavalas*.[121] President Martelly regularly violated the Haitian Constitution throughout his Administration, including by delaying elections until after legislators' terms had expired and unilaterally appointing local mayors and other municipality leaders—who wield significant power locally.[122] As a result, the Executive branch governed with local control and minimal legislative oversight. Lack of transparency about how reconstruction aid was spent, as well as accusations of money laundering, further weakened public confidence in the Martelly Administration.[123]

After the country overturned initial results of a presidential election in 2015 based on allegations of fraud, President Martelly's hand-picked successor, Jovenel Moïse, won a second race and came into office in February 2017.[124] In 2019, a government anticorruption agency accused President Moïse of embezzling from social programs and reconstruction aid.[125] Haitians spent much of 2019 and 2020 protesting against his handling of the country's dire economic situation and resulting fuel shortages.[126] Road blockades, looting, excessive police force, and gang violence accompanied the demonstrations.[127]

The prolonged period of political instability since 2010 has impeded the government's ability to enact long-term policies to advance human rights and protections from politically-motivated violence, and has contributed to a dysfunctional justice system and high levels of impunity. Politicians regularly employ armed groups, such as gangs, to commit human rights abuses for political gain.[128] The *Police Nationale d'Haïti* ("Haitian National Police") lack the resources and political will to prevent political violence and other crimes such as armed robberies, domestic violence, and sexual assault (*see* Chapter 4, Section B below).[129] Additionally, the judicial system is under-resourced and inefficient, as well as burdened by a large backlog of cases, under-paid staff, outdated legal codes, and poor facilities.[130] Bribes are common at all levels of the judicial system.[131] Given Haiti's widespread impunity and desperate economic situation, gang activity has proliferated throughout the capital and traveled to more rural areas; an estimated one-third of the country is now controlled by gangs.[132] Women and other minority groups in Haiti are among the most vulnerable to economic and political instability, and the next section will focus on why they in particular have been forced to flee their country.

## B. Disproportionate Impact of Poverty and Political Violence on Haitian Women

Political instability and natural disasters have left Haitian women vulnerable to SGBV. But these forms of violence are also linked to poverty, lack of rights enforcement, and pervasive patriarchal attitudes and discrimination in employment, education, and government and social institutions.[133]

Poverty results in a lack of education and employment opportunities for everyone, but especially women, because they are often financially dependent on men and viewed as inferior.[134] Attending school in Haiti, which requires fees for books, uniforms, and tuition, is often too expensive for families to pay.[135] Young women and adolescent girls may be forced into prostitution or transactional sex to pay for school-related expenses.[136] Furthermore, women's unemployment in the formal sector is a third higher than that of men, and the disparity is even greater in rural parts of the country.[137] Women who find work often experience high levels of sexual harassment from male colleagues and superiors, which is not specifically prohibited by Haitian law.[138] Women in the informal sector, such as street market women, are vulnerable to gang and other forms of violence at work and on their way to and from work. While men and women have the same legal access to economic assistance programs, women face more barriers in securing collateral for credit and information on lending programs, as well as other resources.[139]

Haitian women face many obstacles to political participation, including domestic responsibilities, stereotypes, and political violence.[140] Like many parts of the world, politics in Haiti remains a male-dominated arena. Male family members and partners may forbid women from joining a political party or force them to vote according to their political preferences.[141] The historical use of rape and physical violence as political tools in Haiti, dating back to slavery and, more recently, the 2004 coup, has made many women fearful of entering politics.[142] While the government has taken steps towards increasing women's participation in political processes, a lack of political will among existing politicians inhibits progress.[143]

Reliable statistics are difficult to collect, but reports indicate that between 28 and 70 percent of Haitian women have been victims of SGBV.[144] Reports of SGBV against women and girls increased after the 2010 earthquake,[145] which is presumed to be as a result of both unsafe living conditions in displacement camps and advocacy by women's groups to encourage reporting and policing. However, most women do not report SGBV against them for fear of retaliation, stigma, and lack of confidence in the police and judicial system to hold the perpetrator accountable.[146] Hundreds of Haitian women have also been victims of sexual exploitation and abuse at the hands of UN Peacekeepers.[147]

Laws and the courts inadequately protect Haitian women from SGBV. For example, the Haitian penal code lacks definitions for "consent" or spousal rape.[148] Prosecutions of SGBV, specifically rape, are increasingly making their way into the courts, but conviction rates are low as the Haitian justice system still presents many structural (*see* Chapter 4, Section A above) and social barriers that discriminate against female complainants at each level of the process.[149] Domestic violence is rarely prosecuted unless the victim is murdered.[150]

In sum, various factors such as political instability and violence, the failing economy, impunity, corruption, and threats of domestic and other forms of SGBV pushed women to leave Haiti in the aftermath of the 2010 earthquake.

CHAPTER

# 5 HISTORICAL PATTERNS OF HAITIANS WHO ARRIVED TO MEXICO





## Historical patterns of Haitians who arrived to Mexico

There are few historical accounts of Haitian migration to or through Mexico to the United States prior to 2015. From 2000-2005, fewer than 20 Haitian refugees were officially in Mexico. This number grew steadily after 2006, peaking at 191 in 2011 right after the earthquake, and falling to 175 in 2014.[151] As explained in this section, Haitian migration changed dramatically in 2015 after thousands of Haitians who had fled Haiti for Brazil and Chile after the 2010 earthquake started traveling to Mexico on their way to the U.S.-Mexico border.

### A.  Wave of Haitian Migrants in 2015–2018



Haitian migrants made up 80 percent of migrants living in Tijuana in 2016, according to a comprehensive report on Haitian and Central American emigration into Mexico published by *El Colegio de la Frontera Norte* ("College of the Northern Border" or "COLEF").[152] COLEF surveyed over 600 Haitians in Mexico.[153] At the time that these interviews were conducted in March of 2017, most of the Haitian population had arrived over land from Brazil (90.5%) and a small minority (5.9%) had arrived from Chile.[154]

Haitians leaving Brazil passed through between eight to 10 countries over the course of three months. The journey was dangerous and exhausting. Once in Mexico, Haitian migrants generally passed through immigration detention centers in Tapachula in one day, and obtained a temporary document that allowed them to travel throughout the country.[155]

Of the migrants surveyed in the COLEF report, 96 percent of the surveyed migrants were from Haiti and four percent were from Central America (El Salvador, Guatemala, and Honduras).[156] The population was mostly male (67%).[157] Of the migrants interviewed (both Haitian and other), 43 percent intended to stay in Tijuana, 21.7 percent wanted to travel to the United States, 30.2 percent was unsure, 3.5 percent wanted to go to another city in Mexico, and 0.7 percent wanted to return to their home country.[158]

Almost all of the migrants interviewed (92%) said they were looking for work in Tijuana, but only 20 percent was employed. In terms of their reason for unemployment,

57.5 percent cited lacking viable work papers, 18.5 percent too low wages, 1.5 percent discrimination, 3.4 percent unable to find work, and 10.4 percent had a language barrier. Overall, respondents reported that their wages were insufficient for their necessities, and that the difficulty in paying bills caused them to seek residence in the United States.[159]

## B. Brazil: A Destination for Haitians After the January 2010 Earthquake

### 1. Migration and Legal Context of Migration to Brazil Before 2016

Many Haitian migrants arriving in Mexico had initially spent time in Brazil (*see* Chapter 5, Section A above). Haitians began migrating to Brazil by the thousands following Haiti's devastating 2010 earthquake. Starting in January 2011, Brazil issued 100 work visas to Haitians each month. In 2012, Brazil stopped the quota system altogether, and by the end of 2014 more than 50,000 Haitians lived in Brazil.[160] From 2010 to 2018, 128,968 Haitian nationals reportedly entered Brazil, of which 32,498 eventually left and 96,487 stayed.[161] In that same period, only 6,954 were granted legal status as refugees and issued work and social security cards.[162] Recognized refugees could apply for permanent residence after four years.[163]

The large number of Haitians entering Brazil created a need for some type of legalization of their status, but the Brazilian government at first had trouble defining what this adjustment would be. According to Brazilian *Lei No. 9.474* adopted in 1997, an individual who applies for refugee status will receive a provisional identity document (a "refugee protocol"), a temporary work permit, and a taxpayer identification number to use while their claim is being processed.[164] Government delay in issuing these documents – made worse by the large number of Haitians entering the country – created a severe social crisis in areas receiving migrants.[165] For example, in one municipality, a lack of housing for migrants led to their sleeping in an open football field with no bathrooms nor running water.[166] Furthermore, the *Comitê Nacional para os Refugiados* ("National Committee for Refugees" or "CONARE"), Brazil's refugee agency, refused to give refugee status to many of the first wave of Haitians to arrive in 2010 and 2011 because they did not recognize natural disasters as a basis for granting asylum.[167]

In 2012, in an attempt to stem the flow of Haitians entering Brazil without documentation, as well as to get around the restrictive definition of a refugee, the *Conselho Nacional de Imigração*[168] ("National Immigration Council" of Brazil or "CNIg") granted all Haitian nationals authorization to reside in Brazil for "humanitarian reasons" for up to five years.[169] The Brazilian humanitarian visa could be obtained at the Brazilian embassy in Port-au-Prince, which was allowed to issue 1,200 such visas a year.[170] Once in Brazil, a humanitarian visa-holder could apply for permanent residence by demonstrating she 1) found work and 2) was domiciled in Brazil. Haitians who achieved permanent residence were given "foreigner identity cards."[171] In 2013, the limit on the number of humanitarian visas was removed, as well as the requirement that they be processed in Port-au-Prince. [172] This meant that Haitians already living in Brazil could for the first time apply for the humanitarian visa from within the country.

In 2015, in response to criticism that the humanitarian program failed to stem the flow of Haitian migration or offer adequate relief, CONARE and CNIg issued a ministerial order regularizing the status of 43,871 Haitians with pending asylum applications in Brazil.[173] This order automatically extended to these Haitians the ability to apply for permanent residence within one year and archived their refugee applications.[174] However, the economic and social climate made actually living in Brazil difficult.

## 2.  Economic Recession, Xenophobia, and Anti-Black Racism Forced Haitians to Leave Brazil

While there are legal avenues to permanent residency for Haitians living in Brazil, the lack of available employment has made staying in the country difficult. Haitians who arrived in Brazil after the earthquake found construction jobs as the nation prepared to host the FIFA World Cup in 2014 and the 2016 Olympics. After the completion of these events, the country fell into a recession.[175] By 2017, Brazil's unemployment rate reached 13.1 percent, and nearly 30,000 Haitians left due to the lack of work.[176]

Xenophobic and anti-Black racist attitudes have also forced Haitians to leave Brazil. In 2015, groups of Haitian immigrants were shot in São Paulo in two different attacks.[179] The attacks appeared to be motivated in part by the belief that Haitians were responsible for the economic downturn, as one attacker yelled, "Haitians, you steal our jobs!"[180] An influx of Venezuelan migrants in 2016 further increased tensions between native Brazilians and immigrant communities.[179] In March 2018, a group of Brazilians forcibly expelled migrants from an improvised shelter in Roraima State and burned their belongings.[180] Rumors of these xenophobic attacks against Haitians and other migrants created a climate of fear among Haitian communities.

While hate crimes are outlawed in Brazil, the 2018 assassination of the female Black politician Marielle Franco exposed the country's continuing struggle with anti-Black racism (as well as misogyny, homophobia, and classism).[181] According to the *Forum Brasileiro de Segurança Pública* ("Brazilian Security Forum"), 71 percent of people murdered in Brazil in 2017 were Black.[182] Additionally, while all women are disproportionately targeted for violence in Brazil, more Black women are killed per year than the national average of women killed.[183]

At the same time that unemployment, anti-migrant xenophobia, and anti-Black racial tensions increased in Brazil, legal avenues to residency decreased.[184] Even though word likely got back to Haiti that life in Brazil was rife with discrimination and lacked job prospects, more Haitian migrants continued to enter Brazil than left between 2016 – 2018, reflecting just how dire living conditions are in Haiti.[185]

## 3.  New Legal Restrictions Put in Place Against Haitian Migration

In 2018, the Brazilian government shortened the humanitarian visa to 90 days for Haitians entering Brazil.[186] During these 90 days, a visa holder may apply for permanent residency for up to two years.[187] Residency is renewable, if an applicant can show: 1) she has not been absent from Brazil for more than 90 days during each migratory year; 2) she entered the national territory and departed only via Brazil's migratory checkpoints; 3) she does not have a criminal record; and 4) she has proof of available means of subsistence.[188] After four years of residing in Brazil full-time, an

applicant may apply for citizenship as long as she has proof of occupation or enough assets to support herself.[189]

As an alternative to applying for permanent residence through asylum or a humanitarian visa, a Haitian may also do so if she has a child born in Brazil. Temporary or permanent family reunification visas are available to dependents of any Brazilian citizen or foreign national with permanent residence in the country.[190] Parents of a Brazilian-born child can obtain naturalization after living for one year in the country after receiving a family reunification visa.[191]

As a result of Brazil's immigration reforms between 2010 and 2015, many Haitians were able to regularize their statuses and find work, providing much-needed relief after the 2010 earthquake and exodus. However, as the next section will show, as Brazil entered an economic recession in 2016 and began receiving an influx of refugees from other countries in addition to continued Haitian migration, opportunities for receiving legal status in Brazil decreased. Humanitarian visas are still available from the Brazilian embassy in Port-au-Prince under the 2018 law, but obtaining employment —a requirement for achieving permanent residency— is more difficult. Furthermore, existing racism and xenophobia have made living in Brazil dangerous for many Haitians.

## C.  Response of Mexico's Immigration Authorities to the 2015-2018 Wave of Haitian Migration

Haitians started to arrive at Mexico's border with the United States in large numbers in 2016.[192] At that time, policies implemented by the INM expedited official permission for Haitians to travel through Mexico by claiming they were 'stateless', and granting a TVRH card[193] or an *oficio de salida del país* after a one-day stay in detention.[194] When interviewing Haitian migrants in 2017, COLEF noted that the overwhelming majority who resided in Tijuana (71.4%) had taken four days or less to arrive there after first entering Mexico.[195] INM's rapid processing of Haitians' TVRH cards made this quick transit possible. In many cases, INM officials, in their discretion, declined to perform any review of Haitians' documentation and did not ask questions to verify Haitians' statelessness status.

After approximately October of 2016, INM officials began listing Haiti as the country of origin on their *oficios de salida del país*, which would seem to contradict their own agency's findings that those individuals were stateless.[196] None of the *oficios de salida del país* reviewed by COLEF noted the presence of *Creyol* or French interpreters, which implies that Haitians who did not speak Spanish may not have fully understood how their claims were being processed.[197]

INM's decision to expedite grants of TVRH cards undoubtedly benefited Haitians, and the INM's approach stands in stark contrast to their treatment of Central American migrants during this same time period. In 2017, Central American migrants were routinely prevented from traveling to the U.S.-Mexico border.[198] Since COLEF's report was published in 2018, the INM has stopped issuing the above-noted documentation that facilitated Haitians' travel north (*see* Chapter 8, Section C below).



CHAPTER

# 6 RECENT MIGRATION ROUTE-TRAVEL TO/THROUGH CHILE



## Recent migration route-travel to/through Chile

Although most of the Haitian migrants arriving to Mexico between 2015-2018 had spent time in, or at least transited through Brazil (*see* Chapter 5, Section B above), the Research Team identified a change in the migration patterns from Haiti to Mexico: of the 30 Haitian migrants interviewed in March 2020, only nine had migrated from Brazil before coming to Mexico (two of whom had lived in Chile before living in Brazil), while 21 had migrated from Chile (two of whom had lived in Brazil before living in Chile). Of those coming from Chile, most had lived in Chile for 18 months to two years before migrating to Mexico.

To contextualize these findings (*see* Chapter 8 below), the following section provides an overview of the immigration system in Chile that initially facilitated – and subsequently constrained – the ability of Haitians to migrate to Chile. In addition, the section addresses the gender-based discrimination, racism, and xenophobia experienced by Haitian women in Chile which, as observed by a number of Study participants, is one of the factors motivating them to leave the country and migrate north. Finally, the section outlines the migration route undertaken by the Survey participants from South America to Mexico.

## A.  Situation in Chile

### 1.  Chile as a Destination for Haitians

Although Chile was not historically a "destination country" for migrants, this has changed in recent years.[199] Since Chile began its transition to democracy in 1990, the country has largely experienced political stability and economic growth relative to many other Latin American countries. This led to increased migration by immigrants seeking economic and other opportunities.[200] The Afro-descendant population in Chile has historically been small and not visible, but this has changed significantly in recent years.[201] A small number of Haitians migrated to Chile after Chilean troops were stationed in Haiti as part of a United Nations peacekeeping operation in 2004.[202] The number of Haitians migrating to Chile also began to increase[203] after Haiti's 2010 earthquake[204] and grew exponentially since 2014.[205] This recent influx has been attributed to Brazil's economic collapse in 2014, which forced many Haitians to seek economic opportunities in Chile.[206] Other contributing factors include: Chile's increased profile among Haitians due to media coverage after the Chilean team won the 2015 Copa America soccer competition; the perception among Haitians that Chile is not as racist as other countries, such as the United States; desire for family reunification with Haitians already living in Chile; and word of mouth about the economic and visa opportunities available in Chile.[207] Further, as outlined below, this influx of Haitians was facilitated by the permissive immigration policies under former Chilean President Michelle Bachelet.[208] As of December 2019, the Chilean government estimated that 185,865 Haitians (66,797 of which are women) reside in Chile.[209] Haitians represent the third highest foreign population residing in Chile, after Venezuelans and Peruvians, and constitute 12.5 percent of the total foreign population residing in Chile.[210]

## 2. Chilean Immigration Law Applicable to Haitians Before 2018

Immigration law in Chile is governed by the *Decreto Ley Número 1094 de 1975* ("Decree-Law 1094 of 1975" or "Decree-Law 1094").[211] This law, which was enacted under Chile's dictatorship, has been criticized for framing immigrants as national security threats and not aligning with Chile's human rights obligations.[212] Progressive governments (such as former President Bachelet's) have relied on complementary laws and directives to make the country's overall immigration approach more permissive and human rights-compliant.[213] As will be discussed below, such advances have been easily reversed by the current Administration.

The Decree-Law 1094 provides that foreign nationals with valid passports may be granted a 90-day tourist visa on arrival to Chile.[214] Immigration officials[215] retain significant discretion when evaluating tourist visa requests, for example by requiring a foreign national to demonstrate "sufficient funds" and determining the amount. This discretion has been exercised in discriminatory ways against Haitians. For example, in one case, immigration officials denied entry to a large group of Haitians on the basis that they did not have valid hotel reservations, even though this is not a legal requirement for a tourist visa. The *Instituto Nacional de Derechos Humanos* ("National Human Rights Institute" or "INDH") reported that these Haitians were detained in inhumane conditions for days before they were deported to Haiti.[216] Nevertheless, before 2018, many Haitians successfully entered Chile on a tourist visa and were able to extend their stay using the following two temporary visas.[217]

First, the Decree-Law 1094 provides for an employment-based resident visa, the *visa residente sujeto al contrato* ("resident visa subject to contract") that is valid for up to two years and is extendable.[218] The terms for accessing this visa are onerous. The employer must provide not only an offer of employment but also agree to pay the employee's return flight upon the termination of employment. Further, the visa is tied to the specific employment relationship which, if terminated, means that the employee has 30 days to find other employment or leave Chile.

Second, in 2015, President Bachelet's Administration created another temporary work visa with less onerous requirements.[219] The Decree-Law 1094 provides that foreign nationals may obtain a *visa del residente temporario* ("temporary resident visa") valid for one year (extendable once), where they have 'family ties or interests' in the country.[220] The meaning of this provision, i.e. the actual sub-categories of temporary residence, are established by the government. In 2015, the government created a sub-category of temporary resident visa for employment reasons, which could be obtained by foreign nationals with a Chilean employment contract.[221] Unlike the aforementioned employment-based resident visa, the employer did not need to provide a return flight and the employee was not required to leave Chile if the employment was terminated before the end of the visa. The government argued that this new visa was more compliant with Chile's human rights obligations.

Most Haitians who came to Chile before 2018 relied on the temporary resident visa to extend their stay. A study conducted by the *Centro Nacional de Estudios Migratorios* ("National Center for Migration Studies" or "CENEM") at the *Universidad de Talca* ("University of Talca") in 2017-2018 found that 45.4 percent of the 272 Haitians interviewed, which were a sample representative of the Haitian population in Chile at the time, were in Chile on temporary (residence) visas, almost all working or look-

ing for work.[222] Of those interviewed, 35.1 percent were in the middle of a visa process, and only 2.2 percent were in the country on the employment-based residence visa.[223] The main sources of employment for the Haitians interviewed were unskilled labor (30.7%), services/commerce/hotels (28.9%), and construction work (20.0%). Domestic workers comprised 7.6 percent of the interviewees.[224]

Very few Haitians applied for refugee status in Chile over this period – the highest number of annual requests was 23, in 2016 – and there is no evidence of any Haitian being granted refugee status in Chile between 2010 and 2019.[225]

## B.  The Experience of Haitians in Chile

Haitians residing in the country experience discrimination and, relatedly, significant barriers to integration.[226] Instances of discrimination are not officially tracked in Chile, but there have been numerous media reports of incidents of racism and xenophobia against Haitian migrants.[227] For example, in one instance, two Haitian men were asked by security to leave a mall after customers complained about the presence of "[B]lack people."[228] In another tragic incident, a young Haitian woman died after being detained by police.[229] Bystanders mistakenly reported that she had abandoned her baby at a state child protection office, but she had only left her child briefly in order to find an interpreter to help her make a complaint to the office.

In its 2017 Annual Report, the INDH found that a third of Chileans[230] consider themselves "whiter" than other Latin Americans, and noted how the assumption that "white" is better leads to particular discrimination against Afro-descendant migrants and Indigenous peoples.[231] Among other findings, the INDH report noted that 24.7 percent of Chileans living in metropolitan areas would characterize migrants as "dirtier" than Chileans.[232] The INDH noted in particular the respondents' sexualization and exoticization of Afro-descendant migrant women.[233] For example, respondents associated Afro-descendent migrant women with increased infidelity in the country. This finding is connected with the discriminatory stereotypes, pervasive in Chile, that link migrant women with sex work.[234]

The CENEM study, referenced above, found that 48 percent of Haitians interviewed (33.8% of which were women) had experienced discrimination in some way. The study, which looked at the labor, social, and cultural integration of Haitians, found that 40.6 percent of respondents had experienced discrimination when looking for employment, with 33.2 percent identifying discrimination as the primary barrier to finding employment in Chile.[235] This study demonstrated that 83.6 percent of Haitians have more difficulty finding work than other migrants.[236]

### 1.  Chile's New Immigration Restrictions for Haitians in 2018

The increased visibility of Haitian migrants, particularly in metropolitan areas, "provoked public backlash" and brought the issue of immigration to the forefront of Chilean politics.[237] In 2017, the INDH found that 68.2 percent of Chileans approved of more restrictions on immigration to Chile.[238] In advance of his election in November 2017, current President Sebastián Piñera adopted anti-immigrant rhetoric evocative of the current U.S. Administration.[239]

After President Piñera assumed office on March 11, 2018, his Administration introduced new restrictive measures to "impose order" on Chile's immigration system that make it more difficult for Haitians to enter and work in Chile.[240] Effective April 2018, Haitians are no longer eligible for the 90-day tourist visa discussed above, which is still available to other foreign nationals. Instead, Haitians must apply for a 30-day tourist visa before traveling to Chile.[241] The Piñera Administration stated that this change brought Chile's approach in line with the approach of other Latin American and Caribbean countries but did not specify why it applied only to Haitians. The measures were viewed as a backlash against the recent influx of Haitian migration into Chile.

The government also eliminated the sub-category of temporary resident visas for employment reasons, outlined above, which had facilitated an influx of Haitian migrants.[242] The government suggested that, because the visa was not tied to employment, bad actors had been able to sell fraudulent employment contracts for visa application purposes.[243] In its place, the government created the *visa temporaria de oportunidades* ("temporary opportunity visa") which allows foreign nationals to work in the country for up to one year (extendable once), but can only be obtained from outside of Chile.[244] Finally, as the new law came into effect, the Administration created a process that allowed certain undocumented migrants to regularize their status within three months before being at risk of removal from Chile. Some Haitians had difficulty regularizing their status because the Haitian government was uncooperative in verifying their identity documents.[245]

At the same time, Chile created a program to "voluntarily" return individuals to Haiti who agreed not to travel to Chile for nine years in exchange for Chile covering the expense of their flight.[246] From October 2018 to May 2019, 1,393 Haitians were returned to Haiti on nine flights.[247] These so-called "humanitarian flights" have been criticized as tantamount to deportation.[248]

Under the current Administration, there has been a significant decrease in the number of Haitians entering Chile or receiving temporary visas (*see* Appendix 2).[249]

## 2.  Migration Route from South America to Mexico



As migratory restrictions and economic crises in Latin America pushed many Haitians to leave Chile and Brazil, many chose to travel to Mexico, the United States, and Canada, rather than return home to similar or worse conditions. The Herculean journey that Haitians and other migrants make from Latin America to Mexico traverses nearly seven thousand miles and 11 countries.[250] In total, it can take between two and four months to reach Mexico.[251] Migrants pay smugglers to lead them on foot in addition to using modern technology like WhatsApp to follow traffickers' directions.[252] All of the Haitian migrant women interviewed in the Study took this route (*see* Chapter 8, Section A below).

Haitians beginning the journey from Brazil or Chile can take a bus or taxi to Peru's border.[253] Migrants can purchase transit documents in Peru for US$20; however, these are not always recognized by authorities in that country or neighboring Ecuador.[254] Migrants move on from Ecuador to Colombia, next travelling across the Darien Gap into Panama.[255] This route requires crossing a landscape of tropical rainforest 100 miles wide, taking approximately 20 days on foot. Migrants are forced to cross rivers that quickly rise to a dangerous level. Many have drowned, their bodies carried away by strong currents making them unrecoverable by family members journeying with them.[256]

Smugglers guide migrants through the dangerous jungle and may abandon or rob them at any point.[257] Migrants report high instances of robberies and sexual assault in this region. Migrants also encounter drug trafficking "mules," who require payment in exchange for allowing them to continue on their journey.[258] There appears

to be little protection or accountability for reports of violence against migrants by any of the governments in this region.

Migrants who successfully enter Panama find makeshift camps of concrete block shelters and wooden shacks provided and monitored by *Senafront*, Panama's National Border Service.[259] The camps regularly fill beyond capacity; an official of *Senafront* estimated in 2019 that there were more than 1,500 migrants at the *Penitas* camp, which was planned to hold only 100 – 200 migrants.[260]

Haitian migrants take a bus from Panama to Costa Rica and then to Nicaragua. Nicaragua closed its borders to migrants in 2015, and immigration authorities sent those they apprehend back to Costa Rica.[261] As a result, Haitians can spend up to US$1,000 to move across the country with a "coyote."[262] From Nicaragua, they cross into Honduras, take another bus to Guatemala, and again have to pay smugglers to continue through.[263] Finally, migrants cross the river between Guatemala and Mexico to reach Tapachula. A rough estimate of the journey's cost is between $2,500 and $13,000 – the difference depending largely on negotiating skills and the size of the family traveling.[264]



Photo: S. Priya Morley. Parque Central Miguel Hidalgo, Tapachula, Chiapas.

CHAPTER

# 7 U.S. IMMIGRATION POLICIES UNDERMINE PROTECTIONS FOR HAITIAN ASYLUM SEEKERS



## U.S. Immigration polices undermine protections for Haitian asylum seekers

Although this Report focuses on the situation of Haitian migrant women in Mexico, the intended destination of many Haitians in Mexico is the United States. Most of the Study participants intended to reach the United States to connect with family there or to find work. This section outlines anti-immigrant legislation in the United States that effectively closes the U.S.-Mexico border to Haitian migrants.

For decades, the United States has sought to keep Haitians from accessing its protection system. The first boat carrying Haitians fleeing the brutal Duvalier dictatorship arrived in the United States in the 1960s. The United States denied asylum to all 25 passengers and deported them to the very danger they fled.[265] In the 1970s, immigration authorities created a special program designed to accelerate the processing of Haitian asylum claims to expedite removals without full process.[266] Then in the 1980s, the United States engaged in the repressive tactics of systematically detaining Haitian asylum seekers and interdicting Haitians at sea and returning them to harm in Haiti with no screening at all.[267]

In the 1990s, the U.S. Coast Guard collected tens of thousands of Haitian refugees and imprisoned them in Guantanamo Bay, Cuba. Guantanamo was known as the "HIV prison camp"[268] because of the poor treatment of HIV positive Haitian refugees, who were wrongly blamed for the AIDS epidemic in the United States. These and other draconian policies in the years since, rooted in anti-Black racism, have resulted in a failure of protection, prolonged family separation, and myriad human rights violations of Haitian asylum seekers.[269]

Over the last four years, the Trump Administration has implemented even more extreme measures to eviscerate asylum in the United States, taking particular aim at individuals who arrive at the U.S.-Mexico border. Haitians are no exception and face additional hurdles due to language barriers and historical discrimination.[270] Through a series of cruel and illegal policies, the Administration has, unilaterally, all but eliminated safe haven provided under U.S. law and rooted in international treaty obligations. The policies limit access to the territory, curtail due process, and restrict the definition of who qualifies as a refugee.

Most recently, using the COVID-19 pandemic as pretext, the Administration has indefinitely limited the entry of asylum seekers into the United States ostensibly for public health reasons.[271] Immigration authorities are not required to screen the individuals for fear of persecution or torture before returning them to Mexico or other countries.[272] An extreme measure, the COVID-19 order has effectively closed the U.S. border to anyone who attempts to seek safe haven since March 2020. The Administration has also signed agreements with Guatemala, El Salvador, and Honduras to enable U.S. officials to remove asylum seekers to these countries rather than process their claims in the United States.[273] The agreements were signed despite documentation of widespread human rights violations in those countries and their nascent asylum systems that cannot provide adequate protection to refugees.[274] Taken together, the United States is both at once shirking and outsourcing its refugee obligations.

Beginning in January 2019, the Administration instituted MPP, which has forced more than 60,500 asylum seekers arriving at the U.S.-Mexico border to wait in Mexico for the duration of their U.S. proceedings without documents or other critical support.[275] The United States adopted this policy despite knowledge of dangers faced by migrants in border states, including kidnapping, rape, and murder, committed by criminal organizations with impunity or even with collusion by Mexican authorities. While living in such precarious conditions and far from legal service providers, asylum seekers face an uphill battle. Very few have been able to secure legal representation to navigate the complex U.S. immigration system and less than one percent have been granted protection.[276]

The Administration has further issued two sweeping bans to exclude large categories of individuals from asylum eligibility. First, the United States sought to ban individuals who did not enter the country through an official port of entry from receiving asylum, thus blocking a significant number of claims.[277] Second, the United States sought to ban from asylum all individuals who transited a third country *en route* to the U.S.-Mexico border. This ban categorically denied asylum to all non-Mexicans, including Haitians, who travel through Mexico and other countries to pursue protection, with limited exceptions.[278]

Finally, the Administration has usurped the role of Congress and sought to rewrite substantive asylum law by decree, reversing long-standing jurisprudence and restricting the refugee definition. The Attorney General and his Justice Department have cast doubt in particular on claims involving gender- and family-based persecution as well as claims involving targeting of landowners.[279] These decisions, focused on persecution by non-state actors, will undoubtedly have a deleterious impact on Haitian asylum seekers (*see* Chapter 4 above).[280] A newly proposed regulation attempts to codify these decisions and the asylum bans and adopts several other substantive changes that would cast aside several categories of claims as well as procedural changes that would give asylum seekers their day in court.[281] If the proposed regulation were to go into effect, it is no exaggeration to say that it would all but eliminate protections in the United States for the vast majority of asylum seekers.

