IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; AND THE COUNTY OF EL PASO, TEXAS,<br>         *Plaintiffs,*<br><br>v.<br><br>FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE STATE OF TEXAS DEPT OF PUBLIC SAFETY, AND JAMES MONTOYA, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY FOR THE 34TH DISTRICT,<br>         *Defendants.* | CASE NO. 1:23-CV-1537-DAE (LEAD CASE)<br><br>CONSOLIDATED WITH 1:24-CV-270 |
| LA UNION DEL PUEBLO ENTERO, SARAH DOE, MARY DOE, JOHN DOE, AND JAMES DOE,<br>         *Plaintiffs,*<br><br>v.<br><br>GREGORY ABBOTT, *ET AL.*,<br>         *Defendants.* | |

**DEFENDANT MARTIN'S MOTION TO DISMISS AND ANSWER TO LAS AMERICAS' COMPLAINT**

      Defendant Freeman Martin, in his official capacity as Director of the State of Texas Department of Public Safety, respectfully files this Motion to Dismiss and Answer to the Complaint for Declaratory and Injunctive Relief (ECF No. 1) in Case No. 1:23-1537-DAE.

1

## **MOTION TO DISMISS**

### INTRODUCTION

Defendant Freeman F. Martin, in his official capacity as the Director of the Texas Department of Public Safety ("DPS") ("State Defendant Martin"), moves to dismiss the Complaint for Declaratory and Injunctive Relief filed in Case No. 1:23-1537-DAE (the "Complaint") by Plaintiffs Las Americas Immigrant Advocacy Center ("LA"), American Gateways ("Gateways"), and the County of El Paso, Texas ("the County") (together, "Plaintiffs"), pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) and the Court's Order of April 4, 2025 (ECF No. 49). LA, Gateways, and El Paso County lack standing to sue and all of their claims against State Defendant Martin are barred by both State sovereign immunity and the Eleventh Amendment to the United States Constitution. This Court lacks subject matter jurisdiction and should dismiss this case.

### BACKGROUND

In 2023, the Texas Legislature passed S.B. 4, which was signed into law by Texas Governor Greg Abbott on December 18, 2023. S.B. 4, 88th Leg., 2d C.S. (Tex. 2023). S.B. 4 was not set to go into effect until March 4, 2024. *Id.* Within days after Governor Abbott signed S.B. 4, Plaintiffs filed this pre-enforcement challenge. ECF No. 1. The Court enjoined S.B. 4 on February 29, 2024. *See* ECF No. 42, *United States of America, et al., v. State of Texas, et al.,* No. 1:24-cv-00008-DAE (W.D. Tex. (Feb. 29, 2024).

Plaintiffs assert that S.B. 4 violates the Supremacy Clause of the United States Constitution. ECF No. 1. They allege only a single claim for relief, for "Preemption", and assert that S.B. 4 is preempted as to all its provisions—claiming that all matters set forth in S.B. 4 are "exclusively reserved to the federal government" and "operate[] in a field over which the Congress has exercised exclusive authority." *Id.*

Plaintiffs claim that S.B. 4 is facially unconstitutional, despite S.B. 4 having not yet been allowed to go into effect, shoulders them with the burden to show that there are no possible applications of S.B. 4 that would be constitutional.

On January 20, 2025, President Donald Trump signed Executive Orders 14,159 and 14,165 directing federal immigration authorities to work with state and local law enforcement to help enforce the federal immigration laws. On March 18, 2025, The United States voluntarily dismissed its lawsuit challenging S.B. 4 on grounds of federal preemption. *See* ECF No. 79, *United States of America, et al., v. State of Texas, et al.,* No. 1:24-cv-00008-DAE (W.D. Tex. (Mar. 18, 2025).

The United States' dismissal of its challenge to S.B. 4 leaves only Plaintiffs attempt to vindicate, not their own constitutional rights, but the alleged right of the United States to exclusively enforce its immigration laws. In stark contrast, the United States Department of Homeland Security ("DHS") is now actively cooperating with Texas law enforcement, including DPS, to enforce the federal immigration laws.

As a result, pursuant to both state and federal law, and by agreement between state and federal authorities, DHS and Governor Abbott have authorized the DPS and Texas National Guard to investigate, apprehend, arrest, detain, and remove illegal aliens in Texas—the exact actions authorized by S.B. 4 and challenged by Plaintiffs.

