# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

LAS AMERICAS IMMIGRANT ADVOCACY
CENTER; AMERICAN GATEWAYS; AND THE
COUNTY OF EL PASO, TEXAS,

*Plaintiffs,*

v.

FREEMAN F. MARTIN, IN HIS OFFICIAL
CAPACITY AS DIRECTOR OF THE STATE OF
TEXAS DEPT OF PUBLIC SAFETY, AND JAMES
MONTOYA, IN HIS OFFICIAL CAPACITY AS
DISTRICT ATTORNEY FOR THE 34TH
DISTRICT,

*Defendants.*

LA UNION DEL PUEBLO ENTERO, SARAH
DOE, MARY DOE, JOHN DOE, AND JAMES
DOE,

*Plaintiffs,*

v.

GREGORY ABBOTT, ET AL.,

*Defendants.*

CASE NO. 1:23-CV-1537-DAE (LEAD CASE)

CONSOLIDATED WITH

CASE NO. 1:24-CV-270-DAE

## STATE DEFENDANTS' MOTION TO DISMISS AND ANSWER TO LUPE COMPLAINT

Defendant Gregory Abbott, in his official capacity as Governor of the State of Texas,
Freeman F. Martin, in his official capacity as Director of the Texas Department of Public Safety,
and Warren K. Paxton, in his official capacity as the Attorney General of Texas (collectively "State
Defendants") respectfully file this Motion to Dismiss and Answer in response to Plaintiffs', La
Union del Pueblo Entero et al., ("LUPE Plaintiffs") Complaint for Declaratory and Injunctive
Relief (ECF No. 1, Case No. 1:24-cv-270-DAE).

## MOTION TO DISMISS

### INTRODUCTION

State Defendants[1] move to dismiss LUPE Plaintiffs' Complaint for Declaratory and Injunctive Relief filed in Case No. 1:24-270-DAE (the "LUPE Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) and the Court's Order of April 4, 2025 (ECF No. 49). Plaintiffs lack standing to sue and all of their claims against State Defendants are barred by state sovereign immunity and the Eleventh Amendment to the United States Constitution. Accordingly, this Court lacks subject matter jurisdiction over this case, and Plaintiffs' action should be dismissed.

Subject to the foregoing motion to dismiss, and without waiver thereof, State Defendants hereafter file their Answer to the LUPE Complaint.

### BACKGROUND

The Texas Legislature in late 2023 enacted S.B. 4. Governor Greg Abbott signed S.B. 4 into law on December 18, 2023, and the statute would have gone into effect on March 4, 2024. However, within days of the Governor's signature, various plaintiffs filed lawsuits to block and invalidate S.B. 4. The Court granted a preliminary injunction against enforcement of S.B. 4 on February 29, 2024, which remains in place.

After S.B. 4 was preliminarily enjoined by this Court, LUPE Plaintiffs filed their Complaint on March 12, 2024. (ECF No. 1, No. 1-24-cv-00270-DAE). That case was promptly stayed by this Court and remains stayed. However, the Court on April 3, 2025, directed Defendants to respond to the LUPE Complaint within 30 days.

The LUPE Plaintiffs asserted in their Complaint that S.B. 4 violates the Supremacy Clause

---

[1] The United States of America on March 18, 2025, filed its voluntary dismissal of Case No. 1:24-cv-0008-DAE pursuant to Federal Rule of Civil Procedure 41(a)(1)(A) dismissing claims in that case against The State of Texas, Greg Abbott in his official capacity as Governor of Texas, and the Texas Department of Public Safety.

of the United States Constitution. They assert a claim for relief for "Preemption" and assert that S.B. 4 is preempted as to all its provisions. They claim that S.B. 4 "encroaches upon the federal government's exclusive authority to regulate immigration and interferes with the federal immigration system carefully created by Congress." LUPE Complaint at ¶ 2. The LUPE Plaintiffs assert additional claims that S.B. 4 "violates the Fourth, Eighth, and Fourteenth Amendment to the U. S. Constitution by subjecting individuals to unreasonable seizures and to the cruel and unusual punishment of exile from the U. S., and by depriving individuals of their liberty based on impermissibly vague and overbroad language defining criminal offenses." LUPE Complaint at ¶ 3.

Because S.B. 4 was enjoined before its effective date, Plaintiffs' claims raise a pre-enforcement facial challenge to S.B. 4's constitutional validity. Therefore, they have the burden of showing that there are no possible applications of S.B. 4 that would not be unconstitutional.

Recently, the United States has taken a cooperative tack towards Texas's involvement in immigration enforcement. The United States voluntarily dismissed its lawsuit that had challenged S.B. 4 on preemption grounds. *See* ECF No. 79, No. 1:24-cv-0008-DAE. Even earlier, on January 20, 2025, the President signed Executive Orders 14,159 and 14,165 directing federal immigration authorities to work with state and local law enforcement to help enforce the federal immigration laws. The United States Department of Homeland Security ("DHS") has entered into several Section 287(g) agreements with Texas agencies and is now actively cooperating with Texas law enforcement to enforce the federal immigration laws.

As part of this cooperative arrangement, DHS and Governor Abbott of Texas—both federal and State authorities—have instructed Texas DPS and the Texas National Guard to investigate, apprehend, arrest, detain, and remove illegal aliens in Texas. This new mandate substantially overlaps with the powers that S.B. 4 confers on state law enforcement agencies. Texas DPS is taking many of the same actions that S.B. 4 authorizes to assist federal immigration authorities.