None of the Study participants who intended to emigrate to the United States understood the obstacles that await them at the U.S.-Mexico border. Many interviewees had immediate family members in the United States, such as husbands, young children, parents, and siblings. One interviewee, who was 17-years old, left Haiti to join her father in Miami after her mother was murdered in Haiti.[282]

Having provided context about the Mexican immigration system (*see* Chapter 3, Section B above), the situation in Haiti causing outward migration (*see* Chapter 4 above), the migration of Haitians to Mexico in the last five years, their transit routes through Brazil and Chile (*see* Chapters 5-6 above), and what awaits Haitians at the U.S.-Mexico border in this Chapter, the following section outlines the findings from our Study and subsequent interviews about the current situation of Haitian migrant women in Tapachula.

CHAPTER

# 8 FINDINGS: THE VULNERABILITY OF HAITIAN MIGRANTS IN TAPACHULA



# Findings: the vulnerability of Haitian migrants in Tapachula

Haitians are among the most precarious migrants in Tapachula.[283] The exact number of Haitians living in Tapachula in 2020 is unknown given the fluid nature of their migration, but the estimate is in the thousands.[284] Most Haitians who arrive in Tapachula do not speak Spanish, except for maybe a few words if they previously lived and worked in Chile or the Dominican Republic. Haitian women tend to speak less Spanish than the men because they were less likely to work in Spanish-speaking transit countries, which makes them dependent on a male partner or family member. Few to none of the immigration officials or non-governmental service providers in Tapachula speak *Creyol*, and as a result, Haitian migrants have difficulty understanding the immigration system and how to access the networks of legal and humanitarian services available to them. The needs of Haitians migrants are significant, and legal and humanitarian organizations, as well as government agencies, lack the resources to effectively assist them.

This section weaves the responses from interviews with 29 Haitian migrant women and one 17-year old girl (30 interviews total) together with interviews with migrant advocates and legal service providers to assess the legal and humanitarian needs of Haitian migrant women in Tapachula and to propose solutions to meet their needs. This section discusses the interviewees' stories of migration to Tapachula, their feelings of isolation and difficulties accessing humanitarian services, a fear of returning to Haiti, and lastly, the multiple barriers to asylum and other forms of legal protections, including language barriers, sexism, racism, and xenophobia.

## A.  Traumatic Journey from South America to Mexico: "The voyage here will mark my life forever"[285]

As noted above, all of the Haitian women interviewed had been living in Brazil and/or Chile for a period of time and travelled from there to Tapachula by bus and foot. Along the way, they slept in hotels and shelters or outside. Consistent with other sources, the journey for the women interviewed took between one to two months and cost between US$2,500 and US$10,000, depending on how many family members were traveling and how often they could afford to stay in hotels (*see* Chapter 6, Section D above). Some of the travel money came from savings from work in Haiti, Brazil, or Chile, but most of the money was borrowed from relatives. One woman reported that when she was in Haiti, she was "always putting aside 5 gourdes" (about 5 U.S. cents) for the journey.[286]

Some families traveled alone, but the majority of women interviewed traveled in groups of between 20 to 40 other people, mostly other Haitian migrants, for safety. Traveling through the Darien Gap from Colombia to Panama was the most difficult part. This area consists of 100 miles of tropical rainforest that they traveled on foot. Depending on how fast they were able to walk, the Darien Gap took between 9 and 15 days to pass through. Travelers with young kids or health conditions travelled more slowly. Almost all of the women interviewed shared similar stories about robberies in the Darien Gap. The thieves took everything they had: their luggage, cloth-

ing, shoes, food, cell phones, and money. A few of the interviewees had their pass-ports stolen as well. Families were left in the middle of the jungle with no food or money for food, and often no shoes to walk the rest of the rainforest path. One woman recounted that a thief beat her husband and shot at them.[287] Several women reported that someone in their group died on the journey from health problems or drowning when crossing the Atrato River or someone was murdered by thieves.[288]

All but one of the women interviewed said they went without any food for between 3 to 15 days and survived on salt and river water. The conditions were most traumatic for children and pregnant women. Below are some of the stories shared by the women interviewed:

> My younger son's heart was beating so fast and I think it was because he went days without eating. From that point on, my husband had to carry him on his shoulders.[289]

> There was a young child, 14, whose leg was injured. It got infected and it got worse. The mom had to stay behind until he passed away.[290]

> We slept on the ground in the rain and mud like an animal. It rained so often, almost every day. We put big rocks to make a little bed to sleep.[291] We drank dead people's water along the way to survive.[292]

> I was scared the entire time that I would give birth in the bushes.[293] I went five days without eating while pregnant.[294]

> We saw people dead on the way and they were drowned in the river.[295]

> In the forest we had 11 to 12 days of no food, just drinking water. At one point I could not bear the hunger and I ate the roots of this tree to sustain myself. It made me sick. Thieves in Panama stole all our food money.[296]

The interviewees reported instances of theft but no other significant problems as they made their way through Costa Rica, Nicaragua, Honduras, and Guatemala to Mexico. Most of the interviewees entered Mexico by paying a guide to cross the Suchiate River, which trails the Mexico-Guatemala border, by raft. Once in Mexico, most approached Tapachula by foot and bus, often heading directly to the COMAR office.

## B.  Life of Isolation and Misery in Mexico: "All I do is take care of my children at the house and go to the immigration office to follow up on news of our case"[297]

After their traumatic journey through between 9 and 11 countries, most Haitian migrants arrive in Tapachula with only the clothes on their back. They are desperate for clothes, food, medical attention, housing, and security. Pregnant women and families with babies need additional assistance. The UNHCR gives US$140 per month to each migrant who has applied for asylum, including children, for up to three months. As the women's immigration cases drag beyond this period, this limited support is inadequate. Some women interviewed received food assistance from a local church.

Below is a summary of humanitarian services already available in Tapachula and the needs that are still not being met in the Haitian migrant community.

## 1.   Medical Care

Basic medical assistance is available in the two public hospitals in Tapachula, as well as *Médicos del Mundo* ("Doctors of the World") and *Médicos Sin Fronteras* ("Doctors Without Borders").[298] Pregnant women are able to give birth with one of these medical service providers, however pre-natal care seems to be limited. Several of the women interviewed were pregnant when they arrived in Mexico. Given their physically arduous treks from South America, which for some led to severe malnutrition and dehydration, and the violence some experienced, many of these pregnancies would presumably be high-risk.

Medical assistance is free but many did not trust the care, and could not afford the medicines prescribed or could not read the dosage in Spanish. For example, one woman reported that the hospital gave her child the wrong prescription for his age, so they had to throw it away.[299] Another woman was scared to give birth in Tapachula after hearing that a friend was given a shot that she believed induced early labor. The interviewee said that she did not take the medicine prescribed to her because she did not trust the doctor.[300]

## 2.   Housing

There are two main migrant shelters in Tapachula – *Belén*, run by the Scalabrini Order, and *Jesús el Buen Pastor del Pobre y Migrante*, run by "Sister" Olga Sánchez Martínez and her adult children. The Research Team interviewed several Haitian women at *Buen Pastor*, which at the time housed several hundred Haitian adults and children. Short-term dormitory-style housing and food are available to migrants, though most of the women interviewed preferred to cook for themselves because they were not accustomed to the food served.

Outside of the shelters, Haitian migrants tend to live near the main square in Tapachula or in one of two residential neighborhoods about 15-20 minutes by vehicle from downtown Tapachula (*Los Ángeles* and *Insurgentes*). Both neighborhoods are walking distance to the INM and the *Siglo* XXI detention center. Interviewees and their families lived in sparse, rundown two-room cinder-block homes or two-story apartment buildings. The homes had no kitchen and very little furniture, except for a few thin sleep pads or broken chairs. Most people slept on the concrete floors without any bedding. One interviewee reflected on her situation, "Look at the state we are in, sitting on the floor, sleeping on the floor, no chairs. We want papers to leave Tapachula to find jobs and get out of this situation."[301]

## 3.   Schools

None of the interviewees stated that their children were attending school. Some of the mothers did not believe that any schools were available to their children, while others wanted to keep their children close to home. A few of the women had heard that school sessions were starting, but that classes were already full. The interviewees' children ranged from a few weeks old to 16 years old. Of them, ten were school aged (4-17). One respondent reported being pregnant.



Photo: S. Priya Morley.

### 4.  Work

A common complaint among Haitian migrants was that there is no work available in Tapachula or that they have not yet received work authorization. This is particularly true among Haitian women. Those who try to start businesses without permits are often blocked by Mexican authorities. One interviewee sold food in *Parque Central Miguel Hidalgo*, Tapachula's main square. She said the police "sometimes come and chase us when we are trying to work. Sometimes they take my basket of patties I'm selling, and I go home empty-handed. They did that today; they seem to do that on Fridays."[302]

Demonstrating the effort some Haitian migrants make to find work and the discrimination they face, one woman recalled, "My husband was a mechanic and a welder but there is no work here. He slept in front of a mechanic shop for four days because he heard they were hiring but every time he asked, they said they were not hiring."[303]

### 5.  Lack of Community Center

Tapachula is a transitory place where Haitian migrants await papers to travel to other parts of Mexico or the U.S.-Mexico border. Just when migrants begin to understand the immigration process and how to access humanitarian services, they are authorized to leave.[304] Meanwhile, new migrants enter Tapachula and must learn the system on their own. *Fray Matías* suggested creating a community center for Haitians that would be staffed by a *Creyol* speaker. The center would be a hub for information and services, where humanitarian and legal service providers could meet with the Haitian community to provide trainings and services with language access.[305]

### 6.  Isolation and Fear

Most of the women interviewed reported feeling stuck and isolated in their homes in Tapachula. Some of the interviewees made the journey into town to the COMAR office, but many sent their male partner or family member to COMAR on their behalf. The women gave a myriad of reasons for their discomfort in leaving their homes, including language barriers, unfamiliarity with the city, cost of bus fare, xenophobia and hostility by Mexicans, and the need to take care of their children.[306] JRS offered free diapers to encourage Haitian women to participate in a weekly support group of migrant women and their children, which was facilitated by a *Creyol*-speaking volunteer.[307]

When asked whether she had access to social services, one interviewee replied, "When I try to go out, cars will not stop even though I'm pregnant. If I have to go to the health center, I walk. We do not have rights here."[308] Another woman responded, "Outside, people do not respect you. You are not in your own country and people are mad at you. If anything happens to you, you cannot talk to anyone about it. It's worse than Haiti."[309]

Almost everyone interviewed was fearful of returning to Haiti because of increased generalized violence, including rape and kidnappings. Many women offered details of political persecution. As one woman said, "The Haitian government does not work together, it is destroyed. You cannot work, there is no security, our kids cannot go to school. They are burning schools, there are protests in the streets, it's misery. We cannot live there."[310] "I am very afraid...Even if I had to go back, I would leave again," said one woman.[311]

## C.  Barriers to Asylum and Other Forms of Legal Protection

The recent volume of Haitian cases has overwhelmed the under-resourced COMAR and INM, as well as humanitarian and legal service providers. Patterns of migration to Mexico are evolving, and the country has recently seen a dramatic increase in migrants passing through on their way to the United States (*see* Chapter 3, Section A above). In 2014, Mexico experienced a spike in migration as unaccompanied children from Central America were fleeing proliferating gang violence.[312] Thereafter, Mexico received a wave of Cuban migrants, then Haitians, and then a series of caravans of migrants from Guatemala, El Salvador, and Honduras.[313]

Mexico's immigration system had never received and was not prepared to process tens of thousands of non-Spanish-speaking migrants from countries in the Caribbean and the African continent.[314] Legal service providers have identified several factors that contributed to the arbitrarily low rates of asylum grants for Haitians, including procedural violations, COMAR's lack of knowledge of country conditions in Haiti, and Haitians' marginalization and language barriers.[315]

## 1. COMAR: Delays and Procedural Violations with Asylum Claims, Including Lack of Language Access

Haitian asylum claims began to surge starting in June 2019, from 76 in 2018 to 5,550 in 2019 to 3,627 as of May 2020.[316] In January 2020, 400 of the 462 asylum applications filed with COMAR in Tapachula involved Haitian claimants.[317] Hondurans, historically the largest asylum applicant group by nationality in Mexico, are now the second largest group in Tapachula, after Haitians. By contrast, of all asylum claims filed in Mexico from January to May 2020, Haitians made up 18 percent.[318]

Estimated approval rates in 2013 – May 2020[319] for asylum and complementary protection combined per country are as follows:

- Haiti: 20% approval (13% asylum, 7% complementary protection)
- Venezuela: 98% approval (97% asylum, 1% complementary protection)
- Honduras: 67% approval (54% asylum, 13% complementary protection)
- El Salvador: 71% approval (51% asylum, 20% complementary protection)

Given Mexico's recent designation of Honduras and El Salvador under the Cartagena Declaration, which broadens the definition of refugee, approval rates for these countries are expected to increase (*see* Chapter 3, Section B above). Complementary protection authorizes work permits, but does not offer a path to regularization or family visa petitions (*see* Chapter 3, Section B above).[320] The lack of knowledge of country conditions and lack of language access on the part of COMAR officials, as discussed more fully below, make it difficult for Haitian asylum seekers to prove their claim and for some asylum adjudicators to determine whether the applicants' cases meet the legal standards for asylum.

Mexico ramped up its asylum capacity in 2019, roughly doubling COMAR's budget from 27 million pesos to 60 million pesos, or about US$2.5 million.[321] In addition, COMAR is working closely with the UNHCR, which assists with funding, legal guidance, training, and some staffing. (*see* Chapter 3, Section A above). Despite the additional support, COMAR by all accounts is understaffed, under-resourced, and overwhelmed by the number of cases. The agency does not have adequate interpretation or country conditions expertise for non-Spanish speaking applicants. As a result, COMAR is unable to adequately analyze their cases.[322] According to CNDH (*see* Chapter 2, Section C above), COMAR regularly violates its procedures, which results in delays and unfair denial of asylum applications. CNDH monitors the asylum process and files complaints against COMAR for procedural violations. CNDH also lacked any *Creyol*-speaking staff.

There are two main *pro bono* legal service providers in Tapachula that assist migrants with asylum claims – JRS and *Fray Matías* (*see* Chapter 2, Section C above). Both combine legal representation with psychological counseling services, and both provide assistance to Haitian migrants. One quarter of the migrants that *Fray Matías* served in 2019 were Haitian.[323] Reflecting the same trends as COMAR, JRS reported that Haitian asylum claims made up approximately 80 percent of their cases in March 2020.[324] Both organizations spoke of challenges working with Haitians due to language barriers. *Fray Matías* has a few French-speaking staff members, but no *Creyol* speakers. JRS does not have any French or *Creyol*-speaking staff members.

Once in Mexico, anyone can make a claim for asylum, even if they entered without a visa. As noted in Chapter 3, Section B above, the asylum process authorizes 45 business days for COMAR to process an application (review the application, hold an interview, and make a determination), plus 10 days to notify the applicant of the determination.[325] But COMAR may request an additional extension of 45 days. In practice the process takes at least 100 business days (six months), often as long as a year, which is beyond the legal time limit.[326] During that time, applicants must come to the COMAR office every week to sign off on a list to keep their process active. If they do not sign for two weeks, the process is considered abandoned and must be refiled.[327]

The timeline for these procedural steps depends on the individual COMAR adjudicator's caseload and capacity. As noted in a 2016 report by *Sin Fronteras*, "obstacles have been detected from the time of the first approach by asylum seekers, since the workload in some [COMAR] offices is so large that the staff does not immediately receive the documentation, instead having to schedule appointments that may postpone the procedure by several days."[328] The 45-day term for issuing a resolution, even if regularly flouted, "turns into an element of pressure that leads to a lack of in-depth analysis on the part of the authorities."[329]

Asylum seekers from Haiti have complained that COMAR does not appear to be processing claims in order, granting interviews to individuals who applied after others yet to be interviewed or issuing decisions more quickly in some cases while others languish.[330] Advocates in Tapachula opined that COMAR took advantage of Haitians' lack of language access and comprehension of their rights to extend deadlines or knowingly violate legal procedures.[331] COMAR's office in Tapachula has an asylum officer who speaks French, but no staff members who speak *Creyol*.[332] The UNHCR provides a part-time *Creyol* translator, who works a few days a week for a few hours per shift. Despite COMAR's obligation to provide interpretation support (*see* Chapter 3, Section B above), only three of the Haitian women interviewed said they had been provided a *Creyol* interpreter at COMAR; most said that they or their male partner or family member would bring a friend who spoke some Spanish to translate during COMAR interviews. When asked about her interactions with COMAR, an interviewee responded, "some questions I understood and the ones I did not, I asked for help and they translated with Google."[333]

Language access is essential to guaranteeing asylum seekers' due process – rights to both notice and hearing are compromised when the asylum seeker cannot understand the notice in the language it has been given in, or present the facts necessary to make her case for asylum in a hearing.[334] Asylum seekers, by definition, are seeking safety from persecution in their home countries. As such, the outcome of a COMAR interview can mean the difference between freedom and persecution, or even life and death.[335] For these reasons, an asylum seeker's right to adequate interpretation and translation are guaranteed under Mexican law.[336]

When prompted with questions, only a few women (those who spoke Spanish) understood the meaning of asylum, the status of their claim, or whether they were in danger of being deported. In addition to a lack of qualified interpreters, other common complaints by the women interviewed included: the long delays in rendering decisions, the inability to speak with someone or ask for help at the COMAR office, a lack of transparency about the asylum process, and the seemingly arbitrary nature of decisions.

A common refrain among interviewees was that COMAR staff was racist against Haitians. Below is some commentary from the interviews voicing frustration:

> *When we go to the immigration office, they take better care of the other migrants than Haitians.*[337]

> *Yes, they look down at us all the time. We go to the immigration office all the time to get our papers, but no one takes care of us. Every time they give us appointments so far out and if we want to change the dates, no one helps us.*[338]

> *My husband wakes up at 2am to go to the immigration office to be able to be seen before it closes. They help others but not him.*[339]

Other common violations and deficiencies that have been documented within COMAR nationwide include: making asylum determinations without relevant and available family members present, insufficient advance notice of hearings, the use of non-official sources as evidence, a lack of advisory and legal representation for those who file proceedings before COMAR, and absence of clear procedures for the mechanisms and criteria for case evaluation and analysis.[340] Of particular concern, asylum seekers may request a reconsideration of their decision, which is processed internally within COMAR, but this remedy is rarely successful.[341] The procedures do not allow those who were denied asylum to provide evidence or file grievances regarding the review process (*see* Chapter 3, Section B above).[342]

## 2. INM: Delays in Issuing TVRH cards and Arbitrary Detention

Asylum advocates point to an inherent tension between COMAR, which is mandated to help immigrants, and the INM, which is mandated to detain and deport them.[343] The INM's functions include processing migrant requests for visas, operating the centers of migrant detention throughout Mexico, and handling deportations, which will be discussed further in this section.

### i. Tarjetas de Visitante por Razones Humanitarias (TVRH)

Migrants request TVRH cards (colloquially known as "humanitarian visas") from the INM, which allow them to work and travel for up to a year (*see* Chapter 3, Section B above).[344] The law says applicants should wait no longer than 30 days to get approval for a TVRH card,[345] but advocates and applicants say that it takes at least six months to be issued for those with pending asylum applications.[346] CNDH claims to regularly file complaints with the INM for timeline violations, resulting in sanctions against the immigration officer at fault.[347]

The delay in issuing TVRH cards causes a period of limbo and hardship for Haitian migrants who are desperate to obtain authorization to leave Tapachula, find work, and/or travel to the U.S.-Mexico border. Many Haitian migrants do not intend to live in Mexico long-term or pursue their asylum claim, but they actively pursue it in order to be eligible for a TVRH card. Moreover, due to a lack of language access and legal representation, as discussed more fully above in Chapter 8, Section C (1), many Haitian migrants are confused about the INM and COMAR processes and their rights in both of them. As a result, COMAR is burdened with confused or indifferent asylum applicants, which takes away resources from adjudicating more urgent claims.

Substantial corruption within the INM is another barrier to Haitian migrants' access to immigration documents. According to service providers, INM officials often extort migrants for 10,000-15,000 Mexican pesos (US$458-$688) to process or expedite TVRH cards.[348] If migrants do not pay the bribe, their wait time for a TVRH card could be several additional months. There have been numerous complaints to CNDH of Mexican authorities ripping up migrants' immigration documents unless a bribe is paid, forcing the migrants to begin the process anew if they do not pay the bribe. CNDH reportedly files individual complaints on behalf of migrants in these types of corruption cases.[349]

### ii.  Migrant Detention Centers

There is one main detention center in Tapachula, called *Centro de Detención Siglo* XXI, and two smaller ones for adolescents, *Feria Mesoamericana* and *Albergue Viva México* ("Mesoamerican Fair" and "Viva Mexico Shelter"). *Siglo* XXI has a capacity of 960 people, and CNDH estimated 750 detainees in March 2020.[350] The detained population can easily double or triple with the arrival of migrant caravans.[351] The conditions at all of the detention centers are squalid according to several reports from detainees, but access is extremely limited to human rights organizations and journalists,[352] so the conditions have not been properly documented. For example, at *Siglo* XXI, lawyers of detainees may enter on certain days, but only in reception areas to speak with specific, preapproved clients.[353]

A Haitian man and a pregnant Haitian woman died in August 2019 as a result of poor treatment in migrant detention centers in Tapachula. *Fray Matías* reported that in the case of the pregnant woman, the INM released her when her health condition worsened so that she would not die in their custody.[354] In June 2019, footage went viral in Mexico of a Haitian migrant mother begging in Spanish for help for her sick child, claiming they were not receiving adequate food or drinking water in the *Feria Mesoamericana* detention center.[355] In addition to poor treatment, Haitian migrants have complained of racist and xenophobic attitudes by INM agents in the detention centers in Tapachula, including calling Haitian detainees "dogs" and "assholes".[356] Other forms of discrimination included giving spoiled food and water to Haitian detainees, or deliberately limiting their access to toilets and showers (*see* Chapter 8, Section C, sub-section 3 below).[357]

CNDH claims to visit *Siglo* XXI almost daily and to regularly file reports on a range of abuses such as lack of medical attention, access to water and diapers and milk for babies, and physical abuse against detainees.[358] However, advocates did not find CNDH's monitoring or influence to be effective, in large part because the agency is part of and funded by the Mexican government and is seen to lack independence.[359]

Advocates and migrants complain that INM's determination of which migrants to detain, when to release them, or whether to deport them are arbitrary and influenced by the government's approach to immigration at the relevant time. Five of the women interviewed were apprehended at the border upon entering Mexico and detained at *Siglo* XXI detention center. The stories of detention varied. The time in detention among interviewees ranged from 6 to 21 days. One woman said she was detained for 11 days with her children, but everyone else in her group was deported.[360] Another interviewee, who was pregnant, was released from detention when she and her children fell ill.[361] Another interviewee said her group was stopped by Mexican police as

they entered Mexico and asked for a bribe to pass. They were allowed to pass even though they did not pay the bribe.[362]

### 3.   Xenophobia, Racism, and Discrimination Against Haitian Migrants

Haitian migrants face racial and xenophobic discrimination in Mexico on the basis of their skin color and migrant identity, which is rooted in Mexico's long history of anti-Blackness and xenophobia against Afro-descendant and migrant populations in Mexico. An estimated 1.4 million Mexicans self-identify as of African descent, representing 1.2 percent of the total population, of who 705,000 are women.[363] However, only in the last five years has the federal government officially recognized Afro-Mexicans – by amending the national constitution to recognize them as a distinct group, along with Indigenous Mexicans,[364] and allowing Afro-Mexicans to self-identify (as Afro-Mexican, Afro-descendant, or Black) in the 2015 intercensal survey and the 2020 national census.[365] The anti-Black discrimination that exists in Mexico, as outlined below, serves as a significant barrier to Haitian migrants' protection and support. As one Haitian interviewee stated, "It's like the blood that runs through their veins is not the same as the blood in our veins. They look at you like you are nothing because you're Black. You have a profession, being ignored completely."[366]

Although there have been notable anti-discrimination efforts in the past decades,[367] the profound impact of this historic invisibility is apparent in contemporary analysis of inequality in Mexico, including against immigrants. In a 2010 survey measuring attitudes about discrimination in Mexico, 6 out of 10 immigrants responded that their rights are "not much" respected in Mexico, while 1 out of 10 responded that their rights are not respected at all.[368]

The UN Committee on the Elimination of Racial Discrimination ("CERD") reinforces the claims of xenophobic and racist discrimination made by the Haitian women interviewed. CERD in 2019 recognized Mexico as a "migration corridor" and was concerned that the implementation of migration policies "does not properly ensure that the rights of migrants and asylum seekers, children in particular, are given effective protection."[369] Lastly, CERD noted "an increase in discourse informed by discriminatory views, racial hatred and xenophobia targeting migrants" surrounding the migrant caravans, which intensified in 2018.[370]

The UN Committee on the Elimination of Discrimination against Women ("CEDAW") noted the undue discrimination migrant women face in Mexico, as "many asylum-seeking women and girls do not have effective access to asylum procedures."[371] CEDAW was "also concerned that the rights of migrants, refugees and asylum seekers to work and to access health services and housing is not guaranteed in all states [of Mexico]."[372] Perhaps relatedly, CERD was also troubled by "the multiple forms of discrimination affecting Indigenous women and Mexican women of African descent" in Mexico, which it found "limit[ed] their access to education, work and culturally appropriate health services and their participation in public life and decision-making."[373] This type of discrimination resonates with complaints of Haitian migrant women interviewed in obtaining health services and finding work (as outlined in this Chapter).



Photo: S. Priya Morley. Outside the Instituto Nacional de Migración at Mexico-Guatemala Border.

Black migrants from Haiti and other nations face the reality of racial tensions in Mexico, in addition to the rights violations they face as the result of their migrant status.[374] There have been multiple reports of Black migrants and asylum seekers being treated worse than their Central American counterparts, some stating they are being "treated like animals."[375] However, Hondurans (some identifying as Afro-Latinos and some not) have also reported discrimination.

In addition to racism, Haitians in Tapachula have a difficult time integrating into society because Mexicans there – authorities and the people – are unfamiliar with Haitian history and culture. For example, there is a misperception that Haitians leave Haiti for economic reasons and are not *bona fide* refugees. By contrast, the general perception is that African migrants have left war-torn countries and are more likely to be refugees.[376] More familiarity with Haitian culture and history could alleviate stereotypes and xenophobia against Haitian migrants.

## D.  COVID-19 and Migrants in Mexico

The COVID-19 pandemic, which began affecting Tapachula in March 2020, made the situation for Haitian migrants in Tapachula even more difficult. Border closures in many countries in North and Central America, the closure of migrant shelters and COMAR offices, the loss of jobs due to the pandemic and the subsequent economic downturn, and the difficulty accessing healthcare has worsened the quality of life for migrants living or transiting through Mexico. This section discusses the myriad negative consequences that have affected Haitian migrants due to the global pandemic, including restricting migrants' movement across the region, the closure of migrant shelters, and delays in processing asylum claims.

### 1.   Migration to Mexico

Border closures in several countries in the northern part of Central America and the United States due to COVID-19 have contributed to a lower flow of migrants throughout the region. On March 16, 2020, amidst fears of the spread of COVID-19, Guatemalan President Alejandro Giammattei, announced a 15-day closing of the country's borders and the cancellation of international flights.[377] Guatemala shares a 965-long kilometer border with Mexico (a little under 600 miles) and cities like Tapachula constitute a main entry point for migrants from Central America and extra-continental migrants[378] taking a land route to the United States. Due to this severe restriction on mobility, the number of migrants that entered Mexico, either seeking to settle or attempting to transit to the United States, has greatly reduced since the beginning of the pandemic.[379]

According to the *Unidad de Política Migratoria* ("Migration Policy Unit"), which is located within the SEGOB ("Ministry of the Interior"), from January to April 2020, the number of people deported or given a voluntary return from Mexico declined from 8,706 returns to 2,140. There were no reports of Haitians turned back registered throughout Mexico in March April and May 2020, compared with 245 turned back in January and 37 in February 2020.[380]

Further restricting travel throughout the region, in mid-March 2020, President Nayib Bukele of El Salvador ordered a 21-day restriction on travel with special emphasis on those traveling from certain countries with a high rate of COVID-19 cases, including China, Iran, Italy, and France.[381] Finally, Honduras, a country of transit for many extra-continental migrants on their way to Mexico and the United States, closed its air, land, and sea borders for a week beginning on March 15, 2020.[282] On June 3, 2020 migrants from Africa, Cuba, and Haiti were offered a voluntary return to their country of origin by Honduras' *Instituto Nacional de Migración* ("National Migration Institute") but at the time of publication, it appeared that no one had accepted the offer.[383] The group was reportedly made up of about 300 migrants, who constituted a new caravan on its way to the United States.[384]

Finally, the Trump Administration has used the pandemic as a pretext to limit asylum seekers access to the United States, ostensibly for public health reasons (*see* Chapter 7 above).[385]

### 2.   Mexico: Closure of Migrant Shelters and Lack of Health Care During COVID-19

Under the pretext of containing the spread of COVID-19, Mexico cleared out its 65 government-run migrant shelters throughout the country by returning most of the migrants to their countries of origin.[386] Also in a bid to contain the virus in closely packed spaces like migrant shelters, the INM expressed that it was emptying out these shelters in accordance with health and safety guidelines.[387] By the end of April 2020, Mexico had returned 3,653 migrants to Guatemala, Honduras, and El Salvador, which left only 106 people in those centers. Most of those returned were migrants without immigration status in Mexico. Other privately-run shelters are still open and running.[388]

These deportations, carried out under the guise of keeping the spread of the virus in check, play well into the López Obrador Administration's aggressive policy towards migrants and reflects ongoing pressure from the United States to stem the flow of migrants from reaching Mexico's northern border.[389] Asylum seekers have also been released from shelters and immigration detention and transferred to shelters run by civil society organizations or the Catholic Church, or into rental accommodations with UNHCR assistance.[390] The private, church-run shelters that house Haitian migrants in Tapachula and Tijuana (a city on the Mexico-U.S. border, near San Diego, with many Haitian migrants) remain open, but have administered a shelter-ing-in-place policy for existing residents and have not accepted new residents.[391] Immigrant rights organizations have voiced concerns that the overcrowded asylum shelters will facilitate the spread of the virus.[392]

Many migrants who live outside of shelters are crammed into small homes, often several families to a home, making it impossible to socially distance to prevent the spread of COVID-19 (*see* Chapter 8, Section B above).[393]

Jobs available to Haitian migrants in Tijuana – stores, restaurants, and factories – have been closed since March 2020, leaving migrants without any income.[394] Many migrants in Tijuana and Tapachula are losing their homes, as they are unable to pay rent or landlords no longer wish to rent their properties.[395] An estimated 2,000 migrants are living in tents in makeshift camps along the U.S.-Mexico border.[396] Although new arrivals are quarantined for two weeks before interacting with the general population, living conditions at the camps pose a high risk of virus transmission.[397]

While Mexican law provides that migrants have access to healthcare, many are currently being turned away because hospitals,[398] including Tapachula Regional Hospital, are overwhelmed.[399] Medical care for asylum seekers who were receiving treatment before the outbreak of COVID-19 has stopped, as medical attention is redirected to COVID-19 patients.[400] The majority of migrants and citizens are unable to pay, further rendering adequate healthcare inaccessible.[401]

Furthermore, public health workers who had been visiting asylum shelters to provide some healthcare services have been prevented from doing so because of the government's stay-at-home orders.[402] Navigating COVID-19 is especially difficult for non-Spanish-speaking migrants, as they face difficulty receiving clear information in their language.[403] Most migrants cannot afford COVID-19 tests, which cost between $150-$200 USD.[404]

### 3.   Delays in Processing Asylum Claims

Since late March 2020, COMAR offices in Tapachula have been closed, except that asylum seekers may still submit applications.[405] Although the weekly number of asylum applications in Mexico fell by about 90 percent in April (compared with January and February), hundreds of people are still applying each week.[406] At the end of May, 19,211 applications had been registered for refugee status, with 3,627 applications filed by Haitians.[407]

COMAR has suspended review of applications and enforcement of procedural timelines indefinitely.[408] COMAR has also eliminated the requirement for applicants to check-in weekly at the COMAR office, which is often a difficult task for asylum seek-

ers to complete, especially if they cannot take public transportation due to sheltering-in-place policies.[409] In some urgent cases, COMAR is conducting eligibility interviews over the phone, but advocates note that applicants' rights are being routinely violated during these interviews with the COMAR office in Tapachula, including the right to language access.[410] In addition, lawyers find it difficult to represent their clients during phone interviews and are concerned that their clients are not comfortable telling their stories over the phone.[411] Also of concern, applicants face even longer waiting periods as cases become more backlogged.[412]

The granting of TVRH cards has been further delayed at the INM, as well. Along with delays, advocates report an increase in cases of corruption within the INM offices, particularly in Tapachula. Migrants who are willing to pay can have their applications expedited, putting Haitian migrants at a disadvantage.[413]

Overall, mobility has been reduced in the region due to the pandemic, and processing times for asylum applications has slowed even more. Many migrants who are desperate to leave Tapachula have left without legal papers to take advantage of a decrease in checkpoints during the COVID-19 outbreak. It is likely that conditions of violence and desperation will continue to push people to migrate despite the United States constituting the epicenter of the virus at present.[414]

CHAPTER

# 9 RECOMMEN-DATIONS



## Recommendations for the Mexican government and its agencies, including INM and COMAR

### 1. Ensure access to professional Haitian *Creyol* interpreters in all meetings with COMAR.

Resources must be in invested in providing professional Haitian *Creyol* interpretation in all meetings with Haitian asylum applicants. Language access is essential to guaranteeing Haitians' due process as asylum seekers – their rights to both notice and hearing are compromised when they cannot understand the notice or present the facts necessary to make their case for asylum in a hearing. As of March 2020, UNHCR provided one part-time *Creyol* interpreter in the Tapachula office for a few hours a week. Given that 80 percent of asylum applications were filed by Haitians in March 2020, at least one or more full-time *Creyol* interpreter/s must be available at COMAR, and all written notices must be translated into *Creyol*.