## ARGUMENT

**I.      PLAINTIFFS LACK STANDING**

A federal court has an obligation in every case to assure itself that it has subject matter jurisdiction over the claims asserted by the plaintiffs. *SXSW, LLC v. Fed. Ins. Co.*, 83 F.4th 405, 407 (5th Cir. 2023) (citing *Steel Co. v. Citizens for a Better Environment*, 525 U. S. 83, 93-99 (1998)). Standing is a "bedrock constitutional requirement" for subject matter jurisdiction of a federal court. *United States v. Texas*, 599 U.S. 670, 675 (2023). Each plaintiff bears the burden of establishing standing. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

Additionally, a court must view the claims asserted in each consolidated case separately to determine whether standing and subject matter jurisdiction exist. *Langley v. Jackson State Univ.*, 14 F.3d 1070, 1072 n.5 (5th Cir. 1994). *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 287 (5th Cir. 1989). "Consolidation does not cause one civil action to emerge from two; the actions do not

lose their separate identity; the parties to one action do not become parties to the other." *EEOC v. West Louisiana Health Services, Inc.*, 959 F.2d 1277, (5th Cir. 1992) (internal quotations omitted). Thus, the Court's subject matter jurisdiction over the now-dismissed action brought by the United States, which was originally consolidated with the present case, is not sufficient to establish subject matter jurisdiction over this case brought by Plaintiffs. Similarly, the later-filed case of *La Union del Pueblo Entero, et al. v. Abbott*, et al, No. 1:24-270-DAE, is irrelevant to the determination of Plaintiffs standing.

### A. PLAINTIFFS LA AND GATEWAYS HAVE NO STANDING TO BRING THIS ACTION.

#### 1. LA Standing Allegations.

LA alleges that it is a "nonprofit legal services organization" that serves "legal needs" of "low-income noncitizens and asylum seekers." ECF No. 1 at ¶ 7. LA asserts that "[a] significant portion" of the clients it serves "have recently entered [the United States] without inspection. These community-based clients have been released after an initial arrest by Customs and Border Protection (CBP) or Immigration and Customs Enforcement officers (ICE), or they have never encountered a federal immigration officer." *Id.* at ¶ 49. In other words, LA asserts that a "significant" portion of its clients are illegal aliens who have recently violated federal immigration laws, such as 8 U. S. C. § 1325 (Improper Entry by Alien).

LA alleges that S.B. 4 "will require Las Americas to restructure its services" in various ways. *Id.* at ¶ 51. First, LA claims S.B. 4 will require it "to dedicate more resources" to serve those clients who may be detained in the Texas "state system created by S.B. 4," or who may not receive referrals to other organizations and lawyers in the United States. *Id.* Next, LA claims it will need to "develop wholly new materials and resources" and "to develop and implement new advocacy models" because of S.B. 4. *Id.* at ¶¶ 54, 55. Finally, LA alleges its ability to fulfill its mission will be impaired because S.B. 4 will "decrease the number of non-citizens it is able to assist" and "divert resources" away from those it now serves. *Id.* at ¶¶ 56, 57, 59.

### 2. Gateways Standing Allegations.

Gateways alleges that it provides "direct representation to people appearing in the San Antonio Immigration Court," and "legal orientation, immigration workshops, and pro bono legal representation at immigrant detention facilities in Taylor, Pearsall, and Karnes City, Texas." *Id.* at ¶ 60. Gateways claims S.B. 4 will "frustrate [its] mission to provide free, culturally sensitive, trauma-informed legal representation to individuals and families seeking asylum and other forms of humanitarian immigration relief in the United States" and "to represent low-income noncitizens in securing asylum and other forms of immigration relief." *Id.* at ¶¶ 61, 62.

Gateways also claims S.B. 4 will "eliminate [its] ability to assist noncitizens in securing protection because they will be detained and removed before they can seek federal protections" and "detrimentally affect the representation that [it] provides crime victims eligible for immigration relief, as [those victims] will fear arrest and deportation should they report their victimization." *Id.*

Gateways also asserts that S.B. 4 will force it to "divert organizational resources and develop new programming" because "[i]n addition to providing legal services, a central feature of [its] mission is to engage and educate immigrant communities and local stakeholders about the immigration system and individuals' rights in the immigration process." *Id.* Gateways claims that it "regularly holds trainings on these topics in the communities it serves," but "will have to divert its resources to educate clients and community members about the impact of S.B. 4." *Id.* at ¶ at 64. Gateways claims this will require "time and effort" and it "anticipates needing to make significant changes to the community education materials it uses to train staff, community members, lawyers, and others." *Id.* at ¶ 65.

### 3. LA and Gateways Claim Only Organizational Standing, and Base that Claim on "Frustration of Mission" and "Diversion of Resources" Theories That are No Longer Viable.

LA and Gateways do not claim standing based on any alleged injuries by S.B. 4 to potential future clients. Instead, they claim standing based only on alleged injuries that *may* be caused by

S.B. 4 to LA and Gateways themselves as organizations. Thus, this is merely a claim of "organizational standing."[2]

Moreover, LA and Gateways do not claim they have actually suffered any injuries to date from S.B. 4. They claim only that each non-profit organization will suffer future injuries if S. B. 4 is ever enforced. As the Supreme Court recently stated, an injury that is relied on for standing "must be actual or imminent, and not speculative—meaning that the injury has *already occurred* or be *likely to occur soon*." *FDA v. Alliance for Hippocratic Medicine*, 602 U. S. 387, 381 (2024) (emphasis added). "The threat of future injury must be '*certainly* impending'; mere allegations of possible future injury will not suffice." *James v. Hegar,* 86 F.4th 1076, 1081 (5th Cir. 2023) (emphasis in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U. S. 398, 409 (2013)). LA and Gateways fail to meet that standard.