**ARGUMENT**

## I.    PLAINTIFFS LACK STANDING

A federal court has an obligation in every case to assure itself that it has subject matter jurisdiction over the claims asserted by the plaintiffs. *SXSW, LLC v. Fed. Ins. Co.*, 83 F.4th 405, 407 (5th Cir. 2023), citing *Steel Co. v. Citizens for a Better Environment*, 525 U. S. 83, 93-99 (1998). Standing is a "bedrock constitutional requirement" for subject matter jurisdiction of a federal court. *United States v. Texas*, 599 U. S. 670, 675 (2023). Each plaintiff bears the burden of establishing standing. *FW/PBS, Inc. v. Dallas*, 493 U. S. 215, 231 (1990).

A court must view each consolidated case separately to determine whether standing and subject matter jurisdiction exist. *Langley v. Jackson State Univ.*, 14 F.3d 1070, 1072 n.5 (5th Cir. 1994). *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 287 (5th Cir. 1989). "Consolidation does not cause one civil action to emerge from two; the actions do not lose their separate identity; the parties to one action do not become parties to the other. As a consequence, the subsequent consolidation of two lawsuits did not give the district court subject matter jurisdiction to adjudicate this action [where no federal jurisdiction existed independently]." *EEOC v. West Louisiana Health Services, Inc.*, 959 F.2d 1277 (5th Cir. 1992), quoting *McKenzie v. United States*, 678 F.2d 571, 574 (5th Cir. 1982). Thus, with the Court's alleged subject matter jurisdiction over the dismissed Case No. 1:24-cv-0008-DAE now gone, private plaintiffs must independently establish subject matter jurisdiction of this Court over the two remaining cases.

Additionally, the LUPE Plaintiffs must show that standing exists not only at the outset of a case, but at each successive stage of the case. *See El Paso County v. Trump*, 982 F.3d 332, 337, 341 (5th Cir. 2020) ("Standing must exist at all stages of the litigation"). Because standing is essential to subject matter jurisdiction, it is an issue that cannot be waived, and federal courts are duty-bound to examine the basis of subject matter jurisdiction at all stages in the proceedings and dismiss if standing is lacking. *Reule v. Jackson*, 114 F. 4th 360, 365 (5th Cir. 2024).

The standing requirement entails that plaintiffs must show an injury in fact they have suffered as a result of the conduct of the defendant. Plaintiffs must show a concrete and

particularized, actual or imminent invasion by defendant of a legally protected interest. *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 560 (1991). The LUPE Plaintiffs have not done so and cannot do so as to any of the State Defendants, and therefore lack standing to bring this case. The Court therefore lacks subject matter jurisdiction as to their claims against State Defendants.

### A.  PLAINTIFF LUPE HAS NO STANDING TO BRING THIS ACTION.

#### 1.  <u>LUPE Standing Allegations.</u>

LUPE alleges that it is a "nonprofit membership organization" that engages in "community organizing" and provides "low-cost legal services". LUPE Complaint at ¶ 6. LUPE alleges that it also provides English classes, know-your-rights discussions, and "issue-based advocacy." LUPE Complaint at ¶ 52.

LUPE states that a majority of its legal services clients are non-detained non-citizens, and that a "significant" number of its clients may be "subject to arrest, detention, prosecution, incarceration, and removal" under S.B. 4. LUPE claims S.B. 4 will impair its ability to provide legal services to its clients because it will "interfere with access" to those who are arrested under S.B. 4 and have "open immigration cases with LUPE." LUPE Complaint at ¶ 56. Thus, LUPE alleges, S.B. 4 will reduce the number of people LUPE is able to serve and "decrease LUPE's annual revenue and future grant eligibility for this type of work if certain quotas are not met." *Id.*

Because it has limited resources, LUPE alleges that S.B. 4 will cause it to place its plans to hire an additional farm worker community organizer on hold in order to hire an "immigration-focused community organizer" to provide "community education about the offenses and penalties created by S.B. 4." LUPE Complaint at ¶ 58. Thus, LUPE says S.B. 4 will cause it to divert resources from other important activities. LUPE Complaint at ¶ 61. This diversion of resources LUPE alleges, "will thwart LUPE's mission of providing immigration legal services to non-detained non-U. S. citizens as part of its work to empower communities in the Rio Grande Valley." *Id.*

**2.**    **LUPE Claims Organizational Standing, and Bases that Claim on "Frustration of Mission" and "Diversion of Resources" Theories That are No Longer Viable.**

Thus, LUPE's standing allegations exclusively claim harm inflicted on LUPE's own mission and organization, rather than on its members. This is a claim of "organizational standing."[2]

LUPE does not claim, and could not plausibly claim, standing on the basis that S.B. 4 regulates LUPE itself.[3] Where a plaintiff challenges the government's regulation of *someone else*, as in this case, "standing is not precluded but it is ordinarily substantially more difficult to establish." *FDA* at 382, quoting *Lujan v. Defenders of Wildlife*, 504 U. S. 504 U. S. 555, 562 (1992). Moreover, LUPE does not claim it has suffered any concrete financial injury, or injury to property, caused by S.B. 4.