### 2. Provide COMAR agents with trainings and other resources on country conditions in Haiti.

Before 2016, COMAR rarely received asylum applications from Haiti, so COMAR case workers were not familiar with country conditions in Haiti. Lawyers representing Haitian migrants express that COMAR adjudicators lack knowledge of Haitian politics, history and culture, which prejudices the asylum seekers' claims. More knowledge of country conditions in Haiti could greatly assist COMAR's case managers in asking relevant questions of asylum applicants and understanding asylum claims, which in turn could improve the asylum success rate. Regular trainings and credible written resources must be provided to case managers.

### 3. Increase COMAR's capacity to receive and process asylum claims in a timely manner pursuant to their guidelines.

Recent U.S. policies that are keeping asylum seekers in Mexico have multiplied asylum claims and overwhelmed an already understaffed and under-resourced COMAR. With currently available resources, COMAR cannot process applications in a timely manner and does not have the resources to meet the needs of asylum seekers. The Authors recognize that the Mexican government has already committed to expanding COMAR's operating budget and resources and has added new offices across Mexico,[415] however, COMAR still needs to receive an increase in funding. This additional funding may need to come through the UNHCR, which works closely to support COMAR.[416] (For more about this topic, see the cited document about strengthening COMAR.[417])

### 4. Extend the Cartagena definition of refugee to claims filed by Haitian asylum seekers.

Since the 2010 earthquake, increased political instability and violence, gang criminal activity, and widespread impunity and human rights violations have forced thousands to flee Haiti. This situation of generalized violence and massive human rights violations includes, in particular, the widespread commission of rape and other sexual vi-

olence against Haitian women and girls. Given this situation, Haitian refugee claims should be eligible for recognition under the Cartagena Declaration in Mexico.

## 5. Provide COMAR and INM with anti-racism and anti-Blackness training.

As outlined in the Report, migrant advocates in Tapachula expressed concern that racism was a significant factor in the lower asylum rate for Haitian migrants, compared with similar claims filed by Honduran and Venezuelan applicants. In addition, Haitian migrant women interviewed in the Study believed they experienced discrimination at COMAR and INM because they were Haitian and Black. As outlined in the Report, the UN has condemned Mexico for discriminatory views, racial hatred, and xenophobic targeting of migrants. Anti-racism sensitivity training must be provided at all levels within COMAR and INM, with a focus on anti-Blackness training to uncover deep-rooted practices and patterns of racism within the immigration system and by individual immigration agents.

## 6. Issue Haitians TVRH cards on humanitarian/public interest grounds, on an expedited basis.

While applicants should wait no longer than 30 days to get approval for a TVRH card for those with pending asylum applications, applicants are waiting upwards of six months to be issued the TVRH card. The INM must reduce processing time for TVRH cards, which in practice often facilitates access to employment, school and healthcare.

Further, many Haitian migrants do not intend to live in Mexico long-term or to pursue their asylum claim, but want legal documents that will allow them to travel to the U.S.-Mexico border. They pursue their asylum claim because they think that the TVRH card authorizes them to travel outside of the state of Chiapas. If Haitians were able to obtain TVRH cards without initiating an asylum application, not only would that provide them with temporary status, but it would also be a better reflection of their migratory intentions, which might include eventual travel to the U.S. In sum, it is better to allow people to have an alternative to applying for asylum if that is not their intention.

## 7. Implement a moratorium on deportations during the COVID-19 pandemic.

There is simply no safe way to deport people; deportations risk the consequent spread of this highly contagious and deadly disease in receiving nations, both among COVID-19 negative passengers traveling with COVID-19 positive ones, as well as to people on the ground in Haiti or other receiving nations. Given the severe limitations on the availability of COVID-19 testing in Mexico, INM should halt deportations to Haiti or any country right now because of the pandemic, without exceptions.

## 8. Ensure access to improved medical care for Haitian migrants, with access to *Creyol* translation.

The *Secretaría de Salud* ("Secretary of Health" or "SSA") should make more efforts to ensure Haitian migrants' right to health, including providing meaningful access to

free pre- and post-natal, neo-natal, and pediatric medical services. The INM in collaboration with the SSA, should also make more efforts to ensure that migrants in detention have access to the medical services described above. Also, given the recent but constant influx of Haitian migrants in Tapachula, a Haitian *Creyol*-speaking medical provider or interpreter should be hired at the Tapachula Regional Hospital to ensure Haitian patients are able to effectively communicate with the medical providers. Prescription drug dosage and instructions must be provided in *Creyol*.

### 9. Ensure that COMAR and INM agents apply a gender specific lens in processing claims.

Ensure that COMAR officials use a gender sensitive lens when evaluating asylum claims. The Authors recommend that COMAR and the INM train their agents about women's experiences in the migration process, which frequently differ substantially from those of men. Migrant women comprise almost 50 percent of immigrants in the United States and Mexico, yet much less is known about their experiences during the journey. Gender specific impacts must be considered in making sure that proper gender-specific care is provided to migrant populations. Gender must also be an element that is considered in the evaluation of asylum applications, as provided in Mexican law.[418] For example, wives and partners of male asylum applicants must be screened separately and evaluated for their own potential asylum claims, since they may have experienced gender-based persecution that their husbands are not aware of or that they do not report to COMAR. As discussed in the Report, this is not happening in the case of many Haitian migrant women.

## Recommendation for civil society organizations

### 10. Humanitarian and human rights organizations and legal service providers working with Haitian migrants in Tapachula are encouraged to hire *Creyol*-speaking interpreters and/or staff members, when feasible, and provide anti-racism and anti-Blackness training for their staff.

As with COMAR, humanitarian and human rights organizations and legal service providers in Tapachula have been inundated with a surge of Haitian clients in 2019 and 2020. Some candidly admitted that they lacked the language capacity and cultural familiarity to adequately assist this vulnerable population. Service providers working with Haitian migrants are encouraged to hire a *Creyol*-speaking interpreter or staff member to work directly with this population. Given the relative isolation of Haitian migrant women in Tapachula, most of the women interviewed were not familiar with services available, other than the public hospital and COMAR. Service providers are encouraged to visit the communities where Haitian migrants live and advertise their services in *Creyol*. Anti-racism and anti-Blackness staff trainings are also recommended to identify and eliminate organizational and individual biases and discrimination.



Photo: S. Priya Morley. Ciudad Hidalgo, Mexico - at the Mexico-Guatemala Border.

# APPENDICES





## I.   Statistics of Haitian Migration in Mexico

**Figure 1.** Asylum/Refugee Status Applications Submitted by Haitians from 2013 – May 2020



Sources: Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR). *Cierre de Mayo 2020 & Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018)*. Prepared by Katherine La Puente.

**Figure 2.** Asylum/Refugee Status Applications Submitted by Haitians from 2013 – October 2019, by gender



Sources: Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR), *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2017)*; Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente.

Table 1. Asylum/Refugee Status Application Outcomes of Haitians by outcome type and % female gender, 2013 – May 2020

| Year or Time Period | Asylum/ Refugee Status Granted Total (% Female) | Comple- mentary Protec- tion (CP) Granted Total (% Female) | Asylum/ Refugee Status Denied Total (% Female) | Aban- doned or With- drawn Case Total (% Female) | Total Number Total (% Female) | Grant Rateˆ Overall | Grant Rateˆ for Females |
|---|---|---|---|---|---|---|---|
| **2013** | 1 (0%) | 0 (0%) | 8 (12.5%) | 5 (0%) | 14 (7%) | 11.1% | 0% |
| **2014** | 0 (0%) | 0 (0%) | 21 (42.9%)* | 5 (0%) | 26 (34.6%)* | 0% | 0% |
| **2015** | 0 (0%) | 0 (0%) | 13 (53.8%) | 3 (33.3%) | 16 (50%) | 0% | 0% |
| **2016** | 7 (42.9%) | 0 (0%) | 16 (18.8%) | 23 (13%) | 46 (19.6%) | 30.4% | 50% |
| **2017** | 1 (0%) | 3 (33.3%) | 23 (21.7%)* | 89 (14.6%)* | 116 (16.4%) | 14.8% | 16.7% |
| **Jan 2018 – Sep 2018** | 0 (0%) | 0 (0%) | 4 (25%) | 3 (33.3%) | 7 (28.6%) | 0% | 0% |
| **Jan 2018 – Oct 2019** | 5 (20%) | 9† | 8 (25%) | 72 (38.9%) | 94† | 63.6%† | N/A† |
| **Jan 2013 – May 2020** | 44† | 22† | 329† | N/A | 395† | 16.7%† | N/A† |

Sources: Government of México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados (COMAR). *Boletín Estadístico de Solicitantes de Refugio en México (2013 – 2018), Cierre de octubre 2019, & Cierre de mayo 2020;* Asylum Access, "New COMAR data shows over 13,000 asylum applicants waiting since 2018", 2020. Prepared by Katherine La Puente.

\* Includes unaccompanied minors

ˆGrant rate is defined as asylum/refugee status and complementary protection (CP) granted out of all applications that were either granted or denied. It does not include applications that were abandoned or withdrawn.

†Number is deductive or includes deductive number in calculation, source does not include gender breakdown.

**Note on immigration categories: Family** includes financial dependents; **Work** includes foreigners whose motive to stay is work or an offer of employment; **Property Owner** includes property and real estate owners, investors, retirees or pensioners; **Humanitarian** includes victims or witnesses or humanitarian causes; **Others** include those whose motive to stay are scientific research projects, public interest, or others.

**Note on visa types:** Temporary Resident Visa was previously known as FM3 and referred as such in INM documents. Permanent Resident Visa was previously known as FM2.

Table 2. Temporary Residence Card (TRT) **Issued** for Haitians, by immigration category, 2009 – May 2020

| Year | Family | Work | Property Owner | Student | Huma-nitarian | Others | Total |
|---|---|---|---|---|---|---|---|
| **2020 (Jan – May)** | 14 | 124 | 1 | 12 | N/A | 36 | 187 |
| **2019** | 31 | 569 | 1 | 44 | N/A | 50 | 695 |
| **2018** | 26 | 1,126 | 0 | 44 | N/A | 40 | 1,236 |
| **2017** | 21 | 54 | 1 | 26 | N/A | 13 | 115 |
| **2016** | 23 | 43 | 1 | 29 | N/A | 26 | 122 |
| **2015** | 37 | 37 | 1 | 127 | N/A | 17 | 219 |
| **2014** | 15 | 42 | 2 | 129 | N/A | 5 | 193 |
| **2013** | 13 | 18 | 0 | 135 | 1 | 3 | 170 |
| **2012** | 15 | 12 | 0 | 40 | 0 | 42 | 109 |

| Year | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | Total |
|---|---|---|---|---|---|---|---|---|---|
| **2011** | 0 | 0 | 44 | 4 | 0 | 131 | 0 | 0 | 179 |
| **2010** | 0 | 0 | 44 | 2 | 20 | 571 | 0 | 0 | 637 |
| **2009** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 134 |

Sources: Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020)*. Prepared by Katherine La Puente.

Table 3. Temporary Residence Card (TRT) Renewed for Haitians, by immigration category, 2010 – May 2020

| Year | Family | Work | Property Owner | Student | Others | Total |
|---|---|---|---|---|---|---|
| 2020 (Jan – May) | 4 | 92 | 0 | 44 | 30 | 170 |
| 2019 | 10 | 678 | 1 | 235 | 150 | 1,074 |
| 2018 | 4 | 60 | 1 | 324 | 12 | 401 |
| 2017 | 26 | 52 | 7 | 356 | 14 | 455 |
| 2016 | 19 | 43 | 6 | 349 | 60 | 477 |
| 2015 | 29 | 63 | 1 | 336 | 13 | 442 |
| 2014 | 8 | 62 | 17 | 291 | 0 | 378 |
| 2013 | 10 | 89 | 8 | 196 | 43 | 346 |
| 2012 | 24 | 37 | 0 | 169 | 207 | 455 |

| | Political Asylum | Correspondent | Student | Minister | Refugee | Visitor | Distinguished Visitor | Provisional Visitor | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2011 | 0 | 0 | 151 | 8 | 13 | 400 | 0 | 0 | 572 |
| 2010 | 0 | 0 | 108 | 16 | 82 | 132 | 0 | 0 | 338 |

Sources: Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2010-2020)*. Prepared by Katherine La Puente.

**Table 4.** Permanent Residence Card **(TRP) Issued** for Haitians, by immigration category, 2009 – May 2020

| Year | Family | Work | Property Owner | Huma-nitarian Reasons | Others | Total |
|------|--------|------|----------------|----------------------|--------|-------|
| **2020 (Jan – May)** | 139 | 6 | 0 | 29 | 9 | 183 |
| **2019** | 257 | 13 | 0 | 15 | 32 | 317 |
| **2018** | 168 | 14 | 1 | 10 | 31 | 224 |
| **2017** | 80 | 9 | 0 | 15 | 33 | 137 |
| **2016** | 62 | 39 | 0 | 0 | 30 | 131 |
| **2015** | 54 | 21 | 0 | 1 | 21 | 97 |
| **2014** | 80 | 39 | 0 | 0 | 11 | 130 |
| **2013** | 64 | 32 | 0 | 4 | 23 | 123 |
| **2012** | 17 | 18 | 0 | 0 | 6 | 41 |

| | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | Total |
|------|--------------------|-------------|------------------|-----------|-----------|----------|--------------|----------------|------------|-------|
| **2011** | 0 | 5 | 8 | 0 | 8 | 0 | 1 | 0 | 9 | 31 |
| **2010** | 2 | 27 | 14 | 0 | 14 | 0 | 2 | 0 | 14 | 73 |
| **2009** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 46 |

Sources: Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2009-2020)*. Prepared by Katherine La Puente.

**Table 5.** Permanent Residence Card **(**TRP**) Renewed** for Haitians, by immigration category, 2010 – May 2020

| Year | Family | Work | Property Owner | Huma-nitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| **2020 (Jan – May)** | 4 | 0 | N/A | 10 | 0 | 14 |
| **2019** | 0 | 0 | N/A | 0 | 1 | 1 |
| **2018** | 1 | 0 | N/A | 0 | 5 | 6 |
| **2017** | N/A | N/A | N/A | N/A | N/A | N/A |
| **2016** | N/A | N/A | N/A | N/A | N/A | N/A |
| **2015** | N/A | N/A | N/A | N/A | N/A | N/A |
| **2014** | N/A | N/A | N/A | N/A | N/A | N/A |
| **2013** | N/A | N/A | N/A | N/A | N/A | N/A |
| **2012** | 32 | 58 | 0 | 0 | 21 | 111 |

| | Artists & Athletes | Assimilated | Trusted Director | Scientist | Relatives | Investor | Professional | Property Owner | Technician | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **2011** | 3 | 28 | 24 | 0 | 32 | 0 | 6 | 0 | 26 | 119 |
| **2010** | 4 | 16 | 18 | 0 | 17 | 0 | 5 | 0 | 9 | 69 |

Sources: Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2010-2020)*. Prepared by Katherine La Puente.

Note: 2010-2012 refers to renewals as "refrendos", which we take to mean renewals in this context.

**Table 6.** Permanent Residence Card **(**TRP**)** **for regularization of migration situation** for Haitians, 2013 – May 2020

| Year | Family | Work | Property Owner | Huma-nitarian Reasons | Others | Total |
|---|---|---|---|---|---|---|
| **2020 (Jan – May)** | 74 | N/A | N/A | 0 | 0 | 74 |
| **2019** | 107 | N/A | N/A | 0 | 0 | 107 |
| **2018** | 42 | N/A | N/A | 0 | 0 | 42 |
| **2017** | 22 | N/A | N/A | 0 | 0 | 22 |
| **2016** | 25 | N/A | N/A | 0 | 0 | 25 |
| **2015** | 18 | N/A | N/A | 0 | 0 | 18 |
| **2014** | 29 | 0 | 0 | 0 | 0 | 29 |
| **2013** | 7 | 0 | 0 | 0 | 1 | 8 |

Sources: Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2013-2020)*. Prepared by Katherine La Puente.

**Table 7.** Haitians documented as permanent residents due to recognition of refugee status, 2012 – May 2020

| Year | Number of Individuals |
|---|---|
| **2020 (Jan – May)** | 20 |
| **2019** | 8 |
| **2018** | 6 |
| **2017** | 8 |
| **2016** | N/A |
| **2015** | 1 |
| **2014** | N/A |
| **2013** | 4 |
| **2012** | 3 |

Sources: Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2012-2020)*. Prepared by Katherine La Puente.

**Table 8.** Visitor Cards for Humanitarian Reasons (TVRH) **Issues and Extensions** for Haitians, 2014 – May 2020

| Year | Issues | Extensions |
|------|--------|------------|
| **2020 (Jan – May)** | 2,031 | 81 |
| **2019** | 1,792 | 565 |
| **2018** | 42 | 1,337 |
| **2017** | 2,797 | 1 |
| **2016** | 6 | N/A |
| **2015** | 4 | N/A |
| **2014** | 5 | N/A |

**Sources:** Government of México, Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias (2014-2020)*. Prepared by Katherine La Puente.

Note: Although the condition of visitor for humanitarian reasons (TVRH) was established under the Migration Law passed in 2011, there is only publicly available data for TVRH issues beginning in 2014.

**Table 9.** TRT Issued under Migratory Regularization Program, by immigration category for Haitians, 2015-2018

| Year | Family | Work | Property Owner | Student | Humanitarian Reasons | Others | Total |
|------|--------|------|----------------|---------|----------------------|--------|-------|
| **2018** | 0 | 1 | 0 | 1 | N/A | 1 | 3 |
| **2017** | 0 | 6 | 0 | 1 | 0 | 7 | 14 |
| **2016** | 0 | 1 | 0 | 0 | 0 | 1 | 2 |
| **2015** | 0 | 9 | 0 | 3 | 0 | 8 | 20 |

**Sources:** Government of México, Instituto Nacional de Migración. B*oletín mensual de estadísticas migratorias (2015-2020)*. Prepared by Katherine La Puente.

## References

México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados. Cierre de Marzo 2020. Gobierno de México, 1 Apr. 2020, https://www.gob.mx/cms/uploads/attachment/file/544676/CIERRE_DE_MARZO_2020__1-abril-2020_-2__1_.pdf.

México, Secretaría de Gobernación, Comisión Mexicana de Ayuda a Refugiados. *Cierre de Mayo 2020.* Gobierno de México, 1 Jun. 2020, https://www.gob.mx/cms/uploads/attachment/file/555168/CIERRE_DE_MAYO_2020__1-junio-2020_.pdf.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria, Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2013.* 2018.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria, Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2014.* 2018.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria, Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2015.* 2018.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria, Comisión Mexicana de Ayuda a Refugiados. B*oletín Estadístico de Solicitantes de Refugio en México 2016.* 2018.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria, Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2017.* 2018.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria, Comisión Mexicana de Ayuda a Refugiados. *Boletín Estadístico de Solicitantes de Refugio en México 2018.* 2018.

México, Secretaría de Gobernación, Instituto Nacional de Migración, Centro de Estudios Migratorios. *Boletín mensual de estadísticas migratorias 2009.* 2009.

México, Secretaría de Gobernación, Instituto Nacional de Migración, Centro de Estudios Migratorios. *Boletín mensual de estadísticas migratorias 2010.* 2010.

México, Secretaría de Gobernación, Instituto Nacional de Migración, Centro de Estudios Migratorios. *Boletín mensual de estadísticas migratorias 2011*. 2011.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias 2012*. 2013.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias 2013*. 2013.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria Instituto Nacional de Migración. *Boletín mensual de estadísticas migratorias 2014*. 2014.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria. *Boletín mensual de estadísticas migratorias 2015*. 2016.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria. *Boletín mensual de estadísticas migratorias 2016*. 2017.

México, Secretaría de Gobernación, Subsecretaria de Población, Migración, y Asuntos Religiosos, Unidad de Política Migratoria. *Boletín mensual de estadísticas migratorias 2017*. 2018.

México, Secretaría de Gobernación, Subsecretaria de Derechos Humanos, Población, y Migración, Unidad de Política Migratoria, Registro e Identidad de Personas. *Boletín mensual de estadísticas migratorias 2019*. 2020.

México, Secretaría de Gobernación, Subsecretaria de Derechos Humanos, Población, y Migración, Unidad de Política Migratoria, Registro e Identidad de Personas. *Boletín mensual de estadísticas migratorias 2020*. 2020.

"New COMAR data shows over 13,000 asylum applicants waiting since 2018". *Asylum Access*, 8 Jan. 2020, https://asylumaccess.org/new-comar-data-shows-over-13000-asylum-applicants-waiting-since-2018/. Press Release.

## II.  Statistics of Haitian Migration in Chile

**Figure 1.** Regular Entries, Exits, and Net Migration for Haitian Nationals Per Year from 2010-2019



**Source:** Servicio Jesuita a Migrantes (SJM). *Migración en Chile. Anuario 2019, un análisis multisectorial.* 2020. Prepared by Katherine La Puente.

Note: Regular entries and exits refer to those through official ports of entry, such as borders, seaports, or airports. Net migration is defined as regular entry minus the absolute number of regular exit. 2019 documents the only negative net migration as more Haitians exited Chile than entered.

**Figure 2.** Total Number of Unauthorized Entries of Haitian Nationals Per Year from 2010-2019



**Source:** Servicio Jesuita a Migrantes (SJM). *Migración en Chile. Anuario 2019, un análisis multisectorial.* 2020. Prepared by Katherine La Puente.

Note: Unauthorized entries data is derived from data of those who were denounced to the authorities, so this is very likely an underestimation of how many Haitians actually entered the country in a clandestine manner.

**Figure 3.** Total Number of Ordered and Executed Expulsions of Haitian Nationals Per Year from 2010-2019



Source: Servicio Jesuita a Migrantes (SJM). *Migración en Chile. Anuario 2019, un análisis multisectorial.* 2020. Prepared by Katherine La Puente.

Note: Beginning in 2013, expulsions include both administrative and judicial. Administrative expulsions are ordered by the Ministry of the Interior and Public Security and judicial expulsions are ordered by a criminal judge.

Figure 4. Student, Work, and Temporary Visas Awarded to Haitian Nationals Per Year from 2000-2019



Source: Registros Administrativos del Departamento de Extranjería y Migración of the Government of Chile. *Estadísticas Migratorias*. Prepared by Katherine La Puente.

Figure 5. Total Number of Student, Work, and Temporary Visas Awarded to Haitian Nationals from 2000-2019, by gender and age group



Source: Registros Administrativos del Departamento de Extranjería y Migración of the Government of Chile. *Estadísticas Migratorias*. Prepared by Katherine La Puente.

Figure 6. Student, Work, and Temporary Visas Awarded to Haitian Nationals in 2019, by gender and age group



Source: Registros Administrativos del Departamento de Extranjería y Migración of the Government of Chile. *Estadísticas Migratorias.* Prepared by Katherine La Puente.

Figure 7. Temporary Visas Awarded to Haitian Nationals in 2019, by type of visa



Source: Servicio Jesuita a Migrantes (SJM). *Migración en Chile. Anuario 2019, un análisis multisectorial.* 2020. Prepared by Katherine La Puente.

Note: In 2018, legislation was passed to stop awarding temporary visas based on work. The numbers reflected here are those who applied before 2019, but were awarded in 2019.

**Figure 8.** Applications for Permanent Residency Awarded to Haitian Nationals Per Year from 2003-2019



Source: Registros Administrativos del Departamento de Extranjería y Migración of the Government of Chile. *Estadísticas Migratorias.* Prepared by Katherine La Puente.

**Figure 9.** Total Number of Applications for Permanent Residency Awarded to Haitian Nationals from 2003-2019, by gender and age group



Source: Registros Administrativos del Departamento de Extranjería y Migración of the Government of Chile. *Estadísticas Migratorias.* Prepared by Katherine La Puente.

**Figure 10.** Applications for Permanent Residency Awarded to Haitian Nationals in 2019, by gender and age group



Source: Registros Administrativos del Departamento de Extranjería y Migración of the Government of Chile. *Estadísticas Migratorias.* Prepared by Katherine La Puente.

**Figure 11.** Asylum/Refugee Status Applications Submitted by Haitian Nationals from 2010 – 2019, by gender



Source: Registros Administrativos del Departamento de Extranjería y Migración of the Government of Chile. *Estadísticas Migratorias.* Prepared by Katherine La Puente.

Note: According to data published by the *Departamento de Extranjería y Migración,* no Haitian nationals have been recognized as refugees in Chile during this same time period.

Table 1. Work Visas Awarded to Haitian Nationals Per Year from 2005-2014, by region

| Region of Chile | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Arica y Parinacota** | - | - | - | - | - | - | - | - | - | - | - |
| **Tarapacá** | - | - | - | - | - | - | - | - | - | - | - |
| **Anto-fagasta** | - | - | - | - | - | - | - | - | - | - | - |
| **Atacama** | - | - | - | - | - | - | - | - | - | - | - |
| **Coquimbo** | - | - | 2 | - | 1 | - | - | 9 | 20 | 33 | 65 |
| **Valparaíso** | - | - | - | - | 3 | 2 | 5 | 12 | 9 | 22 | 53 |
| **Metro-politana** | 3 | 17 | 6 | 77 | 226 | 294 | 727 | 1,390 | 2,010 | 2,806 | 7,556 |
| **O'Higgins** | - | - | - | - | - | 5 | 5 | 5 | 5 | - | 20 |
| **Maule** | - | - | - | - | - | - | - | - | - | - | - |
| **Biobío** | - | - | - | - | - | - | - | - | - | - | - |
| **La Arancanía** | - | - | - | - | - | - | - | - | - | - | - |
| **Los Ríos** | - | - | - | - | - | - | - | - | - | - | - |
| **Los Lagos** | - | - | - | - | - | - | - | - | - | - | - |
| **Aisén** | - | - | - | - | - | - | - | - | - | - | - |
| **Magallanes** | - | - | - | - | - | - | - | - | - | - | - |

Source: Sección Estudios del Departamento de Extranjería y Migración del Ministerio del Interior y Seguridad Pública of the Government of Chile. *Migración en Chile 2005-2014.* 2016. Prepared by Katherine La Puente.

**Table 2.** Permanent Residency, Work Visas, and Temporary Visas Awarded to
Haitian Nationals Per Year from 2005-2014 in Metropolitana Region

| Type of Visa | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Total per category for time period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Permanent Residency** | – | 1 | 4 | 39 | 54 | 48 | 224 | 138 | 288 | 741 | 1,537 |
| **Work Visa** | 3 | 17 | 6 | 77 | 226 | 294 | 727 | 1,390 | 2,010 | 2,806 | 7,556 |
| **Temporary Visa** | 7 | 26 | 90 | 44 | 49 | 352 | 178 | 338 | 473 | 717 | 2,274 |
| **Total per year for all categories** | 10 | 44 | 100 | 160 | 329 | 694 | 1,129 | 1,866 | 2,771 | 4,264 | 11,367 |

Source: Sección Estudios del Departamento de Extranjería y Migración del Ministerio del Interior y Seguridad Pública of the Government of Chile. *Migración en Chile 2005-2014.* 2016. Prepared by Katherine La Puente.

**Table 3.** Number of Complaints Filed by Haitian Nationals and Total Migrants
for Violation of Workers' Rights from 2012 to 2019

| Migrant Nationality | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **Haitian Nationals** | 28 | 27 | 43 | 122 | 232 | 872 | 2,151 | 2,114 | 5,589 |
| **Total Migrants** | 727 | 808 | 1,118 | 1,344 | 1,855 | 3,419 | 7,427 | 8,839 | 25,537 |
| **Haitian % of Total** | 3.9% | 3.3% | 3.8% | 9.1% | 12.5% | 25.5% | 29.0% | 23.9% | 21.9% |

Source: Servicio Jesuita a Migrantes (SJM). *Migración en Chile. Anuario 2019, un análisis multisectorial.* 2020. Prepared by Katherine La Puente.

## References

Servicio Jesuita a Migrantes (SJM). *Migración en Chile. Anuario 2019, un análisis multisectorial*. Santiago, Chile. https://www.migracionenchile.cl/publicaciones. 2020.

Chile. Sección Estudios del Departamento de Extranjería y Migración del Ministerio del Interior y Seguridad Pública. *Migración en Chile 2005-2014*. 2016.

Chile. Registros Administrativos del Departamento de Extranjería y Migración. *Estadísticas Migratorias*. https://www.extranjeria.gob.cl/estadisticas-migratorias/.

## III. Overview of Anti-Asylum Policies Implemented in the U.S. Southern Border

| Policy | Description | Is this policy being implemented? |
|---|---|---|
| **Asylum Ban 1.0 (entry ban)** | Implemented in November 2018, this policy banned individuals who did not enter the United States through an official port of entry (POE) from receiving asylum. | No. The policy was halted by the courts starting on December 2018. |
| **Migrant Protection Protocols (MPP)** | Beginning in January 2019, the Administration instituted the MPP under which the government returns asylum seekers arriving at the border to wait in Mexico, under dangerous conditions, for the duration of their immigration proceedings in the U.S. This policy has returned thousands of asylum seekers to extremely dangerous areas and has directly impacted their access to a due process. | Yes. While federal courts have briefly halted the policy at times, it currently remains in effect. |
| **Asylum Ban 2.0 (transit bar)** | Effective July 16, 2019, this policy bars asylum to anyone who transited a third country en route to the southern border unless they (a) applied for international protection in a third country and was denied such protection; or (b) meet definition of "victims of a severe form of trafficking." This policy has separated families across borders and resulted in many being denied relief entirely or left with access to forms of protection that are harder to get and grant less benefits. | No. The transit bar was vacated by a federal court on June 30, 2020. |
| **Asylum Cooperative Agreements (ACAs)** | During the summer of 2019, the Administration signed agreements with Guatemala, El Salvador, and Honduras to enable the U.S. government to "transfer" asylum seekers to these countries to seek protection there, rather than process their claims in the United States. The implementation of the ACA with Guatemala began in November 2019. Through this policy, hundreds of asylum seekers from El Salvador and Honduras were sent to the same region they escaped from, and were deprived form the chance of accessing full and fair asylum proceedings. | Yes. However, the ACA with Guatemala has been suspended since March 2020 due to the COVID-19 pandemic. |

| Policy | Description | Is this policy being implemented? |
|--------|-------------|-----------------------------------|
| **CDC Order Suspending Introduction of Persons from a Country Where a Communicable Disease Exists** | Citing the COVID-19 pandemic, on March 2020 the Centers for Disease Control (CDC) issued an order restricting non-essential travel through the land borders. Following the CDC order, and without any sound public health rationale, DHS determined that asylum seekers lacking proper documentation, including unaccompanied minors, are not engaged in essential travel. This policy authorizes border officials to expel those apprehended along the border back to Mexico or other countries, without asking if they fear persecution or torture or providing any due process protections. Since its implementation, this policy has effectively shut down asylum in the Southern Border. | Yes. The CDC order was extended indefinitely and its reviewed on a monthly basis. |

ANNEXES

# PROFILES OF SELECTED INTERVIEWEES





Profiles from three of the 30 Haitian migrant women interviewed for this Report are included here to humanize the interviewees and portray their larger story of migration. These three women were selected because their interview responses were particularly detailed and emblematic of "typical" narratives of the women interviewed.