Here, LA and Gateways do not claim—nor could they claim—that S.B. 4 regulates either LA or Gateways itself.[3] Where a plaintiff challenges the government's regulation of *someone else*, as in this case, "standing is not precluded but it is ordinarily substantially more difficult to establish." *Hippocratic Medicine*, 602 U.S. at 382 (quoting *Lujan v. Defenders of Wildlife*, 504 U. S. 504 U. S. 555, 562 (1992)).  Moreover, neither LA nor Gateways claim any concrete financial injury, or injury to their property, caused by S.B. 4. Instead, LA and Gateways claim that enforcement of S.B. 4 will (1) frustrate or impair their ability to accomplish their self-described non-profit "missions" to serve the legal needs of illegal alien clients; and (2) "divert resources" from many other activities in support of their missions.

Under *Hippocratic Medicine*, LA and Gateways clearly lack standing to assert their claims in this case. 602 U.S. at 382. As was true of the plaintiff in that case, LA and Gateways "do not allege

---

[2]    As differentiated from "associational standing" or "third party standing."

[3]    LA and Gateways also do not claim that S.B. 4 regulates or has injured any current client of either organization. Presumably, they allege only that if and when S.B. 4 is enforced in the future, they will be asked by currently unknown future clients to provide legal representation related to S.B. 4 to such clients.

the kinds of injuries . . . that unregulated parties sometimes can assert to demonstrate causation." *Id*. at 385. Instead, LA and Gateways base their claim for standing on the theory that S.B. 4 will impair their "ability to provide services and achieve their organizational missions." *Id*. at 384. However, "[t]hat argument does not work to demonstrate standing." *Id*.

LA and Gateways argue that they will be required to divert resources to provide new or different services to its potential clients, or provide its services at different locations, in response to S.B. 4. The Supreme Court rejected a similar argument in *Hippocratic Medicine*, and this court should as well because the "causal link between [Texas's] actions and [LA and Gateways'] alleged injuries is too speculative or otherwise too attenuated to establish standing." *Id*. at 390.

The Court also more broadly rejected the idea that professional or other workers can have standing to challenge governmental actions that they claim will increase or change their workloads because the "asserted causal link is simply too speculative or too attenuated to support Article III standing." *Id*. at 393.

Numerous courts have applied *Hippocratic Medicine* to dismiss cases brought by plaintiffs asserting organizational standing based on diversion-of-resources or frustration-of-mission allegations strikingly like those made by LA and Gateways. *See e.g.*, *Free Speech Coalition v. Knudsen*, 2024 U. S. Dist. LEXIS 192015, 2024 WL 4542260 (D. Mont. 2024) at **28-29 (coalition of businesses, individuals, and a trade association lacked organizational standing to challenge Montana law based on claim that the law would frustrate mission and divert resources); *Coalition on Homelessness v. City and County of San Francesco*, 2024 U. S. Dist. LEXIS 219766, 2024 WL 4982989 (N. D. Cal. 2024) at *31 (coalition lacked organizational standing because "proffered injury amounts to a frustration-of-mission and diversion-of-resources theory that is no longer viable."); B*iden v. Snap, Inc.*, 2025 U. S. Dist. LEXIS 31642 (C. D. Cal. 2025) at **17-18 (foundation lacked organizational standing based on claim of frustration of mission and diversion of resources); *Fakhreddin v. Univ. of Pa.*, 2025 U. S. Dist. LEXIS 16373, 2025 345089 (E. D. Pa. 2025) at **7-9 (faculty group lacked organizational standing based on claim of frustration of purpose and diversion of resources); *Lawson v. Hargett*, 2024 U. S. Dist. LEXIS 147510, 2024 WL

3867526 (M. D. Tenn. 2024) at **43-50 (League of Women Voters lacked organizational standing to challenge election law provisions based on alleged diversion of resources); *Plant Based Foods Ass'n v. Stitt*, 739 F. Supp. 3d 966, 975-76 (W. D. Okla. 2024) (association lacked organizational standing to challenge constitutionality of state statute based on claimed diversion of resources and frustration of mission); *Front Range Equine Rescue v. Vilsack*, 2024 U .S. Dist. LEXIS 185845 (D. D. C. 2024) at **15-19 (non-profit lacked organizational standing based on frustration of mission and diversion of resources); *N. C. Alliance for Retired Americans v. Hirsch*, 741 F. Supp. 3d 318, 331-32 (E. D. N. C. 2024) (plaintiff lacked organizational standing to challenge state law based on asserted frustration of mission).