Instead, LUPE claims that potential future enforcement of S.B. 4 may (1) frustrate or impair its ability to accomplish its self-described non-profit "mission"; and (2) "divert resources" from many other activities in support of its organizational mission. But, as the Supreme Court recently stated, these types of injury do not meet the law of standing's requirement that an injury-in-fact "must be actual or imminent, and not speculative – meaning that the injury has *already occurred* or *be likely to occur soon*." *FDA v. Alliance for Hippocratic Medicine*, 602 U. S. 387, 381 (2024) (emphasis added). *Hippocratic Medicine* clarifies that organizational plaintiffs, like LUPE, cannot satisfy Article III by pointing to potential resource diversion or to frustration of their organizational mission. *See id.* at 393-95. Since these are LUPE's only professed injuries, it lacks standing.

As was true of the plaintiff in *Hippocratic Medicine*, LUPE does "not allege the kinds of

---

[2]    LUPE includes a single paragraph in its Complaint describing an unnamed "LUPE Member A" who apparently is not a plaintiff. LUPE Complaint at ¶ 62. However, LUPE does not allege that LUPE has standing to sue based on the alleged circumstances of a single member.

[3]    LUPE also does not claim that S.B. 4 regulates or has injured any current client of LUPE. Presumably, it alleges only that if and when S.B. 4 is enforced in the future, LUPE may be asked by currently unknown future clients to provide legal representation related to S.B. 4 to such clients.

injuries . . . that unregulated parties sometimes can assert to demonstrate causation." 602 U. S. at 385. Instead, LUPE bases its claim for standing on a theory nearly identical to the one rejected by the Supreme Court:

> According to the medical associations, FDA has "impaired" their "ability to provide services and achieve their organizational missions." That argument does not work to demonstrate standing.
>
> Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization. A plaintiff must show far more than simply a setback to the organization's abstract social interests.

602 U. S. at 394 (internal citations omitted).

The plaintiffs in *Hippocratic Medicine* unsuccessfully argued that the challenged government action would cause them to incur costs in response to that action and to divert resources from other activities to cover costs caused by the challenged government action. Here, LUPE makes substantially the same argument: that S.B. 4 if enforced would cause LUPE to divert its resources to provide new or different services to its potential clients, or provide its services at different locations, in response to S.B. 4. The Supreme Court rejected a similar argument in *Hippocratic Medicine:*

> [Plaintiffs claim] various monetary and related injuries that they allegedly will suffer as a result of FDA's actions – in particular diverting resources and time from other patients…. The causal link between FDA's regulatory actions and those alleged injuries is too speculative or otherwise too attenuated to establish standing.

602 U. S. at 390.

The Court also more broadly rejected the idea that professional or other workers can have standing to challenge governmental actions that they claim will increase or change their workloads.

> And if we were now to invent a new doctrine of doctor standing,

there would be no principled way to cabin such a sweeping doctrinal change to doctors or any other healthcare providers. Firefighters could sue to object to relaxed building codes that increase fire risks. Police officers could sue to challenge a government decision to legalize certain activities that are associated with increased crime. Teachers in border states could sue to challenge lax immigration policies that lead to overcrowded classrooms.

In sum, the doctors in this case have failed to establish Article III standing…. The asserted causal link is simply too speculative or too attenuated to support Article III standing.

602 U. S. at 393.

Numerous courts have applied *Hippocratic Medicine* to dismiss cases brought by plaintiffs asserting organizational standing based on diversion-of-resources or frustration-of-mission allegations strikingly like those made by LUPE. *Free Speech Coalition v. Knudsen*, 2024 U. S. Dist. LEXIS 192015, 2024 WL 4542260 (D. Mont. 2024) at **28-29 (coalition of businesses, individuals, and a trade association lacked organizational standing to challenge Montana law based on claim that the law would frustrate mission and divert resources); *Coalition on Homelessness v. City and County of San Francisco*, 2024 U. S. Dist. LEXIS 219766, 2024 WL 4982989 (N. D. Cal. 2024) at *31 (coalition lacked organizational standing because "proffered injury amounts to a frustration-of-mission and diversion-of-resources theory that is no longer viable."); *Biden v. Snap, Inc.*, 2025 U. S. Dist. LEXIS 31642 (C. D. Cal. 2025) at **17-18 (foundation lacked organizational standing based on claim of frustration of mission and diversion of resources); *Fakhreddin v. Univ. of Pa.*, 2025 U. S. Dist. LEXIS 16373, 2025 345089 (E. D. Pa. 2025) at **7-9 (faculty group lacked organizational standing based on claim of frustration of purpose and diversion of resources); *Lawson v. Hargett*, 2024 U. S. Dist. LEXIS 147510, 2024 WL 3867526 (M. D. Tenn. 2024) at **43-50 (League of Women Voters lacked organizational standing to challenge election law provisions based on alleged diversion of resources); *Plant Based Foods Ass'n v. Stitt*, 739 F. Supp. 3d 966, 975-76 (W. D. Okla. 2024) (association lacked organizational standing to challenge constitutionality of state statute based on claimed diversion of resources and frustration of mission); *Front Range*

*Equine Rescue v. Vilsack*, 2024 U .S. Dist. LEXIS 185845 (D. D. C. 2024) at \*\*15-19 (non-profit lacked organizational standing based on frustration of mission and diversion of resources); *N. C. Alliance for Retired Americans v. Hirsch*, 741 F. Supp. 3d 318, 331-32 (E. D. N. C. 2024) (plaintiff lacked organizational standing to challenge state law based on asserted frustration of mission).