## Profile One

"Marianne"[419] left Haiti for the sake of her family and in fear for her life. She now lives in a shelter outside of Tapachula, Mexico, seven months pregnant and with a Haitian man she met during the journey through Latin America. The expectant mother first left Haiti for Chile because she feared what would happen to her children if she were killed in Haiti. Now she fears what will happen to them if she cannot continue moving forward.

In Haiti, Marianne worked as a street vendor. Her education was limited, as her family was unable to pay for the tuition, uniforms, and books she needed to attend school. She was forced to drop out when she was 14. Working as a vendor was dangerous, however, and Marianne did not feel she had the community support she needed to survive in Haiti. After her sister's husband, a store owner, was shot and paralyzed, Marianne made the difficult decision to leave her two children with family and emigrate to Chile.

In Chile, Marianne worked as a hairdresser. Even now, she takes great pride in her hair. She met a group of people through the salon where she worked who were pooling their money to leave for the United States. They each contributed a part of their paycheck; one person would leave, and then that person would send money and information for the next person when they could. Marianne met the father of her third child while in Chile. When it was her turn to use the pooled money, the couple decided that Marianne would leave first, and her partner promised to meet up with her in Mexico and send additional money on the journey.

As she traveled by foot through Latin America, Marianne feared that she would have to give birth in the bushes. She began the trip with a group, but she was separated from them when she grew weak and was forced to slow down. One man stayed with her and brought her to the shelter in Tapachula.

Marianne is skeptical about the healthcare in Tapachula and would rather not have her baby there either. She also worries that if her child is born in Mexico, where she herself is not a citizen, there will be complications later. While she has been able to access some services through the UNHCR, she does not understand her legal rights as a migrant in Mexico. She still has family to support in Haiti, and she is determined to leave for the United States as soon as she has the necessary papers.

While the journey has been difficult, Marianne is deeply religious and believes God will help her reach where she needs to be.

## Profile Two

> *It's like the blood that runs through their veins is not the same as the blood in our veins. They look at you like you are nothing because you are Black. You have a profession, being ignored completely. – "Fabiola"*

"Fabiola"[420] is a devoted nurse, mother, and wife intending to seek asylum in the United States where she believes that, in addition to finding safety, she will have a healthier living environment, better work opportunities, and most importantly an education that will permit a prosperous life. She is determined to do anything and everything it takes to provide financial freedom for her children and future generations.

Despite having completed university in Haiti and becoming a nurse, Fabiola had a hard time finding work due to the economic crisis. Because her husband was working in Brazil, her family was perceived to be affluent and was a target for kidnapping and ransom in Haiti. After being threatened, Fabiola was forced into hiding and fled for Chile in 2017. After 9 months in Chile and 11 months in Brazil, the family decided to head for Mexico.

The family traveled by foot and bus for two months to reach Mexico from Brazil. They slept in bushes, buses, and sometimes hotels. They encountered thieves in the forest and were forced to give up US$500, leaving them without food for four days. There were easier ways to travel, but not having visas made the journey difficult. Fabiola reflected on the journey to Mexico, "The path is not something someone should have to do. I would not recommend it. But we had to, there is no protection in Haiti, we had to seek a better life." Fabiola relied on faith and the word of others to lead her family to Mexico.

On October 11, 2019, border patrol spotted Fabiola and her family on the bus to Tapachula, but by "God's grace" they were not apprehended. Despite all they went through she thanks God for the strength and willpower to reach Mexico safely. However, life in Mexico has been unpleasant.

Fabiola complained that Black migrants disproportionately are victimized by having to pay higher prices for groceries on the street than Mexican counterparts. She also feels as if the voices of Haitians are not heard in public offices. For example, a public hospital gave her child the wrong prescription for his age to treat his bronchitis. Fabiola also feels frustrated by the lack of progress, "Two times we went to a human rights organization and tried to advocate for ourselves. Friday, we went to the human rights office, they said we needed to find the status of our case from the immigration office. We went yesterday again to the immigration office and they had no updates."

Desperately wanting to seek asylum in the United States, life in Mexico has only brought depression to a once persistent, ambitious, and educated woman looking to advance her nursing career. "Look at the state we are in, sitting on the floor, sleeping on the floor, no chairs. We want papers to leave Tapachula to find jobs and get out of this situation."

## Profile Three

"Marie-Flore"[421] is a Haitian woman, currently living in Tapachula with her husband and eight-month old son. The three share a room in a friend's house. In Haiti, Marie-Flore was studying to be a third-grade teacher.

Haiti's ruling party is *Parti Haïtien Tèt Kale* ("Haitian Bald-Headed Party" or "PHTK"). A close member of Marie-Flore's family was the political coordinator of an opposition party. PHTK members threatened to kill her husband due to her family's politics, and attempted to kill him several times. When PHTK members could not find her husband, they began to threaten her life directly, and Marie-Flore followed her husband to Chile.

Marie-Flore and her husband initially escaped to Chile, but left in November 2019 due to racial discrimination. They traveled to Peru, then through Ecuador, Colombia, Panama, and Costa Rica on their way to Mexico.

The family spent 18 taxing days walking through the Colombian forest to Panama. "Things were very hard then," Marie-Flore told us. "We saw people who had died during the journey, and there were thieves who took our food and money. They even stole the baby's food. We spent seven days without food, but we had some salt so we would get water and add salt to it and give it to the baby."

In Costa Rica, Marie-Flore fell ill and was hospitalized. She still suffers from lower abdomen and back pains from her strenuous journey. After a month, the family crossed through the river in Guatemala into Mexico. They spent their first 11 days in Mexican detention.

Marie-Flore has faced less racial discrimination in Mexico than in other parts of South America, but struggles to meet her basic needs of food, water, and sanitation. A language barrier obstructs the potential for interaction with Mexican citizens, but Marie-Flore remains connected to members of the Haitian community in Mexico. Marie-Flore and her husband have looked for work but have not had any success. She hopes for more visible support from the Mexican government in addition to job opportunities.

## Profile Four

Warsan Shire once said, "No one leaves home unless home is the mouth of a shark." This explains the case of "Darlene."[422] Darlene complained that her home country, Haiti, is plagued with poverty, crime, and violence, making her everyday life there unpredictable and harsh. Darlene talked about political unrest and natural disasters affecting her already struggling nation that forced her to leave in 2001 for the Dominican Republic.

Darlene is a middle-aged woman who does not have any children of her own, but has taken in a boy who is now 16. The boy wants to be a mechanic and made the journey with her from Chile to Mexico. Growing up, Darlene did not have it easy. Her mother had to provide for seven children, with no assistance.

Darlene left the Dominican Republic for South America, traveling through Ecuador and Brazil to arrive in Chile, where she found work. During her time in Chile, she was able to provide financial assistance for her mother who was still in Haiti. However, this did not last. Civil unrest, protests, and looting plagued the country. She lost her job and was unable to pay for her apartment. It seemed that everywhere she went, Darlene had no luck in obtaining the life she envisioned. Yet, she did not stop and instead persisted. Her next journey was to Mexico.

The voyage to Mexico was perilous. Darlene "took the bushes," which is a term used to describe the journey through the forest of Colombia and Panama. Over a year after the journey, Darlene's feet still had sores that represented the journey itself. The trip lasted 15 days where she slept in the forest. When the rain came, 5 adults and an 18-month-old baby within her travel group drowned in the rising water. She and the group also encountered thieves, and their only option was to give all their money to avoid being killed. This caused them to starve for 12 days.

While Darlene awaits her papers in Mexico, she survives off of the money her sister sends, who lives in the Dominican Republic. She is clear that she does not want to return to Haiti, "We cannot work. They were kidnapping people in Haiti and if you did not have any money, they would rape you in your vagina, in your anus, until you pass out. That is why I left."

# Notes





1   *Who is a Migrant?,* IOM – UN Migration, https://www.iom.int/who-is-a-migrant, (last visited July 30, 2020).

2   *What is a Refugee?,* USA for UNHCR, https://www.unrefugees.org/refugee-facts/what-is-a-refugee/ (last visited July 30, 2020).

3   *Sexual and Gender Based Violence,* UNHCR, https://www.unhcr.org/sexual-and-gender-based-violence.html (last visited July 30, 2020).

4   Name changed to protect her identity. *See* Annexes for the profiles of "Fabiola" and three other women the Research Team interviewed.

5   The Research Team also included eight law students from UC Hastings College of the Law, working under the supervision of HBA and CGRS, who were part of a seminar on human rights in Haiti, co-taught by professors Blaine Bookey, Moira Duvernay, and Nicole Phillips.

6   Lauren Villagran, *'All I Want is a Tranquil Life': Asylum Claims Skyrocket in Mexico as Haitians Flee to U.S. Border,* EL PASO TIMES (April 28, 2020), https://www.elpasotimes.com/in-depth/news/2020/04/16/asylum-us-mexico-border-migrants-refugee-trump/5108171002/.

7   Interview with Woman Migrant "CAE006," in Tapachula, Mexico (March 1 – 7, 2020).

8   Blaine Bookey and Lisa Davis, *Fanm Ayisyen Pap Kase: Respecting the Right to Health of Haitian Women and Girls (Health and Human Rights: An International Journal),* INSTITUTE FOR JUSTICE AND DEMOCRACY IN HAITI (2011), https://www.ijdh.org/2011/07/topics/womens-issues/fanm-ayisyen-pap-kase-respecting-the-right-to-health-of-haitian-women-and-girls-health-and-human-rights-an-international-journal/.

9   For more information, *see Haiti: Gender-Based Violence and Rule of Law,* CGRS, https://cgrs.uchastings.edu/our-work/haiti-gender-based-violence-and-rule-law.

10   Comision Mexicana de Ayuda a Refugiados [COMAR] [Mexican Commission for Refugee Aid], *Cierre de Marzo* [Close of May], formato PDF, https://www.gob.mx/cms/uploads/attachment/file/544676/CIERRE_DE_MARZO_2020_1-abril-2020_-2_1..pdf (consultada el 4 June 2020).

11   Salvador Cobo and Pilar Fuerte, *Refugiados en Mexico: Perfiles Sociodemograficos e Integracion Social, [Refugees in Mexico: Sociodemographic Profiles and Social Integration],* ALTO COMISIONADO DE LOS NACIONES UNIDAS PARA LOS REFUGIADOS [ACNUR] 13 (2012), https://www.acnur.org/fileadmin/Documentos/Publicaciones/2013/9167.pdf?file=t3/fileadmin/Documentos/Publicaciones/2013/9167.

12   *Id.* at 14.

13   Helen Kerwin, *The Mexican Asylum System in Regional Context,* 33 MD. J. OF INT'L LAW 297 (2018) [Kerwin].

14   Convention Relating to the Status of Refugees Refugee Convention art. 1, July 21, 1951, 189 U.N.T.S. 2545, available at: https://www.unhcr.org/en-us/3b66c2aa10 [hereinafter Refugee Convention]; Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 879, available at: https://www.ohchr.org/Documents/ProfessionalInterest/protocolrefugees.pdf [hereinafter Refugee Protocol].

15 The United Nations High Commissioner for Refugees [UNHCR], *States Parties to the 1951 Convention Relating to the Status of Refugees and the 1967 Protocol*, https://www.unhcr.org/protect/PROTECTION/3b73b0d63.pdf (last visited June 2, 2020); Sanjula Weerasinghe (UNCHR Consultant), *In Harm's Way: International Protection in the Context of Nexus Dynamics Between Conflict or Violence and Disaster or Climate Change, Legal and Protection Policy and Research Series*, 78 PPLA/2018/05 (December 2018); Refugee Convention, *supra* note 14, art. 1; Ley Sobre Refugiados, Protección Complementaria y Asilo Político [Law on Refugees, Complementary Protection and Political Asylum], Diario Oficial de la Federación [DOF] 01-27-2011, ultima reforma DOF 10-30-2014, formato PDF, http://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP_301014.pdf [hereinafter Law on Refugees] (consultada el July 30, 2020).

16 In 2011, Mexico passed the Ley Sobre Refugiados y Protección Complementaria [Law on Refugees and Complementary Protection] which was later amended to include political asylum in the Law on Refugees cited above. The implementing Regulation of the Law on Refugees and Complementary Protection contains provisions such as the process of submitting an asylum claim (Title Four), and the cancellation of refugee status and withdrawal of complementary protection (Title Six). Refugees are entitled to institutional assistance (Title Eight). This includes determining the vulnerability of refugees and the necessity of special care, addressing immediate needs such as immigration regularization, medical care, temporary accommodation and subsistence, access to educational services, and integration efforts to help refugees settle. Reglamento de la Ley Sobre Refugiados y Protección Complementaria [RLRPC], Diario Oficial de la Federación, [DOF] 02-21-2012, formato PDF, http://www.diputados.gob.mx/LeyesBiblio/regley/Reg_LRPC.pdf [ hereinafter Regulation of the Law on Refugees and Complementary Protection] (consultada el July 30, 2020).

17 *See* Asylum Access, *Mexican Asylum System for U.S. Immigration Lawyers* FAQ (2019), available at: https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf (last visited July 8, 2020); Ariel G. Ruiz Soto, *One Year after the U.S.-Mexico Agreement: Reshaping Mexico's Migration Policies*, MIGRATION POLICY INSTITUTE (June 2020), https://www.migrationpolicy.org/research/one-year-us-mexico-agreement. Note: The Law on Refugees confers refugee status on a person who, "due to well-founded fears of being persecuted for reasons of race, religion, nationality, gender, belonging to a certain social group or political opinions, is outside the country of their nationality and cannot or, because of said fears, does not want to avail itself of the protection of such country." Law on Refugees, art. 13, sec. I. Refugee status will also be considered for persons who do not want to return to their country of origin because they fear that their "security or freedom could be threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances that have seriously disturbed public order," Law on Refugees, art. 13, sec. III; Regulation of Law on Refugees and Complementary Protection, art. 4, sec. I-VI provides: The regulation specifies protected grounds as: Race: "belonging to a particular ethnic group, a group that shares characteristics of common heritage". Religion: "the profession or non-profession of religious belief, as well as the practice of corresponding ceremonies, devotions, or worship". Nationality: "belonging to a particular group based on cultural, ethnic, or linguistic identity, common geographic or political origins, or common convictions that are fundamental to identity or consciousness". Gender: "the gender or sexual preferences of the applicant". Particular social group: "Belonging to a group of persons who possess common characteristics or antecedents or share convictions that are fundamental to identity or consciousness." Political opinion: "The profession of opin-

ions or ideas, actual or imputed, that constitute, or are interpreted as, a criticism or opposition to the politics/policies, customs, or methods of the persecutor."

18   Soto, *supra* note 17. Law on Refugees, art. 2 sec. I.

19   Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mex.-Pan., Nov. 22, 1984, https://www.oas.org/dil/1984_cartagena_declaration_on_refugees.pdf; Law on Refugees, art.13, sec. II; Regulation of Law on Refugees and Complementary Protection, art. 4, sec. I-VI, VII-XI.

20   Weerasinghe, *supra* note 15, at 195.

21   Asylum Access, *supra* note 17, at 5; *see e.g.,* Gobierno de México, *Boletín Estadístico de Solicitantes de Refugio en México,* formato PDF, https://www.gob.mx/comar/articulos/boletin-estadistico-de-solicitantes-de-refugio-en-mexico-182244?idiom=es (consultada el July 6, 2020).

22   Kerwin, *supra* note 13, at 295.

23   Asylum Access, *supra* note 17, at 5.

24   *Id.*

25   Constitución Política de los Estados Unidos Mexicanos [CPEUM], DOF 02-05-1917, última reforma DOF 08-05-2020, available at: http://www.diputados.gob.mx/LeyesBiblio/pdf/1_080520.pdf [hereinafter Constitution of Mexico]; Stephen Meili, *Constitutionalized Human Rights Law in Mexico: Hope for Central American Refugees?, 32* HARV. HUM. RTS J., 116-117 (2019), available at: https://harvardhrj.com/wp-content/uploads/sites/14/2019/07/Meili_Constitutionalized-Human-Rights-Law-in-Mexico.pdf.

26   Constitution of Mexico, art. 11: Toda persona tiene derecho para entrar en la República, salir de ella, viajar por territorio y mudar de residencia, sin necesidad de carta de seguridad, pasaporte, salvoconducto u otros requisitos semejantes. El ejercicio de este derecho estará subordinado a las facultades de la autoridad judicial, en los casos de responsabilidad criminal o civil, y a las de la autoridad administrativa, por lo que toca a las limitaciones que impongan las leyes sobre emigración, inmigración y salubridad general de la República, o sobre extranjeros perniciosos residentes en el país. Toda persona tiene derecho a buscar y recibir asilo. El reconocimiento de la condición de refugiado y el otorgamiento de asilo político, se realizarán de conformidad con los tratados internacionales. La ley regulará sus procedencias y excepciones.

27   INSTITUTO NACIONAL DE MIGRACIÓN [INM] [NATIONAL MIGRATION INSTITUTE], GOBIERNO DE MÉXICO, formato HTML, https://www.gob.mx/inm.

28   *Closed Doors: Mexico's Failure to Protect Central American Refugee and Migrant Children,* HUMAN RIGHTS WATCH (March 31, 2016), https://www.hrw.org/report/2016/03/31/closed-doors/mexicos-failure-protect-central-american-refugee-and-migrant; *Facing Walls: USA and Mexico's Violations of the Rights of Asylum Seekers,* AMNESTY INTERNATIONAL (June 15, 2017), https://www.amnestyusa.org/reports/facing-walls-usa-mexicos-violation-rights-asylum-seekers/.

29   Law on Refugees, art. 18.

30   Regulation of Law on Refugees, arts. 38-39.

31   Law on Refugees, arts. 24; Regulation of Law on Refugees, arts. 45-47.

32   Law on Refugees, arts. 24; Regulation of Law on Refugees, arts. 45-47.

33   *See* Asylum Access, *supra* note 17.

34   Regulation of Law on Refugees and Complementary Protection, art. 24.

35   *Id.* art. 23.

36   *Id.* Chapter III.

37   Law on Refugees, art. 23; Regulation of Law of Refugees and Complementary Protection, arts. 29-30.

38   Law on Refugees, art. 21.

39   For information about the factors COMAR considers in adjudicating a claim, *see* Regulation of Law of Refugees and Complementary Protection, Chapter V.

40   Law on Refugees, art. 25. *See* Regulation of Law of Refugees and Complementary Protection, arts. 45-47.

41   Law on Refugees, art. 48.

42   Law on Refugees, art. 25; Regulation of Law of Refugees, arts. 59-60.

43   Kerwin, *supra* note 13, at 298-299.

44   Ley de Migración [LM], Diario Oficial de la Federación [DOF] 05-25-2011, formato HTML, http://dof.gob.mx/nota_detalle.php?codigo=5190774&fecha=25/05/2011 [herinafter Migration Law].

45   Migration Law, art. 52 sec. V. *See also* Reglamento de la Ley de Migración art. 137, Diario Oficial de la Federación [DOF] 9-28-2012, última reforma DOF 23-05-2014 http://www.diputados.gob.mx/LeyesBiblio/regley/Reg_LMigra.pdf [hereinafter Regulation of Law on Migration]. Note: The Migration Law also provides for the regularization of status, and subsequent permanent residency. This pathway is available where a migrant has close family ties with a Mexican national or legal resident, in cases of extreme vulnerability, or in other circumstances.

46   Kerwin, *supra* note 13, at 296.

47   Weerasinghe, *supra* note 15, at 190.

48   Kerwin, *supra* note 13, at 296-297.

49   Telephone Interviews with Servicio Jesuita a Migrantes [JRS] and El Instituto para las Mujeres en la Migración, A.C. [IMUMI] (May-July, 2020);Regulation of Law on Migration, art. 3, XVII : "Oficio de salida del país: a la resolución que expide la autoridad migratoria del lugar destinado al tránsito internacional de personas, que autoriza a la persona extranjera en situación migratoria irregular a abandonar territorio nacional dentro del plazo otorgado."

50    Telephone Interviews with JRS and IMUMI (May-July, 2020); Caitlyn Yates, *As More Migrants from Africa and Asia Arrive in Latin America, Governments Seek Orderly and Controlled Pathways,* MIGRATION POLICY INSTITUTE, October 22, 2019, https://www.migrationpolicy.org/article/extracontinental-migrants-latin-america.

51    Constitution of Mexico, art. 11 (emphasis added): "Toda persona tiene derecho para entrar en la República, salir de ella, viajar por su territorio y mudar de residencia, sin necesidad de carta de seguridad, pasaporte, *salvoconducto* u otros requisitos semejantes..."

52    Maureen Meyer and Adam Isacson, *The 'Wall' Before the Wall: Mexico's Crackdown on Migration at its Southern Border,* WASHINGTON OFFICE ON LATIN AMERICA [WOLA] 38 (December 17, 2019), https://www.wola.org/analysis/mexico-southern-border-report/; Telephone Interviews with JRS, in Tapachula, Mexico (May-July, 2020); Regulation of the Law on Migration, art. 54: El Instituto podrá autorizar la salida del territorio nacional de personas extranjeras sin documentación migratoria o que tengan documento migratorio vencido, o bien que cuenten con pasaporte o documento de identidad y viaje vencido, siempre y cuando se dirijan al país que emitió dicho documento y sean identificados plenamente como nacionales de ese país o sean residentes legales y tengan permitido reingresar al mismo. En todo caso, el Instituto verificará las listas de control migratorio y, de no existir coincidencia, procederá a emitir un oficio de salida del país. Cuando exista una alerta migratoria la autoridad migratoria actuará de conformidad con la instrucción de la alerta.

53    Meyer and Isacson, *supra* note 53, at 38.

54    Telephone Interviews with JRS and IMUMI (May-July, 2020).

55    Mario J. Penton, *Mexico Seguira Entregando 'Salvoconductos' a Migrantes Cubanos con Destino a EEUU [Mexico Will Continue to Provide 'Safe Conducts' to Cuban Migrants Bound for the US],* EL NUEVO HERALD, April 2, 2019, https://www.elnuevoherald.com/noticias/mundo/america-latina/cuba-es/article228733559.html; Yates; Telephone Interviews with JRS and IMUMI (May-July, 2020). Note: Some practitioners discussed that some Haitians who were detained by the INM in Tapachula received *oficios de salida de la estación migratoria,* which allowed them to exit detention in order to seek regularization of their immigration status within a prescribed amount of time. It does not appear that this is the document which, for years, was called/confused with a *"salvoconducto."* However, it may be that once the INM stopped issuing the *oficios de salida del país* to Haitians and others, those who were detained sought this other exit permit (from detention), whether or not their intention was to regularize their status and stay in Mexico. It is clear that many of the Haitian migrants in Tapachula, including those who initiate refugee/asylum claims, do not intend to stay in Mexico but rather seek any kind of immigration documentation from the Mexican government. Regulation of Law on Migration, art. 3, sec. XVI: Oficio de salida de la estación migratoria: a la resolución que permite la salida de la persona extranjera de la estación migratoria, para iniciar trámites de regularización, dentro del plazo que otorgue la autoridad migratoria; o bien, en el supuesto del último párrafo del artículo 111 de la Ley.

56    Joshua Partlow and Nick Miroff, *Mexico's Next President Could be on a Collision Course with Trump Over Immigration,* THE WASH. POST (September 21, 2018), https://www.washingtonpost.com/world/the_americas/mexicos-next-president-could-be-on-a-collision-course-with-trump-over-immigration/2018/09/21/f3d934ca-b5de-11e8-ae4f-2c1439c96d79_story.html; Lydia Arista, *México va a hacer su parte con los migrantes*

*centroamericanos:* Alejandro Encinas [*Migrant Exodus, Mexico is Going to Do its Part with Central American Migrants: Alejandro Encinas*], EL ECONOMISTA (November 3, 2018), https://www.eleconomista.com.mx/politica/Mexico-va-a-hacer-su-parte-con-los-migrantes-centroamericanos-Alejandro-Encinas-20181103-0009.html; Rodrigo Dominguez-Villegas, *Protection and Reintegration: Mexico Reforms Migration Agenda in an Increasingly Complex Era,* MIGRATION POLICY INSTITUTE (March 7, 2019), https://www.migrationpolicy.org/article/protection-and-reintegration-mexico-reforms-migration-agenda.

57   Madeleine Wattenbarger, *What Does* AMLO *Mean for Migrants?,* THE NATION (December 18, 2018), https://www.thenation.com/article/archive/mexico-lopez-obrador-amlo-migrants-immigration-policy/; Annette Lin, *Will Migrants Stay in Mexico?,* THE NATION (February 7, 2019), www.thenation.com/article/archive/will-migrants-stay-in-mexico/; Dara Lind, *The Migrant Caravan, Explained,* VOX (October 25, 2018), https://www.vox.com/2018/10/24/18010340/caravan-trump-border-honduras-mexico.

58   Wattenbarger, *supra* note 58.

59   Partlow and Miroff, *supra* note 57.

60   Wattenbarger, *supra* note 58.

61   Meyer and Isacson, *supra* note 53, at 6.

62   *Id.*

63   Lineamientos para Trámites y Procedimientos Migratorios [Guidelines for Immigration Procedures], Diario Oficial de la Federación [DOF]: 08-11-2012, formato HTML, http://dof.gob.mx/nota_detalle.php?codigo=5276967&fecha=08/11/2012.

64   Meyer and Isacson, *supra* note 53, at 6. Note: Refer to above section on humanitarian status.

65   *Id.* at 6-7; Sarah Kinosian, *Mexico Plans to Shut its 'Too Successful' Humanitarian Visa Program,* PITTSBURGH POST-GAZETTE (January 29, 2019), https://www.post-gazette.com/news/world/2019/01/28/Mexico-humanitarian-visas-program-Central-American-migrants-asylum-seekers/stories/201901010747.

66   See *Boletines Estadísticos,* GOBERNO DE MÉXICO, http://portales.segob.gob.mx/es//PoliticaMigratoria/CuadrosBOLETIN?Anual=2019&Secc=2 (consultada el 30 July 2020); Amy Guthrie, *Mexico to Issue Limited Humanitarian Visas to Migrants,* AP (March 31, 2019), https://apnews.com/3b38c66771964ffcb8e3d2100267e14e.

67   Kinosian, *supra* note 66; Lin, *supra* note 58; Guthrie, *supra* note 67.

68   See *Boletines Estadísticos,* GOBERNO DE MÉXICO, http://portales.segob.gob.mx/es//PoliticaMigratoria/CuadrosBOLETIN?Anual=2019&Secc=2 (consultada el July 30, 2020); Guthrie, *supra* note 67.

69   Kinosian, *supra* note 66; Lin, supra note 58; *All About the 'Remain in Mexico' Policy,* LATIN AMERICA WORKING GROUP, https://www.lawg.org/all-about-the-remain-in-mexico-policy/ (last visited June 2, 2020).

70   *Civil Society Groups: Mexico Should Reject U.S. Deal that Forces Asylum Seekers to Wait in Mexico,* WOLA (December 23, 2018), available athttps://www.wola.org/2018/12/civil-society-letter-remain-mexico-plan/; Roberto Velasco Alvarez, *Mexico Stands with Immigrants. The New U.S. Asylum Policy Must Respect Their Rights,* THE WASH. POST (January 28, 2019), https://www.washingtonpost.com/opinions/2019/01/28/mexico-stands-with-migrants-new-us-asylum-policy-must-respect-their-rights/; *Q&A: Trump Administration's 'Remain in Mexico' Program,* HUM. RTS WATCH, (January 29, 2020 10:00 AM), https://www.hrw.org/news/2020/01/29/qa-trump-administrations-remain-mexico-program; *Mexico Government Must Ensure the Safety and Well-Being of Asylum Seekers Returned to Mexico Under 'Migrant Protection Protocols,'* WOLA (November 19, 2019), https://www.wola.org/2019/11/remain-in-mexico-letter-mexican-government/; *see also* Maureen Meyer, *Q&A: Analyzing Mexico's Current Migration and Asylum Policies,* WOLA (May 7, 2019), https://www.wola.org/analysis/qa-analyzing-mexicos-current-migration-and-asylum-policies/; Department of State, United States of America, *Joint Declaration and Supplementary Agreement Between the United States of America and Mexico* (June 7, 2019), https://www.state.gov/wp-content/uploads/2019/09/19-607-Mexico-Migration-and-Refugees.pdf.

71   @realDonaldTrump, TWITTER (May 30, 2019 4:30 PM), https://twitter.com/realdonaldtrump/status/1134240653926232064. "On June 10th, the United States will impose a 5% Tariff on all goods coming into our Country from Mexico, until such time as illegal migrants coming through Mexico, and into our Country, STOP. The Tariff will gradually increase until the Illegal Immigration problem is remedied…"

72   U.S. Dep't of State, *Joint Declaration and Supplementary Agreement Between the United States of America and Mexico* (June 7, 2019), https://www.state.gov/wp-content/uploads/2019/09/19-607-Mexico-Migration-and-Refugees.pdf.

73   Maria Verza, *Mexico Migration Chief Resigns, Prisons Director Tapped,* AP (June 14, 2019), https://apnews.com/9eb378d91fcc4c3fb36f5606665ad82c; Richard Gonzales, *Mexico's Migration Chief Abruptly Resigns,* NPR (June 14, 2019), https://www.npr.org/2019/06/14/732857122/mexicos-migration-chief-abruptly-resigns.

74   Carin Zissis, *LatAm in Focus: Explaining Mexico's National Guard,* AS/COA (July 17, 2019), https://www.as-coa.org/articles/latam-focus-explaining-mexicos-national-guard; Anthony Esposito, *Mexico's New National Guard was Created to Fight Crime, but Now It's in a Face-off with Migrants,* REUTERS, July 7, 2019, https://www.reuters.com/article/us-usa-immigration-mexico-security/mexicos-new-national-guard-was-created-to-fight-crime-but-now-its-in-a-face-off-with-migrants-idUSKCN1U20HU.

75   The National Guard began formal operations on June 30, 2019. Andres Manuel Lopez Obrador, *Plan Nacional de Paz y Seguridad [National Peace and Security Plan] 2018-2024,* https://lopezobrador.org.mx/wp-content/uploads/2018/11/Plan-Nacional-de-Paz-y-Seguridad…pdf (last visited June 2 , 2020); Inigo Guevara Moyano, *Mexico's National Guard: When Police are Not Enough,* WILSON CENTER (January 2020), https://www.wilsoncenter.org/sites/default/files/media/uploads/documents/Mexico%27s%20National%20Guard.pdf. Elizabeth Melimopoulos, *Mexico's National Guard: What, Who, and When,* AL JAZEERA (June 30, 2019), https://www.aljazeera.com/news/2019/06/mexico-national-guard-190630095444350.html.

76   *International Organizations Denounce that Proposed National Guard Model in Mexico Violates International Law,* WOLA *(February 21, 2019),* https://www.wola.org/2019/02/

mexico-national-guard-violates-international-law/; *Mexico: Rushed Approval of Public Security Laws is Putting Human Right's at Risk,* AMNESTY INTERNATIONAL (May 22, 2019), https://www.amnesty.org/en/latest/news/2019/05/mexico-leyes-de-seguridad-publica-ponen-en-riesgo-derechos-humanos/; Melimopoulos, *supra* note 76.