*Sarafin v. Hawai'i Pub. Housing Authority*, 2024 U. S. Dist. LEXIS 234366, 2024 WL 5246597 (D. Haw. Dec. 30, 2024), like this case, involved a non-profit legal services provider. Plaintiff Legal Aid Society of Hawai'i ("LASH"), whose "mission is to address critical legal needs through high quality legal advocacy, outreach, and education in the pursuit of fairness and justice", *id*. at **22-23, sued to challenge acts and omissions of the Hawai'i Public Housing Authority as violative or federal and state fair housing laws. LASH alleged that "Defendants' unlawful actions have required LASH to divert resources to addressing those actions, resulting in a frustration of LASH's mission." 2024 U. S. Dist. LEXIS at *11.

The District Court found these allegations insufficient and dismissed LASH's claims for lack of standing. "[T]he fact that responding to Defendants' allegedly discriminatory housing practices in general has caused LASH to reduce the time and resources it expends on 'other mission-critical activities' does not constitute an actionable injury in fact under *Hippocratic Medicine* and *Arizona Alliance* because such harm must be 'an actual and concrete harm' that 'directly and actually affect[s] the organization's 'core' activities , not merely its 'abstract social interests'." 2024 U. S. Dist. LEXIS at *11 (quoting *Hippocratic* Medicine, 602 U. S. at 395, and *Ariz. All. For Retired Ams. v. Mayes*, 117 F.4th 1165 (9th Cir. 2024), rehearing *en banc* granted and opinion vacated, 2025 U. S. App. LEXIS 6367 (9th Cir. March 18, 2025)). "No matter how much a defendant's conduct can be said to frustrate an organization's abstract mission, alleged injuries

8

to an organization's 'general legal, moral, ideological, and policy concerns do not suffice on their own to confer Article III standing to sue in federal court." *Id*.

*Legal Aid Chicago v. Hunter Props. Inc*., 2024 U. S. Dist. LEXIS 177188, 2024 WL 4346615 (N. D. Ill. 2024), also shows that LA and Gateways have no standing. The District Court there held that a legal services provider lacked organizational standing where it challenged defendants' "no evictions policy" in its applications process for apartments. *Id*. Plaintiff's claimed injury was that defendant "forced Legal Aid Chicago to devote more resources to its work representing clients in eviction matters and engaging in advocacy related to housing issues," and thereby "made it harder for Legal Aid Chicago to accomplish its mission." *Id*. The Court rejected these allegations as insufficient for standing, stating "[i]t is hard to see how working on eviction cases or sealing eviction records is an injury, let alone a harm caused by the alleged policy of Hunter Properties. . . An organization's *raison d'etre* is not simultaneously an injury that establishes Article III standing." *Id*. at **27-28. The defendant's actions did not force the plaintiff to "stop her work and do something well outside her job description before she could resume treating patients. That would be an impairment of the doctor's 'core mission' of treating patients. Merely giving a doctor more patients is not." *Id*.

That is precisely the case here. LA and Gateways' claimed mission is to provide legal services and related outreach and education to non-citizens, including illegal aliens. S.B. 4 does not, and could not, cause an injury in fact to those organizations that could support Article III standing under *Hippocratic Medicine*. Their claims should be dismissed for lack of standing and subject matter jurisdiction.

### B. EL PASO COUNTY LACKS STANDING TO SUE STATE DEFENDANT MARTIN TO BLOCK TEXAS STATE CRIMINAL LAW.

#### 1. El Paso County's Standing Allegations.

El Paso County is one of the 254 counties in Texas. It was created by the Texas Legislature pursuant to Article 9 of the Texas Constitution. Unlike cities, counties have no "home rule"

authority; thus, counties like El Paso County have no powers other than those granted to them by the State of Texas. These powers granted by the State do *not* include suing State officials to thwart the enforcement of the State's duly enacted criminal laws. El Paso County cites no legal authority to sue the State of Texas or State officials to block enforcement of state criminal laws.

Like the other Plaintiffs, El Paso County claims standing to challenge S.B. 4 in this case based solely on alleged injuries to the County—i.e., organizational standing. It makes the now-familiar allegations of "diversion of resources" and "frustration of mission." El Paso County claims that S.B. 4 will cause it to expend additional resources on its jail system, its public defender system, its judicial system, and on law enforcement. *Id.* ¶ 71-75. It asserts that "under S. B. 4, the County will be forced to expend its limited resources to implement the law, likely redirecting funds from existing programs and needs." *Id*. at ¶ 71.[5]

El Paso County also asserts that part of its "strategic vision" is to "foster inclusion and quality of life for local immigrants and refugees and promoting collaboration with external partners such as Mexico". Complaint at ¶ 69. El Paso County claims that S. B. 4 will interfere with this "vision" and with its programs to provide services to illegal aliens (whom it refers to euphemistically as "individuals who are undocumented" or "migrants"). Complaint at ¶ 69-70.