*Sarafin v. Hawai'i Pub. Housing Authority*, 2024 U. S. Dist. LEXIS 234366, 2024 WL 5246597 (D. Haw. Dec. 30, 2024), like this case, involved a non-profit legal services provider. Plaintiff Legal Aid Society of Hawai'i ("LASH"), whose "mission is to address critical legal needs through high quality legal advocacy, outreach, and education in the pursuit of fairness and justice", *id*. at \*\*22-23, sued to challenge acts and omissions of the Hawai'i Public Housing Authority as violative or federal and state fair housing laws. LASH alleged that "Defendants' unlawful actions have required LASH to divert resources to addressing those actions, resulting in a frustration of LASH's mission." 2024 U. S. Dist. LEXIS at \*11.

The District Court found these allegations insufficient and dismissed LASH's claims for lack of standing. "[T]he fact that responding to Defendants' allegedly discriminatory housing practices in general has caused LASH to reduce the time and resources it expends on 'other mission-critical activities' does not constitute an actionable injury in fact under *Hippocratic Medicine* and *Arizona Alliance[4]* because such harm must be 'an actual and concrete harm' that 'directly and actually affect[s] the organization's 'core' activities, not merely its 'abstract social interests'. No matter how much a defendant's conduct can be said to frustrate an organization's abstract mission, alleged injuries to an organization's 'general legal, moral, ideological, and policy concerns do not suffice on their own to confer Article III standing to sue in federal court.'"

*Legal Aid Chicago v. Hunter Props. Inc.*, 2024 U. S. Dist. LEXIS 177188, 2024 WL 4346615 (N. D. Ill. 2024), also is similar to this case and shows that LUPE has no standing. The District Court there held that a legal services provider lacked organizational standing where it challenged

---

[4] *Ariz. All. For Retired Ams. v. Mayes*, 117 F.4th 1165 (9th Cir. 2024), rehearing *en banc* granted and opinion vacated, 2025 U. S. App. LEXIS 6367 (9th Cir. March 18, 2025).

defendants' "no evictions policy" in its applications process for apartments. Plaintiff's claimed injury was that defendant "forced Legal Aid Chicago to devote more resources to its work representing clients in eviction matters and engaging in advocacy related to housing issues," and thereby "made it harder for Legal Aid Chicago to accomplish its mission." The Court rejected these allegations as insufficient for standing.

> It is hard to see how working on eviction cases or sealing eviction records is an injury, let alone a harm caused by the alleged policy of Hunter Properties. It is the very work that Legal Aid Chicago calls its broader mission. An organization's raison d'etre is not simultaneously an injury that establishes Article III standing.

> Think about it this way: Legal Aid Chicago is like an emergency-room physician. Hunter Properties is creating more patients, with more severe illnesses, for that doctor. That makes the doctor's job harder. The doctor might have to devote more resources of time, energy, and attention to her patients. But that's not a diversion of resources.

> It's not even an 'impairment of its ability to do work *within* its core mission. It doesn't stop the doctor from doing her job. It is what creates and deepens the need for her job.

> Hunter Properties hasn't turned off the lights in the ER or locked a medicine cabinet. In other words, Hunter Properties hasn't done anything that would force the doctor to stop her work and do something well outside her job description before she could resume treating patients. That would be an impairment of the doctor's 'core mission' of treating patients. Merely giving a doctor more patients is not.

*Id.* at **27-28.

LUPE claims a mission that includes providing legal services and related outreach and education to non-citizens, including illegal aliens. S.B. 4 does not now, and will never, cause an injury in fact to that organization that could support Article III standing under *Hippocratic Medicine*. LUPE's claims should be dismissed for lack of standing and subject matter jurisdiction.

B.    THE DOE PLAINTIFFS LACK STANDING.

1.    **The Doe Plaintiffs' Standing Allegations.**

Four Doe Plaintiffs allege that they may "face" arrest, detention, prosecution, incarceration, and removal to Mexico under S.B. 4 in the future for violating the terms of S.B. 4. LUPE Complaint at ¶ 63. For one thing, plaintiffs ordinarily may not claim standing based on an intent to commit future criminal misconduct. *See O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1973). In any event, none of them allege that they have been arrested, detained, prosecuted or removed pursuant to S.B. 4, or that any of the Defendants have ever threatened any action against *them* pursuant to S.B. 4.  The Doe Plaintiffs merely speculate that they "risk potential arrest and detention" under S.B. 4.

It is indisputable that S.B. 4 has not been enforced against anyone to date. This Court issued a preliminary injunction against enforcement of S.B. 4 on February 29, 2024, before the statute went into effect. In addition, this Court has acknowledged that Executive Orders of the President of the United States and the Governor of Texas in 2025, and subsequent actions pursuant to them, have authorized State Defendants to apprehend, arrest, and detain illegal aliens like the Doe Plaintiffs under federal law without violation of the preliminary injunction. Thus, even assuming plaintiffs could base standing based on the injury flowing from their own criminal misconduct, an order from this Court may not redress the very same future injury they face under federal laws.