77    Pamela Tores, *Los Costos Humanos del Acuerdo Entre Mexico y* EUA *[The Human Costs of the Agreement Between Mexico and the United States],* SIN FRONTERAS IAP (July 23, 2019), https://sinfronteras.org.mx/index.php/2019/07/23/los-costos-humanos-del-acuerdo-entre-mexico-y-eua/ (July 2019 statement by IMUMI and others). *See* Meyer and Isacson, *supra* note 53, at 10-16 for further analysis of the National Guard deployed to the southern border; *Muere una Persona Interna en el Centro de Detención Migratoria de Tapachula* [An Inmate Dies in the Tapachula Detention Center], CENTRO DE DERE-CHOS HUMANOS FRAY MATÍAS DE CÓRDOVA A.C. [FRAY MATÍAS DE CORDOVA HUM. RTS CENTER]August 8, 2019, http://cdhfrayMatías.org/web/muere-una-persona-interna-en-el-centro-de-detencion-migratoria-de-tapachula/; COLECTIVO DE OBSERVACIÓN Y MONITOREO DE DERECHOS HUMANOS EN EL SURESTE MEXICANO [COLLECTIVE FOR OBSERVATION AND MONITORING OF HUMAN RIGHTS IN THE MEXICAN SOUTHEAST], *El* INM *Mantiene Hacinadas a 66 Personas en el Centro de Detención Migratoria de Hitxtla* [The INM keeps 66 People Crowded in the Hitxtla Immigration Detention Center] (November 4, 2019), available at: http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/fb94e2d9121d1dc7b5f016c66d3dacf8.pdf.

78    Meyer and Isacson, *supra* note 53 at 9 shows 31,416; *see also* the Mexican government's database on migrant apprehensions: *Boletines Estadísticos,* GOBERNO DE MÉXICO, http://portales.segob.gob.mx/es//PoliticaMigratoria/CuadrosBOLETIN?Anual=2019&Secc=2 (consultada el 30 July 2020); Note: SIN FRONTERAS IAP, *supra* note 78 states 23,917.

79    SIN FRONTERAS IAP, *supra* note 78.

80    Diana Martínez, *Al Triple, Estaciones Migratorias* [To Triple Migrant Stations], EL HERALDO DE MÉXICO, June 28, 2019, https://heraldodemexico.com.mx/pais/al-triple-estaciones-migratorias/.

81    Meyer and Isacson, *supra* note 53, at 17 (regarding the impact of the US-Mexico agreement in June 2019); *6 Points About the U.S.-Mexico Migration Agreement and the Latest Border Apprehension Numbers,* WOLA (September 10, 2019), https://www.wola.org/analysis/migration-agreement-mexico-border-migrant-arrests/.

82    Maria Verza, *Overcrowding, Abuse Seen at Mexico Migrant Detention Center,* AP (June 17, 2019), https://apnews.com/cae4919e5d5d4d6eb280785618dfa865.

83    *Id.* Delphine Schrank, *Migrant Camps overflow as Mexico Cracks Down after Trump Threats,* REUTERS (April 17, 2019), https://www.reuters.com/article/us-usa-immigration-mexico/migrant-camps-overflow-as-mexico-cracks-down-after-trump-threats-idUSKCN1RT20U.

84    *Muere una Persona Interna en el Centro de Detención Migratoria de Tapachula,* supra note 78.

85    Meyer and Isacson, *supra* note 53, at 38.

86   Telephone Interviews with JRS (May-July, 2020).

87   Appendix 1.

88   Meyer and Isacson, *supra* note 53, at 17.

89   *Id.*

90   Villagran, *supra* note 6.

91   Christopher Sherman, *Mexico's Tough Response to Migrants Doesn't Stir Outcry,* ASSO-CIATED PRESS (Jan. 23, 2020), https://apnews.com/78afe0055e511e74c4894046df-cf5f34.; *see also,* David Agren, *Mexico has Become Trump's Wall: How* AMLO *Became an Immigration Enforcer,* THE GUARDIAN (Jan. 26, 2020), https://www.theguardian.com/world/2020/jan/26/mexico-immigration-amlo-enforcement-trump.

92   Decreto por el que se Crea la Comisión Intersecretarial de Atención Integral en Materia Migratoria, Diario Oficial de la Federación [DOF] 2019-09-19 https://dof.gob.mx/nota_detalle.php?codigo=5572790&fecha=19/09/2019.

93   Maria Verza, *Under U.S. Pressure Mexico Shifts Immigration Policy,* ASSOCIATED PRESS (Sep. 12, 2019), https://apnews.com/4b37a351ad294a52b3834ba0c4a23e27.

94   Dave Graham, *Mexico, U.S. 'Need Each Other' on Migration, Lopez Obrador Says,* REU-TERS (April 23, 2020), https://www.reuters.com/article/us-usa-immigration-mexico/mexico-u-s-need-each-other-on-migration-lopez-obrador-says-idUSKCN2252DH.

95   Azam Ahmed & Michael Crowley, *Mexican Leader Vows 'Dignity' at Trump's Side; Critics Fear Humiliation,* N.Y. TIMES (July 8, 2020), https://www.nytimes.com/2020/07/08/world/americas/mexico-amlo-trump-meeting.html.

96   *See e.g.,* Daniel Dale, *Fact Check: Trump Falsely Claims 'Redemption Money' from Immigrants is Paying for Border Wall,Baffling Experts,* CNN POLITICS (Feb. 12, 2020), https://www.cnn.com/2020/02/12/politics/fact-check-trump-wall-mexico-redemption/index.html.

97   Jorge Ramos, Opinion, *Trump Got His Wish. Mexico is Now the Wall.,* N.Y. TIMES (Feb. 7, 2020), https://www.nytimes.com/2020/02/07/opinion/international-world/mexico-migrants.html.

98   Bureau des Avocats Internationaux [BAI] & Institute for Justice and Democracy in Haiti [IJDH], *Haiti at a Crossroads: An Analysis of the Drivers Behind Haiti's Political Crisis* 11 (May 2019), available at: http://www.ijdh.org/wp-content/uploads/2019/05/IJDH-Report-Haiti-at-a-Crossroads-May-2019.pdf.

99   *Id.*

100  *Id.*

101  *Id.*

102  Haiti Grassroots Watch, HAITI: *Aid or Trade? The Nefarious Effects of U.S. Policies,* GLOBAL RESEARCH (Nov. 7, 2013), https://www.globalresearch.ca/haiti-aid-or-trade-the-nefariouseffects-of-u-s-policies/5357204.s.

103   *The World Bank in Haiti – Overview,* THE WORLD BANK (Sep. 21, 2018), https://www.worldbank.org/en/country/haiti/overview.; Victoria Rames, Sandra Jean-Gilles & Christine Seisun, USAID/*Haiti Gender Assessment,* Vol. 1 – Gender Assessment Report, USAID, 26 (2016), http://pdf.usaid.gov/pdf_docs/PA00MBR5.pdf.

104   FRAN QUIGLEY, HOW HUMAN RIGHTS CAL BUILD HAITI: ACTIVISTS, LAWYERS, AND THE GRASSROOTS CAMPAIGN 30-33 (Vanderbilt University Press 2014).

105   *See generally id.* (Demonstrating how the human rights movement grew in Haiti largely out of the Raboteau Massacre Trial in 1994).

106   Rachel Bunyan, *25 Years After 'Operation Uphold Democracy,' Experts Say the Oft-Forgotten U.S. Military Intervention Still Shapes Life in Haiti,* TIME (Sep. 24, 2019), https://time.com/5682135/haiti-military-anniversary/.

107   Human Rights Watch, *Rape in Haiti: A Weapon of Terror,* REFWORLD (July 1, 1994), https://www.refworld.org/docid/3ae6a7e18.html.

108   *Id.*

109   Athena R. Kolbe & Dr. Royce A. Hutson, *Human Rights Abuse and Other Criminal Violations in Port-au-Prince, Haiti: A Random Survey of Households,* 368 THE LANCET (Aug. 31, 2006) https://www.thelancet.com/journals/lancet/article/piis0140-6736(06)69211-8/fulltext.

110   Press Release, U.S. Rep. Maxine Waters, Rep. Waters Urges U.S. Ambassador Michele Sison Not to Let Haiti Descend into Chaos and Violence (May 28, 2020) https://waters.house.gov/media-center/press-releases/rep-waters-urges-us-ambassador-michele-sison-not-let-haiti-descend-chaos.

111   Marc Lacey, *Estimates of Quake Damage in Haiti Increase by Billions,* N.Y. TIMES (Feb. 16, 2010), https://www.nytimes.com/2010/02/17/world/americas/17haiti.html.

112   Juliette Benet, *Behind the Numbers: The Shadow of 2010's Earthquake Still Looms Large in Haiti,* INTERNATIONAL DISPLACEMENT MONITORING CENTER (Jan. 2020), https://reliefweb.int/report/haiti/behind-numbers-shadow-2010-s-earthquake-still-looms-large-haiti.

113   Jonathan M. Katz, *U.N. Admits Role in Cholera Epidemic in Haiti,* N.Y. TIMES (Aug. 17, 2016) https://www.nytimes.com/2016/08/18/world/americas/united-nations-haiti-cholera.html.

114   Bhawan Singh & Marc J. Cohen, *Climate Change Resilience: The Case of Haiti,* UNIVERSITY OF MONTREAL, OXFAM AMERICA (March 2014), https://www-cdn.oxfam.org/s3fs-public/file_attachments/rr-climate-change-resilience-haiti-260314-en_2.pdf.

115   Alice Thomas, *Two Steps Back: Haiti Still Reeling from Hurricane Matthew,* REFUGEES INT'L (April, 5, 2017), https://www.refugeesinternational.org/reports/2017/4/6/haiti#:~:text=The%20hurricane's%20high%20winds%20and,and%20affected%20 2.1%20million%20people.&text=Damage%20and%20losses%20resulting%20from,percent%20of%20the%20country's%20GNP.

116   *Vulnerability, Risk Reduction, and Adaptation to Climate Change: Haiti,* THE WORLD BANK (April 2011), https://climateknowledgeportal.worldbank.org/sites/default/

files/2018-10/wb_gfdrr_climate_change_country_profile_for_HTI.pdf; Desmond Brown, *Haiti's cry for help as climate change is compared to an act of violence against the island nation,* RELIEFWEB (Dec. 31, 2019), https://reliefweb.int/report/haiti/haiti-s-cry-help-climate-change-compared-act-violence-against-island-nation

117   In January 2010, the exchange rate was US$1 to 25 Gourdes, compared with 109 Gourdes to US$1 in June 2020. *Haiti Gourde to* US *Dollar Spot Exchange Rates for 2010,* EXCHANGE RATES.ORG.UK, https://www.exchangerates.org.uk/HTG-USD-spot-exchange-rates-history-2010.html (last visited July 9, 2020).

118   Tula Connell, *Haiti: Workers Still Struggle 10 Years After the Earthquake,* SOLIDARITY CENTER (Jan. 9, 2020) https://www.solidaritycenter.org/haiti-workers-still-struggle-10-years-after-earthquake/.

119   Kelsey Gasseling, *The Threads of Justice: Economic Liberalization and the Secondhand Trade of Clothes from the United States and Haiti,* 58 B.C. L. REV. 1279 (2017) (citing https://www.cia.gov/library/publications/the-world-factbook/geos/ha.html).

120   Humanitarian Aid, *Haiti: Food Insecurity Expected to Rise Next Year, U.N. Humanitarian Agency Reports,* U.N. NEWS (Dec. 27, 2019), https://news.un.org/en/story/2019/12/1054441.

121   Dan Coughlin & Kim Ives, *Haiti's Rigged Election,* THE NATION (June 15, 2011), https://www.thenation.com/article/haitis-rigged-election/.

122   Jacqueline Charles, *Martelly's One Man Rule Comes to an End in Haiti,* MIAMI HERALD (Jan. 10, 2016), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article54042620.html.

123   Jake Johnston, *Haiti, Six Years Later,* THE HILL (Jan. 13, 2016), https://thehill.com/blogs/congress-blog/foreign-policy/265593-haiti-six-years-later.

124   BAI and IJDH, *supra* note 99, at 5.

125   Jacqueline Charles, *Haiti President Accused of Embezzlement Scheme in Governing Audit of Venezuelan Aid Money,* MIAMI HERALD (June 4, 2019), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article231122978.html.

126   *Haiti,* FREEDOM HOUSE (2019), https://freedomhouse.org/country/haiti/freedom-world/2019.

127   *Id.*

128   Sandra Lemaire, Renan Toussaint, & Matiado Vilme, *Calls Between Haitian Senator, Gang Leader Roil Haiti,* VOICE OF AMERICAS (April 26, 2012), https://www.voanews.com/americas/calls-between-haitian-senator-gang-leader-roil-haiti.

129   Andre Paultre & Sarah Marsh, *Haitian Slums Descend into Anarchy as Crisis Sparks Worst Violence in Years,* REUTERS (Dec. 10, 2019), https://www.reuters.com/article/us-haiti-violence-feature/haitian-slums-descend-into-anarchy-as-crisis-sparks-worst-violence-in-years-idUSKBN1YE2RX; Haut-Commissariat des Nations unies aux droits de l'homme [U.N. High Commission on Human Rights], *Rapport sur les Allégations de Violations et Abus des Droits de l'Homme lors des Attaques dans le Quartier de Bel-Air, à Port-au-Prince, du 4 au 6 Novembre 2019 [Report on the Allegations of Violations and Abuses of*

*Human Rights During the Attacks in the Neighborhood of Bel-Air, in Port-au-Prince, November 4-6, 2019]* (Feb. 2020), https://reliefweb.int/sites/reliefweb.int/files/resources/20200217_haiti_-_rapport_bel-air_-_final_master_version.pdf.

130   IJDH et. al, *Access to Judicial Remedies in Haiti, Submission for the 112th Session of the United Nations Human Rights Committee, October 8 & 9, 2014, Review of Haiti's Report under the International Covenant on Civil and Political Rights,* (Sept. 12, 2014), http://www.ijdh.org/wp-content/uploads/2014/09/hrc_Access-to-judicial-remedies_Sept-12.pdf.

131   *Id.*

132   Jacqueline Charles, *Rapes, Kidnappings, Gangs Holding Haiti Hostage,* UN *Told Security Council,* MIAMI HERALD (Feb. 20, 2020), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article240482716.html.

133   Nicole Phillips, *The Vital Role of Grassroots Movements in Combatting Sexual Violence and Intimate Partner Abuse in Haiti, in* COMPARATIVE PERSPECTIVES ON GENDER VIOLENCE: LESSONS FROM EFFORTS WORLD WIDE, 45-46 (Rashmi Goel and Leigh Goodmark eds., Oxford Publishing 2015).

134   *Id.*

135   *Four Things You Need to Know about Education in Haiti,* THE WORLD BANK (March 12, 2015), https://www.worldbank.org/en/news/feature/2015/03/12/four-things-you-need-to-know-about-education-in-haiti.

136   U.S. Dep't of State, H.R. and Lab, *Country Reports for Practices of Human Rights: Haiti,* (March 2020).

137   Dr. Gabriel Bardall et. al, *Violence Against Women in Elections in Haiti: An* IFES *Assessment,* USAID (May 2018), available at: http://aceproject.org/ero-en/misc/violence-against-women-in-elections-in-haiti-an; In rural areas, nearly 70 percent of women work in the informal sector as street vendors or domestic workers, as well as around 50 percent of women in cities. Canada: Immigration and Refugee Board of Canada, *Haiti: The Situation of Women Who Live Alone, Including Those Who Are Not in Precarious Situations; Whether They Can Access Employment and Housing; Support Services Available to Them (2015-September 2017)* REFWORLD (Oct. 12, 2017), https://www.refworld.org/docid/59ef1c184.html.

138   IJDH et. al, *Gender Issues Facing Women, Submission for the 63rd Session of the United Nations Committee on the Elimination of All Forms of Discrimination against Women, February 25, 2016 Review of Haiti's Report under the Convention on the Elimination of All Forms of Discrimination against Women,* (Jan. 22, 2016), http://www.ijdh.org/wp-content/uploads/2009/12/CEDAW-Haiti-Gender-Issues-22.1.16.pdf.

139   U.S. Dep't of State, H.R. and Lab., *supra* note 138, at 19.

140   Dr. Gabriel Bardall et. al, *supra* note 139, at 2.

141   U.S. Dep't of State, H.R. and Lab., *supra* note 138, at 15.

142   Blaine Bookey & Lisa Davis, *Fanm Ayisyen Pap Kase: Respecting the Right to Health of Haitian Women and Girls,* IJDH http://www.ijdh.org/2011/07/topics/womens-issues/

fanm-ayisyen-pap-kase-respecting-the-right-to-health-of-haitian-women-and-girls-health-and-human-rights-an-international-journal/; *Testimony of Eramithe Delva: English, Creyol (Inter-American Commission on Human Rights)*, IJDH http://www.ijdh.org/2011/03/topics/womens-issues/testimony-of-eramithe-delva-inter-american-commission-on-human-rights/#.uz5mwqJ0DeE.

143   Dr. Gabriel Bardall et. al, *supra* note 139, at 6.

144   HAITIAN MINISTRY OF PUBLIC HEALTH AND POPULATION, *Haiti: 2012 Mortality, Morbidity, and Service Utilization Survey* 16 (2012), https://dhsprogram.com/pubs/pdf/sr199/sr199.eng.pdf; ORGANIZATION OF AMERICAN STATES, *Haiti: response to questionnaire*, OEA/Ser.L/II.7.10, 20 (2008).

145   *The Right of Women in Haiti to be Free from Violence and Discrimination,* Inter-Am. Comm'n H.R., OEA/Ser.L/V/II, doc. 64 para. 127 (2009).

146   NICOLE PHILLIPS, *The Vital Role of Grassroots Movements in Combatting Sexual Violence and Intimate Partner Abuse in Haiti,* in COMPARATIVE PERSPECTIVES ON GENDER VIOLENCE: LESSONS FROM EFFORTS WORLD WIDE, *supra* note 134, at 46.

147   *Open Letter from* BAI & IJDH *Calling for the U.N. to Honor Legal Rights of Victims of Sexual Exploitation and Abuse in Haiti,* IJDH (May 28, 2020) https://www.ijdh.org/2020/06/projects/bai-and-ijdh-pen-an-open-letter-calling-for-the-un-to-honor-legal-rights-of-victims-of-sexual-exploitation-and-abuse-in-haiti/.; King, C., Lee, S. & Bartels, S.A., *'They Were Going to the Beach, Acting like Tourists, Drinking, Chasing Girls': A Mixed-Methods Study on Community Perceptions of Sexual Exploitation and Abuse by* UN *Peacekeepers in Haiti,* 9 STABILITY: INT'L J. OF SECURITY AND DEVELOPMENT, 10 (2020), http://doi.org/10.5334/sta.766.

148   Canada: Immigration and Refugee Board of Canada, *Haiti: Violence against women, including sexual violence; state protection and support services (2012-June 2016),* (Dec. 15, 2016), REFWORLD http://www.refworld.org/docid/58d539d04.html.

149   IJDH et. al, *supra* note 131, at 2.

150   NICOLE PHILLIPS, *The Vital Role of Grassroots Movements in Combatting Sexual Violence and Intimate Partner Abuse in Haiti,* in COMPARATIVE PERSPECTIVES ON GENDER VIOLENCE: LESSONS FROM EFFORTS WORLD WIDE, *supra* note 134, at 50.

151   Cedric Audebert, *The Recent Geodynamics of Haitian Migration in the Americas: Refugees or Economic Migrants?,* REV. BRAS. ESTUD. POPUL. VOL. 34 (April 2017), https://www.scielo.br/scielo.php?pid=S0102-30982017000100055&script=sci_arttext.

152   El Colegio de la Frontera Norte [COLEF], *Informe: Migrantes Haitianos y Centroamericanos en Tijuana, Baja California, 2016-2017 [Report: Haitian and Central American Migrants in Tijuana, Baja California 2016-2017].* POLÍTICAS GUBERNAMENTALES Y ACCIONES DE LA SOCIEDAD CIVIL (May 2018).

153   *Id.* at 12.

154   *Id.* at 28.

155  *Id.* at 33.

156  *Id.* at 36.

157  COLEF, *supra* note 154, at 35.

158  *Id.* at 52.

159  *Id.* at 54.

160  *Id.* at 29.

161  Leonardo Cavalcanti & Marília de Macedo Tadeu de Oliveira, *Relatório Anual 2019, Imi- gração e Refúgio no Brasil,* OBSERVATÓRIO DAS MIGRAÇÕES INTERNACIONAIS, 78 (2019), https://portaldeimigracao.mj.gov.br/images/relatorio-annual/ relat%C3%93RIO%20ANUAL%20OBMigra%202019.pdf.

162  *Id.* at 93.

163  *See* Lei No. 9.474, julio 22, 1997, DIARIO OFICIAL [DOF].

164  *Id.; See also* Canada: Immigration and Refugee Board of Canada, *Brazil: Resident Status of Haitian Citizens in Haiti, Including Their Rights and Responsibilities; Permanent Resi- dent Status; Documents Issued to Haitians, Including Foreigner Identity Cards (Cédula de Identidade de Estrangeiro,* CIE*); Treatment of Haitians in Brazil, Including Access to Em- ployment and Education, State Protection and Support Services (2010-September 2017)* (Oct. 3, 2017), https://www.refworld.org/docid/59ef10f34.html.

165  Sidney Antonio de Silva, *Brazil, a New Eldorado for Immigrants?: The Case of Haitians and the Brazilian Immigration Policy,* 3 URBANITIES 5 (Nov. 2013), http://www. anthrojournal-urbanities.com/vol-3-no-2-november-2013/.

166  *Id.*

167  Canada: Immigration and Refugee Board of Canada, *supra* note 166.

168  CNIg handles more general immigration matters in Brazil, while CONARE focuses on asylum and refugees.

169  Canada: Immigration and Refugee Board of Canada, *supra* note 166.

170  *Id.*

171  *Id.*

172  *Id.*

173  Research Directorate, *Brazil and Haiti: Situation of Haitians in Brazil, Including Rights and Obligations; Permanent Resident Status; Documents Issued to Haitians, Including For- eigner Identity Cards (Cédula de Identidade de Estrangeiro,* CIE*); Treatment of Haitians in Brazil, Including Access to Employment and Education, State Protection and Support Ser- vices (2010-June 2018),* IMMIGRATION AND REFUGEE BOARD OF CANADA (June 21. 2018), https://www.justice.gov/eoir/page/file/1173751/download.

174   Marina Pasquali, *Brazil: Refugee Applications from Haiti 2010-2016, By Status,* STATISTA (Nov. 26, 2019), https://www.statista.com/statistics/819422/number-refugee-applications-haiti-brazil-status/.

175   Gabriela Bazzo, *Haitian Migrants Pouring Into Brazil Don't Find a Warm Welcome,* HUFFINGTON POST (Aug. 22, 2016), https://www.huffpost.com/entry/haitians-migrants-brazil_n_56b4ca40e4b08069c7a6efe7?guccounter=1; *see also* Kevin Hall, *Brazil, Once a Haven, Now a Dead End for Many Haitians,* MIAMI HERALD (Sept. 24, 2016), http://www.miamiherald.com/news/nation-world/world/americas/haiti/article103920161.html.

176   Jeffrey Lesser and Shari Wejsa, *Migration in Brazil: The Making of a Multicultural Society,* MIGRATION POLICY INSTITUTE (March 29, 2018), https://www.migrationpolicy.org/article/migration-brazil-making-multicultural-society; *Brazil Unemployment Rate 1991-2020,* Marcotrends, https://www.macrotrends.net/countries/BRA/brazil/unemployment-rate (last visited July 30, 2020).

177   *Haitian Immigrants Victim of Xenophobic Attack in Brazil,* TELESUR (Aug. 9, 2015), https://www.telesurenglish.net/news/Haitian-Immigrants-Victims-of-Xenophobic-Attacks-in-Brazil-20150809-0002.html.

178   *Id.*

179   *Brazil: Events of 2018,* HUM. RTS WATCH (2019), https://www.hrw.org/world-report/2019/country-chapters/brazil.

180   *Id.*

181   Ana Míria dos Santos, *Assassination in Brazil Unmasks the Deadly Racism of a Country That Would Rather Ignore it,* THE CONVERSATION (April 13, 2018, 12:33 A.M.), https://theconversation.com/assassination-in-brazil-unmasks-the-deadly-racism-of-a-country-that-would-rather-ignore-it-94389.

182   Daniel Cerqueria et al. *Atlas da Violência 2017,* FORUM BRASILEIRO DE SEGURANÇA PÚBLICA, 30 (Jun., 2017), available at : https ://www.ipea.gov.br/atlasviolencia/download/2/2017.

183   *Id.* at 37; *see also* Julio J. Waiselfisz, *Mapa da Violência 2015,* HOMICÍDIO DE MULHERES NO BRASIL, BRASÍLIA, BR: FLACSO (2015), http://www.mapadaviolencia.org.br/pdf2015/MapaViolencia_2015_mulheres.pdf.

184   The amount of time Haitians were allowed to be in Brazil on a humanitarian visa, for example, shortened to 90 days. Additional qualifications were also added to the application for permanent residency, including entry through a designated checkpoint and lack of a criminal record. Research Directorate, *supra* note 175.

185   Leonardo Cavalcanti et al., *supra* note 162, at 78.

186   Research Directorate, supra note 175.

187   *Id.*

188   *Id.*

189 Lei Ordinária 13.445, maio 24 de 2017.

190 *Family Reunification Laws: Brazil,* LIBRARY OF CONGRESS (Sept. 15, 2016), https://www.loc.gov/law/help/family-reunification/foreign.php#_ftn34.

191 Research Directorate, *supra* note 175.

192 Only six percent of surveyed migrants that came from Brazil had lived there for more than five years, indicating that only a small number came in 2011 when the visa program began. The rest came in later years, after the limit on visas was lifted. *See,* COLEF, *supra* note 154, at 30.

193 Asylum Access, *supra* note 17.

194 COLEF, *supra* note 154, at 96-97.

195 *Id.* at 33.

196 *Id.* at 82.

197 *Id.* at 83.

198 *Id.* at 100-101.

199 Cristián Doña Reveco & Amanda Levinson, *Chile: A Growing Destination Country in Search of a Coherent Approach to Migration,* MIGRATION POLICY INSTITUTE (June 6, 2012), https://www.migrationpolicy.org/article/chile-growing-destination-country-search-coherent-approach-migration.

200 Telephone Interview with Clinic Lawyer, Universidad Alberto Hurtado, Facultad de Derecho, Clinica Juridica de Migrantes (April 22 2020); Jacqueline Charles *Haitians Gamble on a Better Life in Chile. But the Odds Aren't Always in Their Favor,* MIAMI HERALD (Mar, 1, 2018), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article202590949.html; Doña Reveco and Amanda Levinson, *supra* note 201.

201 "Until the 1990s, Chile had only a small black population, so the recent arrival of a black migrants has caused a stir. History suggests this ought not to be the case. A 2014 genetic study found that one in two Chileans had ancestors among the thousands of African slaves brought to the country between the 16th and 19th centuries. But Chile's elite have long preferred to emphasize their country's European roots and the newcomers are now the subject of a growing debate." Piotr Kozak, *Caribbean Migrants Risk Danger and Discrimination for a New Life in Chile,* THE GUARDIAN (June 29, 2017), https://www.theguardian.com/world/2017/jun/29/caribbean-migrants-chile-desert-minefield.

202 Charles, *supra* note 202; Nicolás Rojas Pedemonte, Nassila Amode, & Jorge Vásquez, *Migración Haitiana Hacia Chile: Origen y Aterrizaje de Nuevos Proyectos Migratorios* [Haitian Migration to Chile: Origin and Landing of New Migration Projects, MIGRACIÓN HAITIANA HACIA CHILE https://www.cpalsocial.org/documentos/403.pdf, at 69; MINUSTAH *Fact Sheet,* UNITED NATIONS PEACEKEEPING https://peacekeeping.un.org/en/mission/minustah, (last visited Jun. 2, 2020); Chilean politician and diplomat Juan Gabriel Valdés was appointed by the Secretary-General of the United Nations to serve as his Special Representative and Head of the United Nations Stabilization Mission in Haiti (MINUSTAH) from August 2004 – June 2006. Press Release, Secre-

tary-General, Juan Gabriel Valdes Appointed Special Representative and Head of UN Mission in Haiti, U.N. Press Release SG/A/881-BIO/3581 (July 15, 2004).

203 Appendix 2; Doña Reveco & Levinson, *supra* note 201. *See also:* Cristián Doña Reveco, *Amid Record Numbers of Arrivals, Chile Turns Rightward on Immigration,* MIGRATION POLICY INSTITUTE (January 17, 2018), https://www.migrationpolicy.org/article/amid-record-numbers-arrivals-chile-turns-rightward-immigration; Nicolás Rojas Pedemonte, Nassila Amode, & Jorge Vásquez Rencoret, *Racismo y Matrices de 'Inclusión' de la Migración Haitiana en Chile: Elementos Conceptuales y Contextuales Para Discusión* [Racism and Inclusion Matrices of Haitian Migration in Chile: Conceptual and Contextual Elements for Discussion].*Polis (Santiago),* 14, no. 42 Polis (Santiago) 217-245 (2015), https://scielo.conicyt.cl/pdf/polis/v14n42/art_11.pdf.

204 Chile was also involved in Haiti after the 2010 earthquake. After the 2010 earthquake, Juan Gabriel Valdés was appointed by Chilean President Michelle Bachelet as her Presidential Delegate to Haiti. Under his supervision, and in coordination with the United Nations and other countries, Chile provided humanitarian aid to Haiti. *Emol, Ministros de* RR.EE. *y Defensa coordinan con Valdés Ayuda para Haití [EE Ministers and Defense Coordinate with Valdes Aid for Haiti],* EMOL (Jan. 13, 2010), https://www.emol.com/noticias/nacional/2010/01/13/393748/ministros-de-rree-y-defensa-coordinan-con-valdes-ayuda-para-haiti.html. This aid included food and medicines, as well as a 61-member search-and-rescue team: Rhoda Margesson & Mareen Taft-Morales, *Haiti Earthquake: Crises and Response,* CONGRESSIONAL RESEARCH SERVICE (Feb. 2, 2010), https://fas.org/sgp/crs/row/R41023.pdf. Some practitioners have also noted that the humanitarian presence of Chilean troops and non-governmental organizations like Techo (https://www.techo.org/chile/) in Haiti after the 2010 earthquake contributed to the visibility of Chile as a destination country for Haitians: Telephone Interview with Clinic Lawyer, Universidad Alberto Hurtado, Facultad de Derecho, Clinica Juridica de Migrantes (April 22 2020).

205 Tamar Ziff & Camille Preel-Dumas, *Coordinating a Humane Response to the Influx of Haitian Migrants in Chile,* THE DIALOGUE: VOCES (Sept. 4, 2018), https://www.the-dialogue.org/blogs/2018/09/the-influx-of-haitian-migrants-in-chile/; Rocío Montes, *La Esperanza de Haití Vuela a Chile,* EL PAÍS (Apr. 9, 2018), https://elpais.com/internacional/2018/04/09/america/1523226516_383567.html.

206 *See e.g.,* IOM *Supports New Legal Pathway for Haitians in Chile,* INTERNATIONAL OR-GANIZATION FOR MIGRATION (Aug. 28, 2018), https://www.iom.int/news/iom-supports-new-legal-pathway-haitians-chile; Manuel Orozco, *Latin American and Caribbean Migration from Weak and Failing States,* THE DIALOGUE (Jul., 2019), https://www.thedialogue.org/wp-content/uploads/2019/09/Migration-Patterns-and-State-Fragility.pdf, at table 15, at 18; Rocío Montes, *La Esperanza de Haití Vuela a Chile,* EL PAÍS (Apr. 9, 2018), https://elpais.com/internacional/2018/04/09/america/1523226516_383567.html; Kevin G. Hall, *Brazil, Once a Haven, Now a Dead End for Many Haitians,* MIAMI HERALD (Sept. 24, 2016), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article103920161.html.