The County claims that S. B. 4 will frustrate its claimed mission in two additional ways. El Paso County says one of its top priorities is "Leading in Justice Reform." It claims that S. B. 4 "will directly frustrate the County's goal to lead in justice reform by forcing it to incarcerate persons that may not be a high risk to public safety." *Id*. at ¶ 76. The County also alleges that it

---

[5] In Texas, it is not the County (governed by the County Commissioners' Court), but the separately elected Sheriff that has responsibility for management and operation of the county's jail system and is the chief law enforcement officer of the county, as well as the executive officer of the county and district courts. Thus, even if these "injuries" alleged by El Paso County could support standing under Article III—and they cannot—the proper plaintiff would be the elected Sheriff of El Paso County, Oscar Ugarte, and not El Paso County. But the duty of Texas Sheriffs is to enforce state criminal laws, not thwart their enforcement. See *Texas Ass'n of Counties Handbook* (2025).

funds and manages legal services for "the most vulnerable residents of the County." El Paso County claims that S.B. 4 "directly frustrates the County's efforts" by "diluting the trust" the community has in its local government. *Id.* at ¶ 77.

### 2. El Paso County Only Asserted Injury from S.B. 4 is too Attenuated to Establish Standing under *Hippocratic Medicine*.

El Paso County lacks standing to sue to challenge S.B. 4, a criminal law enacted by the State of Texas. El Paso does not claim standing to sue on behalf of its citizens (or illegal aliens passing through or residing in the County), and thus claims only organizational standing. The County *speculates* that enforcement of S.B. 4 would cause additional costs to the County related to resulting arrests and incarceration of accused and convicted offenders who violate S.B. 4.

If this were sufficient to create Article III standing, then every one of the 254 counties of Texas would have standing to challenge any state criminal law it does not want to enforce. Indeed, every county, city, and other political subdivision in every state in the Union would have standing to challenge any criminal law its parent state enacts, because all such criminal laws potentially engender some arrest and jail costs for them. Of course, that is not a sufficient injury in fact for Article III standing.

S.B. 4 does not regulate El Paso County. Thus, the County is an unregulated entity for which standing is "ordinarily substantially more difficult to establish." *Hippocratic Medicine*, 602 U. S. at 382. To overcome that barrier, El Paso County merely offers the familiar "diversion of resources" and "frustration of mission" arguments which, as previously discussed, the Supreme Court in *Hippocratic Medicine* found are too speculative and too attenuated to support standing under Article III. *Id.*

Even so, the arguments El Paso County offers are particularly weak. Counties are integral parts of the State, and their central mission is to *carry out* the laws of the State enacted for the benefit of the State's citizens. The primary mission of counties is *not* to provide services to *noncitizens* who violate state law and have entered the State, and remain in it, in violation of federal

immigration laws. Nor is it within the powers of Texas counties—which have no powers other than those granted by the state – to determine that their self-proclaimed "vision" and "priorities" outrank and take precedence over the priorities of the democratically-elected Texas Legislature and the Governor of Texas as embodied in S.B. 4.

It simply is not within the powers granted to El Paso County to second-guess the Texas State Government or the federal government. In *El Paso County v. Trump*, 982 F.3d 332 (5th Cir. 2020), the Fifth Circuit held that El Paso County lacked standing to challenge government use of funds to build a border wall, rather than on a construction project at Fort Bliss. The County alleged that it would suffer economic injury from the redirection of the funds by reason of loss of tax revenues. The Fifth Circuit found the impact on El Paso County too indirect and attenuated to support standing. Such "incidental and attenuated harm is insufficient to grant a state or county standing." *Id.* at 341.

El Paso County will continue to perform its core governmental mission regardless of whether S.B. 4 is enforced or not. It will continue to enforce Texas criminal and civil laws for the protection and benefit of Texas citizens and provide needed governmental services to them. These core services include building and maintaining roads, maintenance of county buildings and facilities, election administration, tax collection, and many others. But they do not include determining what state criminal laws may be enforced.

Under *Hippocratic Medicine*, El Paso County has alleged no injury in fact caused by S. B. 4 that is not too attenuated or speculative to support Article III standing. The Court therefore lacks subject matter jurisdiction of this action and should dismiss it pursuant to Federal Rule 12(b)(1).

## II.   PLAINTIFFS' SUIT AGAINST THE DIRECTOR OF DPS IS BARRED BY STATE SOVEREIGN IMMUNITY AND THE ELEVENTH AMENDMENT.

Plaintiffs sue Freeman F. Martin, the Director of the Texas Department of Public Safety since December 1, 2024, solely in his official capacity. Such a suit is effectively a suit against the State of Texas. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). "Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign

immunity." *National Press Phot. Ass'n v. McCraw*, 90 F.4th 770, 785 (5th Cir. 2024) ("*McCraw*"); *Texas Dem. Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020).