The Fifth Circuit in *Nat'l Press Photographers Ass'n v. McGraw*, 90 F.4th 770 (5th Cir. 2024), held that plaintiffs in that case lacked standing to sue the Director of Texas DPS and the Chief of the Texas Highway Patrol for their claim that a Texas statute violated the Due Process Clause of the Fourteenth Amendment to the U. S. Constitution. The Court noted that an allegation of future injury that is not "conjectural or hypothetical" may be sufficient for standing, but only if "the threatened injury is certainly impending, or there is a substantial risk it will occur. 90 F.4th at 782, quoting *Susan B. Anthony List v. Driehaus*, 573 U. S. 149, 158 (2014).

As in this case, the plaintiffs in *McGraw* could not carry their burden to show that

defendants have ever "arrested or prosecuted anybody", including the plaintiffs, for violating the challenged statute. The Fifth Circuit held that, "in the absence of any imminent or even credible threat of prosecution", the plaintiffs' pre-enforcement challenge to the statute was "a mere hypothetical dispute lacking the concreteness and imminence required by Article III." 90 F. 4th at 782.[5] The Fifth Circuit held in *McCraw* that the plaintiffs lacked standing and dismissed their Due Process claim.

The same result is required here as to all of the Doe Plaintiffs' claims. No one has enforced S.B. 4 against them. There is no imminent or credible threat that the Sate Defendants will do so against any of the Doe Plaintiffs. Speculation and fear that someday such a hypothetical prosecution may come to pass is not sufficient to constitute an injury in fact for standing purposes. The Court should dismiss the Doe Plaintiffs' claims for lack of standing and subject matter jurisdiction.

## II.    PLAINTIFFS' SUIT AGAINST STATE DEFENDANTS IS BARRED BY STATE SOVEREIGN IMMUNITY AND THE ELEVENTH AMENDMENT.

Plaintiffs sue the Governor of Texas, the Attorney General of Texas, and the current Director of Texas DPS, all solely in their official capacities. Such a suit is effectively a suit against the State of Texas. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). "Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *McCraw*, 90 F.4th at 785 (5th Cir. 2024); *Texas Dem. Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020).

The legal fiction of *Ex Parte Young*, 209 U.S. 123 (1908), provides a narrow exception to State sovereign immunity in the "subset of cases to which it applies." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024). *Ex Parte Young* "permits plaintiffs to sue a state officer in his official capacity for an injunction to stop *ongoing* violations of federal law." *Id.* (emphasis added). There

---

[5]    State Defendants acknowledge that the Fifth Circuit applies more relaxed standing rules in First Amendment cases. This is not a First Amendment case.

are no such ongoing violations of federal law by reason of any enforcement of S.B. 4.

The *Ex Parte Young* exception to sovereign immunity can apply only to state officials who have some connection to the enforcement of the challenged statute. Here, neither Governor Abbott nor Attorney General Paxton have such connections to the enforcement of S.B. 4. Neither the Governor of Texas nor the Attorney General of Texas is so much as mentioned in the text of S.B. 4. Neither has the "*particular* duty to enforce" the challenged statute "and a demonstrated willingness to exercise that duty" required by the Fifth Circuit. *United States v. Abbott*, 85 F. 4th 328, 337 (5th Cir. 2023), quoting *Tex. All. For Retired Ams. v. Scott*, 28 F. 4th 669, 672 (5th Cir. 2022). A "general duty to see that the laws are implemented" is not enough. *Id.* (citing *City of Austin v. Paxton*, 943 F. 3d 993, 999-1000 (5th Cir. 2019)).

The Governor of Texas has various executive powers but no power to prosecute individuals for state criminal offenses; "prosecutions are undertaken by local authorities so only those officials may be sued." *United States v. Abbott*, 85 F. 4th at 337, citing *Mi Familia Vota v. Abbott*, 977 F. 3d 461, 464, 467 (5th Cir. 2020); *see also In re Abbott,* 956 F.3d 696, 709 (5th Cir. 2020). Governor Abbott cannot fall within the *Ex Parte Young* exception to sovereign immunity in this case, and therefore is immune from suit and liability in this case.

The same reasoning and result apply to Attorney General Paxton here. Plaintiffs allege no prosecutions or threats of prosecutions under S.B. 4 by the Attorney General. Indeed, the Attorney General of Texas has no independent power to prosecute criminal offenses. *State v. Stephens*, 663 S.W. 3d 45, 51-54 (Tex. Cr. App. 2019); see *Mi Familia Vota v. Ogg*, 105 F.4th 313, 318 (5th Cir. 2024). Because Attorney General Paxton has no "particular duty" to enforce S.B. 4 and certainly has not enforced S. B. 4, he cannot be subject to the *Ex Parte Young* exception and is entitled to sovereign immunity and dismissal here.

The Director of DPS does potentially have enforcement responsibilities under S.B. 4 but is still entitled to sovereign immunity and dismissal. As in *McCraw*, this is a pre-enforcement challenge to a Texas statute. S.B. 4 has not been enforced to date against anyone, much less against

any of the Plaintiffs in this case. In those circumstances, the Fifth Circuit concluded in *McCraw*:

> Because Plaintiffs have provided no evidence that Defendants will enforce Chapter 423, we hold that the *Ex Parte Young* exception does not apply to [the Director of the Texas Department of Public Safety and the Chief of the Texas Highway Patrol] and they are entitled to sovereign immunity.