207 Rojas Pedemonte, *supra* note 204, at 104-105, 114-116.

208 Rojas Pedemonte, *supra* note 204, at 107-108.

209 *Estimación de Personas Extranjeras Residentes Habituales en Chile al 31 de Diciembre 2019 [Estimate of Foreign Persons and Habitual Residents of Chile as of December 31, 2019,* IN-

STITUTO NACIONAL DE ESTADÍSTICAS (INE) Y EL DEPARTAMENTO DE EX-TRANJERÍA (DEM), [NATIONAL STATISTICS INSTITUTE AND THE DEPARTMENT OF IMMIGRATION] (Mar. 21, 2020), https://www.ine.cl/docs/default-source/demografia-y-migracion/publicaciones-y-anuarios/migraci%C3%B3n-internacional/estimaci%C3%B3n-poblaci%C3%B3n-extranjera-en-chile-2018/estimaci%C3%B3n-poblaci%C3%B3n-extranjera-en-chile-2019-metodolog%C3%ADa.pdf?s-fvrsn=5b145256_6.

210   INE/DEM, *supra* note 211, at 3.

211   Law No. 1094 de 1975, julio 19, 1975, DIARIO OFICIAL [DOF] [hereinafter Law No. 1094]. In Spanish: https://www.extranjeria.gob.cl/leyes-migratorias/ In English: https://www.extranjeria.gob.cl/media/2019/03/ley_reglamento_ingles.pdf

212   Doña Reveco, *supra* note 205; Joao M. Da Silva, *Chile's Decree-Law 1094: A Source of Immigrant Vulnerability* (Sept., 2018) (unpublished M.A. dissertation, City University of New York), https://academicworks.cuny.edu/gc_etds/2839/, at 2-3.

213   Doña Reveco & Levinson, *supra* note 201.

214   Law No. 1094 art. 3, sec. 87-102 (Chile); Da Silva, *supra* note 214, at 41 and 48.

215   The *Policía de Investigaciones* have authority for immigration enforcement.

216   *See e.g.,* INDH *Evalúa Acciones Legales por Retención de Haitianos en Aeropuerto de Santiago [INDH Evaluates Legal Action for the Retention of Haitians in Santiago Airport],* CO-OPERATIVA.CL (Mar. 6, 2018), www.cooperativa.cl/noticias/pais/poblacion/inmigrantes/indh-evalua-acciones-legales-por-retencion-de-haitianos-en-aeropuerto-de/2018-03-06/143159.html; Justine Fontaine, *Chile : Polémiques Racistes Autour de la Présence de Migrants Haïtiens [Chile: Racist Controversies Around the Presence of Haitian Migrants],* RFI (Mar. 7, 2018), www.rfi.fr/fr/ameriques/20180307-chili-migrants-haitiens-bienvenus-charters-racisme-polemique.

217   Telephone Interview with Clinic Lawyer, Universidad Alberto Hurtado, Facultad de Derecho, Clinica Juridica de Migrantes (April 22, 2020).

218   Law No. 1094, sec. 23-26; *Visa Sujeta a Contrato [Visa Subject to a Contract],* DEPARTA-MENTO DE EXTRANJERÍA Y MIGRACIÓN, GOBIERNO DE CHILE [DEPARTMENT OF IMMIGRATION AND MIGRATION, GOVERNMENT OF CHILE], https://www.extranjeria.gob.cl/trabajar-en-chile/visa-sujeta-a-contrato/, (last visited June 4, 2020).

219   Circular N°7 de fecha 26 de febrero de 2015, que instruye sobre visación temporaria por motivos laborales, Departamento de Extranjería y Migración [Circular N°7 de 2015].

220   Law No. 1094, sec. 29-33; Carolina Stefoni et al., *Ley y Política Migratoria en Chile. La Ambivalencia en la Comprensión del Migrante [Immigration Law and Policy in Chile. Ambivalence in the Understanding of Migrants], La Contrucción Social del Sujeto Migrante en América Latina. Prácticas, Representaciones y Categorías [The Social Construction of the Migrant Subject in Latin America. Practices, Representations and Categories]* 93 (2011), available at: https://www.academia.edu/11933320/Ley_y_pol%C3%ADtica_migratoria_en_Chile_La_ambivalencia_en_la_comprensi%C3%B3n_del_migrante; Visa Temporaria

[Temporary Visa], DEPARTAMENTO DE EXTRANJERÍA Y MIGRACIÓN, GOBIER-NO DE CHILE [DEPARTMENT OF IMMIGRATION AND MIGRATION, GOVERN-MENT OF CHILE] https://www.extranjeria.gob.cl/vivir-en-chile/visa-temporaria/ (last visited June 4, 2020); *Decreto No. 597 de 1984 [Decree no. 597 of 1984]*, junio 14, 1984, DI-ARIO OFICIAL [DOF].

221 Circular N°7 de 2015.

222 *Haitianos en Chile, Integración Laboral, Social, y Cultural [Haitians in Chile Labor, Social, and Cultural Integration]*, CENTRO NACIONAL DE ESTUDIOS MIGRATORIOS (CE-NEM), UNIVERSIDAD DE TALCA http://www.cenem.utalca.cl/docs/publicaciones/Haitianos_en_Chile.pdf (last accessed May 27, 2020).

223 CENEM, *supra* note 223, at 25.

224 CENEM, *supra* note 223, at 14.

225 Appendix 2.

226 Amode/Rojas/Vásquez; Charles, *supra* note 202; *Kozak,* supra note 203.

227 Charles, *supra* note 202. *See additional examples:* (1) *Comunidad Haitiana Publicó: 'La Lepra Ttiene Ttratamiento, la Xenofobia no' [Haitian Community Publishes: 'Leprosy Has Treatment, Xenophobia Does Not']*, CNN CHILE (Aug. 1, 2017), https://www.cnnchile.com/pais/comunidad-haitiana-publico-la-lepra-tiene-tratamiento-la-xenofobia-no_20170801/#:~:text=Comunidad%20haitiana%20public%C3%B3%3A%20%E2%80%9C-La%20lepra%20tiene%20tratamiento%2C%20la%20xenofobia,con%20la%20enferme-dad%20en%20Valdivia.&text=Este%20lunes%20en%20Valdivia%20fue%20confirmado%20un%20caso%20de%20lepra. (2) *Denuncian Agresión Xenófoba a Haitia-no en Terminal Pesquero de Santiago" [Xenophobic Aggression Denounced Against Haitian in Santiago Fishing Terminal]*, COOPERATIVA.CL (May 25, 2017), www.cooperativa.cl/noticias/pais/policial/denuncian-agresion-xenofoba-a-haitiano-en-terminal-pesquero--de-santiago/2017-05-25/175851.html. (3) *Cinco ciudadanos haitianos vivían en un establo de animales en Villarrica [Five Haitian Citizens Lived in an Animal Stable in Villarrica]*, 24 HORAS TVN (June 1, 2018), www.24horas.cl/nacional/cinco-ciudadanos-haitianos-vivian-en-un-establo-de-animales-en-villarrica-2606779.

228 *Sacados por ser Haitianos: la Denuncia por Discriminación que Pesa Sobre Exclusivo Mall ABC1 [Kicked Out for Being Haitian: The Discrimination Complaint that Weighs on Exclu-sive Mall ABC1]*, EL DINAMO, (Sept. 22, 2017), www.eldinamo.com/nacion-al/2017/09/22/sacados-por-ser-haitianos-la-denuncia-por-discriminacion-que-pesa-sobre-exclusivo-mall-abc1/.

229 *Muere Joven Haitiana que fue Acusada de Abandonar a su Bebé [Young Haitian Woman Who was Accused of Abandoning Her Baby Dies]*, CNN CHILE (Sept. 30, 2017), www.cnnchile.com/pais/muere-joven-haitiana-que-fue-acusada-de-abandonar-su-bebe_20170930/; INDH *Estudia Acciones Legales por Muerte de Ciudadana Haitiana [INDH Studies Legal Actions for Death of Haitian Citizen]*, INSTITUTO NACIONAL DE DERECHOS HUMANOS (INDH) (Oct. 2, 2017), www.indh.cl/indh-estudia-acciones-le-gales-muerte-ciudadana-haitiana-estaba-detenida-hospitalizada/.

230 Note: the INDH surveyed a sample of 2,047 Chileans that, as a group, represent the Chil-ean population in general. See INDH Report, 22.

231 *Manifestaciones de Discriminación Racial en Chile: un Estudio de Percepciones [Manifestations of Racial Discrimination in Chile: A Study of Perceptions], Informe Anual Situación de los Derechos Humanos en Chile 2017 [Annual Report on the Situation of Human Rights in Chile 2017],* SANTIAGO DE CHILE: INSTITUTO NACIONAL DE DERECHOS HUMANOS (2017, https://www.indh.cl/bb/wp-content/uploads/2017/12/01_Informe-Anual-2017.pdf at 22-23 [hereinafter INDH Report].

232 INDH Report, *supra* note 232, at 23.

233 INDH Report, *supra* note 232 at 27.

234 *Ser Mujer Migrante En Chile: Discriminación Racial, Cosificación Sexual y Violencia Económica [Being a Migrant Woman in Chile: Racial Discrimination, Sexual Objectification, and Economic Violence],* EL MOSTRADOR (Aug. 6, 2019), www.elmostrador.cl/braga/destacados-braga/2019/08/06/ser-mujer-migrante-en-chile-discriminacion-racial-cosificacion-sexual-y-violencia-economica/.

235 CENEM, *supra* note 223, at 12, 15, 22, and 23.

236 CENEM, *supra* note 223, at 18.

237 Doña Reveco, *supra* note 205; Telephone Interview with Clinic Lawyer, Universidad Alberto Hurtado, Facultad de Derecho, Clinica Juridica de Migrantes (April 22 2020).

238 INDH Report, *supra* note 232, at 24.

239 Doña Reveco & Camilo Carreno, *Pinera: 'Muchas de las Bandas de Delincuentes en Chile son de Extranjeros' [Pinera: 'Many of the Criminal Gangs in Chile are Made up of Foreigners'],* LA TERCERA (Nov. 29, 2016), https://www.latercera.com/noticia/pinera-muchas-las-bandas-delincuentes-chile-extranjeros/.

240 *Presidente Piñera Anuncia Reforma Migratoria, [President Pinera Announces Immigration Reform],* GOBIERNO DE CHILE (Apr. 9, 2018), https://prensa.presidencia.cl/discurso.aspx?id=73020; Diego Acosta, Marcia Vera-Espinoza, & Leiza Brumat, *The New Chilean Government and its Shifting Attitudes on Migration,* MPC BLOG (May 3, 2018), https://blogs.eui.eu/migrationpolicycentre/new-chilean-government-shifting-attitudes-migration-governance/#fn4; *Chilean, Haitian Presidents Discuss Immigration Policy Reforms,* TELESUR (Apr. 14, 2018), https://www.telesurenglish.net/news/Chilean-Haitian-Presidents-Discuss-Immigration-Policy-Reforms-20180414-0022.html. Note: The Piñera Administration proposed a new immigration law to replace the Decree-Law 1094 as well which has not been passed into law yet.

241 GOBIERNO DE CHILE, *supra* note 242. Note: The Piñera Administration also created a one-year family reunification/humanitarian visa for Haitians, which must be obtained at the Chilean Consulate in Haiti.

242 Circular Nº8 de fecha 20 de abril de 2018, Departamento de Extranjería y Migración.

243 Jaime Liencura, *La Razón por la que se Eliminó la Visa que Facilitaba a Extranjeros Llegar de Turista y Quedarse Trabajando,* PUBLICMETRO (Apr. 24, 2018), https://www.publimetro.cl/cl/noticias/2018/04/24/razon-por-la-que-se-elimino-la-visa-que-facilitaba-a-extranjeros-llegar-de-turista-y-quedarse-trabajando.html.

244  The Piñera Administration also created two temporary resident visa categories targeted at highly skilled/professional foreign nationals.

245  Telephone Interview with Guerline Joseph, Director, Haitian Bridge Alliance (July 30, 2020).

246  Lucia Newman, *Why is Chile Flying Migrants Back Home?*, AL JAZEERA (Nov. 8, 2018), https://www.aljazeera.com/news/2018/11/chile-flying-migrants-home-181108100212637.html; *Plan Humanitario de Regreso Ordenado*, DEPARTAMENTO DE EXTRANJERÍA Y MIGRACIÓN (Mar. 27, 2020), https://www.chileatiende.gob.cl/fichas/56635-plan-humanitario-de-regreso-ordenado.

247  Maria Jose Navarrete, *Plan de Retorno Humanitario Finaliza con 1.393 Ciudadanos que Regresaron Puerto Príncipe [Humanitarian Plan for Orderly Returns Program Ends With 1,393 Citizens Who Returned to Port-au-Prince]*, LA TERCERA (May 29, 2019), www.latercera.com/nacional/noticia/plan-retorno-humanitario-finaliza-1-393-ciudadanos-regresaron-puerto-principe/675546/.

248  Telephone Interview with Clinic Lawyer, Universidad Alberto Hurtado, Facultad de Derecho, Clinica Juridica de Migrantes (April 22, 2020); *Chile Repatriates Haitian Migrants*, ASSOCIATED PRESS (Nov. 7, 2018), www.apnews.com/6b1c1ab9100b410c-b4451efbe14a9e53; Aislinn Laing & Natalia A. Ramos Miranda, *Chile Sends 176 Haitian Migrants Home on Criticized 'Humanitarian Flight*, REUTERS (Nov. 7, 2018), www.reuters.com/article/us-chile-migrants/chile-sends-176-haitian-migrants-home-on-criticized-humanitarian-flight-idUSKCN1NC30V; Lucia Newman, *Why is Chile Flying Migrants Back Home?*, AL JAZEERA (Nov. 8, 2018), https://www.aljazeera.com/news/2018/11/chile-flying-migrants-home-181108100212637.html.

249  Appendix 2.

250  Jacqueline Charles, *New Migration: Haitians Carve a Dangerous 7,000 Mile Path to the U.S.*, MIAMI HERALD (Sept. 24, 2016), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article103920086.html.

251  *Id.*

252  Arelis R. Hernández, *Immigration Officials Partner with Panama to Boost Screening of Migrants Passing Through to the U.S.*, THE WASH. POST (Aug. 27, 2019), https://www.washingtonpost.com/immigration/immigration-officials-partner-with-panama-to-boost-screening-of-migrants-passing-through-to-us/2019/08/26/532f6150-c81d-11e9-a4f3-c081a126de70_story.html.

253  *Id.*

254  *Id.*

255  Kirk Semple, *Haitians, After a Perilous Journey, Find Doors to the U.S. Abruptly Shut*, N.Y. TIMES, (Sept. 23, 2016), https://www.nytimes.com/2016/09/24/world/americas/haitians-mexico-brazil-deport-united-states.html.

256  *Id.*

257  Kate Linthicum, *The Desperate Trek: Crossing the Darién Gap*, L.A. TIMES (Dec. 22, 2016) https://www.latimes.com/projects/la-fg-immigration-trek-america-colombia/.

258   Associated Press, *Panama Sees Surge of Migrants Crossing Dangerous Darién Gap,* NBC NEWS (May 16, 2019, 6:35 AM), https://www.nbcnews.com/news/latino/panama-sees-surge-migrants-crossing-dangerous-darien-gap-n1006376).

259   Arelis R. Hernández, *supra* note 253.

260   Associated Press, *supra* note 259.

261   Oswaldo Rivas, *Nicaragua Closes Border to Cuban Migrants, Rebukes Costa Rica,* REUTERS, (Nov. 15, 2015, 4:50 PM), https://www.reuters.com/article/us-nicaragua-cuba/nicaragua-closes-border-to-cuban-migrants-rebukes-costa-rica-idUSKCN0T502920151116.

262   Jacqueline Charles, *Chile is Used to Welcoming Migrants; but Haitians Don't Always Get a Warm Reception,* MIAMI HERALD (March 5, 2018, 8:12 PM), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article202589599.html.

263   Jacqueline Charles, *supra* note 85.

264   *Id.*

265   *See, e.g.,* Cheryl Little, *United States Haitian Policy: A History of Discrimination,* 10 N.Y.L. SCH. J. HUM. RTS. 269 (1993).

266   *See Haitian Refugee Center v. Civiletti,* 503 F. Supp. 442, 452 (S.D. Fla. 1980), *aff'd as modified, Haitian Refugee Center v. Smith,* 676 F.2d 1023 (5th Cir. 1982) ("The manner in which INS treated the more than 4,000 Haitian plaintiffs violated the Constitution, the immigration statutes, international agreements, INS regulations and INS operating procedures. It must stop.").

267   *See Jean v. Nelson,* 711 F.2d 1455 (11th Cir. 1983) (finding "stark pattern" of discrimination against Haitian asylum seekers); *Sale v. Haitian Centers. Council,* 509 U.S. 155 (1993) (holding repatriation of interdicted Haitians did not violate U.S. refugee obligations).

268   Miriam Pensack, *Remembering Haitian Internment in Trump's America,* NACLA (July 19, 2018), https://nacla.org/news/2018/07/20/remembering-haitian-internment-trump%E2%80%99s-america.

269   *See* Ali Vitali, Kasie Hunt and Frank Thorp, *Trump Referred to Haiti and African Nations as 'Shithole' Countries,* NBC NEWS (Jan. 11, 2018) https://www.nbcnews.com/politics/white-house/trump-referred-haiti-african-countries-shithole-nations-n836946.

270   The Administration has further attempted to undermine protections by ending the Temporary Protected Status ("TPS") designated for Haitians following the 2010 earthquake. Although this policy does not benefit Haitians currently in Mexico—as only those present in the United States within a year following the earthquake qualify for TPS—the discriminatory treatment highlights the conditions Haitians continue to face. *See Saget v. Trump,* 375 F. Supp. 3d 280, 368-69 (E.D.N.Y. 2019) (finding that the decision to terminate TPS for Haitians was motivated by non-white animus).

271   *See, e.g.,* Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16559-01 (Mar. 24, 2020) (effective date Mar. 20, 2020); Order Under Sections 362 and 365 of the Public Health Service Act Suspending

Introduction of Certain Persons From Countries Where a Communicable Disease Exists." 85 Fed. Reg. 17,060-17088 (Mar. 26, 2020) (effective date Mar. 20, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective date Apr. 20, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020) (effective date May 21, 2020).

272   As of mid-May, over 20,000 people had been expelled under the policy. Of that number, only 59 people were allowed to even request asylum and, of those, only two individuals were permitted to enter the United States to pursue their claim. *See* Camilo Montoya-Galvez, *Only 2 Migrants Allowed to Seek Humanitarian Protection Under Trump's Coronavirus Border Order,* CBS NEWS (May 13, 2020), https://www.cbsnews.com/news/only-2-migrants-allowed-to-seek-humanitarian-protection-under-trumps-coronavirus-border--order/. *See also* Hum. Rts First, *Pandemic as Pretext: Trump Administration Exploits* COVID-*19, Expels Asylum Seekers and Children to Escalating Danger* (May 2020), available at: https://www.humanrightsfirst.org/sites/default/files/PandemicAsPretextFINAL.pdf.

273   *See, e.g.,* 84 Fed. Reg. 63,994 (Nov. 19, 2019); Hum. Rts. Watch and Refugees Int'l, *Deportation with a Layover: Failure of Protection under the* US-*Guatemala Asylum Cooperative Agreement* (May 19, 2020), https://www.hrw.org/report/2020/05/19/deportation-layover/failure-protection-under-us-guatemala-asylum-cooperative.

274   The agreements are currently being challenged in U.S. federal court. *See U.T. v. Barr,* 1:20-cv-00116-EGS (filed Jan. 15, 2020).

275   *See* TRAC Immigration, *Details on* MPP (*Remain in Mexico*) *Deportation Proceedings* (June 2020), available at: https://trac.syr.edu/phptools/immigration/mpp/.

276   According to government statistics, only 558 of the 65,499 cases heard under MPP were granted protection and less than three percent were represented. *See id.* The Ninth Circuit Court of Appeals upheld a lower court decision enjoining MPP. However, the injunction is stayed pending U.S. Supreme Court Review. *See Innovation Law Lab v. Nielsen,* No.3:19-cv-00807-RS (N.D. Cal.), *prelim. inj. stayed pending petition for cert., Wolf v. Innovation Law Lab,* -- S.Ct.--, 2020 WL 1161432 (Mar. 11, 2020) (Mem.); *see also Innovation Law Lab v. Wolf,* 951 F.3d 986 (9th Cir. 2020).

277   This policy has been enjoined and is not in effect. *See East Bay Sanctuary Covenant v. Trump,* 950 F.3d 1242 (9th Cir. 2020); *O.A. v. Trump,* 404 F.Supp.3d 109 (D.D.C. 2019), *appeal pending.*

278   This policy was enjoined and is not in effect at the time of writing, but litigation is ongoing and the situation evolving rapidly. *See East Bay Sanctuary Covenant v. Barr,* --- F.3d ----, 2020 964 F.3D 832 (9th Cir. 2020); *Capital Area Immigrants' Rights Coal. v. Trump,* --- F.Supp.3d ----, 2020 WL 3542481 (D.D.C. June 30, 2020).

279   *Matter of A-B-,* 27 I&N Dec. 316 (A.G. 2018) (casting doubt on the viability of gender defined particular social groups and "private" persecutor claims more generally); *Matter of L-E-A-,* 27 I&N Dec. 581 (A.G. 2019) (casting doubt on the viability of family based particular social groups); *Matter of E-R-A-L-,* 27 I&N Dec. 767 (B.I.A. 2020) (rejecting particular social group defined by landownership).

280   The highest immigration tribunal in the United States has also ruled in a precedential opinion that Haitians who were offered permanent residence in Brazil should be deemed firmly resettled in that country, whether they were able to access that status or not, and therefore ineligible for asylum. *Matter of K-S-E-*, 27 I&N Dec. 818 (B.I.A. 2020). The case is on appeal at the Ninth Circuit.

281   Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear, 85 FR 36264 (June 15, 2020), https://www.federalregister.gov/documents/2020/06/15/2020-12575/procedures-for-asylum-and-withholding-of-removal-credible-fear-and-reasonable-fear-review. The public comment period for this rule closed on July 15, 2020. Over 80,000 comments were made, which the agencies must review. The timing for publication of a final rule is unknown.

282   Interview with Woman Migrant "CME004," in Tapachula, Mexico (March 1 – 7, 2020).

283   Interview with Staff Member, Centro de Derechos Humanos Fray Matías de Cordova [Fray Matías], in Tapachula, Mexico (Feb. 11, 2020).

284   *Id.*

285   Interview with Woman Migrant "ABS002," in Tapachula, Mexico (March 1 – 7, 2020).

286   Interview with Woman Migrant "BB003," in Tapachula, Mexico (March 1 – 7, 2020).

287   Interview with Woman Migrant "CME002," in Tapachula, Mexico (March 1 – 7, 2020).

288   Interview with Woman Migrant "CAE003," in Tapachula, Mexico (March 1 – 7, 2020).

289   Interview with Woman Migrant "AB001," in Tapachula, Mexico (March 1 – 7, 2020).

290   Interview with Woman Migrant "CAE006," in Tapachula, Mexico (March 1 – 7, 2020).

291   Interview with Woman Migrant "AB004," in Tapachula, Mexico (March 1 – 7, 2020).

292   Interview with Woman Migrant "CME003," in Tapachula, Mexico (March 1 – 7, 2020).

293   Interview with Woman Migrant "BB003," in Tapachula, Mexico (March 1 – 7, 2020).

294   Interview with Woman Migrant "CAE003," in Tapachula, Mexico (March 1 – 7, 2020).

295   Interview with Woman Migrant "BB004," in Tapachula, Mexico (March 1 – 7, 2020).

296   Interview with Woman Migrant "CAE006," in Tapachula, Mexico (March 1 – 7, 2020).

297   Interview with Woman Migrant "AB001," in Tapachula, Mexico (March 1 – 7, 2020).

298   The Research Team did not speak with any medical service providers.

299   Interview with Woman Migrant "AB003," in Tapachula, Mexico (March 1 – 7, 2020).

300   Interview with Woman Migrant "BB003," in Tapachula, Mexico (March 1 – 7, 2020).

301   Interview with Woman Migrant "AB003," in Tapachula, Mexico (March 1 – 7, 2020).

302   Interview with Woman Migrant "CAE005," in Tapachula, Mexico (March 1 – 7, 2020).

303   Interview with Woman Migrant "SG003," in Tapachula, Mexico (March 1 – 7, 2020).

304   Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

305   *Id.*

306   When asked whether she accesses social services, one interviewee replied, "When I try to go out, cars won't stop even though I'm pregnant. If I have to go to the health center, I walk. We don't have rights here." Interview with Woman Migrant "CME002," in Tapachula, Mexico (March 1 – 7, 2020). Another woman responded, "Outside, people don't respect you. You aren't in your own country and people are mad at you. If anything happens to you, you can't talk to anyone about it. It's worse than Haiti." Interview with Woman Migrant "CAE003," in Tapachula, Mexico (March 1 – 7, 2020).

307   Interview with Staff Member, JRS, in Tapachula, Mexico (March 1- 7, 2020)

308   Interview with Woman Migrant "CME002," in Tapachula, Mexico (March 1 – 7, 2020).

309   Interview with Woman Migrant "CAE003," in Tapachula, Mexico (March 1 – 7, 2020).

310   Interview with Woman Migrant "ABS005," in Tapachula, Mexico (March 1 – 7, 2020).

311   Interview with Woman Migrant "CAE004," in Tapachula, Mexico (March 1 – 7, 2020).

312   Dara Lind, *The 2014 Central American Migrant Crisis,* VOX NEWS (Oct. 10, 2014), https://www.vox.com/2014/10/10/18088638/child-migrant-crisis-unaccompanied-alien-children-rio-grande-valley-obama-immigration.

313   Interview with Staff Member, Comisión Nacional de los Derechos Humanos en México [CNDH], in Tapachula, Mexico (Mar. 2, 2020).

314   *Id.*

315   Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

316   Comisión Mexicana de Ayuda a Refugiados [COMAR] [Mexican Commission for Refugee Aid], *Estadística Mayo 2020 [Statistics May 2020],* (Jun. 1, 2020) https://www.gob.mx/cms/uploads/attachment/file/555168/cierre_DE_MAYO_2020__1-junio-2020_.pdf.

317   Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

318   COMAR, *supra* note 317.

319   *Id.*

320   Interview with Staff Member, Fray Matías (Feb. 11, 2020). It is believed that complementary protection is preferred because of external political pressure on COMAR offices to keep asylum rates low for Haitians.

321   Villagran, *supra* note 6.

322   Interview with Staff Member, CNDH, in Tapachula, Mexico (Mar. 2, 2020).

323   Villagran, *supra* note 6.

324  Interview with Staff Member, JRS, in Tapachula, Mexico (Mar. 6, 2020).

325  Law on Refugees, Complementary Protection, and Political Asylum, art. 24; Regulation of Law on Refugees and Complementary Protection, arts. 45-47.

326  *Id.*

327  Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

328  Sin Fronteras IAP, *Evolución y Retos del Asilo en México: 20 años de asistencia legal e incidencia por las personas Refugiadas,* 15 (Sept. 2016).

329  *Id.*

330  Interview with Staff Member, JRS, in Tapachula, Mexico (Mar. 6, 2020).

331  Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

332  The Haitian Constitution provides for two national languages – French and Haitian Creole *(Creyol),* Constitution of Rep. of Haiti, March 29, 1987, art. 5. An estimated five percent of Haitians speak French fluently, but 100 percent are fluent in *Creyol. See* Cordelia Hebblethwaite, *Should Creole Replace French in Haiti's Schools?,* BBC NEWS (Aug. 24, 2011), https://www.bbc.com/news/world-latin-america-14534703.

333  Interview with Woman Migrant "AB004," in Tapachula, Mexico (March 1 – 7, 2020).

334  Grace Benton, *"Speak English:" Language Access and Due Process in Asylum Proceedings,* 34 GEO. IMMIGR. L.J., 453 (2020).

335  *Id.* at 485.

336  Law on Refugees, Complementary Protection, and Political Asylum, art. 23; Regulation of Law on Refugees and Complementary Protection, arts. 29-30.

337  Interview with Woman Migrant "SMA003," in Tapachula, Mexico (March 1 – 7, 2020).

338  Interview with Woman Migrant "ABS001," in Tapachula, Mexico (March 1 – 7, 2020).

339  Interview with Woman Migrant "SG001," in Tapachula, Mexico (March 1 – 7, 2020).

340  Sin Fronteras IAP, *supra* note 329, at 15, 35. "Although the Law and its Regulations contemplate guidelines to be followed, the resolutions that are issued exhibit serious process omissions which, in turn, reveal the lack of a methodology orienting the reviewing mechanism. This should consist of taking each step and recourse contemplated by the law in every case, thus assuring the same conditions and possibilities to all seekers. In contrast, there are attestations of telephone interviews instead of personal interviews, and also of the absence of interviews with some members in family groups and the undertaking of studies of the country of origin using unofficial sources and a lack of qualified interpreters, among other deficiencies."

341  Interview with Staff Member, JRS, in Tapachula, Mexico (Mar. 6, 2020).

342  Sin Fronteras IAP, *supra* note 329, at 15. Haitian interviewees often sent their male partner to COMAR on their behalf because of fear of leaving their home in Tapachula (*see*

Chapter 8, section B above). However, women's asylum claims are linked to their spouses' claims. If the spouse is denied, the entire family is also denied, although women often have their own, separate grounds for asylum. Sometimes women are not communicated this by male partners. While some Haitian women interviewed met their partner in Haiti, many had met their partner in Brazil or Chile, or even on the voyage to Mexico. Women are left with the option of an arduous process to appeal COMAR's decision and re-submitting their own claim if their spouse's claim is denied.

343   Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

344   In addition to having a pending asylum application, one can apply for a TVRH card if they are a minor elderly, ill, or have been a witness to a crime and are assisting with its investigation or prosecution. Minors can directly apply for a TVRH card without filing an asylum application. There is a specialized "minor process" (*proceso de menor*) that takes place in a different manner through representatives from National System for Comprehensive Family Development (*Sistema Nacional para el Desarrollo Integral de la Familia,* or SNDIF or DIF).

345   Lineamientos para Trámites y Procedimientos Migratorios [Guidelines for Immigration Procedures], Diario Oficial de la Federación [DOF]: 08-11-2012, formato HTML, http://dof.gob.mx/nota_detalle.php?codigo=5276967&fecha=08/11/2012.

346   TVRH cards are valid for one year, and are renewable under the law. However, in practice advocates state that INM does not renew the visas unless the visa has been awarded due to witnessing a crime, and the related criminal case is still pending. Interview with Staff Member, JRS, in Tapachula, Mexico (March 6, 2020).

347   Interview with Staff Member, CNDH, in Tapachula, Mexico (Mar. 2, 2020).

348   Interview with Staff Member, JRS, in Tapachula, Mexico (Mar. 6, 2020).

349   Interview with Staff Member, CNDH, in Tapachula, Mexico (Mar. 2, 2020).

350   *Id.*

351   Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

352   The Research Team spoke with a foreign journalist based in Mexico City who was denied entry to *Siglo* XXI in February 2020.

353   Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

354   Jonathan Greig, *Two Haitians, Including A Pregnant Woman, Die From Poor Treatment in Mexican Detention Center,* THE HAITIAN TIMES (Sep. 26, 2019), https://haitiantimes.com/2019/09/26/two-haitians-including-a-pregnant-woman-die-from-poor-treatment-in-mexican-detention-center/.

355   Chiara Giordano, *Mother pleads for help in harrowing video from Mexico detention centre: 'My son is dying,'* THE INDEPENDENT (Jun. 27, 2019), https://www.independent.co.uk/news/world/americas/mexico-woman-help-detention-centre-video-feria-mesoamericana-a8977326.html.

356   *Muere una Persona Interna en el Centro de Detención Migratoria de Tapachula [An Inmate Dies in the Tapachula Detention Center], supra* note 78.