The legal fiction of *Ex Parte Young,* 209 U.S. 123 (1908), provides a narrow exception to State sovereign immunity in the "subset of cases to which it applies." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024). *Ex Parte Young* "permits plaintiffs to sue a state officer in his official capacity for an injunction to stop *ongoing* violations of federal law." *Id.* (emphasis added). There are no such ongoing violations of S.B. 4.

As in *McCraw*, this is a pre-enforcement challenge to a Texas statute. S.B. 4 has not been enforced to date against anyone, much less against any of the Plaintiffs in this case. In those circumstances, the Fifth Circuit concluded in *McCraw*:

> Because Plaintiffs have provided no evidence that Defendants will enforce Chapter 423, we hold that the *Ex Parte Young* exception does not apply to [the Director of the Texas Department of Public Safety and the Chief of the Texas Highway Patrol] and they are entitled to sovereign immunity.

90 F.4th at 787.

Similarly, in *Mi Familia Vota v. Ogg*, the Fifth Circuit found that District Attorney Ogg had taken no action to enforce the Texas Election Code provisions challenged in that case. 105 F.4th at 330. The Court found that "some affirmative action on the part of the named defendant" to enforce the challenged law was required. In its absence, the Court concluded that Ogg was not subject to suit under *Ex Parte Young* and that she was entitled to sovereign immunity. *Id.* at 333.

The same conclusion applies in this case. Plaintiffs have not alleged or provided any evidence of any "affirmative action" by State Defendant Martin, the new Director of DPS, to enforce S. B. 4 against them.

As this Court has recognized, *see* Order Clarifying/Modifying Preliminary Injunction Issued on February 29, 2024 (ECF No. 77 in Case No. 1:24-cv-8-DAE) circumstances have changed significantly since the Court entered its preliminary injunction on February 29, 2024.

1. On January 20, 2025, President Trump issued his Executive Order 14165,

13

> which among other actions, effectively closes the Texas/Mexico border.
>
> 2. On January 20, 2025, President Trump issued Executive Order 14159, directing Federal agencies to seek state and local cooperation in border enforcement; and
>
> 3. On January 29, 2025, Texas Governor Greg Abbott issued a series of his own Executive Orders authorizing certain actions by Texas law enforcement and Texas State Guard personnel regarding activities on the Texas/Mexico border.

The Court correctly stated that actions taken by Texas DPS in 2025 in accordance with the above Executive Orders of the President and Governor have not violated and do not violate the Court's preliminary injunction against enforcement of S. B. 4.

By the same logic, the fact that these actions are permissible—functions state officers could carry out under S.B. 4 to assist federal officers carrying out federal laws—proves that this pre-enforcement facial challenge fails: S.B. 4 is plainly lawful in at least some applications; Texas DPS officers today are actively apprehending, arresting, and detaining illegal aliens in Texas in similar circumstances as they would if acting under S.B. 4. It is non-sensical to claim that exercises of state power to assist implementation of federal laws constitutes "ongoing violations of federal laws." *Mi Familia Vota*, 105 F.4th at 325.

As in *McCraw* and *Mi Familia Vota*, the narrow *Ex Parte Young* exception to State sovereign immunity does not apply in this case. Plaintiffs cannot claim in good faith that there are any *ongoing* violations of federal law by State Defendant Martin through enforcement of S. B. 4. Accordingly, State Defendant Marin has State sovereign immunity from suit and liability.

### III. PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW.

#### A. TEXAS'S INVOCATION OF SELF-DEFENSE AUTHORITY UNDER THE CONSTITUTION—NOW BOLSTERED BY PRESIDENTIAL ACTIONS—NEGATES PLAINTIFFS' STATUTORY PREEMPTION CLAIM.

President Trump's Executive Orders and Proclamations confirm that Plaintiffs' claims fail. A second, non-justiciable finding that invasion conditions exist shows that facial relief was always

improper. A now-shared goal of immigration enforcement means the previous assessment of the equitable factors no longer holds. And the possibility of collaboration—now actualized—undercuts the district court's preemption analysis based on enforcement priorities.

The Constitution provides that the federal government "shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion." U.S. CONST. art. IV, §4. In a letter on Inauguration Day, Governor Abbott explicitly asked the President to exercise his federal self-defense authority under this provision based on the same conditions that justified the Governor's invocation of self-defense authority under Article I, Section 10, Clause 3: "The en masse entry into this country by violent criminals, known terrorists, and other hostile foreign actors murdering at will is an invasion, as FBI officials told Congress just last year. These criminals come in open defiance of our laws and often by force, outfitted with body armor, burying improvised explosive devices, and decorating trees with trophies from sexual assaults." X, Greg Abbott (@GregAbbott_TX) (Jan. 20, 2025, 12:04 PM), https://x.com/GregAbbott_TX/status/1881402347617972410.

Later that day, the President echoed the Governor's assessment. In Executive Order 14,165, President Trump recognized that the United States has been invaded:

> Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level. Millions of illegal aliens from nations and regions all around the world successfully entered the United States where they are now residing, including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent.