90 F.4th at 787. Indeed, the Fifth Circuit in *McCraw* dismissed the Director of Texas DPS on sovereign immunity grounds despite acknowledging that DPS was authorized to enforce the statute at issue there. *Id.* at 786 (recognizing that "[a]s heads of Texas law-enforcement agencies, Director McCraw and Chief Mathis . . . are directly responsible for enforcing" the challenged statute but dismissing in the absence of "a demonstrated willingness to exercise their duty to enforce") (quotation cleaned up).

*Ex Parte Young* requires at least "a scintilla of enforcement by the relevant state official with respect to the challenged law," *id.* (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)). There is none here. Sovereign immunity and the Eleventh Amendment therefore shield State Defendant Martin from suit here.

In *Mi Familia Vota v. Ogg*, the Fifth Circuit found that District Attorney Ogg had taken no action to enforce the Texas Election Code provisions challenged in that case. 105 F.4th at 330. The Court found that "some affirmative action on the part of the named defendant" to enforce the challenged law was required. In its absence, the Court concluded that Ogg was not subject to suit under *Ex Parte Young* and that she was entitled to sovereign immunity. *Id.* at 333.

The same conclusion applies in this case. Plaintiffs have not alleged or provided any evidence of any "affirmative action" by Governor Abbott, Attorney General Paxton, or Director Martin to enforce S.B. 4 against them.

As this Court has recognized, *see* Order Clarifying/Modifying Preliminary Injunction Issued on February 29, 2024 (ECF No. 77, No. 1:24-cv-8-DAE) circumstances have changed significantly since the Court entered its preliminary injunction on February 29, 2024.

1. On January 20, 2025, President Trump issued his Executive Order 14165, which among other actions, effectively closes the Texas/Mexico border.

2. On January 20, 2025, President Trump issued Executive Order 14159, directing Federal agencies to seek state and local cooperation in border enforcement; and

3. On January 29, 2025, Texas Governor Greg Abbott issued a series of his own Executive Orders authorizing certain actions by Texas law enforcement and Texas State Guard personnel regarding activities on the Texas/Mexico border.

The Court correctly stated that actions taken by Texas DPS in 2025 in accordance with the above Executive Orders of the President and Governor Abbott have not violated and do not violate the Court's preliminary injunction against enforcement of S.B. 4.

By the same logic, the fact that these actions are permissible—functions state officers could carry out under S.B. 4 to assist federal officers carrying out federal laws—proves that this pre-enforcement facial challenge fails: S.B. 4 is plainly lawful in at least some applications; Texas DPS officers today are apprehending, arresting, and detaining illegal aliens in Texas in similar circumstances as they would if acting under S.B. 4. It is non-sensical to claim that exercises of state power to assist implementation of federal laws constitutes "ongoing violations of federal laws." *Mi Familia Vota*, 105 F.4th at 325.

Plaintiffs simply have not shown that they are imminently threatened by any *ongoing* violations of federal law by any of the State Defendants. As in *McCraw* and *Mi Familia Vota*, the narrow *Ex Parte Young* exception to State sovereign immunity does not apply in this case. In addition, Plaintiffs lack standing to sue any of State Defendants for the reasons set forth above. As a result, the Court lacks subject matter jurisdiction in this case. This action must be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1).

III.    **PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW.**

A.    **TEXAS'S INVOCATION OF SELF-DEFENSE AUTHORITY UNDER THE CONSTITUTION—NOW BOLSTERED BY PRESIDENTIAL ACTIONS—NEGATES PLAINTIFFS' STATUTORY PREEMPTION CLAIM.**

President Trump's Executive Orders and Proclamations confirm that Plaintiffs' claims fail. A second, non-justiciable finding that invasion conditions exist shows that facial relief was always improper. A now-shared goal of immigration enforcement means the previous assessment of the equitable factors no longer holds. And the possibility of collaboration—now actualized—undercuts the district court's preemption analysis based on enforcement priorities.

The Constitution provides that the federal government "shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion." U.S. CONST. art. IV, §4. In a letter on Inauguration Day, Governor Abbott explicitly asked the President to exercise his federal self-defense authority under this provision based on the same conditions that justified the Governor's invocation of self-defense authority under Article I, Section 10, Clause 3: "The en masse entry into this country by violent criminals, known terrorists, and other hostile foreign actors murdering at will is an invasion, as FBI officials told Congress just last year. These criminals come in open defiance of our laws and often by force, outfitted with body armor, burying improvised explosive devices, and decorating trees with trophies from sexual assaults." X, Greg Abbott (@GregAbbott_TX) (Jan. 20, 2025, 12:04 PM), https://x.com/GregAbbott_TX/status/1881402347617972410.

Later that day, the President echoed the Governor's assessment. In Executive Order 14,165, President Trump recognized that the United States has been invaded:

> Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level. Millions of illegal aliens from nations and regions all around the world successfully entered the United States where they are now residing, including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent.