357   *Id.*

358   Interview with Staff Member, CNDH, in Tapachula, Mexico (Mar. 2, 2020).

359   Interview with Staff Member, Fray Matías (Feb. 11, 2020).

360   Interview with Woman Migrant "CME002," in Tapachula, Mexico (March 1 – 7, 2020).

361   Interview with Woman Migrant "SG001," in Tapachula, Mexico (March 1 – 7, 2020).

362   Interview with Woman Migrant "CME004," in Tapachula, Mexico (March 1 – 7, 2020).

363   CERD et. al, *Concluding observations on the combined eighteenth to twenty-first periodic reports of Mexico,* UNITED NATIONS COMM. ON THE ELIMINATION OF RACIAL DISCRIMINATION, U.N. Doc. CERD/C/MEX/CO/18-21 (Sept 19, 2019) https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CERD/C/MEX/CO/18-21&Lang=En.

364   Ebony Bailey, *Afro-Mexicans May Finally Get Recognition in the Mexican Constitution, But Many Say That's Not Enough,* REMEZCLA (May 3, 2019), https://remezcla.com/features/culture/afro-mexicans-constitution-recognition/.

365   Leonie Rauls, *Behind Afro-Mexicans' Historic Effort to be Counted,* AMERICAS QUARTERLY (April 28, 2020), https://americasquarterly.org/article/afro-mexicans-make-their-mark/.

366   Interview with Woman Migrant "AB003," in Tapachula, Mexico (March 1 – 7, 2020).

367   For example, in 2014, the National Program for Equality and Anti-discrimination (*Programa Nacional para la Igualdad no Discriminación* / PRONAIND) was founded to address and combat discrimination in Mexico. In 2015, the Mexican state included a question about Afro-descendant self-identification on the 2015 Intercensal Survey (EIC), which was a major step in the visibility of Afro-descendant Mexican populations. CERD et. al, *supra* note 365. It reported that 1.2% of the Mexican population was of African descent, with 705,000 of those individuals identifying as women. CEDAW et. al, *Joint Statement on Protecting and empowering girls and demanding equality,* UNITED NATIONS COMMITTEE ON THE ELIMINATION OF ALL FORMS OF DISCRIMINATION AGAINST WOMEN AND THE UNITED NATIONS COMMITTEE ON THE RIGHTS OF THE CHILD (Oct. 11, 2019), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=int%2fCERD%2fNGO%2fMEX%2f35603&Lang=en). A 2017 UN Report from the International Convention on the Elimination of All Forms of Racial Discrimination reveals the flaws in the EIC that underrepresented the poverty and marginalization that Afro-descendant Mexicans face. United Nations Comm. on the Elimination of Racial Discrimination, CERD et. al, *supra note 365.* In 2019, Afro-descendant populations were constitutionally recognized. A series of anti-discrimination efforts have been made, culminating with the January 2020 ratification of the Inter-American Convention against all forms of Discrimination and Intolerance, showing a commitment to inclusion and equal treatment. GOBIERNO DE MÉXICO, Comunicado No. 024 (Jan 21, 2020) (https://www.gob.mx/sre/prensa/el-gobierno-de-mexico-reitera-su-compromiso-contra-toda-forma-de-discriminacion-e-intolerancia).

368   National Council to Prevent Discrimination, *National Survey on Discrimination in Mexico,* ENADIS (2010).

369   CERD et. al, *supra* note 365.

370   *Id.*

371   CEDAW et. al, *Concluding Observations on the Ninth Periodic Report of Mexico,* UNITED NATIONS COMM. ON THE ELIMINATION OF DISCRIMINATION AGAINST WOMEN, U.N. Document CEDAW/C/MEX/CO/9 (July 25, 2018) https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=cedaw/C/mex/co/9&Lang=En.

372   *Id.* In addition, CEDAW recommends that Mexico: (1) Ensure effective access to fair, efficient and gender-sensitive refugee status determination procedures; (2) Ensure that the rights of migrant, refugee and asylum-seeking women and girls to health services, housing and employment are implemented in all states; and (3) Ensure that all necessary services with regard to employment, health care, psychological counselling, education and participation in public affairs are made available to migrant, refugee and asylum-seeking women.

373   CERD et. al, *supra* note 365.

374   Interview with Staff Member, CNDH, in Tapachula, Mexico (Mar. 2, 2020).

375   Sandra Cuffe, *Rights Groups Slam Mexico Detention of Documented Asylum Seekers,* AL JAZEERA (Oct. 18, 2019), https://www.aljazeera.com/news/2019/10/rights-groups-slam-mexico-detention-documented-asylum-seekers-191018210341607.html.

376   Interview with Staff Member, Fray Matías, inTapachula, Mexico (Feb. 11, 2020).

377   Cordón Sanitario, *Guatemala Cierra Fronteras,* EL ECONOMISTA (March 16, 2020), https://www.eleconomista.com.mx/internacionales/Guatemala-cierra-fronteras-20200316-0092.html.

378   Meyer and Isacson, *supra* note 53.

379   SRE *Reporta Reducción Drástica de Flujo Migratorio en México por Coronavirus [SRE Reports Drastic Reduction in the Flow of Migration in Meixco Due to Coronavirus],* TELEVISA NEWS (April 17, 2020), https://noticieros.televisa.com/ultimas-noticias/coronavirus-migrantes-sre-frontera-mexico-covid19/.

380   *See Boletines Estadísticos,* GOBIERNO DE MÉXICO, Http://portales.segob.gob.mx/es//PoliticaMigratoria/CuadrosBOLETIN?Anual=2019&Secc=2 (consultada el July 30, 2020); Guthrie, *supra* note 67.

381   *El Salvador Cierra sus Fronteras por* COVID-*19, y Suspende Actividades Públicas por 21 días [El Salvador Closes its Borders Due to* COVID-*19, and Suspends Public Activities for 21 Days],* EL IMPARCIAL, March 11, 2020, https://www.elimparcial.com/mundo/El-Salvador-cierra-sus-fronteras-por-COVID-19-y-suspende-actividades-publicas-por-21-dias-20200311-0202.html.

382   *Honduras Cierra Fronteras por una Semana Por Covid-19 [Honduras Closes Borders for a Week Due to* COVID-*19],* PRENSA LATINA (March 15, 2020), https://www.prensa-latina.cu/index.php?o=rn&id=349963&seo=honduras-cierra-fronteras-por-una-semana-por-covid-19.

383  *Honduras Ofrece Retorno Voluntario Asistido a Migrantes Varados por* COVID-19 *[Honduras Offers Assisted Voluntary Return to Migrants Stranded due to* COVID-19*]*, LA PRENSA (June 3, 2020) https://www.laprensa.hn/honduras/1384336-410/honduras-migrantes-varados-covid-19-cubanos-africanos-.

384  *Honduras Frena Migración de Africanos Hacia México [Honduras Slows African Migration to Mexico]*, LA PRENSA, (Feb. 6, 2020) https://www.laprensa.hn/fotogalerias/honduras/1384109-411/honduras-migracion-africanos-mexico-caravana-.

385  *See, e.g.,* Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16559-01 (Mar. 24, 2020) (effective date Mar. 20, 2020); Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists." 85 Fed. Reg. 17,060-17088 (Mar. 26, 2020) (effective date Mar. 20, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective date Apr. 20, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020) (effective date May 21, 2020).

386  Reuters, *Mexico All but Empties Official Migrant Centers in Bid to Contain Coronavirus,* VOA (April 27, 2020) https://www.voanews.com/covid-19-pandemic/mexico-all-empties-official-migrant-centers-bid-contain-coronavirus.

387  *Id.*

388  *Id.*

389  Reuters, *supra* note 388; *See also* Elyssa Pachico and Maureen Meyer, *One Year After U.S.-Mexico Migration Deal, a Widespread Humanitarian Disaster,* WOLA (June 6, 2020), https://www.wola.org/analysis/one-year-after-mexico-migration-deal-humanitarian-disaster/.

390  *Despite Pandemic Restrictions, People Fleeing Violence and Persecution Continue to Seek Asylum in Mexico,* UNHCR CANADA (April 29, 2020), https://www.unhcr.ca/news/despite-pandemic-restrictions-people-fleeing-violence-persecution-continue-seek-asylum-mexico/.

391  Telephone Interview with Staff Member, Al Otro Lado (June 25, 2020) and Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

392  Julia Ainsley, *As* COVID-19 *Looms, Conditions for Migrants Stalled at U.S. Border are a 'Disaster in the Making',* NBC NEWS, May 12, 2020, https://www.nbcnews.com/politics/immigration/covid-19-looms-conditions-migrants-stalled-u-s-border-are-n1204506.

393  Telephone Interview with Staff Member, Al Otro Lado (June 25, 2020).

394  *Id.*

395  Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

396  Alice Driver, *At the* US-*Mexico border, asylum chaos and coronavirus fear,* THE NEW HUMANITARIAN (June 22, 2020), https://www.thenewhumanitarian.org/news/2020/06/22/us-Mexico-border-asylum-chaos-coronavirus-

397 *Id.*

398 Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

399 Ainsley, *supra* note 394.

400 Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

401 *Id.*

402 Ainsley, *supra* note 394.

403 Driver, *supra* note 398.

404 Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

405 *Id.*

406 Pierre-Marc René, *Death Threats Drive Refugees to Flee Coronavirus Lockdown,* UNHCR (April 28, 2020), https://www.unhcr.org/news/stories/2020/4/5ea713024/death-threats-drive-refugees-flee-coronavirus-lockdown.html.

407 Diego Carranza Jimenez, *Mexico Exceeds 10,000 Deaths From COVID-19 and Reaches More Than 93,400 Infections,* AA (June 2, 2020), https://www.aa.com.tr/es/mundo/m%C3%A9xico-supera-las-10-mil-muertes-por-covid-19-y-alcanza-m%C3%A1s-de-93400-contagios/1861500.

408 COMAR, "Comunicado No. 61/2020" [Release No. 61/2020"], May 27, 2020, https://www.gob.mx/comar/articulos/comunicado-no-61-2020.

409 *Asylum Law in a Pandemic: Interview with an Asylum Access Mexico Lawyer in Tijuana,* ASYLUM ACCESS (April 9, 2020), https://asylumaccess.org/asylum-law-in-a-pandemic-interview-with-an-asylum-access-mexico-lawyer-in-tijuana/.

410 Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

411 *Asylum Law in a Pandemic: Interview With an Asylum Access Mexico Lawyer in Tijuana, supra* note 411.

412 Interview with Staff Member, Fray Matías, in Tapachula, Mexico (Feb. 11, 2020).

413 *Id.*

414 *La Pandemia Del Coronavirus Acentúa la Crisis Migratoria en México [The Coronavirus Pandemic Accentuates the Migration Crisis in Mexico],* EXPANSIÓN POLÍTICA (May 13, 2020), https://politica.expansion.mx/mexico/2020/05/13/la-pandemia-del-coronavirus-acentua-la-crisis-migratoria-en-mexico.

415 Ariel G. Ruiz Soto, *One Year after the U.S.-Mexico Agreement: Reshaping Mexico's Migration Policies,* MIGRATION POLICY INSTITUTE (June 2020), https://www.migrationpolicy.org/research/one-year-us-mexico-agreement#:~:text=One%20Year%20after%20the%20U.S.%2DMexico%20Agreement%3A%20Reshaping%20Mexico's%20Migration%20Policies,-By%20Ariel%20G&text=In%20turn%2C%20the%20United%20States,address%20the%20drivers%20of%20migration.

416 IMUMI, *Información Básica para Entender las Acciones de Trump para Impedir Asilo en EUA [Basic Information to Understand Trump's Actions to Impede Asylum in US], 14* (July 2019).

417 IMUMI, *Propuestas y Recomendaciones Para la Construcción de Una Agenda Migratoria y de Asilo en México* Ficha #3 *[Proposals and Recommendations for the Construction of a Migration and Asylum Agenda in Mexico: File #3],* available at: http://pendientesenmigracion.imumi.org/.

418 Sin Fronteras IAP, *supra* note 78, at 65.

419 Interview with Woman Migrant "BB003," in Tapachula, Mexico (March 1 – 7, 2020).

420 Interview with Woman Migrant "AB003," in Tapachula, Mexico (March 1 – 7, 2020).

421 Interview with Woman Migrant "SG003," in Tapachula, Mexico (March 1 – 7, 2020).

422 Interview with Woman Migrant "CAE006," in Tapachula, Mexico (March 1 – 7, 2020).







# EXHIBIT 21

July 28, 2022

Merrick Garland, Attorney General
Lisa Monaco, Deputy Attorney General
Vanita Gupta, Associate Attorney General
Kristen Clarke, Assistant Attorney General
Christine Stoneman, Chief, Federal Coordination and Compliance
Steven Rosenbaum, Chief, Special Litigation
United States Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C.  20530

*Via email*

Re:     **Operation Lone Star: Racial Profiling in Texas Department of Public Safety (DPS)
         Traffic Stops and High Death Toll from DPS Vehicle Pursuits**

Dear Attorney General Garland, Deputy Attorney General Monaco, Associate Attorney General
Gupta, Assistant Attorney General Clarke, Ms. Stoneman, and Mr. Rosenbaum,

       The Texas Department of Public Safety (DPS)—the state police agency—has blanketed
communities throughout South Texas with officers. This is one facet of Operation Lone Star
(OLS), Governor Greg Abbott's long-running anti-immigrant initiative. As part of this initiative
in South Texas, DPS officers are regularly conducting pretextual traffic stops. There is
significant evidence that DPS is engaged in racial profiling—discriminating against Latinx
drivers and passengers—in these stops. And, troublingly, the stops turn into deadly vehicle
pursuits with alarming frequency: we have linked DPS vehicle pursuits in South Texas to 30
deaths since the start of OLS, a startlingly high number.

       Federal civil rights investigation and intervention is urgently needed. Based on this
evidence, we urge the Department of Justice to investigate DPS for a pattern and practice of civil
rights violations not only in the context of Texas' migrant arrest program, as we have previously
urged, but also in OLS traffic stops. DOJ has both the authority and the responsibility to
intervene to end racial profiling by DPS, and to intervene to end other DPS practices that result
in regular civil rights violations.

       For years, DPS has turned South Texas into a police state by periodically saturating
border communities with surges of DPS officers conducting traffic stops. DPS has a history of
disproportionately stopping and citing Latinx drivers in past DPS surges. These stops have led to
severe consequences: repeated expensive tickets for minor traffic violations for drivers in some
of the poorest counties in Texas, and a climate of fear in which many Latinx residents limit their
travel to avoid contact with law enforcement.

       Now, DPS's traffic stop saturation approach—and the attendant harms to Latinx
individuals in border communities—is resurgent under OLS. Governor Abbott has sent up to
1,000 DPS officers to Texas border communities. DPS officers' stops under OLS, like their stops

in prior surges of state police to the border, have plain indicia of racial profiling. Tarleton State University researchers' analysis of 2021 DPS traffic stop data concluded that there is "a reasonable probability that racial profiling is a significant contributor to" disparities in DPS traffic stops between Latinx and white drivers. For example, DPS is disproportionately searching Latinx individuals in traffic stops without results, a strong indicator of racial profiling—71% of DPS traffic stop searches of Latinx individuals in 2021 turned up no contraband whatsoever.

Further, in some of DPS officers' own accounts of traffic stops, the officers have provided passengers' perceived Latinx ethnicity as the apparent justification for prolonging the stop to investigate for smuggling of people under state law. In other accounts, DPS officers have described prolonging the stop based on passenger ethnicity together with another characteristic that does not provide a lawful basis for extending the contact—like vehicle passengers' lack of identity documents, when Texas law does not require passengers to carry such documents. In at least one account, a DPS officer even outrageously claimed that he detected a "distinct odor" that "undocumented aliens emit"—demonstrating the implicit bias that appears pervasive in DPS officers' OLS traffic stops.

DPS's saturation presence in South Texas has deadly consequences. In the 16 months since the start of OLS, DPS has engaged in vehicle pursuits that have killed at least 30 people. This death toll includes drivers and passengers of pursued vehicles, and bystanders who happened to be on the same road as a DPS vehicle pursuit. Because DPS has historically disproportionately targeted Latinx drivers for traffic stops and because OLS itself has indicia of bias-based policing, these vehicle pursuits likely disproportionately kill Latinx drivers and passengers. DPS has to our knowledge made no effort to remedy this problem of deadly consequences to its vehicle pursuits. Contrary to law enforcement best practices, DPS leaves pursuit decisions up to the discretion of the individual officer. The agency also provides no meaningful policy guidance as to when to deploy different intervention tactics. The consequence is deadly crashes that are entirely foreseeable.

We have repeatedly urged DOJ to investigate involvement in the OLS trespass arrest program by a variety of state and local agencies, including DPS. We again renew that call for a formal investigation into state and local agencies' participation in the trespass arrest program under Title VI of the Civil Rights Act of 1964. Title VI bars discrimination on the basis of race, color, or national origin in any program or activity that receives federal financial assistance. The OLS trespass arrest program targets Black and Brown migrants for arrest and funnels them into a separate criminal system rife with civil rights abuses. It is dangerous, oppressive, and illegal.

The traffic stops that DPS is conducting under OLS are likewise dangerous, oppressive, and illegal. The impact on border communities—from the chilling effects on daily life to the risk of serious injury and death from vehicle pursuits—is immense. We request that DOJ initiate a Title VI investigation not only into DPS's conduct in trespass arrests under OLS but also into the agency's conduct in traffic stops under OLS. Further, we request that DOJ investigate DPS for a pattern or practice of civil rights violations, pursuant to its independent authority to investigate law enforcement agencies under 34 U.S.C. § 12601. In light of the serious and significant

2

evidence of racial profiling in DPS traffic stops, and the alarming death toll from DPS vehicle pursuits, investigation is urgently needed.

Inquiry into DPS's conduct under OLS is all the more urgent in light of recent information that a DPS officer in South Texas was "friends" with Lucas Denney, the leader of the Patriot Boys—a white supremacist vigilante group aligned with the Proud Boys. Denney was a fugitive from the FBI for months due to his role in the January 6, 2021, insurrection at the U.S. Capitol. While he was a fugitive, Denney hid out in Kinney County, a Texas border county heavily involved in the OLS trespass arrest program. Denney was arrested on the ranch of Kinney County Attorney Brent Smith.[1] Reportedly, he had lived there for three months and was patrolling for migrants.[2] According to Denney's attorney, a DPS officer who was Denney's "friend" drove Denney from Kinney County to Del Rio for Denney to turn himself in to the FBI.[3] Denney recently pled guilty to assault on police with a dangerous weapon; his conduct on January 6 included swinging a PVC pipe at a Capitol officer and attacking another officer who suffered a heart attack from the day's events.[4]

This episode raises very serious concerns about DPS's ties to white supremacist extremist groups–as well as Kinney County's ties to white supremacist groups, and ties between such groups and the Operation Lone Star program more broadly. These armed vigilante groups, seeking to hunt down migrants, are creating a volatile atmosphere with the potential for violence against Black and Brown people in South Texas.[5] A DPS officer's friendship with a leader of a

---

[1] Smith is one of the driving forces behind the trespass arrest program and may have been one of its architects. OLS Trespass Arrest Program Title VI Suppl. Compl., Feb, 23, 2022, 15-17, https://www.aclutx.org/sites/default/files/operation_lone_star_title_vi_supplemental_complaint.pdf. He is also one of the key promoters of the racist effort to convince Governor Abbott to declare an "invasion" based on migration to Texas. *E.g.*, Texas Scorecard, *Kinney County Attorney Brent Smith on the Border*, ~ 2:15, https://www.youtube.com/watch?v=gisIvULDgso&ab_channel=TexasScorecard ("In my view, we need to declare an invasion under Article I of the Constitution and the Texas Constitution and actually prevent their [migrants'] entry from occurring in the first place."). This language of "invasion" is the same rhetoric that fueled the 2019 El Paso Wal-Mart shooting that killed 23. Heidi Pérez-Moreno & James Barragán, *Critics Denounce Greg Abbott and Dan Patrick's "Invasion" Rhetoric on Immigration, Saying It Will Incite Violence*, Tex. Tribune, June 17, 2021, https://www.texastribune.org/2021/06/17/greg-abbott-dan-patrick-el-paso-invasion-immigration/.
[2] James Dobbins, *A January 6 Fugitive Was Arrested on a Property Connected to the Kinney County Attorney*, Tex. Monthly, July 19, 2022, https://www.texasmonthly.com/news-politics/lucas-denney-brent-smith-kinney; Elizabeth Findell, *In a Texas Border Town, Armed Groups Arrive to Look for Migrants*, The Wall Street Journal, Dec. 16, 2021, https://www.wsj.com/articles/in-a-texas-border-town-armed-groups-arrive-to-look-for-migrants-11639668989.
[3] Dobbins, *January 6 Fugitive Arrested on a Property Connected to the Kinney County Attorney*, *supra*.
[4] Tom Jackman, *Texas Man, Temporarily Lost in System, Pleads Guilty to Assaulting Police on Jan. 6*, Wash. Post, Mar. 17, 2022, https://www.washingtonpost.com/dc-md-va/2022/03/17/denney-pleads-guilty/.
[5] *See* OLS Trespass Arrest Program Title VI Compl., Dec. 15, 2021, 43-49, https://www.aclutx.org/sites/default/files/field_documents/ols_trespass_arrest_title_vi_complaint.pdf; OLS Trespass Arrest Program Title VI Suppl. Compl., Feb, 23, 2022, 11-15, *supra* note 1; OLS Trespass

3

white supremacist vigilante group in a county participating in OLS warrants severe scrutiny–particularly given a lack of clarity as to when the two met and interacted.[6] This tie between a DPS officer and a January 6 insurrectionist, possibly in the context of OLS, highlights the need for federal investigation of discriminatory policing by DPS in Texas's anti-immigrant initiative.

## I.    DPS's History of Saturating Border Communities and Indicia of Accompanying Racial Profiling

Governor Abbott has deployed up to 1,000 DPS officers to border communities under OLS.[7] This is part of a pattern of similar actions by the Texas government: since 2006, Texas has regularly surged state police to the border for what it terms "border security operations." These surges go by militaristic names and include Operation Rio Grande in 2006, Operation Border Star in 2008, Operations Strong Safety and Strong Safety II in 2013 and 2014, and Operation Secure Texas in 2015—and, now, Operation Lone Star.[8]

Past DPS surges have led to increased stops for minor traffic violations, creating unnecessary contacts with law enforcement for people living and traveling in border communities. Historically, DPS has particularly increased stops and citations in the Rio Grande Valley. Between 2012 and 2014, for example, traffic stops in Starr County increased 233%, and stops in Hidalgo County increased 40%.[9] In 2014, Hidalgo and Starr Counties had 2% of the state's vehicle traffic but 6% of state DPS citations and 10% of state DPS warnings.[10] One driver described a 2019 stop in the Rio Grande Valley, for traveling 3 miles over the speed limit, in

---

Arrest Program Title VI 2nd Suppl. Compl., Apr. 7, 2022, 7, https://www.aclutx.org/sites/default/files/ols_supplemental_complaint_4.7.22.pdf.

[6] Dobbins, *supra* note 2 (Denny's attorney stating, regarding the "friendship" between his client and the DPS officer, "I do not know how they were friends, for how long, or where the friendship started.").

[7] Emily Hernandez, *What is Operation Lone Star? Gov. Greg Abbott's Controversial Border Mission, Explained*, Tex. Tribune, Mar. 30, 2022, https://www.texastribune.org/2022/03/30/operation-lone-star-texas-explained (noting how up to 1,000 DPS troopers have been deployed at one time in Operation Lone Star); Tanvi Varma, *Records: Operation Lone Star Resulting in Increases as High as 1,000% in Minor Citations for Drivers in Starr County*, KRGV, Aug. 5, 2021, https://www.krgv.com/news/records-operation-lone-star-resulting-in-increases-as-high-as-1-000-in-minor-citations-for-drivers-in-starr-county/ (DPS spokesperson stating, "We're providing over 1,000 DPS resources to the RGV and Del Rio sectors").

[8] Tex. Legis. Budget Bd., *Update: State Funding for Border Security, September 1, 2015 - February 29, 2016*, at 5 (May 2016), https://www.lbb.texas.gov/Documents/Publications/Presentation/3248_Update_State_Funding_Border_Security.pdf.

[9] Brian M. Rosenthal, *What Texas' Border Surge Means: Traffic Stops*, Hous. Chronicle, Sept. 8, 2015, https://www.houstonchronicle.com/local/gray-matters/article/A-close-up-lesson-on-police-work-along-the-6490668.php.

[10] Marty Schladen, *In Rio Grande Valley, Officials Question the Reason for DPS Stops*, El Paso Times, Mar. 28, 2015, https://www.elpasotimes.com/story/archives/2015/03/28/rio-grande-valley-officials-question-reason-dps-stops/73899258/.

which the DPS trooper informed him that the stop was because "he just wanted somebody to talk to."[11]

Concerningly, DPS has a history of racial disparities in stops during such policing surges that indicates racial profiling by the agency. From 2009 to 2011 and again from 2012 to 2014, in two time frames coinciding with a DPS surge, a Border Network for Human Rights review of DPS traffic stop data found that citations of Latinx drivers in border counties soared while those of white drivers in the same counties *dropped*. In Starr County, citations of Latinx drivers increased 127%, while citations of white drivers dropped 40%; in Webb County, there was an 87% increase in Latinx driver citations versus a 30% drop for white drivers; in Cameron County, there was a 9% increase for Latinx drivers versus a 28% decrease for white drivers.[12] A 2016 *Austin American-Statesman* analysis found that 35% of DPS officers searched Black and Latinx drivers at least twice as often as white drivers. These officers were overwhelmingly less likely to find evidence of contraband in their searches of Black and Latinx drivers—an indication of racial profiling.[13]

During DPS surges, many border residents endure repeated stops. Examining one surge, the Dallas Morning News found that more than 600 people in Starr and Hidalgo Counties were stopped 10 or more times; more than 300 were stopped 20 or more times; and one person was stopped 52 times.[14]

The harms from these racially disparate and repeated stops—and from the environment they create in affected communities—are grave. DPS stops have the potential to lead to serious consequences for drivers and passengers, including tickets with high fines. One Starr County resident described struggling financially after receiving three tickets over just a few months, as well as three or four warnings, after the state sent state police to the area pursuant to Operation Lone Star.[15] More broadly, DPS's saturation of border communities creates a climate of fear. Many border residents are afraid to venture out of their homes due to the fear that a routine errand may lead to severe economic consequences or, for undocumented individuals, deportation. As Starr County Judge Eloy Vera explained during a prior surge of DPS troopers, "In Starr County, unfortunately, a lot of our people are very humble, on low incomes, and they

---

[11] Aaron Nelsen, *"When Do They Leave?": Border Residents Bear the Latest Surge of DPS Troopers*, Tex. Monthly, June 24, 2021, https://www.texasmonthly.com/news-politics/rio-grande-valley-dps-troopers/.

[12] Border Network for Human Rights, *Race, Traffic Stops, & Ensuring Public Safety for a Changing Texas: A Review of White vs. Hispanic Disparities in Texas DPS Traffic Stops, 2009-2014*, at 9 (Apr. 2016), http://bnhr.org/wp-content/uploads/2016/04/DPS-Report.pdf.

[13] Eric Dexheimer et al., *Not So Black and White*, Austin American-Statesman, Sept. 9, 2016, http://specials.mystatesman.com/dps-stop-search-data/.

[14] Tom Benning & Andrew Chavez, *After 2 Years and $800M, Texas' Border Boost Has One Solid Outcome: More Traffic Tickets*, The Dallas Morning News, Nov. 22, 2016, https://www.dallasnews.com/news/politics/2016/11/22/after-2-years-and-800m-texas-border-boost-has-one-solid-outcome-more-traffic-tickets/.

[15] Varma, *Records: Operation Lone Star Resulting in Increases as High as 1,000% in Minor Citations for Drivers in Starr County*, *supra* note 7.

are afraid to go out" due to the likelihood of receiving a traffic citation.[16] As a result, he went on to explain, "It has played havoc on our economy. People will not go out, they stay home. They might go out once a week to our stores."[17]

Meanwhile, traffic stops decline in other parts of Texas with reallocation of DPS to the border[18]—while border communities bear the brunt of hyper-policing.

History appears to be repeating itself under OLS. Again, stops under these surges have frequently been for minor traffic violations. At the start of OLS, citations by DPS in Starr County skyrocketed for materials on a windshield: DPS citations for having anything on a car windshield increased 1,060%, and DPS citations for having any transparent material on a windshield increased 840%.[19]

And there is significant evidence of racial profiling by DPS officers in recent stops of Latinx drivers and passengers in OLS areas. First, 2021 DPS traffic stop data shows meaningful disparities between stop outcomes for Latinx and white individuals.[20] Tarleton State University researchers, in analyzing this data, concluded there is "a reasonable probability that racial profiling is a significant contributor to" those disparities.[21] They characterized their findings as "concerning."[22] They surmised, "These findings may indicate that the DPS has not made appropriate organizational course corrections through policy, training, and analysis of their own data."[23] Specifically, the researchers found that:

- "DPS searched Hispanics at a higher rate than Whites." This was true statewide, and it was true more granularly in DPS Regions 2 (West Texas) and 3 (Lower Rio Grande Valley). These two regions are the regions in which counties with large deployments of DPS officers—such as Kinney, Val Verde, Uvalde, Cameron, Hidalgo, and Starr Counties—are located.[24]

- "DPS conducted a significantly greater portion of consent searches on Hispanics relative to Whites." Because consent searches—where an officer asks for permission to search—

---

[16] Border Network for Human Rights, *Race, Traffic Stops, & Ensuring Public Safety for a Changing Texas*, *supra* note 12, at 7 (quoting Judge Vera, as reported in Steve Taylor, *Vera Fears Border Security Bill Will Bring More Harassment for Starr County Residents*, Rio Grande Guardian, July 14, 2015, https://riograndeguardian.com/vera-fears-border-security-bill-will-bring-more-harassment-for-starr-county-residents/).

[17] *Id.*

[18] Benning & Chavez, *After 2 Years and $800M, Texas' Border Boost Has One Solid Outcome: More Traffic Tickets*, *supra* note 14.

[19] Varma, *Records: Operation Lone Star Resulting in Increases as High as 1,000% in Minor Citations for Drivers in Starr County*, *supra* note 7.

[20] Tarleton State University Institute for Predictive Analytics in Criminal Justice, *Additional Analysis of State of Texas 2021 Racial Profiling Data: Hispanic Data Analysis Report, June 14, 2022*, at 18. https://web.tarleton.edu/ipac/wp-content/uploads/sites/12/2022/07/IPAC2021AnnualReportHispanicFindings.pdf.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.* at 8, 17.

6

are discretionary searches, they are strong indicators of racial profiling. DPS asked for and was granted consent to search by 19.5% of white drivers but 32.1% of Latinx drivers.[25]

- "DPS had a significantly lower contraband hit rate with Hispanics relative to Whites." The percentage of searches that produce contraband is likewise a strong indicator of racial profiling. "The lower the hit rate, the greater the probability that racial profiling is a contributing factor. . . . In order to be confident that no racial profiling is occurring, contraband hit rates . . . should remain relatively equal across races."[26] Statewide, the researchers characterized the disparity between Latinx and white people in contraband hit rates as "concerning." "When DPS officers searched Hispanics, they were wrong (no contraband discovered) over 71% of the time."[27] DPS Regions 2 and 3, where OLS traffic stops occur, had lower hits rates for Latinx than for white individuals.[28]

- DPS had higher consent search rates of Latinx individuals and *far* lower contraband hit rates with Latinx individuals than did the state overall. The state's rates for consent search are 33.9% for white drivers and 25.3% for Latinx driver; as described above, there is a wide disparity in the other direction for DPS's consent search rates. For contraband hit rates, the state is at 44.4% for Latinx individuals and 48.6% for whites. DPS, by contrast, finds contraband on 28.5% of Latinx individuals and 39.6% of white individuals.[29]

Again, the Tarleton State University researchers concluded that these findings regarding 2021 data—data for the OLS time period—were "concerning" and "suggest[ed] a reasonable probability that racial profiling is a significant contributor."[30] These indicia of racial profiling, coupled with DPS's history and the specifics of OLS DPS officer affidavits, necessitate a federal investigation into racial profiling of Latinx individuals by DPS officers in OLS traffic stops.