*Securing Our Borders*, Exec. Order No. 14,165, 90 Fed. Reg. 8,467, 8,467 (Jan. 20, 2025). In a Proclamation, the President determined that these conditions triggered the federal self-defense authority under Article IV, Section 4:

> By the power vested in me by the Constitution and the laws of the United States, I have determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States. Accordingly, I am issuing this Proclamation based on my express and inherent powers in Article II of the Constitution of the United States, and in faithful execution of the immigration laws passed by the Congress, and suspending the physical entry of aliens involved in an invasion into the United States across the

southern border until I determine that the invasion has concluded.

*Guaranteeing the States Protection Against Invasion*, Proc. No. 10,888, 90 Fed. Reg. 8,333, 8,335 (Jan. 20, 2025).

These developments are highly relevant. First, Texas has explained why invocation of its own authority under the Self-Defense Clause, U.S. Const. art. I, §10, cl. 3, is a political question. *See, e.g.*, Texas.Br.39; Post-Argument Supplemental En Banc Brief for Appellants at 1-5, *United States v. Abbott*, 110 F.4th 700 (5th Cir. 2024) (No. 23-50632), ECF 229. Texas has also explained that plaintiffs' facial challenges to S.B.4 fail because they are based on federal statutes and the U.S. Constitution trumps federal statutory law. *See* Texas.Br.39-40. At least some applications of S.B.4 are plainly lawful under the Self-Defense Clause—for example, against members of transnational cartels. *See* Texas.Br.36-40. That is sufficient to defeat a facial challenge because plaintiffs cannot "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added). In other words, to prevail the plaintiffs would need to show S.B.4 is unlawful "in every application." Texas R. 28(j) Letter, ECF 200 (citing *United States v. Rahimi*, 602 U.S. 680 (2024)).

This Court has previously disagreed that the Self-Defense Clause is relevant to the preemption issues here because—in the panel majority's preliminary view—federal statutory law preempts S.B.4 notwithstanding Texas's invocation of its own sovereign authority to defend itself.

President Trump's recognition of an invasion thus not only bolsters Texas's original invocation of a constitutional affirmative defense, but fundamentally undermines Plaintiffs' claims. As the federal government explained to the en banc Court in *United States v. Abbott*, 110 F.4th 700 (5th Cir. 2024), whether an invasion is occurring is a political question committed (in the federal government's view) to the political branches of the federal government. See, e.g., Post-Argument Supplemental En Banc Brief for Appellee at 2, No. 23-50632, ECF 231. Because the federal government now recognizes an invasion, including with respect to "potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent," 90 Fed. Reg. 8,467 at 8,467, applying S.B.4 to such individuals

cannot be preempted. Accordingly, there is no basis for a facial challenge to S.B.4, thus defeating a preliminary injunction. Under the Constitution, valid federal statutory law applies "unless" a State is "actually invaded." U.S. CONST. art. I, §10, cl. 3. Given the President's non-justiciable recognition of an invasion—in addition to the Governor's recognition of the same—any statutory preemption argument necessarily fails with respect to at least some applications of S.B.4.

> **B.** **ALTERNATIVELY, RECENT FEDERAL-STATE COLLABORATION SHOWS WHY THIS PRE-ENFORCEMENT CHALLENGE NECESSARILY FAILS AS A MATTER OF LAW.**

What was once a possibility of federal-state collaboration is now an actuality. Texas had previously highlighted how federal laws authorize collaboration with State personnel on immigration enforcement. *See, e.g.*, 8 U.S.C. § 1357(g). All that has changed is the federal government's enforcement priorities: The district court once thought application of S.B.4 would "frustrate federal policies," but now President Trump is determined to enforce the INA with the help of the States. The Supremacy Clause gives priority to federal laws, "not the criminal law enforcement priorities or preferences of federal officers." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). But respectfully, that is all this Court's preliminary injunction ever rested on—the shifting sand of enforcement priorities, not the actual text of immigration laws.

The federal government now has expressly invited States to cooperate with it in enforcing federal immigration laws. Executive Order 14,159 directs the Secretary of Homeland Security "[t]o ensure [that] State and local law enforcement … can assist with the protection of the American people" by "authoriz[ing] State and local law enforcement officials … to perform the functions of immigration officers." 90 Fed. Reg. 8,443 at 8,445. And Executive Order 14,165 declares that "[i]t is the policy of the United States" to "enact[] Federal-State partnerships to enforce Federal immigration priorities." 90 Fed. Reg. 8,467 at 8,467.