*Securing Our Borders*, Exec. Order No. 14,165, 90 Fed. Reg. 8,467, 8,467 (Jan. 20, 2025). In a Proclamation, the President determined that these conditions triggered the federal self-defense

authority under Article IV, Section 4:

> By the power vested in me by the Constitution and the laws of the United States, I have determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States. Accordingly, I am issuing this Proclamation based on my express and inherent powers in Article II of the Constitution of the United States, and in faithful execution of the immigration laws passed by the Congress, and suspending the physical entry of aliens involved in an invasion into the United States across the southern border until I determine that the invasion has concluded.

*Guaranteeing the States Protection Against Invasion*, Proc. No. 10,888, 90 Fed. Reg. 8,333, 8,335 (Jan. 20, 2025).

These developments are highly relevant. First, Texas has explained why invocation of its own authority under the Self-Defense Clause, U.S. Const. art. I, §10, cl. 3, is a political question. *See, e.g.*, Texas.Br.39; Post-Argument Supplemental En Banc Brief for Appellants at 1-5, *United States v. Abbott*, 110 F.4th 700 (5th Cir. 2024) (No. 23-50632), ECF 229. Texas has also explained that plaintiffs' facial challenges to S.B.4 fail because they are based on federal statutes and the U.S. Constitution trumps federal statutory law. *See* Texas.Br.39-40. At least some applications of S.B.4 are plainly lawful under the Self-Defense Clause—for example, against members of transnational cartels. *See* Texas.Br.36-40. That is sufficient to defeat a facial challenge because plaintiffs cannot "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added). In other words, to prevail the plaintiffs would need to show S.B.4 is unlawful "in every application." Texas R. 28(j) Letter, ECF 200 (citing *United States v. Rahimi*, 602 U.S. 680 (2024)).

This Court has previously disagreed that the Self-Defense Clause is relevant to the preemption issues here because—in the panel majority's preliminary view—federal statutory law preempts S.B.4 notwithstanding Texas's invocation of its own sovereign authority to defend itself.

President Trump's recognition of an invasion thus not only bolsters Texas's original invocation of a constitutional affirmative defense, but fundamentally undermines Plaintiffs' claims. As the federal government explained to the en banc Court in *United States v. Abbott*, 110 F.4th 700

(5th Cir. 2024), whether an invasion is occurring is a political question committed (in the federal government's view) to the political branches of the federal government. See, e.g., Post-Argument Supplemental En Banc Brief for Appellee at 2, No. 23-50632, ECF 231. Because the federal government now recognizes an invasion, including with respect to "potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent," 90 Fed. Reg. 8,467 at 8,467, applying S.B.4 to such individuals cannot be preempted. Accordingly, there is no basis for a facial challenge to S.B.4, thus defeating a preliminary injunction. Under the Constitution, valid federal statutory law applies "unless" a State is "actually invaded." U.S. CONST. art. I, §10, cl. 3. Given the President's non-justiciable recognition of an invasion—in addition to the Governor's recognition of the same—any statutory preemption argument necessarily fails with respect to at least some applications of S.B.4.

> **B.    ALTERNATIVELY, RECENT FEDERAL-STATE COLLABORATION SHOWS WHY THIS PRE-ENFORCEMENT CHALLENGE NECESSARILY FAILS AS A MATTER OF LAW.**

What was once a possibility of federal-state collaboration is now an actuality. Texas had previously highlighted how federal laws authorize collaboration with State personnel on immigration enforcement. *See, e.g.*, 8 U.S.C. § 1357(g). All that has changed is the federal government's enforcement priorities: The district court once thought application of S.B.4 would "frustrate federal policies," but now President Trump is determined to enforce the INA with the help of the States. The Supremacy Clause gives priority to federal laws, "not the criminal law enforcement priorities or preferences of federal officers." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). But, respectfully, that is all this Court's preliminary injunction ever rested on—the shifting sand of enforcement priorities, not the actual text of immigration laws.

The federal government now has expressly invited States to cooperate with it in enforcing federal immigration laws. Executive Order 14,159 directs the Secretary of Homeland Security "[t]o ensure [that] State and local law enforcement ... can assist with the protection of the American

people" by "authoriz[ing] State and local law enforcement officials … to perform the functions of immigration officers." 90 Fed. Reg. 8,443 at 8,445. And Executive Order 14,165 declares that "[i]t is the policy of the United States" to "enact[] Federal-State partnerships to enforce Federal immigration priorities." 90 Fed. Reg. 8,467 at 8,467.

In response to these and other actions by the President, Governor Abbott issued five Executive Orders aimed at assisting federal officials in regaining and maintaining border security. The orders specifically direct State agencies and officials to:

- deploy "any physical infrastructure to improve operational security at the southern border," Executive Order GA-50, 50 Tex. Reg. 807, 807 (2025);

- eliminate "the operations of designated foreign terror organizations, like Mexican cartels … by sharing intelligence" with the federal government, Executive Order GA-51, 50 Tex. Reg. 807, 808 (2025);

- lease facilities "suitable and available for use by Immigration and Customs Enforcement" to the federal government, Executive Order GA-52, 50 Tex. Reg. 808, 809 (2025); • develop a plan to assist the federal government in securing the border, Executive Order GA-53, 50 Tex. Reg. 809, 810 (2025); and

- "assist federal actors … with carrying out functions under federal immigration laws," Executive Order GA-54, 50 Tex. Reg. 810, 810 (2025).