## II.  Racial Profiling in OLS Traffic Stops: DPS Officer Affidavits from Smuggling Cases

In addition to the statistical evidence of racial profiling described above, probable cause affidavits from Kinney and Val Verde Counties reveal regular racial profiling by DPS officers in traffic stops that involve Latinx passengers. We have analyzed arrest affidavits by DPS officers

---

[25] *Id.* at 9, 17.
[26] *Id.* at 12, 17.
[27] *Id.* at 17.
[28] *Id.* at 12.
[29] *Id.* at 17.
[30] *Id.* at 18.

from 18 traffic stops[31] that resulted in arrests under Texas state law for "smuggling of persons."[32] In nearly half of those stops—8 out of 18, or 44%—the affidavits strongly indicate racial profiling by DPS officers. Specifically, they show state police relying on the race of passengers to formulate reasonable suspicion to prolong the traffic stop to investigate smuggling of persons or to formulate probable cause for arrest.[33]

The arrest affidavits show that DPS's racial profiling in traffic stops occurs in two primary ways—ethnicity alone and ethnicity combined with ordinary daily activities. First, several affidavits show DPS relying on passengers' perceived Latinx ethnicity alone to prolong traffic stops to investigate for human smuggling: it is the only information that the officer provides to justify prolonging the stop. Second, in other affidavits DPS officers describe combining passengers' perceived Latinx identity with other ordinary characteristics—such as having a backpack or appearing, in the DPS officer's judgment, scared—to justify reasonable suspicion for further investigation or probable cause for arrest.

Both of these approaches to generating reasonable suspicion or probable cause violate federal anti-discrimination law and the Constitution.

### A.      DPS Reliance on Perceived Latinx Ethnicity in Violation of the Constitution and Title VI of the Civil Rights Act

The use of race to develop reasonable suspicion or probable cause in a traffic stop is unlawful. Law enforcement may not extend a traffic stop beyond the time it takes for the officer to deal with the traffic infraction that formed the basis for the stop, absent reasonable suspicion of a crime.[34] As the Fifth Circuit has explained, "A factual condition which is consistent with the smuggling of [undocumented noncitizens] in a particular area, will not predicate reasonable suspicion, if [1] that factual condition occurs even more frequently among the law abiding public in the area" or [2] there are substantially more people numerically in the general population who possess that characteristic than there are people who are violating the law.[35] **"For example," the**

---

[31] We are in possession of 20 such affidavits—18 are for arrests of drivers, and 2 are for arrests of passengers who allegedly colluded with the drivers in 2 of those same stops.

[32] Smuggling of persons under Texas law includes, among other acts, "knowingly . . . us[ing] a motor vehicle . . . to transport an individual with the intent to . . . conceal the individual from a peace officer or special investigator" and "knowingly . . . encourag[ing] or induc[ing] a person to enter or remain in this country in violation of federal law by concealing, harboring, or shielding that person from detection." Tex. Penal Code § 20.05(a)(1)(A), (a)(2).

[33] One affidavit that we have counted as racial profiling does not mention the passengers' race or ethnicity. However, in it the DPS officer claims to detect a "distinct odor" in the vehicle that "undocumented immigrants emit." Because the affidavit invokes a racist trope as the justification for prolonging the stop, we have included it as racial profiling.

[34] *Rodriguez v. United States*, 575 U.S. 348 (2015).

[35] *United States v. Jones*, 149 F.3d 364, 369 (5th Cir. 1998). The original opinion uses the phrase "illegal alien," for which we have substituted "undocumented noncitizen." *See United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1619 (2021) (substituting "noncitizen" for "alien" in statutory text).

**Fifth Circuit has explained, "the fact that one is of Mexican national origin does not create reasonable suspicion that one is an [undocumented noncitizen], since, in border areas, there are far more legal citizens than [undocumented noncitizens] of Mexican origin."[36]**

Thus, DPS's reliance on perceived Latinx ethnicity to develop reasonable suspicion or probable cause of smuggling violates the Fourth Amendment and constitutes unlawful discrimination in violation of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964. The DPS officer affidavits that we analyzed are from vehicle stops in Kinney County and Val Verde County. The demographics of both those counties are majority Latinx: Kinney County's population is roughly 62% Latinx; Val Verde's, roughly 82%.[37] Prolonging stops for vehicles with multiple Latinx passengers will therefore sweep in many residents of these border communities. This is also true in other border and non-border counties saturated with DPS officers due to OLS. And importantly, by their nature these affidavits represent only the stops in which DPS officers *did* decide to effectuate an arrest. They do not include any stops prolonged due to racial profiling that did not end in arrest—perhaps after the DPS trooper realized that a stopped vehicle's occupants were Latinx family, coworkers, or groups of friends traveling together, completely unrelated to a violation of the Texas "smuggling" statute. Similar stops that did not end in arrest would, of course, likewise violate the Constitution and Title VI's prohibition on racial discrimination.

In 4 of the 18 stops, DPS officers provided only passenger ethnicity as a possible justification for prolonging the stop:

- A DPS officer pulled over a vehicle in Kinney County for darkly tinted windows. The officer stated in the affidavit, "During the roadside interview, I observed 2 Hispanic male passengers in the vehicle. The two passengers were later identified as undocumented persons by their Honduras identification cards." This—the ethnicity of the passengers—is the only justification given in the probable cause affidavit for prolonging the stop beyond the purpose of investigating the window tint violation and instead converting the stop into an investigation for smuggling.
- Similarly, a DPS officer stopped a vehicle in Kinney County for failure to dim headlights and for darkly tinted windows. The officer stated, "During the roadside interview, I observed 3 Hispanic males sitting low in the vehicle. The three passengers were later identified as

---

[36] *Jones*, 149 F.3d at 369; *see also United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) (en banc) (holding, in the context of a Border Patrol traffic stop near an interior checkpoint, that "at this point in our nation's history, and given the continuing changes in our ethnic and racial composition, Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required").

[37] U.S. Census Bureau, *QuickFacts: Kinney County, Texas* (Jul.1, 2021), https://www.census.gov/quickfacts/kinneycountytexas; U.S. Census Bureau, *QuickFacts: Val Verde County, Texas* (Jul. 1, 2021), https://www.census.gov/quickfacts/fact/table/valverdecountytexas/PST045221.

undocumented persons." Again, no other explanation was provided for continuing the stop to investigate smuggling.

- A DPS officer stopped a vehicle in Kinney County for going 69 miles per hour in a 60 mile-per-hour zone. The officer stated that, in addition to the driver, "the vehicle was also occupied by three (3) Hispanic male passengers and one (1) female passenger." There is no other rationale provided for converting the stop into an investigation for smuggling.
- In Kinney County, a DPS officer stopped a sports car for speeding. Upon approaching the vehicle, he "observed five males: three black and two Hispanic." He then asked the driver to step out of the vehicle, apparently to engage in further investigation—and the affidavit provides no further rationale for this choice.

### B. DPS Reliance on Perceived Latinx Ethnicity and An Ordinary Characteristic in Violation of the Constitution and Title VI of the Civil Rights Act

Stops relying on race plus another ordinary characteristic are similarly unlawful–since the ordinary characteristic alone cannot justify the stop. Ordinary characteristics that regularly occur among the general population cannot form a basis for developing reasonable suspicion or probable cause.[38] For example, courts have held that the ordinary characteristics of having a blue tarp draped across a car's interior, having a muddy car, or having a single key as opposed to a key ring do not form a basis to suspect criminal activity. A blue tarp could be used to conceal people being smuggled, but it is also used to hide belongings from car burglars and, regularly, in camping.[39] A muddy vehicle could be muddy because it unlawfully crossed the Rio Grande, but "there is simply nothing suspicious about a muddy 4 Runner traveling in an area where one should expect most vehicles to have some mud on them."[40] While drug couriers may have single keys because vehicles are being passed from courier to courier, many people who are not drug couriers also don't use a key ring while driving.[41]

Three DPS officer affidavits from OLS traffic stops involve unlawful reliance on race plus this kind of ordinary characteristic that forms no basis for developing probable cause. In one affidavit, a DPS officer justified suspicion of smuggling on the grounds that Latinx vehicle occupants had backpacks and undocumented immigrants may "often carry backpacks." But many travelers who are not undocumented immigrants "often carry backpacks," as do schoolchildren, hikers, and many people traveling to or from work.

In another affidavit, a DPS officer described prolonging a stop based on the passenger's perceived Latinx ethnicity and frightened demeanor. But as courts have increasingly recognized, Black and Brown people's negative experiences with or knowledge of disparities in treatment by

---

[38] *Jones*, 149 F.3d at 369.
[39] *Id.*
[40] *Id.*
[41] *United States v. Flores*, 2017 WL 2937577 at *7 (S.D. Tex. Apr. 4, 2017).

10

law enforcement affect how they interact with law enforcement.[42] And when any person, "whether innocent or guilty, would be preoccupied with [the law enforcement officer's] presence, then any inference that might be drawn from" nervousness "is destroyed."[43]

In a third affidavit, a DPS officer justified prolonging a stop because Latinx passengers lacked identity documents. However, Texas law does not require individuals to carry documents with them to prove their identity or require vehicle passengers (as opposed to drivers) to show identification to law enforcement.[44] A passenger may simply choose not to, and frequently does for any number of reasons ranging from forgetfulness to inconvenience to principle.

Here are the specifics of these affidavits from 3 of 18 stops that provide race plus an ordinary characteristic as the only possible basis for prolonging the stop:

- A DPS officer pulled over a vehicle in Kinney County for failure to stop at the appropriate point behind a stop sign and because the vehicle had a temporary tag with no vehicle identification number connected in the state system. As the officer explained, "A traffic stop was conducted, and the Honda pulled over [in a particular location]. 3 Hispanic Males were observed in the vehicle and upon initial contact, it was discovered that none of the occupants had identifying documents with them." This is the only description in the affidavit as to what led the DPS officer to require all occupants to exit the vehicle and to investigate for smuggling. As described above, Texas law does not require individuals to carry documents with them to prove their identity or require vehicle passengers (as opposed to drivers) to show identification to law enforcement.

- In Val Verde County, a DPS officer stopped a vehicle for a temporary tag that "flapp[ed] while the vehicle was in motion- and was not readable." The officer observed two men in the vehicle. As the officer described the encounter, the driver "stated to me that he was traveling to San Antonio Texas, from Eagle Pass, Texas. He stated that he was working in Eagle Pass and the passenger in the vehicle was a co-worker. The front seat passenger was a Hispanic male who looked extremely scared." This was the officer's only justification for extending the stop for further investigation.

- Also in Val Verde County, a DPS officer stopped a vehicle because it was on a county road that "is not the most direct route to Austin or San Antonio" and appeared to be carrying a heavy load. Consequently, the officer stated, he "believed [the vehicle] was trying to avoid" interior Border Patrol checkpoints. The officer stopped the vehicle pretextually for speeding. He then "observed two Hispanic males inside of the vehicle with backpacks on the floorboard." The officer stated in his probable cause affidavit, "Undocumented Migrants often carry backpacks with them when they travel, based on my training and experience I believed the two Hispanic males to be Undocumented and [the driver] to be Human

---

[42] *E.g.*, *Commonwealth v. Warren*, 58 N.E. 3d 333, 342 (Mass. 2016).

[43] *Id.* at 370.

[44] *Cf.* Tex. Transp. Code § 521.025 (requiring that drivers carry a license while operating a vehicle and display that license to law enforcement when asked); Tex. Penal Code § 38.02 (requiring individuals to provide identifying information to law enforcement officers under certain circumstances but not requiring the provision of identification).

Smuggling." Of course, *many* people who are not undocumented migrants also carry backpacks with them when they travel.

### C.       DPS Invocation of a Racist Trope to Justify Probable Cause

Finally, in one affidavit a DPS officer claimed, "I smelled an odor that was emitting from inside the vehicle. . . . I identified the smell as an odor that is associated with human smuggling. Undocumented aliens emit a distinct odor due to sweat and being exposed to the environment." The officer provided this justification for prolonging the stop to investigate smuggling. This is plainly outrageous, and it is bias-based policing. It is of a piece with the longstanding racist, nativist myths that Latinx people, people from outside the United States generally, and Mexicans specifically are dirty.[45]

## IV.   DPS Vehicle Pursuits under Operation Lone Star: A High Death Toll

These indicia of racial profiling raise very grave concerns about civil rights violations by DPS; so too do DPS vehicle pursuits. DPS officers are engaging in many vehicle pursuits under OLS—and those pursuits have resulted in at least 30 deaths in the past 16 months, a startlingly high toll. In December 2021, just nine months after the program started, DPS stated that it had already engaged in 1,046 vehicle pursuits pursuant to OLS.[46] This is an increase from before OLS. In just the first month of OLS, DPS has stated, pursuits by the department almost doubled—from 20 in February 2021 to 38 in March 2021.[47]

These vehicle pursuits by DPS are dangerous for border communities and routinely pose a risk not only to drivers and passengers but also to bystanders. DPS's policy for initiation and conduct of vehicle pursuits is contrary to best law enforcement practices: it rests discretion entirely with the individual officer, with very little guidance as to how to exercise that discretion. The result is tragic, with DPS pursuits regularly killing people traveling through counties caught up in OLS. The evidence of racial profiling in discretionary traffic stop decisions by DPS raises serious concerns that, as a result, vehicle pursuits disparately harm Latinx individuals.

---

[45] Ferris State University, Jim Crow Museum, *Mexican and Latino Stereotypes*, https://www.ferris.edu/HTMLS/news/jimcrow/mexican.htm; Laura M. Padilla, *"But* You're *Not a Dirty Mexican": Internalized Oppression, Latinos & Law*, 7 Tex. Hisp. J.L. & Pol'y 59 (2001).

[46] Operation Lone Star Briefing, Dec. 16, 2021, ~ 00:00:30, https://www.facebook.com/watch/live/?ref=search&v=410888664056374.

[47] Dave Hendricks, *Crackdown on Smuggling Leads to Spike in Vehicle Pursuits*, Progress Times, May 7, 2021, https://www.progresstimes.net/2021/05/07/crackdown-on-smuggling-leads-to-spike-in-vehicle-pursuits/.

### A.        DPS Vehicle Pursuit Policy: Contrary to Best Practices

DPS's policy regarding vehicle pursuits is extremely bare-bones and, contrary to law enforcement agency best practices, leaves discretion in decisions about pursuits to individual officers with little guidance. An excerpt from the Texas Highway Patrol manual made public in March 2017 states:

> There are many times when it is not practicable to continue pursuit of a violator. The decision of when to abandon pursuit can only be made by the officer involved. When, in the judgment of the officer, the mission of the Department can no longer be served or when it becomes evident that continued pursuit will bring about unwarranted danger to the public or to the officer, he should abandon pursuit and take whatever legal action is practicable.[48]

The policy does not provide any guidance as to under what circumstances "the mission of the Department can no longer be served" or what degree of danger to the public or the officer makes continued pursuit "unwarranted." DPS's use of force policy states, briefly, that a DPS officer "may have to use the vehicle as a tool to end the commission of a crime"; that such use of a vehicle is use of force; and that the use of force must be guided by DPS's general use of force policies.[49] It provides no more specific guidance on use of force in this context.

More recently, in December 2021 and specifically with respect to Operation Lone Star, DPS Lieutenant Chris Olivarez explained regarding vehicle pursuits:

> Every agency has their own policy in place on pursuits. We leave it to the discretion of the troopers to make that decision based on the circumstances. So we leave it up to them to make that decision—whether they continue to engage or disengage from a pursuit.[50]

Lieutenant Olivarez's description confirms that DPS's minimal policy leaving discretion up to the individual officer and providing virtually no guidance for the exercise of that discretion is still in effect.

This is contrary to widely understood agency best practices. For example, the International Association of Chiefs of Police recommends that an officer should engage in pursuit only when "the need to apprehend the fleeing suspect [is] greater than the risk presented by the pursuit."[51] Moreover, "unless a greater danger would result, pursuits should not be undertaken if the identity of the fleeing suspect is known or can be obtained with enough

---

[48] The DPS vehicle pursuit policy released to the public in March 2017 is available at https://www.documentcloud.org/documents/3699762-DPSPursuitPolicy.html.

[49] The DPS use of force policy is available at https://s3.documentcloud.org/documents/3115640/DPS-Use-Of-Force.pdf. The use of force policy provides guidance on discharging firearms at vehicles. *Id.* at 5-15 - 5-16.

[50] Operation Lone Star Briefing, Dec. 16, 2021, ~ 14:00, https://www.facebook.com/watch/live/?ref=search&v=410888664056374.

[51] International Association of Chiefs of Police, *Vehicular Pursuits*, Dec. 2019, at 3, https://www.theiacp.org/sites/default/files/2019-12/Vehicular%20Pursuits%20-%202019.pdf.

certainty that they can be apprehended at a later time"—such as "where the license number of the vehicle can be obtained."[52]

In addition to failing to provide adequate safeguards around directing officers to disengage from a pursuit, neither the vehicle pursuit policy nor the use of force policy provides meaningful guidance about intervention tactics like roadblocks, ramming, or vehicle physical contact maneuvers.[53] Further, the policies fail to prohibit pursuit actions like "caravanning" (multi-vehicle close pursuit) and "paralleling" (traveling along a parallel road), which are dangerous to traffic not involved in the pursuit.[54] Finally, leaving discretion entirely to the individual officer carries significant risk in light of the many demands on an officer while in the middle of a situation in which a pursuit might arise.[55]

### B.    DPS Operation Lone Star Vehicle Pursuits: A High Death Toll

Since the start of OLS, vehicle pursuits in which DPS has been involved in counties with an OLS presence[56] have led to at least 30 fatalities and 71 injuries—an extremely high number. This figure is based on publicly available information—collating news accounts throughout South Texas. By comparison, in 2021 Border Patrol vehicle pursuits caused 23 deaths across the *entire* southern border, from California to Texas.[57]

The tally raises serious concerns that DPS's policy and any training are in practice inadequate for public safety—and, especially in light of the mounting death toll, that DPS is deliberately indifferent to its failure to protect the lives of vehicle drivers, passengers, and members of the public. DPS's saturation of border communities, its history of racially disparate stops, and the evidence of racial profiling under OLS all also indicate that DPS's policy failures

---

[52] *Id.*

[53] *See id.* at 5-6.

[54] *See id.* at 5.

[55] *Id.* at 2.

[56] We include in this category both counties on the Texas-Mexico border and counties near the border that have opted into Governor Abbott's anti-immigrant initiative by declaring a state of disaster. *See* Office of the Tex. Governor, *Governor Abbott Renews Border Security Disaster Declaration in July 2022*, July 21, 2022, https://gov.texas.gov/news/post/governor-abbott-renews-border-security-disaster-declaration-in-july-2022. While Cameron, Hidalgo, and Starr Counties—the Rio Grande Valley border counties—and El Paso County have not opted into Governor Abbott's disaster declaration, we believe based on officials' statements that DPS presence in those counties is nevertheless attributable to OLS. *See, e.g.*, Press Release, Office of the Tex. Governor, *Operation Lone Star Boosts Local Border Security Efforts, Ramps Up Law Enforcement Capabilities*, July 8, 2022, https://gov.texas.gov/news/post/operation-lone-star-boosts-local-border-security-efforts-ramps-up-law-enforcement-capabilities (Office of the Texas Governor describing vehicle pursuit in Hidalgo County in OLS press release); Operation Lone Star Briefing, Dec. 16, 2021, ~ 14:15 (OLS spokesperson describing vehicle pursuit in Hidalgo County at OLS press conference and discussing vehicle pursuits in the Rio Grande Valley and "anywhere along the border" apparently as part of OLS).

[57] ACLU of Texas, *CBP Fatal Encounters Tracker*, https://www.aclutx.org/en/cbp-fatal-encounters-tracker.

and training adequacies are disproportionately harming Latinx drivers and passengers—foreseeably, because DPS chooses to engage with Latinx drivers and passengers in communities in South Texas.

DPS vehicle pursuits in OLS counties—in which DPS has been involved as either the lead or sole agency, or in a support role—include:

- **March 2021, Val Verde County, 8 killed and 3 injured:** DPS stated that a vehicle pursuit led the pursued vehicle to crash head-on into a vehicle uninvolved in the chase, roughly 30 miles north of Del Rio. Eight passengers in the pursued vehicle were killed. One passenger in that vehicle and two occupants of the bystander vehicle, one of whom was a child, were hospitalized.[58]
- **March 2021, La Salle County, 3 killed:** DPS stated that it deployed spike strips during a chase and that the driver eventually lost control of the vehicle and crashed, killing three passengers.[59]
- **March 2021, La Joya, 2 killed and 6 injured:** DPS stated that a vehicle evaded a traffic stop and lost control, crashing into a car carrying two area residents. Both occupants of the bystander vehicle were killed, and six passengers in the pursued car were injured.[60]
- **Aug. 2021, Brooks County and Edinburg, 1 killed and 3 injured:** According to DPS, a vehicle sped off when DPS attempted to conduct a traffic stop near Falfurrias. The driver lost control of the vehicle, which rolled over. The driver died, and three passengers were hospitalized.[61]
- **Aug. 2021, Brooks and Hidalgo Counties:** DPS stated that a DPS trooper attempted a traffic stop near Falfurrias. The driver evaded the stop and continued at a high rate of speed, according to DPS. DPS stated that the vehicle continued, crashing into a concrete barrier and then traveling on a rim, until the deployment of spike strips. One of the two passengers was found unresponsive and passed away. DPS did not attribute this death to the pursuit but rather to illness that began before the passenger was picked up: it stated that "DPS troopers and Texas Rangers confirmed it was not a fatal crash."[62]

---

[58] Associated Press, *8 Immigrants Killed When Pickup Crashes in Texas Border City*, USA Today, Mar. 17, 2021, https://www.usatoday.com/story/news/2021/03/17/eight-immigrants-killed-when-pickup-crashes-del-rio-texas/4737252001/.

[59] Arelis R. Hernández, *In South Texas, Frustration with High-Speed Chases, Increased Crime Exacerbates Political Tensions*, Wash. Post, May 4, 2021, https://www.washingtonpost.com/immigration/texas-border-crime/2021/05/03/749b4b5a-994b-11eb-b28d-bfa7bb5cb2a5_story.html.

[60] Valley Central, *DPS Searching for Driver in Deadly La Joya Crash*, Mar. 17, 2019, https://www.valleycentral.com/news/local-news/dps-searching-for-driver-in-deadly-la-joya-crash/.

[61] KRGV, *McAllen Teen Accused of Leading DPS Troopers on High Speed Chase Dies*, Sept. 3, 2021, https://www.krgv.com/news/mcallen-teen-accused-of-leading-dps-troopers-on-high-speed-chase-dies/.

[62] MyRGV, *17-Year-Old McAllen Man Charged in Smuggling Case*, Aug. 26, 2021, https://myrgv.com/featured/2021/08/26/17-year-old-mcallen-man-charged-in-smuggling-case/.

- **Sept. 2021, Maverick County, 1 injured:** DPS stated that a vehicle evaded a stop for a traffic violation. As a result of the ensuing chase, the driver crashed into a vehicle not involved in the pursuit, injuring one passenger in the chased vehicle.[63]
- **Nov. 2021, Laredo, 3 killed, 5 injured:** DPS stated that an officer attempted to pull over a vehicle for a traffic stop but that the driver evaded the stop. The pursued vehicle crashed into another car near an intersection in Laredo. The driver of the bystander vehicle was killed, as were two passengers in the pursued vehicle. Five people were taken to the hospital.[64]
- **Nov. 2021, La Joya, 2 killed and 10 injured:** DPS stated that an officer attempted to conduct a traffic stop and the vehicle instead drove away at a high speed. The vehicle rolled over: two people died at the scene, and ten were taken to a local hospital for what DPS characterized as "major to minor injuries."[65]
- **Dec. 2021, Mission, 2 killed and 7 injured:** DPS officers assisted in a chase initiated by Border Patrol when a vehicle did not stop for a traffic stop. The vehicle collided with a car not involved in the chase, killing both occupants of the car and sending the seven occupants of the pursued vehicle to the hospital for injuries. After the crash, a local police chief suggested that protocols for vehicle pursuits needed to be reexamined in order to protect public safety, given the deaths of bystanders.[66] Border Patrol's vehicle pursuits likewise frequently end in fatalities and do not align with law enforcement best practices.[67]
- **Dec. 2021, La Gloria, 1 killed:** A DPS officer assisted in a chase initiated by Border Patrol after a vehicle failed to yield. According to CBP, the DPS officer used a vehicle immobilization device. CBP stated that the driver attempted to evade the device but crashed into a nearby off-road object, and the vehicle rolled over. The passenger in the vehicle was killed.[68]

---

[63] Texas Dep't of Public Safety - South Texas Region, Facebook (Sept. 7, 2021), https://www.facebook.com/permalink.php?story_fbid=pfbid0mAwBDuTpDTPemY9pe4iDRumNXYZ8 HTt3bc8Lci9n4utuSto4WiiYh16J6QkEVcALl&id=2118412605136040

[64] Fox South Texas, *High Speed Chase in Laredo Ends with Three Fatalities*, Nov. 16, 2021, https://foxnewssouthtexas.com/2021/11/16/high-speed-chase-in-laredo-ends-with-three-fatalities/.

[65] KRGV, *DPS: 2 Dead in One-Vehicle Crash North of La Joya*, Nov. 26, 2021, https://www.krgv.com/videos/dps-2-dead-in-one-vehicle-crash-north-of-la-joya/.

[66] Crystal Martinez, *Mission Teen Charged in Deadly Weekend Crash*, KRGV, Dec. 14, 2021, https://www.krgv.com/news/mission-teen-charged-in-deadly-weekend-crash/.

[67] ACLU of New Mexico & ACLU of Texas, *Fact Sheet: The Deadly Trend of Border Patrol Vehicle Pursuits*, https://www.aclutx.org/sites/default/files/field_documents/border_patrol_vehicle_pursuit_policy_brief_0 1_03_22.pdf.

[68] U.S. Customs & Border Protection, *CBP Statement on Death of Mexican Man After He Was Ejected From a Vehicle Following Failure to Yield Near La Gloria, Texas*, Dec. 6, 2021, https://www.cbp.gov/newsroom/speeches-and-statements/cbp-statement-death-mexican-man-after-he-was-ejected-vehicle.

- **Dec. 2021, La Rosita, 4 injured:** A DPS officer attempted to initiate a traffic stop. According to DPS, the vehicle sped away and eventually crashed into a power pole.[69]
- **Feb. 2022, Zavala County, 3 killed and 4 injured:** A DPS officer pursued a vehicle that failed to stop. The vehicle crashed after driving on the shoulder to pass another vehicle.[70]
- **Feb. 2022, La Joya, 6 injured:** According to CBP, a DPS officer attempted to stop a minivan. A pursuit ensued, and the driver crashed into a tree.[71]
- **March 2022, La Salle County, 2 killed and 4 injured:** A pursued vehicle lost control and rolled over, killing two and hospitalizing four.[72]
- **April 2022, Hidalgo County, 2 killed and 6 injured:** According to CBP, DPS vehicle took over a Border Patrol chase. The vehicle crashed, causing two occupants to die and sending six to the hospital.[73]
- **April 2022, Encinal, 1 killed and 4 injured:** According to CBP, DPS joined in a chase in which the pursued vehicle crashed.[74]
- **June 2022, El Paso, 8 injured:** A DPS highway patrol vehicle performed a Precision Immobilization Technique and hit an SUV that it was chasing, causing the SUV to roll over and injuring all eight of its occupants. One passenger was ejected from the vehicle.[75]

This accounting is taken entirely from publicly available news sources. It is likely not exhaustive. Nevertheless, the available information demonstrates a pattern of deaths resulting from vehicle pursuits by DPS in OLS counties. At least 30 deaths in South Texas OLS counties in DPS vehicle pursuits in the past year is an alarmingly high number.

DPS's history of disproportionate stops of vehicles with Latinx drivers, and the evidence of racial profiling in OLS traffic stops provided above, raises concerns that disproportionate

---

[69] KRGV, *4 Hospitalized After DPS Chase Ends in a Crash in Starr County*, Dec. 16, 2021, https://www.krgv.com/news/4-hospitalized-after-dps-chase-ends-in-a-crash-in-starr-county.

[70] Bob Price & Randy Clark, *Three Dead, Four Injured in Suspected Human Smuggling Crash in Texas Near Border*, Feb. 15, 2022, https://www.breitbart.com/border/2022/02/15/three-dead-four-injured-in-suspected-human-smuggling-crash-in-texas-near-border/.

[71] U.S. Customs & Border Protection, *Four Vehicle Pursuits and a Stash House Leads to 36 Arrests*, Feb. 24, 2022, https://www.cbp.gov/newsroom/local-media-release/four-vehicle-pursuits-and-stash-house-leads-36-arrests.

[72] Brenda Camacho, *Two Dead Following a Vehicle Pursuit on IH-35*, KGNS, Mar. 27, 2022, https://www.kgns.tv/2022/03/27/two-dead-following-vehicle-pursuit-ih-35/.

[73] U.S. Customs & Border Protection, *Smuggling Incident Results in Fatal Crash North of San Manuel, Texas*, Apr. 28, 2022, https://www.cbp.gov/newsroom/speeches-and-statements/smuggling-incident-results-fatal-crash-north-san-manuel-texas.

[74] U.S. Customs & Border Protection, *Failure to Yield Incident at Laredo North Checkpoint Leads to Crash with One Fatality and Multiple Injuries*, Apr. 29, 2022, https://www.cbp.gov/newsroom/speeches-and-statements/failure-yield-incident-laredo-north-checkpoint-leads-crash-one.

[75] Daniel Borunda, *SUV Smuggling Migrants Crashes After Hit by Texas DPS Vehicle in El Paso Highway Pursuit*, El Paso Times, June 23, 2022, https://www.elpasotimes.com/story/news/crime/2022/06/23/texas-dps-chase-el-paso-migrants-smuggling-crash-border-highway/7709849001/.

contacts with Latinx drivers and passengers that result from racial profiling are leading to racially disparate vehicle pursuits as well. In combination with DPS's plainly deficient policy—which leaves discretion with the individual officer and fails to provide adequate safeguards for the safety of all involved—racial profiling in encounters may be leading to deaths of Latinx drivers and passengers as the result of unconstitutional traffic stops.

<p style="text-align:center">***</p>

Under Governor Abbott's Operation Lone Star initiative, DPS has saturated South Texas communities with state police officers conducting traffic stops. Historically, similar large-scale movement of DPS to border communities to conduct traffic stops has resulted in racially disproportionate citation of Latinx drivers. In 2021, DPS traffic stops exhibited "concerning" disparities. DPS officers' affidavits from OLS traffic stops provide strong evidence that officers are currently racially profiling in deciding whether to prolong stops. A DPS officer's ties to a vigilante and January 6 insurrectionist who apparently hid from the FBI for three months on the Kinney County Attorney's ranch while patrolling for migrants raises very serious concerns about the agency's ties to white supremacist extremism. And DPS vehicle pursuits have led to many deaths—at least 30—in South Texas OLS counties in the first year of OLS's operation.

We therefore urgently renew our call for a Title VI investigation into DPS and other state and local agencies for their role in the OLS migrant arrest program, and call on DOJ to investigate DPS for its OLS traffic stops as well. Federal action is critically necessary to protect Black and Brown individuals caught up in the OLS migrant arrest program—and Latinx drivers and passengers in South Texas communities. We also request that DOJ investigate DPS for a pattern or practice of civil rights violations, pursuant to its authority under 34 U.S.C. § 12601.


Sincerely,

| | |
|---|---|
| Kathryn Huddleston, Staff Attorney | Erin Thorn, Senior Attorney |
| Savannah Kumar, Attorney | Kassandra Gonzalez, Manne Family Fellow |
| ACLU of Texas | Texas Civil Rights Project |