In response to these and other actions by the President, Governor Abbott issued five Executive Orders aimed at assisting federal officials in regaining and maintaining border security. The orders specifically direct State agencies and officials to:

- deploy "any physical infrastructure to improve operational security at the southern border," Executive Order GA-50, 50 Tex. Reg. 807, 807 (2025);
- eliminate "the operations of designated foreign terror organizations, like Mexican cartels … by sharing intelligence" with the federal government, Executive Order GA-51, 50 Tex. Reg. 807, 808 (2025);
- lease facilities "suitable and available for use by Immigration and Customs Enforcement" to the federal government, Executive Order GA-52, 50 Tex. Reg. 808, 809 (2025); • develop a plan to assist the federal government in securing the border, Executive Order GA-53, 50 Tex. Reg. 809, 810 (2025); and
- "assist federal actors … with carrying out functions under federal immigration laws," Executive Order GA-54, 50 Tex. Reg. 810, 810 (2025).

Consistent with this last order, the Governor entered into a Memorandum of Understanding with U.S. Customs and Border Protection authorizing Texas National Guard soldiers to investigate, arrest, and transport illegal aliens. That includes transport "for the purposes of removal and/or repatriation." CBP-TNG MOU art. V (Jan. 31, 2025); see also X, Ali Bradley (@AliBradleyTV) (Feb. 2, 2025, 9:29 AM), https://x.com/AliBradleyTV/status/1886436756741877882 (attaching memorandum). Applying S.B.4 is one additional way that Texas personnel may help federal officers regain and maintain operational control of the border.

Plaintiffs' facial challenge fails if even *a single* application of S.B. 4 is lawful. Current federal-state collaboration shows at least some applications would not conflict with federal law and thus are not preempted.

### C.  FINALLY, PLAINTIFFS HAVE NO FREESTANDING "PREEMPTION" CAUSE OF ACTION.

This Court previously concluded that the United States has an implied cause of action in equity to press preemption challenges to enjoin the enforcement of a state criminal code. State Defendants continue to respectfully disagree. That view not only contradicts more than 300 federal statutes that go out of their way to provide federal authority to sue in equity—all of which would be pointless if this Court's view of *In re Debs* was correct. It also contradicts the centuries-old separate sovereigns doctrine, which recognizes that federal and state sovereigns may enact and

enforce separate—and overlapping—criminal codes. Title 18 of the U.S. Code does not preempt the field of state criminal laws.

But even if this Court is right that the United States has long had an unused license to sue in equity to enforce the Supremacy Clause by countermanding overlapping state criminal laws, that is no help to these private Plaintiffs. As to them, at least, a simple rule obtains: "It is equally apparent that the Supremacy Clause is not the 'source of any federal rights' … and certainly *does not create a cause of action*." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324-25 (2015) (internal quotation and citation omitted) (emphasis added).

## CONCLUSION

State Defendant Martin is entitled to State sovereign immunity from this suit and requests that the Court grant such immunity and dismiss Plaintiffs' claims against him prior to further subjecting him to suit herein and prior to any consideration of the merits, and further requests that the Court dismiss such claims against State Defendant Martin for lack of standing and lack of subject matter jurisdiction. The Court should grant judgment in favor of State Defendant Martin, award State Defendant Martin his costs herein, and grant State Defendant Martin such other and further relief to which he may be entitled. Alternatively, State Defendant Martin asks this Court to dismiss claims on the merits which plainly fail as a matter of law.

| | |
|---|---|
| Date: May 5, 2025 | Respectfully submitted. |
| | |
| **KEN PAXTON** | **ZACHARY BERG** |
| Attorney General | Special Counsel |
| | Tex. State Bar No. 24107706 |
| **BRENT WEBSTER** | |
| First Assistant Attorney General | **WADE A. JOHNSON** |
| | Special Counsel |
| **RALPH MOLINA** | Texas Bar No. 24062197 |
| Deputy First Assistant Attorney General | |
| | **WILLIAM H. FARRELL** |
| **RYAN D. WALTERS** | Assistant Attorney General |
| Deputy Attorney General for Legal Strategy | Texas Bar No. 00796531 |
| | |
| **RYAN G. KERCHER** | |
| Chief, Special Litigation Division | **OFFICE OF THE ATTORNEY GENERAL OF TEXAS** |
| Texas Bar No. 24060998 | Special Litigation Division |
| | P.O. Box 12548, Capitol Station |
| **KATHLEEN T. HUNKER** | Austin, Texas 78711-2548 |
| Deputy Chief, Special Litigation Division | Tel.: (512) 463-2100 |
| Texas Bar No. 24118415 | Ryan.kercher@oag.texas.gov |
| | Kathleen.hunker@oag.texas.gov |
| /s/ *David Bryant* | David.Bryant@oag.texas.gov |
| **DAVID BRYANT** | Zachary.berg@oag.texas.gov |
| Senior Special Counsel | Wade.johnson@oag.texas.gov |
| Tex. State Bar No. 03281500 | Biff.farrell@oag.texas.gov |
| | |
| | **COUNSEL FOR STATE DEFENDANT MARTIN** |

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 5, 2025 and that all counsel of record were served by CM/ECF.

/s/ *David Bryant*
**DAVID BRYANT**

20