Consistent with this last order, the Governor entered into a Memorandum of Understanding with U.S. Customs and Border Protection authorizing Texas National Guard soldiers to investigate, arrest, and transport illegal aliens. That includes transport "for the purposes of removal and/or repatriation." CBP-TNG MOU art. V (Jan. 31, 2025); see also X, Ali Bradley (@AliBradleyTV) (Feb. 2, 2025, 9:29 AM), https://x.com/AliBradleyTV/status/1886436756741877882 (attaching memorandum). Applying S.B.4 is one additional way that Texas personnel may help federal officers regain and maintain operational control of the border.

Plaintiffs' facial challenge fails if even *a single* application of S.B. 4 is lawful. Current federal-state collaboration shows at least some applications would not conflict with federal law and thus are not preempted. *See* Compl. ¶¶72-76. It also dooms Plaintiffs' unreasonable search and

seizure claim, which rests on the idea that S.B. 4 is preempted. Any aliens apprehended for violating valid federal or state criminal laws are reasonably seized. *See* Compl. ¶¶77-80. Plaintiffs' cruel and unusual punishment claim is premised on the possibility that some aliens may be "exiled" to a country that is not their home. It is hard to see how such aliens subjected to S.B. 4 could complain: They crossed from a country that is not their home (Mexico) into another country that is also not their home (United States). But more importantly, even accepting this extravagant view of the Eighth Amendment Plaintiffs' facial claim would fail if applied to a Mexican national returned to Mexico. *See* Compl. ¶¶81-84. Finally, Plaintiffs' vagueness claim is fundamentally inconsistent with their preemption claim: Plaintiffs' preemption claim asserts that S.B. 4 is unlawful for copying federal criminal laws prohibiting illegal entry; Plaintiffs' vagueness claim asserts that S.B. 4 is too vague because it uses terms like "denied admission" and "removed." But if the federal INA provisions that Plaintiffs believe preempt S.B. 4 are not unconstitutionally vague themselves, then neither are the similar provisions of S.B. 4. *See* Compl. ¶¶85-96.

## C.   FINALLY, PLAINTIFFS HAVE NO FREESTANDING "PREEMPTION" CAUSE OF ACTION.

This Court previously concluded that the United States has an implied cause of action in equity to press preemption challenges to enjoin the enforcement of a state criminal code. State Defendants continue to respectfully disagree. That view not only contradicts more than 300 federal statutes that go out of there way to provide federal authority to sue in equity—all of which would be pointless if this Court's view of *In re Debs* was correct. It also contradicts the centuries-old separate sovereigns doctrine, which recognizes that federal and state sovereigns may enact and enforce separate—and overlapping—criminal codes. Title 18 of the U.S. Code does not preempt the field of state criminal laws.

But even if this Court is right that the United States has long had an unused license to sue in equity to enforce the Supremacy Clause by countermanding overlapping state criminal laws, that is no help to these private Plaintiffs. As to them, at least, a simple rule obtains: "It is equally

apparent that the Supremacy Clause is not the 'source of any federal rights' … and certainly *does not create a cause of action.*" *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324-25 (2015) (internal quotation and citation omitted) (emphasis added).

CONCLUSION

Each of State Defendants is entitled to State sovereign immunity from this suit and requests that the Court grant such immunity and dismiss Plaintiffs' claims against each State Defendant prior to further subjecting any of them to suit herein and prior to any consideration of the merits, and further requests that the Court dismiss such claims against each of State Defendants for lack of subject matter jurisdiction with prejudice, and grant judgment in favor of each State Defendant, award each of State Defendants his costs herein, and grant each of State Defendants such other and further relief to which he may be entitled. Alternatively, State Defendants ask this Court to dismiss claims on the merits which plainly fail as a matter of law.

Date: May 5, 2025                           Respectfully submitted.

**KEN PAXTON**                              **ZACHARY BERG**
Attorney General                           Special Counsel
                                           Tex. State Bar No. 24107706

**BRENT WEBSTER**                           **WADE A. JOHNSON**
First Assistant Attorney General           Special Counsel
                                           Texas Bar No. 24062197

**RALPH MOLINA**                            **WILLIAM H. FARRELL**
Deputy First Assistant Attorney General    Assistant Attorney General
                                           Texas Bar No. 00796531
**RYAN D. WALTERS**
Deputy Attorney General for Legal Strategy

**RYAN G. KERCHER**                         **OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
Chief, Special Litigation Division         Special Litigation Division
Texas Bar No. 24060998                     P.O. Box 12548, Capitol Station
                                           Austin, Texas 78711-2548
                                           Tel.: (512) 463-2100
**KATHLEEN T. HUNKER**                      Ryan.kercher@oag.texas.gov
Deputy Chief, Special Litigation Division  Kathleen.hunker@oag.texas.gov
Texas Bar No. 24118415                     David.Bryant@oag.texas.gov
                                           Zachary.berg@oag.texas.gov
/s/ David Bryant                           Wade.johnson@oag.texas.gov
**DAVID BRYANT**                            Biff.farrell@oag.texas.gov
Senior Special Counsel
Tex. State Bar No. 03281500
                                           **COUNSEL FOR ALL STATE DEFENDANTS**


**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 5, 2025 and that all counsel of record were served by CM/ECF.


/s/ David Bryant
**DAVID BRYANT**

22